## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: | ) |
|  | ) Chapter 11 |
| JPK NEWCO, LLC, | ) |
|  | ) Case No. 25-00200 (ELG) |
| Debtor. | ) |
|  | ) |
| DEVELOPER RE1, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Adv. Proc. No. 25-10037-ELG |
|  | ) State Court Case 2022-CAB-005935 |
| DP CAPITAL LLC, *et al*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
| 423 KENNEDY ST HOLDINGS, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) State Court Case 2022-CAB-005935 |
|  | ) (State Court Cases Consolidated) |
| DP CAPITAL LLC, *et al*, | ) |
|  | ) |
| Defendants. | ) |

## RELEVANT DOCUMENTS

Adv. Proc. 25-10037 (ELG)

| Date | Docket No. | Description |
|---|---|---|
| 09/01/2025 | 1 | Adversary case 25-10037. Notice of Removal by Developer RE1 LLC, 423 Kennedy St Holdings LLC |
| 09/01/2025 | 1-1; pp. | Hearing Order (setting deadlines and Jury Trial 9/9/24) |

| Date | Docket No. | Description |
|---|---|---|
| | | 1543-48 [1] |
| 09/01/2025 | 1-1; pp. 1560-65 | Consent Motion to Extend Scheduling Order Deadlines to Allow the Parties to Participate in a Private Mediation |
| 09/01/2025 | 1-1; pp. 1658-86 | Second Amended Complaint |
| 09/01/2025 | 1-1; pp. 1760-74 | Plaintiffs' Consent Motion to Consolidate and to Modify Scheduling Order |
| 09/01/2025 | 1-3; pp. 733-64 | Verified Complaint filed by 423 Kennedy St Hodings, LLC (without Exhibits) |
| 09/01/2025 | 3 | Motion for Remand Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |
| 09/15/2025 | 7 | Objection and Statement of No Consent to Final Orders Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |

Adv. Proc. 25-10015 (ELG)

| Date | Docket No. | Description |
|---|---|---|
| 05/28/2025 | 1 | Adversary case 25-10015. Complaint by JPK NewCo LLC, WCP Fund I LLC, SF NU, LLC, Russell Drazin against Developer RE1 LLC, 423 Kennedy St Holdings LLC |
| 06/27/2025 | 5 | Motion to Stay and to Suspend All Deadlines Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |
| 07/23/2025 | 7 | Opposition Filed by Russell Drazin, JPK NewCo LLC, SF NU, LLC, WCP Fund I LLC |
| 08/20/2025 | 14 | Motion of Developer RE1, LLC and 423 Kennedy St Holdings, LLC for Abstention and to Dismiss or Stay Proceedings Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |
| 09/01/2025 | 17 | Opposition Filed by Russell Drazin, JPK NewCo LLC, SF NU, LLC, WCP Fund I LLC |

---

[1] Many of the ECF page numbers (at the top) of ECF Nos. 1-2 and 1-3 are obscured, so the page number references used for AP 25-10037-ELG are to the page numbers located in the bottom right corner as those numbers are not obscured.

Adv. Proc. 24-10023 (ELG)

| Date | Docket No. | Description |
|------|-----------|-------------|
| 07/04/2024 | 1 | Adversary case 24-10023. Notice of Removal |
| 3/25/2025 | 46 | Motion for Remand *(Renewed)* Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |
| 04/12/2025 | 51 | Opposition Filed by DP Capital LLC, Russell Drazin, Daniel Huertas, JPK NewCo LLC, SF NU, LLC, WCP Fund I LLC |
| 05/12/2025 | 64 | Order Granting Renewed Motion To Remand |

Case No. 25-00200 (ELG)

| Date | Docket No. | Description |
|------|-----------|-------------|
| 05/27/2025 | 1 | Chapter 11 Voluntary Petition Non-Individual Subchapter V. Fee |
| 06/23/2025 | 19 | Motion to Dismiss Case *Filed in Bad Faith* Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |
| 07/23/2025 | 29 | Opposition Filed by WCP Fund I LLC |
| 07/24/2025 | 30 | Opposition Filed by JPK Newco, LLC |
| 07/28/2025 | 31 | Chapter 11 Small Business Subchapter V Plan |
| 09/02/2025 | 58 | Objection to Confirmation Objection to Plan of Reorganization Filed by 423 Kennedy St Holdings LLC, Developer RE1 LLC |

8161\0002\4922-5533-8864.v2

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Special Counsel for JPK NewCo LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re: | ) |
| | ) |
| JPK NewCo LLC, | ) Case No. 25-200-ELG |
| | ) |
| Debtor. | ) Chapter 11 |
| | ) |
| Developer RE1 LLC, | ) |
| | ) |
| Plaintiff, | ) Adv. Case No. _____ |
| | ) |
| v. | ) State Court Case 2022-CAB-005935 |
| | ) |
| DP Capital LLC; Russell Drazin; Daniel Huertas; SF NU, LLC; WCP Fund I LLC; and JPK NewCo LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| 423 Kennedy St Holdings LLC, | ) |
| | ) State Court Case 2022-CAB-005935 |
| Plaintiff, | ) (State Court Cases Consolidated) |
| | ) |
| v. | ) |
| | ) |
| DP Capital LLC; Russell Drazin; Daniel Huertas; WCP Fund I LLC; and JPK NewCo LLC, | ) |
| | ) |
| Defendants. | ) |

1

## NOTICE OF REMOVAL

Comes now JPK NewCo LLC ("JPK"), by and through undersigned counsel, pursuant to Section 1452 of Title 28 of the United States Code, Section 1334 of Title 28 of the United States Code, and Federal Rule of Bankruptcy Procedure 9027, and hereby gives notice of the removal of the above-captioned consolidated matters from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia (which, as noted *infra*, results in the referral of the matter to the United States Bankruptcy Court for the District of Columbia), and in support thereof notes as follows:

### The Removed Cases

1.     These are civil actions commenced in the Superior Court of the District of Columbia by Developer RE1 LLC ("DRL"), on or about December 16, 2022, and by 423 Kennedy St Holdings LLC ("423 Kennedy"), on or about July 13, 2023, with the two cases being subsequently consolidated on or about June 11, 2024.

2.     DRL owns the real property located at 5501 First Street, NW, Washington, DC 20011 (the "DRL Property").

3.     423 Kennedy owns the real property located at 423 Kennedy Street, NW, Washington, DC 20011 (the "423 Kennedy Property").

4.     WCP Fund I LLC ("WCP") loaned monies to both DRL and 423 Kennedy, securing such loans with deeds of trust fixed upon the DRL Property and the 423 Kennedy Property, respectively.

5.     WCP declared both loans to be in default following the occurrence of various breaches of the promissory notes and deeds of trust; despite such defaults, WCP permitted each borrower until the maturity date of the loans to pay off the underlying promissory notes.

2

6.      When neither 423 Kennedy nor DRL paid their correlative loans at maturity, WCP commenced the process of foreclosing upon the respective properties.

7.      These cases were brought by 423 Kennedy and DRL in an effort to (i) enjoin WCP from foreclosing; (ii) assert WCP did not have the right to declare defaults under the promissory notes and deeds of trust; and (iii) seek various forms of damages, including forfeiture and monetary damages.

8.      423 Kennedy and DRL are also suing (i) Russell Drazin, the substitute trustee under the deeds of trust, on a theory of breach of fiduciary duty; and (ii) Daniel Huertas, DP Capital LLC, and SF NU, LLC, on various theories (though SF NU, LLC is only a party to one of the two consolidated cases), some of which are pegged to ownership of the promissory notes and rights under the deeds of trust.

9.      Certain promissory notes and correlative deeds of trust, implicated in these two consolidated cases, are now held by JPK, the above-captioned debtor.

10.     423 Kennedy and DRL are also suing JPK as part of these consolidated actions, seeking similar relief and endeavoring to avoid the conveyance of two promissory notes and correlative deeds of trust to JPK.

11.     The core litigation goals in these two cases, on the parts of DRL and 423 Kennedy, appear to be frustrating the collection efforts of JPK and the other defendants, challenging the indebtedness owed and seeking relief from the terms of commercial loan documents.

**The JPK Bankruptcy and Related Adversary Proceeding**

12.     On May 27, 2025, JPK filed a voluntary petition for chapter 11 relief, pursuant to the allowances of Section 301 of Title 11 of the United States Code, therein electing to proceed under Subchapter V of chapter 11.

13.     At all times since, JPK has been a debtor-in-possession.

14.     DRL has filed a proof of claim, in JPK's bankruptcy case, therein expressly indicating the facts supporting such claim are "outlined" in the above-captioned, now-removed civil litigation.

15.     423 Kennedy has also filed a proof of claim in JPK's bankruptcy case, therein expressly indicating the facts supporting such claim are "outlined" in the above-captioned, now-removed civil litigation.

16.     In connection with JPK's chapter 11 case, JPK has brought suit against DRL and 423 Kennedy seeking, *inter alia*, a turnover of monies due and owing under fully matured promissory notes, alongside varies forms of declaratory relief. *See JPK NewCo LLC v. Developer RE1 LLC, et al.*, Case No. 25-10015-ELG (Bankr. D.D.C. 2025).

17.     The promissory notes at issue in the foregoing adversary proceeding are amongst those at issue in this now-removed litigation.

18.     The declaratory relief sought in the foregoing adversary proceeding overlaps, partially but substantively, with various issues to be adjudicated in this now-removed litigation.

**Core Status**

19.     Insofar as the claims brought by DRL and 423 Kennedy in this case now inform proofs of claim in JPK's bankruptcy, this is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

20.     Insofar as JPK is also asserting claims against DRL and 423 Kennedy, emanating from the same subject matter as the proofs of claim lodged by DRL and 423 Kennedy, this is a core proceeding. 28 U.S.C. § 157(b)(2)(C).

21.     Insofar as this case concerns the same subject matter as JPK's suit against DRL and 423 Kennedy for turnover, this is a core proceeding. 28 U.S.C. § 157(b)(2)(E).

4

22.     Insofar as this now-removed litigation concerns an allegation that JPK received assets via fraudulent conveyance, this is a core proceeding. 28 U.S.C. § 157(b)(2)(H).

23.     Insofar as this now-removed litigation challenges the extent of liens held by JPK, and challenges JPK's ability to foreclose upon those liens, this is a core proceeding. 28 U.S.C. § 157(b)(2)(K).

24.     Insofar as this now-removed litigation seeks an order permanently enjoining JPK from utilizing lien instruments that are assets of its estate, this is a core proceeding. 28 U.S.C. § 157(b)(2)(M).

25.     Insofar as this now-removed litigation seeks to prevent JPK from liquidating two assets of the bankruptcy estate, and the outcome of this litigation will profoundly impact JPK's reorganization, this is a core proceeding. 28 U.S.C. §§ 157(b)(2)(O), 157(b)(2)(A).

### Formalistic Recitations

26.     As acknowledged by the Superior Court of the District of Columbia, the proceedings in these two cases are subject to the automatic stay set forth in Section 362 of Title 11 of the United States Code. Such stay has never been terminated.

27.     Pursuant to DCt.LBR 5011-1, these consolidated cases are automatically referred to the United States Bankruptcy Court for the District of Columbia upon being removed from the Superior Court of the District of Columbia.

28.     Attached hereto as Exhibit A is "a copy of all process and pleadings," together with all docket entries, in the consolidated cases.

29.     A copy of this notice is being docketed in the Superior Court of the District of Columbia, in a manner substantially contemporaneous with its filing herein, sans Exhibit A.

30.     The Defendants consent to the entry of final orders or judgments of the United

States Bankruptcy Court for the District of Columbia.

                                        Respectfully submitted,

Dated: September 1, 2025             By: /s/ Maurice B. VerStandig
                                        Maurice B. VerStandig, Esq.
                                        Bar No. MD18071
                                        The VerStandig Law Firm, LLC
                                        1452 W. Horizon Ridge Pkwy, #665
                                        Henderson, Nevada 89012
                                        Phone: (301) 444-4600
                                        Facsimile: (301) 444-4600
                                        mac@mbvesq.com
                                        *Counsel for the Defendants*

*[Certificate of Service on Following Page]*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of September, 2025, a copy of the foregoing is

being tendered to a third party commercial mailing vendor to be sent, via first class mail, postage

prepaid, on September 2, 2025, to:

James D. Sadowski, Esq.
Greenstein DeLorme & Luchs, P.C.
801 17th Street, NW
Suite 1000
Washington, DC 20006
*Counsel for Developer RE1 LLC and*
*423 Kennedy St Holdings LLC*

Alexandria J. Smith, Esq.
Greenstein DeLorme & Luchs, P.C.
801 17th Street, NW
Suite 1000
Washington, DC 20006
*Counsel for Developer RE1 LLC and*
*423 Kennedy St Holdings LLC*

423 Kennedy St Holdings, LLC
1629 K Street, NW
Suite 300
Washington, DC 20006

Developer RE1 LLC
1629 K Street, NW
Suite 300
Washington, DC 20006

A copy is also being sent to each of the foregoing lawyers, electronically, through the docketing

of this notice in the consolidated Superior Court case.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

---

| | |
|---|---|
| **DEVELOPER RE1 LLC,** | **Case No.     2022 CAB 005935** |
| **Plaintiff,** | |
| **v.** | **Judge Ebony M. Scott** |
| **DP CAPITAL, LLC d/b/a WASHINGTON CAPITAL PARTNERS,** *et al.*, | **Next Event: Remote Mediation Session November 16, 2023 at 1:30 P.M.** |
| **Defendant.** | |

---

<u>**HEARING ORDER**</u>

This matter was before the Court on July 25, 2023 to consider: (1) Plaintiff's Opposed Emergency Motion for a Temporary Restraining Order to Prevent an Imminent Foreclosure Sale ("Motion For TRO"), filed on July 11, 2023, and Opposition to Plaintiff's Opposed Motion for a Temporary Restraining Order to Prevent an Imminent Foreclosure Sale, filed on July 17, 2023; and (2) Plaintiff's Opposed Motion to Exceed the Page Limit in an Emergency Motion, filed on July 11, 2023.

In the Motion for TRO, the Plaintiff sought to prevent a Foreclosure Sale of the Property at issue, which was scheduled for 2:00 p.m. the same day.  The source of the controversy is Defendants' allegation that Plaintiff defaulted on two loans, which matured on December 24, 2022. According to the Defendant, the failure to resolve the alleged default entitled Defendants to foreclose upon property, located at 5501 1st Street, N.W., Lot 138, Square 3389, pursuant to the operative Commercial Deeds of Trust signed by the parties on December 21, 2021.[1]

---

[1] The "1st Trust" was in the amount of $3,579,000.00 and the "2nd Trust" was in the amount of $524,000.00.

At the Hearing, the Plaintiff called Mr. Mel Negussie as a witness, Plaintiff's project developer. Mr. Negussie credibly testified that he has a 10% ownership interest in Plaintiff LLC and the LLC was created to develop 5501 1st Street, NW, Lot 138 (the Project"), exclusively. Mr. Negussie became involved in the Project in 2019 and brought in investors. In 2021, the Defendants agreed to refinance the Project and provided the Plaintiff with a loan for approximately $4,000,000.00. Mr. Negussie testified that no construction loan was attached to property so amounts to be paid were "always the same" because the Plaintiff was only making interest payments. Although he admitted that four or five loan payments were untimely, he testified that the Defendants always accepted the payments. Mr. Negussie testified that on November 30, 2022, he requested a payoff statement from the Defendants so that the Plaintiff could refinance, and that he began taking steps to refinance in August 2022 with different banks. Although he advised Defendant Daniel Huertas of his intent to refinance, he never received payoff statements for the Project. Soon after he requested these statements, the relationship began to breakdown. On December 6, 2022, Mr. Negussie had a conversation with Mr. Huertas and asked about the requested payoff statements. The next day, according to Mr. Negussie, Mr. Huertas advised that because of how the 2501 I Street project turned out, the investors for the Project were unhappy and unless Mr. Negussie did right by that project, he will "make life difficult for [him]," which Mr. Negussie considered to be a threat as Mr. Huertas was the "decisionmaker". That same evening, Mr. Negussie received an unsigned default notice, for the first time, via email, showing a new payoff dated December 8, 2022 with default interest. Mr. Negussie testified that given the default, the Plaintiff could not complete the refinancing and stopped construction on the Project. According to Mr. Negussie, the basis given for the alleged default was: (1) a water lien, which was

removed prior to the foreclosure notice was sent;[2] (2) real estate taxes, which were paid by the time Plaintiff received the default email; and (3) a breach of the deed of trust as a result of default. On June 23, 2023, a company called "SF NU, LLC" sent to Plaintiff a Notice of Foreclosure Sale of Real Property or Condominium Unit, setting the date of the foreclosure sale on July 25, 2023, at 2:00 p.m.

The Court reviewed the facts in light of Super. Ct. Civ. R. 65 to determine if an injunction is proper in this matter. In determining whether a Temporary Restraining Order should be issued, the Court must consider the following factors: (1) likelihood of irreparable harm in the absence of a preliminary injunction; (2) likelihood of success on the merits of the underlying cause of action; (3) that the "balance of injuries" favors granting an injunction; and (4) that the public interest would be served by granting the injunctive relief sought. *In re Antioch University*, 418 A.2d 105, 109 (D.C. 1980).

At the onset, the Court found Mr. Negussie to be credible and credited his testimony in full.  As to the first element, certainly the deprivation of property is the one of the hallmarks of irreparable harms.  The Court noted that if the foreclosure went forward, the Plaintiff would lose its interests in the property and the improvements.  The Court found that the likelihood of irreparable harm is significant and cannot be addressed through other means.  Thus, the first element weighed in favor of the Plaintiff.

As to the second element, the Court noted that on July 17, 2023, the parties filed a Notice of Related Case in parallel matter 2023 CAB 4260.  In the Notice, the Parties stated that the claims in both cases are substantially the same, they involve the same five Defendants, and the events are

---

[2] Defendant's  counsel represented at the Hearing that he credits the testimony of Mr. Negussie that the water bills were being sent to the to the wrong address.

overlapping.  In the parallel matter, the Honorable Milton Lee granted the Plaintiff's request for

an injunction to stop an immediate foreclosure initiated by the Defendants.    Judge Lee, in his

Order dated July 24, 2023, found a likelihood of success on the merits of the claims plead, which

includes tortious interference.  While not the law of the case in this case, the Court found Judge

Lee's opinion quite persuasive.  As to Count I, the Tortious Interference with Business Relations

claim, for the reasons stated on the record, the Court found that soon after Mr. Negussie demanded

a payoff statement to refinance the Project loan, the Defendants intentionally frustrated the

refinancing and caused a termination of the Project.  In terms of the breach of duty of good faith

and fair dealing claim, the Court found that the Plaintiff would likely succeed on this claim as well

because of Mr. Negussie's testimony – namely that the Defendants evaded the spirt of the contract,

willfully rendered imperfect performance, and interfered with Plaintiff's ability to perform under

the contract.  Thus, for the reasons more elucidated on the record, the Court found that the second

element weighed in favor of the Plaintiff.

As to the third element, the Court found that the Plaintiff would be harmed more if the

Court were to deny the instant Motion.  The record demonstrates that the Defendants "torpedoed"

the Plaintiff's efforts to perform under the deed of trust.  As to the fourth element, the Court found

that the public interest is best served when there is no tortious interference in property and in fair

business dealings, especially here where there is evidence of a pretextual basis for the default.

Thus, for the reasons more elucidated on the record, the Court found that the third and fourth

elements also weighed in favor of the Plaintiff.

Finally, as to the Bond, the Court agreed with Judge Lee that Defendants failed to provide

evidence of what the bond might be, and Plaintiff testified that they made payments on the loan

through the end of December 2022 even though Defendants discontinued the construction draws

that were necessary for the project to move forward.   Judge Lee stated that Plaintiffs clearly had limited funds to continue the project and if the bond requirement were interpreted as a mandatory requirement, the inability of a moving party to pay a bond would effectively deny access to judicial review, and equity would support the waiver of the bond requirement given the overall strength of the Plaintiff's case.  This Court agrees.

Upon Consideration of Plaintiff's Opposed Emergency Motion for a Temporary Restraining Order to Prevent an Imminent Foreclosure Sale, the Opposition thereto, the facts and arguments presented at the Hearing, and a review of the entire record herein, the Court granted the Motion, stopping the imminent foreclosure sale.  Plaintiff's Opposed Motion to Exceed the Page Limit in an Emergency Motion was declared to be unopposed pursuant to a Praecipe filed by the Defendants and Defendants' representations at the Hearing.  Additionally, given the Court's ruling, the Court granted the Plaintiff's Oral Motion to Extend the Scheduling Order Deadlines, and the new deadlines shall be enumerated below.

Accordingly, based upon the entire record herein, it is this 15th day of August 2023, hereby:

**ORDERED** that the Plaintiff's Opposed Emergency Motion for a Temporary Restraining Order to Prevent an Imminent Foreclosure Sale is **GRANTED**; it is further

**ORDERED** that Defendants must immediately stop taking any action to foreclose on the Property located at 5501 1st Street, N.W., Lot 138, Square 3389 pending further order of this Court, it is further

**ORDERED** that this Order enjoining any foreclosure sale applies to SF NU, LLC, and the Defendants must immediately notify SF NU, LLC of the contents of this Order; it is further

**ORDERED** that Plaintiff's Opposed Motion to Exceed the Page Limit in an Emergency Motion is **GRANTED**; it is further

**ORDERED** that Plaintiff's Oral Motion to Extend Scheduling Order Deadlines is

**GRANTED** and the new deadlines are as follows:

| | |
|---|---|
| Close of Discovery | November 10, 2023 |
| Motions Deadline | December 8, 2023 |
| Motions Decided Deadline | January 12, 2024 |
| Trial Readiness Hearing | September 6, 2024, at 2:00 p.m. |
| Jury Trial | September 9, 2024, at 9:30 a.m. |

**SO ORDERED**.

**Associate Judge Ebony M. Scott**
*(Signed in Chambers)*

**Copies via Odyssey to:**

James D. Sadowski, Esq.
jds@gdllaw.com
*Counsel for Plaintiff*

Maurice B. Verstandig, Esq.
mac@mbvesq.com
*Counsel for Defendants*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

DEVELOPER RE1 LLC,

     *Plaintiff*,

v.

DP CAPITAL, LLC d/b/a WASHINGTON
CAPITAL PARTNERS, *et al.*

     *Defendants*.

2022-CAB-005935
Judge Ebony M. Scott
Discovery Closed – 11/10/23

## CONSENT MOTION TO EXTEND THE SCHEDULING ORDER DEADLINES TO ALLOW THE PARTIES TO PARTICIPATE IN A PRIVATE MEDIATION

The Plaintiff, Developer RE1 LLC ("Developer RE1"), and all of the Defendants, jointly move this Court to modify the Scheduling Order pursuant to District of Columbia Superior Court Rule 16(b)(7)(A).  In support of this Consent Motion, the parties state as follows:

1.     This case primarily involves a dispute between a developer, its lender, and persons affiliated with the lender.

2.     Rather than continue to run up legal fees and costs in discovery, the parties have decided to devote their time and resources toward a private mediation before the Honorable Richard Levy (Ret.), a private mediator with JAMS.  JAMS has a high success rate in helping resolve contested litigation.

3.     The current discovery closed deadline is November 10, 2023.  There is also a court ordered mediation set for November 16, 2023.

4.     Given the private mediator's existing workload, the private mediation with JAMS will not be able to be scheduled until early December 2023, which is several weeks after the close of discovery.

4863-4920-5386.v1

5.      The parties seek an approximate ninety (90) day extension to the existing Scheduling Order deadlines so that the parties can participate in private mediation with JAMS and hopefully resolve this case by a private settlement.

6.      This is the parties' second request for a modification of the Scheduling Order.  A copy of the existing Scheduling Order deadlines is shown in the screen shot below:

| Close of Discovery | November 10, 2023 |
| Motions Deadline | December 8, 2023 |
| Motions Decided Deadline | January 12, 2024 |
| Trial Readiness Hearing | September 6, 2024, at 2:00 p.m. |
| Jury Trial | September 9, 2024, at 9:30 a.m. |

Source:  Hearing Order dated August 15, 2023, page 6.

7.      Because the trial date in this case is not until September 9, 2024, there is sufficient time after the private mediation is completed to complete discovery should the private mediation not be successful.

8.      The private mediation will also include the litigants in a related case -- *423 Kennedy St. Holdings, LLC v. DP Capital, LLC d/b/a Washington Capital Partners, et al.*, 2023-CAB-004260 (Assigned to Judge Milton Lee) -- so there is an opportunity to resolve two pending cases before this court, not just this one.

9.      No party will be prejudiced as a result of this extension request, and allowing mediation could easily result in a settlement of this matter, which will benefit the parties and the Court.  The private mediation may also result in there being no need for the court ordered mediations in the two pending cases.

4863-4920-5386.v1

10.   Because there is good cause to extend the deadlines and no adverse or prejudicial

consequence to doing so, the parties' respectfully request that all upcoming deadlines be

extended as follows:

|  | Current Date | Amended Date |
|---|---|---|
| Discovery Requests | Expired | 01/10/2024 |
| Close of Discovery | 11/10/2023 | 02/13/2024 |
| Dispositive Motions Deadline | 12/08/2023 | 03/13/2024 |
| Dispositive Motions Decided | 01/12/2024 | 04/15/2024 |
| ADR - Mediation | 11/16/2023 | 04/25/2024 |
| Pretrial Date | Set after ADR | To be set upon completion of ADR |
| Trial Readiness Hearing | 09/06/24 | 09/06/24 [No Change] |
| Jury Trial | 09/09/24 | 09/09/24 [No Change] |

11.   The parties respectfully request that this Court enter an Order extending the

Scheduling Order Deadlines in accordance with the proposed schedule set forth above.  A

proposed order is attached.

Respectfully submitted,


Dated:  November 6, 2023          /s/ James D. Sadowski
                                 James D. Sadowski, Esq. # 446635
                                 Greenstein DeLorme & Luchs, P.C.
                                 801 17th Street, N.W., Suite 1000
                                 Washington, DC  20006
                                 Telephone:  (202) 452-1400
                                 Email:    jds@gdllaw.com
                                 *Counsel for Plaintiff*


Dated:  November 6, 2023          /s/ Maurice B. VerStandig
                                 Maurice B. VerStandig, Esq. #1034066
                                 The VerStandig Law Firm, LLC
                                 9812 Falls Road, #114-160
                                 Potomac, MD  20854
                                 Email:  mac@mbvesq.com
                                 *Counsel for Defendants*

3

<span style="letter-spacing:1px">C</span>ERTIFICATE OF <span style="letter-spacing:1px">S</span>ERVICE

I HEREBY CERTIFY that on November 6, 2023, a true and correct copy of the foregoing

Consent Motion was filed using eFileDC, and a notice of filing should be sent electronically

through eFileDC to all counsel of record in this case.

/s/ James D. Sadowski
James D. Sadowski

4

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| DEVELOPER RE1 LLC, | |
| *Plaintiff,* | |
| v. | 2022-CAB-005935 |
| | Judge Ebony M. Scott |
| DP CAPITAL, LLC d/b/a WASHINGTON CAPITAL PARTNERS, *et al.* | |
| *Defendants.* | |

## CONSENT ORDER MODIFYING THE SCHEDULING ORDER

UPON CONSIDERATION of the Parties' Consent Motion to Extend the Scheduling Order

Deadlines to Allow the Parties to Participate in Private Mediation ("Consent Motion"), and for

good cause shown, it is this _____ day of November, 2023, hereby

ORDERED that the Consent Motion is GRANTED, and the Scheduling Order is amended

as follows:

| | Current Date | Amended Date |
|---|---|---|
| Discovery Requests | Expired | 01/10/2024 |
| Close of Discovery | 11/10/2023 | 02/13/2024 |
| Dispositive Motions Deadline | 12/08/2023 | 03/13/2024 |
| Dispositive Motions Decided | 01/12/2024 | 04/15/2024 |
| ADR - Mediation | 11/16/2023 | 04/25/2024 |
| Pretrial Date | Set after ADR | To be set upon completion of ADR |
| Trial Readiness Hearing | 09/06/24 | 09/06/24 [No Change] |
| Jury Trial | 09/09/24 | 09/09/24 [No Change] |

_____
Associate Judge Ebony M. Scott

Copies via EfileDC  to:

James D. Sadowski, Esq.
Alexandria J. Smith, Esq.
Spencer B. Ritchie, Esq.
Maurice B. VerStandig, Esq.

In the Superior Court of the District of Columbia
Civil Division

FILED
CIVIL ACTIONS BRANCH
MAR 07 2024
Superior Court
of the District of Columbia
Washington, D.C.

DEVELOPER RE1 LLC,

    *Plaintiff,*

v.

DP CAPITAL, LLC D/B/A WASHINGTON
CAPITAL PARTNERS, *ET AL.*

    *Defendants.*

Case No. 2022-CAB-005935
Judge Ebony Scott

## SECOND AMENDED COMPLAINT

COMES NOW THE PLAINTIFF, Developer RE1 LLC ("Developer RE1"), by

undersigned counsel, and sues DP Capital, LLC d/b/a Washington Capital Partners, the WCP

Fund I, LLC, Daniel Huertas, Russell Drazin, and SF NU, LLC ("SF NU"). The First Amended

Complaint includes claims for tortious interference with business relations, breach of the duty of

good faith and fair dealing, and permanent injunctive relief. The Second Amended Complaint

also seeks a declaratory judgment as to the meaning of certain provisions in the two Deeds of

Trust, and seeks injunctive relief to prevent a foreclosure. The Second Amended Complaint also

adds SF NU as a Defendant and adds a claim for breach of fiduciary duty against Mr. Drazin.

The Second Amended Complaint also seeks a declaratory judgment declaring that Mr. Drazin

cannot serve as the trustee under the two Deeds of Trust due to an actual conflict of interest. In

support of its Second Amended Complaint, Developer RE1 avers as follows:

4856-0691-6010.v1

## THE PARTIES

1.      The Plaintiff, Developer RE1 LLC ("Developer RE1") is a District of Columbia limited liability company that is authorized to do business in the District.

2.      The first Defendant, DP Capital, LLC ("DP Capital"), is a Virginia limited liability that does business under the trade name "Washington Capital Partners". For convenience, the Complaint refers to DP Capital, LLC d/b/a Washington Capital Partners as "WCP".

3.      The second Defendant, WCP Fund 1, LLC ("WCP Fund"), is a Delaware limited liability company that engages in a lending business in the District.

4.      The WCP controls the WCP Fund.

5.      The third defendant, Daniel Huertas ("Mr. Huertas"), is an individual that resides at 909 Chinquapin Road in McLean, Virginia, 22012. Mr. Huertas is listed as the Chief Executive Officer of WCP on WCP's website. Mr. Huertas controls WCP.

6.      The fourth defendant, Russell Drazin ("Mr. Drazin"), is an individual who is counsel to the WCP and the WCP Fund. Mr. Drazin is also listed as Trustee under two deeds of trust that he drafted, the terms of which are at issue in this case.

7.      The fifth defendant, SF NU, LLC ("SF NU"), is believed to be a New Mexico limited liability company that has not filed a certificate of authority to transact business in the District. SF NU has a business address of 1455 Research Boulevard, Suite 510, Rockville, Maryland, 20850. For convenience, the WCP, the WCP Fund, Mr. Huertas, and SF NU may sometimes be referred to as the "Lender Defendants".

2

## STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

### The WCP Claims that It Is a Company That Can be Trusted and That It Has an "Unwavering Commitment to the Highest Ethical Standards"

8.      In a June 16, 2022 news article published on the internet by Modern Luxury DC, two officers of WCP were quoted as saying that:

> "*We never want to let our clients fail,*" says [Giselle] Bonzi. "Our borrowers end up trusting that if they work with us, we will do everything in our power to help them succeed." The duo understands the importance of a client's positive experience and the clear communication of each step in the lending process because it builds trust[;]" and

> "Real estate financing involves a lot of high trust," says [Daniel] Huertas. "We've developed a highly relational experience with our clients through innovative products, practices and standards. *What sets us apart from other lenders is our unwavering commitment to the highest ethical practices in the industry,* which historically have been very informal."

Source: https://dc.capitolfile.com/power-players-dc (italic emphasis added).

9.      But in reality, the WCP does not have the highest ethical standards. The WCP is a company that has engaged in predatory lending practices, and as this Complaint will show, Mr. Huertas, the WCP, the WCP Fund, and SF NU have engaged in unethical, outrageous conduct that was specifically designed to make one of their client's construction projects fail.

### The Ownership of Developer RE1, Its Purpose, and the Property.

10.     Developer RE1 is the record owner of real property in the District known as 5501 1st Street, N.W., Lot 138, Square 3389 (the "Property").

11.     Developer RE1 is partially owned by Mr. Negussie.

12.     Developer RE1 is a domestic, sole purpose, limited liability company, and the sole purpose of Developer RE1 is to own and develop the 5501 1st Street Property.

13.     The Defendants all knew that Developer RE1 was a sole purpose entity whose only asset was the Property and any the improvements that Developer RE1 made to the Property.

3

14.    On December 23, 2021, the WCP helped facilitate Developer RE1 obtaining an
acquisition finance loan for the Property with the WPC Fund.

The Loan Documents with the WCP and the WCP Fund.

15.    As part of the refinancing, on December 23, 2021, Developer RE1, as Grantor,
signed a Deed of Trust (the 'First DOT") for the Property that named the WCP Fund as
Beneficiary and Mr. Drazin, as Trustee.  A true copy of the First DOT is attached as Exhibit A.

16.    The First DOT was a form deed of trust that was prepared by Mr. Drazin as
counsel for the WCP and the WCP Fund.

17.    The WCP and the WCP Fund did not permit Developer RE1 to make any changes
to the terms of the First DOT before it was signed.

18.    On December 23, 2021, Developer RE1 signed a Commercial Deed of Trust Note
(the "First Note") in the amount of $3,579,000.00, as "Borrower", in favor of the WCP Fund.  A
true copy of the First Note is attached as Exhibit B.

19.    The First Note was a form of promissory note that was prepared by Mr. Drazin as
counsel for the WCP and the WCP Fund.

20.    The WCP and the WCP Fund did not permit Developer RE1 to make any changes
to the terms of the First Note before it was signed.

21.    On December 23, 2021, Developer RE1 signed a second, additional Deed of Trust
("Second DOT") for the Property that also named the WCP Fund as Beneficiary and Mr. Drazin
as Trustee.  A true copy of the Second DOT is attached as Exhibit C.

22.    The Second DOT was a form of deed of trust  prepared by Mr. Drazin as counsel
for the WCP and the WCP Fund.

23.   The WCP and the WCP Fund did not permit Developer RE1 to make any changes to the terms of the Second DOT before it was signed

24.   On December 23, 2021, Developer RE1 signed a second Commercial Deed of Trust Note (the "Second Note") in the amount of $524,000.00, as "Borrower", a copy of which is attached as Exhibit D.

25.   The Second Note was a form of promissory note that was prepared by Mr. Drazin as counsel for the WCP and the WCP Fund.

26.   The WCP and the WCP Fund did not permit Developer RE1 to make any changes to the terms of the Second Note before it was signed.

27.   On December 23, 2021, Developer RE1 paid $122,679.70 in loan origination fees to the WCP Fund.

28.   The WCP Fund appears to have assigned its interest in the Second DOT to SF NU in an Assignment of Deed of Trust ("Assignment"). The Assignment lists Mr. Huertas as trustee, but has conflicting dates on it. There is text showing a December 21, 2021 execution date, but there is also a notary seal showing execution on June 28, 2022.

29.   The maturity date for the First Note and the Second Note was December 23, 2022.

30.   As of November 3, 2022, there was no allegation made by any Defendant to Developer RE1 that any default by Developer RE1 existed either the First Note, the Second Note, the First DOT, or the Second DOT.

31.   As of November 3, 2022, Developer RE1 had made all payments to the WCP Fund that were due under the First Note and the Second Note.

5

4856-0691-6010.v1

<u>Mr. Huertas Threatens to Make Trouble for Developer RE1 If Developer RE1 Did not
Accede to His Demands Regarding Another, Unrelated Development</u>

32.    On November 3, 2022, Mr. Huertas sent an email to Developer RE1 (via Mr.

Negussie) to inquire about the status of the payoff of both loans by Developer RE1.  Mr. Huertas

wrote that:  "we [WCP and the WCP Fund] will not be working with you after the maturity of

5505."  A copy of the November 3, 2022 email is attached as Exhibit E.

33.    On November 15, 2022, Mr. Huertas sent another email to Developer RE1 (via

Mr. Negussie) "following up on the refinance progress on both projects."  A true copy of the

November 15, 2022 email is attached as Exhibit F.

34.    As of November 15, 2022, there was no allegation made by any Defendant that

any default by Developer RE1 existed either the First Note, the Second Note, the First DOT, or

the Second DOT.

35.    By as early as November 15, 2022, the Defendants each knew that Developer

RE1 had secured alternative financing for the Property with another lender named Main Street

Bank, and that Developer RE1 expected to close on the new refinancing loans in December of

2022.  A true copy of a November 17, 2022 email sent by Mr. Huertas is attached as Exhibit G.

36.    As of November 30, 2022, there was no allegation made by any Defendant that

any default by Developer RE1 existed either the First Note, the Second Note, the First DOT, or

the Second DOT.

37.    On November 30, 2022, Developer RE1 made a request by email to WCP for the

payoff figures for both loans for the Property.  A copy of the November 30, 2022 email sent by

Developer RE1 to WCP is attached as Exhibit H.

38.    That same day (November 30, 2022), Developer RE1 requested, and WCP

agreed, to provide the payoff figures for both loans as of December 23, 2022.  A copy of the

6

second November 30, 2022 email exchange between Developer RE1 and WCP is attached as Exhibit I.

39.    On or about December 1, 2022, Mr. Negussie contacted Mr. Huertas to inquire with WCP about whether the WCP/WCP Fund would agree to extend the maturity date for the First Note and the Second Note for six to twelve months.  Mr. Huertas replied that the only way an extension of the maturity date would be granted would be if Developer RE1 paid down the First Note and the Second Note by $1 million to $1.5 million (in principal).

40.    On or about December 6, 2022, Mr. Negussie contacted Mr. Huertas again to inquire whether WCP will be willing to extend the maturity date for the First Note and the Second Note loans for six to twelve months if Developer RE1 paid down the notes by $500,000 to $750,000.  Mr. Huertas reiterated that, at a minimum, the notes needed to be paid down by $1 million.  Mr. Negussie then told Mr. Huertas that he would try to raise that amount ($1 million) from additional investors.

41.    As of December 7, 2022, there was no allegation made by any Defendant to Developer RE1 that any default existed either the First Note, the Second Note, the First DOT, or the Second DOT.

42.    As of December 7, 2022, Developer RE1 had made all payments due under the First Note and the Second Note.  By that date, Developer RE1 had paid $332,319.03 in interest payments to the WCP Fund.

43.    On December 8, 2022, Mr. Huertas told Developer RE1 during a telephone call with Mr. Negussie that the Defendants and an unnamed investor were displeased with how the development of another, unrelated property (located at 2507 I Street, NW) had turned out.  For

4856-0691-6010.v1

convenience, the unrelated development project at 2507 I Street, NW will be referred to as the "2507 I Street Project".

44.     SF NU is believed to also have a financial interest in the 2507 I Street Project.

45.     During that call, Mr. Huertas told Mr. Negussie that WCP was "withdrawing the payoff statements recently issued and that he was defaulting all loans [Mr. Negussie] was associated with at WCP," including Developer RE1.  Mr. Huertas further stated that the 2507 I Street Project has "turned out very bad and that the person who lent the money to WCP ("Investor Lender") to provide the loan to 2507 I St Holdings LLC, is 'pissed off' with the quality of the work done," and that this Investor Lender "is very wealthy and will make life hard for you", and "has now bought the notes" on Developer RE1 and another project financed by WCP, and that WCP is "defaulting the loans."  Mr. Huertas also said: "why don't you do the honorable thing and have your investors buy 2507 I St to make things right" or have them "take care of the $700,000" shortfall on the 2507 I Street Project.

46.     During that call, Mr. Huertas told Mr. Negussie that he should "do the right thing" by arranging for an approximate $700,000 shortfall (on the 2507 I Street Project) to be paid to the WCP Fund, and that if Mr. Negussie did not arrange for that shortfall to be paid, then the Defendants and the unnamed investor "would make trouble for you on all of your other projects".

47.     During the December 8, 2022 phone call, Mr. Negussie told Mr. Huertas that it was not appropriate for either him (Mr. Huertas) or the WCP to be trying to force Developer RE1 or Mr. Negussie to pay for the debts of someone else on another, unrelated project, and that it was not appropriate for Mr. Huertas or the WCP to be making threats to either Mr. Negussie or to be making threats to any other development project that Mr. Negussie was involved with.

8

4856-0691-6010.v1

48.     After Mr. Negussie refused to accede to Mr. Huertas' threats related to the 2507 I
Street Project, Mr. Huertas stated, in retaliation, that all prior Payoff Statements previously sent
were withdrawn and that he would place Developer RE1 and the borrower on another, unrelated
project named 423 Kennedy St Holdings LLC ("423 Kennedy") in default under their loan
documents with the WCP Fund.

49.     The Defendants knew that 423 Kennedy is a domestic, sole purpose limited
liability company that is partially owned by Mr. Negussie.

50.     The Defendants knew that the sole purpose of 423 Kennedy is to develop the
property located in the District at 423 Kennedy Street, NW.

51.     The Defendants knew that there is no legal or other business relationship between
423 Kennedy and Developer RE1.

52.     The Defendants knew that 423 Kennedy does not control Developer RE1 and that
Developer RE1 does not control 423 Kennedy.

53.     The Defendants knew that Developer RE1 and 423 Kennedy are not "affiliates" of
one another, and that those entities have no business relationship with each other.

54.     Mr. Huertas provided no basis for why or how the Defendants could suddenly put
Developer RE1 in default under any of the loan documents for the Property, other than Mr.
Huertas' belief that he could put Developer RE1 in "default" under another, unrelated loan
because he (Mr. Huertas) was dissatisfied with how construction turned out at the 2507 I Street
Project.

55.     The Defendants knew that the developer of the 2507 I Street Project, and the
borrower under the loan documents for that project, was 2507 I St Holdings, LLC ("2507
Holdings").

9

56.     The Defendants knew that 2507 I Holdings is a domestic, sole purpose limited liability company that is owned by Charles Paret (a 50% owner) and by Mr. Negussie (the other 50% owner).

57.     The Defendants knew that there is no legal or other business relationship between Developer RE1 and 2507 Holdings.

58.     The Defendants knew that 2507 Holdings does not control Developer RE1 and that Developer RE1 does not control 2507 Holdings.  The Defendants also knew that the two entities are not affiliates of one another, and that the two entities have no business relationship with each other.

59.     The Defendants knew that Developer RE1 has no interest in the 2507 I Street Project

60.     The Defendants knew that Mr. Negussie did not have a controlling interest in either 423 Kennedy or the 2507 I Street Project.

<u>Mr. Huertas Follows Up on His Unethical, Improper Threats to Developer RE1 By Improperly Demanding Payment  of $727,598.67 in "Default Penalties" and "Default Interest" and By Threatening Developer RE1 With Foreclosure.</u>

61.     Later that same day (December 8, 2022), Mr. Huertas followed through with his threats to "make trouble" for you (referring to Mr. Negussie, another, unrelated development project being undertaken by 423 Kennedy, and Developer RE1) by arranging for Leslie Calderas, a WCP Servicing Manager, to send a letter entitled "Notice of Default" to Developer RE1 and to 423 Kennedy (c/o Mr. Negussie) by email.  A true copy of the email from Leslie Calderas is attached as Exhibit J.  True copies of each "Notice of Default" that were included with Mr. Calderas' December 8, 2022 email are attached as Exhibit K and Exhibit L, respectively.

62.     The "Notice of Default" sent to Developer RE1 appears to reference the First DOT, the First Note, the Second DOT, and the Second Note.

10

63.     Each "Notice of Default" states that it was being sent by the "Vice President" of
the WCP, but neither notice was signed by anyone at the WCP.  The WCP web site indicates that
the Vice President of the WCP is Christina Araujo.

64.     Each "Notice of Default" also states that it was referencing "a copy of the first
page of the Deed of Trust as Exhibit A", but there was no "Exhibit A" attached to either notice.

65.     The lack of a signature on each "Notice of Default" and the failure by the WCP to
include the referenced exhibit with each "Notice of Default" are indications that the two notices
were hastily prepared by either Mr. Huertas or by someone else at the WCP.

66.     Each Notice of Default did not contain any legal basis or other explanation for
how or why Developer RE1 had defaulted under any of the loan documents.

67.     Each Deed of Trust contains a "Notices" provision that states how notices are
required to be sent.  The "Notices" provision, which is Section 11.1 in both the First DOT and
the Second DOT states:

> All notices, demands, requests and other communications pursuant to the provisions of
> the Note and this Deed of Trust shall be in writing and shall be deemed to have been
> properly given or served for all purposes when presented personally, or one business day
> after having been sent by a nationally recognized overnight delivery service or a local
> courier service, charges prepaid, or three (3) calendar days after having been sent by
> United States Registered or Certified Mail - Return Receipt Requested, postage prepaid,
> to the respective addresses as follows:
>
> (a) If to the Grantor, then to: 1629 K Street, Suite 300, Washington DC 20006
>
> (b) If to the Beneficiary, then to: 2815 Hartland Rd Suite 200, Falls Church, VA
> 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire,
> 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015
>
> (c) If to the Trustee, then to them at: 2815 Hartland Rd Suite 200, Falls Church,
> VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin,
> Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015
>
> Any of the parties may designate a change of address by notice in writing to the other.
> Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the

11

giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

See Ex. A (First DOT) at pages 17-18 and Ex. C (Second DOT) at pages 17-18.

68.     In the First DOT and the Second DOT, email is not listed as a permissible means to send notice.

69.     In the email that transmitted the letters purporting to be default notices under the two loans the WCP included two Payoff Statements.  True copies of the two Payoff Statements for Developer RE1 that were included with the email transmitting each "Notice of Default" are attached as Exhibit M and Exhibit N, respectively.

70.     The Payoff Statement sent by WCP for the first loan included a demand that Developer RE1 pay $276,776.00 in "Default Interest" and a "Default Penalty" of $357,900.00. *See* Ex. M.

71.     The Payoff Statement sent by WCP for the second loan including a demand that Developer RE1 pay $40,522.67 in "Default Interest" and $52,400.00 for a "Default Penalty".

<u>Mr. Huertas "Lawyers Up" and Asks an Attorney to Come Up with A Cover Story.</u>

72.     After receiving the email with each Notice of Default, Mr. Negussie called Mr. Huertas by telephone to inquire as to the basis for why the Defendants were now claiming that Developer RE1 was in default under any loan document.  During that call, Mr. Huertas told Mr. Negussie that he would not talk about the basis for the defaults, rather, Mr. Negussie would have to discuss the basis for the defaults with the WCP's counsel.

73.     On information and belief, on or about December 8, 2022, soon after Mr. Huertas directed someone from the WCP to send the Notice of Default to Developer RE1, Mr. Huertas called Mr. Drazin and told Mr. Drazin to scour through every provision of the loan documents to try to find a reason to justify the Defendants' decision to declare that Developer RE1 was in

4856-0691-6010.v1

default of the loan documents when they each knew, in fact, that there were no defaults by

Developer RE1 under any of its loan documents.

74.     On information and belief, Mr. Huertas directed Mr. Drazin to come up with a

cover story as part of a joint effort by the Defendants to conceal the fact that there was no valid

basis for declaring Developer RE1 to be in default under any of the loan documents and to

conceal the real reason why Developer RE1 was improperly placed in default by the Defendants.

75.     As of December 8, 2022, Mr. Drazin knew that he had a fiduciary duty, as

Trustee, to both the borrower (Developer RE1) and to the lender under the First DOT and the

Second DOT.

76.     As of December 8, 2022, Mr. Drazin knew that that his representation of the

Lender Defendants as counsel created an actual conflict of interest with his fiduciary duty as

Trustee to Developer RE1, as borrower.  Nevertheless, Mr. Drazin willfully ignored the fiduciary

duty that he owed to Developer RE1, as borrower, and began to act solely on behalf of, and take

instructions solely from, and provide legal advice to, the Lender Defendants.

77.     Mr. Drazin also knew that it was improper, and a breach of the fiduciary duty that

he owed to Developer RE1, to try to find ways to justify -- after the fact -- the Lender

Defendants' issuance of the Default Notice.

78.     The real reason that the Lender Defendants improperly alleged that Developer

RE1 was in default under the loan documents was because the Lender Defendants and/or their

representatives, were angry that the 2507 I Street Project did not turn out the way that they

wanted it to.

.

4856-0691-6010.v1

79.     The First DOT and the Second DOT state that Mr. Drazin, as Trustee, could collect of "commission" of 2.50% of the total amount then due, and another "commission" of 5.00% the proceeds of a foreclosure sale.

80.     There is a financial incentive for Mr. Drazin to inflate the amounts that are claimed to be due from Developer RE1 by the WCP and the WCP Fund given that one of the two "commissions" payable to him is based upon "the total amount then due".

<u>Money is the Root of All Evil</u>.

81.     As a result of their spite, their evil, improper motive, and their greed, the Lender Defendants improperly alleged that Developer RE1 was in default under the loan documents to try to line their own pockets and to cause as much financial and reputational damage as possible to Developer RE1, to Mr. Negussie, and to 423 Kennedy.[1]

82.     The Lender Defendants also caused WCP to issue a "Notice of Default" to Developer RE1 for the express purpose of trying to interfere with the refinancing of the loans that they knew that Developer RE1 had secured with Main Street Bank.

83.     The Lender Defendants also caused WCP to issue each notice "Notice of Default" to Developer RE1 for the express purpose of trying to prevent Developer RE1 from being able to go to closing on the refinancing loan with Main Street Bank.

84.     The Lender Defendants also caused the WCP to issue the each "Notice of Default" to Developer RE1 for the express purpose of improperly pressuring either Developer RE1, 423 Kennedy, and/or Mr. Negussie to pay someone else's debt to the WCP Fund and/or SF NU (*i.e.*, 2507 I Holdings' alleged debt to the WCP Fund and/or SF NU).

---

[1]     423 Kennedy has filed a lawsuit against the WCP, the WCP Fund, and Mr. Huertas for similar claims of misconduct. *See 423 Kennedy St Holdings LLC v. DP Capital, LLC d/b/a Washington Capital Partners, et al.*, 2022-CAB-005903.

14

85.     The Defendants knew that they had no legal right to demand that Developer RE1, 423 Kennedy, or Mr. Negussie either correct, or pay for, any problems that the Defendants claimed existed at the 2507 I Street Project.

86.     The actions of the Defendants, which they took acting in concert, were taken to attempt to inflict maximum economic and reputational damages upon Developer RE1 and its members.  The Defendants' misconduct is a form of extortion.

<u>The Cover Story Does Not Survive Scrutiny Under the Terms of the First DOT and the Second DOT</u>

87.     Mr. Drazin came up with the cover story that Mr. Huertas had requested that he provide for the Lender Defendants.  When asked by counsel for Developer RE1 to provide a basis for the default claims regarding Developer RE1, Mr. Drazin responded be email that:

(a)     "there is a massive Water/Sewer balance due and owing to DC Water ($44,857.93).  DC Water recorded an actual lien in the Land Records (Certificate of Delinquent Water/Sewer Charges dated August 29, 2022 and recorded on August 30, 2022 as Instrument No. 2022090397).  The delinquent Water/Sewer balance is a lien superior to the liens of the Deeds of Trust encumbering 5501 1st Street, NW.

(b)     Second-Half 2022 Real Estate Taxes were due and payable no later than September 15, 2022.  DEVELOPER RE1 LLC did not timely pay those Taxes.  Payment was not made until October 16 and 19, 2022."  A true copy of Mr. Drazin's email response listing the alleged defaults by Developer RE1 is attached as Exhibit O.

88.     For convenience, the alleged DC Water Debt will be referred to as the "DC Water Alleged Debt Claim" and the second property tax payment claim will be referred to as "Property Tax Late Payment Claim."

15

89.     Developer RE1 first became aware of that there may be outstanding DC Water

invoices on or about August 31, 2022.  That was because DC Water was sending the invoices for

the Property to the wrong address.  The dates of the DC Water invoices were 02/23/22, 03/18/22,

04/19/22, 05/18/22 and 06/16/22 (the "Disputed Invoices").  Upon learning of the Disputed

Invoices, Developer RE1 promptly contacted DC Water and disputed the amounts that DC Water

claimed was due.

90.     On September 22, 2022, DC Water stated in an email that "the dispute deadline

date for these charges has expired" and that "[b]ills must be paid or disputed by their respective

due dates."  Because Developer RE1 did not receive an invoice until on or about August 31,

2022, DC Water claimed that the deadline to dispute any of the Disputed Invoices had already

expired by about sixty days.

91.     On September 22, 2022, Developer RE1 submitted (by email) a Petition for

Administrative Hearing to contest the Disputed Invoices.  Developer RE1 is currently waiting for

an administrative hearing to be scheduled.  A true copy of the September 22, 2022 email and the

Petition for Administrative Hearing are attached together as Exhibit P.

92.     Pursuant to Section 7.6 of the First DOT and the Second DOT, Developer RE1

reasonably believes that it has the right to either discharge the DC Water Alleged Debt Claim

"within thirty (30) calendar days" or to "appeal therefrom" any final judgment without being in

violation of the covenant in Section 7.6 (entitled "Judgments").

93.     Developer RE1 cannot be declared in "default" based upon the first pre-textual

basis provided by Mr. Drazin (the DC Water Alleged Debt) for equitable reasons, and because

cure provisions in each deed of trust indicate that Developer RE1 had the right (under Section

7.6) to either appeal from, or to discharge (by payment) any lien filed by DC Water.

16

4856-0691-6010.v1

94.     The only provision of the loan documents that Mr. Drazin cited as a claimed basis

for a "default" by Developer RE1 was Section 7.9 of the First DOT and the Second DOT.

95.     The First DOT and the Second DOT each have a Section 7.9 that are identical.

Section 7.9 is part of the "Events of Default" provisions of the First DOT and the Second DOT.

Section 7.09 states:

> <u>Other Indebtedness</u>.  Any default under or breach of any document or
> instrument evidencing or securing any indebtedness, obligation, or liability
> of any kind or nature - *other than the Indebtedness and the Obligations*
> *secured hereby - of Grantor* or any guarantor of the Indebtedness, <u>*or any*</u>
> <u>*of their affiliates*</u>*. to Beneficiary.* whether now existing or hereafter created
> or arising, direct or indirect, material or immaterial, and whether absolute
> or contingent, joint, several or joint and severally and howsoever owned,
> held, or acquired.

*See* Ex. A (First DOT) and Ex. C (Second DOT) at pages 11-12 (italic and underlined emphasis

added).

96.     The second alleged default by Developer RE1 claimed by Mr. Drazin (the

Property Tax Late Payment Claim) involves the late payments of property taxes by Developer

RE1 on October 16 and 19, 2022 instead of on September 15, 2022.

97.     The property taxes of $16,522.89 was paid by Developer RE1 on October 16,

2022, and the property tax of $222.28 was paid by Developer RE1 on October 19, 2022.  True

copies of the receipts for the property tax payments are attached as Exhibit Q and Exhibit R,

respectively.

98.     The late payment of taxes by Developer RE1 caused no harm whatsoever to the

WCP Fund.

99.     The First DOT and the Second DOT contain language indicating that a

foreclosure cannot occur if an Event of Default, whether alleged or actual, has already been

cured.

17

100.    No claim of default was made by WCP against Developer RE1 until after WCP

became aware that Developer RE1 was obtaining a refinance loan for the Property with Main

Street Bank.

101.    On information and belief, Mr. Huertas directed Mr. Drazin to come up with a

cover story as part of a joint effort by the Defendants to conceal the fact that there was no valid

basis for declaring Developer RE1 to be in default under any of the loan documents and to

conceal the real reason why Developer RE1 was improperly placed in default by the Defendants.

102.    The real reason that the Defendants improperly alleged that Developer RE1 was

in default under the loan documents was because the Defendants and/or their representatives,

were angry that the 2507 I Street Project did not turn out the way that they wanted it to.

103.    The Defendants apparently claim that Section 7.9 is a cross-default provision.  A

cross-default provision in a contract is a provision that allows a "default" under one agreement to

constitute a "default" under another agreement.

104.    In order for Section 7.9 to apply as a cross-default provision as to Developer RE1,

two conditions must have occurred:  (1) Developer RE1 must be in "default" of "any document

or instrument evidencing or securing any indebtedness, obligation, or liability" to the WCP

Fund; and (2) Developer RE1 must be an "affiliate of" 423 Kennedy.

105.    The First DOT and the Second DOT do not define the term "affiliate."  Under

federal banking law, the term "affiliate" means "any company that controls, is controlled by, or

is under common control with another company."  15 U.S. Code §6809 (6).

106.    Developer RE1 does not control 423 Kennedy and vice versa.

107.    Developer RE1 is not controlled by 423 Kennedy and vice versa.

108.    There is also no common control of Developer RE1 and 423 Kennedy.

18

4856-0691-6010.v1

109.    Mr. Negussie does not have a "controlling" interest in 423 Kennedy.

110.    Because 423 Kennedy and Developer RE1 cannot be considered "affiliates", the
Defendants cannot invoke Section 7.9 as a basis to find that an "Event of Default" has occurred
by Developer RE1 under either the First DOT or the Second DOT, even if 423 Kennedy was
actually in "default" of any loan agreement with the WCP Fund.

111.    Mr. Drazin alleged a default under Section 7.9 as a pretext, and as part of a cover
story, for the actual, improper reason that the Defendants falsely, and improperly, claimed that
Developer RE1 was in default of the First DOT and/or the Second DOT.

112.    The Lender Defendants have, through their counsel Mr. Drazin, also improperly
claimed, without any legal right or justification that:  "There is no right to cure.  There is no right
to deceleration.  There is no right to reinstatement.  The Loans are in default and are
accelerated."  *See* Ex. O (the use of "Loans" appears to be referring to the First Note, the First
DOT, the Second Note, and the Second DOT).

Developer RE1 Will Be Irreparably Harmed if the Defendants' Predatory Lending
Practices Are Left Unchecked

113.    The Defendants have threatened to foreclose on the Property even though they
know that they have no legal right to foreclose on the Property.

114.    There is no valid, legal basis under any provision of either the First DOT or the
Second DOT that would permit the Defendants to foreclose on the Property.

115.    If the Defendants follow through on their threat to foreclose on the Property,
Developer RE1 and its members will be irreparably harmed and they could lose their entire
investment.

116.    The Defendants' conduct shows that they have an evil motive, that they are acting
with actual malice to impose damages on Developer RE1 and others, and they are intentionally

19

and willfully disregarding Developer RE1's rights under the loan documents and under the law.
The Defendants' misconduct and improper lending practices also constitute outrageous conduct
further justifying an award of punitive damages.

117.    The Defendants knew that the First Note and the Second Note list a maturity date
of December 23, 2022.  The Defendants deliberately timed their improper interference with
Developer RE1's business relations -- right before a holiday period -- to make it close to
impossible for Developer RE1 to close on the refinancing loan prior to the maturity date, and to
tie up any refinancing indefinitely so that they can try to foreclose on the Property

118.    As of January 11, 2023, none of the Defendants had sent 423 Kennedy a written
default notice that complies with the notice provisions of either the First Note, the First DOT, the
Second Note, or the Second DOT.

119.    On June 23, 2023, Mr. Drazin, apparently on behalf of SF NU, sent to Developer
RE1 a Notice of Foreclosure Sale of Real Property or Condominium Unit ("Foreclosure
Notice").

120.    On July 12, 2023, Developer RE1 sent a letter to Mr. Drazin demanding that he
resign as Trustee due to his conflict of interest.  Afte receiving that letter, Mr. Drazin refused to
resign as Trustee,

COUNT I
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
Count I is Asserted Against  All Defendants Except Mr. Drazin

121.    Paragraphs 1-120 of the Second Amended Complaint are incorporated by
reference.

122.    Developer RE1 was in the process of closing on a refinancing of the existing
loans with Main Street Bank.

20

123.    The Defendants each knew of the existence of Developer RE1's business relations with Main Street Bank.

124.    As a result of the Defendants' improper demand that Developer RE1 pay Default Interest and Default Penalties, Developer RE1 will not be able to obtain a release of the First DOT and the Second DOT as part of the refinancing with Main Street Bank.

125.    As a direct result of the Defendants' direct and continuing interference with Developer RE1's business relations with Main Street Bank, Developer RE1 will not be able to go to closing on the refinancing loans with Main Street Bank.

126.    The Defendants have intentionally interfered with Developer RE1's development of the Property and Developer RE1's refinancing of the loans with Main Street Bank without any valid justification.

127.    Developer RE1 has been damaged by the Defendants' tortious interference with its business relations, and will continue to be damaged, if the Defendants' misconduct is not stopped.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully requests that this Honorable Court enter judgment in its favor and against Defendants WCP, WCP Fund 1, LLC, and Mr. Huertas under Count I for: (a) any and all damages (to be determined) that the Plaintiff has suffered and will suffer as a result of the Defendants' intentional interference with Developer RE1's business relations (currently estimated to be at least $3 million); (b) reasonable attorney's fees if allowed by law; (c) punitive damages of $1,000,000.00; (d) costs; and (d) pre- and post-judgment interest.

4856-0691-6010.v1

## COUNT II
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
Count II Is Asserted Against Defendants WCP, WCP Fund, and SF NU Only

128.     Paragraphs 1–127 of the Second Amended Complaint are incorporated by reference.

129.     Every contract in the District of Columbia contains an implied covenant of good faith and fair dealing.

130.     The First Note is a contract between Developer RE1 and the WCP Fund and/or SF NU.

131.     The First DOT is a contract between Developer RE1 and the WCP Fund and/or SF NU.

132.     The Second Note is a contract between Developer RE1 and the WCP Fund and/or SF NU.

133.     The Second DOT is a contract between Developer RE1 and the WCP Fund and/or SF NU.

134.     Through their improper conduct, the WCP, the WCP Fund, and/or SF NU have breached the implied covenant of good faith and fair dealing contained in the First Note, the First DOT, the Second Note, and the Second DOT.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully request that this Honorable Court enter judgment in its favor under Count II against Defendants DP Capital, LLC d/b/a Washington Capital Partners, the WCP Fund 1, LLC, and SF NU, LLC: (a) any and all damages (to be determined) that the Plaintiff has suffered will suffer as a result of the Defendants' intentional interference with contracts (currently estimated to be $3 million; (b) reasonable attorney's fees if allowed by law (c) costs; and (d) pre- and post-judgment interest.

4856-0691-6010.v1

## COUNT III
### DECLARATORY JUDGMENT
Count III Is Asserted Against Defendants WCP, the WCP Fund, and SF NU Only

135.     Paragraphs 1–134 of the Second Amended Complaint are incorporated by reference.

136.     The First DOT is a contract between Developer RE1 and the WCP Fund and/or SF NU.

137.     The Second DOT is a contract between Developer RE1 and the WCP Fund and/or SF NU.

138.     There is an actual and justiciable controversy between Developer RE1 and WCP, the WCP Fund, and SF NU as to whether Developer RE1 is an "affiliate" of 423 Kennedy, which controversy is ripe for adjudication.

139.     It is settled law in the District that "equity abhors forfeitures … [and] so indeed does the law." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (2009) (citing *Association of American Railroads v. Connerton*, 723 A.2d 858, 862 (D.C.1999) (citation omitted) and citing with approval *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir.1997) ("the law abhors a forfeiture.")).

140.     There is an actual and justiciable controversy between Developer RE1, the WCP, the WCP Fund, and SF NU as to whether an unresolved dispute about water bills, or the late payment of taxes, neither of which caused any harm to the WCP Fund, can be used to effectuate a forfeiture of the Property.

141.     There is an actual and justiciable controversy between Developer RE1 and the WCP, the WCP Fund, and SF NU as to whether the First DOT, the Second DOT, the First Note,

23

1680

and the Second Note have unenforceable liquidated damages (and other) provisions, which controversy is ripe for adjudication.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully request that under Count III, this Honorable Court declare that: (a) under Section 7.9 of the First DOT and the Second DOT, 423 Kennedy St Holdings LLC is not an affiliate of Developer REI, LLC; (b) any provision of either the First DOT or the Second DOT that allows the WCP Fund to declare a default by Developer RE1 after the fact, after the alleged default has already been cured (or is in the process of being adjudicated), and without providing any notice to the borrower or any opportunity to cure, and that results in either (i) additional interest and penalties entirely disproportionate to the harm, if any, caused the alleged default; or (ii) a forfeiture, is unconscionable and enforceable as a matter of public policy; and (c) the First DOT, the Second DOT, the First Note, and the Second Note have liquidated damages (and other) provisions that are unenforceable and cannot be used to support any basis for a foreclosure.

## COUNT IV
### PERMANENT INJUNCTIVE RELIEF
(TO STOP ENFORCEMENT OF THE FIRST DOT,
THE SECOND DOT, AND ANY FORECLOSURE)
Count IV Is Asserted Against All Defendants

142.   Paragraphs 1–141 of the Second Amended Complaint are incorporated by reference.

143.   Unless enjoined, the Defendants will continue to improperly claim that Developer RE1 is in default of the First Note, the First DOT, the Second Note, and the Second DOT.

144.   The Defendants unethical, outrageous, and illegal conduct, as described in this Second Amended Complaint, is causing irreparable harm to Developer RE1.  The Property is unique, and Developer RE1 could lose its entire interest in the Property.

24

4856-0691-6010.v1

145. Developer RE1 does not have an adequate remedy at law.

146. If the Defendants are not enjoined, they will proceed to foreclose on the Property.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully request that under Count

IV this Honorable Court enter an injunction prohibiting the Defendants from invoking any

remedy under the First Note, the First DOT, the Second Note, or the Second DOT, including,

without limitation, enjoining the Defendants: (a) from attempting to enforce any provisions in the

First Note, the First DOT, the Second Note, and the Second DOT that the court determines are

inapplicable and/or unenforceable; (b) from collecting any impermissible fees, interest, and

penalties; and (c) from initiating any foreclosure on the Property until after Developer RE1's

claims in Counts I, II and III of the First Amended Complaint have been decided.

COUNT V

BREACH OF FIDUCIARY DUTY

Count V is Asserted Against Defendant Drazin Only

147. Paragraphs 1-146 of the Second Amended Complaint are incorporated by
reference.

148. As Trustee under the First DOT and the Second DOT, Defendant Drazin had, and
has, a fiduciary duty to both the lender and the borrower (Developer RE1).

149. Defendant Drazin has had an actual conflict of interest while serving
simultaneously as counsel for the Lender Defendants and as Trustee under the First DOT and the
Second DOT.

150. While serving in his role as Trustee under the First DOT and the Second DOT,
Defendant Drazin has at all times acted solely in favor of, and made decisions solely in favor of,
the Lender Defendants.

25

4856-0691-6010.v1

151.    While serving in his role as Trustee under the First DOT and the Second DOT, Defendant Drazin has at all times acted against, and made decisions that have all been against, the interests and rights of Developer RE1, as borrower, under the First DOT and the Second DOT.

152.    While serving in his role as Trustee under the First DOT and the Second DOT, Defendant Drazin has shown a callous indifference to Developer RE1's rights as borrower.

153.    While serving in his role as Trustee under the First DOT and the Second DOT, Defendant Drazin has been in continual consultation with, and dominated by, the Lender Defendants.

154.    Defendant Drazin breached his fiduciary duty by engaging in the conduct described in this Complaint, by not immediately resigning as Trustee when he had actual knowledge that the interests of Developer RE1 and the Lender Defendants became adverse, by continuing to act solely in favor of the Lender Defendants while Trustee, and by issuing correspondence and a Foreclosure Notice when he had actual knowledge of his conflict of interest.

155.    Due to his actual conflict of interest, Defendant Drazin bears the burden of proving that he has been faithful to his trust, and that he carefully scrutinized the conduct of the Lender Defendants under the First DOT and the Second DOT.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully request that this Honorable Court enter judgment in its favor under Count V against Defendant Russell S. Drazin for: (a) any and all damages (final amount to be determined) that the Plaintiff has suffered and will suffer as a result of the Defendant Drazin's breach of his fiduciary duty (currently estimated

to be at least $3 million); (b) reasonable attorney's fees if allowed by law; (c) costs; and (d) pre- and post-judgment interest.

COUNT VI

DECLARATORY JUDGMENT THAT DEFENDANT DRAZIN CANNOT SERVE AS THE TRUSTEE AND THAT THE FORECLOSURE NOTICE IS INVALID

Count VI is Asserted Against All Defendants

156.   Paragraphs 1-155 of the Second Amended Complaint are incorporated by reference.

157.   Defendant Drazin has an actual conflict of interest that prevents him from serving as Trustee under the First DOT and the Second DOT.

158.   Due to his conflict of interest as counsel for the Lender Defendants, Defendant Drazin cannot uphold his fiduciary duties to the borrower (Developer RE1) as Trustee under the First DOT and the Second DOT.

159.   Any actions taken by Defendant Drazin as Trustee under the First DOT and the Second DOT must be either set aside or suspended unless and until Defendant Drazin proves that he has been faithful to his obligations to both the borrower (Developer RE1) and the lender under the First DOT and the Second DOT.

160.   There is an actual and justiciable controversy between Developer RE1 and the Lender Defendants as to whether Defendant Drazin can serve as Trustee when he has an actual conflict of interest, which controversy is ripe for adjudication.

161.   There is an actual and justiciable controversy between Developer RE1 and the Lender Defendants as to whether any actions that Defendant Drazin took as Trustee while he had an actual conflict of interest are valid, which controversy is ripe for adjudication.

WHEREFORE, the Plaintiff, Developer RE1 LLC, respectfully request that under Count VI this Honorable Court declare that:  (a) Defendant Drazin cannot serve as Trustee under the

27

First DOT and the Second DOT due to an actual conflict of interest; and (b) that any action that

Defendant Drazin took while he had a conflict of interest must be either set aside or suspended

until Defendant Drazin bears his burden of proving that he was at all times faithful to his

fiduciary duties to both the borrower (Developer RE1) and the lender under the First DOT and

the Second DOT.

## DEMAND FOR A JURY TRIAL

Developer RE1, LLC demands a trial by jury as to all claims asserted in the Second

Amended Complaint for which a jury trial is allowed under the law.


Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  March 1, 2024

/s/ James D. Sadowski
James D. Sadowski (D.C. Bar No. 446635)
Alexandria J. Smith (D.C. Bar. No. 1781067)
Spencer B. Ritchie (D.C. Bar No. 1673542)
801 17th Street, NW, Suite 1000
Washington, DC 20006
Telephone:  (202) 452-1400
Email:  jds@gdllaw.com
*Counsel for Plaintiff Developer RE1, LLC*

28

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of this Second Amended Complaint was filed

through eFileDC this 1st  day of March , 2024, and a notice of filing should be sent by eFileDC

to all counsel of record in the case.

/s/ James D. Sadowski
James D. Sadowski

29

eFiled
6/7/2024 1:36:49 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

DEVELOPER RE1 LLC,

    *Plaintiff*,

v.

DPA CAPITAL, LLC d/b/a WASHINGTON
CAPITAL PARTNERS, *et al.*,
*Defendants*.

Case No. 2022-CAB-005935
Judge Ebony Scott

---

423 KENNEDY ST HOLDINGS LLC,

    *Plaintiff*,

v.

DPA CAPITAL, LLC d/b/a WASHINGTON
CAPITAL PARTNERS, *et al.*,

    *Defendants*.

Case No. 2023-CAB-004260
Judge Milton Lee

## PLAINTIFFS DEVELOPER RE1, LLC AND
## 423 KENNEDY ST HOLDINGS, LLC'S
## CONSENT MOTION TO CONSOLIDATE AND TO MODIFY SCHEDULING ORDER

Pursuant to D.C. Super. Ct. Civ. R. 42(a)(1)(B), counsel for 423 Kennedy St Holdings,

LLC ("423 Kennedy") and for Developer RE1, LLC ("Developer RE1") (collectively,

"Plaintiffs"), hereby move to consolidate the two above-captioned cases into a single proceeding.

The two cases involve common issues of fact, similar loan documents, the same Defendants, and

they relate to similar events and transactions.  In support of this consent motion to consolidate,

the Plaintiffs state as follows:[1]

I.      FACTUAL BACKGROUND

These cases pertain to disputes under multiple sets of loan documents between Developer

RE1 (in Case No. 2022-CAB-005935) and 423 Kennedy (in Case No. 2023-CAB-004260), as

Plaintiffs, and Defendants WCP Fund 1, LLC ("WCP Fund"), DPA Capital d/b/a Washington

Capital Partners ("WCP"), Daniel Huertas, who controls WCP, and Russell Drazin, the Trustee

under all four Deeds of Trust.  *See* Second Am. Compl. (in 2022-CAB-005935) ¶¶ 2-7 and

Counts I-II and Compl. (in 2023-CAB-004260) ¶¶ 2-7 (and Counts I-II).  Both cases also seek a

declaratory judgment as to the meaning of, and disputes about, certain, identical provisions in the

Deeds of Trust.  Compls. (Count III).  Both cases also seek temporary and permanent injunctive

relief to prevent a foreclosure sale.  Compls. (Count IV).  Finally, both cases assert a breach of

fiduciary duty claim against Mr. Drazin and seek declaratory judgment that Mr. Drazin cannot

serve as the trustee and that the foreclosure notice that he issued is invalid.  Compls. (Counts V-

VI).

In the earlier-filed case (2022-CA-005935),  Developer RE1 alleges that the Defendants

manufactured defaults under two Deeds of Trust as a pretext to prevent Developer RE1 from

closing on a refinancing loan.  Second Am. Compl. (2022-CA-005935) ¶ 111.  Developer RE1

further alleges that the Defendants acted in concert to inflict maximum economic and

reputational damages on Developer RE1 by engaging in conduct akin to extortion to leverage

their position in regard to an unrelated development.  *See id.* ¶¶ 72-80.   In the later filed case

---

[1]   The Defendants consent to the relief sought, but by doing so they do not agree with all of the
characterizations of the facts.

(2023-CAB-004260), 432 Kennedy alleges that the Defendants manufactured defaults under two

Deeds of Trust as a pretext to prevent 423 Kennedy from obtaining refinancing on a property

located at 423 Kennedy Street, N.W., Lot 56, Square 3260, in Washington, D.C.  Compl. 2023-

CAB-004260) ¶ 125.  432 Kennedy further alleges that the Defendants acted in concert to inflict

maximum economic and reputational damages against 423 Kennedy (and others) by engaging in

conduct akin to extortion to leverage their position with respect to an unrelated development.  *Id.*

¶¶ 86-97.

## II.   Legal Standard for Motion to Consolidate

Rule 42 of the District of Columbia Superior Court Rules of Civil Procedure provides

that if actions before the court involve a common question of law or fact, the court may

consolidate them.  D.C. Super. Ct. Civ. R. 42(a)(1)(B).  Any motion to consolidate two or more

civil actions must be decided by the judge on whose calendar appears the oldest assigned case

covered by the motion – here Judge Scott.  *See id.* R. 42(a)(2).  The question of whether to

consolidate multiple cases is a question over which the court has "great latitude" under the abuse

of discretion standard.  *See Altimont v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 287-88

(D.C. 1977).  In deciding whether to consolidate multiple cases, a core principle of consideration

is the avoidance of the wasteful expenditure of energy and money incidental to the separate

litigation of identical issues.  *See Columbia Plaza v. Security National Bank,* 525 F.2d 620 (D.C.

Cir. 1975).

## III.   Legal Analysis for a Motion to Consolidate

The two cases here concern numerous, common, and overlapping questions of law and

fact.  Namely, the cases involve the interpretation of two almost identical sets of loan documents

involving the same Defendants.  *See* Second Am. Compl. (2022-CAB 005935) ¶¶ 15-28 and

Compl. (2023-CAB-004260) ¶¶ 20-35.  Both cases center around an assertion that the

Defendants have deliberately interfered with the refinancing of the loans on the two properties

and both cases contain the same cause of actions against the same parties.  Both of the cases are

also predicated on the legal theory that Defendants interfered with Plaintiffs' refinancing efforts

to leverage their position with respect to an unrelated development.  *Compare* Second Am.

Compl. (2022-CAB-005935) ¶ 40 *with* Compl. (2023-CAB-004260) ¶ 54.  Both cases will

involve the same or similar witnesses.  The consolidation of these two cases would both preserve

judicial resources and preserve expenses to the litigants because the fact patterns and the

disputed legal issues are nearly identical.  Accordingly, consolidation of the two cases in this

instance is appropriate.

IV.    SCHEDULING ORDER

     The parties also request that the Court set a new Scheduling Order consolidating the

discovery deadlines for the two cases.  A copy of the existing Scheduling Order in Case 2022-

CAB-005935 is attached as Exhibit A.  A list of the discovery completed to date in both cases is

attached as Exhibit B.   The trial date in the earlier-filed case is set for September 9, 2024, so

there remains sufficient time for the parties to complete discovery.  No party would be

prejudiced as a result of modifying the discovery deadlines.  Moreover, there is good cause to

modify the discovery deadlines and no adverse or prejudicial consequence to doing so.  The

parties respectfully request that the deadlines in the case, after consolidation, be modified as

follows:

|  | Amended  Date |
|---|---|
| Discovery Requests | 05/08/2024 |
| Close of Discovery | 07/09/2024 |
| Dispositive Motions Deadline | 07/26/2024 |

4

| Dispositive Motions Decided | 08/26/2024 |
| ADR - Mediation | Completed |
| Trial Readiness Hearing | 09/06/2024 [No Change] |
| Jury Trial | 09/09/2024 [No Change] |

V.  CONCLUSION

For the foregoing reasons, Plaintiffs and the Defendants jointly request that the above-captioned cases be consolidated into the earlier-filed case (2022-CAB-005935) and that a new Scheduling Order be entered that extends the deadlines for the consolidated cases.  A proposed order is attached.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Date:    June 7, 2024

/s/ Erin B. McAuliffe
James D. Sadowski, #446635
Alexandria J. Smith, #1781067
Erin B. McAuliffe, #1722421
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Telephone:  (202) 452-1400
Facsimile:  (202) 452-1410
E-mail:   jds@gdllaw.com / ajs@gdllaw.com /
ebm@gdllaw.com
*Counsel for Plaintiff 423 Kennedy St Holdings,
LLC* and *Plaintiff Developer RE1 LLC*

5

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of June, 2024, a true copy of the foregoing

Motion to Consolidate and Modify Scheduling Order was filed in both of the above-captioned

cases (2022-CAB-005935 and 2023-CAB-004260) using eFileDC, and that a notice of filing

should be sent electronically to counsel of record in both cases.

/s/ Erin B. McAuliffe
Erin B. McAuliffe


<u>CERTIFICATE REGARDING CONSENT</u>

The Plaintiffs obtained Defendants' consent to the relief requested in this Motion by

phone calls and emails with Mac Verstandig, Esq.

/s/ Erin B. McAuliffe
Erin B. McAuliffe

6

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

DEVELOPER RE1 LLC,

     *Plaintiff,*

v.

DPA CAPITAL, LLC d/b/a WASHINGTON CAPITAL PARTNERS, *et al.*,

*Defendants.*

Case No. 2022-CAB-005935
Judge Ebony Scott

Consolidated with
Case No. 2023-CAB-004260

423 KENNEDY ST HOLDINGS LLC,

     *Plaintiff,*

v.

DPA CAPITAL, LLC d/b/a WASHINGTON CAPITAL PARTNERS, *et al.*,

     *Defendants.*

## [PROPOSED]  ORDER

UPON CONSIDERATION of the Plaintiffs' Consent Motion to Consolidate and Modify Scheduling Order, it is this _____ day of _____, 2024, hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that case number 2023-CAB-004260 is hereby CONSOLIDATED with case number 2022-CAB-005935, and all future filings should be filed in the lead case (2022-CAB-005935); and it is further

ORDERED that the Scheduling Order will be amended as follows:

7

|                              | Amended  Date            |
|------------------------------|--------------------------|
| Discovery Requests           | 05/08/2024               |
| Close of Discovery           | 07/09/2024               |
| Dispositive Motions Deadline | 07/26/2024               |
| Dispositive Motions Decided  | 08/26/2024               |
| ADR - Mediation              | Completed                |
| Trial Readiness Hearing      | 09/06/2024 [No Change]   |
| Jury Trial                   | 09/09/2024 [No Change]   |

SO ORDERED.

_____

Ebony Scott, Associate Judge

*Copies to counsel of record via eFileDC.*

8

# EXHIBIT A

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DEVELOPER RE1 LLC,      )
              Plaintiff,    )
                        )    Civil Case No. 2022 CAB 005935
v.                      )
                        )    Judge Ebony M. Scott
DP CAPITAL, LLC d/b/a    )
WASHINGTON CAPITAL    )    Next Court Event:  Trial Readiness Hearing
PARTNERS, *et al.*,        )    September 6, 2024 at 2:00 p.m.
          Defendants.    )

---

## ORDER GRANTING CONSENT MOTION TO EXTEND THE SCHEDULING ORDER DEADLINES

Upon consideration of the Consent Motion to Extend the Scheduling Order Deadlines, filed on March 1, 2024, and the entire record herein, it is this **7th day of March 2024**, hereby:

**ORDERED** that the Consent Motion is **GRANTED**; it is further

**ORDERED** that the Scheduling Order shall be amended as follows:

| Event | Current Deadline | New Deadline |
|---|---|---|
| Exchange Fact Witness Lists | -- | 03/08/2024 |
| Proponent's Rule 26(a)(2)(B) Report | -- | 03/15/2024 |
| Opponent's Rule 26(a)(2)(B) Report | -- | 04/12/2024 |
| Discovery Requests | -- | 04/24/2024 |
| Close of Discovery | -- | 05/24/2024 |
| Filing Motions | 03/13/2024 | 06/24/2024 |
| Dispositive Motions Decided | 04/15/2024 | 07/24/2024 |
| Pretrial | To be set upon completion of Mediation | |

**SO ORDERED**.

_____
**Ebony M. Scott**
Associate Judge

**Copies Via Odyssey to:**

Alexandria J. Smith, Esq.
ajs@gdllaw.com
*Counsel for Plaintiff Developer RE1, LLC*

Spencer B. Ritchie, Esq.
sbr@gdllaw.com
*Counsel for Plaintiff Developer RE1, LLC*

James D. Sadowski, Esq.
jds@gdllaw.com
*Counsel for Plaintiff Developer RE1, LLC*

Maurice B. Verstandig, Esq.
mac@mbvesq.com
*Counsel for Defendants DP Capital, LLC d/b/a Washington Capital Partners, Russel Drazin,
Daniel Huertas, & WCP Fund I LLC*

# EXHIBIT B

## DISCOVERY COMPLETED TO DATE
### (2022-CAB-005935)

| Description | Date Served |
|---|---|
| Plaintiff's First Set of Requests for Production of Documents to Defendant DP Capital, LLC d/b/a Washington Capital Partners | May 19, 2023 |
| Plaintiff's First Set of Interrogatories to Defendant DP Capital, LLC d/b/a Washington Capital Partners | May 19, 2023 |
| Objections and Answers to Plaintiff's First Set of Interrogatories to Defendant DP Capital, LLC d/b/a Washington Capital Partners | June 20, 2023 |
| Objections and Responses to Plaintiff's First Set of Requests for Production of Documents to Defendant DP Capital, LLC d/b/a Washington Capital Partners | June 20, 2023 |
| Defendant DP Capital, LLC d/b/a Washington Capital Partners' First Production of Documents to Plaintiff | July 2, 2023 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant Daniel Huertas | July 6, 2023 |
| Plaintiff's First Set of Interrogatories to Defendant Daniel Huertas | July 6, 2023 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant Russell Drazin | July 8, 2023 |
| Plaintiff's First Set of Interrogatories to Defendant Russell Drazin | July 8, 2023 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant WCP Fund I, LLC | July 8, 2023 |
| Plaintiff's First Set of Interrogatories to Defendant WCP Fund I, LLC | July 8, 2023 |
| Notice of Deposition of Daniel Huertas | July 9, 2023 |
| Notice of Deposition of Russell Drazin | July 9, 2023 |
| WCP Fund I LLC's Requests for Production to Developer RE1 LLC | July 10, 2023 |
| WCP Fund I LLC's Requests for Admission to Developer RE1 LLC | July 10, 2023 |
| Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories to Defendant DP Capital, LLC d/b/a Washington Capital Partners | July 14, 2023 |
| Defendant DP Capital, LLC d/b/a Washington Capital Partners' Supplemental Production of Documents to Plaintiff | July 14, 2023 |
| Deposition (partial) of Daniel Huertas | July 19, 2023 |

| Description | Date Served |
|---|---|
| Plaintiff Developer RE1's Responses to WCP's Requests for Admissions | August 18, 2023 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant SF NU, LLC | April 24, 2024 |
| Plaintiff's First Set of Interrogatories to Defendant SF NU, LLC | April 24, 2024 |
| Plaintiff's First Requests for Production of Documents to Defendant SF NU, LLC | April 24, 2024 |
| Plaintiff's Second Set of Requests for Production of Documents to Defendant Russell Drazin | April 24, 2024 |
| Plaintiff's Second Set of Interrogatories to Defendant Russell Drazin | April 24, 2024 |
| Defendant Drazin's Answers to Second Set of Interrogatories | May 28, 2024 |
| Responses to Second Set of Requests for Production of Documents to Defendant Russell Drazin | May 28, 2024 |
| Defendant SF NU, LLC's Answer to Interrogatories | May 28, 2024 |
| Defendant SF NU, LLC's Responses to Requests for Production of Documents | May 28, 2024 |
| Defendant SF NU, LLC's First Production of Documents to Plaintiff | May 28, 2024 |

### DISCOVERY COMPLETED TO DATE
(2023-CAB-004260)

| Description | Date Served |
| --- | --- |
| Notice of Subpoena to Main Street Bank | November 17, 2023 |
| Plaintiff's First Set of Interrogatories to Defendant DP Capital LLC d/b/a Washington Capital Partners | May 7, 2024 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant DP Capital LLC d/b/a Washington Capital Partners | May 7, 2024 |
| Plaintiff's First Set of Interrogatories to Defendant Russell Drazin | May 7, 2024 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant Russell Drazin | May 7, 2024 |
| Plaintiff's First Set of Interrogatories to Defendant Daniel Huertas | May 8, 2024 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant Daniel Huertas | May 8, 2024 |
| Plaintiff's First Set of Interrogatories to Defendant WCP Fund I, LLC | May 8, 2024 |
| Plaintiff's First Set of Requests for Production of Documents to Defendant WCP Fund I, LLC | May 8, 2024 |

eFiled
07/13/2023 4:05:05 PM
Superior Court
of the District of Columbia

In the Superior Court of the District of Columbia
Civil Division

423 Kennedy St Holdings LLC,
1629 K Street, N.W - Suite 300
Washington, DC  20006

    *Plaintiff,*

v.

DP Capital, LLC d/b/a Washington
Capital Partners,
8401 Greensboro Drive - Suite 960
McLean, VA  22102,

WCP Fund I, LLC
2815 Hartland Road - Suite 200
Falls Church, VA  22043,

Daniel Huertas,
909 Chinquapin Road
McLean, VA  22102,

Russell S. Drazin
4400 Jenifer Street, NW - Suite 2
Washington, DC 20015,

  and

SF NU, LLC
1455 Research Boulevard - Suite 510
Rockville, MD 20850

    *Defendants.*

Case No:   2023-CAB-004260

## Verified Complaint

Comes Now The Plaintiff, 423 Kennedy St Holdings LLC ("423 Kennedy"), by

undersigned counsel, and sues DP Capital, LLC d/b/a Washington Capital Partners, the WCP

Fund I, LLC, Daniel Huertas, Russell Drazin, and SF NU, LLC.  This Verified Complaint

4884-5924-1840.v1

("Complaint") includes claims for breach of contract, tortious interference with business

relations, breach of the duty of good faith and fair dealing, and breach of fiduciary duty by a

Trustee.  The Complaint also seeks a declaratory judgment as to the meaning of certain

provisions in two Deeds of Trust, that certain provisions are unenforceable as a matter of law,

that the Trustee has a conflict of interest that prevents him from serving as Trustee, and that

actions taken by the Trustee are invalid and must be set aside or suspended.  The Complaint also

seeks injunctive relief to prevent a foreclosure.  In support of its Complaint, 423 Kennedy avers

as follows:

<u>THE PARTIES</u>

1.      The Plaintiff, 423 Kennedy St Holdings LLC ("423 Kennedy") is a District of

Columbia limited liability company that is authorized to do business in the District.

2.      The first Defendant, DP Capital, LLC ("DP Capital"), is a Virginia limited

liability that does business under the trade name "Washington Capital Partners".  For

convenience, the Complaint refers to DP Capital, LLC d/b/a Washington Capital Partners as

"WCP".

3.      The second Defendant, WCP Fund I, LLC ("WCP Fund"), is a Delaware limited

liability company that engages in a lending business in the District.

4.      The WCP controls the WCP Fund and services its loans.

5.      The third defendant, Daniel Huertas ("Mr. Huertas"), is an individual that resides

at 909 Chinquapin Road in McLean, Virginia, 22012.  Mr. Huertas is listed as the Chief

Executive Officer of WCP on WCP's website.  Mr. Huertas controls WCP.

6.      The fourth defendant, SF NU, LLC ("SF NU"), is believed to be a New Mexico

limited liability company that has not filed a certificate of authority to transact business in the

District.  SF NU has a business address of 1455 Research Boulevard, Suite 510, Rockville,

Maryland, 20850.  For convenience, the WCP, the WCP Fund, Mr. Huertas, and SF NU will be

referred to as the "Lender Defendants".

7.     The fifth defendant, Russell Drazin ("Mr. Drazin"), is an individual who is

counsel to the WCP, the WCP Fund, and SFNU.  Mr. Drazin is also listed as Trustee under two

deeds of trust that he drafted, the terms of which are at issue in this case.

STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

The WCP Claims that It Is a Company That Can be Trusted and That It Has an
"Unwavering Commitment to the Highest Ethical Standards"

8.     In a June 16, 2022 news article published on the internet by Modern Luxury DC,

two officers of WCP were quoted as saying that:

> "*We never want to let our clients fail,*" says [Giselle] Bonzi. "Our borrowers
> end up trusting that if they work with us, we will do everything in our power to
> help them succeed." The duo understands the importance of a client's positive
> experience and the clear communication of each step in the lending process
> because it builds trust[;]" and

> "Real estate financing involves a lot of high trust," says [Daniel] Huertas.
> "We've developed a highly relational experience with our clients through
> innovative products, practices and standards. *What sets us apart from other
> lenders is our unwavering commitment to the highest ethical practices in the
> industry*, which historically have been very informal."

Source:  https://dc.capitolfile.com/power-players-dc (italic emphasis added).

9.     But in reality, the WCP does not have the highest ethical standards.  The WCP is

a company that has engaged in predatory lending practices, and as this Complaint will show, Mr.

Huertas, the WCP, the WCP, and SF NU have engaged in unethical, outrageous conduct that was

specifically designed to make one, if not more, of their clients' construction projects fail.

3

<u>The Ownership of 423 Kennedy, Its Purpose, and the Property.</u>

10.     423 Kennedy is the record owner of real property in the District known as 423 Kennedy Street, N.W., Lot 56, Square 3260 (the "Property").

11.     423 Kennedy is a domestic, sole purpose, limited liability company, and the sole purpose of 423 Kennedy is to own and develop the Property.

12.     The Defendants all knew that 423 Kennedy was a sole purpose entity whose only asset was the Property and any the improvements that 423 Kennedy made to the Property.

13.     423 Kennedy is co-owned by two members:  Mel Negussie (a 50% owner) and the Brighton KSDC, LLC ("Brighton Group") (the other 50% owner).

14.     The Brighton Group is comprised of forty-one individual investors, many of whom used their personal retirement savings to invest in the Brighton Group's membership interest in 423 Kennedy.

15.     On January 31, 2020, the WCP helped facilitate 423 Kennedy obtaining a construction finance loan for the Property with the WPC Fund.

16.     Due to unforeseen complications with the soil and water at the Property, 423 Kennedy increased the original loan amount and refinanced the original construction finance loan on March 31, 2022.

<u>Prior to Closing, the WCP and the WCP Fund Represent to 423 Kennedy That they Will Provide Construction Draws to Fund the Project</u>

17.     As part of the refinancing, the WCP and the WCP Fund agreed that they would provide construction draws to 423 Kennedy (up to $4,650,000.00) as construction on the project progressed.  The WCP and the WCP Fund's agreement to provide construction draws was memorialized on the HUD 1 Settlement Statement signed at closing.

4

18.     423 Kennedy relied upon the WCP and the WCP Fund's express promise to provide construction draws to 423 Kennedy during the course of construction and prior to signing any closing documents.

19.     The total amount of construction draws that the WCP and the WCP Fund agreed to provide 423 Kennedy was also listed in an approved Construction Budget & Draw Schedule and in Terms Sheets prepared by the WCP and the WCP Fund prior to closing.  423 Kennedy also relied upon the representations contained in these documents before signing any of the loan documents at closing.

<u>The Loan Documents with the WCP and the WCP Fund</u>

20.     As part of the refinancing, on March 31, 2022, 423 Kennedy, as Grantor, signed a Deed of Trust (the 'First DOT") for the Property that named the WCP Fund as Beneficiary and Mr. Drazin, as Trustee.  A true copy of the First DOT is attached as Exhibit A.

21.     The First DOT was a form deed of trust that was prepared by Mr. Drazin as counsel for the WCP and the WCP Fund.

22.     The WCP and the WCP Fund did not permit 423 Kennedy to make any changes to the terms of the First DOT before it was signed.

23.     On March 31, 2022, 423 Kennedy signed a Commercial Deed of Trust Note (the "First Note") in the amount of $8,689,693.00, as "Borrower", in favor of the WCP Fund.  A true copy of the First Note is attached as Exhibit B.

24.     The First Note was a form of promissory note that was prepared by Mr. Drazin as counsel for the WCP and the WCP Fund.

25.     The WCP and the WCP Fund did not permit 423 Kennedy to make any changes to the terms of the First Note before it was signed.

5

26.     On March 31, 2022, 423 Kennedy signed a second, additional Deed of Trust ("Second DOT") for the Property that also named the WCP Fund as Beneficiary and Mr. Drazin as Trustee.  A true copy of the Second DOT is attached as Exhibit C.

27.     The Second DOT was a form of deed of trust was prepared by Mr. Drazin as counsel for the WCP and the WCP Fund.

28.     The WCP and the WCP Fund did not permit 423 Kennedy to make any changes to the terms of the Second DOT before it was signed

29.     On March 31, 2022, 423 Kennedy signed a second Commercial Deed of Trust Note (the "Second Note") in the amount of $1,256.000.00, as "Borrower", a copy of which is attached as Exhibit D.

30.     The Second Note was a form of promissory note that was prepared by Mr. Drazin as counsel for the WCP and the WCP Fund.

31.     The WCP and the WCP Fund did not permit 423 Kennedy to make any changes to the terms of the Second Note before it was signed.

32.     As of March 31, 2022, 423 Kennedy had paid $261,202.33 in loan origination fees to the WCP Fund by making payments to company called "WCP Servicing, LLC".

33.     The new, refinanced loans were set to mature on March 31, 2023.

34.     Beginning in April of 2022, the WCP and the WCP Fund started providing construction draws to 423 Kennedy as they had initially promised to 423 Kennedy prior to closing.

35.     The WCP Fund may have assigned its interest in the Second DOT to SF NU in an Assignment of Deed of Trust ("Assignment").  The Assignment lists Mr. Huertas as trustee, but

6

has conflicting dates on it.  There is text showing a December 21, 2021 execution date, but there is also a notary seal showing execution on June 28, 2022.

36.     Due to changing economic conditions, in September of 2022, 423 Kennedy began the process of refinancing the two loans on the Property with another lender.

37.     As of October 6, 2022, there was no allegation made by any Defendant to 423 Kennedy that any default by 423 Kennedy existed either the First Note, the Second Note, the First DOT, or the Second DOT.

38.     As of October 6, 2022, 423 Kennedy had made all payments to the WCP Fund that were due under the First Note and the Second Note.

<u>The Lender Defendants Begin Their Corrupt Plan to Try To Foreclose on the Property by Starving 423 Kennedy of Construction Draw Funds.</u>

39.     On or about October 6, 2022, and contrary to the prior, express representations that WCP and WCP Fund had made to 423 Kennedy prior to closing about the funding of construction draws, Mr. Huertas informed 423 Kennedy by telephone that the WCP would no longer provide construction draws to 423 Kennedy.

40.     The reason that Mr. Huertas gave for not funding any further construction draws to 423 Kennedy was because Mr. Negussie was involved with Mr. Charles Paret in the development of other projects (projects that were unrelated to the Property), and that the Defendants were "disappointed" that those other projects "were not constructed well".

41.     The Defendants knew that if the WCP did not fund construction draws, 423 Kennedy would be harmed because it would not be able to complete the development of the Property.

42.     On or about October 24, 2022, the WCP transmitted a Payoff Statement to 423 Kennedy listing the amounts required to pay the WEP Fund to retire the balances owed under the

7

First Note and to release the First DOT from the Property. A true copy of the October 24, 2022 Payoff Statement for the first loan is attached as Exhibit E.

43.      On or about October 24, 2022, WCP transmitted a Payoff Statement for the Second Note listing the amounts required to pay the balance due to the WEP Fund under the Second Note and to release the Second DOT from the Property. A true copy of the Payoff Statement for the second loan is attached as Exhibit F.

44.      As of October 24, 2022, 423 Kennedy had made all payments to the WCP Fund that were due under the First Note and the Second Note.

45.      As of October 24, 2022, there was no allegation made by any Defendant to 423 Kennedy that any default existed either the First Note, the Second Note, the First DOT, or the Second DOT.

46.      On November 3, 2022, Mr. Huertas sent an email to 423 Kennedy (via Mr. Negussie) to inquire about the status of the payoff of both loans by 423 Kennedy. Mr. Huertas stated that WCP "would not provide any construction loan draws to 423 Kennedy". A copy of the November 3, 2022 email is attached as Exhibit G.

47.      As of November 3, 2022, there was no allegation made by any Defendant that any default by 423 Kennedy existed either the First Note, the Second Note, the First DOT, or the Second DOT.

48.      As of November 3, 2022, 423 Kennedy had made all payments to the WCP Fund that were due under the First Note and the Second Note.

49.      On November 15, 2022, Mr. Huertas sent another email to 423 Kennedy (via Mr. Negussie) in which he reiterated that WCP would not release any more construction draws. A copy of the November 15, 2022 email is attached as Exhibit H.

50.     As of November 15, 2022, there was no allegation made by any Defendant that any default by 423 Kennedy existed either the First Note, the Second Note, the First DOT, or the Second DOT.

51.     By as early as November 17, 2022, the Defendants each knew that 423 Kennedy had secured alternative financing for the Property with another lender named Main Street Bank, and that 423 Kennedy expected to close on the new refinancing loan with Main Street Bank in December of 2022.

52.     On or about November 21, 2022, WCP transmitted another Payoff Statement listing the amounts required to pay the balance due to the WEP Fund under the First Note and to release the First DOT from the Property.  A true copy of the November 21, 2022 Payoff Statement for the first loan is attached as Exhibit I.

53.     On or about November 21, 2022, WCP transmitted a Payoff Statement listing the amounts required to pay the balance due to the WEP Fund under the Second Note and to release the Second DOT from the Property.  A true copy of the November 21, 2022 Payoff Statement for the second loan is attached as Exhibit J.

54.     As of November 21, 2022, there was no allegation made by any Defendant to 423 Kennedy that any default existed either the First Note, the Second Note, the First DOT, or the Second DOT.

55.     WCP sent all the Payoff Statements listed in paragraphs 42, 43, 52, and 53 to 423 Kennedy because WCP knew that 423 Kennedy was attempting to go to closing on the refinance of both loans.

56.     None of the Payoff Statements that are referenced in paragraphs 42, 43, 52, and 53 included any request by any Defendant for the payment of default fees, default interest, or any

9

other amount that was based upon any allegation that there was a "default" by 423 Kennedy

under either the First Note, the Second Note, the First DOT or the Second DOT.

> <u>After the Lender Defendants Starve 423 Kennedy of Construction Draw Funds, Mr.
> Huertas Then Demands that Either 423 Kennedy or Mr. Negussie Resolve Another Debt
> Owed to the WCP for Another, Unrelated Project, "Or Else".</u>

57.     As of December 8, 2022, 423 Kennedy had made all payments due under the First

Note and the Second Note.  By that date, 423 Kennedy had paid $514,560.80 in interest

payments to the WCP Fund.  That interest amount is in addition to prior payments made by 423

Kennedy to the WCP of approximately $378,818.53 in interest under the original loan.

58.     On December 8, 2022, Mr. Huertas told 423 Kennedy during a telephone call with

Mr. Negussie that the Defendants and an unnamed investor were displeased with how the

development of another, unrelated property (located at 2507 I Street, NW) had turned out.  For

convenience, the unrelated development project at 2507 I Street, NW will be referred to as the

"2507 I Street Project".

59.     SF NU is believed to also have a financial interest in the 2507 I Street Project.

60.     During that call, Mr. Huertas told Mr. Negussie that WCP was "withdrawing the

payoff statements recently issued and that he was defaulting all loans that Mr. Negussie was

associated with at WCP, including 423 Kennedy." Mr. Huertas further stated that the 2507 I

Street Project has "turned out very bad and that the person who lent the money to WCP

("Investor Lender") to provide the loan to 2507 I St Holdings LLC, is 'pissed off' with the

quality of the work done".  Mr. Huertas further stated that the Investor Lender "is very wealthy

and will make life hard for you", and "has now bought the notes" on 423 Kennedy and another

project financed by WCP, and that WCP is "defaulting the loans."  Mr. Huertas also said: "why

don't you do the honorable thing and have your investors buy 2507 I St to make things right" or

have them "take care of the $700,000" shortfall on the 2507 I Street Project.

10

61.     During that call, Mr. Huertas told Mr. Negussie that he should "do the right thing" by arranging for an approximate $700,000 shortfall (on the 2507 I Street Project) to be paid to the WCP Fund, and that if Mr. Negussie did not arrange for that shortfall to be paid, then the Defendants and the unnamed investor "would make trouble for you on all of your other projects".

62.     During the December 8, 2022 phone call, Mr. Negussie told Mr. Huertas that it was not appropriate for either him (Mr. Huertas) or the WCP to be trying to force 423 Kennedy or Mr. Negussie to pay for the debts of someone else on another, unrelated project, and that it was not appropriate for Mr. Huertas or the WCP to be making threats to either Mr. Negussie or to be making threats to any other development project that Mr. Negussie was involved with.

63.     After Mr. Negussie refused to accede to Mr. Huertas' threats related to the 2507 I Street Project, Mr. Huertas stated, in retaliation, that all prior Payoff Statements that were sent to 423 Kennedy were withdrawn and that he would place 423 Kennedy and the borrower on another, unrelated project named Developer RE1, LLC ("Developer RE1") in default under their loan documents with the WCP Fund.

64.     The Defendants knew that Developer RE1 is a domestic, sole purpose limited liability company that is partially owned by Mr. Negussie.

65.     The Defendants knew that the sole purpose of Developer RE1 is to develop the property located in the District at 5501 First Street, NW.

66.     The Defendants knew that there is no legal or other business relationship between 423 Kennedy and Developer RE1.

67.     The Defendants knew that 423 Kennedy does not control Developer RE1 and Developer RE1 does not control 423 Kennedy.

4884-5924-1840.v1

68.     The Defendants knew that Developer RE1 and 423 Kennedy are not "affiliates" of one another, and that those entities have no business relationship with each other.

69.     Mr. Huertas provided no basis for why or how the Defendants could suddenly put 423 Kennedy in default under any of the loan documents for the Property, other than Mr. Huertas' belief that he could put 423 Kennedy in "default" under two, unrelated loans because he (Mr. Huertas) was dissatisfied with how construction turned out at the 2507 I Street Project.

70.     The Defendants knew that the developer of the 2507 I Street Project, and the borrower under the loan documents for that project, was 2507 I St Holdings, LLC ("2507 Holdings").

71.     The Defendants knew that 2507 I Holdings is a domestic, sole purpose limited liability company that is owned by Charles Paret (a 50% owner) and by Mr. Negussie (the other 50% owner).

72.     The Defendants knew that there is no legal or other business relationship between 423 Kennedy and 2507 Holdings.

73.     The Defendants knew that 2507 Holdings does not control 423 Kennedy and 423 Kennedy does not control 2507 Holdings.  The Defendants also knew that the two entities are not affiliates of one another, and that the two entities have no business relationship with each other.

74.     The Defendants knew that Mr. Negussie does not have a controlling interest in either 423 Kennedy or 2507 Holdings.

75.     The Defendants knew that 423 Kennedy has no interest in the 2507 I Street Project.

76.     The Defendants knew that Developer RE1 has no interest in the 2507 I Street Project.

4884-5924-1840.v1

<u>Mr. Huertas Follows Up on His Unethical, Improper Threats to 423 Kennedy By
Improperly Demanding Payment of More than $1.5 Million in "Default Penalties" and
"Default Interest" and By Threatening 423 Kennedy With Foreclosure.</u>

77.    Later that same day (December 8, 2022), Mr. Huertas followed through with his

threats to "make trouble" for Mr. Negussie, 423 Kennedy and Developer RE1 by arranging for

Leslie Calderas, a WCP Servicing Manager, to send a letter entitled "Notice of Default" to Mr.

Negussie by email.  A true the "Notice of Default" is attached as Exhibit K.

78.     "Notice of Default" appears to reference either the First Note, the First DOT, the

Second Note, and/or the Second DOT.

79.    The "Notice of Default" states that it was being sent by the "Vice President" of

the WCP, but it was not signed by anyone at the WCP.  The WCP web site indicates that the

Vice President of the WCP is Christina Araujo.

80.    The "Notice of Default" also states that it was referencing "a copy of the first

page of the Deed of Trust as Exhibit A", but there was no "Exhibit A" attached to the notice.

81.    The lack of a signature on the "Notice of Default" and the failure by the WCP to

include the referenced exhibit with the "Notice of Default" are indications that the notice was

hastily prepared by either Mr. Huertas or by someone else at the WCP.

82.    The Notice of Default did not contain any legal basis or other explanation for how

or why 423 Kennedy had defaulted under the terms of any of the loan documents.

83.    Each Deed of Trust contains a "Notices" provision that states how notices are

required to be sent.  The "Notices" provision, which is Section 11.1 in both the First DOT and

the Second DOT states:

> All notices, demands, requests and other communications pursuant to the
> provisions of the Note and this Deed of Trust shall be in writing and shall
> be deemed to have been properly given or served for all purposes when
> presented personally, or one business day after having been sent by a
> nationally recognized overnight delivery service or a local courier service,

13

charges prepaid, or three (3) calendar days after having been sent by
United States Registered or Certified Mail - Return Receipt Requested,
postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: 1629 K Street, Suite 300, Washington
DC 20006

(b) If to the Beneficiary, then to: 2815 Hartland Rd Suite 200, Falls
Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn:
Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington,
DC 20015

(c) If to the Trustee, then to them at: 2815 Hartland Rd Suite 200,
Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC,
Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2,
Washington, DC 20015

Any of the parties may designate a change of address by notice in writing
to the other.  Whenever in this Deed of Trust the giving of notice by mail
or otherwise is required, the giving of such notice may be waived in
writing by the person or persons entitled to receive such notice.

See Ex. A (First DOT) at pages 17-18 and Ex. C (Second DOT) at pages 17-18.

84.     In the First DOT and the Second DOT, email is not listed as a permissible means
to send notice.

85.     In the email that transmitted the letter purporting to be a "Notice of Default"
under one of the two loans, the WCP included two Payoff Statements.  A copy of the two Payoff
Statement that were included with the email transmitting each "Notice of Default" are attached
as Exhibits L and M.

86.     The new Payoff Statement sent by WCP for the first loan included a demand that
423 Kennedy pay $456,927.95 in "Default Interest" and a "Default Penalty" of $868,969.30.
Neither of those two charges appeared on any prior Payoff Statements sent by the WCP to 423
Kennedy.

87.     The new Payoff Statement sent by WCP for the second loan including a demand
that 423 Kennedy pay $97,130.67 in "Default Interest" and $125,600.00 for a "Default Penalty".

14

Neither of those two charges appeared on any prior Payoff Statements sent to 423 Kennedy by the WCP.

<u>Mr. Huertas "Lawyers Up" and Asks Defendant Drazin to Come Up with A Cover Story</u>.

88.    After receiving the email with the Notice of Default, Mr. Negussie called Mr. Huertas by telephone to inquire as to the basis for why the WCP and the WCP Fund were now claiming that 423 Kennedy was in default under any loan document.  During that call, Mr. Huertas told Mr. Negussie that he would not talk about the basis for the defaults, rather, Mr. Negussie would have to discuss the basis for the defaults with the WCP's counsel.

89.    On information and belief, on or about December 8, 2022, soon after Mr. Huertas directed someone from the WCP to send the Notice of Default to 423 Kennedy, Mr. Huertas called Mr. Drazin and told Mr. Drazin to scour through every provision of the loan documents to try to find a reason to justify the Defendants' decision to declare that 423 Kennedy was in default of the loan documents when they each knew, in fact, that there were no defaults by 423 Kennedy under any of its loan documents.

90.    On information and belief, Mr. Huertas directed Mr. Drazin to come up with a cover story as part of a joint effort by the Defendants to conceal the fact that there was no valid basis for declaring 423 Kennedy to be in default under any of the loan documents and to conceal the real reason why 423 Kennedy was improperly placed in default by the Defendants.

91.    As of December 8, 2022, Mr. Drazin knew that he had a fiduciary duty, as Trustee, to both the borrower (423 Kennedy) and to the lender under the First DOT and the Second DOT.

92.    As of December 8, 2022, Mr. Drazin knew that that his representation of the WCP and the WCP Fund as counsel created an actual conflict of interest with his fiduciary duty as Trustee to 423 Kennedy, as borrower.  Nevertheless, Mr. Drazin willfully ignored the fiduciary

duty that he owed to 423 Kennedy, as borrower, and began to act solely on behalf of, and take

instructions solely from, and provide legal advice to, the Lender Defendants.

93.     Mr. Drazin also knew that it was improper, and a breach of the fiduciary duty that

he owed to 421 Kennedy, to try to find ways to justify -- after the fact -- the Lender Defendants'

issuance of the Default Notice.

94.     The real reason that the Lender Defendants improperly alleged that 423 Kennedy

was in default under the loan documents was because the Lender Defendants and/or their

representatives, were angry that the 2507 I Street Project did not turn out the way that they

wanted it to.

95.     The First DOT and the Second DOT state that Mr. Drazin, as Trustee, could

collect of "commission" of 2.50% of the total amount then due, and another "commission" of

5.00% the proceeds of a foreclosure sale.

96.     There is a financial incentive for Mr. Drazin to inflate the amounts that are

claimed to be due from 423 Kennedy Street by the WCP and the WCP Fund given that one of the

two "commissions" payable to him is based upon "the total amount then due".

97.     As a result of their evil, improper motive and their greed, the Defendants

improperly alleged that 423 Kennedy was in default under the loan documents to try line their

own pockets and to cause as much financial and reputational damage as possible to 423

Kennedy, to Mr. Negussie, and to Developer RE1.[1]

---

[1]     Developer RE1 filed a lawsuit against the WCP, the WCP Fund, and Mr. Huertas for
similar claims of misconduct.  *See Developer RE1, LLC v. DP Capital, LLC d/b/a Washington
Capital Partners, et al,* 2022-CAB-005935.  That case is currently in the discovery phase.

4884-5924-1840.v1

98.     The Lender Defendants also caused WCP to issue each the "Notice of Default" to 423 Kennedy for the express purpose of trying to interfere with the refinancing of the loans that they knew that 423 Kennedy had secured with Main Street Bank.

99.     The Lender Defendants also caused WCP to issue the "Notice of Default" to 423 Kennedy for the express purpose of trying to prevent 423 Kennedy from being able to go to closing on the refinancing loan with Main Street Bank.

100.    The Lender Defendants also caused the WCP to issue the "Notice of Default" to 423 Kennedy for the express purpose of improperly pressuring either 423 Kennedy, Developer RE1, and/or Mr. Negussie to pay someone else's debt to the WCP Fund and/or SF NU (*i.e.,* 2507 I Holdings' alleged debt to the WCP Fund and/or to SF NU).

101.    The Defendants knew that they had no legal right to demand that 423 Kennedy, Developer RE1, or Mr. Negussie either correct, or pay for, any problems that the Defendants claimed existed at the 2507 I Street Project.

102.    The Defendants knew that they had no legal right, or factual basis, to claim that 423 Kennedy was in default of any loan document.

103.    The actions of the Defendants, which they took acting in concert, were taken to attempt to inflict maximum economic and reputational damages upon 423 Kennedy and its members.  The Defendants' misconduct is a form of extortion.

### The Cover Story Does Not Survive Scrutiny Under the Terms of the First DOT and the Second DOT

104.    Mr. Drazin came up with the cover story that Mr. Huertas had requested that he provide for the Lender Defendants.  When asked by counsel for 423 Kennedy to provide a basis for the default claims regarding 423 Kennedy, Mr. Drazin responded that: "The District recorded a Certificate of Delinquent Fines dated November 17, 2022 and recorded on November 17, 2022

17

as Instrument No. 2022114185 ("Fine Certificate").  A copy of Mr. Drazin's reply email listing

the alleged defaults is attached as Exhibit N.

105.    The Fine Certificate relates to Notice of Infraction dated December 3, 2021

("NOI") that was issued to 423 Kennedy by the D.C. Department of Consumer and Regulatory

Affairs ("DCRA").  The violation alleged in the NOI was listed as "Prohibitive Excessive

Vegetative Growth" that carried with it a fine of $500.00.  A true copy of the NOI is attached at

Exhibit O.

106.    423 Kennedy did not have notice of the NOI at the time it was issued because the

DCRA sent a copy of the NOI to the wrong email address.

107.    On September 7, 2022, the Office of Administrative Hearings issued a Final

Order regarding the NOI.  A copy of the Final Order is attached as Exhibit P.

108.    423 Kennedy noted an appeal of the Final Order on September 12, 2022.  A copy

is 423 Kennedy's appeal is attached as Exhibit Q.

109.    Pursuant to Section 7.6 of the First DOT and the Second DOT, 423 Kennedy has

the right to either discharge "within thirty (30) calendar days" or to "appeal therefrom" any final

judgment without being in violation of the covenant in Section 7.6 (entitled "Judgments").

110.    423 Kennedy originally planned to wait for the District to respond to its appeal of

the fine that was issued as a result of the NOI.  However, after 423 Kennedy received each

"Notice of Default", and even though 423 Kennedy believed that each "Notice of Default" that

was sent to it by The Defendant was improper and was sent as a pretext, on December 10, 2022,

423 Kennedy paid the District $1,657.43 to discharge that fine and any lien that was recorded as

a result of the NOI.  A copy of confirmation of the $1,657.34 payment to the District is attached

as Exhibit R.

4884-5924-1840.v1

111.    December 10, 2022 is less than thirty days after November 17, 2022.

112.    On December 11, 2022, the District of Columbia Office of Administrative
Hearings (OAH) vacated the Final Order.  *See* Exhibit S.

113.    There are no outstanding fines owed by 423 Kennedy to the District.

114.    423 Kennedy cannot be declared in "default" based upon the first pre-textual basis
provided by Mr. Drazin because 423 Kennedy had the right (under Section 7.6) to either appeal
from, or to discharge (by payment), any lien filed by the District.

115.    The only provision of the loan documents that Mr. Drazin cited as a claimed basis
for a "default" by 423 Kennedy was Section 7.9 of the First DOT and the Second DOT.

116.    The First DOT and the Second DOT each have a Section 7.9 that are identical.
Section 7.9 is part of the "Events of Default" provisions of the First DOT and the Second DOT.
Section 7.09 states:

> <u>Other Indebtedness</u>.  Any default under or breach of any document or
> instrument evidencing or securing any indebtedness, obligation, or liability
> of any kind or nature - *other than the Indebtedness and the Obligations
> secured hereby - of Grantor* or any guarantor of the Indebtedness*, or any
> of their affiliates, to Beneficiary,* whether now existing or hereafter created
> or arising, direct or indirect, material or immaterial, and whether absolute
> or contingent, joint, several or joint and severally and howsoever owned,
> held, or acquired.

*See* Ex. A (First DOT) and Ex. C (Second DOT) at pages 11-12 (italic and underlined emphasis
added).

117.    The Defendants apparently claim that Section 7.9 is a cross-default provision.  A
cross-default provision in a contract is a provision that allows a "default" under one agreement to
constitute a "default" under another agreement.

118.    In order for Section 7.9 to apply as a cross-default provision as to 423 Kennedy,
two conditions must have occurred:  (1) Developer RE1 must be in "default" of "any document

19

or instrument evidencing or securing any indebtedness, obligation, or liability" to the WCP

Fund; and (2) Developer RE1 must be an "affiliate of" 423 Kennedy.

119.   The First DOT and the Second DOT do not define the term "affiliate."  Under

federal banking law, the term "affiliate" means "any company that controls, is controlled by, or

is under common control with another company."  15 U.S. Code §6809 (6).

120.   Developer RE1 does not control 423 Kennedy and vice versa.

121.   Developer RE1 is not controlled by 423 Kennedy and vice versa.

122.   There is also no common control of Developer RE1 and 423 Kennedy.

123.   Mr. Negussie does not have a "controlling" interest in 423 Kennedy.

124.   Because 423 Kennedy and Developer RE1 cannot be considered "affiliates", the

Defendants cannot invoke Section 7.9 as a basis to find that an "Event of Default" has occurred

by 423 Kennedy under either the First DOT or the Second DOT, even if Developer RE1 was

actually in "default" of any loan agreement with the WCP Fund.

125.   Mr. Drazin alleged a default under Section 7.9 as a pretext, and as part of a cover

story, for the actual, improper reason that the Defendants falsely, and improperly, claimed that

423 Kennedy was in default of the First DOT and/or the Second DOT.

126.   The Lender Defendants have, through their counsel Mr. Drazin, also improperly

claimed, without any legal right or justification that:  "There is no right to cure.  There is no right

to deceleration.  There is no right to reinstatement.  The Loans are in default and are

accelerated."  *See* Ex. N (the use of "Loans" appears to be referring to the First Note, the First

DOT, the Second Note, and the Second DOT) (underlined emphasis in original).

<u>423 Kennedy Will Be Irreparably Harmed if the Defendants' Predatory Lending Practices Are Left Unchecked</u>

127.     On December 8, 2022, the Defendants threatened to foreclose on the Property even though they know that they had no legal right to foreclose on the Property.

128.     The Property has been improved by 423 Kennedy by constructing a mixed use, six level (including the lower cellar unit) building with thirty-three residential units and one commercial unit comprising 36,512 square feet.

129.     The improvements that 423 Kennedy made to the Property are 75-80% complete, and the Project would have been completed in the first quarter of 2023 but for the Defendants' misconduct.

130.     The Property has a current value of $11.9 million.

131.     There was no valid, legal basis under any provision of either the First DOT or the Second DOT that would have permitted the Defendants to foreclose on the Property.

132.     The Defendants deliberately sabotaged 423 Kennedy's ability to complete construction and its refinancing efforts.  But for the Defendants' misconduct, 423 Kennedy would have closed on a refinance loan and paid the WCP Fund in full in December of 2022.

133.     The Defendants also deliberately timed their improper interference with 423 Kennedy's business relations during an approaching holiday period to make it impossible for 423 Kennedy to close on the refinancing loan with Main Street Bank prior to the end of this year, and to tie up any refinancing indefinitely so that they can try to foreclose on the Property.

134.     On June 23, 2023, Mr. Drazin, apparently now acting on behalf of SF NU, sent to 423 Kennedy a Notice of Foreclosure Sale of Real Property or Condominium Unit ("Foreclosure Notice").  A copy of the Foreclosure Notice is attached as Exhibit T.

4884-5924-1840.v1

135.    The Foreclosure Notice sets the date and time of the foreclosure sale on July 25, 2023 at 2:10 p.m.

136.    If the Defendants follow through on the scheduled foreclosure sale, 423 Kennedy, its members (Mr. Negussie and the Brighton Group), and all forty-one of the Brighton Group's investors, will be irreparably harmed and they could lose their entire investment.

137.    The Defendants' conduct shows that they have an evil motive, that they are acting with actual malice to inflict damages on 423 Kennedy and others, and they are intentionally and willfully disregarding 423 Kennedy's rights under the loan documents and under the law.  The Defendants' misconduct and improper lending practices also constitute outrageous conduct further justifying an award of punitive damages.

138.    As of July 12, 2023, none of the Defendants have sent 423 Kennedy a written default notice that complies with the notice provisions of either the First Note, the First DOT, the Second Note, or the Second DOT.

COUNT I
BREACH OF CONTRACT
Count I is Asserted Against Defendants WCP, WCP Fund, and SF NU Only

139.    Paragraphs 1-138 of the Complaint are incorporated by reference.

140.    There was either an express contract or an implied-in-fact contract between 423 Kennedy and the WCP and the WCP Fund to fund construction draws.

141.     The WCP and the WCP Fund breached the contract by unilaterally refusing to fund construction draws and due to no fault of 423 Kennedy.

142.    To the extent that SF NU is found to have been assigned any rights in the contract from either the WCP or the WCP Fund, SF NU is bound by the contract and equally responsible for its breach.

4884-5924-1840.v1

143.    423 Kennedy has been damaged by the breach of contract by the WCP, the WCP Fund, and SF NU.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully requests that under Count I this Honorable Court enter judgment in its favor and against Defendants DP Capital, LLC d/b/a Washington Capital Partners, the WCP Fund I, LLC, and SF NU, LLC for: (a) any and all damages (final amount to be determined) that 423 Kennedy has suffered and will suffer as a result of the Defendants' breach of contract (currently estimated to be at least $1 million); (b) reasonable attorney's fees if allowed by law; (c) costs; and (d) pre- and post-judgment interest.

## COUNT II
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
Count II is Asserted Against All Defendants Except Mr. Drazin

144.    Paragraphs 1-143 of the Complaint are incorporated by reference.

145.    423 Kennedy was in the process of closing on a refinancing loan with Main Street Bank.

146.    The Defendants each knew of the existence of 423 Kennedy's business relations with Main Street Bank.

147.    As a result of the Defendants' improper demand that 423 Kennedy pay Default Interest and Default Penalties, 423 Kennedy will not be able to obtain a release of the First DOT and the Second DOT as part of the refinancing with Main Street Bank.

148.    As a direct result of the Defendants' direct and continuing interference with 423 Kennedy's business relations with Main Street Bank, 423 Kennedy will not be able to go to closing on the refinancing loans with Main Street Bank or any other bank.

4884-5924-1840.v1

149.    The Defendants have intentionally interfered with 423 Kennedy's construction business and development of the Property and 423 Kennedy's refinancing of the loans with Main Street Bank without any valid justification.

150.    423 Kennedy has been damaged by the Defendants' tortious interference with its business relations, and will continue to be damaged, if the Defendants' misconduct is not stopped.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully requests that under Count II this Honorable Court enter judgment in its favor and against Defendants WCP, WCP Fund I, LLC, Mr. Huertas, and SF NU, LLC for:  (a) any and all damages (final amount to be determined) that the Plaintiff has suffered and will suffer as a result of the Defendants' intentional interference with 423 Kennedy's business relations (currently estimated to be at least $1 million); (b) reasonable attorney's fees if allowed by law; (c) punitive damages of $1 million; (d) costs; and (d) pre- and post-judgment interest.

## COUNT III
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
Count III Is Asserted Against Defendants WCP, WCP Fund, and SF NU Only

151.    Paragraphs 1- 150 of the Complaint are incorporated by reference.

152.    Every contract in the District of Columbia contains an implied covenant of good faith and fair dealing.

153.    The First Note is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

154.    The First DOT is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

155.    The Second Note is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

156.    The Second DOT is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

157.    There was also either an express or implied-in-fact contract between 423 Kennedy and the WCP, the WCP Fund and/or SN FU to fund construction draws.

158.    Through their improper conduct, the WCP, the WCP Fund, and SF NU have breached the implied covenant of good faith and fair dealing contained in the First Note, the First DOT, the Second Note, the Second DOT, and the contract to fund construction draws.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully request that under Count III this Honorable Court enter judgment in its favor against Defendants DP Capital, LLC d/b/a Washington Capital Partners, the WCP Fund I, LLC, and SF NU, LLC:  (a) any and all damages (to be determined) that the Plaintiff has suffered will suffer as a result of the breaches of the duty of good faith and fair dealing (currently estimated to be at least $1 million); (b) reasonable attorney's fees if allowed by law (c) costs; and (d) pre- and post-judgment interest.

## COUNT IV
### DECLARATORY JUDGMENT
Count IV Is Asserted Against Defendants WCP, the WCP Fund, and SF NU Only

159.    Paragraphs 1-158 of the Complaint are incorporated by reference.

160.    The First DOT is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

161.    The Second DOT is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

25

162.    The First Note is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

163.    The Second Note is a contract between 423 Kennedy and the WCP Fund and/or SF NU.

164.    There is an actual and justiciable controversy between WCP, the WCP Fund, and SF NU as to whether Developer RE1 is an "affiliate" of 423 Kennedy, as that term is used in the First DOT and the Second DOT, which controversy is ripe for adjudication.

165.    There is an actual and justiciable controversy between the Count IV Defendants as to whether the Developer RE1 is an "affiliate" of 423 Kennedy, as that term is used in the First DOT and the Second DOT, which controversy is ripe for adjudication.

166.    There is an actual and justiciable controversy between the WCP, the WCP Fund, and SF NU and 423 Kennedy as to whether the First DOT, the Second DOT, the First Note, and the Second Note contain unenforceable liquidated damages (and other) provisions, which controversy is ripe for adjudication.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully request that under Count III this Honorable Court declare that: (a) under Section 7.9 of the First DOT and the Second DOT, Developer REI, LLC is not an affiliate of 423 Kennedy St Holdings LLC; and (b) the First DOT, the Second DOT, the First Note, and the Second Note have liquidated damages (and other) provisions that are unenforceable and cannot be used to support any basis for a foreclosure.

Case 25-10037-ELG   Doc 8-2   Filed 09/04/25   Entered 09/04/25 00:30:22   Desc
Exhibit B - All Pleadings and Other Documents Filed in Plan Page 689 of 1716

COUNT V

INJUNCTIVE RELIEF

(TO STOP ENFORCEMENT OF THE FIRST DOT,
THE SECOND DOT, AND ANY FORECLOSURE)
Count V Is Asserted Against All Defendants

167.     Paragraphs 1-166 of the Complaint are incorporated by reference.

168.     Unless enjoined, the Defendants will continue to improperly claim that 423

Kennedy is in default of the First Note, the First DOT, the Second Note, and the Second DOT.

169.     The Defendants unethical, outrageous, and illegal conduct, as described in this

Complaint, is causing irreparable harm to 423 Kennedy.  The Property is unique, and 423

Kennedy could lose its entire interest in the Property.

170.     423 Kennedy does not have an adequate remedy at law.

171.     If the Defendants are not enjoined, they will proceed to foreclose on the Property.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully request that

under Count V this Honorable Court enter an injunction prohibiting the Defendants from

invoking any remedy under the First Note, the First DOT, the Second Note, or the Second DOT,

including, without limitation, enjoining the Defendants: (a) from attempting to enforce any

provisions in the First Note, the First DOT, the Second Note, and the Second DOT that the court

determines are inapplicable and/or unenforceable; (b) from collecting any impermissible fees,

interest, and penalties; and (c) from initiating any foreclosure on the Property until after 423

Kennedy's claims in the Complaint have been decided.

COUNT VI

BREACH OF FIDUCIARY DUTY

Count VI is Asserted Against Defendant Drazin Only

172.     Paragraphs 1-171 of the Complaint are incorporated by reference.

173.    As Trustee under the First DOT and the Second DOT, Defendant Drazin had, and

has, a fiduciary duty to both the lender and the borrower (423 Kennedy).

174.    Defendant Drazin has had an actual conflict of interest while serving

simultaneously as counsel for the Lender Defendants and as Trustee under the First DOT and the

Second DOT.

175.    While serving in his role as Trustee under the First DOT and the Second DOT,

Defendant Drazin has at all times acted solely in favor of, and made decisions solely in favor of,

the Lender Defendants.

176.    While serving in his role as Trustee under the First DOT and the Second DOT,

Defendant Drazin has at all times acted against, and made decisions that have all been against,

the interests and rights of 423 Kennedy, as borrower, under the First DOT and the Second DOT.

177.    While serving in his role as Trustee under the First DOT and the Second DOT,

Defendant Drazin has shown a callous indifference to 423 Kennedy's rights as borrower.

178.    While serving in his role as Trustee under the First DOT and the Second DOT,

Defendant Drazin has been in continual consultation with, and dominated by, the Lender

Defendants.

179.    Defendant Drazin breached his fiduciary duty by engaging in the conduct

described in this Complaint, by not immediately resigning as Trustee when he had actual

knowledge that the interests of 423 Kennedy and the Lender Defendants became adverse, by

continuing to act solely in favor of the Lender Defendants while Trustee, and by issuing

correspondence and a Foreclosure Notice when he had actual knowledge of his conflict of

interest.

28

180.     Due to his actual conflict of interest, Defendant Drazin bears the burden of proving that he has been faithful to his trust, and that he carefully scrutinized the conduct of the Lender Defendants under the First DOT and the Second DOT.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully request that this Honorable Court enter judgment in its favor under Count VI against Defendant Russel S. Drazin for:  (a) any and all damages (final amount to be determined) that the Plaintiff has suffered and will suffer as a result of the Defendant Drazin's breach of his fiduciary duty (currently estimated to be at least $1 million); (b) reasonable attorney's fees if allowed by law; (c) costs; and (d) pre- and post-judgment interest.

## COUNT VII
### DECLARATORY JUDGMENT THAT DEFENDANT DRAZIN CANNOT SERVE AS THE TRUSTEE AND THAT THE FORECLOSURE NOTICE IS INVALID
Count VII is Asserted Against All Defendants

181.     Paragraphs 1-180 of the Complaint are incorporated by reference.

182.     Defendant Drazin has an actual conflict of interest that prevents him from serving as Trustee under the First DOT and the Second DOT.

183.     Due to his conflict of interest as counsel for the Lender Defendants, Defendant Drazin cannot uphold his fiduciary duties to the borrower (423 Kennedy) as Trustee under the First DOT and the Second DOT.

184.     Any actions taken by Defendant Drazin as Trustee under the First DOT and the Second DOT must be either set aside or suspended unless and until Defendant Drazin proves that he has been faithful to his obligations to both the borrower (423 Kennedy) and the lender under the First DOT and the Second DOT.

29

4884-5924-1840.v1

761

185.    There is an actual and justiciable controversy between 423 Kennedy and the Defendants as to whether Defendant Drazin can serve as Trustee when he has an actual conflict of interest, which controversy is ripe for adjudication.

186.    There is an actual and justiciable controversy between 423 Kennedy and the Defendants as to whether any actions that Defendant Drazin took as Trustee while he had an actual conflict of interest are valid, which controversy is ripe for adjudication.

WHEREFORE, the Plaintiff, 423 Kennedy St Holdings LLC, respectfully request that under Count VII this Honorable Court declare that:  (a) Defendant Drazin cannot serve as Trustee under the First DOT and the Second DOT due to an actual conflict of interest; and (b) that any action that Defendant Drazin took while he had a conflict of interest must be either set aside or suspended until Defendant Drazin bears his burden of proving that he was at all times faithful to his fiduciary duties to both the borrower (423 Kennedy) and the lender under the First DOT and the Second DOT.

## DEMAND FOR A JURY TRIAL

423 Kennedy St Holdings, LLC demands a trial by jury as to all claims asserted in the Complaint for which a jury trial is allowed under the law.

4884-5924-1840.v1

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  July 13, 2023

/s/ James D. Sadowskif
James D. Sadowski (D.C. Bar No. 446635)
Alexandria J. Smith (D.C. Bar. No. 1781067)
801 17th Street, NW, Suite 1000
Washington, DC 20006
Phone:  (202) 452-1400; Fax: 202-452-1410
Email:  jds@gdllaw.com; ajs@gdllaw.com
*Counsel for Plaintiff 423 Kennedy St Holdings LLC*

4884-5924-1840.v1

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

423 KENNEDY ST HOLDINGS LLC,

     *Plaintiff,*

v.

DP CAPITAL, LLC D/B/A WASHINGTON
CAPITAL PARTNERS *et al.*

     *Defendants.*

Case No: _____

## VERIFICATION OF MEL NEGUSSIE

I, Mel Negussie, declare under oath that:

1.    I am over the age of 18, I am otherwise competent to be a witness, and I am authorized to give this Verification on behalf of 423 Kennedy St Holdings, LLC, the Plaintiff in this case ("423 Kennedy").

2.    I have personal knowledge of the facts set forth in the Verified Complaint.

3.    The facts stated in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.

4.    423 Kennedy will be irreparably harmed if a foreclosure sale that is scheduled for July 25, 2023 at 2:10 p.m., which sale was orchestrated by the Defendants in this case, is not stopped by the issuance of a temporary restraining order.

I declare under penalty of perjury that the foregoing facts are true to the best of my knowledge.

_____
Mel Negussie

4894-4804-5424.v1

764

**KUTAK ROCK LLP**
Jeremy S. Williams (DC 994825)
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Co-Counsel for Developer RE1, LLC and*
*423 Kennedy St Holdings, LLC*

**GREENSTEIN DELORME & LUCHS, P.C.**
James D. Sadowski (VSB No. 38326)
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| JPK NEWCO, LLC, | ) Case No. 25-00200 (ELG) |
| | ) |
| Debtor. | ) Subchapter V |
| | ) |
| DEVELOPER RE1, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 25-10037-ELG |
| | ) State Court Case 2022-CAB-005935 |
| DP CAPITAL LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| 423 KENNEDY ST HOLDINGS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) State Court Case 2022-CAB-005935 |
| v. | ) (State Court Cases Consolidated) |
| | ) |
| DP CAPITAL LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFFS' MOTION FOR REMAND

Developer RE1, LLC and 423 Kennedy St Holdings, LLC (collectively, the "Claimants"

or "Plaintiffs"), by counsel, hereby move this Court for entry of an order, pursuant to 11 U.S.C. §

105(a), 28 U.S.C. §1334(c) and §1452(b), Fed. R. Bankr. P. 9006, and LBR 9027-1(b):

(a) remanding the above-captioned adversary proceeding to the D.C. Superior Court; and (b)

suspending all related deadlines pending the entry of an order affirming the same (the "Motion").

In support of the Motion, the Plaintiffs represent as follows:

**Background**

1.      The factual and procedural background is well known to this Court from certain

prior cases and is hereby incorporated by reference.[1]   Additional background is available in the

*Motion to Dismiss Chapter 11 Petition Filed in Bad Faith* [Dkt. No. 19] and the *Motion of*

*Developer RE1, LLC's and 423 Kennedy St Holdings, LLC for Abstention and to Dismiss or Stay*

*Proceedings* [Dkt. No. 48] (the "Abstention Motion").

2.      To summarize, JPK NewCo, LLC (the "Debtor") was created by the defendants in

the above-captioned adversary proceeding (the "Defendants") for the improper purposes of:  (a)

delaying a trial on the Plaintiffs claims in D.C. Superior Court and hindering their ability to pursue

their claims; and (b) so that the Defendants could relitigate prior decisions from that D.C. Superior

Court in this Court – a Court that they consider to be their "home court" that would make decisions

more favorable to their positions.

3.      This is the second time WCP Fund I LLC ("WCP Fund"), an insider of the Debtor,

has attempted this maneuver.

4.      Specifically, the WCP Fund previously sought to remove the two above-captioned

cases - *423 Kennedy St Holdings, LLC v. The WCP Fund, et al.,* Case No. 2023-CAB-004260 (D.C.

Super. Ct.) and *Developer RE1, LLC v. the WCP Fund I, LLC, et al.,* 2022-CAB-005935 (D.C.

Super Ct.) (hereinafter, the "Consolidated Superior Court Cases") – to this Court in connection

---

[1]      *See* Case No. 24-00262-ELG and Adv. Proc. No. 24-10023-ELG.

2

with a prior involuntary bankruptcy proceeding also filed by insiders of the Debtor – WCP Fund and DP Capital LLC. *See In re Charles Paret* [Case No. 23-00217; Adv. Proc. No. 24-10023] (in which case WCP Fund also sought removal of a D.C. Superior Court case).

5.      Around the same time, the Debtor was subject to an involuntary bankruptcy proceeding that was ultimately dismissed pursuant to the *Consent Order Granting the United States Trustee's Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)* [Case No. 24-02262; Dkt. No. 85].

6.      The Court then remanded the Consolidated Superior Court Cases back to D.C. Superior Court pursuant to the *Order Granting Renewed Motion to Remand* [Adv. Proc. No. 24-10023; Dkt. No. 64] on the bases of both mandatory and permissive abstention.

7.      As the Court correctly predicted at the remand hearing, the Debtor, however, would not and did not give up.

8.      As Plaintiffs' counsel predicted at a hearing in July of last year – before knowing anything about the Debtor – the Debtor was using the removal process to attempt to relitigate issues that have already been decided by the D.C. Superior Court. Such efforts have now resumed in the form of the above-captioned bankruptcy, the related adversary proceeding, and a second removal of the Consolidated Superior Court Cases, which is now requiring this motion for remand.

9.      Specifically, on May 27, 2025, the Debtor initiated the above-captioned proceeding under Subchapter V of Chapter 11 of the Bankruptcy Code (the "Bankruptcy"). Almost immediately, thereafter, the Debtor, among others, initiated an adversary proceeding against the Claimants [Adv. Proc. No. 25-10015] (the "Adversary") which Adversary is premised on the exact same issues which are currently before the D.C. Superior Court pursuant to the Consolidated Superior Court Cases.

10.     Despite the fact that the issues raised not only in this Bankruptcy but also the Adversary, can and should be addressed by the D.C. Superior Court; despite the fact that the issues are already well underway of being resolved by the D.C. Superior Court; and despite the fact that the Debtor has no direct threat or business operations that require an immediate restructuring, the Debtor has nonetheless sought to cut off the rights of the Claimants and has forged ahead with its Bankruptcy and the Adversary.

11.     In furtherance of this scheme, the Debtor has now removed the above-captioned Consolidated Superior Court Cases a second time (the "Removal").

12.     This Court was never designed to be either the Defendants' "home court" or to act as the first line of appeal for the Defendants from prior, adverse decisions made by the D.C. Superior Court, but allowing this case to continue here is exactly what this Court will become.

13.     The type of manipulative, procedural gamesmanship that the Defendants have engaged in should not be condoned by this Court.  This Court was established to hear legitimate core bankruptcy proceedings filed by legitimate debtors, with additional "related to" jurisdiction, all of which is sorely lacking here.

14.     In contrast, what we have here is a Debtor who was created solely as a siloed company for the purpose of filing bankruptcy.  Such entity was assigned, seemingly without consideration, two subordinate debts allegedly owed by the Claimants.  The Debtor seemingly fabricated a creditor and a receivable, which it utilized to get into bankruptcy in the first instance. When that case was dismissed and the Consolidated Superior Court Cases were properly remanded, the Debtor tried again.  This time, it pursued its Bankruptcy voluntarily, and immediately upon filing, filed the Adversary, in an effort to gain more of a foothold with this Court.

4

The Debtor has now sprinted past the line of reasonableness and again sought removal of the Consolidated Superior Court Cases.

15.     A quick peak behind the veil reveals the reality of this situation.  The reality is that WCP Fund and its related entities did not like its chances in the Consolidated Superior Court Cases.  As such, it has gone to extreme lengths to try to create bankruptcy jurisdiction, run up litigation costs for the Plaintiffs, and to try and entrench itself with this Court to have a second bite at the removal apple.

16.     The simplest solution here, which is supported by the Bankruptcy Code, the United States Code, the Bankruptcy Rules, and applicable case law, is to let the D.C. Superior Court finish the job is started and adjudicate the Consolidated Superior Court Cases.  Once the rights of the parties are adjudicated, the Bankruptcy and the Adversary, to the extent they even remain necessary, can be fast-tracked.  Enforcing the appropriate outcome here includes remanding the Consolidated Superior Court Cases to the Court which has been exercising jurisdiction over them for a substantial period of time – the D.C. Superior Court.

## **LEGAL ARGUMENTS**

17.     Permitting this Removal and not remanding the Consolidated Superior Court Cases requires that this Court suspend numerous rules and stretch the case law beyond reasonable interpretation.  From a global perspective, the only thing which has changed since the hearing held on May 8, 2025, when this Court previously remanded the Consolidated Superior Court Cases, is that the Debtor's case remains pending.  That fact does not change the numerous findings of this Court which justified remand. First, the Debtor, despite being well-aware of the existence of the Consolidated Superior Court Cases, missed the deadline for removal.  Second, mandatory abstention requires that these cases be remanded.  Finally, even if the Debtor somehow satisfied

each of these hurdles, which it cannot do, it would need to establish that permissive abstention is

not the more logical outcome here, which it clearly is.

## A.    Defendants' Notice of Removal is Untimely.

18.    The Debtor has not timely sought its Removal.  Fed. R. Bankr. P. Rule 9027(a)(2),

which governs the time for filing a notice of removal of a civil action that is pending before

commencement of a bankruptcy case, provides that:

> If the claim or cause of action in a civil action is pending when a
> case under the Code is commenced, a notice of removal may be filed
> only within the longest of (A) 90 days after the order for relief in the
> case under the Code, (B) 30 days after entry of an order terminating
> a stay, if the claim or cause of action in a civil action has been stayed
> under § 362 of the Code [11 USCS § 362], or (C) 30 days after a
> trustee qualifies in a chapter 11 reorganization case but not later than
> 180 days after the order for relief.

Fed. R. Bankr. P. 9027(a)(2).

19.    The Bankruptcy was filed on May 27, 2025.  Under Fed. R. Bank. P. 9027(a)(2),

any notice of removal should have been filed no later than August 25, 2025.  The Debtor is clearly

aware of the Consolidated Superior Court Cases and aware of the timing obligations for removal.

The Removal here was filed after that deadline and the Debtor did not otherwise seek to extend

such deadline.  The only reasonable assumption is that this delay was a tactic more so than a

necessity.  The Consolidated Superior Court Cases must be remanded for this reason alone and

such relief should be even more clear when considered in conjunction with the other procedural

defects.  *See In re Exchange Parts of America, Inc.*, 138 B.R. 585, 587 (Bankr. W.D. Ark. 1992)

(finding that court must remand removal not filed timely even though the litigation pertained to

property of the estate); *see also In re Jandous Elec. Const. Corp.*, 106 B.R. 48, 50 (Bankr. S.D.N.Y.

1989) (removal more than 90 days after Chapter 11 filing was time-barred).

## B.    Mandatory Abstention is Appropriate.

20.     Even if the Removal had been timely, the doctrine of mandatory abstention applies

because the claims in the Consolidated Superior Court Cases are non-core proceedings.  This Court

has expressed approval of the Third Circuit's distinction between core and non-core proceedings.

"Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under

title 11 are referred to as 'core' proceedings; whereas proceedings [that are only otherwise] 'related

to' a case under title 11 are referred to as 'non-core' proceedings."  *Va. Hosp. Ctr.-Arlington Health

Sys. v. Akl (In re Akl)*, 397 B.R. 546, 549 (Bankr. D.D.C. 2008) (*In re Combustion Eng'g, Inc.*, 391

F.3d 190, 225 (3d Cir. 2004)).

21.     With respect to mandatory abstention, 28 U.S.C. 1334(c)(2) provides that:

> Upon timely motion of a party in a proceeding based upon a State
> law claim or State law cause of action, related to a case under title
> 11 but not arising under title 11 or arising in a case under title 11,
> with respect to which an action could not have been commenced in
> a court of the United States absent jurisdiction under this section,
> the district *court shall abstain from hearing such proceeding if an
> action is commenced, and can be timely adjudicated, in a State
> forum of appropriate jurisdiction.*

28 U.S.C. 1334(c)(2) (italic emphasis added).

22.     As this Court noted at the hearing on May 8, 2025 [Adv. Proc. No. 24-10023], there

can be no dispute that the D.C. Superior Court can timely adjudicate the claims in the Consolidated

Superior Court Cases.  In fact, the only disruption to the timely adjudication of those claims was

the delay caused by the prior bankruptcy filings and the pending actions.  A jury trial was scheduled

to start on September 9, 2024 and had it not been for these proceedings, the rights of all parties

would have already been adjudicated.  The request for a jury trial also favors remand given this

Court's prior recognition that such consent is unlikely.  *See*  May 8, 2025 Hr'g [Adv. Proc. No. 24-

10023].   The D.C. Superior Court has also gained a much better familiarity with the claims and

7

issues in the Consolidated Superior Court Cases during the lengthy history of the cases.  As a result, this Court should abstain from hearing the Consolidated Cases under 28 U.S.C. 1334(c)(2).

23.     Even aside from such reasoning, the Debtor cannot meet its burden of showing that there is a core proceeding here. As an initial matter, the Consolidated Superior Court Cases are separate and apart from the Adversary.  While the outcome of the Consolidated Superior Court Cases may ultimately mean there is no asset to be pursued in the Adversary, such relationship is tangential at best.  What is more important, however, is that the "asset" sought in the Adversary does not meet the standard for a core proceeding.  In the Adversary, the Debtor asserts that the receivable allegedly due from the Claimants is property of the Debtor and subject to section 542. What the Debtor ignores, however, is the remainder of section 542(b) which provides that such receivable must be "matured, payable on demand, or payable on order [ie: uncontingent and liquidated]." 11 U.S.C. § 542.  Such debt must also be **<u>presently</u>** payable. *See Porter-Hayden Co. v. First State Mgmt. Group, Inc. (In re Porter-Hayden Co.)*, 304 B.R. 725, 732 (Bankr. D. Md. 2004) (quoting 5 Collier on Bankruptcy ¶ 542.03 n.1 (15th ed. rev. 2003)) (emphasis added). The terms 'matured, payable on demand, or payable on order' create a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor.' *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. August 14, 2007) (quoting *In re CIS Corp.*, 172 B.R. 748, 760 (S.D.N.Y. 1994)).  In short, section 542(b) is appropriate only when the contracting party is **"<u>unconditionally liable</u>."**  *See In re MF Glob., Inc.*, 531 B.R. 424, 437-38 (Bankr. S.D.N.Y. 2015) (emphasis added).  The alleged receivable is anything but that.  The Court can review the Consolidated Superior Court Cases and quickly determine that the Adversary is miles away from satisfying the applicable standard.  As an initial matter, the Claimants are the Plaintiffs

8

in the underlying Consolidated Superior Court Cases. Such cases arose because the Plaintiffs have valid lender liability claims against various parties and all efforts of the WCP Fund parties to rebut that assertion have been rejected to date. If the Claimants prevail, then the alleged receivable sought in the Adversary is worthless. In fact, the only reason the Debtor has engaged in these actions is because it was starting to become apparent that the Claimants were likely to prevail on their lender liability claims. Given that the alleged receivable is anything but certain, which section 542 of the Bankruptcy Code requires to impose jurisdiction, the Court must abstain.

**C.      Discretionary Abstention is Also Appropriate Here.**

24.      In the event this Court finds that the requirements for mandatory abstention are not satisfied, it should still exercise its discretion to abstain from adjudicating this case in the interests of comity and respect for state law pursuant to 28 U.S.C. § 1334(c)(1).

25.      Under 28 U.S.C. § 1334(c)(1), "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

26.      In evaluating whether permissive abstention is appropriate, courts have looked to a variety of factors, including but not limited to: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of applicable state law; (4) comity; (5) the degree of relatedness or remoteness to the proceeding in the main bankruptcy court; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed defendants. *See, e.g., In re Merry-Go-Round Enters., Inc.*, 222 B.R. 254, 257 (D. Md. 1998). In addition, if most of the factors have been established for mandatory abstention, "bankruptcy courts should give careful consideration to whether it would

be appropriate to exercise their discretion to abstain under section 1334(c)(1)."  *Frelin*, 292 B.R.

at 383 (citing *In re Williams*, 256 B.R. 885 (8th Cir. BAP 2001)).

27.     Abstention would provide the most efficient use of estate resources, and it would

prevent unjustified interference with the D.C. Superior Court's authority, and it would will have a

positive effect on the administration of the Debtor's bankruptcy estate.  The Consolidated Superior

Court Cases were filed significantly before the Adversary and the proceedings in the Consolidated

Superior Court Cases have already progressed far beyond the current status of the Adversary.  The

Claimants have already spent considerable time, energy, and resources in the Consolidated

Superior Court Cases.   Forcing the Claimants to essentially re-litigate its efforts in the

Consolidated Superior Court Cases in the Adversary Proceeding is duplicative and unnecessary.

Thus, abstention by the Court will serve the best interests of judicial economy.

28.     As mentioned previously, the Adversary presents state law claims that are already

being addressed in the Consolidated Superior Court Cases.  There are no issues presented under

the Adversary that are unique to bankruptcy law and any argument regarding jurisdictional basis

for the Adversary Proceeding is questionable at best.  The state law causes of action asserted by

all parties involved are best determined by the D.C. Superior Court – the court that routinely hears

such matters.  Thus, the interest of comity favors abstention.

29.     In addition, permissive abstention is appropriate because other than the transfer of

the underlying note and this Court's ruling in the prior proceedings, the Debtor would not be a

party to the Consolidated Superior Court Cases and would not be able to remove these cases to

this Court.   *See* 28 U.S.C. § 1452 ("**a party** may remove any claim or cause of action . . ..")

(emphasis added), *see also In re Providence Wireless, LLC*, 587 B.R. 858, 863-64 (Bankr. E.D.N.C.

2018); *In re Advance Iron Works, Inc.*, 495 B.R. 404, 410 (Bankr. S.D. Ill. 2013) (finding that

removal by debtor of proceeding to which it was not a party, even with consent, required remand). This reason alone warrants remand.

30.     Since the Consolidated Superior Court Cases generally involve non-debtor defendants, it should proceed regardless of the Debtor's bankruptcy filing. *See Frelin*, 292 B.R. at 385; *see also In re Grubbs Construction Co.*, 305 B.R. at 482. For these reasons, abstention is the most logical conclusion.

**D.      The Court Should Suspend All Deadlines.**

31.     To the extent the Court takes this Motion under advisement, it would be a waste of judicial resources for this Court to consider any pending motions or other matters if this case is going to be remanded to the D.C. Superior Court. For purposes of judicial economy alone, the Court should immediately issue an order under 11 U.S.C. §105(a) suspending the deadlines and hearings for all matters the Defendants are seeking to have this Court consider before a remand decision is made.

WHEREFORE, Plaintiffs request that the Court grant this Motion by: (a) remanding the Consolidated Superior Court Cases to the D.C. Superior Court; (b) requiring the Defendants to pay the Plaintiffs for the attorney's fees that they have incurred and will incur as a result of the Defendants' improper removal of the cases; (c) suspending all pending deadlines, if necessary; and (d) granting such other and further relief as may be deemed appropriate.

Dated: September 1, 2025                     **DEVELOPER RE1, LLC AND**
                                             **423 KENNEDY ST HOLDINGS, LLC**


                                             /s/ *Jeremy S. Williams*
                                             Jeremy S. Williams (DC 994825)
                                             KUTAK ROCK LLP
                                             1021 East Cary Street, Suite 810
                                             Richmond, Virginia 23219
                                             Telephone: (804) 644-1700
                                             Facsimile: (804) 783-6192

11

Email: jeremy.williams@kutakrock.com

and

James D. Sadowski (VSB No. 38326)
GREENSTEIN DELORME & LUCHS, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410
Email: jds@gdllaw.com

*Co-Counsel for Developer RE1, LLC and
423 Kennedy St Holdings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Local Rules of this Court, I hereby certify under penalty of perjury that on September 1, 2025, a true and correct copy of the foregoing Motion for Remand was served via the Court's CM/ECF system to all necessary parties.

*/s/ Jeremy S. Williams*
       Counsel

| | |
|---|---|
| **KUTAK ROCK LLP** | **GREENSTEIN DELORME & LUCHS, P.C.** |
| **KUTAK ROCK LLP** | James D. Sadowski (DC 446635) |
| Jeremy S. Williams (DC 994825) | Alexandria J. Smith (DC 1781067) |
| 1021 East Cary Street, Suite 810 | 801 17th Street, N.W., Suite 1000 |
| Richmond, Virginia 23219 | Washington, D.C. 20006 |
| Phone: (804) 644-1700; Fax: (804) 783-6192 | Phone: (202) 452-1400; Fax: (202) 452-1410 |
| *Co-Counsel for Developer RE1, LLC and* | |
| *423 Kennedy St Holdings, LLC* | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| JPK NEWCO, LLC, | ) | Case No. 25-00200 (ELG) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| DEVELOPER RE1, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 25-10037-ELG |
| | ) | State Court Case 2022-CAB-005935 |
| DP CAPITAL LLC, *et al,* | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |
| | ) | |
| 423 KENNEDY ST HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | State Court Case 2022-CAB-005935 |
| | ) | (State Court Cases Consolidated) |
| DP CAPITAL LLC, *et al,* | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

## PLAINTIFFS' STATEMENT THAT THEY DO NOT CONSENT
## TO THE ENTRY OF FINAL ORDERS OR JUDGMENT

Developer RE1, LLC ("RE1") and 423 Kennedy St Holdings, LLC ("423 Kennedy" and

together with RE1, the "Plaintiffs"), by counsel, file this statement under Fed. R. Bankr. P.

9027(e)(3).  Plaintiffs do not consent to this Court issuing any final orders or judgment as to the

removed cases.

Dated:  September 15, 2025

**DEVELOPER RE1, LLC AND 423
KENNEDY ST HOLDINGS, LLC,**

/s/ James D. Sadowski
James D. Sadowski (DC 446635)
Alexandria J. Smith (DC 1781067)
GREENSTEIN DELORME & LUCHS, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410
Email: jds@gdllaw.com

Jeremy S. Williams (DC 994825)
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia  23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: jeremy.williams@kutakrock.com

*Co-Counsel for Developer RE1, LLC and
423 Kennedy St Holdings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of September, 2025, a true copy of the foregoing
was served electronically and a Notice of Electronic filing should be sent to all persons receiving
notices via the Court's CM/ECF system.

/s/ James D. Sadowski
James D. Sadowski

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Proposed Special Counsel for*
*JPK NewCo LLC and Counsel*
*for all Other Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JPK NewCo LLC, | ) | Case No. 25-200-ELG |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | |
| JPK NewCo LLC; WCP Fund I LLC; SF NU, LLC | ) | |
| and Russell Drazin in his Official Capacity as | ) | |
| TrusteeUnder Two Deeds of Trust, | ) | |
| | ) | Adv. Case No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Developer RE1 LLC and 423 Kennedy St | ) | |
| Holdings LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Come now JPK NewCo LLC, debtor in possession ("JPK" or the "Debtor"),WCP Fund I

LLC ("WCP"); SF NU, LLC ("SNL"); and Russell Drazin in his official capacity as trustee under

two deeds of trust ("Mr. Drazin") (collectively, the "Plaintiffs" and each a "Plaintiff"), by and

through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7003 and Federal

1

Rule of Civil Procedure 3, and as and for their complaint against Developer RE1 LLC ("DRL")

and 423 Kennedy St Holdings LLC ("423 Kennedy") (collectively, the "Defendants" and each a

"Defendant") state as follows:

## Introduction

1.　　　Yesterday afternoon, JPK filed a voluntary petition for bankruptcy relief, with the

Debtor's two largest assets—promissory notes secured by correlative deeds of trust, on which the

Defendants are respectively bound—being the subject of legally meritless allegations.

2.　　　The Defendants are in manifest breach of the promissory notes held by JPK, having

committed myriad payment defaults over time, having permitted senior liens to accrue upon the

real estate serving as collateral, and having failed to pay both notes at maturity.

3.　　　Yet the Defendants, through a series of scurrilous and legally infirm allegations,

have prevented JPK from being able to collect upon these promissory notes, whether by

foreclosure or otherwise.

4.　　　These allegations include claims that JPK acquired the two promissory notes

through a fraudulent conveyance that ought to be avoided, thereby casting aspersions upon the

propriety of JPK's ownership of the notes and calling into question the asset composition of JPK's

bankruptcy estate.

5.　　　For JPK to effectively reorganize, the Debtor must (i) establish that it properly

holds both promissory notes, with all attendant rights under the correlative deeds of trust; (ii)

establish that neither promissory note is burdened by any claims for setoff; (iii) remove the cloud

the Defendants have placed upon the quality and enforceability of these debt instruments.

6.　　　Accordingly, JPK now brings this suit in an effort to (a) efficiently administer the

Debtor's estate; (b) liquidate claims the Defendants purport to hold against the Debtor's estate; (c)

pursue counterclaims against those who have asserted claims that now pend against the Debtor's estate; (d) facilitate the payment of debts that are property of the Debtor's estate; (e) establish JPK's acquisition of the at-issue promissory notes did not constitute a fraudulent conveyance; (f) determine the validity and extent of liens held by JPK on assets of the Defendants; and (g) ensure the promissory notes are orderly liquidated as assets of the Debtor's estate.

7.      The other Plaintiffs join in this suit, being persons (natural and legal) with a direct interest in the outcome of this litigation.

## Parties

8.      JPK is a District of Columbia limited liability company that is a debtor-in-possession in the above-captioned bankruptcy proceeding.

9.      WCP is a Delaware limited liability company.

10.     SNL is a New Mexico limited liability company.

11.     Mr. Drazin is a natural person who is a citizen of the District of Columbia by virtue of his ongoing domicile therein; he brings suit solely in his official capacity as trustee under two deeds of trust identified *infra*.

12.     DRL is a District of Columbia limited liability company.

13.     423 Kennedy is a District of Columbia limited liability company.

## Jurisdiction and Venue

14.     This Honorable Court enjoys jurisdiction over this suit, pursuant to the allowances of Section 1334 of Title 28 of the United States Code since (i) at least one cause of action set forth herein arises under Title 11 of the United States Code; (ii) at least one cause of action set forth herein arises in a case pending under Title 11 of the United States Code; and (iii) at least one cause of action set forth herein relates to a case pending under Title 11 of the United States Code.

15.     Venue is properly laid in this Honorable Court pursuant to Section 1409 of Title 28 of the United States Code since this is a case under Title 11 of the United States Code, arising in a case under Title 11 of the United States Code, and related to a case under Title 11 of the United States Code, with the correlative case pending in this Honorable Court.

**General Allegations: Loans**

16.     On December 23, 2021, WCP loaned $4,103,000.00 to DRL, with the loan being evidenced by promissory notes for $3,579,000.00 (the "First DRL Note") and $524,000.00 (the "Second DRL Note"), respectively.

17.     The DRL Promissory Notes are each secured by deeds of trust (collectively, the "DRL Deeds of Trust") on the real property commonly known as 5501 First Street, NW, Washington, DC 20011 (the "DRL Property").

18.     Four months later, on March 31, 2022, WCP loaned $9,945,693.00 to 423 Kennedy, with the loan being evidenced by promissory notes for $8,689,693.00 (the "First 423 Kennedy Note") and $1,256,000.00 (the "Second 423 Kennedy Note").

19.     The 423 Kennedy Notes are each secured by deeds of trust (collectively, the "423 Kennedy Deeds of Trust") on the real property commonly known as 419-423 Kennedy Street, NW, Washington, DC 20011 (the "423 Kennedy Property").

20.     On April 15, 2024, the Second 423 Kennedy Note and the accompanying 423 Kennedy Deed of Trust were assigned by WCP to JPK.

21.     Also on April 15, 2024, the Second DRL Note—which had previously been transferred from WCP to SNL—and the accompanying DRL Deed of trust were assigned by SNL to JPK.

4

## General Allegations: DRL Defaults

22.     Pursuant to the Second DRL Note, DRL was required to make monthly interest payments to the noteholder.

23.     DRL failed to timely make the monthly interest payment due on July 1, 2022, with the payment coming some thirteen days late.

24.     DRL failed to timely make the monthly interest payment due on October 1, 2022, with the payment coming some five days late.

25.     DRL failed to timely make the monthly interest payment due on November 1, 2022, with the payment coming some eight days late.

26.     Pursuant to the Second DRL Note, DRL was required to pay the Second DRL Note at maturity on December 24, 2022.

27.     DRL failed to pay the Second DRL Note at maturity and has failed to pay the note at all times since.

28.     The DRL Deeds of Trust require DRL to pay all taxes and obligations in a timely manner, so as to ensure there is no accrual of statutory liens senior to those of the lenders.

29.     DRL failed to pay water and sewer bills, causing a $44,857.93 lien to be placed upon the DRL Property in August 2022.

30.     DRL also failed to timely pay more than $16,700.00 in taxes on the DRL Property for the second half of 2022, causing another senior lien to accrue.

31.     DRL defaulted under the terms of the Second DRL Note and the DRL Deeds of Trust at least six times, with three defaults coming in the form of late interest payments, one default coming in the form of a failure to pay the note at maturity, and two defaults coming in the form of permitting senior liens to accrue on the DRL Property.

**General Allegations: 423 Kennedy Defaults**

32.     Pursuant to the Second 423 Kennedy Note, 423 Kennedy was required to make an interest payment of $12,560.00 on or before the first day of each month.

33.     423 Kennedy failed to timely make the monthly interest payment due on May 1, 2022, with the payment coming some 74 days late.

34.     423 Kennedy failed to timely make the monthly interest payment due on June 1, 2022, with the payment coming some 43 days late.

35.     423 Kennedy failed to timely make the monthly interest payment due on July 1, 2022, with the payment coming some 13 days late.

36.     423 Kennedy failed to timely make the monthly interest payment due on December 1, 2022, with the payment coming some seven days late.

37.     423 Kennedy failed to make the monthly interest payment due on January 1, 2023, with the payment having never been made.

38.     423 Kennedy failed to make the monthly interest payment due on February 1, 2023, with the payment having never been made.

39.     423 Kennedy failed to make the monthly interest payment due on March 1, 2023, with the payment having never been made.

40.     Pursuant to the Second 423 Kennedy Note, 423 Kennedy was required to pay the Second 423 Kennedy Note, in full, not later than March 31, 2023.

41.     The Second 423 Kennedy Note was not paid at maturity and remains unpaid.

42.     Pursuant to the 423 Kennedy Deeds of Trust, 423 Kennedy was to pay all obligations to third parties as they came due and ensure the 423 Kennedy Property remain free of municipal liens.

43.     On November 17, 2022, 423 Kennedy allowed a senior lien in favor of the District of Columbia Department of Buildings to accrue on the 423 Kennedy Property.

44.     In total, 423 Kennedy defaulted under the Second 423 Kennedy Note and the 423 Deeds of Trust some nine times, with four defaults coming in the form of late interest payments, three defaults coming in the form of interest payments being missed altogether, one default coming in the form of a failure to pay the debt at maturity, and one default coming in the form of allowing a municipal lien to erode that of the lender's from above.

**General Allegations: Defendants' Allegations and
Impact on the Debtor's Estate and Reorganization**

45.     After defaulting under both the Second 423 Kennedy Note and the Second DRL Note multiple times, both Defendants elected to make a series of allegations aimed at eliminating—or at least minimizing—their respective monetary obligations to the noteholders, endeavoring to stave off a foreclosure of the assets securing these promissory notes.

46.     The crux of the Defendants' allegations is as follows:

a.      The noteholders ceased voluntarily forbearing from exercising collection rights under the respective loan documents after Daniel Huertas ("Mr. Huertas"), the principal of WCP, had a disagreement with Mel Negussie ("Mr. Negussie"), the principal of both Defendants;

b.      The noteholders were unjustified in electing to enforce the plain terms of the loan documents based on the disagreement with Mr. Negussie and, instead, were legally bound to forbear from so doing for an ill-defined period of time;

c.      By enforcing the plain terms of the loan documents—including the terms governing default interest—the noteholders made a refinancing the subject debt unfeasible in nature;

       d.     Mr. Drazin, as trustee under the deeds of trust securing the Second DRL Note and the Second 423 Kennedy Note, had an independent obligation to investigate the merits of the alleged defaults and to conduct a fact-finding inquiry before scheduling foreclosure sales;

       e.     Mr. Drazin, as an attorney who represents WCP, is forbade from serving as trustee under any deeds of trust securing debts owed to WCP; and

       f.     When the Second DRL Note and the Second 423 Kennedy Note were conveyed to JPK, such constituted a fraudulent conveyance on account of being a series of actions meant to hinder, delay or defraud creditors of WCP and/or SNL.

47.     By making these allegations, the Defendants have cast a cloud over the enforceability and marketability of the Second DRL Note and the Second 423 Kennedy Note.

48.     In light of these allegations, there is a suggestion that the Debtor's two largest assets are, in fact, the byproduct of an avoidable fraudulent conveyance (or, as it is, two avoidable fraudulent conveyances) and may be accordingly removed from the Debtor's bankruptcy estate.

49.     In light of these allegations, Mr. Drazin—as the trustee under the deeds of trust securing the promissory notes held by the Debtor in this bankruptcy case—cannot proceed to exercise his obligations thereunder without inviting undue legal risk.

50.     In light of these allegations, the Debtor cannot market the Second DRL Note or the Second 423 Kennedy Note to a potential buyer of distressed paper, as part of JPK's efforts to reorganize, without suffering the deleterious impact of a discount that will be assigned to negotiable paper subsumed in the Defendants' allegations.

51.     In light of these allegations, a purchaser of the DRL Property and/or the 423 Kennedy Property, at a foreclosure auction, would be less likely to pay a market-appropriate sum

for the assets, instead being compelled to discount any acquisition cost in accord with the likelihood of litigation ensuing.

### Count I – Turnover (11 U.S.C. § 542(b))
### JPK v. DRL

52.     JPK incorporates, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

53.     As of May 13, 2025, DRL is lawfully indebted to JPK, in the sum of $911,426.88, pursuant to the Second DRL Note, with interest accruing thereunder.

54.     The Second DRL Note is matured.

55.     DRL is thusly legally bound to pay to JPK, as debtor-in-possession, the sum of $911,426.88, plus hereafter accrued interest and hereafter incurred legal fees and expenses of collection, except to the extent of any setoff.

WHEREFORE, JPK respectfully prays this Honorable Court (i) enter judgment in favor of JPK, and against DRL, in the sum of $911,426.88, together with all pre-judgment interest and legal fees; and (ii) afford such other and further relief as may be just and proper.

### Count II – Turnover (11 U.S.C. § 542(b))
### JPK v. 423 Kennedy

56.     JPK incorporates, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

57.     As of May 13, 2025, 423 Kennedy is lawfully indebted to JPK, in the sum of $2,169,087.98, pursuant to the Second 423 Kennedy Note, with interest accruing thereunder.

58.     The Second 423 Kennedy Note is matured.

59.     423 Kennedy is thusly legally bound to pay to JPK, as debtor-in-possession, the sum of $2,169,087.98, plus hereafter accrued interest and hereafter incurred legal fees and expenses of collection, except to the extent of any setoff.

WHEREFORE, JPK respectfully prays this Honorable Court (i) enter judgment in favor of JPK, and against 423 Kennedy, in the sum of $2,169,087.98, together with all pre-judgment interest and legal fees; and (ii) afford such other and further relief as may be just and proper.

### Count III – Declaratory Relief as to Trustee's Duties (28 U.S.C. § 2201)
### JPK and Mr. Drazin v. 423 Kennedy and DRL

60.     JPK and Mr. Drazin incorporate, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

61.     Mr. Drazin is the trustee under the deeds of trust securing the Second DRL Note and the Second 423 Kennedy Note.

62.     JPK has been assigned all rights under the Second DRL Note and the Second 423 Kennedy Note, including all rights under the correlative deeds of trust.

63.     There exists an actual controversy between and amongst (i) JPK and Mr. Drazin, on the one hand; and (ii) DRL and 423 Kennedy, on the other hand, insofar as (a) JPK and Mr. Drazin maintain that, under District of Columbia law, a trustee serving under a deed of trust is only obligated to follow the terms of the subject deed of trust and the statutory laws of the District of Columbia, while (b) DRL and 423 Kennedy maintain that such a trustee must, instead, conduct an independent investigation into the veracity of any alleged breach of loan documents and undertake a correlative fact-finding inquiry before proceeding to conduct a foreclosure auction.

64.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the administration of JPK's bankruptcy estate, since JPK wishes to explore a foreclosure of the DRL Property and the 423 Kennedy Property as part of a plan of reorganization.

65.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the administration of JPK's bankruptcy estate, since Mr. Drazin will not conduct a foreclosure auction to collect upon the Second DRL Note and the Second 423 Kennedy Note for so long as doing so would expose him to undue risk of litigation.

WHEREFORE, JPK and Mr. Drazin respectfully pray this Honorable Court (i) declare a trustee serving under a deed of trust, in the District of Columbia, has only those obligations established in the trust instrument itself and arising under District of Columbia statutory law; and (ii) afford such other and further relief as may be just and proper.

### Count IV – Declaratory Relief as to Trustee's Service (28 U.S.C. § 2201)
### JPK and Mr. Drazin v. 423 Kennedy and DRL

66.     JPK and Mr. Drazin incorporate, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

67.     Mr. Drazin is the trustee under the deeds of trust securing the Second DRL Note and the Second 423 Kennedy Note.

68.     JPK has been assigned all rights under the Second DRL Note and the Second 423 Kennedy Note, including all rights under the correlative deeds of trust.

69.     There exists an actual controversy between and amongst (i) JPK and Mr. Drazin, on the one hand; and (ii) DRL and 423 Kennedy, on the other hand, insofar as (a) JPK and Mr. Drazin maintain that, under District of Columbia law, an attorney representing a noteholder may simultaneously serve as trustee under a deed of trust securing the subject note, with such being common practice and a vital efficiency of the local negotiable paper industry, while (b) DRL and 423 Kennedy maintain that an attorney representing a noteholder is forbade from also serving as a trustee under a deed of trust securing any debt owed to the noteholder.

11

70.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the administration of JPK's bankruptcy estate, since JPK wishes to explore a foreclosure of the DRL Property and the 423 Kennedy Property as part of a plan of reorganization.

71.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the administration of JPK's bankruptcy estate, since Mr. Drazin will not conduct a foreclosure auction to collect upon the Second DRL Note and the Second 423 Kennedy Note for so long as doing so would expose him to undue risk of litigation.

WHEREFORE, JPK and Mr. Drazin respectfully pray this Honorable Court (i) declare an attorney representing a noteholder, in the District of Columbia, may serve as trustee under a deed of trust securing the subject promissory note; and (ii) afford such other and further relief as may be just and proper.

### Count V – Declaratory Relief as to Foreclosure (28 U.S.C. § 2201)
### JPK v. 423 Kennedy and DRL

72.     JPK incorporates, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

73.     Pursuant to the plain terms of the Second DRL Note and the Second 423 Kennedy Note, each Defendant was to make monthly payments, in a timely fashion, to the noteholder.

74.     Pursuant to the plain terms of the Second DRL Note and the Second 423 Kennedy Note, each Defendant was to pay the correlative note, in full, at maturity.

75.     Pursuant to the plain terms of the DRL Deeds of Trust and the 423 Kennedy Deeds of Trust, the Defendants were required to pay all taxes and obligations in a timely manner, so as to ensure no statutory liens accrue upon the collateral securing the correlative promissory notes.

76.     DRL and 423 Kennedy habitually violated these obligations under the promissory notes and deeds of trust.

77.     None of the at-issue promissory notes or deeds of trust require the sending of any default notice.

78.     None of the at-issue promissory notes or deeds of trust afford any opportunity to cure.

79.     Even if there existed an opportunity to cure, numerous monetary breaches remain extant as of the filing of this Complaint.

80.     The deeds of trust provide that, upon the occurrence of a default, the respective Defendants' properties may be sold at foreclosure auction "upon the instruction of the Beneficiary," by the trustee serving thereunder.

81.     There exists an actual controversy between and amongst JPK and the Defendants, insofar as (i) JPK maintains these habitual breaches of the Second DRL Note, the Second 423 Kennedy Note, and the correlative deeds of trust, to give rise to foreclosure of the assets securing those deeds of trust, whereas (ii) the Defendants maintain the terms of the loan documents are not enforceable and commercial instruments should be governed by a standard akin to that governing consumer loan documents.

82.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the administration of JPK's bankruptcy estate, since JPK needs to know if it may foreclose upon the DRL Property and/or the 423 Kennedy Property as part of an effort to retire the Second DRL Note and/or the Second 423 Kennedy Note and to thereby make funds available for distribution to creditors.

83.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the determination of the validity and extent of the liens created by the deeds of trust securing the promissory notes.

84.     This controversy is within the jurisdiction of this Honorable Court as such directly

bears upon the ability of JPK to liquidate the Second DRL Note and the Second 423 Kennedy note,

both of which are assets of JPK's bankruptcy estate.

WHEREFORE, JPK respectfully prays this Honorable Court (i) declare DRL to be in

breach of the Second DRL Note; (ii) declare 423 Kennedy to be in breach of the Second 423

Kennedy Note; (iii) declare DRL to be in breach of the DRL Deeds of Trust; (iv) declare 423

Kennedy to be in breach of the 423 Kennedy Deeds of Trust; (v) declare JPK to be entitled to

direct the trustee, under the DRL Deeds of Trust and the 423 Kennedy Deeds of Trust, to foreclose

upon the DRL Property and the 423 Kennedy Property; and (vi) afford such other and further relief

as may be just and proper.

### Count VI – Declaratory Relief as to Defaults (28 U.S.C. § 2201)
### JPK v. 423 Kennedy and DRL

85.     JPK incorporates, by reference, each and every preceding paragraph of this

Complaint, as though fully set forth herein.

86.     Pursuant to the Second DRL Note and the Second 423 Kennedy Note, time is of

the essence with regard to all obligations thereunder.

87.     The former holder of the Second DRL Note and the Second 423 Kennedy Note

forbore from exercising various rights and remedies thereunder, following the initial breaches by

the Defendants, until such a time as the former holder was no longer inclined to gratuitously

forebear.

88.     There exists an actual controversy between and amongst JPK and the Defendants,

insofar as (i) JPK maintains there is no duty to gratuitously forebear from exercising remedies

under debt instruments and such forbearance, if briefly exercised, cannot constitute a waiver in

connection with debt instruments for which time is of the essence; while (ii) the Defendants

14

maintain a lender is legally bound to gratuitously forbear from exercising remedies under debt instruments until such a time as a borrower is able to refinance the debt obligations at pre-default interest rates.

89.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon computation of any setoffs that may impact the debt owed by the Defendants to JPK and the Defendants' legal obligation, under Section 542 of Title 11 of the United States Code, to pay that debt to the Debtor's bankruptcy estate.

90.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the allowance or disallowance of claims against JPK's bankruptcy estate.

91.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the validity, *vel non*, of a counterclaim the Defendants assert against JPK's estate.

92.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the sum for which JPK's bankruptcy estate may liquidate the Second DRL Note and the Second 423 Kennedy Note.

WHEREFORE, JPK respectfully prays this Honorable Court (i) declare the holder of the Second DRL Note to have no obligation to forbear from collecting thereunder upon the occurrence of a default by DRL; (ii) declare the holder of the Second 423 Kennedy Note to have no obligation to forbear from collecting thereunder upon the occurrence of a default by 423 Kennedy; (iii) declare DRL to be in breach of the Second DRL Note; (iv) declare 423 Kennedy to be in breach of the Second 423 Kennedy Note; (v) declare there to be no setoff against the debt owed on the Second DRL Note; (vi) declare there to be no setoff against the debt owed on the Second 423 Kennedy Note; and (vii) afford such other and further relief as may be just and proper.

**Count VII – Declaratory Relief as to Fraudulent Conveyance (28 U.S.C. § 2201)**
**JPK, WCP and SNL v. 423 Kennedy and DRL**

93.     JPK incorporates, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

94.     The Defendants have alleged JPK obtained the Second DRL Note and the Second 423 Kennedy Note through a fraudulent transfer that may be avoided under District of Columbia law.

95.     Specifically, the Defendants have posited that transferring the debt instruments to JPK, after the Defendants made various allegations against WCP and SNL, constituted an action to hinder or delay the Defendants' pursuit of tort claims.

96.     Specifically, the Defendants have posited that JPK was insolvent when it received the promissory notes.

97.     There exists an actual controversy between and amongst (i) JPK, WCP and SNL, on the one hand, and (ii) the Defendants, on the other hand, insofar as (a) JPK, WCP and SNL maintain that a note holder is free to transfer a promissory note at any time, whereas (b) the Defendants maintain that if *in rem* claims are asserted against an asset, there exists a *de facto* prohibition on transference of the troubled asset.

98.     There exists an actual controversy between and amongst (i) JPK, WCP and SNL, on the one hand, and (ii) the Defendants, on the other hand, insofar as (a) JPK, WCP and SNL maintain District of Columbia law only considers the solvency of the transferor, not the transferee, in assessing whether a transaction amounts to a fraudulent conveyance; whereas (b) the Defendants maintain that transfer of an asset to an insolvent transferee is fraudulent and avoidable under District of Columbia law.

16

99.     This controversy is within the jurisdiction of this Honorable Court as such directly bears upon whether the Second DRL Note and the Second 423 Kennedy Note may be administered as part of the Debtor's estate.

100.    This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the allowance or disallowance of claims against the Debtor's estate.

101.    This controversy is within the jurisdiction of this Honorable Court as such directly bears upon whether the Debtor may be ordered to turn over to WCP and/or SNL assets that are scheduled as property of the Debtor's estate.

102.    This controversy is within the jurisdiction of this Honorable Court as this is a proceeding to determine whether or not a fraudulent conveyance has occurred.

WHEREFORE, JPK, WCP and SNL respectfully pray this Honorable Court (i) declare JPK's acquisition of the Second DRL Note to not constitute a fraudulent conveyance under District of Columbia law; (ii) declare JPK's acquisition of the Second 423 Kennedy Note to not constitute a fraudulent conveyance under District of Columbia law; and (iii) afford such other and further relief as may be just and proper.

### Count VII – Declaratory Relief as to Validity of Loan Documents (28 U.S.C. § 2201) JPK and WCP v. 423 Kennedy and DRL

103.    JPK incorporates, by reference, each and every preceding paragraph of this Complaint, as though fully set forth herein.

104.    The Defendants have alleged the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust to be unenforceable on the basis that they each contain illicit liquidated damages clauses.

105.    JPK does not believe the loan documents contain liquidated damages provisions, much less illegal liquidated damages provisions.

17

106.    There exists an actual controversy between and amongst JPK and the Defendants, insofar as (i) JPK maintains the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust to be valid and lawful instruments that may be enforced in accord with their express terms; and (ii) the Defendants maintain the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust to be unenforceable, in part or whole, on the basis that the documents contain unenforceable liquidated damages provisions.

107.    This controversy is within the jurisdiction of this Honorable Court as such directly bears upon whether the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust may be administered as part of the Debtor's estate.

108.    This controversy is within the jurisdiction of this Honorable Court as such directly bears upon the validity and extent of the liens held by JPK.

WHEREFORE, JPK respectfully prays this Honorable Court (i) declare the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust to be valid and enforceable debt instruments; (ii) declare the Second DRL Note, the Second 423 Kennedy Note, the DRL Deeds of Trust, and the 423 Kennedy Deeds of Trust to not contain unenforceable provisions for liquidated damages; and (iii) afford such other and further relief as may be just and proper.

*[Signature on Following Page]*

18

Respectfully submitted,

Dated: May 28, 2025

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Proposed Special Counsel for*
*JPK NewCo LLC and Counsel*
*for all Other Plaintiffs*

GREENSTEIN DELORME & LUCHS, P.C.
James D. Sadowski (DC Bar #446635)
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax (202) 452-1410
Email: jds@gdllaw.com; ajs@gdllaw.com
*Counsel for Defendants Developer RE1 LLC and*
    *423 Kennedy St Holdings LLC*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In Re:<br><br>JPK NEWCO, LLC,<br><br>    *Debtor.* | Case No.:  25-00200-ELG<br><br>Purported Chapter 11 |
| JPK NEWCO, LLC, ET AL.,<br><br>    *Plaintiffs,*<br><br>v.<br><br>DEVELOPER RE1, LLC. ET AL.,<br><br>    *Defendants.* | Adv. Pro. No. 25-10015-ELG |

## DEFENDANTS' MOTION TO STAY AND TO SUSPEND ALL DEADLINES

The Defendants, Developer RE1 LLC ("Developer RE1") and 423 Kennedy St Holdings

LLC ("423 Kennedy") (collectively, "Borrowers"), move to stay this case and to suspend all

deadlines until after this Court first determines whether it has jurisdiction and whether the

underlying Chapter 11 case filed by JPK NewCo LLC ("JPK NewCo") was filed in bad faith.

## CONDENSED FACTUAL BACKGROUND

1.      As this Court knows from a different adversary proceeding, the Plaintiffs in this case, the WCP Fund I, LLC ("WCP Fund'), SF NU, LLC ("SF NU"), and Russell Drazin are a subset of the defendants in a prior adversary proceeding that this Court recently remanded to the D.C. Superior Court based upon mandatory and permissive abstention.  *See generally Developer RE1, et al. v. DP Capital, LLC d/b/a Washington Capital Partners, LLC, et al.,* Case No. 24-AP-10023-ELG (also known as D.C. Superior Court Case. No. 2002-CAB-005935) (the "Remanded Cases").

2.      The remand decision was made at a hearing on May 8, 2025, with a subsequent order issued on May 12, 2025.  *See* ECF ## 63-64 in 24-AP-10023-ELG.

3.      On May 27, 2025 at 8:19 am, the D.C. Superior Court issued a short order in one of the Remanded Cases transferring the 423 Kennedy Case from Judge Shana Frost Martini to Judge Ebony Scott, the original judge assigned to the cases when they were consolidated in June of 2024.  Simultaneously with the issuance of the short order, the D.C. Superior Court issued notices in the Remanded Cases setting a status conference before Judge Scott on June 27, 2025.

4.      On May 27, 2025 at 5:16 pm, within hours of the D.C. Superior Court issuing the short order and setting a status conference in the Remanded Cases, JPK NewCo filed a voluntary petition under Chapter 11 with this Court.  *See* ECF # 1 filed in *In Re JPK NewCo,* 25-00200-ELG ("*JPK NewCo II*").

5.      On May 30, 2025, even though only JPK NewCo, one of six defendants in the Remanded Cases, had sought bankruptcy protection, counsel for the Plaintiffs filed a Suggestion of Stay in the Remanded Cases stating that "continuation of this suit would offend the provisions

of Section 362 of Title 11 of the United States Code cited *supra* and, as such, *this case* is stayed

by operation of law." (italic emphasis in "this case" added).

6.       Counsel for the Plaintiffs is a very experienced bankruptcy lawyer who knows

full well that the protections of the automatic stay under 11 U.S.C. § 362 afforded to *a debtor* do

not apply to all defendants and all claims in a civil case just because one defendant in the case

has sought bankruptcy protection, yet he "suggested" that the D.C. Superior Court stay the entire

case as to all claims and all defendants in the Remanded Cases.

7.       On June 13, 2025, the Borrowers filed a Response to the Suggestion of Stay in

which they objected to a stay of the Remanded Cases case as to any claims not involving JPK

NewCo.  A copy of that response is attached as Exhibit 1 and incorporated by reference.

8.       On June 18, 2025, Judge Scott issued an order staying the Remanded Cases.  As

a result, yet another bankruptcy-related roadblock has been deliberately put in place by the

Plaintiffs here to prevent the Borrowers from taking depositions and completing discovery in the

Remanded Cases.

9.       On June 23, 2025, the Borrowers filed a Motion to Dismiss Chapter 11 Petition

Filed in Bad Faith seeking a dismissal of *JPK NewCo II* for "cause" under 11 U.S.C. 1112(b).

*See* ECF #19 filed in 25-00200 (the "Motion to Dismiss").

<u>THE LEGAL BASIS FOR THE MOTIONS</u>

10.       Because brevity is the heart of good pleading, the Borrowers incorporate by

reference the facts and legal arguments set forth in the Motion to Dismiss and in Exhibit 1.  In a

nutshell, the Motion to Dismiss describes how the Plaintiffs here colluded to create federal

jurisdiction to gain a tactical advantage and to try to overturn and avoid decisions that they had

lost, or were losing, in D.C. Superior Court.  *See generally* the Motion to Dismiss.

3

11.     The Court has the inherent and statutory authority to issue orders to control its
docket and to extend response deadlines in an adversary proceeding. *See* 11 U.S.C. §105(a)
("The court may issue any order, process, or judgment that is necessary or appropriate to carry
out the provisions of this title."); *see also* LBR 7012-2 (providing for the extension of deadlines
in an adversary proceeding).

12.     This Court should not be hearing any issues in an adversary proceeding whose
jurisdiction is alleged to be dependent upon *JPK NewCo II* until after a decision is made on the
Motion to Dismiss.  The Court took this exact approach when the validity of the prior,
involuntary Chapter 11 petition involving JPK New Co was subject to similar a motion to
dismiss filed by the U.S. Trustee's Office.  *See* ECF #37 in 24-00262-ELG ("*JPK NewCo I*")
(U.S. Trustee's motion to dismiss *JPK NewCo I* for cause under 11 U.S.C. § 1112(b)) *see also*
ECF # 24 in Adv. P. 23-10023-ELG (continuing all pending motions while the motion to dismiss
*JPK NewCo I* was pending).

## STATEMENT OF NO CONSENT
### TO THE ENTRY OF FINAL ORDERS AND/OR JUDGMENTS

13.     The claims in this adversary proceeding involve purely state law claims.

14.     A bankruptcy judge may resolve non-core proceedings only if the parties
consent.  *See* 28 U.S.C. § 157(c)(1)-(2).

15.     Pursuant to LBR 7012-1 and Fed. R. Bankr. P. 7012(b), the Borrowers state that
they do not consent to the entry of finals orders and/or judgments by this Court.

16.     This Court should not be resolving what are clearly non-core proceedings that
the Plaintiffs are attempting to forum shop to this Court before this Court has had any chance to
determine whether it even has jurisdiction, and/or whether it should abstain from hearing this
case for the same reasons that it previously abstained from hearing the Remanded Cases.

CONCLUSION

For these reasons, and for any reasons that may be advanced at the hearing on July 30,

2025, the Borrowers request that the Court stay this case and suspend the Borrowers' response

deadlines until after the Motion to Dismiss is decided.  The Borrowers reserve their rights to file

a motion seeking abstention, and/or to respond to the Complaint, and/or to raise any and all

additional defenses that exist, of which there are many, if the Court denies the Motion to

Dismiss.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  June 27, 2025              /s/ James D. Sadowski
                                   James D. Sadowski (DC Bar #446635)
                                   Alexandria J. Smith (DC Bar #1781067)
                                   801 17th Street, N.W., Suite 1000
                                   Washington, D.C.  20006
                                   Phone: (202) 452-1400; Fax: (202) 452-1410
                                   Emails:  jds@gdllaw.com; ajs@gdllaw.com
                                   *Counsel for Defendants Developer RE1 LLC
                                      and 423 Kennedy St. Holdings LLC*


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2025, a true copy of the foregoing

Defendants' Motion to Stay and Suspend All Deadlines was served electronically and a Notice of

Electronic filing should be sent to all persons receiving notices via the Court's CM/ECF system.

/s/ James D. Sadowski
James D. Sadowski

5

eFiled
6/13/2025 4:48:17 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

DEVELOPER RE1, LLC AND
423 KENNEDY ST HOLDINGS, LLC,

    *Plaintiffs*,

v.

DP CAPITAL, LLC D/B/A WASHINGTON
CAPITAL PARTNERS, ET AL.,

    *Defendants*.

Case No. 2022-CAB-005935
Judge Ebony Scott
Next Event: Remote Status Hearing
June 27, 2025 (10:00 a.m.)

## PLAINTIFFS' RESPONSE TO SUGGESTION OF STAY

The Plaintiffs, Developer RE1 LLC ("Developer RE1") and 423 Kennedy St Holdings,

LLC ("423 Kennedy"), by counsel, file this response to the Suggestion of Stay filed by the

Defendants on May 28, 2025. For convenience, Developer RE1 and 423 Kennedy will be

referred to as the "Borrowers".

    1.    Defendant JPK NewCo, LLC ("JPK NewCo") is now a defendant in this case.

The Defendants created JPK NewCo for multiple improper purposes. The first improper purpose

was to create an issue that Defendant SF NU, LLC ("SF NU") could use -- the failure to join an

indispensable party -- to file a motion to dismiss as a means of delaying this case. The second

improper purpose JPK NewCo was created was so that the Defendants could delay their

depositions and their employees' depositions (noticed for July 8-9, 2024) and the trial in this case

(set for September 9, 2024).

    2.    JPK NewCo is not really a separate, independent company. JPK NewCo is co-

owned by Defendants WCP Fund I, LLC ("WCP Fund") and SF NU, with the WCP Fund

holding a controlling interest.

3.      Defendant Daniel Huertas controls the corporate Defendants in this case.

4.      The Defendants intentionally caused JPK NewCo, which had no cash or funding, to become insolvent by borrowing money – a $50,000 loan (evidenced by a promissory note) from a friend of Mr. Huertas named Shaheen Sariri.  The Defendants knew that JPK NewCo could not pay back, and would not pay back, the loan from Mr. Sariri.

5.      After the first payment due under the loan was not made to Mr. Sariri, the Defendants arranged for JPK NewCo to become a debtor in an involuntary Chapter 11 bankruptcy case by using Mr. Sariri as the straw man to initiate that proceeding.  With JPK NewCo in bankruptcy, the Defendants could argue that all of the claims in this case should be heard by the bankruptcy court.  The involuntary Chapter 11 case is *In Re: JPK NewCo, LLC,* Case No. 24-0026-ELG ("*JPK NewCo I*").

6.      Put another way, the Defendants were unhappy with this Court's prior rulings, and with litigating the claims in this case in the D.C  Superior Court,[1] so they created a phony company that had no business purpose, moved limited assets over to that company, then arranged for JPK NewCo to make a loan they knew would not be repaid in order the create the appearance that JPK NewCo was a legitimate company that needed bankruptcy protection.  Once the claims in this case were under bankruptcy court jurisdiction, the plan was for the Defendants to try to undo, and overturn, multiple prior decisions that this Court had already made.

7.      The Defendants' manufactured bankruptcy case scheme was exposed after representatives of the U.S. Trustee's office interviewed Mr. Huertas, JPK NewCo's representative, at the initial debtor interview of JPK NewCo.  During that interview, the U.S.

---

[1]    The removal of these cases ensured that the September 9, 2024 trial date -- a trial date that this Court specially set and reserved at the Defendants' request outside of its normal scheduling procedures -- would not take place.

2

Trustee's office learned that JPK NewCo was a sham company that existed only on paper.  JPK

NewCo had no employees, no operating expenses, and it did not conduct any legitimate business.

As a result, the U.S. Trustee's Office filed a motion to dismiss *JPK NewCo I* for being filed in

bad faith.  A copy of that motion, which summarizes the Defendants' scheme, is attached as

Exhibit A.

8.      In *JPK NewCo I*, the Plaintiffs filed a Motion to Remand this case back to this

Court.  Judge Elizabeth Gunn denied that motion without prejudice, in part because she was not

sure whether *JPK NewCo I* would be dismissed as being filed in bad faith.

9.      Even though the issue of whether *JPK NewCo I* was filed in bad faith was set for

a two-day evidentiary hearing, that issue did not get decided.  Instead, on February 25, 2025,

*JPK NewCo I* was dismissed by an agreed order based upon JPK NewCo's failure to pay

required fees to the U.S. Trustee.

10.     After *JPK NewCo I* was dismissed, the Plaintiffs filed a Renewed Motion for

Remand, which was set for a hearing on May 15, 2025.  At that hearing, Judge Elizabeth Gunn

determined that these cases should be remanded back to this Court.

11.     On May 27, 2025, about two weeks after the remand order, and the same day that

this Court issued a notice of remote hearing, JPK New Co filed a new Chapter 11 bankruptcy

case known as *In Re JPK NewCo LLC,* Case No. 25-10015-ELG ("*JPK NewCo II*").

12.     The Borrowers will soon be filing a motion to dismiss *JPK NewCo II* for being

filed in bad faith because the Defendants are again misusing, and abusing, the bankruptcy court

process for improper purposes.

13.     The U.S. Trustee's office has not yet decided whether it will be filing a motion to

dismiss *JPK NewCo II* for being filed in bad faith.

3

14.     The Defendants are trying again to improperly forum shop the claims in this case away from D.C. Superior Court.  The day after *JPK NewCo II* was filed, several of the Defendants here filed an adversary proceeding in the U.S. Bankruptcy Court against the Borrowers asserting claims that are based upon the same facts, the same loan documents, and similar issues in this case.  *See JPK NewCo, LLC. et al., v. Developer RE1, LLC and 423 Kennedy St Holdings, LLC,* Case. No. 25-10015-ELG.  This filing is part of a continuing pattern of the Defendants using their superior economic resources to bury the Borrowers with both duplicative litigation and legal expenses.

15.     By operation of federal law, even though *JPK NewCo II* is a manufactured bankruptcy case filed by a phony company for improper purposes in bad faith, the claims in this case as to JPK NewCo must be stayed by the automatic stay provisions of 11 U.S.C. § 362. However, no other defendant in this case is a debtor in a pending bankruptcy case.  The automatic stay provisions apply only to a debtor in a pending bankruptcy case, not to any co-defendants, so this case should not be stayed as to any defendant other than JPK New Co.

16.     The Borrowers request that the Court let this case move forward, and not stay the case, as to any defendant except JPK NewCo.

17.     The Borrowers will provide the Court with an update on the status of *JPK NewCo II* at the remote Status Hearing set for June 27, 2025.

8161\0002\4929-6867-4382

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: June 13, 2025                    /s/ James D. Sadowski
                                        Alexandria J. Smith (D.C. Bar. No. 1781067)
                                        James D. Sadowski (D.C. Bar No. 446635)
                                        801 17th Street, NW, Suite 1000
                                        Washington, DC 20006
                                        Telephone: (202) 452-1400
                                        Email: jds@gdllaw.com
                                        *Counsel for Plaintiffs Developer RE1 LLC and 423
                                        Kennedy S. Holdings, LLC*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 13th day of June 2025 a copy of the Plaintiffs' Response to

Suggestion of Stay was filed using the Court's electronic filing system (eFileDC) and a notice of

electronic filing should be served on all counsel of record.

/s/ James D. Sadowski
James D. Sadowski

5

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re: | Case No.:  25-00200-ELG |
| JPK NEWCO, LLC, | Purported Chapter 11 |
| *Debtor.* | |
| | |
| JPK NEWCO, LLC, ET AL., | |
| *Plaintiffs,* | |
| v. | Adv. Pro. No. 25-10015-ELG |
| DEVELOPER RE1, LLC. ET AL., | |
| *Defendants.* | |

**NOTICE OF HEARING AND OPPORTUNITY TO OBJECT TO
DEFENDANTS' MOTION TO STAY AND TO SUSPEND ALL DEADLINES**

NOTICE IS HEREBY GIVEN that Developer RE1, LLC ("RE1") and 423 Kennedy St Holdings, LLC ("423 Kennedy") (collectively the "Borrowers"), by undersigned counsel, have filed a Motion to Stay and to Suspend All Deadlines ("Motion to Stay). The Motion to Stay seeks a stay of this case and the suspension of all deadlines.

<u>YOUR RIGHTS MAY BE AFFECTED.</u>  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one).

NOTICE OF DEADLINE TO OBJECT:  If you do not want the court to grant the motions, or if you want the Court to consider your views on the motions, then on or before **July 23, 2025,** you or your attorney must file with the Court a written objection to the motions, together with the proposed order required by Local Bankruptcy Rule 9072-1.  The objection and

8161\0002\4925-2923-2465.v1

proposed order must be filed with the Clerk of the Bankruptcy Court, E. Barrett Prettyman U.S.

Courthouse, 3rd and Constitution Avenue, N.W., Washington, D.C. 20001.  The objection must

contain a complete specification of the factual and legal grounds upon which it is based. You

may append affidavits and documents in support of your objection.

    If you mail, rather than deliver, your response to the Clerk of the Bankruptcy Court for

filing, you must mail it early enough so that the court will receive it by the date stated above.

You must also mail a copy of your objection to:

> James D. Sadowski, Esq.
> Greenstein DeLorme & Luchs, P.C.
> 801 17th Street, N.W., Suite 1000
> Washington, DC  20006
> *Counsel for Defendants Developer RE1, LLC*
> *and 423 Kennedy St. Holdings, LLC*

    NOTICE OF HEARING:  A hearing on the Motion to Stay has been scheduled before the

Honorable Elizabeth L. Gunn, United States Bankruptcy Judge, for **July 30, 2025 at 10:00**

**a.m.**  The hearing will be held in a hybrid in-person or Zoom for Government format. All

participants may choose to appear either (a) in-person in Courtroom 1, United States Bankruptcy

Court for the District of Columbia, E. Barrett Prettyman Courthouse, 333 Constitution Ave. NW,

Washington, DC 20001 or (b) by video using Zoom for Government.  All parties participating by

Zoom for Government before Judge Gunn should review and be familiar with the Virtual

Hearing expectations.  For the Zoom meeting code, you may contact Courtroom Deputy Aimee

Mathewes by email at Aimee_Mathewes@dcb.uscourts.gov.

    If you or your attorney do not take these steps, the Court may decide that you do not

oppose the relief sought in the Motion to Stay and may enter an order granting the relief

requested. Parties in interest with questions may contact the undersigned.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  June 27, 2025                    /s/ James D. Sadowski
                                          James D. Sadowski, DC Bar. No. 446635
Alexandria J. Smith, DC Bar. No. 1673542
801 17th Street, N.W. - Suite 1000
Washington, DC  20006
Telephone: (202) 452-1400 ext. 5407
Email:    jds@gdllaw.com; ajs@gdllaw.com
*Counsel for Defendants Developer RE1, LLC and*
*  423  Kennedy St. Holdings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2th day of June, 2025, a true copy of this Notice of Hearing and Opportunity to Object to Defendants' Motion to Stay and to Suspend All Deadlines was served electronically and a Notice of Electronic filing should be sent to all persons receiving notices via the Court's CM/ECF system.

                                      /s/ James D. Sadowski
                                      James D. Sadowski

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Special Counsel for*
*JPK NewCo LLC and Counsel*
*for all Other Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JPK NewCo LLC, | ) | Case No. 25-200-ELG |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| JPK NewCo LLC, *et al*, | ) | |
| | ) | Adv. Case No. 25-10015-ELG |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Developer RE1 LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO DEFENDANTS' MOTION
## TO STAY AND TO SUSPEND ALL DEADLINES

Come now JPK NewCo LLC, debtor in possession ("JPK" or the "Debtor"),WCP Fund I

LLC ("WCP"); SF NU, LLC ("SNL"); and Russell Drazin in his official capacity as trustee under

two deeds of trust ("Mr. Drazin") (collectively, the "Plaintiffs" and each a "Plaintiff"), by and

through undersigned counsel, in opposition to the Defendants Motion to Stay and to Suspend All

Deadlines (the "Motion," as found at DE #5, with the proponents thereof being known as "DRL"

1

and "423 Kennedy" and being collectively known as the "Defendants" or "Movants") and state as follows:

## I.      Introduction

Unhappy that JPK has elected to reorganize through Subchapter V, and seemingly equally unhappy that a state court judge has elected to stay the Defendants' litigation against the Debtor and others, 423 Kennedy and DRL ask this Honorable Court to stay the instant litigation pending adjudication of their motion to have JPK's bankruptcy case dismissed. In support of this argument, the Movants insist, *inter alia*, "[t]his Court should not be resolving what are clearly non-core proceedings. . ." Motion, DE #5, at ¶ 16. Otherwise, the Defendants' theory of relief appears to be that the Debtor ought not be able to take any cognizable steps toward reorganization unless and until the Movants are first able to challenge the Debtor's right to seek to reorganize.

There exists a cart. There exists a horse. And there exist two Movants that have placed these items in the wrong order.

Of palpable note, this case *is* a core proceeding. Counts I and II of the complaint in this matter are for turnover under Section 542 of Title 11 of the United States Code (the "Bankruptcy Code"). The Movants may not like that Congress has given bankruptcy courts jurisdiction to hear turnover cases, and they assuredly may not like that their ongoing failure to pay debts as they come due has resulted in DRL and 423 Kennedy being sued for turnover. But there exists no cognizable universe in which the Movants could be seriously urging that an adversary proceeding for turnover is not a core proceeding.

Similarly, the Movants appear to be cavalierly endeavoring to dictate the order and pacing of a Subchapter V bankruptcy case, throwing into tumult the Debtor's efforts to adhere to the mandate of expediently endeavoring to reorganize as a small business. While the Movants are

certainly free to seek dismissal of the main case (and their motion to do so has now been opposed by the Debtor's largest equity holder), they are assuredly not free to unilaterally refuse to participate in the bankruptcy process unless and until their grievances are first adjudicated. The Local Rules of this Honorable Court very specifically provide for circumstances in which a bridge order is not required; answering an adversary complaint is not one such circumstance. And the time for the Movants to do so has long since elapsed.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Motion be denied.

## II.    Argument: The Case Should Not be Stayed

### a.    This is a Core Proceeding

At the heart of the Motion is a fundamental misapprehension of governing law: this is not a core proceeding and, as such, there is no good reason for this case to proceed in this court. Putting aside that there assuredly exist myriad sound reasons for non-core matters to be adjudicated as adversary proceedings, this case is a textbook core proceeding.

Title 28 of the United States non-exhaustively delineates those matters deemed to be "core proceedings," including "orders to turn over property of the estate." 28 U.S.C. § 157(b)(2)(E). And Section 542 of the Bankruptcy Code, in turn, is titled "Turnover of property to the estate," 11 U.S.C. § 542, and provides, *inter alia*, ". . . an entity that owes a debt that is property of the estate and that is matured . . . shall pay such debt to, or on the order of, the trustee, except to the extent

that such debt may be offset under section 553 of this title against a claim against the debtor," 11 U.S.C. § 542(b).[1]

Transparently, the first two counts of the complaint in this case are for turnover under Section 542(b) of the Bankruptcy Code. The Debtor alleges, pertinently, that (i) JPK owns two promissory notes on which the Movants, respectively, are obligated, Complaint, DE #1, at ¶¶ 20-21; (ii) both such notes are matured, *id.* at ¶¶ 27, 41,54, 58; and (iii) both such debts remain unpaid to the Debtor, *id.* at ¶¶ 55, 59.

The Movants would, of course, have been free to file a motion to dismiss, urging these causes of action to be inadequately pleaded. But, putting aside that it is difficult to see a good faith basis for any such motion, the Movants have now also allowed their response deadline to lapse, thereby forfeiting their right to bring such a challenge to the turnover claims (or any other claims). *See, e.g.*, *Doe v. Vali Hosp. LLC*, 2024 U.S. Dist. LEXIS 33469, at *3-4 (M.D. Fla. Feb. 27, 2024). ("Here, Defendants first filed a motion to dismiss the verified complaint in December 2023, well after their deadline to answer or otherwise respond to the verified complaint had passed. The Court dismissed that motion. With that dismissal, Defendants forfeited their opportunity to raise their defenses in the context of a motion to dismiss under Federal Rule of Civil Procedure 12.") (citing Fed. R. Civ. P. 12(g)(2)).

Critically, though, unless and until the Movants actually challenge the turnover claims on the merits (something they are affirmatively trying to avoid doing through the instant Motion), this is—and will continue to be—a textbook core proceeding.

---

[1] Omitted from this quote are two exceptions to the relevant obligation. One concerns parties without notice of a bankruptcy case and the other concerns the obligations of life insurance companies. 11 U.S.C. § 542(c-d). It is respectfully suggested there does not exist any contention that either such exception is pertinent *sub judice*.

### b. The Movants Cannot Unilaterally Refuse to Obey Deadlines

The Movants in this case were served the day after summonses were issued. *See* DE #4. Their deadline to respond was June 30, 2025. *See* DE #3. Yet they have steadfastly refused to respond, instead opting to *sua sponte* treat the deadline imprinted upon the summonses as advisory in nature and first asking this Honorable Court to stay their obligations. Litigants, quite plainly, cannot do this.

The Local Rules provide that bridge orders are *not* required in two very specific situations: requests to extend the time to file a plan of reorganization and motions to extend the time to assume or reject an unexpired lease of nonresidential real property. Local Rule 9006-2. Quite plainly, the time to answer an adversary proceeding complaint is not one of these delineated circumstances. And given that this Honorable Court has specifically allowed for automatic bridge orders in two situations, the Local Rules, by resultant inference, do *not* provide for a party to proceed sans bridge order in any other circumstance. *See, e.g.*, *United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*, 400 F. Supp. 2d 59, 62 (D.D.C. 2005) ("The canon of surplus usage is complemented, in this case, by the rule of *expressio unius est exclusio alterius* which directs that 'the mention of some implies the exclusion of others not mentioned.'") (quoting *United Dominion Indus. v. United States*, 532 U.S. 822, 836 (2001)).

Of course, the Local Rules do allow for motions to be presented on an expedited basis, for time to be shortened and for hearings to be held quite promptly. *See* Local Rule 9013-2. Yet, somehow, the Defendants have decided that they are apparently above this rule, just as they are seemingly above the response deadline imprinted on a summons, as the Defendants did not so much as endeavor to shorten time or otherwise try to have their stay request heard before the response deadline on the summonses expired.

To be sure, this is a Subchapter V case. Such matters are meant to proceed expeditiously. *See In re Nat'l Small Bus. All.*, 642 B.R. 345, 348-49 (Bankr. D.D.C. 2022) (discussing "the Congressional goals of ensuring that Subchapter V cases provide a quicker reorganization process. …"). *See also In re Online King LLC*, 629 B.R. 340, 350 (Bankr. E.D.N.Y. 2021). ("This stringent burden is in keeping with the design of a subchapter V case to move the case expeditiously. It is a fast-tracked process aimed at giving the qualifying debtor a less expensive and accelerated path to reorganize its business affairs. . .").

Therein lies the true problem with the Defendants' Motion: In ignoring what is a core proceeding, in ignoring the rules governing extensions of time, and in unilaterally electing to extend their own response deadline, they have stalled an adversary proceeding designed to move expeditiously alongside the underlying bankruptcy case. Assuredly, the Defendants are entitled to seek dismissal of JPK's bankruptcy (though, as noted in a now-docketed opposition to their motion in the main case, the Defendants' contentions lack merit). But the Defendants are not entitled to slow the process of a Subchapter V proceeding simply because they do not much like that JPK is trying to reorganize and have some fairly strong feelings about why JPK should be prohibited from reorganizing.

It is difficult to conceive of an adversary defendant that wishes to be sued. And, though some notable exceptions certainly exist, it stands to reason that most putative creditors do not much like that debtors can reorganize in chapter 11. Yet, what the Defendants herein seem to propose is that when these two pervasive eventualities intersect, as they so often do, an adversary defendant can simply stall out the at-issue proceeding by seeking to dismiss a debtor's bankruptcy case. Such is nowhere permitted in governing law or applicable rules and such assuredly ought not be countenanced here.

## III.    Conclusion

WHEREFORE, the Plaintiffs respectfully prays this Honorable Court (i) deny the Motion;

(ii) direct the Defendants to file an answer within three (3) business days; and (iii) afford such

other and further relief as may be just and proper.

Respectfully submitted,

Dated: July 23, 2025                    By: /s/ Maurice B. VerStandig
                                            Maurice B. VerStandig, Esq.
                                            Bar No. MD18071
                                            The VerStandig Law Firm, LLC
                                            1452 W. Horizon Ridge Pkwy, #665
                                            Henderson, Nevada 89012
                                            Phone: (301) 444-4600
                                            Facsimile: (301) 444-4600
                                            mac@mbvesq.com
                                            *Special Counsel for*
                                            *JPK NewCo LLC and Counsel*
                                            *for all Other Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of July, 2025, a copy of the foregoing was

served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

**KUTAK ROCK LLP**
Jeremy S. Williams (DC 994825)
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Co-Counsel for Developer RE1, LLC and*
*423 Kennedy St Holdings, LLC*

**GREENSTEIN DELORME & LUCHS, P.C.**
James D. Sadowski (VSB No. 38326)
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| JPK NEWCO, LLC, | ) Case No. 25-00200 (ELG) |
| | ) |
| Debtor. | ) Subchapter V |
| | ) |
| | ) |
| JPK NEWCO, LLC, *et al.*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 25-10015 (ELG) |
| | ) |
| DEVELOPER RE1, LLC, *et al*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MOTION OF DEVELOPER RE1, LLC AND 423 KENNEDY ST
## HOLDINGS, LLC FOR ABSTENTION AND TO DISMISS OR STAY PROCEEDINGS

Developer RE1, LLC ("RE1") and 423 Kennedy St Holdings, LLC ("423 Kennedy" and

together with RE1, the "Claimants"), by counsel, hereby move the Court to stay or dismiss the

above-captioned Chapter 11 proceeding (the "Chapter 11 Proceeding") filed by JPK NewCo, LLC

("JPK") and/or the above-captioned adversary proceeding (the "Adversary Proceeding" and

collectively with the Chapter 11 Proceeding, the "Proceedings") filed by JPK, WCP Fund I LLC

("WCP Fund"), SF NU, LLC ("SF NU"), and Russell Drazin ("Mr. Drazin") (collectively, "WCP

Parties"), pursuant to 11 U.S.C. § 305, or abstain from hearing the Adversary Proceeding in favor

of an ongoing state-court proceeding, pursuant to 28 U.S.C. §§ 1334(c)(1) and (c)(2), and Federal

Rule of Bankruptcy Procedure 5011. In support for the requested relief, the Claimants state as

follows:

<u>**Summary of Argument**</u>

Both of the Proceedings arise from manufactured jurisdiction which conflicts with ongoing

litigation in the D.C. Superior Court and creates the potential for disparate treatment of the same

underlying facts and legal claims. The Bankruptcy Code was not intended to be utilized as a

litigation tactic and in a case such as this, the Court should stay or dismiss the Proceedings, or at

a minimum, abstain from hearing the Adversary Proceeding until *423 Kennedy St Holdings, LLC*

*v. The WCP Fund, et al.,* Case No. 2023-CAB-004260 (D.C. Super. Ct.) and *Developer RE1, LLC*

*v. the WCP Fund I, LLC, et al.,* 2022-CAB-005935 (D.C. Super Ct.) (hereinafter, the

"Consolidated Superior Court Cases") are resolved.[1] The Adversary Proceeding is either a non-

core proceeding that is subject to mandatory abstention by the Court pursuant to 28 U.S.C. §

1334(c)(2) or from which the Court should exercise permissive abstention under 28 U.S.C. §

1334(c)(1). Under any of these standards, the Court should refuse to adjudicate the Adversary

Proceeding since it presents the same dispute already being litigated in the Consolidated Superior

Court Cases. Staying or dismissing the Proceedings, or, at minimum, abstaining as to the

Adversary Proceeding here promotes judicial economy and will conserve estate resources until the

D.C. Superior Court ultimately enters a final judgment. Just as the courts held on three separate

occasions that Johnson & Johnson should resolve their litigation in the original forums, so too

should the Debtor. *See, e.g. In re Red River Talc LLC*, 670 B.R. 251 (Bankr. S.D. Tex. 2025).

---

[1]     On June 7, 2024, the parties filed a joint motion to consolidate the two cases, and on June 11, 2024, Judge Scott
issued an order consolidating the two cases, designating the RE1 case (2022-CA-005935-B) as the lead case in
which all future filings should be made.

**Factual and Procedural Background**

1.     The factual and procedural background is well known to this Court from certain prior cases and is hereby incorporated by reference,[2] as is the factual background in the *Motion to Dismiss Chapter 11 Petition Filed In Bad Faith* [Case No. 25-00200; Docket No. 19].

2.     As previously noted, WCP Fund loaned funds to the Claimants which were secured by a first promissory note, second promissory note, first deed of trust, and second deed of trust for each of the respective properties.  The second promissory notes for each of the properties will hereinafter be referred to as the "Second Notes".

3.     Facing the very real threat of losing its litigation against the Claimants, the WCP Parties, unbeknownst to the Claimants, arranged for the Second Notes to be transferred to the Debtor in April of 2024.  So secretive was this scheme by WCP and the Debtor that at no point during the discovery that followed did the WCP Parties produce any documents: (a) about the formation of the Debtor; (b) showing how and for what consideration the Debtor acquired "the promissory note and deed of trust from the WCP"; or (c) showing any related communications concerning those transactions.  The Claimants learned that the Debtor conducts no business, has no assets but for the loan documents[3] and seemingly exists for no purpose other than isolating an alleged asset of WCP Fund in a remote entity. In essence, the Debtor entity was created solely to manufacture bankruptcy jurisdiction and hinder the efforts of the Claimants.   The Debtor subsequently did just that, it caused Mr. Sariri to file an involuntary bankruptcy proceeding to which the Debtor consented and waylaid the Consolidated Superior Court Cases.  That original bankruptcy was subsequently dismissed.

---

[2]     *See* Case No. 24-00262-ELG and Adv. Proc. No. 24-10023-ELG.

[3]     The Debtor allegedly has a note payable from Energy Morrocco for a relatively de minimis amount. (the "Energy Morocco Note"). The validity and collectability of such note is still in dispute and upon information and belief, this note was created just to show a "business transaction."

4931-9722-8641.1

4.      Shortly thereafter, the Debtor voluntarily filed the instant Chapter 11 Proceeding and immediately thereafter, the Adversary Proceeding.  At the time of filing, the same issues raised in the Adversary Proceeding remain pending in the Consolidated Superior Court Cases.   In essence, the Adversary Proceeding brought by the WCP Parties and the Consolidated Superior Court Cases brought by the Claimants together present state law cross claims for breach of contract, with both sides requesting appropriate damages for breach of the same loan documents.

5.      In connection with the Consolidated Superior Court Cases, the parties have already conducted extensive discovery and motions practice in connection therewith, including: (i) two motions for temporary restraining orders, (ii) a motion to dismiss and opposition thereto, (iii) the deposition of Mr. Daniel Huertas, (iv) interrogatories, (v) requests for production of documents, (vi) a deposition of Mr. Daniel Huertas, (vii) a motion for a protective order and opposition thereto, (viii) a motion to dismiss the counterclaim, (ix) opposition thereto, and (x) private mediation.  The Adversary Proceeding simply seeks to now relitigate those issues in a different forum.

## Legal Argument

### A.    Abstention Pursuant to 11 U.S.C. § 305

6.      This Court should either dismiss or suspend the Proceedings.   Such abstention is both necessary and appropriate in this case.  Section 305(a)(1) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension . . ." 11 U.S.C. § 305(a)(1).  Relief pursuant to § 305(a) is appropriate where such action is in the best interest of both the creditors and the debtor.  *In re TPG Troy, LLC*, 492 B.R. 150 (Bankr. S.D.N.Y. 2013); *In re Gerova Fin. Group, Ltd.*, 482 B.R. 86 (Bankr. S.D.N.Y. 2012).  In determining whether section 305 relief is in the best interests of the creditors and the debtor, courts look to "the facts of the individual case while

considering a number of criteria." *In re Corino*, 191 B.R. 283, 287 (Bankr. N.D.N.Y. 1995). The

decision is committed to the discretion of the Bankruptcy Court and is determined based on the

totality of the circumstances. *In re Mylotte, David & Fitzpatrick*, 2007 WL 302352 *5 (Bankr.

E.D. Pa. Oct. 11, 2007). Courts have generally looked to the following factors to gauge whether

dismissal or suspension is in the best interests of the creditors and the debtor:

(a) economy and efficiency of administration;

(b) whether another forum is available to protect the interests of both parties or
there is already a pending proceeding in state court;

(c) whether federal proceedings are necessary to reach a just and equitable
solution;

(d) whether there is an alternative means of achieving an equitable distribution
of assets;

(e) whether the debtor and the creditors are able to work out a less expensive
out-of-court arrangement which better serves all interests in the case;

(f) whether a non-federal insolvency has proceeded so far that it would be
costly and time consuming to start afresh with the federal bankruptcy
process; and

(g) the purpose for which bankruptcy jurisdiction has been sought.

*See In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 202 (Bankr. D. Del. 2015); *In re

Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002); *In re Fax Station, Inc.*, 118

B.R. 176, 177 (Bankr. D.R.I. 1990).

7.      In this case, relief under section 305 is in the best interests of both the Debtor and

the Claimants. The Debtor is not an operating entity and has, at most, a recently manufactured

receivable in the form of the Second Notes and the Energy Morocco Note. There are no

employees, there is only one other alleged creditor and there are no ongoing operations which the

Debtor must preserve. In short, there is nothing time-sensitive about the Debtor's case. In contrast,

should the Proceedings continue, the Debtor will be forced to expend resources and incur

administrative expenses to fulfill the requirements of the Bankruptcy Code. Expenditures which may be unnecessary and will only serve to reduce any potential distribution to creditors. Abstention will benefit the Debtor by allowing it to avoid the costs and distraction of bankruptcy and will benefit the Claimants because their rights and remedies will be adequately addressed in the Superior Court Case.

8.     The second abstention factor is plainly satisfied considering the Consolidated Superior Court Cases are currently pending before the D.C. Superior Court. The Debtor's attempt at jurisdictional maneuvering is not in the best interests of judicial economy. Forcing the Claimants to litigate and re-litigate matters that are pending before the D.C. Superior Court is duplicative, unnecessary, and inefficient. In addition, the continuation of the Chapter 11 Proceeding at this point will also likely cause the Debtor to face unnecessary litigation in connection therewith, absent finality of the issues underlying the Consolidated Superior Court Cases.

9.     Abstention solves these problems and dramatically streamlines the parties' disputes. Staying or dismissing the Proceedings would provide the most efficient use of the Debtor's and the Claimants' resources.

10.    Federal bankruptcy proceedings are not necessary to resolve the Debtor's issues. As noted above, the D.C. Superior Court is already reviewing the claims which underlie the Proceedings. The D.C. Superior Court is more than capable of reaching a fair and equitable solution and candidly, is likely best equipped to interpret and apply the laws of the District of Columbia. Having the Adversary Proceeding heard in Federal Court at most, would be more expedient, but given the nature of the Debtor's business, any marginal delay in having the matters heard in D.C. Superior Court is not prejudicial in the slightest.

6

11.     The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U. S. 279, 286, 287 (1991).  Here, the Debtor is not seeking a fresh start – it is shopping for what it believes will be a more favorable forum.  It is well-established that courts should discourage forum-shopping so that the substantive rights of the litigants are not impacted by the location of the litigation.  *See Butner v. United States*, 440 U.S. 48, 55 (1979).  The Debtor is not a legitimate debtor with a business that needs a fresh start -- it is an alter ego of the WCP Fund, DP Capital , LLC d/b/a Washington Capital Partners, Mr. Huertas, and SF NU. The original noteholder could have and should have resolved its issues in the D.C. Superior Court.  Instead, a new entity with no legitimate business purpose was formed, that entity was assigned the Second Notes without consideration and that new entity filed bankruptcy.  The sole purpose of which was to try and force the Claimants to relitigate the Consolidated Superior Court Cases in a separate forum that it deems more friendly.   There is no legitimate bankruptcy purpose here.

12.     For the reasons set forth above, the Claimants assert that it is appropriate for this court to stay or dismiss the Proceedings, pending resolution of the Consolidated Superior Court Cases, pursuant to 11 U.S.C. § 305.

**B.**     **The Adversary Proceeding is a Non-Core Proceeding That is Subject to Mandatory Abstention by the Court Pursuant to 28 U.S.C. § 1334(c)(2).**

13.     Mandatory abstention applies to the Adversary Proceeding since it is a non-core proceeding.  Under 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in, or related to cases under title 11."  "A proceeding 'arises under' title 11 if a claim asserted is created by or based on a provision of the bankruptcy code."  *C & B, L.L.C. v. Grubbs Emergency Servs., Inc. (In re Grubbs Construction Co.)*, 305 B.R. 476, 480 (Bankr. W.D. Ark. 2003) (citations omitted); *see Frelin v.*

*Oakwood Homes Corp.*, 292 B.R. 369, 377 (Bankr. E.D. Ark. 2003). A proceeding "arises in" a case if it has no existence outside the bankruptcy case and is not based on any right created by the Bankruptcy Code. *Id.* Courts identified core proceedings as those that "arise under" or "arise in" a bankruptcy case, while non-core proceedings are only "related to" the bankruptcy case. *Id.* (citations omitted).

14. Under § 1334(c)(2), a bankruptcy court must abstain from hearing a civil proceeding if: (1) a timely motion to abstain is made by a party to the proceeding; (2) the proceeding is based on a state law claim or state law cause of action; (3) the proceeding is related to a case under title 11 but did not arise under title 11 or in a case under title 11; (4) the proceeding could not have been commenced in a court of the United States absent jurisdiction under 28 U.S.C. § 1334; (5) the proceeding is commenced in state court; and (6) the proceeding can be timely adjudicated in a state forum of appropriate jurisdiction. *See Frelin*, 292 B.R. 369, 377 (citing *In re Titan Energy, Inc.*, 837 F. 2d 325, 333 n. 14 (8th Cir. 1988)).

15. The Debtor and its special counsel basically rely on one fact to assert core jurisdiction, a turnover action under section 542. That argument, however, wholly ignores what really happened. Here the Debtor and its owners manufactured jurisdiction through the assignment and creation of a debt the Debtor knew that it could not pay. The true intent of the Bankruptcy Code is not being furthered here. Furthermore, the Debtor does not satisfy section 542.

16. The sole asset alleged in the Adversary Proceeding is a receivable. The Debtor assert such receivable is property of the Debtor and subject to section 542. What the Debtor ignores, however, is the remainder of section 542(b) which provides that such receivable must be "matured, payable on demand, or payable on order [ie: uncontingent and liquidated]." 11 U.S.C. § 542. Such debt must also be presently payable. *See Porter-Hayden Co. v. First State Mgmt.*

8

*Group, Inc. (In re Porter-Hayden Co.)*, 304 B.R. 725, 732 (Bankr. D. Md. 2004) (quoting 5 Collier

on Bankruptcy ¶ 542.03 n.1 (15th ed. rev. 2003)). The terms 'matured, payable on demand, or

payable on order' create a strong textual inference that an action should be regarded as a turnover

only when there is no legitimate dispute over what is owed to the debtor.' " *Andrew Velez Constr.,*

*Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 273

(Bankr. S.D.N.Y. August 14, 2007) (quoting *In re CIS Corp.,* 172 B.R. 748, 760 (S.D.N.Y. 1994)).

In short, section 542(b) is appropriate **only when the contracting party is "unconditionally**

**liable."** *See In re MF Glob., Inc.*, 531 B.R. 424, 437-38 (Bankr. S.D.N.Y. 2015) (emphasis added).

The Court can review the Consolidated Superior Court Cases and determine that the Adversary

Proceeding is miles away from satisfying the applicable standard.  In fact, the only reason the

Debtor has engaged in these actions is because it was starting to become apparent that the

Claimants hold real lender liability claims.  The Debtor, concerned about where the litigation was

headed, engaged in the current scheme.  Given the alleged receivable is anything but certain, which

section 542 of the Bankruptcy Code requires to impose jurisdiction, the Court must abstain.

17.     Relatedly, since the claims set forth in the Adversary Proceeding are solely a

question of state law, the complaint is not based on bankruptcy law and could exist entirely outside

the bankruptcy case.  *See In re Grubbs Construction Co.*, 305 B.R. at 480.  Thus, the Adversary

Proceeding is a non-core proceeding since it cannot be considered as arising under or in a case

under title 11 and jurisdiction is solely established under 1334(b) as "related to" a case under title

11. *See id.*

18.     As for the specific requirements of mandatory abstention, the first requirement

under 28 U.S.C. § 1334(c)(2) is met in this case since this Motion to Abstain has been filed within

21 days of the Court orally denying Claimants' request to dismiss the underlying bankruptcy case and the stay request as moot.[4]

19.     The second requirement under 28 U.S.C. § 1334(c)(2) is met since the causes of action set forth in the Adversary Proceeding are disguised issues of contractual interpretation. In essence, the open issue is whether the WCP Fund breached the terms of the contract such that the Claimants have valid lender liability claims. The Claimants were pursuing these causes of action in the Consolidated Superior Court Cases, which issues are ultimately a question of state law. The Adversary Proceeding is really a counterclaim to such proceedings. No federal law claims are asserted against the parties in either action.

20.     With regard to the third requirement, as detailed above, the Adversary Proceeding is a non-core, "related to" proceeding.

21.     Under the fourth requirement, the Adversary Proceeding could not qualify for federal jurisdiction outside of 28 U.S.C. § 1334. Since the Adversary Proceeding is based on state law claims, there is no federal question at issue. The Adversary Proceeding is here only because the WCP Fund manufactured jurisdiction.

22.     Under the fifth requirement, the dispute described in the Adversary Proceeding is already being adjudicated in the Consolidated Superior Court Cases. Furthermore, the WCP Parties and the Claimants have already invested significant time and expense litigating the Consolidated Superior Court Cases. The Adversary Proceeding does not present any cause of action that is unique to this Court that cannot be resolved in the Consolidated Superior Court Cases. The focus of the Consolidated Superior Court Cases concerns the WCP Parties intentionally frustrating the Claimant's refinancing efforts and evading the text and spirit of the loan documents

---

[4]     The Court has not yet issued orders memorializing its decisions from July 31, 2025.

by wrongfully placing the Claimants in default. The Claimants were ultimately unable to make payments on the Notes, which was a by-product of the breach by the WCP Parties under the loan documents. The Adversary Proceeding claims arise from the same facts and issues. The parties have already litigated these very issues in D.C. Superior Court over the course of approximately three years.

23.     Under the sixth requirement, the parties' dispute under the loan documents can be timely adjudicated in the Consolidated Superior Court Cases. Prior to the commencement of the Adversary Proceeding, the D.C. Superior Court was advancing the consolidated cases. In fact, a trial date was set in the Consolidated Superior Court Cases. Additionally, the parties commenced formal discovery, including scheduling depositions. Significantly, the Claimants obtained a temporary restraining order which directly correlates to the same dispute presented in the Adversary Proceeding. In contrast, were this Court to decline to abstain, it would be starting from the beginning and covering matters already handled by the D.C Superior Court. Moreover, this Court has already made a finding that the claims here could be timely adjudicated in the Superior Court. *See Order Granting Renewed Motion to Remand* [Adv. Proc. No. 24-10023; May 12, 2025].

24.     Since all the requirements for mandatory abstention by this Court have been satisfied, the Court should abstain from adjudicating the Adversary Proceeding.

## C.     In the Alternative, the Court Should Abstain from Adjudicating the Adversary Proceeding Based on Discretionary Abstention Under 28 U.S.C. § 1334(c)(1).

25.     In the event this Court finds that the requirements for mandatory abstention are not satisfied, it should still exercise its discretion to abstain from adjudicating this case in the interests of comity and respect for state law pursuant to 28 U.S.C. § 1334(c)(1).

26.     Under 28 U.S.C. § 1334(c)(1), "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law, from

11

abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

27.     In evaluating whether permissive abstention is appropriate, courts have looked to a variety of factors, including but not limited to: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of applicable state law; (4) comity; (5) the degree of relatedness or remoteness to the proceeding in the main bankruptcy court; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed defendants. *See, e.g., In re Merry-Go-Round Enters., Inc.*, 222 B.R. 254, 257 (D. Md. 1998).  In addition, if most of the factors have been established for mandatory abstention, "bankruptcy courts should give careful consideration to whether it would be appropriate to exercise their discretion to abstain under section 1334(c)(1)."  *Frelin*, 292 B.R. at 383 (citing *In re Williams*, 256 B.R. 885 (8th Cir. BAP 2001))

28.     Abstention would provide the most efficient use of estate resources, prevent unjustified interference with the D.C. Superior Court's authority and will have a positive effect on the administration of the Debtor's bankruptcy estate.  The Consolidated Superior Court Cases were filed significantly before the Adversary Proceeding and the proceedings in the Consolidated Superior Court Cases have already progressed far beyond the current status of the Adversary Proceeding.  The Claimants have already spent considerable time, energy and resources in the Consolidated Superior Court Cases as noted in paragraph 6, *infra*.  Forcing the Claimants to essentially re-litigate its efforts in the Consolidated Superior Court Cases in the Adversary Proceeding is duplicative and unnecessary.  Thus, abstention by the Court will serve the best interests of judicial economy.

12

29.     As mentioned previously, the Adversary Proceeding presents state law claims that are already being addressed in the Superior Court Case. There are no issues presented under the Adversary Proceeding that are unique to bankruptcy law and any argument regarding jurisdictional basis for the Adversary Proceeding is questionable at best. The state law causes of action asserted by all parties involved are best determined by the D.C. Superior Court who routinely hears such matters. Thus, the interest of comity favors abstention.

30.     Since the Consolidated Superior Court Cases involve non-debtor defendants, it may proceed regardless of the Debtor's bankruptcy filing. *See Frelin*, 292 B.R. at 385; *see also In re Grubbs Construction Co.*, 305 B.R. at 482. This also presents issues with retaining jurisdiction in the Adversary Proceeding. The D.C. Superior Court could reach the conclusion that the Claimants have no liability under the notes, that the Claimants are entitled to a reduction in their debt or that the WCP Fund owes the Claimants money. If the Adversary Proceeding proceeds separately, it could potentially reach a different conclusion but be premised on the same facts. This would create an irreconcilable disparity as the Debtor took the Second Notes subject to whatever defenses and rights of setoff the Claimants have against the WCP Fund. Absent such event, given the nature of the Consolidated Superior Court Cases, the decision of the D.C. Superior Court will provide finality for the dispute presented under the Adversary Proceeding even if the Debtor is not a party. *See Frelin*, 292 B.R. 369 at 385. For these reasons, abstention is the logical conclusion.

**D.     Conclusion**

31.     For the reasons stated above, the Court should dismiss or stay the Proceedings, or at a minimum, abstain from adjudicating the Adversary Proceeding. The Adversary Proceeding is the determinative factor for the success of the Chapter 11 Proceeding and those issues are already being litigated in the Consolidated Superior Court Cases. The Debtor's collection efforts against the Claimants are subject to the same rights and defenses as the Claimants have against the WCP

13

Fund. If the Claimants prevail in the Consolidated Superior Court Cases and the D.C. Superior Court finds that the Claimants either have a total right of setoff or that money is owed to the Claimants, the Adversary Proceeding has no value and the Chapter 11 Proceeding will likely be dismissed.  If the D.C. Superior Court finds in favor of the WCP Fund, then the Adversary Proceeding can likely be resolved in short order since the underlying facts are similar and the Chapter 11 Proceeding likely proceeds uncontested.  In short, this Court has two realistic options: (i) allow the Adversary Proceeding to proceed, recognizing that this Court may reach an entirely different conclusion from the D.C. Superior Court, which will require reconciliation, likely by an appellate court; or (ii) abstain from hearing the Adversary Proceeding and stay or dismiss the Chapter 11 Proceeding while the parties finish the Consolidated Superior Court Cases.[5]  To abstain from adjudicating the Adversary Proceeding will allow the Court to obtain the benefit of judicial economy by deferring to the D.C. Superior Court, which court has been and can continue to adjudicate the issues between the parties..

WHEREFORE, the Claimants requests that the Court (i) stay or dismiss the Proceedings; (ii) or in the alternative, abstain from adjudicating the Adversary Proceeding, and (iii) grant such other and further relief deemed just and proper.

[*Remainder of page intentionally left blank*]

---

[5]    The Debtor has intimated that it will seek to remove the Consolidated Superior Court Cases to this Court.  The Claimants believe that such efforts would be completely contrary to the Bankruptcy Code, a futile effort and nothing but the furtherance of a litigation tactic.

Dated: August 20, 2025

**DEVELOPER RE1, LLC AND
423 KENNEDY ST HOLDINGS, LLC,**

/s/ *Jeremy S. Williams*
Jeremy S. Williams (DC 994825)
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: jeremy.williams@kutakrock.com

and

James D. Sadowski (VSB No. 38326)
GREENSTEIN DELORME & LUCHS, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410
Email: jds@gdllaw.com

*Co-Counsel for Developer RE1, LLC and
423 Kennedy St Holdings, LLC*

## CERTIFICATE OF SERVICE

Pursuant to the Local Rules of this Court, I hereby certify under penalty of perjury that on August 20, 2025, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all necessary parties.

/s/ *Jeremy S. Williams*
Counsel

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Special Counsel for*
*JPK NewCo LLC and Counsel*
*for all Other Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JPK NewCo LLC, | ) | Case No. 25-200-ELG |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| JPK NewCo LLC, *et al*, | ) | |
| | ) | Adv. Case No. 25-10015-ELG |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Developer RE1 LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO MOTION TO ABSTAIN, DISMISS OR STAY

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com
*Special Counsel for*
*JPK NewCo LLC;*
*Counsel for the Plaintiffs*

<u>**TABLE OF CONTENTS**</u>

I.     Introduction ........................................................................................................... 1

II.    Relevant Facts and Allegations ............................................................................ 3

III.   Argument: The Motion Merits Denial .................................................................. 5

      a.  Section 305 Abstention is Inappropriate ................................................. 5

      b.  Mandatory Abstention is Inapplicable Since this is a Core Proceeding .............. 11

          i.  This Case is Core in Nature ................................................... 12

         ii.  Mandatory Abstention is Inapplicable Since this Case Could Have Been Commenced in a Federal Court ............................................ 17

      c.  The Centrality of this Case to  JPK's Reorganization Militates Against Discretionary Abstention ................................................ 19

    IV.  Conclusion .................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*ABBOTT v. AFCO Enters.*,
1983 U.S. Dist. LEXIS 17400 (D. Utah Apr. 27, 1983) ................................................. 5

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.*
*(In re Andrew Velez Constr., Inc.)*,
373 B.R. 262 (Bankr. S.D.N.Y. 2007) ..................................................................... 13, 14

*Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittmn, LLP*,
2008 U.S. Dist. LEXIS 50510 (D.D.C. July 2, 2008) ................................................. 20

*Colorado River Water Conservation Dist. v. U. S.*,
424 U.S. 800 (1976) ................................................................................................. 19, 22

*Cty. Of Allegheny v. Frank Mashuda Co.*,
360 U.S. 185 (1959) ...................................................................................................... 19

*Eastman v. Eastman (In re Eastman)*,
188 B.R. 621 (9th Cir. BAP 1995) ................................................................................. 6

*Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*,
483 F.3d 292 (5th Cir. 2007) ....................................................................................... 18

*Enovational Corp. v. Md. (In re Enovational Corp.)*,
2023 Bankr. LEXIS 1878 (Bankr. D.D.C. July 27, 2023) ........................................... 15

*Geron v. Reifer (In re Eight-115 Assocs., LLC)*,
650 B.R. 43 (Bankr. S.D.N.Y. 2023) ............................................................................ 20

*In re 801 South Wells Street Ltd. Partnership*,
192 B.R. 718 (Bankr. N.D. Ill. 1996) ............................................................................ 7

*In re AMC Investors, LLC*,
406 B.R. 478 (Bankr. D. Del. 2009) ............................................................................... 6

*In re Aramid Ent. Fund, LLC*,
628 B.R. 584 (Bankr. S.D.N.Y. 2021) .......................................................................... 20

*In re Auto-Pak, Inc.*,
52 B.R. 3 (Bankr. D.D.C. 1985) .................................................................................... 16

*In re Bailey's Beauticians Supply Co.*,
671 F.2d 1063 (7th Cir. 1982) ........................................................................................ 9

*In re Bioline Labs.*,
9 B.R. 1013 (Bankr. E.D.N.Y. 1981) .......................................................................... 9

*In re Blackman*,
55 B.R. 437 (Bankr. D.D.C. 1985) ............................................................................ 11

*In re E-Z Pay Servs.*,
2007 Bankr. LEXIS 5132 (Bankr. S.D. Tex. Oct. 26, 2007) ...................................... 18

*In re First Va. Reinsurance, Ltd.*,
339 B.R. 366 (Bankr. E.D. Va. 2004) ........................................................................ 19

*In re Freeway Foods of Greensboro, Inc.*,
449 B.R. 860 (Bankr. M.D.N.C. 2011) ...................................................................... 19

*In re Lunt*,
2011 Bankr. LEXIS 1645 (Bankr. D. Kan. May 2, 2011) .......................................... 22

*In re Merry-Go-Round Enters., Inc.*,
222 B.R. 254 (D. Md. 1998) ...................................................................................... 20

*In re MF Glob., Inc.*,
531 B.R. 424 (Bankr. S.D.N.Y. 2015) ....................................................................... 14

*In re Monitor Single Lift I, Ltd.*,
381 B.R. 455 (Bankr. S.D.N.Y. 2008) .............................................................. 6, 7, 10

*In re Nogin Commerce LLC*,
670 B.R. 711 (Bankr. S.D.N.Y. 2025) ......................................................................... 6

*In re Northshore Mainland Servs., Inc.*,
537 B.R. 192 (Bankr. D. Del. 2015) ................................................................... 6, 8, 9

*In re Paper I Partners, L.P.*,
283 B.R. 661 (Bankr. S.D.N.Y. 2002*)* ........................................................................ 7

*In re S.G. Phillips Constructors, Inc.*,
45 F.3d 702 (2d Cir. 1995) ........................................................................................ 12

*In re Schur Mgmt. Co., Ltd.*,
323 B.R. 123 (Bankr. S.D.N.Y. 2005) ......................................................................... 6

*In re Skybridge Spectrum Found.*,
2021 Bankr. LEXIS 1534 (Bankr. D.D.C. June 3, 2021) ............................................ 7

*In re Sun World Broadcasters, Inc.*,
5 B.R. 719 (Bankr. M.D. Fla. 1980) ................................................................. 9

*In re Trina Assoc.*,
128 B.R. 858 (Bankr. E.D.N.Y. 1991) ............................................................... 7

*In re Wilson*,
2013 Bankr. LEXIS 3142 (Bankr. D.D.C. Aug. 5, 2013) ............................... 12

*Neufeld v. City of Baltimore*,
964 F.2d. 347 (4th Cir. 1992) ........................................................................ 19

*Patterson v. United States*,
2007 U.S. Dist. LEXIS 43705 (D.D.C. June 18, 2007) .................................. 17

*Porter-Hayden Co. v. First State Mgmt. Group, Inc. (In re Porter-Hayden Co.)*,
304 B.R. 725 (Bankr. D. Md. 2004) ............................................................... 13

*Publicker Indus. v. United States*,
980 F.2d 110 (2d Cir. 1992) ........................................................................... 18

*Richardson v. Nationstar Mortg. (In re Richardson)*,
2018 Bankr. LEXIS 2759 (Bankr. D.D.C. Sep. 11, 2018) .............................. 15

*Rosen's, Inc. v. Souers (In re Souers)*,
1996 Bankr. LEXIS 2010 (Bankr. S.D. Iowa Oct. 9, 1996) ............................. 5

*Sticka v. Rivera (In re Rivera)*,
2005 Bankr. LEXIS 3423 (B.A.P. 9th Cir. Sep. 14, 2005) ............................. 21

*Va. ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*,
92 F. Supp. 3d 469 (E.D. Va. 2015) .............................................................. 19

*Va. Hosp. Ctr.-Arlington Health Sys. v. Akl (In re Akl)*,
397 B.R. 546 (Bankr. D.D.C. 2008) ............................................................... 15

*Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*,
370 B.R. 236 (B.A.P. 9th Cir. 2007) ................................................................ 9

*Welch Family Ltd. P'ship Four v. Brown (In re A V. Car & Home, LLC)*,
2018 Bankr. LEXIS 3955 (Bankr. D.D.C. Dec. 14, 2018) ............................. 11

*Wilks v. United States (In re Wilks)*,
1999 Bankr. LEXIS 516 (B.A.P. 9th Cir. Apr. 22, 1999) ................................. 5

**Statutes**

11 U.S.C. § 305 ................................................................................................... *passim*

11 U.S.C. § 542 ...................................................................................................... 13, 14

28 U.S.C. § 151 ........................................................................................................... 18

28 U.S.C. § 1334 ............................................................................................. 11, 12, 17

28 U.S.C. § 1367 ......................................................................................................... 18

**Rules**

Local Rule 9013-1 ........................................................................................................ 1

**Treatises**

2 Collier on Bankruptcy P 305.02 ........................................................................... 6, 7

5 Collier on Bankruptcy ¶ 542.03 ............................................................................. 13

Come now DP Capital, LLC ("DPCL"), WCP Fund I LLC ("WCP"), SF NU, LLC ("SNL"), Daniel Huertas ("Mr. Huertas"), and Russell Drazin ("Mr. Drazin") (collectively, the "Defendants" and each a "Defendant") and JPK NewCo LLC, debtor-in-possession ("JPK" or the "Debtor"), by and through undersigned counsel, pursuant to Local Rule 9013-1(d), and in opposition to the Motion of Developer RE1, LLC and 423 Kennedy St Holdings, LLC for Abstention and to Dismiss or Stay Proceedings (the "Motion," as found at DE #134) filed by Developer RE1 LLC ("DRL") and 423 Kennedy St Holdings LLC ("423 Kennedy") (collectively, the "Defendants" and each a "Defendants") state as follows:

## I.     Introduction

Having tried—and failed—to secure a dismissal of JPK's underlying bankruptcy case, the Defendants now assert that a statutorily core proceeding ought not be heard by this Honorable Court, no matter Congress' clear design, no matter the plain text of governing statutes, and no matter the volumes of case law firmly holding otherwise. In so doing, they misconstrue the relevant record and try—mightily—to contort governing law. Yet the effort, which has by now become a familiar refrain from two parties seemingly petrified of the topically-expert examination of the frailties underlying their meager claims, ultimately fails.

The Motion is teeming with material shortcomings. The Defendants posit abstention to be appropriate because "[t]he Debtor is not an operating entity," Motion, DE #14, at ¶ 7, whilst ignoring the extraordinary irony of JPK being actively operational not merely on account of separate business pursuits but, too, because the act of endeavoring to collect from the Defendants has become a point of ongoing operation unto itself. The Defendants equally bemoan delay and expense, *id.*, whilst manifestly ignoring that it has been their own actions—time and again—that have invited the unnecessary procrastination of adjudication of their claims on the merits.

1

Then, inexplicably, the Defendants urge this Honorable Court—situated at the intersection of Constitution Avenue and Third Street—is not well equipped to interpret the laws of the District of Columbia. *Id.* at ¶ 10. Tellingly, and in marked juxtaposition to the aforementioned time-centric grievance, the Defendants nonetheless acknowledge adjudication of their claims would be more expedient in this venue. *Id.*

The Motion proceeds to urge JPK "is not a legitimate debtor," *id.* at ¶ 11, seemingly endeavoring to garner a second consideration of arguments already proffered—and failed—in a motion to dismiss JPK's bankruptcy case. Worse, the functional thesis for this contention appears to be that since the Defendants would rather not have their claims heard in a bankruptcy court, the reorganization of JPK must, *ipso facto*, be illegitimate in nature. DRL and 423 Kennedy genuinely seem to posit that while almost all creditors have some disdain for the bankruptcy process, alongside disdain for the debtors who invoke bankruptcy protections, the disdain of these two Defendants is somehow so magnificently special as to merit differentiated treatment.

Remarkably, the Motion next urges that claims arising under Title 11 of the United States Code (the "Bankruptcy Code"), and expressly recognized as being "core" in Title 28 of the United States Code, are not actually core. Even though the first two counts of the governing pleading in this case are for turnover, and even though that is a cause of action that literally does not exist outside of bankruptcy, the Defendants fervently assert this case is non-core in nature. In so doing, they not only posit case law in a disingenuous fashion but, more fundamentally, ask this Honorable Court to assume the success of their defense to these claims for relief. Stated otherwise, the Motion essentially posits that since the Defendants believe they might ultimately prevail in their defense, these causes of action should be regarded as non-core from the outset.

The Defendants finally urge abstention to be appropriate, based on the long and storied history of these issues in the Superior Court. In so doing, however, they seem to fundamentally miss that by now it is this Honorable Court—not the Superior Court—with greater and fresher familiarity with the matters. They also seem to, inexplicably, insist that claims for turnover under the Bankruptcy Code are "state law claims," *id.* at ¶ 29, and that such claims are not uniquely arising under the Bankruptcy Code, *id.*

For these reasons, and as extrapolated upon *infra*, the Motion should be denied and recognized as what the document truly is: yet another delay-centric effort on the part of two companies utterly determined to not permit the frailty of their legal claims to be exposed to scrutiny.

The Motion also merits denial for one added reason: of even date herewith, the oft-invoked Superior Court litigation, which the Defendants urge ought to be first adjudicated, is being removed to this Honorable Court.

## II.    Relevant Facts and Allegations

The allegations at the center of this case are markedly familiar in nature, closely mirroring those regularly confronted by this Honorable Court in claim objections and adversary proceedings alike:

1.      On December 23, 2021, DRL borrowed $4,103,000.00 from WCP, as memorialized by two promissory notes in the respective sums of $3,579,000.00 and $524,000.00 (the "DRL Notes"). *See* Complaint, DE #1, at ¶ 16.

2.      The DRL Notes are both secured by deeds of trust (the "DRL Deeds of Trust") on the real property commonly known as 5501-5505 1st Street, NW, Washington, DC 20011. *Id.* at ¶ 17.

3.     Similarly, on March 31, 2022, 423 Kennedy borrowed $9,945,693.00 from WCP, as memorialized by two promissory notes in the respective sums of $8,689,693.00 and $1,256,000.00 (the "423 Kennedy Notes"). *Id.* at ¶ 18.

4.     The 423 Kennedy Notes are secured by deeds of trust (the "423 Kennedy Deeds of Trust") on the entity's eponymous property. *Id.* at ¶ 19.

5.     The second DRL Note and the second 423 Kennedy Note, alongside their correlative deeds of trust, were both subsequently assigned to JPK. *Id.* at ¶¶ 20-21.

6.     Both DRL and 423 Kennedy repeatedly defaulted under their respective notes and deeds of trust by, *inter alia*, allowing senior liens to accrue on the entities' properties, failing to make interest payments in a timely manner, and failing to pay any of the four—let alone all four—notes at maturity. *Id.* at ¶¶ 22-44.

7.     DRL and 423 Kennedy are unhappy their principal was spoken to in an allegedly less-than-pleasant tone, *id.* at 46, and thusly believe they should not be held accountable for their myriad economic and non-economic breaches—even though the majority of those breaches well precede the Defendants' principal enduring a phone call he did not find enjoyable.

8.     DRL and 423 Kennedy accordingly now urge that the trustee serving under a deed of trust has an independent duty to act as a fact-finder, to adjudicate disputes, and to forbear from foreclosing unless and until a defaulting party acknowledges the error of their ways. *Id.*

9.     The Defendants also posit that the decision to assign two defaulted notes and deeds of trust to JPK was a fraudulent conveyance, even though absolutely no one is alleging WCP or SNL were insolvent at the time of the transfers. *Id.* at ¶ 48.

10. These allegations have, unfortunately, cast a cloud over the promissory notes and deeds of trust held by JPK, precluding the Debtor from being able to foreclose on its collateral and collect upon the monies being held at bay by the Defendants. *Id.* at ¶¶ 50-51.

11. The two promissory notes held by JPK are now fully matured and remain unpaid. *Id.* at ¶¶ 53, 57.

## III. Argument: The Motion Merits Denial

### a. Section 305 Abstention is Inappropriate

The Defendants initially urge abstention is proper under Section 305 of the Bankruptcy Code. In furtherance of this contention, they do not merely take aim at this adversary proceeding but, equally, having *just* failed to succeed in their attempt to have the main bankruptcy case dismissed, suggest the entire reorganization ought to be jettisoned. This is, to be sure, a somewhat cantankerous argument: if the Defendants cannot have the bankruptcy case dismissed, they would like it to simply never be heard. Unsurprisingly, this is also an argument wholly devoid of legal merit.

As a starting point, the Section 305 argument is only applicable to the main bankruptcy case since such abstention does not apply to adversary proceedings. *See, e.g.*, *Rosen's, Inc. v. Souers (In re Souers)*, 1996 Bankr. LEXIS 2010, at *7 (Bankr. S.D. Iowa Oct. 9, 1996) ("Since this is an adversary proceeding, abstention under § 305(a) will not be addressed."); *Wilks v. United States (In re Wilks)*, 1999 Bankr. LEXIS 516, at *12 (B.A.P. 9th Cir. Apr. 22, 1999) (noting Section 305 to not apply to adversary proceedings); *ABBOTT v. AFCO Enters.*, 1983 U.S. Dist. LEXIS 17400, at *7 n.1 (D. Utah Apr. 27, 1983) ("Section 305 provides for abstention over an entire bankruptcy case rather than proceedings or controversies that arise within the case, such as an adversary proceeding.").

5

Per the plain statutory language, abstention under Section 305(a)(1) is only applicable where "the interests of creditors and the debtor would be better served by such dismissal or suspension. . ." 11 U.S.C. § 305(a)(1). As observed by a leading treatise, this rigor—considering the interests of both creditors and the debtor—facially creates a prism whereby "few fact patterns fall within section 305(a)." 2 Collier on Bankruptcy P 305.02. Tellingly, as extrapolated upon by the same treatise: "Accordingly, parties who wish to seek dismissal of a case based primarily on the debtor's misconduct or bad faith should invoke, in most instances, the dismissal provisions contained in the relevant chapter under which the case was filed." *Id. See also In re Nogin Commerce LLC*, 670 B.R. 711 (Bankr. S.D.N.Y. 2025) ("The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal.") (quoting *In reMonitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (quoting *Eastman v. Eastman (In re Eastman)*, 188 B.R. 621, 624 (9th Cir. BAP 1995)); citing *In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005)).

To be sure, as observed by the very case relied upon by the Defendants: "Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." *In re Northshore Mainland Servs., Inc*., 537 B.R. 192, 203 (Bankr. D. Del. 2015) (quoting *In re AMC Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (quoting *Monitor Single Lift I, Ltd*., 381 B.R. at 462)).

Unsurprisingly, Section 305(a)(1) relief is normally only sought where an out-of-court restructuring or liquidation is underway, 2 Collier on Bankruptcy P 305.02, or where "recalcitrant

creditors commence an involuntary case in order to extract more favorable treatment from the debtor." *Id.* Quite plainly, neither scenario is afoot instantly.

There appears to only be one instance, in the history of this Honorable Court, where Section 305(a)(1) abstention has been even discussed in a memorandum opinion. There, an involuntary petition was filed against an alleged debtor that was not actually a moneyed business, with the petitioning creditor looking to advance claims that were the subject of bona fide disputes as to liability and/or amount. *In re Skybridge Spectrum Found.*, 2021 Bankr. LEXIS 1534, at *30 (Bankr. D.D.C. June 3, 2021). The request for abstention ended up being moot, since this Honorable Court elected to dismiss the case *en toto* because, *inter alia*, "[u]nder even the most favorable review of a reasonable version of the supportable facts, this case must be dismissed for failure to meet the requirements of § 303 of the Bankruptcy Code." *Id.* at *32.

When other courts consider abstention requests under Section 305, such generally entails a recognition of the thoroughly extraordinary nature of such relief coupled with contemplation of the following factors:

> "(1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought."

*In re Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (quoting *In re Paper I Partners, L.P.*, 283 B.R. 661, 678 (Bankr. S.D.N.Y. 2002) (citing *In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996)); *In re Trina Assoc.*, 128 B.R. 858, 867 (Bankr. E.D.N.Y. 1991))).

Here, the economy and efficiency of administration favor proceeding with a reorganization that is already well underway. While the Defendants are doing their best to stymie this chapter 11 case, the reality remains that a plan has already been filed, ballots have already been mailed, a status conference has already been held, a motion to dismiss has already been heard and denied, and more than 55 entries have already graced the main case docket. Moreover, as the Defendants themselves acknowledge, the dispute between JPK and the Defendants can be most expediently resolved in this Honorable Court. *See* Motion, DE #14, at ¶ 10 ("Having the Adversary Proceeding heard in Federal Court at most, would be more expedient. . .").

Remarkably, the Defendants suggest that the delays occasioned by abstaining and insisting disputes be adjudicated in Superior Court are not "prejudicial in the slightest." *Id.* In so doing, however, DRL and 423 Kennedy seem to miss the egregious irony of the Defendants both being the source of repeated delays and the very reason for this case's existence: the promissory notes held by JPK matured *years* ago. Of course it is not prejudicial to the Defendants to continue to dishonor their debts whilst squatting on their collateral. But every passing day of such conduct is enormously prejudicial to JPK, which has neither the money it is due nor the collateral that has been pledged in support of the payment of that money.

The second factor is the availability of another forum. This factor seems to—almost uniformly—concern other forums in which a *reorganization* may be accomplished. The Defendants rely on *Northshore Mainland Servs.*, but in that case abstention was only granted in favor of Bahamian debtors (in contrast to an affiliated Delaware debtor), *Northshore Mainland Servs.*, 537 B.R. at 195, who were subject to pending petitions for liquidation in the Bahamas, *id.* at 197. Even there, the decision to partially abstain was rooted in a judge's recognition that, *inter alia*, "I perceive no reason - - and have not been presented with any evidence - - that the parties

expected that any 'main' insolvency proceeding would take place in the United States." *Id.* at 206.

The pendency of such external reorganization-centric proceedings is almost always (if not always)

critical to Section 305(a)(1) relief being granted. *See, e.g.*, *Wechsler v. Macke Int'l Trade, Inc. (In

re Macke Int'l Trade, Inc.)*, 370 B.R. 236, 247 (B.A.P. 9th Cir. 2007) ("Typical circumstances for

dismissing under § 305(a)(1) include the pendency of proceedings such as assignments for the

benefit of creditors, state court receiverships, or bulk sale agreements. . .") (citing *In re Bailey's

Beauticians Supply Co.*, 671 F.2d 1063 (7th Cir. 1982); *In re Sun World Broadcasters, Inc.*, 5 B.R.

719 (Bankr. M.D. Fla. 1980); *In re Bioline Labs.*, 9 B.R. 1013 (Bankr. E.D.N.Y. 1981)).

Here, there are no other insolvency proceedings. JPK is not the subject of a receivership

proceeding. JPK is not the subject of an assignment for the benefit of creditors. JPK is not the

subject of a bankruptcy proceeding in another jurisdiction. JPK is not the subject of a foreign main

proceeding. There is no other forum in which JPK can reorganize. And such is implicit in the

Motion: the Defendants are not urging JPK reorganize elsewhere; the Defendants, having already

failed to prevail on their motion to dismiss, are just once again urging that JPK ought not be

permeated to reorganize *at all*.

The third factor is the necessity of federal proceedings. Again, this appears to stand in

contrast to state *reorganization* proceedings—not run of the mill civil litigation. As discussed

*supra*, Section 305(a)(1) relief is normatively only granted where there exists an alternative forum

in which to reorganize or liquidate, with such forums often being state or foreign courts (whether

through receivership, assignment, or otherwise). No such option is available to JPK. If JPK wishes

to reorganize—which, quite plainly, JPK does—this Honorable Court is the only available venue

for such to be accomplished.

9

The fourth factor is an alternative mechanism for justly distributing assets. Once again, just as with the two foregoing factors, this is inapplicable. There is not a receivership or ABC alternative. JPK has elected to use bankruptcy to reorganize and the Defendants' efforts to torpedo that bankruptcy have failed; this is the only viable forum in which JPK may seek to apply assets in satisfaction of extant debts, whilst simultaneously and synergistically working to liquidate the amount of those debts.

The fifth consideration is "whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case." *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65. Here, the Defendants and JPK seem fairly certain to not be able to work out much of anything—much less anything less expensive—between and amongst themselves. If the Defendants would pay the monies they owe to JPK, a path forward might well be viable. Otherwise, it appears the Defendants' vexatious tendencies will be an impediment to anything being worked out, let alone to anything being worked out in a remotely economical fashion.[1]

The next criterion is "whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process." *Id.* Plainly, as discussed *passim*, no such other proceeding exists, let alone has progressed to any point whatsoever.

The final question is the purpose for which bankruptcy jurisdiction has been sought. Once again, though, the Defendants appear to fundamentally misapprehend that Section 305(a)(1)

---

[1] The Defendants have sought to dismiss this bankruptcy. They have also challenged whether a business actively trying to collect from them actually qualifies as being engaged in business. They are now seeking abstention. They are also now seeking to slow the schedule dictated by Congress. While no such motion is imminent, it does bear notation that Section 1927 of Title 28 of the United States Code proscribes precisely this sort of try-try-again vexatious onslaught.

motions are normally premised upon alternative reorganization/liquidation avenues and involuntary bankruptcy cases. The answer is that JPK has sought bankruptcy jurisdiction to reorganize. That includes having a topically expert court consider issues related to the debtor/creditor relationship. Such is entirely proper. And nothing about JPK's history suggests bankruptcy jurisdiction was sought to defeat a receivership, to end-run an assignment for the benefit of creditors, or to frustrate foreign main proceedings.

JPK is not aware of any case, in any court, where a Section 305(a)(1) motion has been granted in the absence of an alternative reorganization or liquidation proceeding pending elsewhere. There is a reason case law firmly instructs that this provision is not a substitute for a motion to dismiss a bankruptcy case and ought not be conflated with a motion to dismiss a bankruptcy case. That the Defendants seem to fundamentally misapprehend as much, and endeavor to use their Motion as an effort to seek a proverbial second bite at the dismissal apple.

### b. Mandatory Abstention is Inapplicable Since this is a Core Proceeding

The Defendants next assert that mandatory abstention is necessitated herein because this is not a core proceeding. In so doing, the Plaintiffs appear to misconstrue what does—or does not—constitute a "core" proceeding, tainting the resulting analysis in the Motion. Most plainly stated, a turnover action is a core proceeding, and this case is core for myriad other reasons as well.

As observed by this Honorable Court, "[u]nder 28 U.S.C. § 1334(c)(2) mandatory abstention does not apply if a proceeding is a core proceeding." *Welch Family Ltd. P'ship Four v. Brown (In re A V. Car & Home, LLC)*, 2018 Bankr. LEXIS 3955, at *2-3 (Bankr. D.D.C. Dec. 14, 2018). *See also In re Blackman*, 55 B.R. 437, 445 (Bankr. D.D.C. 1985) (". . . mandatory abstention applies only in non-core proceedings. . ."); *In re Wilson*, 2013 Bankr. LEXIS 3142, at *5-7 n.4 (Bankr. D.D.C. Aug. 5, 2013) ("Mandatory abstention under 28 U.S.C. § 1334(c)(2) with respect

to such a proceeding would be inapplicable because mandatory abstention applies only to non-core, related to proceedings.") (citing *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 708 (2d Cir. 1995)).

The inapplicability of mandatory abstention to core proceedings is rooted in the language of the mandatory abstention statute itself:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

There are thusly two conjunctive elements to mandatory abstention: (i) the matter must not be a core proceeding; and (ii) the case must also be devoid of any independent basis to have been commenced in a "court of the United States." As discussed in detail *infra*, these are core proceedings, so this Honorable Court need not reach the second prong. Yet, even if the second prong were to be reached, it would not be satisfied *sub judice*.

### i.     This Case is Core in Nature

The Defendants posit that "[t]he Debtor and its special counsel basically rely on one fact to assert core jurisdiction, a turnover action under section 542." Motion, DE #14, at ¶ 15. This statement is objectively errant. No doubt, the two turnover causes of action render this case decidedly core in nature. But, too, myriad other realities also render this a core dispute.

Title 28 of the United States Code provides, familiarly, for an expressly non-exhaustive list of "core proceedings," that includes, *inter alia*:

> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11;

12

(C) counterclaims by the estate against persons filing claims against the estate. . .

(E) orders to turn over property of the estate. . .

(H) proceedings to determine, avoid, or recover fraudulent conveyances. . .

(K) determinations of the validity, extent, or priority of liens. . .

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims. . .

28 U.S.C. § 157(b)(2).

The most obvious "core" component of this case is the two claims for turnover. 28 U.S.C. § 157(b)(2)(E). The Defendants acknowledge, in their Motion, that a receivable is subject to a statutory turnover claim if it is "matured, payable on demand, or payable on order. . ." Motion, DE #14, at ¶ 16 (quoting 11 U.S.C. § 542). They also note that "[s]uch debt mut . . . be presently payable." *Id.* (citing *Porter-Hayden Co. v. First State Mgmt. Group, Inc. (In re Porter-Hayden Co.)*, 304 B.R. 725, 732 (Bankr. D. Md. 2004) (quoting 5 Collier on Bankruptcy ¶ 542.03 n.1 (15th ed. rev. 2003)).

Plainly, the promissory notes held by JPK are "matured." Both notes have due dates that have long-since passed. Both notes went unpaid at maturity. Both notes remain unpaid. That the Defendants do not wish to pay the notes does not much change that they are "matured." And nothing in the statutory text creates an exception for notes that have matured but where the obligor(s) thereupon have a fervent desire to resist paying debts as they come due.

In support of the proposition that a contested turnover action is not core, the Defendants cite to *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262 (Bankr. S.D.N.Y. 2007). But that is not a case that addresses whether or not claims are core; to the contrary, the word "core" does not appear anywhere in the subject opinion. To the contrary, *Andrew Velez Constr.* only pertinently stands for the rather innocuous proposition

13

that one cannot seek turnover of fraudulently conveyed assets before first obtaining recovery on an underlying fraudulent conveyance claim. *Id.* at 273. Indeed, in that case, "[t]he Debtor essentially acknowledged during argument that Count II of the Complaint, as drafted, fails to state a turnover claim." *Id.*

The Defendants next invoke *In re MF Glob., Inc.*, 531 B.R. 424 (Bankr. S.D.N.Y. 2015), another case that does not address the core nature of claims or even contain the word "core." There, Judge Glenn addressed a claim objection involving assertions about a customer's securities account carrying a negative margin balance. *Id.* at 425. The case was not a turnover action; to the contrary, the court observed, *inter alia*, "the Trustee is not seeking affirmative relief under section 542(a) of the Bankruptcy Code. Rather, the Trustee is solely seeking a determination that Sonson's account with MFGI is in deficit for purposes of temporarily disallowing his claim under section 502(d)." *Id.* at 431 (internal citations omitted).

*MF Glob.* does not concern a matured promissory note (or any promissory note at all). Nor does the case involve an actual claim for turnover, instead only considering turnover-centric issues in the context of a claim objection. And it is thusly at-best unclear why the Defendants believe this case serves to undermine the plain statutory text of Section 542, which allows for a turnover suit to be brought in connection with a matured promissory note.

To be sure, disputes as to validity may well give rise to defenses to a turnover claim. And if those defenses are successful, they may serve to limit the extent of relief available to JPK when judgment is ultimately entered. But the notion being advanced by the Defendants—that defenses ought to be heard, assessed on the merits, and *de facto* adjudicated, at the outset of a case, so as to determine if a cause of action is actually "core" in nature—is one that would utterly turn the litigation process on its head.

Even if this temporally-scrambled theory of case assessment were to be accepted, though, such would only beg inquiry as to why the Defendants believe they do not owe JPK the monies indicated on the face of matured promissory notes. Notably absent from the Motion is a discussion of why a subsequent transferee would not be entitled to collect on a duo of matured promissory notes. And if the Defendants' response—as JPK strongly suspects—is that the Defendants should not have to pay the sums due under the notes because the Defendants possess tort claims against one or more prior holders in due course, such would require the Defendants to cogently set forth both (i) those tort claims; and (ii) the rationale why such claims create an *in rem* burden on the notes themselves. Or, stated otherwise, even if the Defendants have claims against WCP or SNL, there does not appear to be any cognizable theory upon which those claims would defeat the rights of JPK as a holder in due course of the two at-issue notes.

The foregoing notwithstanding, this case is also "core" for several other reasons. As a starting point, the merits, *vel non*, of the Defendants' theories of liability became core when the Defendants filed proofs of claim. *See* 28 U.S.C. § 157(b)(2)(C); *Enovational Corp. v. Md. (In re Enovational Corp.)*, No. 22-00055-ELG, 2023 Bankr. LEXIS 1878, at *11 (Bankr. D.D.C. July 27, 2023) (". . . a bankruptcy court may be called upon to resolve certain core matters including amounts owed on proofs of claims. . ."); *Va. Hosp. Ctr.-Arlington Health Sys. v. Akl (In re Akl)*, 397 B.R. 546, 550 (Bankr. D.D.C. 2008) (noting issues concerning proofs of claim to be core proceedings); *Richardson v. Nationstar Mortg. (In re Richardson)*, 2018 Bankr. LEXIS 2759, at *8 (Bankr. D.D.C. Sep. 11, 2018) ("If Count I had any validity, the amounts recovered pursuant to Count I would be a setoff against Richardson's liability to Nationstar, and, accordingly, the adjudication of Count I is part of the adjudication of Richardson's objection to Nationstar's proof

of claim. That makes it a core proceeding."). Indeed, as observed by this Honorable Court more

than 40 years ago:

> Although this Court is skeptical of plaintiff's assertion that its claim is a core
> proceeding because plaintiff seeks an order "to turn over property of the estate,"
> the Court has no doubt that an appropriate basis for classification as a core
> proceeding does exist. That basis is found in 28 U.S.C. § 157(b)(2)(C), which
> provides that "counterclaims by the estate against persons filing claims against the
> estate" constitute core proceedings. It is true that plaintiff has not denominated its
> complaint in this adversary proceeding as a counterclaim to defendant's proof of
> claim which was earlier filed in this Debtor's bankruptcy case, but it would seem
> relatively simple for plaintiff to amend the complaint so as to cast it in terms of a
> counterclaim to the proof of claim.

*In re Auto-Pak, Inc.*, 52 B.R. 3, 4-5 (Bankr. D.D.C. 1985) (Bason, J.).

To be sure, the Defendants have both filed proofs of claim. Those claims are both premised

upon the contentions the Defendants seem to believe to lessen (or abrogate) their liability on the

promissory notes. And while objections to those claims are yet to be filed, just as in the *Auto-Park*

case, it may be safely surmised that such objections will soon form a part of the record in this case

as part of consolidation with the Superior Court cases being removed. Indeed, it is difficult to see

the instant case as already being anything other than a *de facto* counterclaim to those proofs of

claim.

So, too, is this a core proceeding because part of the relief sought is a determination

concerning an alleged fraudulent conveyance. 28 U.S.C. § 157(b)(2)(H). Count VII of the

complaint seeks a determination as to the Defendants' theory that JPK received the two promissory

notes, and correlative deeds of trust, through a fraudulent conveyance. *See* Complaint, DE #1, at

¶¶ 93-102. This is patently core, being a "proceeding to determine . . . fraudulent conveyances."

The operative pleading also seeks a determination as to the validity and extent of the liens

held by JPK. *Id.* at ¶¶ 103-108. Such would seem the epitome of a suit seeking "determinations of

the validity, extent, or priority of liens." 28 U.S.C. § 157(b)(2)(K).

Indeed, this is a lawsuit through which the Debtor is trying to collect upon the notes it

holds, and to liquidate its obligations (if any) to the Defendants, as part of an effort to

comprehensively reorganize. Even putting aside the plain language of Section 157, it is genuinely

difficult to conceive of a more emphatically "core" proceeding. The issues *sub judice* are those

that are integral to the Debtor's emergence from chapter 11. Suggesting those issues to not be core

to this case tests credulity.

### ii. Mandatory Abstention is Inapplicable Since this Case Could Have Been Commenced in a Federal Court

As noted *supra*, there are two conjunctive prongs to mandatory abstention analysis: (i)

whether a proceeding is core and (ii) whether a case could have been commenced in a "court of

the United States" in the first instance. Since this is very much a core proceeding, the second prong

need not be addressed. However, even if that second criterion were somehow reached, the

Defendants would still fail to show that this case "could not have been commenced in a court of

the United States," 28 U.S.C. § 1334(c)(2), for the very simple reason that the Superior Court of

the District of Columbia—a court in which the Defendants are assuredly subject to general

jurisdiction—is a "court of the United States." *See, e.g.*, *Patterson v. United States*, 2007 U.S. Dist.

LEXIS 43705, at *2 (D.D.C. June 18, 2007) (". . . Superior Court judges are federal Article I judges

appointed by the President of the United States for fixed terms and confirmed by the Senate.")

(citing *Palmore v. United States*, 411 U.S. 389, 392 (1973)).

Equally, it bears notation that this case *was* commenced in a court of the United States: the

United States District Court for the District of Columbia, of which this Honorable Court serves as

a "unit." 28 U.S.C. § 151. The mere pendency of JPK's bankruptcy case, coupled with this specific

adversary proceeding's post-petition commencement, would be sufficient to allow the case to be

brought in federal court under the allowances of Title 28. *See* 28 U.S.C. § 1367 (". . . in any civil

17

action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

As explained by the United States Court of Appeals for the Fifth Circuit—in reliance on a prior holding by the United States Court of Appeals for the Second Circuit—the pendency of a related bankruptcy case is sufficient, unto itself, to endow district courts with supplemental jurisdiction and to thusly permit a case to be commenced in a court of the United States:

> Section 1367(a) provides for supplemental jurisdiction (subject to irrelevant exceptions) over claims forming part of the same case or controversy with "any civil action over which the district courts have original jurisdiction." This includes bankruptcy jurisdiction. It follows that district courts have supplemental jurisdiction over claims that form part of the same case or controversy with bankruptcy claims.

*Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 300 (5th Cir. 2007) (citing *Publicker Indus. v. United States*, 980 F.2d 110, 114-15 (2d Cir. 1992)). *See also In re E-Z Pay Servs.*, 2007 Bankr. LEXIS 5132, at *4 (Bankr. S.D. Tex. Oct. 26, 2007) ("The Fifth Circuit has held that bankruptcy courts may not exercise supplemental jurisdiction under 28 U.S.C. § 1367, but district courts have supplemental jurisdiction over claims that form part of the same case or controversy with bankruptcy claims.") (citing *TXNB Internal Case*, 483 F.3d 292).

Plainly, this case could have been commenced in a court of the United States—whether the one across the street or the one down the hallway. And that reality is sufficient, unto itself, to foreclose mandatory abstention.

**c. The Centrality of this Case to JPK's Reorganization Militates Against Discretionary Abstention**

The Defendants are also errant in suggesting discretionary abstention to be proper. As set forth above, there is an incredibly intimate nexus between this litigation and JPK's efforts to reorganize. Equally, the issues raised *sub judice*—questions of the impact, *vel non*, of defaults under commercial loan documents—are ones upon which this Honorable Court has expertise. The outcome of this litigation will have a profound impact upon the emergence of JPK from chapter 11. It is not merely sensible but, indeed, legally proper for this litigation to remain in this venue.

As a starting point, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 813 (1976). *See also Va. ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*, 92 F. Supp. 3d 469, 475 (E.D. Va. 2015) ("[A] federal court must accept the jurisdiction granted it, and only in rare occasions is discretionary abstention warranted.") (quoting *In re Freeway Foods of Greensboro, Inc.*, 449 B.R. 860, 879 (Bankr. M.D.N.C. 2011)).

As observed by Judge Tice, "[t]he general rule, however, is that a federal court must accept the jurisdiction granted it, and only on very rare occasions is discretionary abstention warranted." *In re First Va. Reinsurance, Ltd.*, 339 B.R. 366, 373 (Bankr. E.D. Va. 2004) (citing *Colorado River*, 424 U.S. at 817; *Neufeld v. City of Baltimore*, 964 F.2d. 347, 349 (4th Cir. 1992)). *See also Cty. Of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959) ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.").

In seeking this rare and extraordinary remedy, the burden is on the party seeking discretionary abstention to set forth why such is appropriate. *See, e.g.*, *Geron v. Reifer (In re Eight-115 Assocs., LLC)*, 650 B.R. 43, 50 (Bankr. S.D.N.Y. 2023) ("The movant bears the burden of establishing that permissive abstention is warranted.") (citing *In re Aramid Ent. Fund, LLC*, 628 B.R. 584, 594 (Bankr. S.D.N.Y. 2021)).

The precedent of the United States District Court for the District of Columbia instructs that seven factors are to be considered when weighing whether a movant has met its burden on a motion seeking discretionary abstention:

> (1) "the effect on the efficient administration of the bankruptcy estate"; (2) "the extent to which issues of state law predominate"; (3) "the difficulty or unsettled nature of applicable state law"; (4) "comity"; (5) "the degree of relatedness or remoteness to the proceeding in the main bankruptcy court"; (6) "the existence of the right to a jury trial"; and (7) "prejudice to the involuntarily removed defendants."

*Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittmn, LLP*, 2008 U.S. Dist. LEXIS 50510, at *14 (D.D.C. July 2, 2008) (quoting *In re Merry-Go-Round Enters., Inc.*, 222 B.R. 254, 257 (D. Md. 1998)).

As discussed *passim*, this litigation will have an abiding impact on JPK's bankruptcy estate. JPK owns fully matured notes. The Defendants are refusing to pay the correlative debts. If paid, JPK can use those monies to fund part of its plan obligations and can successfully operate as a post-confirmation going concern by placing those funds back into circulation through the making of new loans. Meanwhile, if there is any validity to the Defendants' theories of nonpayment (and it is respectfully urged there is not), such needs to be determined so JPK can have a comprehensive understanding of its obligations to creditors and the funds it is entitled to collect net of any setoffs.

*Vis a vis* the second question, this is not a case where state law issues predominate over bankruptcy issues. As discussed above, two of the claims in this case literally arise under the

Bankruptcy Code. Moreover, as noted by the Bankruptcy Appellate Panel of the Ninth Circuit, "Congress gave the bankruptcy court exclusive jurisdiction over property of the estate, and the bankruptcy court has unique expertise on debtor-creditor matters." *Sticka v. Rivera (In re Rivera)*, 2005 Bankr. LEXIS 3423, at *29 (B.A.P. 9th Cir. Sep. 14, 2005). And such is particularly true in the prism of this case and this particular court: there is likely no court—state or federal—in the United States more expertly familiar with the adjustment of the creditor/debtor relationship, in the context of single asset real estate entities and promissory notes secured by such entities' titular assets, than this Honorable Court.

In assessing the third criterion, there are no "difficult or unsettled questions of state law" at issue in this case. Yes, the Defendants are trying to create new law—in direct contravention of well-settled law—that would subject commercial notes and deeds of trust to the standards of consumer loans. And, yes, the Defendants are trying to overturn decades-old precedent instructing that trustees under deeds of trust have solely-ministerial duties. But such does not render the questions *sub judice* "difficult" or "unsettled;" such only means the Defendants are endeavoring to confront a perilous fact pattern through a series of challenges to well-settled law.

On the fourth question, comity well dictates that an adversary proceeding, tethered to a main bankruptcy case, be heard in a bankruptcy court. While the Superior Court of the District of Columbia is, no doubt, a formidable federal court, there is no construction of "comity" that leans even marginally in favor of having a non-bankruptcy court hear a claim arising under the Bankruptcy Code (excepting, perhaps, a scenario where a district court is exercising jurisdiction sans referral).

The fifth inquiry is "the degree of relatedness or remoteness of the proceeding to the main bankruptcy case." As noted *passim*, the relatedness of this proceeding to the JPK bankruptcy is

markedly intimate in nature. The disposition of this case is central to JPK's plan of reorganization, with the debtor having an asset base comprised largely—albeit not entirely—of two of the four promissory notes and deeds of trust that the Defendants are seeking to have cancelled or nullified.

The sixth question is a right to trial by jury. The claims in this case are for turnover and declaratory relief; none of these causes of action implicate such a right. And, in any event, the underlying loan documents contain waivers of any right to trial by jury.

The seventh consideration is prejudice to removed defendants. Since this is an original proceeding, there do not exist any removed defendants and this is inapplicable. (To be sure, this case may well be consolidated with the related matter, which is being removed. But even if so, it is the parties represented by undersigned counsel—not DRL and 423 Kennedy—who are the "removed defendants" in that action.)

In assessing the foregoing factors, the existence of a core matter "strongly mitigates against" granting abstention. *In re Lunt*, 2011 Bankr. LEXIS 1645, at *6 (Bankr. D. Kan. May 2, 2011). And, of course, abstention remains a rare and extraordinary remedy, of which the Supreme Court has cautioned that utilization should be "the exception, not the rule." *Colorado River*, 424 U.S. at 813. There is simply no basis to make such an exception in this case, where nearly every factor militates against abstention and where the administration of JPK's estate hangs in the proverbial balance. This Honorable Court has expertise in the issues presented in this litigation, has a docket that can ably accommodate this litigation, and has jurisdiction over this litigation.

## IV.    Conclusion

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: September 1, 2025          By:     /s/ Maurice B. VerStandig
                                          Maurice B. VerStandig, Esq.
                                          Bar No. MD18071
                                          The VerStandig Law Firm, LLC
                                          9812 Falls Road, #114-160
                                          Potomac, Maryland 20854
                                          Phone: (301) 444-4600
                                          mac@mbvesq.com
                                          *Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of September, 2025, a copy of the foregoing was

served electronically upon filing via the ECF system, with copies being sent to all parties receiving

electronic notice herein.

                                          /s/ Maurice B. VerStandig
                                          Maurice B. VerStandig

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Charles Paxton Paret, | ) | Case No. 23-217-ELG |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| Developer RE1 LLC, | ) | |
| | ) | Adv. Case No. _____ |
| Plaintiff, | ) | |
| | ) | State Court Case 2022-CAB-005935 |
| v. | ) | |
| | ) | |
| DP Capital LLC; Russell Drazin; Daniel Huertas; | ) | |
| SF NU, LLC; and WCP Fund I LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| 423 Kennedy St Holdings LLC, | ) | |
| | ) | State Court Case 2022-CAB-005935 |
| Plaintiff, | ) | (State Court Cases Consolidated) |
| | ) | |
| v. | ) | |
| | ) | |
| DP Capital LLC; Russell Drazin; Daniel Huertas; | ) | |
| and WCP Fund I LLC | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

Come now WCP Fund I LLC ("WCP"), DP Capital LLC ("DPCL"), SF NU, LLC ("SNL"),

Daniel Huertas ("Mr. Huertas"), and Russell Drazin ("Mr. Drazin") (the "Defendants"), by and

through undersigned counsel, pursuant to Section 1452 of Title 28 of the United States Code,

Section 1334 of Title 28 of the United States Code, and Federal Rule of Bankruptcy Procedure

1

9027, and hereby give notice of the removal of the above-captioned consolidated matters from the
Superior Court of the District of Columbia to the United States District Court for the District of
Columbia (which, as noted *infra*, results in the referral of the matter to the United States
Bankruptcy Court for the District of Columbia), and in support thereof note as follows:

### The Removed Cases

1.      These are civil actions commenced in the Superior Court of the District of
Columbia by Developer RE1 LLC ("DRL"), on or about December 16, 2022, and by 423 Kennedy
St Holdings LLC ("423 Kennedy"), on or about July 13, 2023, with the two cases being
subsequently consolidated less than a month ago, on or about June 11, 2024.

2.      DRL owns the real property located at 5501 First Street, NW, Washington, DC
20011 (the "DRL Property").

3.      423 Kennedy owns the real property located at 423 Kennedy Street, NW,
Washington, DC 20011 (the "423 Kennedy Property").

4.      WCP loaned monies to both DRL and 423 Kennedy, securing such loans with deeds
of trust fixed upon the DRL Property and the 423 Kennedy Property, respectively.

5.      WCP declared both loans to be in default following the occurrence of various
breaches of the promissory notes and deeds of trust; despite such defaults, WCP permitted each
borrower until the maturity date of the loans to pay off the underlying promissory notes.

6.      When neither 423 Kennedy nor DRL paid their correlative loans at maturity, WCP
commenced the process of foreclosing upon the respective properties.

7.      These cases were brought by 423 Kennedy and DRL in an effort to (i) enjoin WCP
from foreclosing; (ii) assert WCP did not have the right to declare defaults under the promissory

notes and deeds of trust; and (iii) seek various forms of damages, including forfeiture and monetary damages.

8.      423 Kennedy and DRL are also suing (i) Mr. Drazin, the substitute trustee under the deeds of trust, on a theory of breach of fiduciary duty; and (ii) Mr. Huertas, DPCL, and SF NU, on various theories (though SF NU is only a party to one of the two consolidated cases), some of which are pegged to ownership of the promissory notes and holding rights under the deeds of trust.

9.      Certain promissory notes and correlative deeds of trust, implicated in these two consolidated cases, are now held by JPK NewCo LLC ("JPK"), a party to whom certain debt instruments were transferred earlier this year. 423 Kennedy and DRL have refused to join JPK, the holder of such instruments, despite the economic and property rights of JPK being implicated by these proceedings.

10.     The core litigation goals in these two cases, on the parts of DRL and 423 Kennedy, appear to be frustrating the collection efforts of the Defendants and JPK, challenging the indebtedness owed to various Defendants and JPK, and seeking relief from the terms of commercial loan documents.

**The Alleged Partnership**

11.     On July 2, 2024, Wendell Webster ("Mr. Webster" or the "Trustee") filed an amended complaint (the "Amended Complaint"), in connection with the Chapter 7 bankruptcy of Charles Paret ("Mr. Paret" or the "Debtor"), alleging, *inter alia*, the existence of a partnership between Messrs. Paret and Huertas that "involve[s]" 423 Kennedy and myriad other companies and real estate assets. *See In re Paret*, Case No. 23-217-ELG at DE #132, ¶ 45.[1]

---

[1] The Amended Complaint was subsequently also docketed in the adversary proceeding captioned *Webster v. Huertas, et al.*, Case No. 23-10025, at DE #39.

12.     The Amended Complaint further alleges, *inter alia*, that Mr. Huertas "used" DRL "to purchase foreclosed properties belonging" to the partnership between Messrs. Paret and Huertas. *Id.* at ¶ 46.[2]

13.     While the Amended Complaint suffers myriad flaws, a plain reading of the document reveals the Trustee is asserting that 423 Kennedy is a part of the partnership the Trustee alleges to exist and, further, that the same partnership has an interest in the property owned by DRL. *Id.*, *passim*.

14.     The Amended Complaint seeks "imposition of a constructive trust on" the properties comprising the alleged partnership, "transfer" of the alleged partnership's properties "to the trust," and injunctive relief, among myriad other remedies. *Id.* at pp. 17- 20.

15.     Stated otherwise: the Trustee is asserting that Mr. Huertas and Mr. Paret have a partnership that owns some combination of 423 Kennedy, DRL, the 423 Kennedy Property, the DRL Property, WCP's interest in the 423 Property, and/or WCP's interest in the DRL Property.

**Debtor Allegations**

16.     The assertions in the Amended Complaint are consistent with theories the Debtor has espoused in connection with his bankruptcy proceedings.

17.     Specifically, less than a week ago, on June 25, 2024, a meeting of creditors was held in the Debtor's bankruptcy case (the "Meeting of Creditors").

18.     At the Meeting of Creditors, the following colloquy touched upon the interplay of (i) the alleged partnership, (ii) 423 Kennedy, and (iii) the DRL Property:

MR. SADOWSKI: Okay. One second, Mr. Gardner (sic).

---

[2] The manner in which this allegation is worded is such that it is not clear if the Trustee is alleging DRL was used to purchase multiple properties or a single property; the Defendants do not mean to suggest the Trustee is alleging multiple properties to have been acquired by DRL, especially insofar as it is believed DRL has only ever owned the DRL Property.

Now, when you were being asked some questions by Mr. VerStandig, you gave some answers that things were currently in debate. I'm not going to debate you over your answers, but would it be fair to sum it up that -- all right. Let me ask it this way. Do you currently own a membership interest in 423 Kennedy Street Holdings, LLC?

MR. PARET: I believe I do.

MR. SADOWSKI: Okay. And is that belief based upon this theory that WCP was a partner with you? Is that what the basis for that belief is?

MR. PARET: That is correct.

MR. SADOWSKI: Okay. And would the same hold true for 5501? Excuse me. I don't have the address right in front of my face here. 5501 First Street Holdings, LLC, you indicated that it's -- there's a debate over whether you have a membership interest in that. And my understanding from your testimony is that the date is -- that the belief that you have, you have a membership interest is on this partnership theory with the WCP. Is that right?

MR. PARET: That is correct, along with the fact that the LLCs that were in ownership, the investor group have ownership in those LLCs. That's -- that's -- it's still unclear. But that is the -- that's the theory.

Transcript of Meeting of Creditors, attached hereto as Exhibit A, at 46:19-47:17.

19.     The theories espoused by Mr. Paret at the Meeting of Creditors appear to be consistent with those promoted by the Trustee in the Amended Complaint.

## Core and "Related To" Status

20.     If the Trustee is correct (i) that 423 Kennedy is part of the putative partnership between the Debtor and Mr. Huertas; and (ii) that Mr. Huertas has wrongfully "used" DRL to foreclose an asset belonging to the alleged partnership, the disposition of these cases will directly impact the administration of the Debtor's bankruptcy estate without regard to whether 423 Kennedy and DRL prevail, the Defendants prevail, or some combination thereof.

21.     Should the Defendants prevail in these actions, the the lone asset of 423 Kennedy— an alleged part of the partnership the Trustee is seeking to establish—will be foreclosed.

22.     Should 423 Kennedy and/or DRL prevail in these actions, 423 Kennedy—an entity the Trustee insists to be part of the alleged partnership—will retain its eponymous asset, and/or

DRL (an entity the Trustee alleges to have been "used" by Mr. Huertas to take a partnership property) will retain its sole asset.

23.     Stated more simply: the Trustee is alleging a vast partnership, concerning myriad properties and interests therein; these cases concern the disposition of two such properties and security interests.

24.     The relief sought by DRL and 423 Kennedy in these cases includes, *inter alia*, a determination of the validity and extent of liens; to the extent that the Trustee is correct that one or both of those liens are partnership assets, this is a core proceeding pursuant to Section 157(b)(2)(I) of Title 28 of the United States Code.

25.     Equally, the Trustee asserts a partnership interest in assets titled in the name of both 423 Kennedy and DRL; to the extent the Trustee is correct in such assertion, these two cases will directly affect the liquidation of the assets of the Debtor's estate, thereby rendering this a core proceeding under Section 157(b)(2)(O) of Title 28 of the United States Code.

26.     Further, in light of the various allegations set forth in the Amended Complaint, these two cases are most certainly "related to" the administration of Mr. Paret's bankruptcy estate.

### General Denial

27.     For the avoidance of doubt or ambiguity, Mr. Huertas and WCP deny—in the most vehement terms possible—that there ever existed a partnership with Mr. Paret.

28.     The removal of these cases is not based upon any theory in which the Amended Complaint ought to be credited as true or legally proper but, rather, solely upon the relatively uncontroversial theory that the Amended Complaint ought to be credited as constituting the current allegations of a bankruptcy trustee in connection with the administration of the estate that he has been charged with liquidating for the benefit of creditors.

**Formalistic Recitations**

29.     If the Trustee's allegations in the Amended Complaint are correct, the proceedings in these two cases are subject to the automatic stay set forth in Section 362 of Title 11 of the United States Code, and such stay has never been terminated.

30.     Pursuant to DCt.LBR 5011-1, these consolidated cases are automatically referred to the United States Bankruptcy Court for the District of Columbia upon being removed from the Superior Court of the District of Columbia.

31.     Attached hereto as Exhibit B is "a copy of all process and pleadings," together with all docket entries, in the consolidated cases.

32.     A copy of this notice is being docketed in the Superior Court of the District of Columbia, in a manner substantially contemporaneous with its filing herein, sans Exhibits A and B.

33.     The Defendants consent to the entry of final orders or judgments of the United States Bankruptcy Court for the District of Columbia.

Respectfully submitted,

Dated: July 4, 2024

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for the Defendants*

*[Certificate of Service on Following Page]*

7

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of July, 2024, a copy of the foregoing is being

tendered to a third party commercial mailing vendor to be sent, via first class mail, postage prepaid,

on July 5, 2024, to:

James D. Sadowski, Esq.
Greenstein DeLorme & Luchs, P.C.
801 17th Street, NW
Suite 1000
Washington, DC 20006
*Counsel for Developer RE1 LLC and*
*423 Kennedy St Holdings LLC*

Alexandria J. Smith, Esq.
Greenstein DeLorme & Luchs, P.C.
801 17th Street, NW
Suite 1000
Washington, DC 20006
*Counsel for Developer RE1 LLC and*
*423 Kennedy St Holdings LLC*

423 Kennedy St Holdings, LLC
1629 K Street, NW
Suite 300
Washington, DC 20006

Developer RE1 LLC
1629 K Street, NW
Suite 300
Washington, DC 20006

A copy is also being sent to each of the foregoing lawyers, electronically, through the docketing

of this notice in the consolidated Superior Court case.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF COLUMBIA
2
      In Re:                        .  Case No. 23-00217-ELG
3                                   .  Chapter 7
      CHARLES PAXTON PARET,         .
4                                   .  Washington, D.C.
                 Debtor.            .  June 25, 2024
5     . . . . . . . . . . . . . . .  .

6                    341 MEETING OF THE CREDITORS
                       BEFORE WENDELL WEBSTER
7                        CHAPTER 7 TRUSTEE

8     APPEARANCES:

9     For the Debtor:            Martin Law Group, P.C.
                                 By: ELIZABETH KORBUT, ESQ.
10                               8065 Leesburg Pike
                                 Suite 750
11                               Vienna, VA 22182

12    For the Chapter 7          McNamee Hosea, P.A.
      Trustee:                   By: JUSTIN PHILIP FASANO, ESQ.
13                               6404 Ivy Lane
                                 Suite 820
14                               Greenbelt, MD 22070

15    For WCP Fund I LLC, DP     The VerStandig Law Firm, LLC
      Capital LLC, 1Sharpe       By: MAURICE BELMONT VERSTANDIG, ESQ.
16    Opportunity Intermediate   9812 Falls Road
      Trust:                     #114-160
17                               Potomac, MD 20854

18    For Manik Chamarthy:       Greenstein DeLorme & Luchs, P.C.
                                 By: JAMES SADOWSKI, ESQ.
19                               801 17th Street, N.W.
                                 Suite 1000
20                               Washington, DC 20006

21    For Welch Family Limited   By: TODD LEWIS, ESQ.
      Partnership Group:
22

23

24
      Proceedings recorded by electronic sound recording.
25    Transcript produced by transcription service.



Colloquy

1        (Proceedings commenced at 10:30 a.m.)

2        (Witness sworn.)

3            MR. WEBSTER:  All right.  State your full name for the

4    record.

5            MR. PARET:  Charles Paxton Paret.

6            MR. WEBSTER:  Did you read the bankruptcy petition and

7    bankruptcy schedules and the forms that were filed in this case

8    on your behalf?

9            MR. PARET:  I did.

10           MR. WEBSTER:  And are you personally familiar with

11   that information?

12           MR. PARET:  I am.

13           MR. WEBSTER:  And it is true and accurate, correct?

14           MR. PARET:  Yes.  There's some edits and additions

15   that were -- that we're making that I found going back through,

16   items that are missing that I still -- that I still believe

17   that I have ownership in that haven't been discontinued or

18   haven't been -- are not part of my larger claims.

19           MR. WEBSTER:  I understand, but you can continue to

20   clarify that, correct, going forward?

21           MR. PARET:  Yes, of course.

22           MR. WEBSTER:  All right.  Now, is there any reason why

23   you can't answer the questions this morning?

24           MR. PARET:  Why would there not be a reason why I

25   can't answer the questions?



Colloquy

1          MR. WEBSTER:  Well, no.  I'm just required to ask you

2     that question.  But I take it there is no reason you can't

3     answer, correct?  You're ready to proceed, right?

4          MR. PARET:  Unless I don't know the answer to the

5     question.

6          MR. WEBSTER:  Very good.  Very good.  I understand.

7     All right.  So do the bankruptcy schedules identify all of your

8     assets and creditors in the case?

9          MR. PARET:  They identify -- there are some missing

10    creditors.  There's some missing -- not -- nobody that had

11    filed anything, but there's missing creditors, I believe.  And

12    there's missing -- there's a few missing properties that I

13    still have ownership in that were not included in there.

14         MR. WEBSTER:  All right.  So I'm going to make a note

15    of that, and we'll follow back up on that.  All right?

16         MR. PARET:  Absolutely.

17         MR. WEBSTER:  You may need to update the schedules at

18    some point to complete them.  Now, do you still live at the

19    same address that you lived at when the bankruptcy petition was

20    filed?

21         MR. PARET:  Well, you're saying 343 First Street?

22         MR. WEBSTER:  Is that the address, 343 First Street?

23         MR. PARET:  It's where I live now.

24         MR. WEBSTER:  343 First Street.  North.  What?

25    Northwest?  Northeast?



www.escribers.net | 800-257-0885

Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit A1b Meeting of Creditors Transcript   Page 208 of 53

4

Colloquy

1          MR. PARET:  No, no.  Berryville, Virginia.

2          MR. WEBSTER:  343 First Street.  Varityville,

3   Virginia.

4          MR. PARET:  Berryville, Virginia.

5          MR. WEBSTER:  Berryville.  Berryville, Virginia

6          MR. PARET:  22611.  And when the bankruptcy was filed

7   I was moving around between my house in DC where I lived with

8   my ex-wife and our other house here.

9          MR. WEBSTER:  I got you.  So now, let me ask you.  How

10  long did you live in the District of Columbia before you moved

11  to Berryville?

12         MR. PARET:  We haven't.  We've always been in

13  Virginia, but we've -- we've -- we've had a house in DC.  My

14  wife's had a house in DC we'd go back and forth to quite

15  frequently.

16         MR. WEBSTER:  How long did you have that house?

17         MR. PARET:  I never had it.  My wife had it for,

18  maybe, eight, seven -- seven, six years, something like that.

19         MR. WEBSTER:  Oh, I see.  So that never really was

20  your address, the DC house.  Your address was always the

21  Virginia house, correct?

22         MR. PARET:  Yes, sir.

23         MR. WEBSTER:  All right.  How long did you live in

24  Virginia?

25         MR. PARET:  I've lived in Virginia for, maybe, six --



www.escribers.net | 800-257-0885

Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Meeting of Creditors Transcript   Page 209 of 53

5
Colloquy

 1    six years.  Six, seven years.  I had another address before

 2    that in DC.  I lived in an apartment before I was married.

 3            MR. WEBSTER:  So hold on then.  You lived in Virginia

 4    for six years.

 5            MR. PARET:  Let me give you -- let me give you the --

 6    I would say 2018.  2018, 2019 I started going out more to

 7    Virginia.  That's correct.

 8            MR. WEBSTER:  All right.  And you still live there

 9    now.  You still live in Virginia now, correct?

10            MR. PARET:  Yes.

11            MR. WEBSTER:  All right.

12            MR. PARET:  Between here and Atlanta, where my wife

13    has a business, and we go back and forth.

14            MR. WEBSTER:  And the property that you live in in

15    Virginia, is that your residence, or are you renting it?

16            MR. PARET:  It is.

17            MR. WEBSTER:  Your residence?

18            MR. PARET:  It is my residence.

19            MR. WEBSTER:  All right.

20            MR. PARET:  Okay.

21            MR. WEBSTER:  Are you planning on buying any real

22    estate in the next 120 days?

23            MR. PARET:  No.

24            MR. WEBSTER:  Do you have a mobile phone number you

25    can give me?



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Meeting of Creditors Transcript   Page 210 of 53

6

Colloquy

1          MR. PARET:  Yes.  202-834-7673.

2          MR. WEBSTER:  And do you have an email address?

3          MR. PARET:  Yes.

4          MR. WEBSTER:  Go ahead.

5          MR. PARET:  C as in Charlie, P as in Paul, P as in

6     Paul.

7          MR. WEBSTER:  Is that two P's?

8          MR. PARET:  Yeah.

9          MR. WEBSTER:  Is that two P's?

10         MR. PARET:  Yeah.  Two P's.

11         MR. WEBSTER:  Okay.  Go ahead.

12         MR. PARET:  @colomariver.com.

13         MR. WEBSTER:  Spell that.

14         MR. PARET:  C-O-L-O-M-A-R-I-V-E-R.com.

15         MR. WEBSTER:  Thank you.  Are you currently single,

16    married or separated?

17         MR. PARET:  I just have a partner.  I'm not married.

18         MR. WEBSTER:  All right.  Single.  Do you have any

19    dependents?

20         MR. PARET:  I have a daughter.

21         MR. WEBSTER:  One daughter.  Are you currently

22    employed?

23         MR. PARET:  Yes.  I'm working as an advisor in putting

24    together real estate transactions.

25         MR. WEBSTER:  Do you have an employment address



Colloquy

1  different from your home?

2          MR. PARET:  No.

3          MR. WEBSTER:  Okay.  Your home address. Have you ever

4  filed for bankruptcy before?

5          MR. PARET:  No, I never filed for bankruptcy.  I was

6  involuntary, put into it.

7          MR. WEBSTER:  I see.  I understand.  Have you

8  purchased a car within the last six months?

9          MR. PARET:  No.

10          MR. WEBSTER:  All right.  You currently own a vehicle?

11          MR. PARET:  I do.

12          MR. WEBSTER:  Is it insured?

13          MR. PARET:  It is.

14          MR. WEBSTER:  All right.  You have any life insurance

15  with cash surrender value?

16          MR. PARET:  No.

17          MR. WEBSTER:  Were you expecting any tax refunds at

18  the time you filed the bankruptcy case -- at the time the

19  bankruptcy case was filed?

20          MR. PARET:  No, but there could be.  We've engaged a

21  tax company, and there could be substantial refunds that we're

22  in the process of working through.

23          MR. WEBSTER:  All right.  In the process.  Okay.

24          MR. PARET:  I can give you the name of that accountant

25  if you need that.



8

Colloquy

1          MR. WEBSTER:  Please do.

2          MR. PARET:  It's Bobby Bhatia.

3          MR. WEBSTER:  Bobby?

4          MR. PARET:  Bhatia LLP or is it Bhatia, CPA &

5     Consultants.

6          MR. WEBSTER:  Spell it for me.  Bobby?

7          MR. PARET:  B --

8          MR. WEBSTER:  Wait a minute.  I'm sorry.  Bobby,

9     B-O-B-B-Y?

10         MR. PARET:  Yes, sir.

11         MR. WEBSTER:  All right.

12         MR. PARET:  B-H-A-T-I-A.

13         MR. WEBSTER:  CPA?

14         MR. PARET:  Yes, sir.

15         MR. WEBSTER:  All right.  And is there a phone number?

16         MR. PARET:  I don't -- I don't have it on me at the

17    moment, but I can have it emailed to you at another time.

18         MR. WEBSTER:  Very good.  Very good.  All right.  Does

19    anyone owe you any money, including wages?

20         MR. PARET:  Yeah.  There's probably a long.  I have to

21    go through that list.  Yeah.

22         MR. WEBSTER:  Okay.  And that would be added to your

23    schedules, correct, monies that are owed?

24         MR. PARET:  You would think -- I think one is, I mean,

25    there's some people that I can't really find that owe me an


www.escribers.net  |  800-257-0885

Colloquy

```
 1   exorbitant amount of money.  I don't know where they're

 2   located.  I looked into hiring a private investigator, and I

 3   can't seem to -- seem to locate one of the individuals.  The

 4   other individual is based in DC.  Owes me probably about

 5   $75,000.  He used my money to buy a personal residence instead

 6   of an investment.  And he's based in DC.

 7        MR. WEBSTER:  All right.  Do you own any antique

 8   collectibles?

 9        MR. PARET:  I did for -- I had -- I had a bunch of

10   stuff under consignment on a store that I used to manage, but I

11   no longer -- I've been -- I no longer have that property

12   anymore or any of the antiques that were in there other than

13   what's in my house, my furniture and stuff --

14        MR. WEBSTER:  All right.

15        MR. PARET:  -- now.

16        MR. WEBSTER:  So all of your property though, is

17   listed in the bankruptcy schedules now; is that correct?

18        MR. PARET:  That's correct.

19        MR. WEBSTER:  All right.  Do you have any domestic

20   support obligations that you're required to pay?

21        MR. PARET:  Other than taking care of my daughter and

22   my wife, no, I don't have any other.

23        MR. WEBSTER:  But I mean, not -- that's not in the

24   form of a domestic support obligation.  Is that right?

25        MR. PARET:  No, I don't.
```



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit A - Meeting of Creditors Transcript   Page 214 of 496

10

Colloquy

1          MR. WEBSTER:  Okay.  All right.

2          MR. PARET:  But --

3          MR. WEBSTER:  Have you --

4          MR. PARET:  I have to take care of my family.

5          MR. WEBSTER:  I understand.  I understand.  Have you

6    transferred any property out of your name in the last four

7    years?

8          MR. PARET:  No.  No.

9          MR. WEBSTER:  All right.  Have you sold a house or

10   business in the last four years?

11         MR. PARET:  You know, I've had -- no.  I've had some

12   properties taken from me, but I haven't had any -- I haven't

13   sold or exited.

14         MR. WEBSTER:  I understand.  Has anyone passed away

15   that you would expect to inherit property from?

16         MR. PARET:  No.

17         MR. WEBSTER:  Have you been involved in an automobile

18   accident where you might have a claim against someone?

19         MR. PARET:  No.

20         MR. WEBSTER:  And now, are you currently involved in

21   any litigation where you're suing anyone?

22         MR. PARET:  Yes.

23         MR. WEBSTER:  All right.  And is that information in

24   the schedules?

25         MR. PARET:  It should be.



Colloquy

1    MR. WEBSTER:  All right.  We'll follow up if it's not.

2  Now, you said you're -- are you in the process of finalizing

3  your personal taxes, or are these business taxes?  You said you

4  have an accountant that's looking into the tax issues.

5    MR. PARET:  It will be a combination of personal and

6  business.

7    MR. WEBSTER:  All right.  So you're in the process of

8  doing that?

9    MR. PARET:  Yes.

10    MR. WEBSTER:  All right.  And we need to speak to

11  speak to Bobby Bhatia about that.

12    MR. PARET:  (Indiscernible).

13    MR. WEBSTER:  All right.

14    MR. PARET:  And I spoke to my agent at the IRS, and

15  she's aware that we're amending the -- there's some tax

16  obligations that are incorrect that date back to 2019.  So

17  hopefully, by the time we're done with these taxes, all of that

18  will be amended.

19    MR. WEBSTER:  I understand.  Now, did you list all of

20  your bank accounts in the schedules?

21    MR. PARET:  I did.

22    MR. WEBSTER:  All right.  Do you have a stock account

23  or mutual fund account?

24    MR. PARET:  I do not.

25    MR. WEBSTER:  All right.  And have you paid anyone



www.escribers.net | 800-257-0885

Colloquy

1    more than $600 in bills in the past three months?

2          MR. PARET:  Other than my current obligations,

3    mortgages, car payments --

4          MR. WEBSTER:  All right.  And that information is

5    reflected in the schedules.  Correct?

6          MR. PARET:  Correct.  All right.

7          MR. WEBSTER:  Do you have a college education fund for

8    your daughter?

9          MR. PARET:  I do not.

10         MR. WEBSTER:  Have you owned or had any interest in an

11   LLC or a business in the past four years?

12         MR. PARET:  Yes, of course.

13         MR. WEBSTER:  And that's reflected in the schedules

14   too, correct?

15         MR. PARET:  Yeah, there's a lot of LLCs.  Now, the

16   problem is most of those LLCs are either defunct or I'm not

17   renewing them.  So either they're -- they're part of the

18   current litigation, or I've just let them go because I can't

19   pay to renew them.

20         MR. WEBSTER:  I understand.  But they are listed in

21   your schedules.

22         MR. PARET:  Yes.

23         MR. WEBSTER:  All right.

24         MR. PARET:  There are some that are missing or that

25   have properties attached to them that were not in the schedules

Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Meeting of Creditors Transcript   Page 217 of 53

13

Colloquy

 1  that I did not think that I would have a claim to, but the LLCs

 2  are still active and the properties are still active, and these

 3  are assets that are outside of the current litigation with one

 4  of my creditors.

 5          MR. WEBSTER:  Okay.  So we may have to follow up with

 6  you on that.  Have you been involved in any type of trust in

 7  the last three years?

 8          MR. PARET:  No.  There was a trust that was set up in

 9  Virginia that never went -- it was never actually set up.  It

10  was meant to be for a project.  I think it was called the Paret

11  Family Limited Partnership Trust, but it never was set up, and

12  there's nothing attached to it.  And it just -- it should have

13  gone defunct at this point.

14          MR. WEBSTER:  All right.  Do you own any

15  cryptocurrency?

16          MR. PARET:  I did, and it's one of the ongoing

17  litigations.  I'm trying to find one of my -- the gentleman who

18  ran off with it is one of my debtors that ran off with quite --

19  quite a large sum of it.

20          MR. WEBSTER:  All right.  And is that referred to in

21  the schedules?

22          MR. PARET:  It should be, yes.

23          MR. WEBSTER:  All right.  What about a Venmo account?

24  Do you have a Venmo account?

25          MR. PARET:  I personally do not, but I think, like,



Colloquy

1    one of my -- my retail businesses did for a while.

2         MR. WEBSTER:  All right.  How about a PayPal account?

3         MR. PARET:  No.

4         MR. WEBSTER:  And have you made any electronic

5    transfers to any parties from any of these accounts in the past

6    year?

7         MR. PARET:  To what accounts?

8         MR. WEBSTER:  From any of those electronic accounts in

9    the past year.

10        MR. PARET:  Yeah, I think for my -- it's set up under

11   my house payments where renters can -- people that rent my

12   little cottages that are at my house and properties that I

13   manage, they pay through -- they can pay through Venmo.  It's

14   mostly where they pay.  If they don't pay through Venmo,

15   they'll pay through, like, just an online processing.

16        MR. WEBSTER:  So but --

17        MR. PARET:  That goes to --

18        MR. WEBSTER:  That's the Venmo account, though, that's

19   listed for your business.

20        MR. PARET:  That's correct, Your Honor.  Yes.

21        MR. WEBSTER:  Yeah, you said you said you didn't have

22   one personally, but your business -- you have a business name.

23        MR. PARET:  Yeah.

24        MR. WEBSTER:  All right.

25        MR. PARET:  It should be at least.  I mean, I have an



Case 25-10023-ELG    Doc 8-1    Filed 07/06/25    Entered 07/06/25 00:58:28    Desc
Exhibit A - Meeting of Creditors Transcript    Page 219 of 53    15

Colloquy

1    admin that manages all of that.

2            MR. WEBSTER:  All right.  All right.

3            MR. PARET:  I'll double check with you.

4            MR. WEBSTER:  Oh.  Very good.  Okay.  I don't have any

5    more 341 interrogatory questions right now, but we may have to

6    follow up once we review your schedules.  All right?

7            MR. PARET:  Okay.

8            MR. WEBSTER:  All right.  The attorneys on the line

9    beginning with Attorney Fasano.  Do you have any follow-up

10   questions?

11           MR. FASANO:  Yeah.  All right.  Mr. Paret, I saw you

12   listed, it looked like forty or fifty, maybe eighty or ninety

13   LLCs.  I know those LLCs are involved in litigation, but did

14   any of those LLCs still own any property in --

15           MR. PARET:  Yes.

16           MR. FASANO:  Yes.  Which ones are those?

17           MR. PARET:  1114 8th Street Holdings L.L.C.

18           MR. FASANO:  Okay.  And does that one own the property

19   at that address?

20           MR. PARET:  Correct.  And I'm a fifty percent owner of

21   that address of that company.  Yes.

22           MR. FASANO:  Okay.

23           MR. PARET:  There was a very, you know, the partner in

24   that deal, in order to avoid a claim against the property by

25   one of our investors, he made me sign, like, a small release,



Exhibit Relevant Documents Page 496

Colloquy

```
 1    but I've had my counsel look at it, and he said, that's

 2    invalid.  There's been no dissolution of the partnership, and

 3    there's been no dissolving of the asset, and it's worth

 4    probably $2 million.  And I think we have about a $900,000

 5    first position trust that's on that.

 6          MR. FASANO:  All right.  Is there any second position

 7    trust on it?

 8          MR. WEBSTER:  I don't think so.  No.

 9          MR. FASANO:  Okay.  Who's the other fifty percent

10    owner?

11          MR. PARET:  I believe Easy Loans (phonetic).  Ryan

12    Shandell.

13          MR. FASANO:  Ryan.  How do you spell his last name?

14          MR. PARET:  S-H-A-N-D-E-L-L.

15          MR. FASANO:  Okay.  Are there any other --

16          MR. PARET:  Go ahead.

17          MR. FASANO:  Are there any other companies that still

18    own property that you have an interest in?

19          MR. PARET:  Yes.  There was 729 Kennedy Street

20    Holdings.  It's not a party to the WCP litigation.

21          MR. FASANO:  Okay.  And what does that own?  I mean,

22    does that own 729 Kennedy Street?

23          MR. PARET:  Yes.

24          MR. FASANO:  So what?  Fifty percent interest?

25          MR. PARET:  1,000,003, and it's -- I think it has a
```



Colloquy

1    $550,000 first position.

2            MR. FASANO:  You own --

3            MR. PARET:  No, I own sixty-five percent.  Sixty-three

4    percent, something like that.  I don't know the exact amount.

5            MR. FASANO:  Who's the other owner?

6            MR. PARET:  That's a group of small investors that are

7    part of the litigation.

8            MR. FASANO:  Okay.  And WCP has no lien on that?

9            MR. PARET:  No.

10           MR. FASANO:  Okay.  Who has the lien on that?  .

11           MR. PARET:  Dave McClure (phonetic).  I forget the

12   name of the lender.  It's something, Hive Lending (phonetic).

13   Hive lending.

14           MR. FASANO:  Hive lending?  Like a beehive.

15           MR. PARET:  Yes.

16           MR. FASANO:  Okay.  Anything else?

17           MR. PARET:  Well, there's a property in question that

18   I signed a release for, but it may be a little gray.  There was

19   a property in southeast DC, a fairly sizable site, where we

20   made a deal with a developer that we could close on the land,

21   but in order for him to close on the land he had -- we had to

22   lower our purchase price, and he would give us a concession.  I

23   don't think there's any -- if either -- I mean, I could try to

24   litigate it, but I'm not sure it's worth going after, because

25   we did sign, sort of, a release.  But there was an agreement

Colloquy

 1   between us and the other party.  It's just a single individual,

 2   but we sold them a property for a million dollars, and the --

 3   it ended up being, like, more like 300,000, because we couldn't

 4   get the appraisal done.  But I don't know if I have any real

 5   claim to it at this point, but -- I forgot.  I forgot about --

 6        MR. FASANO:  What is the entity and what is the

 7   property?

 8        MR. PARET:  I have to send it to you.  It's -- it's

 9   just lots.  It's just empty lots.  There's no property.

10        MR. FASANO:  Okay.  And it's not in your company's

11   name right now?

12        MR. PARET:  No, it was in a company that I

13   established.  I think it was reassigned to a new -- it was sold

14   to a new entity, but it was sold for no money.  It was just --

15   we just lowered the price and to get -- to get him approved for

16   the loan, so he could close on it quickly.  It's slightly

17   complicated, but I can -- I can -- it's worth a lot of money

18   now.  It's probably worth maybe $3 million now, but this is

19   five, six, seven years ago, something like that.

20        MR. FASANO:  So you lowered the price and that he

21   would qualify for a loan because he couldn't get the appraisal?

22        MR. PARET:  And we were supposed to -- we were

23   supposed to work together on the property to get the

24   entitlements, which we did work on after he closed and get it,

25   you know, get the financing together.  It was being held in his



Colloquy

 1    name during that time.  But a lot of things happened between

 2    now and then, and we just sort of.

 3            MR. FASANO:  And what is his name?

 4            MR. PARET:  His name's Peter Corbett (phonetic).  Or

 5    wait, wait.  I'm sorry.  Let me make sure of this.  Corbetts.

 6    It's not Peter Corbett.  It's Corbett-Daly (phonetic).

 7            MR. FASANO:  Corbett-Daly.  Is that his last name is

 8    Corbett-Daly or is --

 9            MR. PARET:  Yeah.

10            MR. FASANO:  Okay.

11            MR. PARET:  And the name of the LLC  The name of the

12    LLC was 15th Place Holdings, LLC.

13            MR. FASANO:  UU:  Got it.  And do you know, is that

14    within the last four years?

15            MR. PARET:  2019, sort of.

16            MR. FASANO:  Sort of.

17            MR. PARET:  Maybe.

18            MR. FASANO:  Okay.

19            MR. PARET:  Maybe.  I mean, I think it went into --

20    hold on.  Let me see.  Yeah.  This is all in 2018 from -- we

21    closed in -- it -- the purchase price that we were selling it

22    to the entity, I believe, was for 800,000.  I'm looking at the

23    details now.  We actually ended up settling for 300 or

24    something very way below market value, so he could close on the

25    loan.  But you can build thirty units in --

Colloquy

1         MR. FASANO:  You mean like, a second note on the

2    property?  Second deed of trust.

3         MR. PARET:  No it was -- I think it was more of a -- I

4    have somewhere in an email, I think we -- the structure of how

5    we did it.  I'd have to share it with you.  I'd have to find

6    it.

7         MR. FASANO:  Right.  Any other properties, any other

8    LLCs that still have property?

9         MR. PARET:  I'd have to go back through that list

10   again.  I know it was a lot, but I think there was, like, one

11   or two more that were slightly outstanding.  I'll go -- I don't

12   want to say no, and then have there be another one and me -- me

13   being questioned as regarding of what my you know.  I just, I

14   don't know off the top of my head.  I'd have to go back through

15   to look.

16        MR. FASANO:  Marlin Mead (phonetic), that is the guy

17   who owes you 75,000?

18        MR. PARET:  I mean, it's accruing interest heavily.

19   Yeah.

20        MR. FASANO:  So what?  What happened with that?

21        MR. PARET:  He bought a house using that money, and

22   it's worth quite a lot of money now, I think.  I think it's

23   worth quite substantially.  I can send you the -- I mean, as of

24   it was a $40,000 principal as of July 18th, 2019, accruing

25   three percent a month since that date.



Case 25-10033-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit A - Meeting of Creditors Transcript   Page 225 of 53

21

Colloquy

1          MR. FASANO:  So he took your money.  He bought a house

2    with it.  Was there a loan document between you?

3          MR. PARET:  There was a -- there was a promissory

4    note.  And a few other things, I believe.  Yes.  I can -- I can

5    share that with you.

6          MR. FASANO:  Okay.

7          MR. PARET:  But I knew he used that money to buy a

8    house.  And the house is, I think, has 300 or $400,000 in

9    equity in it.

10          MR. FASANO:  Is he living there?

11          MR. PARET:  I believe so.  James Lomax (phonetic).

12    The name of the -- the name of the -- the name of the address

13    that he used to acquire the property was -- can I give you the

14    address?

15          MR. FASANO:  Yeah.

16          MR. PARET:  6017 Seat Pleasant Drive in Capital

17    Heights, Maryland.  But he never he never used that money to

18    buy that house.  He used it to buy something else.  To buy

19    another house that he was developing, and then ended up moving

20    in as a personal residence.

21          MR. FASANO:  Right.  Have you sued?

22          MR. PARET:  I have been emailing him consistently.  I

23    haven't filed suit yet.  But I had enough of other things and

24    other things I'm dealing with regarding filings.

25          MR. FASANO:  Okay.  And James Lomax, IV, that's the



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit-Relevant of Creditors Transcript 228 Page 226 of 53

22

Colloquy

1    guy you can't find?

2              MR. PARET:  Correct.

3              MR. FASANO:  And he sold 320 bitcoin?

4              MR. PARET:  Something like that.

5              MR. FASANO:  I just went online.  That looks like it's

6    valued around $60,000 right now.  Does that seem right?

7              MR. PARET:  Something like that.

8              MR. FASANO:  Okay.

9              MR. PARET:  Yeah, if I could find him.  If you look

10   up, there was an LLC, a Coloma River LLC that he had registered

11   in Florida.  He went ghost on me probably, maybe, five years

12   ago.  We had a total of, like, 500 and something bitcoin,

13   something like that.  I think at the time where it began to

14   disappear was somewhere around 300.  At the time they were,

15   like, $300 a coin or something like -- it wasn't substantial

16   the way it is now, but I've tried to hire people to find him.

17             MR. FASANO:  What else?

18             MR. PARET:  Right.  Keep going.  I think that's about

19   it.

20             MR. FASANO:  Give me two seconds.  The consigned

21   goods.  Were you running a store in Clark County?

22             MR. PARET:  Yeah, I was.  I mean, it was a -- just a

23   hobby project.  Called Neatoville (phonetic).  It was an asset

24   that I was trying to buy over -- over time through, like, a

25   lease to own structure.  And the guy went back on his offer,

Colloquy

 1  and I couldn't keep staff there to manage it, and just ended up

 2  walking away from the store and everything in it.  There was a

 3  lot of, you know, assets and things that were being sold under

 4  that, under that LLC, but I didn't have time to manage it, and

 5  it didn't really make any money.

 6          MR. FASANO:  What was the LLC?

 7          MR. PARET:  Neatoville LLC.  N-E-A-T-O.  It doesn't

 8  have any value now.  I mean, it's nothing.

 9          MR. FASANO:  You would buy goods on consignment?  Or

10  not buy goods.  People would consign goods to it?

11          MR. PARET:  Yeah.  I never was involved in it.  I

12  don't have time to.  I mean, it's not my business.  It was more

13  of a way to, you know, grow community, and it was a hobby, if

14  any.

15          MR. FASANO:  All right.  So you're living at 343 First

16  Street?

17          MR. PARET:  Yeah.

18          MR. FASANO:  Okay.  What is 98 East Fairfax?

19          MR. PARET:  It's part of 343 First Street.  It's just

20  a separate -- a separate parcel.  And I'm here now.  It's the

21  house.  I live on a farm.  I, you know, I have animals.  I take

22  care of the animals, and 98 East Fairfax is the rear entrance

23  of my farm.  It's the main farmhouse that attaches to this

24  parcel.

25          MR. FASANO:  So First Street is the house.  Fairfax is



Colloquy

1    the farm.

2           MR. PARET:  Fairfax is the farm.  It's all connected.

3    And I have a guest house on that property as well.  But it used

4    to be, originally, in the early days, about 100, 150 years ago,

5    It used to be all one parcel.  It was subdivided, and I

6    reconnected them.

7           MR. FASANO:  Are you actively farming there?

8           MR. PARET:  I am.

9           MR. FASANO:  What are you farming?

10          MR. PARET:  I have cows, and I think, a couple of

11   ducks.

12          MR. FASANO:  Any crops?

13          MR. PARET:  No, minus the hay.  That's it.

14          MR. FASANO:  How many cows?  Do you know?

15          MR. PARET:  Eight.

16          MR. FASANO:  And how many ducks?

17          MR. PARET:  Four or six.

18          MR. FASANO:  Are these milk cows?

19          MR. PARET:  Yeah, they're -- they're Angus beef.

20          MR. FASANO:  Angus beef.  So are they (indiscernible)

21   cows?

22          MR. PARET:  I guess they're cows, but they're --

23   they're not, I mean, I'm not breeding them.

24          MR. FASANO:  Right.

25          MR. PARET:  I mean, the guy who manages it all does



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit Relevant Creditors Transcript Page 229 of 53

25

Colloquy

 1 | it, but we just.  I just do it for food.

 2 | MR. FASANO:  Right.

 3 | MR. PARET:  I don't do it for money.

 4 | MR. FASANO:  You don't sell the cows?  You just --

 5 | MR. PARET:  No cows.

 6 | MR. FASANO:  Yeah.  Got it.  Okay.

 7 | That's going to be all my questions for now.  I'll

 8 | open up the floor to everyone else.

 9 | MR. WEBSTER:  Well does Attorney VerStandig have any

10 | questions?

11 | MR. VERSTANDIG:  Yes.  And just as a sort of

12 | preliminary matter, can we keep the 341 open until such a time

13 | as amended schedules are filed?

14 | UNIDENTIFIED SPEAKER:  I think we're going to need to,

15 | yeah.

16 | MR. WEBSTER:  Yes, we'll do that.

17 | MR. VERSTANDIG:  Mr. Paret, earlier today you

18 | indicated that you have a partner, but you're not married.  And

19 | then subsequently, you made a reference to your wife.  What is

20 | your marital status?

21 | MS. KORBUT:  You're muted.

22 | MR. PARET:  When I was talking about my wife, I meant

23 | my ex-wife.

24 | MR. VERSTANDIG:  Okay.  Do you have a support

25 | obligation to your ex-wife?



Colloquy

1        MR. PARET:  No, I do not.

2        MR. VERSTANDIG:  Do you send your ex-wife money?

3        MR. PARET:  No.

4        MR. VERSTANDIG:  I'm sorry.  Say that one more time.

5        MR. PARET:  No.

6        MR. VERSTANDIG:  Okay.  So when you talked about

7    supporting your child and your wife, what did you mean by

8    supporting your wife?

9        MR. PARET:  Oh, I'm sorry.  I mean, supporting my

10   partner.  I'm not married.  I'm engaged.  I'm not married.

11       MR. VERSTANDIG:  Do you have a wedding date?

12       MR. PARET:  No.

13       MR. VERSTANDIG:  Did you present your partner with an

14   engagement ring?

15       MR. PARET:  I did.

16       MR. VERSTANDIG:  When did you become engaged?

17       MR. PARET:  It's like, I think, October of last year.

18       MR. VERSTANDIG:  October of 2023?

19       MR. PARET:  Correct.

20       MR. VERSTANDIG:  Okay.  Where did you procure the

21   engagement ring?

22       MR. PARET:  I got it through -- well, I got it from --

23   I think I got it from an estate, like, an estate sale.

24       MR. VERSTANDIG:  It's a used engagement ring?

25       MR. PARET:  Yes, absolutely.



Colloquy

 1              MR. VERSTANDIG:  How much did you pay for it?

 2              MR. PARET:  I think I paid, like, 2 or $3,000.

 3              MR. VERSTANDIG:  Are you familiar with the property

 4      known as 4910 Georgia Avenue?

 5              MR. PARET:  Yes.

 6              MR. VERSTANDIG:  Okay.  You're currently being sued in

 7      federal court over your involvement with that property,

 8      correct?

 9              MR. PARET:  Yes.

10              MR. VERSTANDIG:  Do you claim, through partnership or

11      otherwise, to have any ownership interest in that property, as

12      we sit here today?

13              MR. PARET:  Is that pertinent to this conversation?

14              MR. VERSTANDIG:  Yes.

15              MR. PARET:  I mean, can I answer this question without

16      my other counsel?

17              MR. VERSTANDIG:  Mr. Paret, you're under oath, and

18      it's your meeting of creditors.  Unless someone instructs you

19      otherwise, you're going to answer my questions today.  So do

20      you claim to have an ownership interest in 4910 Georgia Avenue?

21              MR. PARET:  I do.

22              MR. VERSTANDIG:  What is the nature of your ownership

23      interest?

24              MR. PARET:  I think that's currently in debate.

25              MS. KORBUT:  Considering it's an ongoing proceeding,



Colloquy

1    is this something that can be updated as the proceeding

2    continues?

3              MR. VERSTANDIG:  Mr. Paret has certainly changed

4    answers in the past.  He's welcome to change them in the

5    future.

6              All right.  Mr. Paret, are you familiar with a

7    property known as 423 Kennedy Street in Washington, DC?

8              MR. PARET:  Yes.

9              MR. VERSTANDIG:  Okay.  Do you claim to have an

10   ownership interest in that property?

11             MR. PARET:  That's currently in debate.

12             MR. VERSTANDIG:  I understand you're saying it's in

13   debate.  What is your position in the debate?  Do you maintain

14   that you have an interest, or do you maintain that you don't

15   have an interest?

16             MR. PARET:  We maintain that we have an interest.

17             MR. VERSTANDIG:  Okay.  When you say we, who is we?

18             MR. PARET:  My LLC, 423 Kennedy Street Holdings.

19             MR. VERSTANDIG:  Okay.  Do you own an interest in 423

20   Kennedy Street Holdings LLC?

21             MR. PARET:  That's currently in debate.

22             MR. VERSTANDIG:  Okay.  But you maintain that you do?

23             MR. PARET:  It's currently in debate.

24             MR. VERSTANDIG:  No.  Mr. Paret, I'm not asking you if

25   there's a debate.  I'm asking you what your position is.  And I

Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Meeting of Creditors Transcript   Page 233 of 496

29

Colloquy

1  understand.  Judges can tell you that you're wrong.  Other

2  people can argue with you.  Is it your position that you own an

3  interest in 423 Kennedy Street, the property in Washington, DC?

4       MR. PARET:  It's currently in debate.

5       MR. VERSTANDIG:  Mr. Paret, that's not an acceptable

6  answer.  If you don't know, you can tell me that you don't

7  know, and we can talk about the facts.  And if you'd rather do

8  this for 4910 Georgia or one of the other sixty-some odd

9  properties, that's fine.  I picked a few properties at random.

10 But I want to understand.  Is it your position -- and look.  A

11 judge may say otherwise.  Lawyers may say otherwise.  Other

12 people may say otherwise.  But is it your position, Charles

13 Paxton Paret, that you own an interest in the real property

14 situated at 423 Kennedy Street in the District of Columbia?

15      MR. PARET:  It's currently in debate.

16      MS. KORBUT:  Mac, I think you got the answer you're

17 going to get on this one.  I think he understood.

18      MR. PARET:  I can go -- I can go all day, Mac.  Let's,

19 you know, you're going to get the same thing out of me.

20      MR. VERSTANDIG:  Okay.

21      MR. PARET:  Let's move on.  In the interest of time.

22      MR. VERSTANDIG:  Mr. Paret, what is your position in

23 that debate?  Do you believe that you own an interest, or do

24 you not believe that you own an interest?  I'm sorry.  I didn't

25 hear an answer.



Colloquy

1              MR. PARET:  I didn't give one.

2              MR. VERSTANDIG:  Chuck, please answer the question.

3              MR. PARET:  I -- I believe that my investors have an

4     ownership interest in that property.  And our LLC, our LLC has

5     an ownership interest in that property.  And I'm not going to

6     speak on behalf of my interest.

7              MR. VERSTANDIG:  Why are you not going to speak on

8     behalf of your interest?

9              MR. PARET:  Because it's currently in debate.

10             MR. VERSTANDIG:  Only for the record at this point,

11    because obviously a contempt admission's forthcoming.

12             Mr. Trustee, would you please direct the debtor to

13    answer the question?

14             MR. WEBSTER:  Well, I believe he's saying that he

15    doesn't -- he's not able to answer it, because it's unclear.

16    That's my understanding.

17             MR. PARET:  That is correct, Mr. Webster.

18             MR. VERSTANDIG:  But Mr. Paret, now, it is your

19    position that an entity you own owns an interest in that

20    property?

21             MR. PARET:  I mean, you're trying to get me to answer

22    that question the way you want me to answer the question.  And

23    as Mr. Webster stated, it is currently unclear.  My only

24    position that I'm stating on record is that the LLC that we own

25    had interest in that property, and my investors had interest in

Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit Relevant Creditors Transcript   Page 235 of 496   of 53

31

Colloquy

 1    that property.  And that is all at this time that I will say.

 2              MR. VERSTANDIG:  Well, Mr. Paret, you've sued my

 3    client for, I believe, half a billion dollars on the theory

 4    that you have an interest in that property and fifty some odd

 5    others, correct?

 6              MR. PARET:  That is correct.

 7              MR. VERSTANDIG:  Did you voluntarily file that

 8    lawsuit, or were you forced to do so?

 9              MR. PARET:  Force?  Force by who?

10              MR. VERSTANDIG:  Well, I just want to make sure, since

11    you're not answering today, that you at least understood what

12    you were doing when you filed that lawsuit.

13              MR. PARET:  I mean, we were filing that lawsuit on

14    behalf of, you know, the other partners and investors that were

15    in that project.

16              MR. VERSTANDIG:  So you filed it on behalf of them.

17    The lawsuit is <u>Charles Paret v. Daniel Huertas</u>, correct?  You

18    don't have any co-plaintiffs?

19              MR. PARET:  No, there's -- it's currently myself and

20    the LLCs, I believe.

21              MR. VERSTANDIG:  I'm sorry.  It's your position that

22    the LLCs are your co-plaintiffs?

23              MR. PARET:  No.  I'm sorry.  I misspoke.

24              MS. KORBUT:  Mr. VerStandig, is any of this calculated

25    towards finding out whether or not the estate has any assets?

Colloquy

 1          MR. VERSTANDIG:  Yeah.  It appears the estate's only

 2     asset, other than things that haven't been scheduled and

 3     several hundred million dollars in stolen bitcoin is a

 4     litigation claim against my client.  I'm trying to gently

 5     explore whether or not he even understands the litigation claim

 6     he filed

 7          MS. KORBUT:  Mac, currently, we're not discussing the

 8     litigation claim, and he doesn't have his attorneys present

 9     that are representing him in that litigation claim, so I can't

10     really speak to it, nor could I cover what should or shouldn't

11     be disclosed in this meeting under that proceeding.  So this

12     seems like something that needs to be sorted out in the

13     litigation proceedings and not in these ones.

14          MR. VERSTANDIG:  Well, he's not represented in the

15     litigation, because it's an asset of the estate.  So we don't

16     need to worry about him having litigation counsel present.  I'm

17     simply asking for his understanding of what he's asserting.

18     I'm not asking him to make legal conclusions.  I'm not asking

19     him to play judge.

20          MR. PARET:  If my attorneys are present that are

21     representing me, I'm going to give the same response, that it's

22     unclear.

23          MR. VERSTANDIG:  Okay.  Who are the attorneys that are

24     representing you, Mr. Paret?

25          MR. PARET:  Blank Rome, Donald Temple.



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Meeting of Creditors Transcript   Page 237 of 496

33

Colloquy

1          MR. VERSTANDIG:  When did you engage the services of

2    Blank Rome?

3          MR. PARET:  I currently -- I think they currently are

4    being engaged now, I believe.

5          MR. VERSTANDIG:  So they're not your attorneys at the

6    moment.  They're yet to be engaged?

7          MR. PARET:  I believe so.  They -- they were engaged

8    with me on a -- on a matter of, the OAG matter, which is not

9    related to this.

10          MR. VERSTANDIG:  Well, let me ask you a different

11   question.  Since you were placed into bankruptcy, have you

12   hired any attorney other than the Martin Law Group without the

13   permission of the bankruptcy court?

14          MR. PARET:  No.

15          MR. VERSTANDIG:  Okay.  So if Blank Rome is still

16   being engaged, are you saying that they represented you since

17   before the bankruptcy, even though there is --

18          MR. PARET:  No.  They haven't been formally engaged

19   yet?

20          MR. VERSTANDIG:  Okay.  What about Mr. Temple?  When

21   did you formally engage Mr. Temple?

22          MR. PARET:  I think May or May or April, May, March of

23   2023, somewhere around that time.

24          MR. VERSTANDIG: Is Mr. Temple holding a retainer for

25   you?



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit A - Meeting of Creditors Transcript   Page 238 of 496

34

Colloquy

1          MR. PARET:  He is not.

2          MR. VERSTANDIG:  You paid him somewhere between 10 and

3    $20,000, correct?

4          MR. PARET:  That's correct.

5          MR. VERSTANDIG:  Okay.  And that was to represent you

6    in connection with the litigation against my client, correct?

7          MR. PARET:  Correct.

8          MR. VERSTANDIG:  Okay.  And he did not complete that

9    representation, did he?

10         MR. PARET:  He has not as of yet.

11         MR. VERSTANDIG:  Okay.  So is it your position that he

12   owes you some of that money back?

13         MR. PARET:  No.

14         MR. VERSTANDIG:  You believe he earned all of it, even

15   though he didn't finish the representation?

16         MR. PARET:  I mean, he's still working on the

17   representation, so I believe so.

18         MR. VERSTANDIG:  So he represents you?

19         MR. PARET:  I mean, currently, on paper, yes, I

20   believe so.

21         MR. VERSTANDIG:  Do you know when he filed his

22   employment application with the bankruptcy court?

23         MR. PARET:  I don't know if he -- I don't think he was

24   representing me in the bankruptcy court.  It -- Jeff Martin was

25   representing me in the bankruptcy court.



Colloquy

1    MR. VERSTANDIG:  But we can agree that the litigation

2    is in the bankruptcy court, correct?

3        MR. PARET:  Correct.  And we're trying to -- we're

4    waiting on the direction.  And I believe he was entering his

5    office to employ or whatever the language that's used shortly

6    with the trustee.

7        MR. VERSTANDIG:  So it's your understanding that the

8    trustee is going to be engaging Donald Temple?

9        MR. PARET:  And Blank Rome.

10       MR. VERSTANDIG:  Mr. Trustee, subject to the meeting

11   being held up, I have nothing further at this time.  Thank you.

12       MR. WEBSTER:  All right.  Ms. can I have your attorney

13   identify herself?  I see it's listed as Elizabeth.  Can you

14   give me your full name for the record, ma'am?

15       MS. KORBUT:  Elizabeth Korbut.  K-O-R-B as in boy-U-T

16   as in Tom.

17       MR. WEBSTER:  K-O-R-B as in boy.  What else?

18       MS. KORBUT:  U-T as in Tom.

19       MR. WEBSTER:  All right.  Thank you very much.  Any

20   other party on the line have any questions of the debtor?

21       MR. SADOWSKI:  Mr. Gardner (sic), this is Jim

22   Sadowski.  I do.

23       MR. WEBSTER:  All right, Mr. Sadowski.  First of all,

24   what is your connection with the case?

25       MR. SADOWSKI:  I entered an appearance on behalf of



1  Manik Chamarthy --

2          MR. WEBSTER:  All right.

3          MR. SADOWSKI:  -- as a creditor or potential creditor.

4          MR. WEBSTER:  All right.

5          MR. SADOWSKI:  -- related to money that was invested

6  in 4910 Georgia Avenue.

7          MR. FASANO:  Jim, can you spell that?

8          MR. SADOWSKI:  Sure.  Manik Chamarthy?

9          MR. FASANO:  Yeah.

10          MR. SADOWSKI:  Justin, I think I entered an

11  appearance.

12          MR. FASANO:  I'll look it up.  I'll look it up.

13          MR. SADOWSKI:  Yeah.  Mr. Gardner (sic), did you want

14  me to proceed, or are we waiting for Ms. Korbut?

15          UNIDENTIFIED SPEAKER:  You can go ahead.

16          MR. SADOWSKI:  Okay.  Mr. Gardner (sic), am I able to

17  share my screen to pull up the schedules?  It's disabled

18  currently.  I don't have to, but it might be helpful.

19          MR. WEBSTER:  Is there a technical problem?

20          MR. SADOWSKI:  It says the host has disabled

21  participant screen sharing, so I don't think the option is

22  available.

23          MR. WEBSTER:  Hold on a second.  Screen sharing.  I

24  just checked on it.  Let's see if it's available now.

25          MR. SADOWSKI:  It is.  Thank you.

Colloquy

 1           MR. WEBSTER:  All right.

 2           MR. SADOWSKI:  Permission to share my screen?

 3           MR. WEBSTER:  Certainly.

 4           MR. SADOWSKI:  Now, Mr. Paret, I can't see what's

 5   being shared, but do you see some color-coded numbers and

 6   entities on the screen?

 7           MR. PARET:  I do.

 8           MR. SADOWSKI:  Yeah.  I'll represent to you that this

 9   is your schedules, page 10 of 46.  Sure.

10           MR. PARET:  Yeah.

11           MR. SADOWSKI:  Mr. Paret, is there any reason why

12   these things are color coded the way they are?

13           MR. PARET:  I actually have no idea why they were like

14   that.  No idea.

15           MR. SADOWSKI:  Okay.  All right.  And I take it, is

16   this, like, this page is prepared in some sort of Excel file?

17           MR. PARET:  Yes.

18           MR. SADOWSKI:  And does the same holds true for page

19   12, which has some color coding on it.

20           MR. PARET:  Yeah.

21           MR. SADOWSKI:  Is that an Excel file?

22           MR. PARET:  Yes.

23           MR. SADOWSKI:  Okay.  Going back to page 10, I'm

24   looking -- I don't see on page 10.  Maybe I missed it.  I don't

25   see any reference to 4910 Georgia.  Did I miss that or?



Colloquy

1          MR. PARET:  Should be.  It should be in there.

2     There's a -- there's a -- there is a bunch of missing ones that

3     were not listed in here for some reason.  Most of these are

4     defunct, but there is a lot of them that were missing in here.

5          MR. SADOWSKI:  So do you recall what the -- when I say

6     4910 Georgia Avenue, we're talking about the property in DC at

7     that address, right?

8          MR. PARET:  Correct.

9          MR. SADOWSKI:  Yeah.  Do you remember the entity that

10    was associated with that property as an owner?

11         MR. PARET:  Yeah.  It was 4910 Georgia Avenue Holdings

12    LLC.

13         MR. SADOWSKI:  Okay.  Were there any other LLCs

14    involved with the ownership of that property?  .

15         MR. PARET:  I think there was 4910 Georgia Avenue

16    Partners LLC.  Does that ring a bell?

17         MR. SADOWSKI:  It does.  It's actually on my list.

18    And what was that partner's entity relationship to that

19    property?

20         MR. PARET:  That was the property -- that was the

21    ownership structure for their percentage of our ownership.

22         MR. SADOWSKI:  And do you remember what the percentage

23    was?

24         MR. PARET:  Not off the top of my head.

25         MR. SADOWSKI:  Have you heard of an entity called, and



Colloquy

1    I'll spell this.  G4910 LLC.

2            MR. PARET:  Yes.

3            MR. SADOWSKI:  That's G as in go.

4            MR. PARET:  That's correct.

5            MR. SADOWSKI:  How was that entity, G4910 LLC,

6    involved with 4910 Georgia Avenue?

7            MR. PARET:  They were the financing arm of the 4910

8    Georgia Avenue Partners that was then a member of 4910 Georgia

9    Avenue Holdings.  That was the LLC that financed that finance

10   deal.  That was -- I didn't have any ownership of that.  That

11   was the Manik and their group's of ownership.

12           MR. SADOWSKI:  Okay.  Do you remember who else besides

13   you mentioned Manik?  That's Mr. Chamarthy, right?

14           MR. PARET:  Correct.

15           MR. SADOWSKI:  Yeah.  Besides Manik.  I'll just use

16   that name.

17           It's M-A-N-I-K, for those listening.

18           Do you know who else was involved in the financing

19   arm.

20           MR. PARET:  Lala Shore (phonetic), and I think a

21   number of other individuals.  I don't know.  I couldn't -- I

22   couldn't say their names if I -- if you asked me to.  I don't

23   know I can pronounce them.

24           MR. SADOWSKI:  Let me see if I can help you with that.

25   Can you now see on my screen a word file that has Manik number

Colloquy

 1  one at the top?  Manik Chamarthy?

 2         MR. PARET:  Correct.

 3         MR. SADOWSKI:  Okay.  And there's your spelling.  Let

 4  me make this a little bit bigger.  Okay.  Records that I have

 5  indicate that Mr. Chamarthy paid $320,000 on September 27th,

 6  2018 to District Title.  Do you know what that money was for?

 7         MR. PARET:  Yes.  That was the funds that were sent to

 8  the closing that WCP requested for the settlement of 4910

 9  Georgia Avenue.

10         MR. SADOWSKI:  Okay.  And then how about -- I have a

11  similar questions for some others?  I'm going to scroll down.

12  There's a name here that even I can't pronounce.  It's

13  Venugopal Cheegarama (phonetic).

14         MR. PARET:  Yes.  Yeah.

15         MR. SADOWSKI:  Yeah.

16         MR. PARET:  Correct.

17         MR. SADOWSKI:  And then there's a reference to

18  $180,000 also being paid to District Title on September 27th,

19  2018.  Do you recall what that money was for?

20         MR. PARET:  That was for the settlement.  That was to

21  WCP for the settlement of 4910.  That went into the WCP escrow

22  account.  Both of those did.

23         MR. SADOWSKI:  Okay.  All right.  And then when you

24  say WCP, can you help me out?  There's a whole lender there.

25         MR. PARET:  They're the lender for 4910 Georgia



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit Relevant Creditors Transcript 245 of 496   Page 41 of 53

41

Colloquy

1    Avenue.

2            MR. SADOWSKI:  And is that Washington Capital

3    Partners?

4            MR. PARET:  That's right.

5            MR. SADOWSKI:  Do you know if that lender had another

6    name besides WCP, like WCP Fund I or Fund II or Fund V?

7            MR. PARET:  I don't know what their escrow account is

8    at District Title or what their -- what the -- what -- I

9    believe it was WCP Fund I or DP Capital.

10            MR. SADOWSKI:  Okay.  And now let me just scroll to

11    the next one, Mr. Paret.  By the way, Mr. Paret, is it Paret or

12    Parae?

13            MR. PARET:  It's Paret.

14            MR. SADOWSKI:  Paret.  Okay.  I'm sorry about that.  I

15    always pronounced it with a t, but like that, but I'll change

16    that.  Now, there's another name here on the screen.  Ravinder

17    (phonetic), E-E-R-A- --

18            MR. PARET:  Yeah.

19            MR. SADOWSKI:  -- V-E-N-I.  It says $100,000 is paid

20    to District Title on January 10th, 2019.  What was that money

21    for?

22            MR. PARET:  It was for 4910 George Avenue.

23            MR. SADOWSKI:  Okay.  Do you know why this payment

24    came in a couple of months behind the others that I've showed

25    you?


www.escribers.net  |  800-257-0885

Exhibit Exhibit A-Meeting of Creditors Transcript Page 246 of 496

Colloquy

1       MR. PARET:  I think it's because there was more funds

2   that were needed for closing.  I'm not a hundred percent sure.

3       MR. SADOWSKI:  Okay.  That's fair.  And you can scroll

4   down to the next one, which is -- give me a second.  We're

5   having a little slow internet connection here.  Okay.  This one

6   I can't pronounce either.  Srikanth.  That's S-R-I-K-A-N-T-H,

7   Tangedipali, T-A-N-G-E-D-I-P-A-L-I and it indicates $50,000 was

8   sent to District Title on January 10th, 2019.  Do you know what

9   those funds were for?

10      MR. PARET:  I believe 4910 Georgia Avenue, but I'd

11  have to -- I'd have to confirm.

12      MR. SADOWSKI:  Okay.  And then the seventh one I have,

13  which would be the last one, indicates -- well, no.  That's

14  only six.  Okay.  So we did this one.  Let me just track back.

15  Going up.  Back to the top, Mr. Paret.  Oh, yeah.  Sorry.

16          (Indiscernible)

17      MR. SADOWSKI:  Yup.  Number 5. 29 C-H-I-N-N-A-R-I LLC.

18  It indicates $200,000 paid to District Title on January 8th,

19  2019.  Do you see that?

20      MR. PARET:  Yes, yes.  These were all -- that's the

21  G4910.  That's Bala Shore (phonetic) wire transfer of 200,000.

22      MR. SADOWSKI:  Okay.  And do you know the collective

23  number?  Sorry, I skipped this one too, Mr. Paret.  I was

24  scrolling too fast.  Number four, Tanuja Vedere.  That's

25  T-A-N-U-J-A.  And then last name capital V-E-D-E-R-E, $150,000.



Colloquy

1    Now, this was paid, it looks like, a day earlier than some of

2    the others.  January 9, 2019 to District Title.  What was this

3    money for?

4         MR. PARET:  That was for G4910.

5         MR. SADOWSKI:  Okay.  Let's see if I skipped that.  I

6    did that one.  Okay.  So of these seven different payments I

7    asked you questions about, what ultimately came of that

8    collective amount of money?

9         MR. PARET:  Well, I mean, it went to the -- it went to

10   WCP for the closing of 4910 Georgia Avenue.

11        MR. SADOWSKI:  Okay.  Thank you.  And now let me go

12   back, if I may.  I'm just going to minimize that transfer list.

13   And other than the group of investors, the investing arm that I

14   told you about, that you testified about, that the investing

15   arm, which was G4910 LLC, who else invested money in 4910

16   Georgia Avenue?

17        MR. PARET:  Along with myself, and I think there is,

18   like, two or three other investors.  Halmer Name (ph.)

19   invested, I think, around 250,000.  And there was a couple of

20   others.  I don't have the capital stack in front of me.

21        MR. SADOWSKI:  Okay.  And do you remember what your

22   investment was?

23        MR. PARET:  I believe somewhere in the realm of

24   900,000 or a million dollars, somewhere in that realm.

25        MR. SADOWSKI:  And what -- see, what they're closing



Colloquy

1   online with WCP, the loan closed.  Then what happened to that

2   project?

3           MR. PARET:  The project went on for quite some time.

4   There were tremendous delays in the construction, and we

5   weren't able to get our construction funds in time.  I think

6   that that date, I believe, of January 2020 was the beginning of

7   COVID.  At that point of time, WCP Funds began to get

8   assaulted, and it just was a very slow process for the next

9   couple of years of getting construction done on that property.

10  And eventually WCP foreclosed on the property.  A group of the

11  investors, Manik included, made an offer to buy out the

12  portfolio for $2.5 million, to buy out Georgia Avenue for $2.5

13  million more than our debt position, and WCP refused.  And then

14  they foreclosed on the property.

15          MR. SADOWSKI:  Okay.  Now --

16          MR. PARET:  We have a debt position of roughly 7.3

17  million with --

18          MR. SADOWSKI:  Okay.

19          MR. PARET:  -- construction and acquisition, along

20  with their fees.  But because they said the properties were

21  cross-collateralized, they refused to take a lesser number,

22  because they were trying to pay down debt across the portfolio

23  with the money from Georgia Avenue.

24          MR. SADOWSKI:  Now, along -- how do you know that?

25  How did you learn of that fact that you just talked about, why

Colloquy

1    WCP was doing that?  Did they tell you that?  Did WCP tell you

2    that, or did you learn that from the grapevine?

3            MR. PARET:  Yeah.  They do.  And they would tell most

4    of the other investors that because of their -- because of the

5    interlacings of my other properties, they had cross-

6    collateralized the debt instruments and they said that the --

7    they needed -- it wasn't enough to pay down the loan overall.

8            MR. SADOWSKI:  And the person you were dealing with at

9    WCP was whom?

10           MR. PARET:  Jared and Daniel Huertas.

11           MR. SADOWSKI:  And does Jared have a name?  Last name?

12           MR. PARET:  Fasnot (phonetic) or something.  I can't

13   pronounce it.

14           MR. SADOWSKI:  Okay.  I'm getting near the end, Mr.

15   Gardner (sic), just FYI.  Now I have up on my screen, Mr.

16   Paret, page 12 of 46.  Do you see it?  It's really hard to see,

17   because it's teeny-weeny print.  Do you know why the -- and I'm

18   going to go down to the line for 419 to 423 Kennedy Street.

19   And I'm squinting at this.  It looks like line 50.  It lists

20   Brighton KSD (phonetic), LLC.  Why is Brighton KSD, LLC listed

21   there?

22           MR. PARET:  Because they were an investor in that

23   property.

24           MR. SADOWSKI:  Okay.

25           MR. PARET:  And I thought they were okay.



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit Relevant Creditors Transcript 25 Page 496 of 53

46

Colloquy

1    MR. SADOWSKI:  So is this -- what is this schedule

2    here on page 12 designed to show the world?  What are you

3    trying to -- what information are you trying to convey here,

4    generally?

5    MR. PARET:  I mean, this is just showing --

6    whatchamacallit.  This is basically showing -- I think this is

7    an estimated.  A lot of these numbers are not correct.  So this

8    was just an estimate of what the investors were going to put in

9    and what they were committed to.  A lot of these numbers

10   changed, and some of these investors never even put money in

11   that are on this list.  This list was to show, you know, what

12   the investment start dates would be if they were going to

13   invest, what the numbers would be, but nobody ever got removed

14   from the list.  So this is just an ongoing list that we had.

15   MR. SADOWSKI:  Okay.  And who was maintaining this

16   list?  Was this somebody over at Coloma River?

17   MR. PARET:  Yeah, the person left, like, five years

18   ago.

19   MR. SADOWSKI:  Okay.  One second, Mr. Gardner (sic).

20   Now, when you were being asked some questions by Mr.

21   VerStandig, you gave some answers that things were currently in

22   debate.  I'm not going to debate you over your answers, but

23   would it be fair to sum it up that -- all right.  Let me ask it

24   this way.  Do you currently own a membership interest in 423

25   Kennedy Street Holdings, LLC?



Colloquy

1    MR. PARET:  I believe I do.

2    MR. SADOWSKI:  Okay.  And is that belief based upon

3    this theory that WCP was a partner with you?  Is that what the

4    basis for that belief is?

5    MR. PARET:  That is correct.

6    MR. SADOWSKI:  Okay.  And would the same hold true for

7    5501?  Excuse me.  I don't have the address right in front of

8    my face here.  5501 First Street Holdings, LLC, you indicated

9    that it's -- there's a debate over whether you have a

10   membership interest in that.  And my understanding from your

11   testimony is that the date is -- that the belief that you have,

12   you have a membership interest is on this partnership theory

13   with the WCP.  Is that right?

14   MR. PARET:  That is correct, along with the fact that

15   the LLCs that were in ownership, the investor group have

16   ownership in those LLCs.  That's -- that's -- it's still

17   unclear.  But that is the -- that's the theory.

18   MR. SADOWSKI:  Okay.  And so I'm just -- should tell

19   the world where I'm going and you, Mr. Krays (phonetic).  I'm

20   currently representing those entities in litigation against the

21   WCP, and the operating agreements that I have indicate that

22   those entities are actually owned by members, not including

23   yourself.  So I just want to make sure.  Do you have an

24   operating agreement, a current operating agreement that shows

25   that you have a membership interest in 423 Kennedy Street

Colloquy

 1  Holdings, LLC?

 2          MR. PARET:  Well, I have the old one.  Yeah.  I can

 3  share with you.

 4          MR. SADOWSKI:  When you say the old one, wasn't that

 5  before your membership interest was sold to Mel Noguchi

 6  (phonetic)?

 7          MR. PARET:  How much did it sell for?

 8          MR. SADOWSKI:  I don't have in front of me.  But let

 9  me ask it.  I'm just trying to find out, Mr. Paret, is there a

10  current operating agreement that you have for 423 Kennedy

11  Street Holdings, LLC?  A current operating agreement, not an

12  old one.  Not one that was amended that shows --

13          MR. PARET:  Yeah, I can -- I can share you the one --

14  I can share the one with you that was still signed.  I mean --

15          MR. SADOWSKI:  Let me finish my question.  Yeah.  Is

16  there a current operating agreement that you have that shows

17  that you have a membership interest in 423 Kennedy Street

18  Holdings LLC?

19          MR. PARET:  I'll have to check with you, and I'll send

20  it to you.

21          MR. SADOWSKI:  Okay.  And the same question is, is

22  there a current member -- current operating agreement that

23  you're aware of that shows that you have a membership interest

24  in 5501 First Street Holdings LLC?

25          MR. PARET:  You'd have to check, and we can send it to



Colloquy

1    you.

2           MR. SADOWSKI:  Okay.  Mr. Fasano, these Excel files

3    are really hard to review on screen.  Is it possible you could

4    get us a sanitized version of this in Excel?  Both what's page

5    10 of 46 and 11, and then page 12 of 46 of the schedules.

6           MR. FASANO:  Elizabeth, can you send that to us in

7    Excel?

8           MS. KORBUT:  Probably, as long as I -- I'm assuming

9    that that's something that we have.  I was just put on this not

10   long ago, but assuming that we have the original Excel, that

11   that's our document, yeah, we should be able to send that.

12          MR. SADOWSKI:  All right.  Thank you.

13          And Mr. Gardner (sic), just the last question.

14          Mr. Paret, are you intending to amend the schedules,

15   particularly these color-coded charts here in blue, green,

16   purple, to add the 4910 Georgia Avenue entity as one of those

17   LLCs which you have an interest?

18          MR. PARET:  Yes.

19          MR. SADOWSKI:  Okay.  Those are all the questions I

20   have, Mr. Gardner (sic).  Thank you very much.

21          Thank you, Mr. Paret.

22          MR. WEBSTER:  Any other parties have any questions for

23   the 341 meeting?  All right.  It didn't sound like anyone else

24   has any questions for the 341 meeting.

25          MR. FASANO:  Wendell?



Colloquy

1        MR. WEBSTER:  Yes.

2        MR. FASANO:  I'm just going to give Mr. Paret an

3    instruction.

4        MR. WEBSTER:  Certainly.

5        MR. FASANO:  When the tax return is filed, we need to

6    get a copy of it.

7        MR. WEBSTER:  Certainly.

8        MR. FASANO:  And potentially a turnover of the tax

9    refund when received.

10        MR. WEBSTER:  Right.

11        MR. FASANO:  So I'm just putting you on notice.

12        MR. WEBSTER:  Right.  Actually, we're not -- we're

13    not.  I'm sorry.  Go ahead.  Who was that?

14        MR. LEWIS:  This is attorney Todd Lewis, on behalf of

15    Welch Family Limited Partnership Group.  I just want to be

16    clear for the record here.  This meeting is going to be

17    continued to a later date?

18        MR. WEBSTER:  Well, I'm not going to conclude it at

19    this point in time, but it's unclear to what extent we'll need

20    to keep it open.  Do you have any questions that need to be

21    asked today?

22        MR. LEWIS:  Not today.  That's why I'm wondering

23    whether the case is clear the 341 is being continued or being

24    adjourned?

25        MR. WEBSTER:  Well, I'm going to keep it open to the



Case 25-10023-ELG   Doc 8-1   Filed 07/06/25   Entered 07/06/25 00:58:28   Desc
Exhibit Exhibit Relevant Creditors Transcript 255 of 496 Page 53 of 53

51

Colloquy

1    extent that there's some issues that we need to follow up on.

2    But at this point in time, that hasn't been clarified.

3            MR. LEWIS:  Okay.  No.

4            MR. WEBSTER:  All right.  Any other parties?  You have

5    any questions?  All right.  I will.

6            UNIDENTIFIED SPEAKER:  No other questions, but we

7    would join in the request of both Mr. Lewis and Mr. VerStandig

8    to leave it open in the event that additional schedules are

9    filed that raise additional questions that we have for this

10   debtor.

11           MR. WEBSTER:  Well, actually, additional schedules are

12   going to be filed.  They're going to be additional information

13   provided.  So we'll decide at that point whether we need to

14   hold another Zoom 341 meeting.

15           But let me just explain to everyone.  Keep in mind,

16   this is a 341 meeting for bankruptcy purposes, not a

17   deposition.  If you need to take a deposition or a 2004 exam,

18   that's actually different from this 341 meeting.  I just want

19   to make sure everyone understands that.  These are not -- this

20   is not a deposition.  Okay?

21           MR. LEWIS:  Understood.

22           MR. WEBSTER:  Very good.  All right.  So with that, we

23   will adjourn the meeting for today and proceed accordingly.

24   Anybody else have anything before we close out?

25           UNIDENTIFIED SPEAKER:  Nothing, Mr. Webster.



1          MR. WEBSTER:  All right.  Thank you, all.

2          UNIDENTIFIED SPEAKER:  Thank you, all.

3          MR. WEBSTER:  Take care.

4          UNIDENTIFIED SPEAKER:  Thank you.

5          MS. KORBUT:  Thank you.

6      (Whereupon the hearing was adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                                    CERTIFICATE

2      I certify that the foregoing is a correct transcript from the

3      electronic sound recording of the proceedings in the above-

4      entitled matter.

5

6

7

8      /s/ Hana Copperman

       _____        Date: June 30, 2024

9      ESCRIBERS LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>CHARLES PAXTON PARET<br><br>*Debtor.* | Case No. 23-00217-ELG<br><br>Chapter 7 |
| DEVELOPER RE1 LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>DP CAPITAL LLC; RUSSELL DRAZIN; DANIEL HUERTAS; SF NU, LLC; and WCP FUND I LLC,<br><br>*Defendants.* | Adv. Pro. No. 24-10023-ELG |
| 423 KENNEDY ST HOLDINGS LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>DP CAPITAL LLC; RUSSELL DRAZIN; DANIEL HUERTAS; and WCP FUND I LLC,<br><br>*Defendants.* | |

PLAINTIFFS' RENEWED MOTION FOR REMAND AND TO SUSPEND
DEFENDANTS' MOTIONS, HEARINGS, AND RELATED RESPONSE DEADLINE

The Plaintiffs, Developer RE1 LLC ("Developer RE1") and 423 Kennedy St Holdings

LLC ("423 Kennedy") (collectively, "Plaintiffs"), pursuant to 11 U.S.C. § 105(a), 28 U.S.C.

§1334(c) and §1452(b), Fed. R. Bankr. P. 9006, and LBR 9027-1(b) move this Court to:  (a)

remand this adversary proceeding to the D.C. Superior Court; and (b) suspend the other pending

motion, hearing, and response deadline until after a decision is made on this renewed motion for

remand.  In support of these requests, the Plaintiffs represent as follows:

OVERVIEW

1.      The Court is already familiar with the factual and procedural history of these

removed cases.  Given that familiarity, and because brevity is the heart of good pleading, the

Plaintiffs refer the Court to the prior filings related to the remand issue, in particular:

    a.    the Plaintiffs' Statement of No Consent to Final Orders of
Judgment filed on July 16, 2024 (ECF No. 12);

    b.    the Plaintiffs' first Motion for Remand and to Suspend Deadlines
filed on July 21, 2024 (ECF No. 13);

    c.    the Plaintiffs' Omnibus Objections to Motions Filed and Notice
by Defendants filed on July 22, 2024 (ECF No. 16); and

    d.    the Plaintiffs' Reply in Support of Motion for Remand filed on
August 26, 2024 (ECF No. 21); and

    e.    the Plaintiffs' Supplemental Brief in Support of Motion for
Remand filed on November 27, 2024 (ECF No. 26).

2.      The Court should also take into consideration the following filings in the

involuntary bankruptcy petition case (24-00262-ELG) involving JPK NewCo, LLC ("JPK

NewCo").  These filings outline the scheme that the Defendants engaged in to attempt to

bootstrap the threadbare jurisdictional arguments for removal by manufacturing a "core

proceeding", *i.e.,* the filing of the involuntary petition against JPK NewCo:

    a.    The US Trustee's Motion to Dismiss Chapter 11 Case Pursuant to
11 U.S.C. 1112(b) (ECF No. 37 in 24-00262-ELG);

    b.    The Plaintiffs' Statement in Support of the US Trustee's Motion to
Dismiss Chapter 11 Case Pursuant to 11 U.S.C. 1112(b) (ECF No.
57 in 24-00262-ELG);

    c.    The Monthly Operating Reports filed by JPK New Co that show
no legitimate business activity whatsoever for JPK NewCo (ECF

2

Nos. 62, 63, 71, 73, 80, and 84 in 24-00262-ELG);

d.  The transcript from the meeting of creditors held in the JPK
NewCo case, again confirming that JPK NewCo was not a
legitimate business;[1] and

e.  The Limited Objection to Application for Compensation (ECF
No. 86 in 24-00262-ELG).

3.  To reiterate, JPK NewCo was created by the Defendants and their counsel, acting

in concert, for the improper purposes of:  (a) delaying a trial on the Plaintiffs claims in D.C.

Superior Court and hindering their ability to pursue their claims; and (b) so that the Defendants

could relitigate prior decisions from that Court in this Court – a Court that they consider to be

their "home court" that would make decisions more favorable to their positions.

4.  After extensive briefing, this Court held a hearing on the motion for remand and

denied that motion without prejudice.  ECF Nos. 28 and 35.  The Court's denial of the motion for

remand "without prejudice" was in part due to the fact that the viability of the JPK NewCo

involuntary case (24-00262-ELG) was on thin ice because the US Trustee's Office had filed a

motion to dismiss that case for being filed in bad faith

5.  The original alleged basis for removal jurisdiction was the pendency of mere

*allegations* in an adversary proceeding involving Charles Paret in another case that one of the

Defendants (Daniel Huertas) removed to this Court on September 1, 2023, just shy of one month

*after* three of his related companies, as creditors, had filed an involuntary petition against Mr.

Paret (23-00217) on August 4, 2023.[2]

---

[1]  A copy of the transcript from the JPK NewCo meeting of creditors is attached as Exhibit 1.

[2]  The petitioning creditors in 23-00217-ELG were:  DP Capital, LLC; 1Sharpe Opportunity
Immediate Trust; and WCP Fund I, LLC.  *See* ECF No. 1 in 23-00217-ELG.  Christina Araujo, who
completed all of JPK New Co's monthly operating reports, and Mr. VerStandig signed the
involuntary petition.

3

6.      To say that the allegations of Mr. Paret about an alleged partnership being formed, in which he claims, without support, that he has a continuing ownership interest in 423 Kennedy and Developer RE1, are "flimsy" would be the understatement of the year.  Mr. Paret signed documents in December 2020 and December 2021 in which he confirmed that he no longer had any membership interests in the entities that owned the two properties now owned by Developer RE1 and 423 Kennedy.  *See* Exhibit 2 and (two Declarations signed by Mr. Paret in December 2021 regarding the membership interests in the prior entities that owned the Developer RE1 property);[3]  *see also* Exhibit 4 (Affidavit of Mr. Paret regarding the ownership of 423 Kennedy dated January 31, 2020).

7.      Several of the Defendants in the adversary proceeding filed motions to dismiss Mr. Paret's partnership (and other) evolving claims, but later folded by signing an agreed order that kept several of Mr. Paret's claims intact.  *See* ECF No. 3 (Motion to Dismiss filed by Mr. Huertas), ECF No. 15 (Motion to Dismiss filed by Mr. Huertas and DP Capital), ECF No. 41 (Motion to Dismiss filed by Mr. Huertas, DP Capital, and the WCP Fund), and ECF No. 46 (Order granting in part and denying in part the last motion to dismiss) in 23-10025-ELG.  The timing of the decision to fold -- in November of 2024 -- before the Court issued a decision on the first motion for remand, should not be lost on this Court.  It was to the Defendants benefit here to keep the Paret claims alive for jurisdictional purposes.

8.      On February 24, 2025, the Court entered an order dismissing the JPK NewCo involuntary case "WITHOUT PREJUDICE" on the basis that the Debtor "failed to pay the quarterly fee due to the United States Truste [sic – "Trustee"]" and for no other reason.  ECF No. 85 (in 24-00262-ELG).

---

[3]   These documents reference 71 Kennedy Street Holdings LLC and 5501 1st St Holdings, LLC. Those entities conveyed title to NT Group, LLC, who then conveyed title to Developer RE1.

4

9.      As Plaintiffs' counsel predicted at a hearing in July of last year -- this before knowing anything about JPK NewCo. -- JPK NewCo was using the removal process to attempt to relitigate issues that have already been decided by the D.C. Superior Courts.  On March 19, 2025, the Defendants filed a Motion to Dismiss or, In the Alternative, for Summary Judgment ("Motion to Dismiss").  The Motion to Dismiss asserts many of the same arguments that were previously asserted, and rejected by, two different judges in D.C. Superior Court before the cases were removed.

10.     As a result of the dismissal of the JPK NewCo involuntary case, the jurisdictional dynamics have now shifted dramatically in favor of remanding these cases to the D.C. Superior Court.  JPK NewCo is no longer a defendant in a pending bankruptcy case, and the court does not have jurisdiction over JPK NewCo's property.

11.     This Court was never designed to be either the Defendants' "home court" or to act as the first line of appeal for the Defendants from prior, adverse decisions made by the D.C. Superior Court, but allowing this case to continue here is exactly what this Court will become.

12.     The type of manipulative, procedural gamesmanship that the Defendants have engaged in, which has to date gone unchecked, should not be condoned by this Court.  This Court was established, with limited jurisdiction, to hear legitimate core bankruptcy proceedings filed by legitimate debtors, with additional "related to" jurisdiction, all of which is sorely lacking here.

13.     This case should go no further until the Court decides this renewed motion for remand.

14. For purposes of judicial economy, the Court should issue an order under 11 U.S.C. §105(a) suspending the deadlines and hearings for the Motion to Dismiss until after a decision is made on this renewed motion for remand.

WHEREFORE, Plaintiffs request that the Court grant this motion by: (a) continuing to withhold a decision on the Motion for Summary Judgment filed by Russell Drazin (ECF No. 7); (b) suspending the hearing and response deadline for the Motion to Dismiss (ECF No. 44); (c) remanding these consolidated cases to the D.C. Superior Court; and (d) requiring the Defendants to pay the Plaintiffs for the attorney's fees that they have incurred and will incur as a result of the Defendants' improper removal of the cases. The Plaintiffs request that they be permitted to submit an application in support of an award of attorneys' fees within a reasonable time period after the entry of the remand order.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: March 25, 2025

/s/ James D. Sadowski
James D. Sadowski (DC Bar # 446635)
Alexandria J. Smith (DC Bar # 1781067)
Erin B. McAuliffe (DC Bar #1722421)
801 17th Street, N.W., Suite 1000
Washington, DC 20006
Telephone: (202) 452-1400
Email: jds@gdllaw.com | ajs@gdllaw.com | ebm@gdllaw.com
*Counsel for Plaintiffs Developer RE1, LLC
and 423 Kennedy St. Holdings, LLC*

6

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of March, 2025, a true copy of the foregoing

Plaintiffs' Renewed Motion for Remand and to Suspend Defendants' Motions, Hearings, and

Related Response Deadlines was served electronically and a Notice of Electronic filing should

be sent to all persons receiving notices via the Court's CM/ECF system.

/s/ James D. Sadowski
James D. Sadowski

Case 24-10237-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 13:46:29   Desc
Exhibit Ex. 1 - Transcript Meeting Documents - Page 265 of 496   Page 1 of 42

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF COLUMBIA
 2
     In Re:                      . Case No. 24-00262-ELG
 3                               . Chapter 11
     JPK NEWCO LLC,              .
 4                               . Washington, D.C.
                 Debtor.         . October 29, 2024
 5   . . . . . . . . . . . . . . .

 6    CONTINUED MEETING OF THE CREDITORS PURSUANT TO SECTION 341 OF
                        THE BANKRUTPCY CODE
 7                 BEFORE KRISTEN S. EUSTIS, ESQ.
                 OFFICE OF THE UNITED STATES TRUSTEE
 8
     APPEARANCES:
 9
     For the Debtor:          Wolff & Orenstein, LLC
10                            By: JEFFREY M. ORENSTEIN, ESQ.
                              15245 Shady Grove Road
11                            Suite 465
                              Rockville, Maryland 20852
12
     For Office of the U.S.   U.S. Department of Justice
13   Trustee:                 By: KRISTEN S. EUSTIS, ESQ.
                              1725 Duke Street
14                            Suite 650
                              Alexandria, Virginia 22314
15
     For Subchapter V         Offit Kurman, P.A.
16   Trustee:                 By: STEPHEN A. METZ, ESQ.
                              7501 Wisconsin Avenue
17                            Suite 1000W
                              Bethesda, Maryland 20814
18
     For Shaheen Saririri:    Hirschler Fleischer
19                            By: KRISTEN E. BURGERS, ESQ.
                              1676 International Drive
20                            Suite 1350
                              Tysons, Virginia 22102
21
     For 423 Kennedy St       Greenstein DeLorme & Luchs, P.C.
22   Holdings LLC and         By: JAMES D. SADOWSKI, ESQ.
     Developer RE1 LLC:       801 17th Street, Northwest
23                            Suite 1000
                              Washington, District of Columbia
24                            20006

25
</pre>



Case 25-10037-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 23:16:59    Desc
Exhibit Ex. 1 - Transcript Meeting of Creditors - Page 266 of 496    Page 2 of 42

2

```
 1    Also Present:            Daniel Huertas
                               Debtor representative
 2
      Proceedings recorded by electronic sound recording.
 3    Transcript produced by transcription service.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 25-10037-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 20:46:29    Desc
Exhibit Ex. 1 - Transcript Meeting Documents - Page 267 of 496    Page 3 of 42

3

```
 1              (Proceedings commenced at 10:02 a.m.)

 2              MS. EUSTIS:  Good morning.  This is the continued 341

 3    meeting of creditors in the case of JPK NewCo LLC, case number

 4    24-262, pending in the United States Bankruptcy Court for the

 5    District of Columbia.  My name's Kristen Eustis.  I'm an

 6    attorney with the Department of Justice, and I represent the

 7    United States Trustee for Region 4 in connection with this

 8    case.  Today's October 29th, 2024, and it is approximately

 9    10:02 a.m.

10              Counsel for the Debtor, can you please identify

11    yourself and your client for the record?

12              MR. ORENSTEIN:  Good morning.  Jeff Orenstein on

13    behalf of JPK NewCo, and with me this morning is Daniel

14    Huertas, principal.

15              MS. EUSTIS:  Thank you.  I can confirm for the record

16    that I have reviewed a copy of Mr. Huertas' identification, and

17    he is who he says he is.

18              Also on the line, Mr. Metz, can you please identify

19    yourself for the record?

20              MR. METZ:  Sure.  Good morning.  This is Steve Metz,

21    the subchapter V trustee.

22              MS. EUSTIS:  Thank you.

23              Mr. Sadowski.

24              Okay.  Ms. Burgers.

25              MS. BURGERS:  Good morning.  This is Kristen Burgers
```



Case 25-10023-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 08:46:59 Desc
Exhibit Ex. 1 - Transcript Meeting Creditors - Page 268 of 496    Page 4 of 42

4

 1    on behalf of the petitioning creditors, Shaheen Sabiri.

 2           THE COURT:  Okay.  And Jim Sadowski is also on the

 3    line.

 4           Anyone else on the line that I have not identified?

 5           Okay.  Pardon.

 6           MR. SADOWSKI:  I'm sorry.  Mr. Eustis, I'm sorry.  I

 7    think I was on mute when I said who I was here for.  It's Jim

 8    Sadowski for Developer RE1 LLC and 423 Kennedy St Holdings LLC.

 9    Sorry about that.

10           MS. EUSTIS:  That's okay.  Thank you.

11           Mr. Huertas.  So first, I will ask questions of you,

12    and then I will allow creditors and parties-in-interest the

13    opportunity to question you about the Debtor's financial

14    affairs.  For those that will be asking questions, please

15    identify yourselves before asking questions so that the Court

16    reporter, if a transcript is requested of this 341 meeting,

17    will be able to identify your voice.

18           So unless you have any questions, Mr. Huertas, we can

19    go ahead and get started.

20           MR. HUERTAS:  Let's get started.

21           MS. EUSTIS:  Okay.

22       (Debtor representative sworn.)

23           MS. EUSTIS:  Please state your name and address.

24           MR. HUERTAS:  Daniel Huertas.  909 Chinquapin Road,

25    McLean, Virginia, 22102.



Case 25-10023-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 13:46:59   Desc
Exhibit Ex. 1 - Transcript Meeting Documents - Page 269 of 496   Page 5 of 42

5

```
 1              MS. EUSTIS:  Thank you.  And did you attend the
 2   initial debtor interview in connection with this case?
 3              MR. HUERTAS:  Yes.
 4              MS. EUSTIS:  And to the best of your knowledge and
 5   belief, have all of the schedules and the statement of
 6   financial affairs been filed in this case?
 7              MR. HUERTAS:  Yes.
 8              MS. EUSTIS:  And to the best of your knowledge and
 9   belief, is the information that's contained in the schedules
10   and statement of financial affairs true and correct?
11              MR. HUERTAS:  Yes.
12              MS. EUSTIS:  And did you review and sign the
13   statements and schedules before they were filed with the court?
14              MR. HUERTAS:  I did.  The one thing I want to point
15   out, there was a small typo that I -- I found, but I don't know
16   if this is the right time to do it or -- but I found a small
17   typo in the form.
18              MS. EUSTIS:  Sure.  What was the typographical error?
19              MR. HUERTAS:  It's on page 12 of my attachment of the
20   schedules.  We have an extra five on the junior lien.
21              MR. ORENSTEIN:  It's the continuation sheet for the
22   schedule A/B.
23              MS. EUSTIS:  Okay.  And Mr. Orenstein, what was that
24   address?
25              MR. ORENSTEIN:  And it's the address -- it's the
```



Case 25-10037-ELG  Doc 46-1  Filed 03/05/25  Entered 03/05/25 18:46:59  Desc
Exhibit Ex. 1 - Transcript of Meeting Document  Page 270 of 496  Page 6 of 42

6

1    address of First Street, Northwest.  It's listed as 55501 First

2    Street, Northwest.  I believe it should be 5501 First Street,

3    Northwest.

4         MS. EUSTIS:  Okay.  Thank you.

5         And thank you, Mr. Huertas, for that.

6         Mr. Huertas, has the Debtor closed its pre-petition

7    bank accounts?

8         MR. HUERTAS:  Yes.

9         MS. EUSTIS:  And where did it maintain its pre-

10   petition bank account?

11        MR. HUERTAS:  Previously was in United Bank.

12        MS. EUSTIS:  Okay.  And was this the Debtor's only

13   account?

14        MR. HUERTAS:  Correct.  Yes.

15        MS. EUSTIS:  Okay.  And has the Debtor opened a

16   debtor-in-possession account?

17        MR. HUERTAS:  Have I opened a -- a -- the new account

18   as requested by the -- by the request?  Yes, I did as what I

19   was supposed to do.

20        MS. EUSTIS:  Okay.  And where is that account located,

21   the debtor-in-possession account?

22        MR. HUERTAS:  I believe it's the same bank, United

23   Bank, but it has a -- it's a different account number.

24        MS. EUSTIS:  Okay.  Mr. Orenstein, was a form 1 signed

25   by the bank?  I didn't see it.



Case 25-10023-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 13:46:59    Desc
Exhibit Ex. 1 - Transcript Meeting of Creditors - Page 271 of 496    Page 7 of 42

7

```
 1              MR. ORENSTEIN:  It was.

 2              MS. EUSTIS:  Okay.

 3              MR. ORENSTEIN:  It was.  It was provided some time

 4    ago.

 5              MS. EUSTIS:  Okay.  Thank you.

 6              Mr. Huertas, what is the nature of the Debtor's

 7    business?  What does the Debtor do?

 8              MR. HUERTAS:  The Debtor business, are you -- are you

 9    referring to JPK NewCo?

10              MS. EUSTIS:  Yes.

11              MR. HUERTAS:  JPK NewCo is it's a holding company of

12    the -- some troubled assets that we had placed in there under

13    advice of counsel.

14              MS. EUSTIS:  So you said it's a holding company of

15    troubled assets that was formed on advice of counsel?  Is that

16    what you -- I just want to make sure I heard you correctly.

17              MR. HUERTAS:  Correct.  It's a holding company.

18    Holding two troubled assets that we have.

19              MS. EUSTIS:  Okay.  Where was the business formed?

20              MR. HUERTAS:  I believe the business was formed in

21    Virginia.

22              MS. EUSTIS:  Okay.  In what year?

23              MR. HUERTAS:  This year.

24              MS. EUSTIS:  2024?

25              MR. HUERTAS:  Correct.
```



Case 25-10007-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 20:48:59    Desc
Exhibit Ex. 1 - Transcript Meeting Documents - Page 272 of 496    Page 8 of 42

8

```
 1              MS. EUSTIS:  Okay.  And you said it was formed to hold

 2    these two troubled assets?

 3              MR. HUERTAS:  Correct.

 4              MS. EUSTIS:  And who previously held these two

 5    troubled assets?

 6              MR. HUERTAS:  One was held by WCP Fund I LLC.  And the

 7    different one was held by SF NU, LLC.

 8              MR. ORENSTEIN:  Kristen, just to clarify, it was

 9    formed in the District of Columbia, not in Virginia.

10              MS. EUSTIS:  Okay.  Thank you, Mr. Orenstein.

11              MR. ORENSTEIN:  Thank you.  The principal office is in

12    Virginia, but it's a D.C. entity.

13              MS. EUSTIS:  Okay.  Okay.  Does JPK NewCo -- is JPK

14    NewCo engaged in any other business activities?

15              MR. HUERTAS:  Not at this time.

16              MS. EUSTIS:  So at the time that it was formed, there

17    was no other ongoing business operations of JPK NewCo?

18              MR. HUERTAS:  Correct.

19              MS. EUSTIS:  And who is Sam Sariri?

20              MR. HUERTAS:  Shaheen Sariri.

21              MS. EUSTIS:  Okay.

22              MR. HUERTAS:  Shaheen Sariri is a creditor of JPK

23    NewCo.

24              MS. EUSTIS:  And he loaned JPK NewCo Money?

25              MR. HUERTAS:  Yes.
```



Case 25-10023-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 13:46:59 Desc
Exhibit Ex. 1 - Transcript Meeting Documents - Page 273 of 496    Page 9 of 42

9

1           MS. EUSTIS:  And how much did Mr. Sariri loan to JPK

2     NewCo?

3           MR. HUERTAS:  $50,000.

4           MS. EUSTIS:  And what was that $50,000 used for by

5     JPK?

6           MR. HUERTAS:  The $50,000 was utilized to fund the

7     cost associated with the litigation.  And we funded a loan to a

8     third-party.

9           MS. EUSTIS:  And who was the third-party?

10          MR. HUERTAS:  The third-party is Energy Morocco LLC.

11          MS. EUSTIS:  Okay.  Thank you.  Did you, Mr. Huertas,

12    have a prior relationship with Mr. Sariri?

13          MR. HUERTAS:  Yes.

14          MS. EUSTIS:  And what was that relationship?

15          MR. HUERTAS:  A business relationship.

16          MS. EUSTIS:  How long had you previously known him

17    for?

18          MR. HUERTAS:  I know Mr. Sariri for -- gosh, it's been

19    a while.  Probably north of fourteen years, fifteen years.

20          MS. EUSTIS:  Would you consider Mr. Sariri a friend of

21    yours personally?

22          MR. HUERTAS:  Yes.

23          MS. EUSTIS:  And your counsel indicated that the

24    principal address of JPK is in Virginia.  What is that address?

25          MR. HUERTAS:  8401 Greensboro Drive, Suite 960,



Case 25-10017-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 13:46:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 274 of 496    Page 10 of 42

10

1     McLean, Virginia 22102.

2            MS. EUSTIS:  And do any other businesses operate out

3     of that address?

4            MR. HUERTAS:  Yes.

5            MS. EUSTIS:  What businesses?

6            MR. HUERTAS:  DP Capital LLC and its affiliates.

7            MS. EUSTIS:  Okay.  Does JPK NewCo pay rent for its --

8            MR. HUERTAS:  No.

9            MS. EUSTIS:  Okay.  Are there any other --

10            MR. HUERTAS:  The answer was no rent.

11            MS. EUSTIS:  I'm sorry.  Go ahead.

12            MR. HUERTAS:  Yeah.  The answer was no, no rent.

13            MS. EUSTIS:  Okay.  Are there any other locations

14     affiliated or associated with JPK NewCo?

15            MS. EUSTIS:  No.

16            MS. EUSTIS:  And just to be clear, JPK NewCo does not

17     own the space out of which it operates; is that correct?

18            MR. HUERTAS:  That is correct.

19            MS. EUSTIS:  Okay.  So there's no rental obligations

20     at all?

21            MR. HUERTAS:  That's correct.

22            MS. EUSTIS:  Okay.  Does JPK NewCo have any employees?

23            MR. HUERTAS:  No employees.

24            MS. EUSTIS:  Are there day-to-day operations of JPK

25     NewCo?



```
 1              MR. HUERTAS:  No.

 2              MS. EUSTIS:  Okay.  Who maintains the books and

 3     records for JPK NewCo?

 4              MR. HUERTAS:  Can you please repeat the question?

 5              MS. EUSTIS:  Who maintains the books and records for

 6     JPK NewCo?

 7              MR. HUERTAS:  DP Capital LLC.

 8              MS. EUSTIS:  Okay.  Is there any individual at DP

 9     Capital LLC that is in charge of maintaining the books and

10     records of the Debtor?

11              MR. HUERTAS:  Yes.

12              MS. EUSTIS:  And who would that be?

13              MR. HUERTAS:  Yes.  Christina with an H.  Christina.

14              MS. EUSTIS:  Um-hum.

15              MR. HUERTAS:  Araujo, A-R-A-U-J-O.

16              MS. EUSTIS:  Great.  Thank you for spelling that for

17     me.

18              MR. HUERTAS:  Sure.

19              MS. EUSTIS:  Okay.  Are the owners of the Debtor still

20     SF NU, LLC and WCP Fund I LLC?

21              MR. HUERTAS:  Yes.

22              MS. EUSTIS:  Okay.  And do you recall what the split

23     of ownership is between WCP Fund I and SF NU?

24              MR. HUERTAS:  I do not recall.  I wonder if I can ask

25     my counsel to see if he has that.  I don't recall the split.
```



Case 25-10027-ELG   Doc 46-1   Filed 03/25/25   Entered 03/25/25 13:46:59   Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 276 of 496   Page 12 of 42

12

```
 1              MS. EUSTIS:  Okay.  That's okay.

 2              MR. HUERTAS:  (Unintelligible) --

 3              MR. ORENSTEIN:  I believe it's -- I believe it's in

 4     the statement of financial affairs.

 5              MS. EUSTIS:  It is, Mr. Orenstein.  That's fine.  If

 6     he doesn't recall, that's fine.  I don't need the split.

 7              Mr. Huertas, do you know who the owners of SF NU, LLC

 8     are?

 9              MR. HUERTAS:  No.

10              MS. EUSTIS:  Do you have any ownership interest in SF

11     NU, LLC?

12              MR. HUERTAS:  No.

13              MS. EUSTIS:  And what about WCP Fund I LLC?  Do you

14     know who the members of this entity are?

15              MR. HUERTAS:  Yes, I know who the members are.

16              MS. EUSTIS:  And who are they?

17              MR. HUERTAS:  There are several members because it's a

18     fund in excess of thirty different LLCs or -- or individuals.

19     I don't have all of those right in my -- readily available, but

20     there is several members of the fund.

21              MS. EUSTIS:  Okay.  And do you have any interests

22     personally in WCP Fund I, LLC?

23              MR. HUERTAS:  Yes.

24              MS. EUSTIS:  Okay.  Okay.  So going back to JPK NewCo,

25     are there any other officers or directors other than SF NU, LLC
```



```
 1    and WCP Fund I LLC?

 2             MR. HUERTAS:  No.

 3             MS. EUSTIS:  Have there been any changes in the

 4    ownership of JPK in the last year?

 5             MR. HUERTAS:  No.

 6             MS. EUSTIS:  Does anyone receive any compensation from

 7    JPK NewCo LLC?

 8             MR. HUERTAS:  No.

 9             MS. EUSTIS:  Does JPK have an interest in any other

10    business entity?

11             MR. HUERTAS:  No.

12             MS. EUSTIS:  Has any individual or entity guaranteed

13    any portion of the Debtor's debts?

14             MR. HUERTAS:  Can you please repeat the question?

15             MS. EUSTIS:  Sure.  Are there any individuals or

16    entities that have guaranteed any portion of the Debtor's

17    business debts?

18             MR. HUERTAS:  No.

19             MS. EUSTIS:  Does the Debtor utilize an accountant?

20             MR. HUERTAS:  No.

21             MS. EUSTIS:  Okay.  And since the Debtor was formed

22    this year, there have been no obligations to file state or

23    federal tax returns; is that correct?

24             MR. HUERTAS:  That's correct.  Yeah.  It was done this

25    year, so we haven't had any obligation to file tax returns or
```



Case 25-10023-ELG   Doc 46-1   Filed 03/25/25   Entered 03/25/25 13:46:59   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 278 of 496   Page 14 of 42

14

```
 1   any of that sort.

 2            MS. EUSTIS:  Okay.  Other than Mr. Sariri, are there

 3   any other creditors of JPK?

 4            MR. HUERTAS:  I listed, besides Mr. Sariri, the

 5   disputed litigation from 423 Kennedy St Holdings LLC and

 6   Developer RE1 LLC as potential creditors --

 7            MS. EUSTIS:  Okay.

 8            MR. HUERTAS:  -- due to the litigation.

 9            MS. EUSTIS:  And is there the potential that there

10   could be monetary amounts due and owing to Developer RE1 and

11   Kennedy St in connection with that litigation?

12            MR. HUERTAS:  Yes, there is a potential.  I don't -- I

13   don't think I owe them anything, but there's a potential for

14   the litigation.

15            MS. EUSTIS:  Okay.  But other than Developer RE1,

16   Kennedy St, and Sariri, there are no other creditors of JPK?

17            MR. HUERTAS:  That's correct.

18            MS. EUSTIS:  Has the Debtor loaned any money to any of

19   its owners, officers, or directors within the last year?

20            MR. HUERTAS:  No.

21            MS. EUSTIS:  Has JPK repaid any loan to any of its

22   owners, officers, or directors within the last year?

23            MR. HUERTAS:  No.

24            MS. EUSTIS:  Have any of its owners, officers,

25   directors loaned any money to the Debtor within the past year?
```



```
 1                    MR. HUERTAS:  No.

 2                    MS. EUSTIS:  So other than the relationship that you

 3       described with Mr. Sariri, does Mr. Sariri have any

 4       relationship to SF NU or WCP and its members that you're aware

 5       of?

 6                    MR. HUERTAS:  No, no.

 7                    MS. EUSTIS:  Okay.  And Mr. Sariri is not a relative

 8       of yours; is that correct?

 9                    MR. HUERTAS:  That's correct.

10                    MS. EUSTIS:  Has JPK NewCo sold or transferred any

11       property within the last year?

12                    MR. HUERTAS:  No.

13                    MS. EUSTIS:  Have there been any distributions paid by

14       JPK to anyone within the last year?

15                    MR. HUERTAS:  No.

16                    MS. EUSTIS:  And do Mr. Sariri, Developer RE1, or

17       Kennedy St have any liens on any of JPK's assets?

18                    MR. HUERTAS:  No.

19                    MS. EUSTIS:  And what are JPK's assets?

20                    MR. HUERTAS:  JPK's assets are the three notes that it

21       holds today.

22                    MS. EUSTIS:  So it holds three notes.

23                    MR. HUERTAS:  That is correct.

24                    MS. EUSTIS:  Can you describe those notes?

25                    MR. HUERTAS:  The three notes are Energy Morocco LLC.
```



Case 25-10027-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 13:46:59   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 280 of 496   Page 16 of 42

16

 1    Do you need an amount?

 2           MS. EUSTIS:  Yes, please.

 3           MR. HUERTAS:  $26,000.  There's a junior lien on 5501

 4    First Street, Northwest, Washington, D.C., for 711,741.83.  And

 5    there's one more junior lien on 419-423 Kennedy Street,

 6    Northwest, Washington, D.C., for $1,678,387.

 7           MS. EUSTIS:  Okay.  Thank you.  And is Energy Morocco

 8    current on its payments to JPK?

 9           MR. HUERTAS:  Not currently.

10           MS. EUSTIS:  Are any payments being made on the junior

11    liens?

12           MR. HUERTAS:  No.

13           MS. EUSTIS:  Have any payments been made by Energy

14    Morocco since the loan was made to it?

15           MR. HUERTAS:  Not.

16           MS. EUSTIS:  Were any payments --

17           MR. ORENSTEIN:  Wait, so the Energy Morocco -- oh, I'm

18    sorry.  The Energy Morocco loan is a note that balloons in

19    December.  And the two junior liens that he described, as you

20    know, that's the subject of litigation that's presently stayed.

21           MS. EUSTIS:  Right.  So Mr. Huertas, my next question

22    was were any payments due under the note to Energy Morocco?

23           MR. HUERTAS:  Were any payments due from Energy

24    Morocco?

25           MS. EUSTIS:  Yes.



```
 1              MR. HUERTAS:  Yes, as form of a loan.

 2              MS. EUSTIS:  Okay.  So Energy Morocco is in default

 3    under the note?

 4              MR. HUERTAS:  Under the note as written, yes.

 5              MS. EUSTIS:  Okay.  Since filing for bankruptcy, is

 6    the Debtor current with all of its post-petition obligations?

 7              MR. HUERTAS:  Can I ask counsel to help answer the

 8    question?

 9              MS. EUSTIS:  No.  I need to know if Energy Morocco --

10    or I'm sorry, not Energy Morocco.  I'm sorry.  JPK NewCo is

11    current on its post-petition obligations.

12              MR. HUERTAS:  I believe it is.

13              MS. EUSTIS:  What are JPK's post-petition obligations?

14    What are its operating costs?

15              MR. HUERTAS:  Sorry.  Can you please repeat the

16    question?  There was some noise in the background.

17              MS. EUSTIS:  Sure.  And if you are not me or Mr.

18    Huertas, can you please mute your line?  Thank you.

19              Yes.  So what are JPK NewCo's operating expenses?

20              MR. HUERTAS:  Currently, zero.

21              MS. EUSTIS:  Has the Debtor had to borrow any money

22    post-petition?

23              MR. HUERTAS:  Sorry.  Can you please repeat the

24    question?

25              MS. EUSTIS:  Sure.  Has the Debtor had to borrow any
```



1    money since filing for bankruptcy?

2            MR. HUERTAS:  No.  Outside of what we have, no.  We

3    haven't borrowed anything else.

4            MS. EUSTIS:  Okay.  And you indicated that there are

5    no operating expenses currently.  Have there ever been any

6    operating expenses for JPK?

7            MR. HUERTAS:  No.  No.

8            MS. EUSTIS:  Do you anticipate that there will be any

9    operating expenses for JPK?

10           MR. HUERTAS:  Not at this time.

11           MS. EUSTIS:  Okay.  So Energy Morocco, there was a

12   loan made to it, you indicated, in the amount of $26,000; is

13   that correct?

14           MR. HUERTAS:  That's correct.

15           MS. EUSTIS:  What is Energy Morocco?

16           MR. HUERTAS:  Energy Morocco is -- is a company -- is

17   in the business of renovating real estate assets.

18           MS. EUSTIS:  And have you or any of the entities that

19   you have an interest in ever loaned money to Energy Morocco

20   before?

21           MR. HUERTAS:  Yes.

22           MS. EUSTIS:  And what entities have made loans to

23   Energy Morocco before?

24           MR. HUERTAS:  WCP Fund I.

25           MS. EUSTIS:  And what were those loans in connection



Case 25-10023-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 23:16:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 283 of 496    Page 19 of 42

19

1    with?

2              MR. HUERTAS:  I don't have that ready available.  We

3    had made similar loans to Energy Morocco in the past.

4              MS. EUSTIS:  Okay.  Do you recall what this loan would

5    be used for, the $26,000 loan?

6              MR. HUERTAS:  Renovation expenses.

7              MS. EUSTIS:  Associated with what project?

8              MR. HUERTAS:  Several projects.  It wasn't just

9    associated with one single project.

10             MS. EUSTIS:  Okay.  And do you know who the owners of

11   Energy Morocco are or the members?

12             MR. HUERTAS:  No.

13             MS. EUSTIS:  Mr. Huertas, did you discuss the filing

14   of an involuntary petition with Mr. Sariri?

15             MR. HUERTAS:  No.

16             MS. EUSTIS:  Did you discuss why JPK NewCo needed a

17   loan from Mr. Sariri with Mr. Sariri?

18             MR. HUERTAS:  Did I discuss why I needed the loan?

19             MS. EUSTIS:  Yes.

20             MR. HUERTAS:  I needed -- let me recall.  Very

21   briefly, I just requested a loan for $50,000.

22             MS. EUSTIS:  And you didn't have any -- did you have

23   any other discussions with Mr. Sariri regarding the loan?

24             MR. HUERTAS:  No.

25             MS. EUSTIS:  Did you negotiate the terms of the loan



Case 24-10023-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 23:46:59 Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 284 of 496    Page 20 of 42

20

1       with Mr. Sariri?

2               MR. HUERTAS:  In our initial conversation.

3               MS. EUSTIS:  In your initial conversation, you did,

4       or --

5               MR. HUERTAS:  Yeah.  We -- we discuss -- yeah, we --

6       in our initial -- yeah, I mean, yes, we discussed the terms of

7       the loan.

8               MS. EUSTIS:  Did anyone else discuss the terms of the

9       loan with Mr. Sariri on --

10              MR. HUERTAS:  No.

11              MS. EUSTIS:  -- JPK NewCo's behalf?

12              MR. HUERTAS:  No.  And was JPK NewCo represented by

13      counsel in connection with the negotiation of the loan with Mr.

14      Sariri?

15              MR. HUERTAS:  No.

16              MS. EUSTIS:  Was Mr. Sariri represented by counsel

17      that you're aware of in connection with the loan?

18              MR. HUERTAS:  Not that I'm aware of.

19              MS. EUSTIS:  Who drafted the note with Mr. Sariri?

20              MR. HUERTAS:  I believe was one of my counsels, one of

21      my legal counsels.

22              MS. EUSTIS:  One of your attorneys?  One of JPK's

23      attorneys?

24              MR. HUERTAS:  Yes.

25              MS. EUSTIS:  I just want to clarify who you mean by



Case 25-10037-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 13:16:59    Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 285 of 496    Page 21 of 42

21

1    "you" -- or "my".

2            MR. HUERTAS:  Right.  It has been a while.  I -- I

3    believe it was one of the JPK -- it -- I mean, it was one of my

4    counsels, not JPK counsels.  I don't -- I don't recall exactly

5    how -- how we went about it.

6            MS. EUSTIS:  Okay.  Would it have been Mr. VerStandig?

7            MR. HUERTAS:  I don't recall.

8            MS. EUSTIS:  Were there any other attorneys other than

9    Mr. VerStandig that were we're working with you at this time or

10   JPK at this time?

11           MR. HUERTAS:  Yeah, there were other people I was

12   working at that time.  There's some that I don't -- I don't

13   recall exactly.  I don't recall exactly who wrote it.

14           MS. EUSTIS:  Do you recall the names of the attorneys

15   that were working with JPK and you on this at the time?

16           MR. HUERTAS:  I don't think they were JPK attorneys.

17   That's the reason that I don't recall exactly who it was.

18           MS. EUSTIS:  Okay.  What about with Energy Morocco?

19   Who drafted the note between -- the note on behalf of Energy

20   Morocco?  Was that drafted by folks on behalf of JPK, or was

21   that drafted by Energy Morocco representatives?

22           MR. HUERTAS:  I -- I don't recall exactly how we wrote

23   that note either.  I think it was internally, we -- we had one

24   of our forms.  So I think I did it myself.  I don't recall

25   exactly how I did it.  I have to go back and see how -- how it



Case 25-10037-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 08:46:29   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 286 of 496   Page 22 of 42

22

1   was done.

2          MS. EUSTIS:  Okay.  Part of the involuntary being

3   filed against JPK, did Mr. Sariri either on his own or through

4   counsel make demand for payment on JPK?

5          MR. HUERTAS:  Yes, make demand for payments.

6          MS. EUSTIS:  Mr. Sariri made demand for payment?

7          MR. HUERTAS:  Correct.  Yeah.

8          MS. EUSTIS:  And if you could provide to your counsel

9   to provide to me any written demand for payment that was made

10  by Mr. Sariri, I would appreciate that.

11         MR. HUERTAS:  I don't think I have anything in

12  writing.  It was a phone conversation.  I told Mr. Sariri that

13  based on the nature of where we stand with the notes, we would

14  not be able to make payments.  And we told him that we were not

15  able to -- to make the financial obligation at this -- at this

16  time.

17         MS. EUSTIS:  Okay.  And the note was -- the money was

18  loaned by Mr. Sariri only almost a month before the involuntary

19  was filed; is that accurate?

20         MR. HUERTAS:  Yes, that is correct.

21         MS. EUSTIS:  Okay.  Okay.  Mr. Metz, do you have any

22  questions for Mr. Huertas?

23         MR. METZ:  I do not.  Thank you.

24         MS. EUSTIS:  Thank you.

25         Mr. Sadowski.



Case 25-10023-ELG Doc 46-1 Filed 03/25/25 Entered 03/25/25 13:46:29 Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 287 of 496   Page 23 of 42

23

1          MR. SADOWSKI:  Yes, I do.  Jim Sadowski, counsel for

2    Developer RE1  and 423 Kennedy St Holdings LLC.

3          Good morning, Mr. Huertas.  To follow up on some of

4    the questions that Ms. Eustis asked, you mentioned that initial

5    conversation with Mr. Sariri about this promissory note or

6    loan.  What date did that happen, that initial conversations?

7          MR. HUERTAS:  I don't recall.

8          MR. SADOWSKI:  Well, was it six months ago?  Was it

9    two months ago?  What's your best range of when that happened?

10          MR. HUERTAS:  Before I received the funds.  I don't

11    recall exactly when.  I'm sorry.  Just before we received the

12    funds, obviously.

13          MR. SADOWSKI:  Okay.  And when did you receive the

14    funds?

15          MR. HUERTAS:  I -- I got to go look.  I don't have an

16    exact date.

17          MR. SADOWSKI:  Okay.  And how did you receive the

18    funds?

19          MR. HUERTAS:  I don't recall.  I'm sorry.

20          MR. SADOWSKI:  Was it a check?  Was it a wire

21    transfer?  Was it something else?

22          MR. HUERTAS:  I think it was a wire.  I'm not a

23    hundred-percent sure.

24          MR. SADOWSKI:  Okay.  Now, the bank account with

25    United Bank, when was that account opened?



Case 24-10023-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 20:46:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 288 of 496    Page 24 of 42

24

1          MR. HUERTAS:  In the earlier part of this year.  I

2     don't have a date.

3          MR. SADOWSKI:  Okay.  But you have bank statements,

4     right, that would show when that account was opened?

5          MR. HUERTAS:  I'm sure we have bank statements.

6          MR. SADOWSKI:  Okay.  And what money went in and out

7     of that account during the period of time that JP (sic) NewCo

8     had activity in that account?

9          MR. HUERTAS:  It was related to this loan and the

10    other funds was related to this litigation.

11         MR. SADOWSKI:  Okay.  Is United Bank the same bank

12    that's used by DP Capital?

13         MR. HUERTAS:  Same bank.

14         MR. SADOWSKI:  Same bank?  And the same bank that's

15    used by WCP Fund?

16         MR. HUERTAS:  Same bank.  Different account numbers.

17         MR. SADOWSKI:  Okay.  Whose idea was it to create JPK

18    NewCo?

19         MR. HUERTAS:  I believe I've already answered the

20    question related to JPK NewCo.

21         MR. SADOWSKI:  It was your lawyer's idea then?

22         MR. HUERTAS:  JPK NewCo was created under advice of

23    counsel.

24         MR. SADOWSKI:  Okay.  So it wasn't your idea to do

25    that, right?



Case 25-10023-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 23:46:59   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 289 of 496   Page 25 of 42

25

```
 1              MR. HUERTAS:  I have already answered that question.

 2              MR. SADOWSKI:  Is that a no?

 3              MR. HUERTAS:  JPK NewCo was created under advice of

 4    counsel.

 5              MR. SADOWSKI:  Okay.  So it wasn't your idea, correct?

 6              MR. HUERTAS:  JPK NewCo was created under advice of

 7    counsel.

 8              MR. SADOWSKI:  All right.  When was that advice given?

 9    What time frame?

10              MR. HUERTAS:  Sometime late last year, early this

11    year.

12              MR. SADOWSKI:  And that advice that was given, was

13    that advice given by Mr. VerStandig?

14              MR. HUERTAS:  JPK NewCo was created under the advice

15    of counsel.

16              MR. SADOWSKI:  All right.  Which counsel?

17              MR. ORENSTEIN:  Daniel, you can answer that question.

18    You cannot tell him what was said, but you can tell him who

19    gave you the advice.

20              MR. HUERTAS:  Mr. Marc -- Mac VerStandig.

21              MR. SADOWSKI:  Okay.  Was there any other attorney

22    besides Mr. VerStandig involved in that advice?

23              MR. HUERTAS:  No.

24              MR. SADOWSKI:  Okay.  Who selected the name JP (sic)

25    NewCo?
```



Case 25-10027-ELG  Doc 46-1  Filed 03/05/25  Entered 03/05/25 08:16:59  Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 290 of 496    Page 26 of 42

26

1          MR. HUERTAS:  Sorry.

2          MR. SADOWSKI:  So who came up with the name, JPK

3    NewCo?  JPK, does that stand for someone's initials, or why did

4    you use JPK NewCo?

5          MR. HUERTAS:  Yeah, it's, like, initials

6          MR. SADOWSKI:  Okay.  And whose initials are JPK?

7          MR. HUERTAS:  The initial JPK is Joseph P. Kennedy.

8          MR. SADOWSKI:  Okay.  All right.  All right.  Is that

9    just a political person that you decided to use his initials,

10   as opposed to, like, JPK or RFK?

11         MR. HUERTAS:  I just like the initials.

12         MR. SADOWSKI:  Okay.  And the preparation of the note

13   with Mr. Sariri, I believe you said you weren't sure who

14   prepared that.  Did JPK NewCo get a bill for the preparation of

15   that note from any attorney?

16         MR. HUERTAS:  No.

17         MS. EUSTIS:  How about the preparation of the note

18   with Energy Morocco?  Did JPK get the legal bill for

19   preparation of that note?

20         MR. HUERTAS:  I don't think so.  I don't know.  It

21   didn't.

22         MR. SADOWSKI:  Has JPK incurred any legal expenses

23   before it filed for bankruptcy?

24         MR. ORENSTEIN:  And just as a correction.  People keep

25   saying before it filed bankruptcy.  It's involuntary.



 1          MR. SADOWSKI:  Sorry.  You're right.  Before the

 2   involuntary petition was filed on July 3rd, had JPK incurred

 3   any legal expenses?

 4          MR. HUERTAS:  I don't recall nothing outside of this.

 5          MR. SADOWSKI:  All right.  Who's paying the bills to

 6   Mr. VerStandig related to any pre-petition services that he

 7   gave JPK NewCo?

 8          MR. HUERTAS:  Sorry.  Repeat the question.

 9          MR. SADOWSKI:  Yeah.  Before July 3rd, 2023, that's

10   the petition date.  When I say pre-petition, that means before

11   July 3rd, 2024.  Sorry.  Who was paying the legal bills for Mr.

12   VerStandig to give advice about forming JPK NewCo?  Was that

13   being paid by WCP Fund, DP Capital, or somebody else?

14          MR. HUERTAS:  I don't recall exactly the entity, but

15   it's one of -- one of DP Capital affiliates, I'm sure.

16          MR. SADOWSKI:  Okay.  Now, was it ever discussed that

17   one reason to create JPK NewCo was to be able to put that

18   company into bankruptcy so that the litigation with my clients

19   could be removed to bankruptcy court?

20          MR. ORENSTEIN:  Objection.  That would be attorney-

21   client privilege if such a conversation took place.

22          MR. SADOWSKI:  Okay.  Mr. Huertas, you're not going to

23   answer that --

24          MR. ORENSTEIN:  I'm instructing him not to answer that

25   question.



Case 25-10037-ELG  Doc 46-1  Filed 03/05/25  Entered 03/05/25 13:46:59  Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 292 of 496   Page 28 of 42

28

1          MR. SADOWSKI:  Okay.  What were the business reasons

2     for forming JPK NewCo?

3          MR. HUERTAS:  JPK NewCo was formed because at a time

4     after the mediation process that we had, I think sometime late

5     last year, there were some negotiations around how to make

6     those liens and ourselves have an agreement.  And the only --

7     the best way to -- to make that agreement work was to take the

8     troubled assets into one entity, as we had a discussion related

9     to participation.  So the only way to do it, like I said, was

10    this way, and it was done under advice of counsel.

11         MR. SADOWSKI:  Okay.  Now, when did the mediation

12    happen between the defendants in the litigation with my

13    clients?  When did that mediation occur with JAMS and Judge

14    Levie?  Do you remember the dates?

15         MR. HUERTAS:  I don't remember the dates, but I -- I

16    think sometime late last year or (unintelligible) I -- I don't

17    exactly when, but it was -- it was cold.

18         MR. SADOWSKI:  Yeah.  Let me see if I can help you

19    with that, Daniel, because I know it was a while ago.  On my

20    calendar, on January 9th, I have a time entry -- I'm sorry, a

21    calendar entry for mediation of JAMS, January 9th, 2024.  Does

22    that refresh your recollection as to when the first mediation

23    session was held?

24         MR. HUERTAS:  I mean, you want me to -- you want me to

25    take your word for it, then I know it was early this year or

Case 25-10003-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 13:46:59 Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 293 of 496    Page 29 of 42

29

```
 1   sometime late last year.  I don't recall exactly.  It was a
 2   while ago --
 3            MR. SADOWSKI:  Yeah.
 4            MR. HUERTAS:  -- like you said very well.  But it was
 5   before JPK was formed.
 6            MR. SADOWSKI:  Okay.  And when was the last mediation
 7   session before Jams?  Do you remember that date?
 8            MR. HUERTAS:  No, I don't have it.  I don't remember
 9   the date.
10            MR. SADOWSKI:  Well, was it within a couple weeks of
11   the first session, or what's your recollection of that?
12            MR. HUERTAS:  I -- I don't recall.
13            MR. SADOWSKI:  Okay.  Do you know why the first
14   mediation session was continued to a second date in January?
15            MR. HUERTAS:  I mean, like I said, I -- I don't
16   recall.  It was a while ago.
17            MR. SADOWSKI:  Okay.
18            MR. HUERTAS:  I know that --
19            MR. SADOWSKI:  When did the -- okay.  When did the
20   mediation end?
21            MR. HUERTAS:  I don't understand your question.  When
22   did it end?
23            MR. SADOWSKI:  Well, my recollection from my calendars
24   and my time sheets and my bills that I sent to the client is
25   that there were two mediation sessions, one on January 9th, and
```



Case 25-10027-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 23:46:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 294 of 496    Page 30 of 42

30

1    the second one on January 25th.  And the mediation concluded on

2    January 25th.  Does that sound about right in terms of timing?

3         MR. HUERTAS:  Unfortunately, you'll need to go by the

4    date you are stating.  I don't want to use your dates.  For --

5    like I said, it was some time before either late last year or

6    early this year.  I don't recall exactly.

7         MR. SADOWSKI:  Okay.  What was the reason the

8    mediation ended?

9         MR. HUERTAS:  I don't recall.

10        MR. SADOWSKI:  Well, isn't that true, Mr. Huertas,

11   that you were the one who told the mediator -- or sorry, who

12   ended the mediation?

13        MR. HUERTAS:  I don't recall.

14        MR. SADOWSKI:  Okay.  What would help refresh your

15   recollection as to why the mediation ended?  Do you have any

16   business records?  Do you have any notes?

17        MR. HUERTAS:  I don't have any notes.

18        MR. SADOWSKI:  Okay.  Returning to the schedules that

19   were filed -- sorry.  Let's talk about SF NU, LLC.  Now, Ms.

20   Eustis asked you if you knew who the owners are, and you said

21   you don't know.  Well, who do you communicate with when you

22   want to communicate with SF NU, LLC?

23        MR. HUERTAS:  I communicate with Mr. Shrensky, Jason

24   Shrensky.

25        MR. SADOWSKI:  Could you spell his name, please, for



1   the record?

2           MR. HUERTAS:  Jason, J-A-S-O-N, Shrensky,

3   S-H-R-E-N-S-K-Y.

4           MR. SADOWSKI:  Okay.  Other than Mr. Shrensky, is

5   there anyone else that you communicate with at SF NU, LLC?

6           MR. HUERTAS:  No.

7           MS. EUSTIS:  Okay.  Why were the notes -- the two

8   notes that I think you've described it as distressed assets or

9   tainted assets, why were they transferred to SF NU, LLC?

10          MR. HUERTAS:  I don't think that's a question for me.

11  I -- I already answer the question related to -- to that so --

12          MR. SADOWSKI:  Oh, because I had a question for you.

13          MR. HUERTAS:  I'm (unintelligible) question.  Okay.

14          MR. SADOWSKI:  Because I have a question for you, Mr.

15  Huertas.

16          MR. HUERTAS:  Well, I can't hear you.  No one answered

17  a question for a different company.  I don't know.

18          MR. SADOWSKI:  Well, you know the answer to that

19  question, correct?

20          MR. HUERTAS:  I don't have an answer for you.

21          MR. SADOWSKI:  So you don't know why the notes were

22  transferred to SF NU, LLC?

23          MR. HUERTAS:  Hold on.  Repeat that again.

24          MR. SADOWSKI:  You don't know why the notes were

25  transferred to SF NU, LLC?



Case 24-11007-JKS    Doc 461    Filed 03/05/25    Entered 03/05/25 13:46:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 296 of 496    Page 32 of 42

32

 1              MR. HUERTAS:  Why the notes were transferred to SF NU,

 2     LLC?  I don't -- I don't -- I don't understand your question.

 3              MR. SADOWSKI:  Okay.  These notes that are being held

 4     by JPK NewCo were originally held by SF NU, LLC, correct.

 5              MR. HUERTAS:  One of them.  That's incorrect.

 6              MR. SADOWSKI:  Okay.

 7              MR. HUERTAS:  There's one of them.

 8              MR. SADOWSKI:  All right.  Which one was currently

 9     held by SF NU, LLC?

10              MR. HUERTAS:  I got to go look.  I don't have it

11     exactly, but I think it's the smaller -- the smaller one.

12              MR. SADOWSKI:  Okay.  So you think that -- well, I

13     guess I can just look at your continuation sheet.  So you think

14     that was the second -- where did I see that?

15              MR. ORENSTEIN:  The smaller one would be First Street.

16              MR. SADOWSKI:  Yeah.  Okay.  Yeah, I'm not real good,

17     Mr. Orenstein, with the street addresses.  I'm better with the

18     entity names, but okay.  So and the other one was -- what's the

19     other one, and why was that other one transferred from the

20     original holder to SF NU, LLC?

21              MR. HUERTAS:  I don't -- I don't understand question.

22     You're asking me why the other note was transferred to SF NU,

23     LLC?  That never happened.

24              MR. SADOWSKI:  Correct.  Correct.

25              MR. HUERTAS:  I don't understand your -- I -- I -- I



Case 25-10023-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 20:14:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 297 of 496    Page 33 of 42

33

1    don't understand your question.

2         MR. SADOWSKI:  Well, I'm trying to figure out what the

3    business purpose is for these notes getting transferred from

4    one entity to the next to the next.  And the business purpose

5    that we were told in some of your filings and in your testimony

6    was that these were tainted assets, and there was some sort of

7    settlement agreement that might be created to hold these assets

8    and figure out a settlement if the assets were held by somebody

9    else.  So I'm trying to figure out why was there a business

10   need to do that.  No settlement agreement was reached, correct,

11   between --

12        MR. ORENSTEIN:  Mr. Sadowski, I'm going to -- Mr.

13   Sadowski, I'm going to interrupt you for a moment, because I'm

14   not sure if you're confusing your own questions.  You asked him

15   why the notes were transferred to SF NU.  And for purposes of

16   the bankruptcy, he's already testified that WCP and SF NU

17   transferred the notes to JPK.  So I'm not sure if you're mixing

18   up your question.

19        MR. SADOWSKI:  Yeah, well, I'm trying to figure out

20   two pieces of that, Mr. Orenstein, and thanks for that because

21   maybe my questions aren't as great as I thought they should be.

22   I want to find out why they went from WCP Fund I LLC to SF NU,

23   and then why they then went from SF NU to JPK NewCo.  There's

24   two steps there because that's where I'm headed with this.

25        So the first question is why transfer the notes out of



Case 25-10023-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 13:16:59   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 298 of 496   Page 34 of 42

34

```
 1   WCP Fund I to SF NU, LLC to begin with.  And then the second
 2   part of that question is why then transfer them again to JPK
 3   NewCo.
 4           MR. HUERTAS:  Okay.  So -- so the first question is
 5   related to internal business practices.  That's probably not
 6   the right forum for me to talk about WCP's or DP Capital
 7   business practices.  How we do business.
 8           The second question, I can't really answer your
 9   question as far as how or why we transfer the note from the
10   fund to JPK NewCo.  And I said to you multiple times that it
11   was under the advice of counsel.
12           MR. SADOWSKI:  Okay.  So is there any other reason
13   other than the advice of counsel why the notes were transferred
14   to JPK NewCo?
15           MR. HUERTAS:  I already gave you an answer.
16           MR. SADOWSKI:  That was the only reason they were
17   transferred, because of advice of counsel?
18           MR. HUERTAS:  On advice of counsel, correct.
19           MR. SADOWSKI:  Okay.  One second just to look through
20   my notes.
21           Now, you mentioned that the WCP Fund I is comprised
22   of -- and I'm not trying to pin you down exactly to what you
23   said, but I wrote down thirty different LLCs and individuals
24   and that you have an interest in WCP Fund I.  What is the
25   extent of your interest in WCP Fund I?
```

Case 25-10023-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 23:16:59   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 299 of 496   Page 35 of 42

35

1          MR. HUERTAS:  I'm a member of the fund.

2          MR. SADOWSKI:  Individually?  And what percentage do

3     you own?

4          MR. HUERTAS:  I own (unintelligible) percent.

5          MR. ORENSTEIN:  I'm going to -- I'm going to object to

6     this question.  I'm going to instruct him not to answer.  This

7     doesn't seem to have anything to do with the operations of JPK

8     or the issues in the JPK case.

9          It's your position that this is relevant with regard

10    to the motion to dismiss, which the United States Trustee has

11    filed.  We're in the process of scheduling -- in the process of

12    having a scheduling order entered that will allow for discovery

13    in this case.  And I think if you're going to ask questions

14    about WCP, it's appropriate for WCP to have its own counsel

15    present at that time to object to the extent that I think

16    it's -- to the extent that he thinks that it's necessary.  I

17    don't think this is appropriate for a 341 meeting.

18         MR. SADOWSKI:  Well, you didn't object before when he

19    gave that answer, Mr. Orenstein.  I'll ask a different

20    question.

21         Mr. Huertas, other than an individual interest in WCP

22    Fund I, do you have an individual interest in any of the LLCs

23    that make up WCP Fund I?

24         MR. ORENSTEIN:  I'm going to give the -- I'm going to

25    make the same objection.  For the reasons stated, I'm going to



Case 25-10037-ELG    Doc 46-1    Filed 03/25/25    Entered 03/25/25 23:46:59    Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 300 of 496    Page 36 of 42

36

1    instruct him not to answer that.

2         MS. EUSTIS:  Mr. Sadowski, this is Kristen Eustis.  I

3    agree with Mr. Orenstein that Mr. Huertas would be entitled to

4    have his own personal counsel present for anything further with

5    respect to his personal interests in these entities.

6         MR. SADOWSKI:  Okay.  Got it.  Okay.  Objection's been

7    noted.  Thank you, Counsel.

8         Mr. Huertas, how did you arrive at the numbers that

9    were used on the schedules to come up with the $2.4 million?

10   Where did those amounts come from?

11        MR. HUERTAS:  Those numbers, I believe, were the

12   unpaid principal balance at the time that I -- that I filled

13   this out.

14        MR. SADOWSKI:  Okay.  So you have some accounting

15   somewhere that shows as of the date you prepared the schedules,

16   X dollars was owed under each of the lien -- of the notes?

17   Sorry.

18        MR. HUERTAS:  Well, that's a face amount.  That's

19   the -- that's the face amount of the current value.  That's

20   what I was asked.

21        MR. SADOWSKI:  Okay.

22        MS. EUSTIS:  You asked me something different.  I'm

23   just clarifying that when I completed the schedules, it was

24   based on what's the total face amount and the current value.

25        MR. SADOWSKI:  Okay.  So getting to Energy of (sic)



Case 25-10023-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 13:46:59 Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 301 of 496    Page 37 of 42

37

1    Morocco LLC, was this $26,000 -- did that serve some other

2    purpose for Energy of (sic) Morocco LLC?  In other words, did

3    the Debtor use those funds -- I'm sorry.  Let me ask it a

4    different way.  Does Energy of (sic) Morocco LLC received draws

5    from DP Capital under various construction projects?

6            MR. HUERTAS:  I'm not going to answer that question.

7    It's related to a separate business, and I'll do it -- I'll do

8    it when my counsel is present for me to answer any other

9    questions related --

10           MR. SADOWSKI:  Okay.  Well, how about the --

11           MR. HUERTAS:  -- (unintelligible) DP Capital.

12           MR. HUERTAS:  How about this $26,000?  Why did Energy

13   of (sic) Morocco need that money at that time?

14           MR. HUERTAS:  They request additional funds for the

15   renovations, and we did a loan for that purpose.

16           MR. SADOWSKI:  And was JPK's business to be loaning

17   money to people for renovations?

18           MR. HUERTAS:  JPK business is again the holding

19   company and the holding company of loans -- of notes.

20           MR. SADOWSKI:  But it wasn't in the loaning business,

21   was it?

22           MR. HUERTAS:  Not before.

23           MR. SADOWSKI:  Okay.  How did JPK expect to pay Mr.

24   Sariri back the money that Mr. Sariri loaned JPK?

25           MR. HUERTAS:  Hopefully, some of these loans, we'll



Case 25-10023-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 13:46:59 Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 302 of 496   Page 38 of 42

38

1    start paying.  And for the payments of the loans, either from

2    Energy Morocco or once the payments for 423 Kennedy and

3    Developer RE1 start happening, we will take care of the

4    creditors.

5              MR. SADOWSKI:  Okay.  And when did JPK expect the --

6              MR. HUERTAS:  (Unintelligible).

7              MR. SADOWSKI:  When did JPK expect that either of my

8    clients were going to start paying money on those loans?

9              MR. HUERTAS:  I don't know.  That's a great question

10   for you and your clients.

11             MR. SADOWSKI:  No, that's a question for you.  You

12   said that you expected -- you just said that you expected that

13   at some point you would pay Mr. Sariri back with money that you

14   got from Developer RE1 and 423 Kennedy.  So what led JPK NewCo

15   to believe that there was going to be money coming in from

16   those two loans in the next year?

17             MR. HUERTAS:  I don't know.  I think if there is

18   payments received -- you ask me a question how I'm -- how I

19   am -- how am I going to pay Mr. Sariri, and the answer to your

20   question was out of the payments that we'll receive in the

21   future, who knows when, related to the Energy Morocco, as well

22   as the junior liens that are in here.

23             MR. SADOWSKI:  All right.  Just one second, Ms.

24   Eustis.

25             All right.  That concludes my questions, Ms. Eustis.



Case 25-10237-ELG    Doc 46-1    Filed 03/05/25    Entered 03/05/25 03:46:59    Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 303 of 496    Page 39 of 42

39

```
 1              Thank you, Mr. Huertas and Mr. Orenstein.

 2              MS. EUSTIS:  Thank you.

 3              Ms. Burgers, do you have any questions?

 4              Okay.  Ms. Burgers had indicated at the beginning of

 5    this meeting that she might have to drop off, so it appears

 6    that she has.

 7              Mr. Huertas, what is the Chapter 11 plan for JPK?

 8    It's my understanding from your testimony that there's no

 9    revenue currently coming in, that the notes that JPK holds are

10    no one is making payment on those notes.  So how does JPK

11    propose that it's going to exit bankruptcy?

12              MR. HUERTAS:  Sure.  Thank you for the question.  At

13    some point, our goal through the resolution of some of these

14    issues related to 423 Kennedy St and Developer RE1 LLC is

15    having the ability, once JPK NewCo is able to bring those funds

16    from these notes, being able to pay back its creditors so --

17              MS. EUSTIS:  And the plan is due, I believe, in two

18    weeks.  And so do you anticipate that those funds will start

19    coming in by the end of the year?

20              MR. HUERTAS:  I don't know.  I -- I'm not an expert on

21    this.  I have no idea.  But at this time, right now, we have

22    three -- two delinquent junior liens in -- in default.  And

23    unfortunately, the Energy Morocco is in default as well.

24              MR. ORENSTEIN:  This is Orenstein.

25              MS. EUSTIS:  Go ahead, Mr. Orenstein.
```



Case 25-10027-ELG Doc 46-1 Filed 03/05/25 Entered 03/05/25 13:46:29 Desc
Exhibit Ex. 1 - Transcript of Relevant Documents - Page 304 of 496    Page 40 of 42

40

```
 1         MR. ORENSTEIN:  Yeah, thanks.  I'm sure you saw the

 2    status report that we filed last week The money from Energy

 3    Morocco is due under the note to be paid in December.  We're

 4    hoping that that will come in by that time.  The litigation

 5    with 423 Kennedy and Developer RE1, as you know, is stayed

 6    pending the Court's decision on whether or not this bankruptcy

 7    case will be dismissed.  We're hoping that it's not going to be

 8    dismissed and at that point, that the Court will lift the stay

 9    so that the litigation can continue.

10         And you're right, the -- I believe it's -- I want to

11    say, off the top of my head, it's the 9th that the plan is due.

12    I may be wrong about that, but it's within the next two weeks.

13    And the plan, generally speaking, will provide that payments

14    will be made from the collection of these notes as and when the

15    payments are received.

16         MS. EUSTIS:  Okay.  All right.  Well, thank you.  I

17    appreciate that.

18         Does anyone else have any questions for Mr. Huertas

19    today?

20         Okay.  Hearing none.  I'm going to conclude this

21    meeting today.  And just, Mr. Orenstein and Mr. Huertas, for

22    your benefit, that does not mean I don't have any more

23    questions for you.  I do, and I do anticipate getting some

24    discovery out in connection with the motion to dismiss.  So I

25    just wanted to make sure that was clear for the record that by
```

Case 25-10297-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 23:16:29   Desc
Exhibit Ex. 1 - Transcript of Meeting of Creditors - Page 305 of 496   Page 41 of 42

41

1   concluding this meeting of creditors, that does not mean that

2   my office does not have any further questions for you in

3   relation to its motion to dismiss.

4           But with that, this --

5           MR. ORENSTEIN:  We understand, and Mr. Huertas is

6   aware of the fact that you may want to take depositions of JPK

7   or potentially Mr. Huertas himself.

8           MS. EUSTIS:  Great.  Thank you, Mr. Orenstein.

9           And thank you all so much for your time today.  I will

10  conclude this meeting.

11          (Whereupon the hearing was adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 25-10037-ELG   Doc 46-1   Filed 03/05/25   Entered 03/05/25 23:46:29   Desc
Exhibit Ex. 1 - Transcript Relevant Documents - Page 306 of 496    Page 42 of 42

42

```
 1                          CERTIFICATE

 2    I certify that the foregoing is a correct transcript from the

 3    electronic sound recording of the proceedings in the above-

 4    entitled matter.

 5

 6

 7

 8    /s/

 9    _____        Date: November 13, 2024
      ESCRIBERS LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



## CONSENT OF THE MEMBERS OF
### 5505 1st St Holdings LLC

The undersigned, Member(s) of 5505 1st St Holdings LLC a District of Columbia Limited Liability Company, adopt the following resolutions:

**WHEREAS**, resolutions were previously adopted by 5505 1st St Holdings LLC whereby the then existing members of 5505 1st St Holdings LLC relinquished their membership interest in to NT Group LLC, copies of which are attached hereto;

**WHEREAS**, the previous resolutions were adopted in error and to correct the error therein, 5505 1st St Holdings LLC hereby executes the following resolutions;

**WHEREAS**, Coloma River Holdings LLC, a District of Columbia limited liability company is the sole member of the Company;

**WHEREAS**, Charles Paret is a sole member of Coloma River Holdings LLC; and

**WHEREAS**, Coloma River Holdings LLC hereby relinquishes its membership interest and resigns from membership in 5505 1st St Holdings LLC in exchange for the $1,500,000.00 (One Million-Five-Hundred Thousand Dollars) that has previously paid toward the purchase of the property owned by 5505 1st St Holdings LLC and the separate property owned by 71 Kennedy St Holdings LLC ("PREVIOUS PAYMENT");

**WHEREAS**, the Member(s) and the Company shall enter into any and all covenants and agreements and will take all actions as may be necessary to effectuate the foregoing.

**NOW, THEREFORE, BE IT:**

**RESOLVED**, the previously adopted resolutions were adopted in error and are corrected as set forth herein.

**RESOLVED**, that Coloma River Holdings LLC, sole member of 5505 1st St Holdings LLC, hereby relinquishes its membership interest and resigns from membership of 5505 1st St Holdings LLC in exchange for the PREVIOUS PAYMENT.

**RESOLVED**, in exchange for PREVIOUS PAYMENT, NT Group LLC shall be the sole member of the Company.

**RESOLVED**, Coloma River Holdings LLC, sole member of 5505 1st St Holdings LLC, Charles Paret, sole member of Coloma River Holdings LLC, and NT GROUP LLC shall enter into any and all covenants and agreements and will take all actions as may be necessary to effectuate the foregoing.

**RESOLVED**, that all acts taken by the Company in connection with the foregoing are hereby ratified and affirmed.

Coloma River Holdings LLC, sole member of the 5505 1st St Holdings LLC, hereby certifies and guarantees:

(1) there are no unpaid real estate taxes, water & sewer bills, or assessments affecting the property except those currently due and payable and no notice has been received regarding future or pending special assessments.

(2) has no knowledge of government abatement and condemnation notices. Affiant has no knowledge of any problems which may/ have impeded the obtaining of a building permit.

(3) has delivered no unrecorded deed, deed of trust, mortgage or lien affecting the property.

(4) specifically swears that ALL property liens of EVERY kind are being paid off, subordinated or assumed.

(5) there are no unrecorded contracts of sale, options or leases affecting the property which contain a right of first refusal or an option to purchase the fee simple title to the property.

(6) knows of no action or proceeding relating to said property or to affiant, which is now pending in any State or Federal Court in the United States, said action to include a bankruptcy / insolvency action in any court.

**5505 1st St Holdings LLC**
a District of Columbia limited liability company

By: COLOMA RIVER HOLDINGS LLC, its            **DATE: December  30, 2021**
       Managing Member and Sole Member

By: _____
       Charles Paret, its
       Managing Member and Sole Member


**ACKNOWLEDGED, ACCEPTED AND AGREED:**

**NT GROUP LLC,**                                             **DATE: December  30, 2021**
a Delaware limited liability company

MEMBER:

_____
By: Mel Negussie, managing member

**UNANIMOUS WRITTEN CONSENT OF THE
MEMBERS OF
71 Kennedy St Holdings LLC**

The undersigned, Member(s) of 71 Kennedy St Holdings LLC, a District of Columbia Limited Liability Company ("Company"), adopt the following resolutions:

**WHEREAS**, resolutions were previously adopted by 71 Kennedy St Holdings LLC whereby the then existing members of 71 Kennedy St Holdings LLC relinquished their membership interest in to NT Group LLC, copies of which are attached hereto;

**WHEREAS**, the previous resolutions were adopted in error and to correct the error therein, 71 Kennedy St Holdings LLC hereby executes the following resolutions;

**WHEREAS**, Charles Paret is the sole member of 71 Kennedy St Holdings LLC;

**WHEREAS**, Charles Paret hereby relinquishes his membership interest and resigns from membership of 71 Kennedy St Holdings LLC in exchange for the $1,500,000.00 (One Million-Five-Hundred Thousand Dollars) that has previously been paid toward the purchase of the property owned by 5505 1st St Holdings LLC and the separate property owned by 71 Kennedy St Holdings LLC ("PREVIOUS PAYMENT");

**WHEREAS**, the Member(s) and the Company shall enter into any and all covenants and agreements and will take all actions as may be necessary to effectuate the foregoing.

**NOW, THEREFORE, BE IT:**

**RESOLVED**, the previously adopted resolutions were adopted in error and are corrected as set forth herein.

**RESOLVED**, that Charles Paret, sole member of 71 Kennedy St Holdings LLC, hereby relinquishes his membership interest and resigns from membership of 71 Kennedy St Holdings LLC in exchange for PREVIOUS PAYMENT.

**RESOLVED**, in exchange for PREVIOUS PAYMENT, NT Group LLC shall become the sole member of the Company.

**RESOLVED**, Charles Paret, sole member of 71 Kennedy St Holdings LLC, and NT GROUP LLC shall enter into any and all covenants and agreements and will take all actions as may be necessary to effectuate the foregoing.

**RESOLVED**, that all acts taken by the Company in connection with the foregoing are hereby ratified and affirmed.

Charles Paret, sole member of 71 Kennedy St Holdings LLC hereby certifies and guarantees:

(1) there are no unpaid real estate taxes, water & sewer bills, or assessments affecting the property except those currently due and payable and no notice has been received regarding future or pending special assessments.
(2) has no knowledge of government abatement and condemnation notices. Affiant has no knowledge of any problems which may/ have impeded the obtaining of a building permit.
(3) has delivered no unrecorded deed, deed of trust, mortgage or lien affecting the property.
(4) specifically swears that ALL property liens of EVERY kind are being paid off, subordinated or assumed.
(5) there are no unrecorded contracts of sale, options or leases affecting the property which contain a right of first refusal or an option to purchase the fee simple title to the property.
(6) knows of no action or proceeding relating to said property or to affiant, which is now pending in any State or Federal Court in the United States, said action to include a bankruptcy / insolvency action in any court.

**71 Kennedy St Holdings LLC**
a District of Columbia limited liability company
**MEMBER:**

DATE: December 30, 2021

Charles, Paret, its
Sole member

**ACKNOWLEDGED, ACCEPTED AND AGREED:**

**NT GROUP LLC,**
a Delaware limited liability company

MEMBER:

DATE: December 30, 2021

By: Mel Negussie, managing member

## AFFIDAVIT OF CHARLES PARET

I, Charles Paret (the "Affiant"), solemnly swear under the penalties of perjury and upon personal knowledge and due inquiry that the following statements are true:

1. That I am the organizer of Coloma River Holdings, LLC a Delaware Limited Liability Company organized on May 26, 2016 ("Coloma"). I am currently and at all times since its May 26, 2016 inception, until the date of this Affidavit, the sole owner/member and sole manager of Coloma.

2. That I am the organizer of Charles Paret, LLC a District of Columbia Limited Liability Company organized on January 8, 2014 ("Paret LLC"). I am currently and at all times since its January 8, 2014 inception, until the date of this Affidavit, the sole owner/member and sole manager of Paret, LLC.

3. That I am the organizer of 423 Kennedy St Holdings, LLC a District of Columbia Limited Liability Company organized on May 20, 2016 ("Kennedy Street").

4. The initial owners of Kennedy Street were myself, Mr. Charles Paret, and Mr. Adam Lobene. On or about April 17, 2017 Mr. Paret and Mr. Lobene entered into an agreement whereby all of Mr. Lobene's right title and interest to Kennedy Street was purchased by Mr. Paret for the sum of $30,000. Such $30,000 was paid to Mr. Lobene and as a result I, Charles Paret was then the 100% holder of all right title and interest in and to Kennedy Street.

5. That on or about July 31, 2017 Mr. John Gosnell acquired an equity interest in and to Kennedy Street. whereupon the owners of Kennedy Street were then Paret LLC and Mr. John Gosnell.

6.      That on November 27, 2018, Brighton-KSDC, LLC acquired an equity interest in and to Kennedy Street. As of such November 27, 2018 date, the owners of Kennedy Street were Brighton-KSDC, LLC, Paret LLC, and Mr. John Gosnell.

7.      That on September 13, 2019, I Charles Paret executed an Assignment of Membership Interest whereby I purported to transfer 50% of all right title and interest from Paret, LLC to Coloma. This transfer was in error, and deemed null and void. For the avoidance of doubt, this error was further rectified by the joining of Coloma to the transfer to Mel Melaku Negussie referenced in paragraphs 9 and 10 below.

8.      That on January 17, 2020, Mr. John Gosnell did redeem all of his right title and interest in and to Kennedy Street. As a result of this transaction all of the membership interests in Kennedy Street were held by Brighton-KSDC, LLC and Paret, LLC.

9.      That simultaneously with the making of a loan from Washington Capital Partners "WCP") to Kennedy Street, WCP has required that the sole holders of membership interest in and to Kennedy Street be Brighton-KSDC, and Mel Melaku Negussie. I, Charles Paret do as of the date of closing on the WCP loan, transfer all right title and interest held by Paret LLC, to Mel Melaku Negussie.

10.     For the avoidance of doubt, I Charles Paret, have caused each of myself, Paret LLC and Coloma to join in the foregoing transfer to Mel Melaku Negussie such that the ownership of Kennedy Street is now as follows:

Brighton-KSDC, LLC          50%

Mel Melaku Negussie          50%

11.     I, Charles Paret also hereby provide further assurance that if any interests I may have either personally or through an entity of which I am a member, in either the property that is the

2

subject of this loan from WCP, or in an entity who holds an interest in said property are later discovered, I will execute any and all necessary documents to effect the complete transfer of said interest to Kennedy Street, or any successors in interest thereto.

This affidavit is provided for the benefit of Washington Capital Partners, LLC and Brighton-KSDC, LLC, such that they are entitled to rely on the same to ensure that the making of the loan is enforceable against Kennedy Street and not susceptible to fraud.

I HEREBY CERTIFY AS OF THIS 31st DAY OF JANUARY, 2020, UNDER PENALTIES OF PERJURY THAT THE MATTERS AND FACTS HERE AND ABOVE SET FORTH ARE UPON MY PERSONAL KNOWLEDGE AND ARE TRUE.

_____
Charles Paret

STATE OF VIRGINIA
COUNTY OF FAIRFAX

    I hereby certify that, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared Charles Paret, known to me (or satisfactorily proven) to be the persons whose name is subscribed to the within instrument, and acknowledged the same for the purposes therein contained, and further acknowledged the foregoing instrument to be their act, and in my presence signed and sealed the same, giving oath under penalties of perjury that the consideration recited herein is correct.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My commission expires 05·31·2021

PARAS SAXENA
Notary Public-Reg. # 7100494
COMMONWEALTH OF VIRGINIA
My Commission Expires May 31, 2021

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Charles Paxton Paret, | ) | Case No. 23-217-ELG |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| Developer RE1 LLC, | ) | |
| | ) | Adv. Case No. 24-10023-ELG |
| Plaintiff, | ) | |
| | ) | (Cases Consolidated) |
| v. | ) | |
| | ) | |
| DP Capital LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| 423 Kennedy St Holdings LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DP Capital LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR REMAND

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com
*Counsel for the Defendants*

## <u>TABLE OF CONTENTS</u>

I.     Introduction ................................................................................................................... 1

II.    Relevant Facts and Allegations ..................................................................................... 2

       a.   Facts and Allegations Internal to the Consolidated Cases .................................... 3

       b.   Facts and Allegations Correlative to *Webster v. Huertas, et al.*, Case
           No. 23-10025-ELG (Bankr. D.D.C. 2023) ........................................................... 4

       c.   Settlement of the Paret Adversary ........................................................................ 4

       d.   Procedural Posture ................................................................................................ 5

III.   Argument: The Motion Merits Denial ........................................................................... 6

       a.   Mandatory Abstention is Inapplicable Since this is a Core Proceeding ............... 6

       b.   The Centrality of this Case to Mr. Paret's Bankruptcy Estate and this
           Honorable Court's Expertise Militate Against Discretionary Abstention ............. 9

       c.   The Plaintiffs' Latest Amendment Introduces a Question of Federal
           Bankruptcy Law .................................................................................................. 14

       d.   The Motion is Untimely ....................................................................................... 15

    IV.  Conclusion .................................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*1015 Half St. Corp. v. Warehouse Concepts, Inc.*,
1999 U.S. Dist. LEXIS 19135 (D.D.C. Oct. 26, 1999)............................................................ 15

*Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittmn, LLP*,
2008 U.S. Dist. LEXIS 50510 (D.D.C. July 2, 2008).............................................................. 10

*Colorado River Water Conservation Dist. v. U. S.*,
424 U.S. 800 (1976)............................................................................................................. 9, 14

*Cty. Of Allegheny v. Frank Mashuda Co.*,
360 U.S. 185 (1959)................................................................................................................. 9

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*,
463 U.S. 1 (1983)............................................................................................................. 12, 15

*Geron v. Reifer (In re Eight-115 Assocs., LLC)*,
650 B.R. 43 (Bankr. S.D.N.Y. 2023).................................................................................... 10

*Holmstrom v. Peterson*,
492 F.3d 833 (7th Cir. 2007) ................................................................................................. 16

*In re Aramid Ent. Fund, LLC*,
628 B.R. 584 (Bankr. S.D.N.Y. 2021)................................................................................... 10

*In re Blackman*,
55 B.R. 437 (Bankr. D.D.C. 1985) ......................................................................................... 6

*In re First Va. Reinsurance, Ltd.*,
339 B.R. 366 (Bankr. E.D. Va. 2004)..................................................................................... 9

*In re Freeway Foods of Greensboro, Inc.*,
449 B.R. 860 (Bankr. M.D.N.C. 2011)................................................................................... 9

*In re Lunt*,
2011 Bankr. LEXIS 1645 (Bankr. D. Kan. May 2, 2011) ........................................................ 13

*In re Merry-Go-Round Enters., Inc.*,
222 B.R. 254 (D. Md. 1998) .................................................................................................. 10

*In re S.G. Phillips Constructors, Inc.*,
45 F.3d 702 (2d Cir. 1995)...................................................................................................... 7

*In re Wilson*,
2013 Bankr. LEXIS 3142 (Bankr. D.D.C. Aug. 5, 2013)......................................................... 6

*Neufeld v. City of Baltimore*,
964 F.2d. 347 (4th Cir. 1992) ........................................................................................... 9

*Sticka v. Rivera (In re Rivera)*,
2005 Bankr. LEXIS 3423 (B.A.P. 9th Cir. Sep. 14, 2005).......................................... 11

*Va. ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*,
92 F. Supp. 3d 469 (E.D. Va. 2015) ................................................................................. 9

*Welch Family Ltd. P'ship Four v. Brown (In re A V. Car & Home, LLC)*,
2018 Bankr. LEXIS 3955 (Bankr. D.D.C. Dec. 14, 2018) ........................................... 6

**Statutes**
28 U.S.C. § 1334........................................................................................................... 6, 7

28 U.S.C. § 1447................................................................................................................ 15

**Rules**
Local Rule 9013-1.............................................................................................................. 1

Local Rule 9027-1........................................................................................................ 2, 15

Come now DP Capital, LLC ("DPCL"), WCP Fund I LLC ("WCP"), SF NU, LLC ("SNL"), Daniel Huertas ("Mr. Huertas"), Russell Drazin ("Mr. Drazin"), and JPK NewCo LLC ("JPK") (collectively, the "Defendants" and each a "Defendant") by and through undersigned counsel, pursuant to Local Rule 9013-1(d), and in opposition to the Plaintiffs' Renewed Motion for Remand (the "Motion," as found at DE #46) filed by Developer RE1 LLC ("DRL") and 423 Kennedy St Holdings LLC ("423 Kennedy") (collectively, the "Plaintiffs" and each a "Plaintiff") state as follows:

## I.    Introduction

Approximately nine months after this case was first removed, the Plaintiffs again seek a remand. This time, the Motion does not cite any case law—whatsoever—and only once invokes a statute outside the filing's prefatory paragraph. The Motion is, thusly, something of an enigma, appearing to be premised, *en toto*, upon contentions that (i) JPK never should have been permitted to be a debtor in bankruptcy in the first instance; and (ii) an absence of merit underlying the claims being asserted against various Defendants by the bankruptcy estate of Charles Paret ("Mr. Paret," with the underlying estate being known as the "Estate" and Wendell Webster, the trustee thereof, being known as the "Trustee").

The first contention would be immaterial, since this adversary proceeding was not docketed within the JPK bankruptcy (and, indeed, was filed before JPK even entered bankruptcy), except the Plaintiffs have now added a claim for relief premised upon the JPK bankruptcy being part and parcel of an alleged fraudulent conveyance. In light of that added claim, though, it becomes ever-important to establish that JPK's bankruptcy was a legitimate filing, for a proper purpose, undertaken in a manner consistent with federal bankruptcy law. It is not bad faith for an entity to be created with cognizance of potential reorganizational actions and the Plaintiffs are—and always

1

have been—errant in asserting otherwise. Remanding this case, and asking the Superior Court to opine on questions of bankruptcy law, would be not only illogical but, indeed, contra to the well-established design of bankruptcy courts being the forums that opine on questions of bankruptcy law.

The second contention—which is more centrally the focus of this brief—is fundamentally errant. There is now a proposed settlement of the Trustee's claims against certain Defendants that, if approved, will cement the Estate's partnership interest in the promissory notes and deeds of trust underlying this litigation. A direct correlation exists between the outcome of this litigation and the recovery occasioned by the Estate, with the Estate's assets including a partnership interest in the very debt instruments being litigated *sub judice*.

Accordingly, the Motion merits denial for three reasons. First, this case is a core proceeding in connection with Mr. Paret's bankruptcy and, as such, this case is properly heard in this Honorable Court. Second, by pleading a new cause of action that turns on resolution of a question of bankruptcy law, the Plaintiffs have introduced a federal question best resolved by this Honorable Court. And, third, the Motion is untimely in nature, having been filed after the thirty day deadline established by Local Rule 9027-1(b) and Title 28 of the United States Code. However, insofar as this Honorable Court did deny a prior remand motion without prejudice, DE #35, the Defendants will focus this brief on the former two issues, going to the substantive—and not procedural—infirmity of the current Motion.

## II.       Relevant Facts and Allegations

Insofar as this Honorable Court is, by now, no doubt quite familiar with the facts of these consolidated cases, the following overview is intentionally brief in nature:

**a. Facts and Allegations Internal to the Consolidated Cases**

1.      On December 23, 2021, DRL borrowed $4,103,000.00 from WCP, as memorialized by two promissory notes in the respective sums of $3,579,000.00 and $524,000.00 (the "DRL Notes"). *See* DRL Complaint, DE #1-2, at pp. 52-59, 90-97.

2.      The DRL Notes are both secured by deeds of trust (the "DRL Deeds of Trust") on the real property commonly known as 5501-5505 1st Street, NW, Washington, DC 20011 (the "DRL Property"). *Id.* at pp. 26-51, 61-89.

3.      Similarly, on March 31, 2022, 423 Kennedy borrowed $9,945,693.00 from WCP, as memorialized by two promissory notes in the respective sums of $8,689,693.00 and $1,256,000.00 (the "423 Kennedy Notes"). *See* 423 Complaint, DE #1-2, at pp. 722-730, 759-767.

4.      The 423 Kennedy Notes are secured by deeds of trust (the "423 Kennedy Deeds of Trust") on the entity's eponymous property (the "423 Kennedy Property"). *Id.* at pp. 696-720, 732-657.

5.      Both DRL and 423 Kennedy repeatedly defaulted under their respective notes and deeds of trust by, *inter alia*, allowing senior liens to accrue on the entities' properties, failing to make interest payments in a timely manner, and failing to pay any of the four—let alone all four—notes at maturity. *See* Notice of Removal, DE #1, at ¶¶ 5-6.

6.      DRL and 423 Kennedy do not believe their various breaches were sufficiently severe to warrant defaults being declared and foreclosures being scheduled, so they respectively brought suit to enjoin those foreclosures, alleging the declared defaults to have amounted to tortious interference with their respective business relations. *See* DRL Complaint, DE #1-2, at pp. 1-24; 423 Kennedy Complaint, DE #1-2, at pp. 663-693.

3

**b. Facts and Allegations Correlative to *Webster v. Huertas, et al.*, Case No. 23-10025-ELG (Bankr. D.D.C. 2023)**

1.     Mr. Paret is a Chapter 7 debtor in this Honorable Court. *See In re Paret*, Case No. 23-217-ELG (Bankr. D.D.C. 2023) (the "Paret Main Case").

2.     In connection with the administration of Mr. Paret's bankruptcy estate, the Trustee has filed an adversary complaint against DPCL, WCP, and Mr. Huertas. *See Webster v. Huertas, et al.*, Case No. 23-10025-ELG (Bankr. D.D.C. 2023) (the "Paret Adversary") at DE # #39-1 (the "Webster Complaint").

3.     The Webster Complaint alleges the loans made by WCP, to DRL and 423 Kennedy, to be "involved" in a partnership between Messrs. Huertas and Paret. *Id.* at ¶ 45.

4.     The Webster Complaint further alleges that Mr. Huertas "used" DRL "to purchase foreclosed properties" belonging to the putative partnership between Messrs. Huertas and Paret. *Id.* at ¶ 46.

5.     The Webster Complaint asks this Honorable Court to impose a constructive trust on the assets of the putative partnership (which would seemingly include either the DRL Notes and 423 Kennedy Notes or, based upon how one construes the Webster Complaint, potentially the DRL Property and the 423 Kennedy Property). *Id.* at pp. 17-20.

**c. Settlement of the Paret Adversary**

1.     In March 2025, the Trustee entered into a settlement agreement (the "Settlement Agreement"), with Mr. Huertas, WCP and DPCL—subject to judicial approval—to resolve the Paret Adversary. *See* Paret Main Case at DE #158.

2.     Pursuant to the Settlement Agreement, Mr. Huertas, WCP and DPCL will, *inter alia*, (i) cause a modest sum of money to be paid to the Trustee; (ii) recognize Mr. Paret's Estate as "having a limited partnership interest," *id.* at ¶ 10(b), in the DRL Notes and 423 Kennedy Notes;

(iii) use the proceeds of the DRL Notes and 423 Kennedy Notes to pay certain additional monies into Mr. Paret's estate, *id.* at ¶ 10(c); and (iv) owe one half of all "net proceeds" derived from the DRL Notes and the 423 Kennedy Notes, to the Trustee (with the computation of "net proceeds" depending on the ultimate performance of the DRL Notes and 423 Kennedy Notes), Paret Main Case at DE #158-1, § 3(c).

3.      In light of the Settlement Agreement, Mr. Paret's Estate is (i) recognized as a limited partner in connection with the promissory notes at issue in this litigation; and (ii) has a vested pecuniary interest in the outcome of this litigation. *Id.* at § 3.

### d. Procedural Posture

1.      These consolidated cases were originally removed on July 4, 2024. *See* DE #1.

2.      Since removal, this Honorable Court has (i) held a hearing on the original remand motion, DE #23; (ii) denied the original remand motion, DE #35; (iii) held a hearing on Mr. Drazin's motion for summary judgment, taking the same under advisement, DE #34; (iv) held a hearing on SNL's motion to dismiss, *id.*; (v) held a hearing on the Plaintiff's motion to dismiss a counterclaim, *id.*; (vi) allowed additional time for the Plaintiffs to file an amended complaint, DE #38; (vii) seen an amended, consolidated pleading filed by the Plaintiffs, DE #40; (viii) issued a summons to a newly-added defendant, DE #42; and (ix) seen a motion to dismiss or, in the alternative, for summary judgment filed by all defendants except Shaheen Sariri ("Mr. Sariri"),[1] DE #44.

3.      The Plaintiffs' third amended complaint, docketed after this Honorable Court dismissed the prior iteration with leave to amend, adds a cause of action for fraudulent conveyance,

---

[1] For want of ambiguity, Mr. Sariri is not represented by undersigned counsel (at least as of present) and, despite being a defendant in this litigation, is not one of the defined "Defendants" for purposes of this brief.

premised upon the JPK bankruptcy. *See* Third Amended Complaint, DE #40, at ¶¶ 200-215; 257-261.

4.     The crux of the newly-added cause of action is that transferring assets to JPK, with knowledge JPK may then seek to reorganize in chapter 11, amount to a tortious act, since the Plaintiffs assert it is *per se* illegal for an entity to be created—and then receive assets—whilst cognizant that a reorganization may soon ensue. *Id.*

## III.     Argument: The Motion Merits Denial

Since the Motion does not engage any statutory analysis or cite any case law, the grounds upon which a remand is being sought are slightly unclear. However, since the Plaintiffs do invoke Sections 1334(c) and 1452(b) in the prefatory clause of the Motion, the Defendants will assume the request is premised upon some combination of (i) equitable abstention; and/or (ii) mandatory abstention. The facts of this case support neither.

### a.     Mandatory Abstention is Inapplicable Since this is a Core Proceeding

Mandatory abstention is inapplicable to cases that encompass a core bankruptcy proceeding. Insofar as the litigation *sub judice* is objectively core in the prism of Mr. Paret's bankruptcy, mandatory abstention is accordingly inappropriate.

As observed by this Honorable Court, "[u]nder 28 U.S.C. § 1334(c)(2) mandatory abstention does not apply if a proceeding is a core proceeding." *Welch Family Ltd. P'ship Four v. Brown (In re A V. Car & Home, LLC)*, 2018 Bankr. LEXIS 3955, at *2-3 (Bankr. D.D.C. Dec. 14, 2018). *See also In re Blackman*, 55 B.R. 437, 445 (Bankr. D.D.C. 1985) (". . . mandatory abstention applies only in non-core proceedings. . ."); *In re Wilson*, 2013 Bankr. LEXIS 3142, at *5-7 n.4 (Bankr. D.D.C. Aug. 5, 2013) ("Mandatory abstention under 28 U.S.C. § 1334(c)(2) with respect to such a proceeding would be inapplicable because mandatory abstention applies only to non-

core, related to proceedings.") (citing *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 708 (2d Cir. 1995)).

The inapplicability of mandatory abstention to core proceedings is rooted in the language of the mandatory abstention statute itself:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

There are thusly two conjunctive elements to mandatory abstention: (i) the matter must not be a core proceeding; and (ii) the case must also be devoid of any independent basis to have been commenced in a "court of the United States." As discussed in detail *infra*, these are core proceedings, so the second prong need not be reached. (To whatever extent the second prong is to be considered, the Defendants would note the District of Columbia Superior Court to be a "court of the United States," but the Defendants appreciate such consideration is one unlikely to be instantly dispositive.)

The Trustee has now been asserting, for nearly a year, that Mr. Paret owns an interest in the promissory notes at issue in the instant litigation. And, under the Settlement Agreement, Mr. Paret's Estate will be recognized as holding a limited partnership interest in those promissory notes and the proceeds thereof. The Plaintiffs, in turn, are seeking cancellation of the subject debt instruments and permanent injunctions prohibiting foreclosure. The Defendants, by contrast, are seeking to proceed with foreclosures so both properties may be sold at public auction to raise money to retire the promissory notes.

Stated otherwise: under the terms of the Settlement Agreement, the Trustee and Estate will hold a direct pecuniary interest in the outcome of this litigation. If the Defendants prevail, monies will flow into Mr. Paret's Estate. If the Plaintiffs prevail, the inflow of monies into Mr. Paret's Estate will be curtailed. The better the outcome for the Defendants, the better the outcome for Mr. Paret's Estate.

Title 28 of the United States Code provides, familiarly, for an expressly non-exhaustive list of "core proceedings," that includes, *inter alia*:

(K) determinations of the validity, extent, or priority of liens. . .

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims. . .

28 U.S.C. § 157(b)(2).

These proceedings are plainly core under Section 157(b)(2)(K). The very heart of these consolidated cases is a dispute as to the enforceability, *vel non*, of four liens: the two DRL Deeds of Trust and the two 423 Kennedy Deeds of trust. The Defendants assert those to be valid, binding liens, ripe for foreclosure. The Plaintiffs assert those liens to be subject to equitable cancellation and/or voiding. The liens all secure promissory notes in which Mr. Paret's Estate is to hold a limited partnership interest under the Settlement Agreement. And this is accordingly a proceeding that will "determine[e] … the validity" of liens in which the Estate holds an interest.

Analysis under Section 157(b)(2)(O) invites the same result. The Defendants are seeking to collect upon promissory notes in which the Estate will have a limited partnership interest. If the Plaintiffs succeed, the assets of Mr. Paret's Estate will be diminished proportionately. If the Defendants succeed, the assets of Mr. Paret's Estate stand to grow proportionately. The promissory notes hanging in the balance are, under the Settlement Agreement, partially assets of the Estate.

8

And it is difficult to conceive of a proceeding more core than one that seeks to cancel, diminish, and enjoin collection of a bankruptcy estate's assets.

### b. The Centrality of this Case to Mr. Paret's Bankruptcy Estate and this Honorable Court's Topical Expertise Militate Against Discretionary Abstention

Discretionary abstention is also improper in these consolidated cases. As set forth above, there is an incredibly intimate nexus between this litigation and Mr. Paret's Estate. Equally, the issues raised *sub judice*—questions of the impact, *vel non*, of defaults under commercial loan documents, as well as the permissibility of pre-structured bankruptcy filings—are ones upon which this Honorable Court has expertise. The outcome of this litigation will materially inform the composition of the Estate being administered by the Trustee. It is not merely sensible but, indeed, legally proper for this litigation to remain in this venue.

As a starting point, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 813 (1976). *See also Va. ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*, 92 F. Supp. 3d 469, 475 (E.D. Va. 2015) ("[A] federal court must accept the jurisdiction granted it, and only in rare occasions is discretionary abstention warranted.") (quoting *In re Freeway Foods of Greensboro, Inc.*, 449 B.R. 860, 879 (Bankr. M.D.N.C. 2011)).

As observed by Judge Tice, "[t]he general rule, however, is that a federal court must accept the jurisdiction granted it, and only on very rare occasions is discretionary abstention warranted." *In re First Va. Reinsurance, Ltd.*, 339 B.R. 366, 373 (Bankr. E.D. Va. 2004) (citing *Colorado River*, 424 U.S. at 817; *Neufeld v. City of Baltimore*, 964 F.2d. 347, 349 (4th Cir. 1992)). *See also Cty. Of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959) ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate

a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.").

In seeking this rare and extraordinary remedy, the burden is on the party seeking discretionary abstention to set forth why such is appropriate. *See, e.g.*, *Geron v. Reifer (In re Eight-115 Assocs., LLC)*, 650 B.R. 43, 50 (Bankr. S.D.N.Y. 2023) ("The movant bears the burden of establishing that permissive abstention is warranted.") (citing *In re Aramid Ent. Fund, LLC*, 628 B.R. 584, 594 (Bankr. S.D.N.Y. 2021)).

The precedent of the United States District Court for the District of Columbia instructs that seven factors are to be considered when weighing whether a movant has met its burden on a motion seeking discretionary abstention:

> (1) "the effect on the efficient administration of the bankruptcy estate"; (2) "the extent to which issues of state law predominate"; (3) "the difficulty or unsettled nature of applicable state law"; (4) "comity"; (5) "the degree of relatedness or remoteness to the proceeding in the main bankruptcy court"; (6) "the existence of the right to a jury trial"; and (7) "prejudice to the involuntarily removed defendants."

*Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittmn, LLP*, 2008 U.S. Dist. LEXIS 50510, at *14 (D.D.C. July 2, 2008) (quoting *In re Merry-Go-Round Enters., Inc*., 222 B.R. 254, 257 (D. Md. 1998)).

Taking the first factor, this litigation will have a direct impact on the Estate and needs to be concluded so the Estate may be fully administered. The Trustee will receive funds from the liquidation of the DRL Notes and the 423 Kennedy Notes. If those notes are cancelled, the Estate will be accordingly hampered. If those notes are collected in full, the Estate stands to make a great

deal of money. And so long as collection of those notes is enjoined,[2] the Estate stands in a state of paralysis.

*Vis a vis* the second question, this is not a case where state law issues predominate over bankruptcy issues. And some attention is properly paid to the criterion being "bankruptcy issues" and not a more narrow consideration of "federal causes of action." As noted by the Bankruptcy Appellate Panel of the Ninth Circuit, "Congress gave the bankruptcy court exclusive jurisdiction over property of the estate, and the bankruptcy court has unique expertise on debtor-creditor matters." *Sticka v. Rivera (In re Rivera)*, 2005 Bankr. LEXIS 3423, at *29 (B.A.P. 9th Cir. Sep. 14, 2005). And such is particularly true in the prism of this case and this particular court: there is likely no court—state or federal—in the United States more expertly familiar with the adjustment of the creditor/debtor relationship, in the context of single asset real estate entities and promissory notes secured by such entities' titular assets, than this Honorable Court.

It also bears notation that—as discussed *infra*—the Third Amended Complaint introduces a substantial federal question into these proceedings. The Plaintiffs are contending that an entity may be held liable for a fraudulent conveyance if found to have siloed assets into a new entity with cognizance of a potential bankruptcy filing. *See* Third Amended Complaint, DE #40, at ¶¶ 200-215; 257-261. If accepted, this would render every so-called "Texas two step" a tortious act for which civil liability may be sought. And consideration of this cause of action will, no doubt, require consideration of the law governing good faith bankruptcy filings. To be sure, not only is this cause of action not one truly subsumed within state law but, too, this cause of action is one that would render this case independently removable as now being inclusive of a federal question. *See, e.g.,*

---

[2] Insofar as a motion to dismiss was granted by this Honorable Court, DE #31, but leave to amend was granted, it is unclear if the pre-removal injunction survived dismissal and repleading. The Defendants do not herein take any position as to whether or not the injunction remains in effect.

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 13 (1983) ("Even though state law creates appellant's causes of action, its case might still "arise under" the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties.").

In assessing the third criterion, there are no difficult or unsettled questions of state law at issue in these consolidated cases. Yes, the Plaintiffs are trying to create new law—in direct contravention of well-settled law—that would subject commercial notes and deeds of trust to the standards of consumer loans. And, yes, the Plaintiffs are trying to overturn decades-old precedent instructing that trustees under deeds of trust have solely-ministerial duties. But such does not render the questions *sub judice* "difficult" or "unsettled;" such only means the Plaintiffs are endeavoring to confront a perilous fact pattern through a series of challenges to well-settled law.

The fourth question is one of "comity," which militates in favor of denying the Motion. As noted *passim*, this litigation is intimately related to a pending bankruptcy case and now involves a substantive question of bankruptcy law There is no cognizable notion of comity that suggests cases tied to bankruptcy proceedings, involving questions of bankruptcy law, ought to be returned to state court; to the contrary, it is the longstanding practice of this Honorable Court—and sister bankruptcy courts—to retain jurisdiction over core proceedings.

On the fifth question, this case is closely related to Mr. Paret's main bankruptcy case. Mr. Paret has premised much of his case upon the notion that he has partnership rights in various assets of WCP. The Trustee, in turn, has followed on these contentions through an adversary proceeding. The Settlement Agreement likely represents the single largest opportunity for Mr. Paret's Estate

to yield funds for distribution to creditors. And the success, *vel non*, of the Plaintiffs in this case will accordingly impact—rather profoundly—the scope of any return to creditors of Mr. Paret.[3]

The sixth consideration is the existence of a right to trial by jury. There can be no trial by jury in these consolidated cases for the simple reason that the Plaintiffs each waived their right to a trial by jury "fully to the extent that any such right shall now or hereafter exist." *See* Promissory Note, DE #1-2, at p. 56, § 7.[4]

The final consideration is one of prejudice to the "involuntarily removed defendants." Putting aside that it is the Defendants who removed these consolidated cases (and assuming prejudice to plaintiffs would accordingly stand in the place of this criterion), there is plainly no prejudice. This Honorable Court is located two blocks from the Superior Court. Remote appearances are as readily managed in this Honorable Court as the Superior Court. The docket of this Honorable Court is actually notably more nimble than that of the Superior Court, allowing for the prompter scheduling of hearings. And, as noted by the *Sticka* Court, bankruptcy courts enjoy preeminent expertise on the topic of the debtor/creditor relationship; this Honorable Court is exceedingly well qualified to adjudicate the various debtor/creditor issues that permeate these consolidated cases.

In assessing the foregoing factors, the existence of a core matter "strongly mitigates against" granting abstention. *In re Lunt*, 2011 Bankr. LEXIS 1645, at *6 (Bankr. D. Kan. May 2, 2011). And, of course, abstention remains a rare and extraordinary remedy, of which the Supreme

---

[3] It is, of course, entirely possible Mr. Paret is concealing other assets that may be discovered by the Trustee. As established at various hearings in the main case, Mr. Paret appears to be unusually apprehensive to making full disclosures and offering information in a candid, forthright and fulsome manner.

[4] All four promissory notes—both DRL Notes and both 423 Kennedy Notes—contain an identical provision.

Court has cautioned that utilization should be "the exception, not the rule." *Colorado River*, 424 U.S. at 813. There is simply no basis to make such an exception in these consolidated cases, where every factor militates against abstention and where the administration of the Estate hangs in the proverbial balance. This Honorable Court has expertise in the issues presented in this litigation, has a docket that can ably accommodate this litigation, and has jurisdiction over this litigation.

### c. The Plaintiffs' Latest Amendment Introduces a Question of Federal Bankruptcy Law

Remand is improper for all of the reasons set forth *supra*. Yet even if, *arguendo*, remand might otherwise be within the realm of discretion, the Plaintiffs have essentially foreclosed any such argument through their election to amend their pleading and sue the Defendants on the theory that the JPK bankruptcy was the *coup de grace* of a fraudulent conveyance. This is now a case that, as pleaded, turns on a substantive question of bankruptcy law. And this is, accordingly, a case that most certainly ought not be remanded to the Superior Court.

There is a circuitous infirmity to the Motion when juxtaposed to the latest pleading of the Plaintiffs: the Plaintiffs are now suing the Defendants, on the theory that the JPK bankruptcy was the byproduct of a fraudulent conveyance, whilst simultaneously urging this Honorable Court to remand (or abstain from hearing) the instant litigation. The Plaintiffs are, at once, now advancing a claim for relief premised upon an allegedly improper utilization of bankruptcy law *and* protesting that such claim for relief should not be adjudicated by a bankruptcy court. Suffice it to posit, this is not a cogent contention, and this new claim for relief only affords added rationale to deny the Motion.

As noted above, the Supreme Court has made clear that "[e]ven though state law creates appellant's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a

substantial question of federal law in dispute between the parties." *Constr. Laborers Vacation Tr.*, 463 U.S. at 13.

Here, the Plaintiffs are suing the Defendants on the theory that the transfer of promissory notes and deeds of trust, to JPK, with cognizance that a bankruptcy may follow, amounts to a fraudulent conveyance. *See* Third Amended Complaint, DE #40, at ¶¶ 200-215; 257-261. The Defendants, if they are not successful on a pending motion to dismiss or for summary judgment, DE #44, will be compelled to defend this cause of action by noting the propriety of a bankruptcy-cognizant transfer. And this Honorable Court, in turn, will need to weigh in on the legality of such a bankruptcy-cognizant pre-petition asset transfer.

To be sure, adjudication of this newly-added cause of action will turn on "resolution of a substantial question of federal law," *Constr. Laborers Vacation Tr.*, 463 U.S. at 13. And this case is accordingly one that would now be independently removable as containing a federal question squarely within the expertise of this Honorable Court.

### d. The Motion is Untimely

Finally, the Defendants additionally note the Motion to be untimely in nature. Under the rules governing practice in this Honorable Court, a motion seeking remand must be filed within 30 days of the date of removal. Local Rule 9027-1(b). And the deadline is not merely rule-based but, too, statutory in nature. *See* 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a).") *See also 1015 Half St. Corp. v. Warehouse Concepts, Inc.*, 1999 U.S. Dist. LEXIS 19135, at *12 (D.D.C. Oct. 26, 1999) (noting a motion to remand on any grounds other than an absence of subject matter jurisdiction must be filed within 30 days of removal).

15

While the Defendants do appreciate that the original remand motion was denied without prejudice, and that such denial may be construed as affording some relief from the temporal dictates of the Local Rules (or even Title 28), the Defendants also note that the tight timeline is designed to avoid the belated remand of cases that have long-since departed another court's docket. *See, e.g., Holmstrom v. Peterson*, 492 F.3d 833, 837 (7th Cir. 2007) (noting the 30-day statutory deadline is "designed to ensure that all remand motions based on defects other than lack of subject matter jurisdiction were made within 30 days to ensure judicial efficiency.")

Where, as here, a case has been pending in this Honorable Court for nearly ten months, and a litany of hearings have been held and an accompanying litany of orders having been issued, there is a synergy in keeping a case in this Honorable Court. Indeed, the operative pleading in this case— an amended, consolidated complaint—was filed *after* removal, in this Honorable Court. That operative pleading adds two new defendants, one of whom—Mr. Sariri—has been added for reasons solely correlative to his interactions with this Honorable Court. And this Honorable Court has, by now, held far more hearings on this case than did the court from which it was removed nearly 10 months ago.

Stated otherwise: Title 28 of the United States Code is designed to ensure cases not be hampered by delayed remand efforts, which unavoidably strain "judicial efficiency." *Holmstrom*, 492 F.3d at 837. Such is particularly true where, as there, this Honorable Court has gleaned a notable "familiarity" with the instant case. Motion, DE #46, at ¶ 1. And to the extent there exist equitable considerations in analysis of the Plaintiffs' second effort to secure a remand, such accordingly militate in favor of denying the Motion.

## IV. Conclusion

WHEREFORE, the Defendants respectfully pray this Honorable Court (i) deny the Motion;

and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: April 12, 2025  By: /s/ Maurice B. VerStandig
          Maurice B. VerStandig, Esq.
          Bar No. MD18071
          The VerStandig Law Firm, LLC
          9812 Falls Road, #114-160
          Potomac, Maryland 20854
          Phone: (301) 444-4600
          mac@mbvesq.com
          *Counsel for the Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of April, 2025, a copy of the foregoing was

served electronically upon filing via the ECF system, with copies being sent to all parties receiving

electronic notice herein.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

The order below is hereby signed.

Signed: May 12 2025



‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Elizabeth L. Gunn
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE:<br><br>    CHARLES PAXTON PARET<br><br>    *Debtor.* | Case No. 23-00217-ELG<br><br>Chapter 7 |
| DEVELOPER RE1 LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>DP CAPITAL LLC; RUSSELL DRAZIN; DANIEL HUERTAS; SF NU, LLC; and WCP FUND I LLC,<br><br>    *Defendants.* | Adv. Pro. No. 24-10023-ELG |
| 423 KENNEDY ST HOLDINGS LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>DP CAPITAL LLC; RUSSELL DRAZIN; DANIEL HUERTAS; and WCP FUND I LLC,<br><br>    *Defendants.* |  |

## <u>ORDER GRANTING RENEWED MOTION TO REMAND</u>

Before the Court  is the Plaintiffs' *Renewed Motion for Remand* ("Motion for Remand")
(ECF No. 46) and the Defendants' *Opposition to the Motion for Remand* (ECF No. 51). At the
conclusion of the hearing held May 8, 2025 (the "Hearing"), the Court issued an oral ruling
granting the Motion for Remand. The Court enters this Order consistent with the oral ruling.

1.  <u>Mandatory Abstention</u>

The Court finds that the Plaintiffs' claims in this case did not arise under Title 11 or arise
in a case under Title 11. As of the date of the Hearing, all of the Plaintiffs' claims as stated in the
Third Amended Complaint (ECF No. 40) arose under state law.[1] Further, none of the Plaintiffs'
claims could have been commenced in a court of the United States absent jurisdiction under 28
U.S.C. § 1334(c)(2). Therefore, the Court finds that it has "related to" jurisdiction over the
Plaintiffs' claims.

Under 28 U.S.C. § 1334(c)(2), a bankruptcy court must abstain (also referred to as
mandatory abstention):

> Upon timely motion of a party in a proceeding based upon a State
> law claim or State law cause of action, related to a case under title
> 11 but not arising under title 11 or arising in a case under title 11,
> with respect to which an action could not have been commenced in
> a court of the United States absent jurisdiction under this section,
> the district court shall abstain from hearing such proceeding if an
> action is commenced, and can be timely adjudicated, in a State
> forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2). For the reasons stated at the hearing, the Court finds that the renewed
Motion for Remand was timely filed after the dismissal of the JPK NewCo LLC chapter 11 case,

---

[1] The Court previously considered and denied without prejudice a motion to remand filed by the Plaintiffs. At the time
of the previous motion, defendant JPK NewCo LLC was a debtor in a chapter 11 case. The JPK NewCo LLC chapter
11 was dismissed less than 30 days prior to the filing of the Motion for Remand. The dismissal of the JPK NewCo
LLC chapter 11 substantially changed the Court's analysis as to its jurisdiction over the claims in the Third Amended
Complaint.

the Plaintiffs' claims can be timely adjudicated in the Superior Court of the District Court of

Columbia, and, therefore, mandatory abstention is appropriate.

2.   Permissive Abstention

Alternatively, the Court finds that abstention under 28 U.S.C. § 1334(c)(1)[2] (also referred

to as permissive abstention) is appropriate. In evaluating whether permissive abstention is

appropriate, courts have looked to a variety of factors, including but not limited to:

(1) the effect on the efficient administration of the bankruptcy estate;

(2) the extent to which issues of state law predominate;

(3) the difficulty or unsettled nature of applicable state law;

(4) comity;

(5) the degree of relatedness or remoteness to the proceeding in the main bankruptcy court;

(6) the existence of the right to a jury trial; and

(7) prejudice to the involuntarily removed defendants.

*See*, *e.g.*, *In re Merry-Go-Round Enters., Inc.*, 222 B.R. 254, 257 (D. Md. 1998).

As noted in more detail at the hearing, most of the permissive abstention factors either support or

are neutral as to abstention.

Therefore, for the reasons stated herein and at the Hearing, it is hereby **ADJUDGED,**

**ORDERED**, and **DECREED** that:

1.      The Plaintiffs' Motion for Remand is **GRANTED**;

2.      The Court hereby **ABSTAINS** under 28 U.S.C. §§ 1334(c)(1) and (c)(2) from

hearing this case.

---

[2] "[N]othing in [§ 1334] prevents a . . . court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding . . . related to a case under title 11." 28 U.S.C. § 1334(c)(1).

3.       This Order is not appealable under 28 U.S.C. § 1334(d).

4.       Due to remand, the Court takes no position or action on the *Motion to Dismiss or,*

*In the Alternative, for Summary Judgment* filed by Defendants DP Capital LLC, WCP Fund I LLC,

Daniel Huertas, Russell Drazin, SF NU, LLC, and JPK NewCo LLC (ECF No. 44).

5.       This case is hereby **REMANDED** to the Superior Court of the District of

Columbia.


[Signed and dated above]



Service to:

Maurice Belmont VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road
#114-160
Potomac, MD  20854

James D. Sadowski, Esq.
Alexandria J. Smith
Greenstein Delorme & Luchs, P.C.
801 17th Street, N.W.
Suite 1000
Washington, DC  20006


**END OF ORDER**

United States Bankruptcy Court for the:

District of Columbia

Case number (*If known*): _____ Chapter 11 _____

☐ Check if this is an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | |
|---|---|
| 1. **Debtor's name** | JPK NewCo, LLC |

| | |
|---|---|
| 2. **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | |

| | |
|---|---|
| 3. **Debtor's federal Employer Identification Number** (EIN) | 99-1758059 |

**4. Debtor's address**

**Principal place of business**

8401 Greensboro Drive
Number       Street

Suite 960

McLean            VA    22102
City                    State    ZIP Code

Fairfax County
County

**Mailing address, if different from principal place of business**

Number       Street

P.O. Box

City                    State    ZIP Code

**Location of principal assets, if different from principal place of business**

Number       Street

City                    State    ZIP Code

**5. Debtor's website** (URL)    _____

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
☐ Partnership (excluding  LLP)
☐ Other. Specify: _____

| Debtor | JPK NewCo, LLC | Case number (if known) | |
|--------|----------------|------------------------|--|
| | Name | | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.naics.com/search/ .

2291

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

☑ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).

☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☐ No

☑ Yes. District **District of Columbia** When **06/23/2024** Case number **24-00262-ELG**

MM / DD / YYYY

District _____ When _____ Case number _____

MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

District _____ When _____

MM / DD / YYYY

Case number, if known _____

| Debtor | JPK NewCo, LLC | Case number (if known) |
|---|---|---|
| | Name | |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

Number          Street

_____

City                                      State          ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☑ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

| Debtor | JPK NewCo, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☑ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million

- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million

- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

### Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  05/27/2025
MM / DD / YYYY

✖ /s/ Daniel Huertas
Signature of authorized representative of debtor

Daniel Huertas
Printed name

Title  Manager

**18. Signature of attorney**

✖ /s/  Jeffrey M. Orenstein
Signature of attorney for debtor

Date  05/27/2025
MM / DD / YYYY

Jeffrey M. Orenstein
Printed name

Wolff & Orenstein LLC
Firm name

15245 Shady Grove Road Suite 465 - North
Number          Street

Rockville
City

MD
State

20850-4231
ZIP Code

3012507232
Contact phone

jorenstein@wolawgroup.com
Email address

448325
Bar number

DC
State

---

**Fill in this information to identify the case:**

Debtor name _____JPK NewCo, LLC_____

United States Bankruptcy Court for the: _____District of Columbia_____

                                                                    (State)

Case number (If known): _____

☐ Check if this is an
amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals                    **12/15**

---

### Part 1:  Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* .........................................................   $ _____0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ......................................................   $ ____3,111,937.52

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* ........................................................   $ ____3,111,937.52

---

### Part 2:  Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D* ...............   $ _____0.00

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 6a of *Schedule E/F*.........................................   $ _____0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* ..........................   +$ _____55,172.43

4. **Total liabilities** ....................................................................................................   $ _____55,172.43
   Lines 2 + 3a + 3b

**Fill in this information to identify the case:**

Debtor name   JPK NewCo, LLC

United States Bankruptcy Court for the: District of Columbia

Case number (If known): _____

☐ Check if this is an
amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Shaheen Sariri Hirfschler Fleicher, PC 1676 International Drive, Suite 1350 McLean, VA, 22101 | | | | | | 55,172.43 |
| 2 | Developer RE1 LLC Greenstein Delorme & Luchs, PC 801 17th Street, NW, Suite 1000 Washington, DC, 20006 | | | Disputed Unliquidated Contingent | | | 0.00 |
| 3 | 423 Kennedy St Holdings, LLC 1629 K Street NW Suite 300 Washington, DC, 20006 | | | Disputed Unliquidated Contingent | | | 0.00 |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
| | Name | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |

Case 25-00103-ELG Doc 8-1 Filed 05/27/25 Entered 05/27/25 13:57:2 Desc Main
Exhibit Relevant Documents Case Page 346 of 496

**Fill in this information to identify the case:**

Debtor name ___JPK NewCo, LLC___

United States Bankruptcy Court for the: ___District of Columbia___

Case number (If known): _____

☐ Check if this is an amended filing

**Official Form 206A/B**

# Schedule A/B: Assets — Real and Personal Property

**12/15**

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**  $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. United Bank | Checking | 8 7 0 0 | $ 935.00 |
| 3.2. | | | $ |

4. **Other cash equivalents** *(Identify all)*

| 4.1. | $ |
|---|---|
| 4.2. | $ |

5. **Total of Part 1**   $ 935.00

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

## Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☑ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

| 7.1. | $ |
|---|---|
| 7.2. | $ |

| Debtor | JPK NewCo, LLC | Case number (if known) |
|---|---|---|
| | Name | |

---

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1. _____ $_____

8.2. _____ $_____

**9. Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.                    $_____

---

**Part 3:   Accounts receivable**

**10. Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.

☐ Yes. Fill in the information below.

| | | | Current value of debtor's interest |
|---|---|---|---|

**11. Accounts receivable**

11a. 90 days old or less: _____ − _____ = ........➔  $_____
         face amount           doubtful or uncollectible accounts

11b. Over 90 days old: _____ − _____ = ........➔  $_____
         face amount           doubtful or uncollectible accounts

**12. Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.      $_____

---

**Part 4:   Investments**

**13. Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

**14. Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. _____  _____  $_____

14.2. _____  _____  $_____

**15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                                    % of ownership:

15.1. _____  _____%  _____  $_____

15.2. _____  _____%  _____  $_____

**16. Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1. _____  _____  $_____

16.2. _____  _____  $_____

**17. Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.                    $_____

---

Debtor _____
JPK NewCo, LLC
Name

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

    ☑ No. Go to Part 6.

    ☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 20. **Work in progress** _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 21. **Finished goods, including goods held for resale** _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 22. **Other inventory or supplies** _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |

23. **Total of Part 5**

    Add lines 19 through 22. Copy the total to line 84.

    $_____

24. **Is any of the property listed in Part 5 perishable?**

    ☐ No
    ☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

    ☐ No
    ☐ Yes. Book value _____ Valuation method _____ Current value _____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

    ☐ No
    ☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

    ☑ No. Go to Part 7.

    ☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** _____ | $_____ | _____ | $_____ |
| 29. **Farm animals** *Examples*: Livestock, poultry, farm-raised fish _____ | $_____ | _____ | $_____ |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) _____ | $_____ | _____ | $_____ |
| 31. **Farm and fishing supplies, chemicals, and feed** _____ | $_____ | _____ | $_____ |
| 32. **Other farming and fishing-related property not already listed in Part 6** _____ | $_____ | _____ | $_____ |

| Debtor | JPK NewCo, LLC | |
|---|---|---|
| | Name | |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$\qquad$ $_____

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

☐ No

☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 7:  Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | | | |
| | $_____ | _____ | $_____ |
| 40. **Office fixtures** | | | |
| | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| | $_____ | _____ | $_____ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 _____ | $_____ | _____ | $_____ |
| 42.2 _____ | $_____ | _____ | $_____ |
| 42.3 _____ | $_____ | _____ | · $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$\qquad$ $_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No

☐ Yes

Debtor _____
          JPK NewCo, LLC
          Name

---

| **Part 8:** | **Machinery, equipment, and vehicles** |
|---|---|

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1 _____ | $_____ | _____ | $_____ |
| 47.2 _____ | $_____ | _____ | $_____ |
| 47.3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |
| 48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |
| 49. **Aircraft and accessories** | | | |
| 49.1 _____ | $_____ | _____ | $_____ |
| 49.2 _____ | $_____ | _____ | $_____ |
| 50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
| | $_____ | _____ | $_____ |

51. **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

$_____

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

| Debtor | JPR NewCo, LLC | |
|---|---|---|
| | Name | |

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☑ No. Go to Part 10.

☐ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 | | $_____ | _____ | $_____ |
| 55.2 | | $_____ | _____ | $_____ |
| 55.3 | | $_____ | _____ | $_____ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 10: Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets**<br>_____ | $_____ | _____ | $_____ |
| **61. Internet domain names and websites**<br>_____ | $_____ | _____ | $_____ |
| **62. Licenses, franchises, and royalties**<br>_____ | $_____ | _____ | $_____ |
| **63. Customer lists, mailing lists, or other compilations**<br>_____ | $_____ | _____ | $_____ |
| **64. Other intangibles, or intellectual property**<br>_____ | $_____ | _____ | $_____ |
| **65. Goodwill**<br>_____ | $_____ | _____ | $_____ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$_____

| Debtor | JPK NewCo, LLC | |
|---|---|---|
| | Name | |

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**

☐ No

☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☐ No

☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 11:  All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.

☑ Yes. Fill in the information below.

|  | Current value of debtor's interest |
|---|---|

71. **Notes receivable**

Description (include name of obligor)

See continuation sheet _____ 3,111,002.52 – 0.00 = ➜ $ 3,111,002.52

Total face amount    doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

| | Tax year _____ | $_____ |
| | Tax year _____ | $_____ |
| | Tax year _____ | $_____ |

73. **Interests in insurance policies or annuities**

_____ $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____ $_____

Nature of claim    _____

Amount requested    $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____ $_____

Nature of claim    _____

Amount requested    $_____

76. **Trusts, equitable or future interests in property**

_____ $_____

77. **Other property of any kind not already listed**  *Examples:* Season tickets, country club membership

_____ $_____

_____ $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.

$ 3,111,002.52

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No

☐ Yes

Debtor    JPK NewCo, LLC
          Name

| | Part 12: | Summary |

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 935.00 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* ............................................... ➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 3,111,002.52 | |
| 91. **Total.** Add lines 80 through 90 for each column. ............91a. | $ 3,111,937.52    91b. | + $ 0.00 |
| 92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. .................. 3,111,937.52 ................................................ | | $ 3,111,937.52 |

Debtor 1     JPK NewCo, LLC

First Name    Middle Name    Last Name             Case number *(if known)*_____

## <u>Continuation Sheet for Official Form 206 A/B</u>

**71) Notes receivable**

| General description | Total face amount | Doubtful or uncollectible amount | Current value |
|---|---|---|---|
| Junior Lien on 419-423 Kennedy St NW, Washington, DC | 2,169,087.98 | 0.00 | 2,169,087.98 |
| Junior Lien on 55501 1st St NW, Washington DC | 911,426.88 | 0.00 | 911,426.88 |
| Energy Morocco LLC | 30,487.66 | 0.00 | 30,487.66 |

**Fill in this information to identify the case:**

Debtor name    JPK NewCo, LLC

United States Bankruptcy Court for the:   District of Columbia

Case number (If known): _____

☐ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   - ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   - ☐ Yes. Fill in all of the information below.

**Part 1:**   List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|

**2.1**   Creditor's name

Describe debtor's property that is subject to a lien

    $_____    $_____

Creditor's mailing address

Describe the lien
_____

Creditor's email address, if known

Is the creditor an insider or related party?
- ☐ No
- ☐ Yes

Date debt was incurred _____

Is anyone else liable on this claim?
- ☐ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Last 4 digits of account number

Do multiple creditors have an interest in the same property?
- ☐ No
- ☐ Yes. Specify each creditor, including this creditor,

As of the petition filing date, the claim is:
Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**2.2**   Creditor's name

Describe debtor's property that is subject to a lien

    $_____    $_____

Creditor's mailing address

Describe the lien
_____

Creditor's email address, if known

Is the creditor an insider or related party?
- ☐ No
- ☐ Yes

Date debt was incurred _____

Last 4 digits of account number

Is anyone else liable on this claim?
- ☐ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Do multiple creditors have an interest in the same property?
- ☐ No
- ☐ Yes. Have you already specified the relative priority?
  - ☐ No. Specify each creditor, including this creditor, and its relative priority.

As of the petition filing date, the claim is:
Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

  - ☐ Yes. The relative priority of creditors is specified on lines _____

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    $_____

Fill in this information to identify the case:

| | |
|---|---|
| Debtor | JPK NewCo, LLC |
| United States Bankruptcy Court for the: | District of Columbia |
| Case number (if known) | _____ |

☐ Check if this is an amended filing

Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims
**12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☑ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** | Priority creditor's name and mailing address | $_____ | $_____ |

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Last 4 digits of account number** _____

**Basis for the claim:**

**Is the claim subject to offset?**
☐ No
☐ Yes

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.2** | Priority creditor's name and mailing address | $_____ | $_____ |

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Last 4 digits of account number** _____

**Basis for the claim:**

**Is the claim subject to offset?**
☐ No
☐ Yes

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.3** | Priority creditor's name and mailing address | $_____ | $_____ |

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Last 4 digits of account number** _____

**Basis for the claim:**

**Is the claim subject to offset?**
☐ No
☐ Yes

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

Case 25-10308-JEG Doc 8-1 Filed 05/20/25 Entered 05/20/25 13:57:22 Desc Main
JFK NewCo, LLC
Name
Case number (if known)
Debtor
Exhibit Redacted Documents Page 19 of 357 of 496

**Part 2:** List All Creditors with NONPRIORITY Unsecured Claims

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | Amount of claim |
|---|---|---|

**3.1** Nonpriority creditor's name and mailing address
423 Kennedy St Holdings, LLC
1629 K Street NW
Suite 300
Washington, DC 20006

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

$ Unknown

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.2** Nonpriority creditor's name and mailing address
Developer RE1 LLC
Greenstein Delorme & Luchs, PC
801 17th Street, NW, Suite 1000
Washington, DC 20006

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

$ Unknown

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.3** Nonpriority creditor's name and mailing address
Shaheen Sariri
Hirfschler Fleicher, PC
1676 International Drive, Suite 1350
McLean, VA 22101

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 55,172.43

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.4** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☐ No
☐ Yes

**3.5** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☐ No
☐ Yes

**3.6** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim:

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☐ No
☐ Yes

| Debtor | Glenwood, LLC | Case number |
|---|---|---|
| | Name | |

## Part 3: List Others to Be Notified About Unsecured Claims

4.  **List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   **If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.**

| | Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|---|
| 4.1. | 423 Kennedy St Holdings LLC, c/o Mel Negussie, Resident Agent<br>1629 K Street NW<br>Suite 300<br>Washington, DC, 20006 | Line 3.1<br>☐ Not listed. Explain: | _____ |
| 4.2. | Charles Paxton Paret<br>343 First Street<br>Berryville, VA, 22611 | Line 3.1<br>☐ Not listed. Explain | _____ |
| 4.3. | Developer RE1 LLC c/o Mel Negussie, Resident Agent<br>1629 K Street NW<br>Suite 300<br>Washington, DC, 20006 | Line 3.2<br>☐ Not listed. Explain | _____ |
| 4.4. | Greenstein Delorme & Luchs, P.C. attn: James D. Sadowski, Esq.<br>801 17th Street N.W.<br>Suite 1000<br>Washington, DC, 20006 | Line 3.1<br>☐ Not listed. Explain | _____ |
| 41. | Hirschler Fleischer attn: Kristen E. Burgers, Esq.<br>1676 International Drive<br>Suite 1350<br>McLean, VA, 22102 | Line 3.3<br>☐ Not listed. Explain | _____ |
| 4.5. | Wendell W. Webster, Trustee<br>1101 Connecticut Ave., NW<br>Suite 402<br>Washington, DC, 20036 | Line 3.1<br>☐ Not listed. Explain | _____ |
| 4.6. | | Line _____<br>☐ Not listed. Explain | _____ |
| 4.7. | | Line _____<br>☐ Not listed. Explain | _____ |
| 4.8. | | Line _____<br>☐ Not listed. Explain | _____ |
| 4.9. | | Line _____<br>☐ Not listed. Explain | _____ |
| 4.10. | | Line _____<br>☐ Not listed. Explain | _____ |
| 4.11. | | Line _____<br>☐ Not listed. Explain | _____ |

Debtor _____
Name

Case number _____

| **Part 4:** | **Total Amounts of the Priority and Nonpriority Unsecured Claims** |

5.  Add the amounts of priority and nonpriority unsecured claims.

|  |  | **Total of claim amounts** |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. **+** | $ 55,172.43 |
| 5c. **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 55,172.43 |

**Fill in this information to identify the case:**

Debtor name _JPK NewCo, LLC_

United States Bankruptcy Court for the: _District of Columbia_

Case number (If known): _____   Chapter _11_

☐ Check if this is an
amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases            12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☑ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☐ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |

**Fill in this information to identify the case:**

Debtor name ___JPK NewCo, LLC___

United States Bankruptcy Court for the: ___District of Columbia___

Case number (If known): _____

☐ Check if this is an
amended filing

## Official Form 206H

## Schedule H: Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. **Does the debtor have any codebtors?**

   ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☑ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, _Schedules D-G_.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |
| 2.1 Russell Drazin | 4400 Jennifer Street, N.W.<br>Suite 2<br>Washington, DC 20015 | 423 Kennedy St<br>Holdings, LLC | ☐ D<br>☑ E/F<br>☐ G |
| 2.2 WCP Fund I LLC | 8401 Greensborgo Drive<br>Suite 960<br>McLean, VA 22102 | 423 Kennedy St Holdings, | ☐ D<br>☑ E/F<br>☐ G |
| 2.3 SF NU, LLC | 1455 Research Blvd<br>Suite 510<br>Rockville, MD 20850 | 423 Kennedy St Holdings, | ☐ D<br>☑ E/F<br>☐ G |
| 2.4 Daniel Huertas | 8401 Greensboro Drive<br>Suite 960<br>McLean, VA 22102 | 423 Kennedy St Holdings, | ☐ D<br>☑ E/F<br>☐ G |
| 2.5 | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.6 | | | ☐ D<br>☐ E/F<br>☐ G |

**United States Bankruptcy Court**

**IN RE:**                                                    Case No._____

JPK NewCo, LLC
_____ Chapter _____

## LIST OF EQUITY SECURITY HOLDERS

| Registered name and last known address of security holder | Shares (Or Percentage) | Security Class (or kind of interest) |
|---|---|---|
| WCP Fund I LLC<br>8401 Greensboro Drive Suite 960, McLean, VA 22102 | 70.56 | |
| SF NU, LLC<br>1455 Research Blvd. Ste 510, Rockville, MD 20850 | 29.44 | |

**Fill in this information to identify the case and this filing:**

Debtor Name ___JPK NewCo, LLC___

United States Bankruptcy Court for the: ___District of Columbia___

Case number (*If known*): _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* ____

☑ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/27/2025___          ✗ /s/ Daniel Huertas
　　　　　　　MM / DD / YYYY                Signature of individual signing on behalf of debtor

　　　　　　　　　　　　　　　　Daniel Huertas
　　　　　　　　　　　　　　　　Printed name

　　　　　　　　　　　　　　　　Manager
　　　　　　　　　　　　　　　　Position or relationship to debtor

**Fill in this information to identify the case:**

Debtor name    JPK NewCo, LLC

United States Bankruptcy Court for the:   District of Columbia

Case number (If known):    _____

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/25

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| Part 1: | Income |
| --- | --- |

1. **Gross revenue from business**

☑ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
| --- | --- | --- |
| **From the beginning of the fiscal year to filing date:**   From _____ to   Filing date<br>       MM / DD / YYYY | ☐ Operating a business<br>☐ Other | $_____ |
| **For prior year:**   From _____ to _____<br>      MM / DD / YYYY    MM / DD / YYYY | ☐ Operating a business<br>☐ Other | $_____ |
| **For the year before that:**   From _____ to _____<br>      MM / DD / YYYY    MM / DD / YYYY | ☐ Operating a business<br>☐ Other | $_____ |

2. **Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
| --- | --- | --- |
| **From the beginning of the fiscal year to filing date:**   From _____ to   Filing date<br>       MM / DD / YYYY | _____ | $_____ |
| **For prior year:**   From _____ to _____<br>      MM / DD / YYYY    MM / DD / YYYY | _____ | $_____ |
| **For the year before that:**   From _____ to _____<br>      MM / DD / YYYY    MM / DD / YYYY | _____ | $_____ |

Case 25-10003-ELG Doc 8-1 Filed 05/27/25 Entered 05/27/25 12:35:28 Desc Main Exhibit Redacted Document Page 365 of 496

| Debtor | JPK NewCo, LLC | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

---

**Part 2:** **List Certain Transfers Made Before Filing for Bankruptcy**

3. **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☑ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.1. | _____<br>Creditor's name | | $_____ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other _____ |
| 3.2. | _____<br>Creditor's name | | $_____ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other _____ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | _____<br>Insider's name<br><br><br>**Relationship to debtor**<br>_____ | _____<br>_____<br>_____ | $_____ | |
| 4.2. | _____<br>Insider's name<br><br><br>**Relationship to debtor**<br>_____ | _____<br>_____<br>_____ | $_____ | |

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
|---|---|---|
| | Name | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | _____ <br> Creditor's name | | _____ | $_____ |
| 5.2. | _____ <br> Creditor's name | | _____ | $_____ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|
| _____ <br> Creditor's name | | _____ | $_____ |
| | Last 4 digits of account number: XXXX– _____ | | |

---

**Part 3:   Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Developer RE1 LLC vs. DP Capital LLC, et al. <br><br> **Case number** <br><br> 24-10023-ELG | Adversary Proceeding - Debtor is not presently a party to the litigation but believes that it is a necessary party and will be added to the case. For that reason, the Debtor makes this disclosure here. | U.S. Bankruptcy Court for the District of Columbia <br><br> 333 Constitution Ave., N.W. <br> Washington, DC 20001 | ☐ Pending <br> ☐ On appeal <br> ☑ Concluded |
| 7.2. | **Case title** <br> Developer RE1 LLC, et al . v. DP Capital, LLC, et al. <br><br> **Case number** <br><br> 2022-CAB-005935 | | **Court or agency's name and address** <br> Superior Court for the District of Columbia <br><br> 500 Indiana Avenue, N.W. <br> Washington, DC 20001 | ☑ Pending <br> ☐ On appeal <br> ☐ Concluded |

Official Form 207          Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          page 3

| Debtor | JPK NewCo, LLC | | Case number (if known) |
|---|---|---|---|
| | Name | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| _____ | _____ | $_____ |
| Custodian's name | **Case title** | **Court name and address** |
| | _____ | _____ |
| | **Case number** | Name |
| | _____ | |
| | **Date of order or assignment** | |
| | _____ | |

---

### Part 4: Certain Gifts and Charitable Contributions

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. _____ | | _____ | $_____ |
| Recipient's name | | _____ | $_____ |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |
| 9.2. _____ | | _____ | $_____ |
| Recipient's name | | _____ | $_____ |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |

---

### Part 5: Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| | _____ | _____ | $_____ |

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
|--------|---------------|--------------------------|
|        | Name          |                          |

| **Part 6:** | **Certain Payments or Transfers** |
|-------------|-----------------------------------|

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | Wolff & Orenstein, LLC | | 3/18/25 | $ 9,500.00 |
| | **Address** | | | |
| | 15245 Shady Grove Road Suite 465N Rockville, MD 20850 | | | |
| | **Email or website address** wolawgroup.com | | | |
| | **Who made the payment, if not debtor?** WCP Fund I, LLC as capital contribution to Debtor | | | |

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | Wolff & Orenstein, LLC | | 5/9/25 | $ 20,000.00 |
| | **Address** 15245 Shady Grove Road Suite 465 North Rockville, MD 20850 | | | |
| | **Email or website address** wolawgroup.com | | | |
| | **Who made the payment, if not debtor?** WCP Fund I, LLC as capital contribution to Debtor | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

☑ None

| | Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|---|
| | | | | $ |
| | **Trustee** | | | |

| Debtor | JPK NewCo, LLC | Case number *(if known)*_____ |
|---|---|---|
| | Name | |

---

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $_____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | **Who received transfer?** | | _____ | $_____ |
| | _____ | | | |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

---

### Part 7: Previous Locations

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| | Address | Dates of occupancy |
|---|---|---|
| 14.1. | | From _____ To _____ |
| 14.2. | | From _____ To _____ |

---

| Debtor | JPK NewCo, LLC | | Case number (if known) | |
|---|---|---|---|---|
| | Name | | | |

---

**Part 8:** **Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| | Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|---|
| 15.1. | _____<br>Facility name | | _____ |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br><br>*Check all that apply:*<br>☐ Electronically<br>☐ Paper |

| | Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|---|
| 15.2. | _____<br>Facility name | | _____ |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br><br>*Check all that apply:*<br>☐ Electronically<br>☐ Paper |

---

**Part 9:** **Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.

Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | EIN: _____ |

Has the plan been terminated?

☐ No

☐ Yes

Debtor    JPK NewCo, LLC                                          Case number *(if known)*_____
          Name

| **Part 10:** | **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units** |

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| 18.1. _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |
| 18.2. _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br>Address | | | ☐ No<br>☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br>Address | | | ☐ No<br>☐ Yes |

| Debtor | JPK NewCo, LLC | | Case number *(if known)*_____ |
|---|---|---|---|
| | Name | | |

---

| **Part 11:** | **Property the Debtor Holds or Controls That the Debtor Does Not Own** |
|---|---|

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | $_____ |
| Name | | | |

---

| **Part 12:** | **Details About Environmental Information** |
|---|---|

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| Case number | Name | | ☐ On appeal |
| | | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | _____ |
| Name | Name | | |

---

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
|--------|----------------|--------------------------|
|        | Name           |                          |

---

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|-----------------------|-----------------------------------|----------------------------|----------------|
| Name                  | Name                              |                            |                |

---

| **Part 13:** | **Details About the Debtor's Business or Connections to Any Business** |
|--------------|----------------------------------------------------------------------|

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number Do not include Social Security number or ITIN. |
|---|---------------------------|-------------------------------------|------------------------------------------------------------------------------|
| 25.1. | Name | | EIN: _____ Dates business existed  From _____  To _____ |
| 25.2. | Name | | EIN: _____ Dates business existed  From _____  To _____ |
| 25.3. | Name | | EIN: _____ Dates business existed  From _____  To _____ |

---

| Debtor | JPK NewCo, LLC | | Case number *(if known)* _____ |
|---|---|---|---|
| | Name | | |

---

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | Dates of service |
|---|---|
| 26a.1. Christina Araujo | From _____ |
| Name | |
| 8401 Greensboro Drive, Suite 960, McLean, VA 22102 | To _____ |

| Name and address | Dates of service |
|---|---|
| 26a.2. | From _____ |
| Name | |
| | To _____ |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

| Name and address | Dates of service |
|---|---|
| 26b.1. | From _____ |
| Name | |
| | To _____ |

| Name and address | Dates of service |
|---|---|
| 26b.2. | From _____ |
| Name | |
| | To _____ |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1. Christina Araujo | |
| Name | |
| 8401 Greensboro Drive, Suite 960, McLean, VA 22102 | |

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
|---|---|---|
| | Name | |

| | Name and address | If any books of account and records are unavailable, explain why |
|---|---|---|
| 26c.2. | _____<br>Name | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| | Name and address |
|---|---|
| 26d.1. | _____<br>Name |

| | Name and address |
|---|---|
| 26d.2. | _____<br>Name |

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $_____ |

| | Name and address of the person who has possession of inventory records |
|---|---|
| 27.1. | _____<br>Name |

| Debtor | JPK NewCo, LLC | Case number (if known) |
|---|---|---|
| | Name | |

| Name of the person who supervised the taking of the inventory | | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|---|
| | | | $ |

**Name and address of the person who has possession of inventory records**

27.2.
_____
Name

---

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| WCP Fund I LLC | 8401 Greensboro Drive Suite 960, McLean, VA 22102 | Member | 70.56 |
| SF NU, LLC | 1455 Research Blvd. Ste 510, Rockville, MD 20850 | Member | 29.44 |

---

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☒ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

---

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☒ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. _____ Name | | | |
| | | | |
| | | | |
| Relationship to debtor | | | |
| _____ | | | |

| Debtor | JPK NewCo, LLC | Case number *(if known)* |
| | Name | |

| Name and address of recipient | | |
|---|---|---|
| 30.2 | | |
| | Name | |

| **Relationship to debtor** | |
|---|---|

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No

☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| | EIN: |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No

☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| | EIN: |

| Part 14: | Signature and Declaration |
|---|---|

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/27/2025___ MM / DD / YYYY

✖ /s/ Daniel Huertas _____  Printed name ___Daniel Huertas___

Signature of individual signing on behalf of the debtor

Position or relationship to debtor ___Manager___

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☐ No

☑ Yes

Debtor Name    JPK NewCo, LLC              Case number *(if known)*_____

## Continuation Sheet for Official Form 207

**11) Payments related to bankruptcy**

| | | | | |
|---|---|---|---|---|
| **Wolff & Orenstein, LLC** | **15245 Shady Grove Road Suite 465N, Rockville, MD 20850** | **$23,000.00** | **7/24/24** | Paid by Debtor through Verstandig Law Firm |
| **See Attached SOFA Part 6, Question 11** | | **$0.00** | | |

423 Kennedy St Holdings LLC, c/o Mel Negussie
1629 K Street NW
Suite 300
Washington, DC 20006


423 Kennedy St Holdings, LLC
1629 K Street NW
Suite 300
Washington, DC 20006


Charles Paxton Paret
343 First Street
Berryville, VA 22611


Daniel Huertas
8401 Greensboro Drive
Suite 960
McLean, VA 22102


Developer RE1 LLC
Greenstein Delorme & Luchs, PC
801 17th Street, NW, Suite 1000
Washington, DC 20006


Developer RE1 LLC
1629 K Street NW
Suite 300
Washington, DC 20006


Developer RE1 LLC c/o Mel Negussie, Resident
1629 K Street NW
Suite 300
Washington, DC 20006


Greenstein Delorme & Luchs, P.C.
attn: James Sadowski
801 17th Street N.W.
Suite 1000
Washington, DC 20006

Hirschler Fleischer attn: Kristen E. Burgers,
1676 International Drive
Suite 1350
McLean, VA 22102


Russell Drazin
4400 Jennifer Street, N.W.
Suite 2
Washington, DC 20015


SF NU, LLC
1455 Research Blvd
Suite 510
Rockville, MD 20850


Shaheen Sariri
Hirfschler Fleicher, PC
1676 International Drive, Suite 1350
McLean, VA 22101


WCP Fund I LLC
8401 Greensborgo Drive
Suite 960
McLean, VA 22102


Wendell W. Webster, Trustee
1101 Connecticut Ave., NW
Suite 402
Washington, DC 20036

United States Bankruptcy Court

District of Columbia

In re:  JPK NewCo, LLC                              Case No.

                                                    Chapter    11

                    Debtor(s)


**Verification of Creditor Matrix**


      The above-named Debtor(s) hereby verify that the attached list of creditors is true and correct to the best of their knowledge.


Date: _____05/27/2025_____          /s/ Daniel Huertas
                                        _____
                                        Signature of Individual signing on behalf of debtor

                                        Manager
                                        _____
                                        Position or relationship to debtor

# LOCAL OFFICIAL FORM NO. 10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

In re                                   )
JPK NewCo, LLC                          )
                                        )        Case No. _____
                                        )
_____,      )        Chapter 11
                                        )
                          Debtor(s).    )

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

[ ] **Flat Fee**

For legal services, I have agreed to accept ........................................................... $_____

Prior to the filing of this statement I have received ................................................ $_____

Balance Due ............................................................................................... $_____

[✔] **Hourly Fee**

For legal services, I have agreed to accept and I received a retainer of. .................... $20,000.00

The undersigned shall bill against the retainer at an hourly rate of ............................. $510.00
   [Or attach firm hourly rate schedule] as such rate may change over time based on periodic increases.  Hourly rate for member Jeffrey M. Orenstein $510.00; for associate Matthew E. Abbott $310.00; for paralegal Jesse Wolff $150.00

 Debtor has agreed to pay all approved fees and expenses exceeding the amount of the retainer, subject to those fees and expenses being approved by the court (when court approval is required) for work performed in a chapter 11 case or chapter 13 case.  Payments of fees and expenses exceeding the retainer, other than payment of amounts approved for payment by court order, will be disclosed by a supplemental Rule 2016(b) statement.

[ ] *Pro Bono* **Representation**

I have agreed to provide services without compensation.

**************************************************************

The debtor [✔] has    [ ] has not agreed to reimburse expenses.

The source of the compensation paid to me was:

[ ] Debtor     [✔] Other (specify)  WCP Fund I, LLC as capital contribution to Debtor

The source of compensation to be paid to me is:

[✔] Debtor     [ ] Other (specify)

With respect to the compensation described herein:

[✔] I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

[ ] I have agreed to share the above-disclosed compensation with another person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case (other than services excluded by the paragraph below) including:

Analysis of the debtor's financial situation and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

Representation of the debtor in adversary proceedings and other contested bankruptcy matters;

[Other provisions as needed]

By agreement with the debtor(s), the above-disclosed fee does not include the following services:

| CERTIFICATION |
|---|
| I certify that the foregoing is a complete statement of any agreement or arrangement for payment to |

05/27/2025            /s/ Jeffrey M. Orenstein (#448325)

*Date*                     *Signature of Attorney*

Wolff & Orenstein LLC

*Name of law firm*

Case 25-00200-ELG Doc 198-1 Filed 06/20/25 Entered 06/20/25 23:50:22 Desc Main
Document Page 1 Page 384 of 496

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In Re:

JPK NEWCO, LLC,

*Debtor.*

Case No.:  25-00200-ELG
Chapter 11

## DEVELOPER RE1, LLC'S AND 423 KENNEDY ST. HOLDINGS, LLC'S MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH

Developer RE1, LLC ("RE1") and 423 Kennedy St Holdings, LLC ("423 Kennedy")

(collectively the "Borrowers"), each a party-in-interest in this case, by counsel, move this Court

to dismiss the Chapter 11 bankruptcy petition filed by JPK NewCo, LLC ("JPK NewCo") for

cause under 11 U.S.C. § 1112(b).  The Borrowers have included the accompanying Table of

Contents, Table of Authorities, and Memorandum in support.

James D. Sadowski, Esq.
D.C. Bar #446635
Greenstein Delorme & Luchs, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C.  20006
Phone:  (202) 452-1400
Email: jds@gdllaw.com
*Counsel for Developer RE1, LLC and*
*423 Kennedy St Holdings, LLC*

<u>T</u>ABLE OF <u>C</u>ONTENTS

Memorandum in Support of Developer RE1, LLC's and 423 Kennedy St. Holdings, LLC's Motion to Dismiss Chapter 11 Petition Filed in Bad Faith .............................. 1

A.  Executive Summary .................................................................................................. 1

B.  Jurisdiction and Venue ............................................................................................. 2

C.  Preliminary Matters .................................................................................................. 2

D.  Detailed Factual Background About the Borrowers, the Loan Documents, and the D.C. Superior Court Cases ...................................................................................... 3

E.  Factual Background Regarding *JPK NewCo I* and the Formation of JPK NewCo. ........... 17

F.  The Legal Standards for Dismissing A Petition That Was Filed In Bad Faith ................... 25

    1.  The Prior Decisions From this Court. ............................................................. 26

    2.  The Second Circuit Test Used for Bad Faith ................................................ 27

    3.  The Third Circuit Test Used for Bad Faith. ................................................... 27

    4.  The Fourth Circuit Test Used for Bad Faith. ................................................. 28

    5.  The Fifth Circuit Test Used for Bad Faith. .................................................... 29

    6.  The Eleventh Circuit "Any Factors" Test Used for Bad Faith. ....................... 29

    7.  Additional Cases Addressing Bad Faith. ...................................................... 30

G.  Legal Argument ...................................................................................................... 31

H.  Conclusion .............................................................................................................. 34

# TABLE OF AUTHORITIES

Cases

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138 (1940)........................ 31

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) ................................................. 29

*Corto v. National Scenery Studios*, 705 A.2d 615 (D.C. 1997) ....................................... 32

*Franklin Mortg. & Inv. Co.*, 143 B.R. 295 (Bankr. D.D.C. 1992) ..................................... 27

*In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.) ........................................ 31

*In re Blue Chip Cap., DC, LLC*, 600 B.R. 735 (Bankr. D.D.C. 2019) ................................. 28

*In Re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d Cir. 1997) ......................................... 28

*In re Dunes Hotel Assocs.*, 188 B.R. 162 (Bankr. D.S.C. 1995) ..................................... 30

*In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) ............................... 29

*In re G–2 Realty Trust*, 6 B.R. 549 (Bankr. D. Mass. 1980) ........................................ 35

*In re Griffieth*, 209 B.R. 823 (N.D.N.Y. 1996) ................................................... 32

*In re Hammonds*, 139 B.R. 535 (Bankr. D. Col. 1992) ............................................... 32

*In re Lilley*, 91 F.3d 491 (3d Cir. 1996) ........................................................ 29

*In re LTL Mgt., LLC*, 64 F.4th 84 (3d Cir. 2023) ................................................. 29

*In re Meltzer*, 516 B.R. 504 (Bankr. N.D. Ill. 2014) ............................................. 34

*In re Natural Land Corp.*, 825 F.2d 296 (11th Cir. 1987) ......................................... 30

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) .................................. 31

*In re Sawyer*, No. 07-10252 SSM, 2007 WL 1275627................................................. 27

*In re Serfass*, 325 B.R. 901 (Bankr. M.D. Fla. 2005) ............................................. 35

*In re Silberkraus*, 253 B.R. 890 (C.D. Cal. Bankr. Ct. 2000) ..................................... 34

*In Re Spagnolia*, 199 B.R. 362 (Bankr. W.D. Ky. 1995) ............................................ 32

*In re Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir. 1985) ................................... 30

*Industrial Insurance Services, Inc. v. Zick (In re Zick)*, 931 F.2d 1124 (6th Cir. 1991) .......... 32

*Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823 (1969) ............................................ 32

*Little Creek Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986)................................ 28

*McDow v. Smith*, 295 B.R.69, 79-81 n. 22 (Bankr. E.D. Va. 2003)................................... 31

*Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D. Ky. 1992) ..... 29

*SEC v. United States Realty & Improvement Co.*, 310 U.S. 434 (1940) .............................. 31

*U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1 (1st Cir. 1988) ............................. 33

*Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop.*, 441 A.2d 956 (D.C. 1982) .......... 32

Statutes

11 U.S.C. § 1112(b)(1) ........................................................................... 27

28 U.S.C. § 1359 .................................................................................... 32

Treatises

2 L. King, *Collier on Bankruptcy* § 301.05[1] (15th ed. 1979) ..................................................... 30

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In Re:

JPK NEWCO, LLC,

*Debtor.*

Case No.: 25-00200-ELG
Chapter 11

MEMORANDUM IN SUPPORT OF
DEVELOPER RE1, LLC'S AND 423 KENNEDY ST HOLDINGS, LLC'S
MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH

### A.  EXECUTIVE SUMMARY

The Chapter 11 petition was filed by JPK NewCo for the improper purposes of delaying civil litigation pending in the D.C. Superior filed by the Borrowers against JPK NewCo's two owners and its related company and individuals:  the WCP Fund I, LLC ("WCP Fund"), DP Capital , LLC d/b/a Washington Capital Partners ("WCP"), Daniel Huertas, Russell Drazin, and SF NU LLC ("SF NU") (the "Lender Defendants").  The Lender Defendants have colluded to manufacture federal jurisdiction to try to have this Court revisit and reverse prior decisions that did not favor them in two consolidated D.C. Superior Court cases.  Mr. Huertas controls the WCP Fund and the WCP.  The WCP Fund and SF NU are the co-owners of JPK NewCo.  JPK New Co's formation, the first involuntary petition by JPK New Co that was later dismissed (24-000262-ELG) ("*JPK NewCo I*"), and this second bankruptcy case are all part or an improper scheme to create federal jurisdiction so that the Borrowers' state law claims are adjudicated in this Court.  All available evidence to date shows that the scheme to create federal jurisdiction was recommended to the Lender Defendants by proposed special counsel for JPK NewCo, Maurice VerStandig.  JPK NewCo is not now, and never has been, a legitimate business that needs bankruptcy protection.  As a result, the Court should dismiss this case for cause.

1

## B. JURISDICTION AND VENUE

1.      The Court has authority to hear and decide this matter under 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue of these proceedings and over this motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Borrowers are parties-in-interest that have standing to seek dismissal of this case.  The Borrowers have been listed as creditors of JPK NewCo with "Disputed Unliquidated Contingent" claims.  ECF # 1 at 6.

## C. PRELIMINARY MATTERS

4.      For many of the background facts about JPK NewCo, the Borrowers rely in large part, but not entirely, upon the facts set forth in The United States Trustee's Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b) filed on September 23, 2024 in *JPK NewCo I*. ECF # 37 in *JPK NewCo I*.

5.      The Borrowers, just like the U.S. Trustee's office in *JPK NewCo I*, have not had any opportunity to take discovery in this case.  The Borrowers also do not have copies of documents that JPK NewCo provided to the U.S. Trustee's office as part of the initial debtor interview in *JPK NewCo I*, which documents informed the U.S. Trustee's office about seeking a dismissal of *JPK NewCo I*.  For those reasons, and because JPK NewCo will almost certainly be contesting this motion, the Borrowers will be serving written discovery requests under Rule 9014 and seeking a scheduling order to allow for the taking of depositions, to set other discovery deadlines, and to schedule an evidentiary hearing.

2

### D.   DETAILED FACTUAL BACKGROUND ABOUT THE BORROWERS, THE LOAN DOCUMENTS, AND THE D.C. SUPERIOR COURT CASES

6.      Although the Court has some familiarity with JPK NewCo and a prior motion to dismiss that was filed that included serious allegations of bad faith by JPK NewCo., the Borrowers are including a comprehensive summary of the D.C. Superior Cases, what happened to those cases after removal and a recent remand decision, and the prior dismissed case involving JPK NewCo, so that there is a comprehensive record of that history in this case.

RE1 and 423 Kennedy.

7.      The Borrowers are sole-purpose limited liability companies that were formed to develop different real estate projects in the District.

8.      RE1, which is partially owned by Mel Negussie, is the record owner of real property in the District known as 5501 1st Street, N.W., Lot 138, Square 3389 (the "RE1 Property").

9.      423 Kennedy, which is co-owned by two members -- Mel Negussie (a 50% owner) and the Brighton KSDC, LLC ("Brighton Group") (the other 50% owner), is the record owner of real property in the District known as 423 Kennedy Street, N.W., Lot 56, Square 3260 (the "423 Property").

10.      The Brighton Group is comprised of forty-one individual investors, many of whom used their personal retirement savings to invest in the Brighton Group's membership interest in 423 Kennedy.

The Loan Documents.

11.      On December 23, 2021, the WCP helped facilitate RE1 obtaining an acquisition finance loan for the RE1 Property with the WPC Fund.

3

12.     On January 31, 2020, the WCP helped facilitate 423 Kennedy obtaining a construction finance loan for the 423 Property with the WCP Fund.  Due to unforeseen complications with the soil and water at the 423 Property, 423 Kennedy increased the original loan amount and refinanced the original construction finance loan on March 31, 2022.

13.     As part of the 423 Kennedy refinancing, the WCP and the WCP Fund agreed that they would provide construction draws to 423 Kennedy (up to $4,650,000.00) as construction on the project progressed.

14.     The loans to RE1 and 423 Kennedy were secured by a first and second promissory note and a first and second deed of trust recorded against the respective properties. The WCP Fund later assigned one or more of the deeds of trust to SF NU.

<u>RE1 and 423 Kennedy Begin the Process to Refinance Their Loans</u>

15.     In September of 2022, RE1 and 423 Kennedy began the process of refinancing their loans.  By early November of 2022, the Borrowers were well into the process of refinancing their loans with Main Street Bank, and those refinancings would have resulted in the WCP Fund being paid in full for both projects.

16.     As part of the refinancing process, in October of 2022 the WCP sent multiple payoff statements to 423 Kennedy.  None of those payoff statements alleged that 423 Kennedy was in default, nor did any of those payoff statements list any late charges or default charges.

17.     By November 3, 2022, the Borrowers had made all payments due under the loan documents and the WCP's own records evidenced that fact.  Up to that time, there was no claim made by anyone that any of the loan documents were in default.

<u>The Lender Defendants Starve 423 Kennedy of Construction Draw Funds.</u>

18.     By October 6, 2022, even though 423 Kennedy had paid all amounts due to the WCP Fund under the notes, the relationship between 423 Kennedy and the WCP started to sour

4

when Mr. Huertas informed Mr. Negussie that the WCP would stop funding construction draws to 423 Kennedy.

The WCP/WCP Fund Send Multiple Payoff Statements Without Making Any Claim of "Default" Under Any of the Loan Documents.

19.     Around October 24, 2022, the WCP sent Payoff Statements listing the amounts needed to pay the balances owed under the 423 Kennedy loans.  Those statements did not include any charges for "Default Interest" or "Default Penalties".  By that date both Borrowers had made all payments to the WCP Fund that were due under the loan documents, and at that time there again was no allegation that any default existed under any of the loan documents.

20.     On November 3, 2022, Mr. Huertas emailed 423 Kennedy to inquire about the status of the payoff of the loans, in which he stated that WCP "would not provide any construction loan draws to 423 Kennedy".  Mr. Huertas knew that if the WCP did not fund construction draws, the 423 Kennedy development project, which was 75-80% complete, could not be completed.

21.     On November 15, 2022, Mr. Huertas sent another email to 423 Kennedy restating that WCP would not release any more construction draws.  By that date, the Lender Defendants also knew that the Borrowers were in the process of securing alternative financing for both properties with Main Street Bank, and that the Borrowers expected to close on the new refinancing loans in December of 2022.

22.     On November 20, 2022, the WCP transmitted another two Payoff Statements to 423 Kennedy because the WCP knew that 423 Kennedy was attempting to go to closing on a refinancing loan.  At that time there was still no claim made that any default existed under either of the loan documents.  None of those Payoff Statements included "Default Interest" or "Default Penalties", or any other amount based upon any claim that 423 Kennedy was in default.

5

23. On November 30, 2022, RE1 made a request by email to the WCP for the payoff figures for both of its loans. That same day, RE1 requested, and WCP agreed, to provide the payoff figures for both loans as of December 23, 2022. The next day, Mr. Negussie contacted Mr. Huertas to inquire with WCP about whether the WCP would agree to extend the maturity date for the RE1 loans for six to twelve months. Mr. Huertas replied that the only way an extension of the maturity date would be granted would be if RE1 paid down the First Note and the Second Note by $1 million to $1.5 million (in principal).

24. Around December 6, 2022, Mr. Negussie contacted Mr. Huertas again to inquire whether WCP will be willing to extend the maturity date for the RE1 notes for six to twelve months if RE1 paid down the notes by $500,000 to $750,000. Mr. Huertas reiterated that, at a minimum, the notes needed to be paid down by $1 million. *Id.* Mr. Negussie then told Mr. Huertas that he would try to raise that amount ($1 million) from additional investors.

<u>The Lender Defendants Demand that the Borrowers Resolve Another Debt Owed to the WCP for Another, Unrelated Project, "Or Else".</u>

25. By December 8, 2022, the Borrowers had made all payments due under the notes and the WCP's records reflected that fact. That same day, Mr. Huertas called Mr. Negussie. During that call, Mr. Huertas told Mr. Negussie that the lender and an unnamed investor were displeased with how the development of another, unrelated property (located at 2507 I Street, NW) had turned out. For convenience, the unrelated development project at 2507 I Street, NW will be referred to as the "2507 I Street Project". SF NU is believed to have a financial interest in the 2507 I Street Project.

26. During that call, Mr. Huertas told Mr. Negussie that WCP was "withdrawing the payoff statements recently issued and that he was defaulting all loans [Mr. Negussie] was associated with at WCP," including RE1. Mr. Huertas further stated that the 2507 I Street

6

Project has "turned out very bad" and that the person who lent the money to WCP ("Investor

Lender") to provide the loan to 2507 I St Holdings LLC, is "pissed off with the quality of the

work done", and that this investor "is very wealthy and will make life hard for you", and "has

now bought the notes" and another project financed by WCP, and that WCP is "defaulting the

loans." Mr. Huertas also said: "why don't you do the honorable thing and have your investors

buy 2507 I St to make things right" or have them "take care of the $700,000" shortfall on the

2507 I Street Project.

27. During that call, Mr. Huertas further told Mr. Negussie that he should "do the

right thing" by arranging for an approximate $700,000 shortfall (on the 2507 I Street Project) to

be paid to the WCP Fund, and that if that did not happen, then the Lender Defendants and the

unnamed investor "would make trouble for you on all of your other projects".

28. In response, Mr. Negussie told Mr. Huertas that it was not appropriate for either

him (Mr. Huertas) or the WCP to be trying to force RE1, 423 Kennedy, or Mr. Negussie to pay

for the debts of someone else on an unrelated project, and that it was not appropriate for Mr.

Huertas or the WCP to be making threats to harm either Mr. Negussie or his related business

projects.

29. After Mr. Negussie refused to accede to Mr. Huertas' threats, Mr. Huertas stated,

in retaliation, that all prior Payoff Statements previously sent were withdrawn and that he would

place RE1 and 423 Kennedy in default under their loan documents with the WCP Fund.

<u>Mr. Huertas Follows Up on His Threats, the WCP Demands Payment of More than $2.3
Million in "Default Interest" and "Default Penalties", and Threatens Foreclosure.</u>

30. Later that day, Mr. Huertas followed through with his threats to "make trouble"

for Mr. Negussie, 423 Kennedy, and RE1 by arranging for Leslie Calderas, a WCP Servicing

Manager, to send a letter entitled "Notice of Default" to RE1 and to 423 Kennedy (c/o Mr. Negussie) by email.

31.     Each Notice of Default did not contain any legal basis or other explanation for how or why either RE1 or 423 Kennedy had defaulted under any of the loan documents. With each Notice of Default, the WCP included new Payoff Statements (one for each loan).

32.     The Payoff Statements sent to by the WCP to RE1 included a demand for payment of "Default Interest" of $276,776.00 and a "Default Penalty" of $357,900.00 under the first loan and "Default Interest" of $40,522.67 and a "Default Penalty" of $52,400.00 for under the second loan.

33.     The new Payoff Statement sent by the WCP to 423 Kennedy included a demand for payment of "Default Interest" of $456,927.95 and a "Default Penalty" of $868,969.30 under the first loan and payment of "Default Interest" of $97,130.67 and a "Default Penalty" of $125,600.00 under the second loan.

<u>Mr. Huertas "Lawyers Up", Asks the WCP's Attorney (Mr. Drazin) to Come Up with A Cover Story, and Mr. Drazin Follows Those Orders.</u>

34.     Immediately after receiving default notices, Mr. Negussie called Mr. Huertas to inquire as to the basis for why the WCP was suddenly now claiming that the Borrowers were in default, but Mr. Huertas told Mr. Negussie that he would not talk about the basis for the defaults, rather, Mr. Negussie would have to contact the WCP's counsel, Mr. Drazin.

35.     On information and belief, that same day Mr. Huertas called Mr. Drazin and told him to scour through every provision of the loan documents to come up with a cover story to justify the decision to declare that the Borrowers were in default when in fact all of the loans were current. As instructed, Mr. Drazin then sent to Borrowers' counsel a series of emails over a

8

period of several days in which Mr. Drazin kept coming up with different, additional claims as to why the Borrowers were in default under the loan documents.

36.     As of the date he was instructed by Mr. Huertas to go find defaults, Mr. Drazin knew that he had a fiduciary duty, as Trustee, to both the Borrowers and to the lender under the deed of trust, and that his representation of the WCP and the WCP Fund as counsel created an actual conflict of interest with his fiduciary duty as Trustee to the Borrowers.  Nevertheless, Mr. Drazin willfully ignored his fiduciary duty to the Borrowers and began to act solely on behalf of, and take instructions solely from, and provide legal advice to, the Lender Defendants.

37.     Mr. Drazin also knew that it was improper, and a breach of the fiduciary duty that he owed to the Borrowers, to try to find ways to justify -- after the fact -- the Lender Defendants' issuance of Default Notices to RE1 and 423 Kennedy on December 8, 2022.

38.     The Lender Defendants knew that by improperly alleging that the Borrowers were in default under the loan documents, and by adding $2.5 million more in "Default Interest" and "Default Penalt[ies]", the Borrowers would not be able to go to closing on any refinance loans. The Lender Defendant deliberately interfered with the refinancing of the loans with Main Street Bank to prevent the Borrowers from being able to refinance the loans and to improperly pressure them to pay someone else's debt (*i.e.*, for the 2507 I Street Project).

39.     The WCP and the WCP Fund refused to withdraw the default notices, refused to issue clean payoff statements, and refused to withdraw their foreclosure threats.  They also deliberately sabotaged the 423 Kennedy project by refusing to fund construction draws.  They timed their interference with the Borrowers refinancing of the loans during the approaching Christmas and New Year's holiday periods to make it impossible for them to close on any

refinancing loan with Main Street Bank prior to the end of 2022, and to tie up any refinancing indefinitely so that they could try to foreclose on the two properties.

<u>The Value of the Two Properties Owned by RE1 and 423 Kennedy</u>

40.     By the end of December 2022, the property owned by 423 Kennedy had been improved by 423 Kennedy and was 75-80% complete.  423 Kennedy had constructed a mixed use, six level building with thirty-three residential units and one commercial unit comprising 36,512 square feet.  The 423 Kennedy project would have been completed in the first quarter of 2023 but for the Lender Defendants' misconduct.

41.     Around December of 2022, the property owned by 423 Kennedy had a current value of $11.9 million, and the property owned by RE1 had a current value of $4 million.

<u>RE1 and 423 Kennedy File Lawsuits With the D.C. Superior Court.</u>

42.     423 Kennedy filed its first lawsuit on December 15, 2022 against the WCP, the WCP Fund, Mr. Huertas, and Mr. Drazin ("the WCP Defendants") in the case known as *423 Kennedy St Holdings, LLC. v. the WCP Fund, et al.,* Case No. 2022-CAB-005903 (D.C. Super. Ct.) ("*423 Kennedy I*").

43.     RE1 filed its lawsuit against the WCP Defendants on December 16, 2022 in the case known as *Developer RE1, LLC v. the WCP Fund I, LLC, et al.,* 2022-CAB-005935 (D.C. Super Ct.).[1]

44.     On December 23, 2022, RE1 and 423 Kennedy each filed a Motion for a Temporary Restraining Order that asked the D.C. Superior Court judges to enjoin the WCP Defendants from going forward with any foreclosure.

---

[1]     Filing the *423 Kennedy I* case before the RE1 case was the priority because the loan documents for 423 Kennedy had an earlier maturity date.

45.     On January 12 ,2023, RE1 filed a First Amended Complaint to correct a few typographical errors.  The WCP Defendants filed an Opposition to RE1's TRO Motion on January 17, 2023, with a Reply filed by RE1 on January 24, 2013.

The First TRO Hearing in *423 Kennedy I.*

46.     The TRO Motion filed in *423 Kennedy I* was set for a hearing on February 7, 2023.  The judge at that hearing determined that because an actual foreclosure notice had not been issued, there was no threat of imminent harm to 423 Kennedy, which resulted in *423 Kennedy I* being dismissed, without prejudice.

47.     Because it seemed unlikely that another judge would grant a TRO to RE1 given the "lack of imminent harm" decision in *423 Kennedy I*, and to facilitate settlement discussions, RE1 voluntarily withdrew its TRO Motion on February 28, 2023.

Initial Settlement Talks After the First TRO Decision.

48.     On March 20, 2023, the parties met at Mr. Drazin's office in the District, and after that first meeting the parties exchanged various settlement proposals by email, but no agreement was reached as the parties were very far apart on the economic terms and on the issues of whether the disputes could be settled together on a global basis.

The Motion to Dismiss Filed in the RE1 Case is Denied.

49.     The WCP Defendants moved to dismiss RE1's First Amended Complaint on January 16, 2023, which RE1 opposed on February 16, 2023.  No reply was filed, and the motion to dismiss was not denied by Judge Ebony Scott until an oral ruling at the Initial Scheduling Conference on March 24, 2023.  Judge Scott later issued a Track II Scheduling Order that set a discovery closed deadline of August 10, 2023 along with a subsequent order dated April 7, 2023 that memorialized her oral decision to deny the motion to dismiss.

<u>The Lender Defendants Issue Foreclosure Notice for Both Properties.</u>

50.      The initial threats of foreclosure by the WCP turned into a reality.  On June 23, 2023, SF NU sent RE1 a notice of foreclosure sale and the WCP Fund sent a Notice of Foreclosure to 423 Kennedy.  Both foreclosure notices were signed by Mr. Drazin.  The foreclosure sales for the two properties were both scheduled for July 25, 2023 (at 2:00 p.m. for RE1 and 2:10 p.m. for 423 Kennedy) at the office of Harvey West Auctioneer's, Inc.

<u>RE1 Renews Its TRO Motion and 423 Kennedy Files a New Lawsuit and TRO Motion Against the Lender Defendants.</u>

51.      On July 11, 2023, RE1 filed a renewed TRO Motion to stop the foreclosure on its property.

52.      On July 12, 2023, the Borrowers sent a joint letter to Mr. VerStandig demanding that the foreclosure notices be withdrawn and that Mr. Drazin resign as trustee due to his conflict of interest.  Neither demand was met.  The next day, 423 Kennedy filed a new case against the WCP Defendants in *423 Kennedy St Holdings, LLC v. The WCP Fund, et al.,* Case No. 2023-CAB-004260 (D.C. Super. Ct.) ("*423 Kennedy II*").  In *423 Kennedy II*, 423 Kennedy added affirmative claims against Mr. Drazin for breach of his fiduciary duty as Trustee and seeking declaratory judgments that (a) Mr. Drazin could not serve as trustee and (b) that the foreclosure notice that he issued was invalid.[2]

53.      RE1 took the deposition of Mr. Huertas on July 18, 2023.  At his deposition, Mr. Huertas was unable to explain how RE1 was in default under its loan documents.  In response to

---

[2]      The *423 Kennedy II* claims included: breach of contract (Count I); tortious interference with business relations (Count II); breach of the duty of good faith and fair dealing (Count III); breach of fiduciary duty by the Trustee (Count IV), for declaratory judgment and injunctive relief to stop the foreclosure (Count V); declaratory judgment (Mr. Drazin cannot serve as Trustee and the foreclosure notice is invalid) (Count VI), and that the loan documents contain unenforceable liquidated damages provisions that constitute a penalty (Count VII).

12

multiple questions about the basis for the alleged defaults, all that Mr. Huertas could say, in conclusory fashion, was that: "the borrower was in default" without providing any explanation as to the basis for the default under the loan documents. Near the end of that day's testimony, Judge Milton Lee's chambers sent an email to all counsel notifying them that he had set a hearing on 423 Kennedy's TRO Motion for Friday, July 21, 2023 at 1:00 pm.

The Hearing on 423 Kennedy's TRO Motion and Order Granting That Motion.

54. Mr. Negussie gave testimony on behalf of 423 Kennedy at the TRO hearing before Judge Milton Lee on Friday, July 21, 2023, which testimony largely mirrored the allegations in the complaint in *423 Kennedy II*. The Lender Defendants did not rebut Mr. Negussie's testimony, either by submitting a contrary affidavit or by calling a witness that gave contrary testimony. The Lender Defendants called one accounting department witness whose testimony primarily consisted of authenticating a record of 423 Kennedy's loan payments kept by the WCP.

55. On Monday, July 24, 2023, Judge Milton Lee issued an order granting 423 Kennedy's TRO Motion. In that order, Judge Lee credited Mr. Negussie's testimony; rejected nearly all the arguments made by the Lender Defendants, and determined that 423 Kennedy was likely to prevail on the merits as to its claims.

The Hearing on RE1's TRO Motion and Decisions Granting that Motion.

56. On July 24, 2023, Judge Scott issued an order setting a hearing RE1's Renewed TRO Motion for July 25, 2023 at 10:30 a.m. Mr. Negussie gave testimony on behalf of RE1 at that hearing. Once again, the Lender Defendants did not rebut Mr. Negussie's testimony, either by submitting a contrary affidavit or by calling a witness that gave contrary testimony at the hearing. The Lender Defendants again called the same accounting department witness, whose

13

testimony again primarily consisted of authenticating a record of RE1's loan payments kept by the WCP.

57.     After excusing the parties during a recess, Judge Scott issued an oral decision granting RE1's TRO Motion and determining that RE1 was likely to prevail on the merits as to its claims.  At that hearing the Lender Defendants requested that Judge Scott set a trial date, which she reserved for September 9, 2024.[3]  Judge Scott later memorialized her oral decision granting the TRO Motion in a written order dated August 15, 2023.

<u>The Discovery "Cease Fire" and Private Mediation with JAMS.</u>

58.     After the two TRO decisions, the parties agreed to put the brakes on taking any further depositions and responding to pending discovery requests and instead focus their efforts on trying to resolve their disputes through a private mediation with JAMS.  To allow for that mediation, the parties sought joint extensions of the Scheduling Order deadlines on both cases.  The mediation first scheduled to take place in mid-December 2023 was rescheduled to early 2024.

59.     The Borrowers and the WCP Defendants attended two mediation sessions with a retired judge with JAMS.  The first session took place in person on January 9, 2024 at JAMS' office, but no agreement was reached, so a second session was scheduled for January 25, 2024 via Zoom.  The second session, however, ended abruptly when Mr. Huertas unilaterally decided that negotiations were over.

60.     After the second session, the Borrowers sent multiple additional settlement proposals to Lender Defendants' counsel by email, but those proposals were mostly met with

---

[3]     Judge Scott noted that it was unusual for her to schedule a trial date so early in the case (trial dates are not usually set until after a pre-trial conference), but she was persuaded by the Lender Defendants to set an expedited trial date of September 9, 2024.

14

silence -- sometimes for several weeks -- and/or a rejection (by email) without any

counterproposal. The Lender Defendants finally responded to a March 4, 2024 proposal on

March 29, 2024, but in that response they moved in an opposite direction from prior proposals.

      RE1 Files a Second Amended Complaint.

61.     On March 1, 2024, RE1 filed an unopposed Motion for Leave to File a Second

Amended Complaint to more closely mirror the claims in *423 Kennedy II* and to add SF NU as

defendant because SF NU (not the WCP Fund) issued the foreclosure notice to RE1.

62.     The motion for leave was granted on March 7, 2024. SF NU was served with the

Second Amended Complaint on March 26, 2024. The WCP Defendants filed an Answer to the

Second Amended Complaint along with a Counterclaim (filed by the WCP Fund) on April 2,

2024.

      The Lender Defendants Create JPK NewCo, and Transfer Some Loan Documents to It.

63.     Unbeknownst to the Borrowers, the Lender Defendants had created JPK NewCo

and arranged for some, but not all, of the Borrowers' loan documents to be transferred to that

entity around April 15-16, 2024. By that date, settlement discussions were over.

      The Lender Defendants Start Creating More Roadblocks in the Superior Court Cases.

64.     On April 21, 2024, less than a week after some loan documents were transferred

to JPK NewCo, SF NU filed a motion to dismiss the Second Amended Complaint in RE1 case.

In the motion to dismiss, SF NU claimed that JPK NewCo was an indispensable party because

"JPK NewCo owns the note, and holds the rights arising under the correlative deed of trust."

65.     The Lender Defendants used the fact that they transferred some loan documents to

JPK NewCo as a basis for the entire RE1 case to be dismissed. In hindsight, it is clear that the

Lender Defendants wanted RE1 to amend its complaint to include JPK NewCo because they

were planning to put JPK NewCo into bankruptcy, but RE1 did not take the bait.

66. On April 23, 2024, RE1 filed a motion to dismiss the WCP Fund's Counterclaim as untimely. On May 6, 2024, RE1 filed an opposition to SF NU's motion to dismiss.

67. On May 7-8, 2024, 423 Kennedy served its first set of interrogatories and requests for the production of documents on the Lender Defendants. In interrogatory answers (dated June 7, 2024), the WCP Defendants disclosed that they were "knowledgeable about [JPK NewCo's] acquisition of the promissory note and deed of trust, from WCP."

68. On June 7, 2024, the parties filed a joint motion to consolidate the two cases, and on June 11, 2024, the Judge Scott issued an order consolidating the two cases, designating the RE1 case (2022-CA-005935-B) as the lead case in which all future filings should be made.

69. At no time during discovery did the Lender Defendants produce any documents: (a) about the formation of JPK NewCo.; (b) showing how and for what consideration JPK NewCo acquired "the promissory note and deed of trust from the WCP"; or (c) documents showing any related communications concerning those transactions. The Lender Defendants also never produced a privilege log or any copies of any legal bills for the services of Mr. VerStandig.

70. The Lender Defendants also did not serve any discovery requests on 423 Kennedy, nor did they note any depositions, even though a trial was scheduled for September 9, 2024. The Lender Defendants also did not assert any counterclaim against 423 Kennedy for the amounts allegedly due under the loan documents.

71. The facts listed in paragraphs 64-70 are all "tells" that the Lender Defendants never really planned to go to trial on September 9, 2024 because they had secretly transferred the rights under some of the Borrower's loan documents to JPK NewCo and were planning to put JPK NewCo into bankruptcy.

16

72.     On June 26, 2024, the Clerk's office sent notice of the Trial Readiness hearing that was set for September 6, 2024.

73.     On July 3, 2024 at 6:04 pm, the Borrowers noted the depositions of all of the Lender Defendants and of multiple fact witnesses (employees of the WCP) to take place back-to back on July 8-9, 2024.  Just a few hours later (11:50 pm), the Lender Defendants filed a notice of removal of the now consolidated cases resulting in the Adversary Proceeding entitled *Developer RE1, et al., v. WCP Fund I, LLC, (In re Paret),* Adv. Pro. 24-10023-ELG ("Removed AP Case").

74.     During the next few days, the Lender Defendants "flooded the zone" by filing multiple additional motions and notices in the Removed AP Case.  *See* ECF Nos. 3-9 (filed in Adv. Pro. 24-10023-ELG).

75.     It is obvious from the timing that the Lender Defendants filed a notice of removal to prevent the Borrowers from taking deposition, then later put JPK NewCo into bankruptcy to ensure further that the September 9, 2024 trial did not take place.

76.     On July 21, 2024, the Borrowers moved to remand the Removed AP Case to the D.C. Superior Court, arguing, *inter alia,* that the removal was untimely.  *See* ECF # 13 (filed in Adv. Pro. 24-10023-ELG).

E.   FACTUAL BACKGROUND REGARDING *JPK NEWCO I*
AND THE FORMATION OF JPK NEWCO.

77.     On July 23, 2024 (at 8:51 a.m.), the same morning that a hearing was being held in the Removed AP Case (at 10:00 a.m.), Shaheen Sariri ("Sariri") filed an involuntary Chapter

17

11 Petition against JPK NewCo through counsel, Kristen Burgers.  The Involuntary Petition

stated that Sariri was owed $51,443.52 under a Promissory Note.  ECF # 1 in *JPK NewCo I*. [4]

78.     The Involuntary Summons was issued by the Clerk's Office on July 24, 2024 and

a Certificate of Service of the Involuntary Petition and Summons was filed on July 25, 2024.

ECF ## 3-4 in *JPK NewCo I*.

79.     The Certificate of Service states that Ms. Burgers served copies of the Summons

and Involuntary Petition on JPK NewCo by first-class mail, postage prepaid, on July 25, 2024.

ECF # 4 in *JPK NewCo I*.

80.     On August 6, 2024, JPK NewCo consented to the Involuntary Petition and elected

to proceed under subchapter V of Chapter 11 of the Bankruptcy Code.  ECF # 6 in *JPK NewCo I*.

81.     An Order for Relief was entered on August 7, 2024.  ECF # 8 in *JPK NewCo I*.

82.     On August 20, 2024, WCP Fund, Mr. Huertas, the other defendants and JPK

NewCo, as debtor-in possession, all through counsel Mr. VerStandig, filed an opposition to the

motion to remand the Removed AP Case.  *See* ECF# 20 (filed in Adv. Pro. 24-10023-ELG).

That opposition argued, among other things, that the "litigation will have a momentous impact

upon the administration of two separate bankruptcy estates, while also being likely dispositive of

[JPK NewCo's] ability to reorganize." *Id.* p. 1.

83.     On August 28, 2024, the Court held a hearing on the motion to remand and

determined that it did have jurisdiction over the Removed AP Case, but that all proceedings in it

should be stayed pending resolution of an expected motion to dismiss this bankruptcy case,

among other reasons.

---

[4]     Many of the facts in paragraphs 77- 105 have been copied, in whole or in part, from the
U.S. Trustee's Motion to Dismiss *JPK NewCo I*.  *See* ECF # 37 *in JPK NewCo I*.  Based upon all
information available to the Borrowers thus far, the Borrowers believe those facts to be accurate.

18

<u>JPK NewCo's Lack of Any Indicia That It is a Legitimate Company and the Lender
Defendants' Collusive Efforts to Create Federal Jurisdiction.</u>

84.     JPK NewCo was formed more than a year after the D.C. Superior Court cases

were filed.  Since its formation, JPK NewCo has conducted no legitimate business.  It has no

employees, it generates no income from sales, it produces no goods, and it provides no services.

85.     JPK NewCo's principal place of business is the WCP's offices in McLean, VA –

an address that is also shared with the WCP Fund and where Mr. Huertas' office is located.

Until April 15, 2024, JPK NewCo existed simply as a shell entity.

86.     On April 15, 2024, the WCP Fund and SF NU, while still defendants in the

Consolidated Cases, assigned some or all their interests in the RE1 loan and the 423 Kennedy

loan to JPK NewCo.  Although the assignment documents indicate that the assignments were

"for value received," given that JPK NewCo had no money and provided no services, it appears

that these assignments were actually for no consideration.

87.     On June 3, 2024, when the discovery period in the Consolidated Cases was

nearing completion, Shaheen Sariri, a friend of Mr. Huertas, "loaned" JPK NewCo $50,000,

which JPK NewCo, despite having no income or assets other than assigned notes that would

yield no income due the TRO Orders in the Consolidated Cases, was supposed to repay, in full

with 10.55% annual interest, two months later on August 3, 2024.  The first payment was due on

July 1, 2024.  A true and correct copy of the Sariri Note was attached as Exhibit 1 to the U.S.

Trustee's motion to dismiss *JPK NewCo I*.  ECF # 37-1 in *JPK NewCo I***.**

88.     Given that JPK NewCo had no ability to repay this "loan" to Mr. Sariri, it is

obvious that this "loan" was a sham.  Indeed, it was never intended that JPK NewCo would

repay this loan.  Rather, the purpose of this "loan" arrangement was to cause JPK NewCo to

incur a debt to a single individual, Mr. Sariri, so Mr. Sariri could then initiate an involuntary

19

bankruptcy against JPK NewCo, thereby giving the Lender Defendants another potential ground to allow this Court, which they perceive as a friendlier forum, to have jurisdiction over all or part of the Borrowers' claims.

89.     Once JPK NewCo received the "loan" from Mr. Sariri on June 21, 2024, it dispersed those funds as follows.  First, on June 25, 2024, it gave $23,000 to Mr. VerStandig to hold until the involuntary bankruptcy was filed at which time it would be used to retain bankruptcy counsel for JPK NewCo.  At some time after JPK NewCo transferred this money to Mr. VerStandig, but before this bankruptcy case was commenced, Mr. VerStandig contacted Jeffrey Orenstein to arrange for him to represent JPK NewCo once the involuntary petition was filed.[5]

90.     Second, on June 25, 2024, JPK NewCo loaned the remaining $26,000 to an entity known as Energy Morroco, LLC,[6] a loan that was not scheduled to be repaid (other than a $325 interest payment to be made each month) until December 21, 2024 (well after the "loan" from Mr. Sariri was due to be paid in full).  A true and correct copy of the Energy Morroco Loan Agreement was attached as Exhibit 2 to the U.S. Trustee's motion to dismiss JPK NewCo I.  *See* ECF # 37-2 in *JPK NewCo I.*

91.     The purpose of the loan to Energy Morroco, LLC, was to give JPK NewCo the appearance of carrying on some type of legitimate business activity.

92.     All available information to date indicates that the plan to create federal jurisdiction through the loan from Mr. Sariri and a subsequent bankruptcy filing by JPK NewCo

---

[5]     Mr. Orenstein has acknowledged that he was contacted by Mr. VerStandig in early 2024 regarding the potential representation of one of Mr. VerStandig's clients in a Chapter 11 filing.

[6]     The Note signed by Energy Morroco LLC identifies it as a Delaware LLC.  Delaware and District of Columbia online public records show that the entity is named Energy Morocco (one "r", not two) LLC.  The Note is dated June 24, 2024.

20

was created and carried out on the advice of the Lender Defendants' and JPK NewCo's attorney, Mr. VerStandig.

93. Given that on July 1, 2024, when the first payment to Mr. Sariri came due, JPK NewCo had (by design) no cash on hand to repay the "loan", it failed to make its first payment to Mr. Sariri. Then, on July 23, 2024, Mr. Sariri filed an involuntary Chapter 11 petition against JPK NewCo. There is no evidence that any demand for payment was ever made by Mr. Sariri.

94. Before JPK NewCo was served with the involuntary petition (*see* ECF # 4 in *JPK NewCo I*), Mr. VerStandig contacted Mr. Orenstein to obtain his banking information in order to wire Mr. Orenstein the $23,000 that Mr. VerStandig was holding for JPK NewCo.[7]

95. The next day, on July 24, 2024, the Court issued the summons in this bankruptcy case. *See* Doc. 3 in *JPK NewCo I*.

96. That same day, on July 24, 2024, a day before JPK NewCo was served with the involuntary petition, Mr. VerStandig wired the $23,000 to Mr. Orenstein to be used as a retainer for Mr. Orenstein's representation of JPK NewCo.

97. On July 25, 2024, a day after Mr. Orenstein received the retainer to represent JPK NewCo in this bankruptcy case, Mr. Sariri served, by regular mail, a copy of the summons and involuntary petition, on JPK NewCo. *See* ECF # 4 in *JPK NewCo I*.

98. Mr. Orenstein's engagement agreement with JPK NewCo is dated as of July 30, 2024. A true and correct copy of the engagement agreement was attached as Exhibit 3 to the U.S. Trustee's motion to dismiss *JPK NewCo I*. *See* ECF # 37-3 in *JPK NewCo I*.

---

[7] Although service was legally accomplished on July 25, 2024, that service was by regular mail, so JPK NewCo could not have actually received service by regular mail on July 25, 2024. *See* ECF # 4 in *JPK NewCo I*.

8161\0002\4934-0098-3376.v1

99.     On August 6, 2024, JPK NewCo answered the involuntary petition and consented to be a debtor in this case.  *See* ECF # 6 in *JPK NewCo I*.

100.    On August 6, 2024, Mr. Orenstein filed an application to be employed as NewCo's bankruptcy counsel.  *See* ECF # 5 in *JPK NewCo I*.  On that same date, Mr. VerStandig filed an application to be employed as special counsel for JPK NewCo, to represent it in the Consolidated Cases.  *See* ECF # 12 in *JPK NewCo I*.  As of August 6, 2024, JPK NewCo was not a party in the Consolidated Cases.

101.    On August 20, 2024, the Borrowers filed an Objection to the Application to Employ Mr. Orenstein and his firm.  *See* ECF # 14 in *JPK NewCo I*.  Doc. No.  14.

102.    On August 26, 2024, the Borrowers filed an Objection to the Application to Employ Special Counsel.  *See* ECF # 15 in *JPK NewCo I*.

103.    On September 4, 2024, the U.S. Trustee filed and Objection to the Application to Employ Mr. Orenstein, an Objection to the Application to Employ Mr. VerStandig as Special Counsel, and a Motion to Return Compensation.  *See* ECF ## 20-22 in *JPK NewCo I*.

104.    On September 17, 2024, the U.S. States Trustee filed a Supplemental Opposition to the Applications and the Motion to Return Compensation.  *See* ECF ## 31 in *JPK NewCo I*.

105.    On September 18, 2024, Mr. VerStandig filed his Reply in Support of Application to Approve Employment of Maurice B. VerStandig, Esq. and The VerStandig Law Firm As Special Counsel To JPK NewCo LLC and Opposition To Motion For Return Of All Compensation Received From Or On Behalf Of Debtor.  *See* ECF #34 in *JPK NewCo I*.

106.    On September 18, 2024, Mr. Orenstein and Wolff & Orenstein, LLC filed their Opposition to Motion for Return of all Compensation Received from or on Behalf of the Debtor.  *See* ECF #35 in *JPK NewCo I*.

107.    On September 23, 2024, the U.S. Trustee filed a motion to dismiss *JPK NewCo I*

for cause under 11 U.S.C. § 1112(b).  *See* ECF #37 in *JPK NewCo I*.

108.    At a hearing on September 25, 2024 regarding the motions to employ (and the

motion to disgorge) the Court granted the applications to employ Mr. Orenstein and Mr.

VerStandig and thereafter Mr. Orenstein filed additional documents on behalf of JPK NewCo.

*See* ECF # 41 in *JPK NewCo I* (audio file from the hearing).

109.    Mr. Sariri and the WCP Fund each filed separate Oppositions to the U.S.

Trustee's motion to dismiss.  JPK NewCo's opposition incorporated the opposition filed by the

WCP Fund.  *See* ECF ## 48 (Mr. Sariri's Opposition), and 56 (WCP Fund's forty-page

Opposition), and 58 (JPK NewCo' Opposition) in *JPK NewCo I*.

110.    The WCP Fund has admitted that JPK NewCo was created as a separate entity to

"to firewall any liability [to the Borrowers] from reaching WCP or its various co-defendants."

*See* ECF #56 at 6, ¶¶ 15 (WCP Opposition filed in 24-00262).  The WCP fund also represented

to this Court that JPK NewCo was formed to be ". . . focused on addressing multiple litigation

claims and thusly likely sheltering WCP and SNL from the ultimate economic reach of the

subject litigation claims." *Id.* ¶ 18.

111.    The Borrowers filed a Statement in Support of the US Trustee's motion to dismiss

on October 14, 2024.  *See* ECF ## 57 in *JPK NewCo I*.

112.    At a status hearing on October 16, 2024 on the U.S. Trustee's motion to dismiss,

the parties generally discussed the discovery schedule and the Court set two dates for an

evidentiary hearing starting on January 28, 2025 and continuing January 30, 2025 (if needed).

113.    Toward the end of the October 16, 2024 status hearing, Special Counsel *in JPK*

*NewCo I* mentioned that "yesterday" JPK Newco received a first quarterly fee invoice from the

U.S. Trustee's office for the first quarterly fee and suggested that it was "equity's" position that "no quarterly fee has come due or will come due." *See* ECF # 59 in *JPK NewCo I* (starting at 0:06:40 into the recording).

114. At a status conference on November 6, 2024, the January 2025 evidentiary hearing dates were moved to February 4 and 6, 2025 due to Mr. Ornstein's unavailability on January 30, 2025. At that hearing the Court declined to set any Plan hearings giving the pendency of the U.S. Trustee's motion to dismiss, so February 4, 2025 was set as the new status conference for the Plan. *See* ECF # 69 in *JPK NewCo I* (audio recording from the hearing).

115. The Court entered a Scheduling Order for the deadlines as to the U.S. Trustee's motion to dismiss on November 13, 2024, but that order was later modified by an amended scheduling order on January 7, 2025 that continued the discovery completion date to March 4, 2025. *See* ECF ## 70 and 76 in *JPK NewCo I.*

116. On February 25, 2025, *JPK NewCo I* was dismissed without prejudice in a Consent Order Granting the U.S. Trustee's motion to dismiss. The sole basis listed for dismissal was JPK NewCo's failure to pay quarterly fees to the U.S. Trustee's office. *See* ECF ## 85 in *JPK NewCo I.*

<u>The WCP Fund Inserts Conditions in the Proposed Settlement Agreement (in the Charles Paret Chapter 7 Case) to Bootstrap Its Arguments About Federal Jurisdiction in the Removed Cases.</u>

117. On March 28, 2025, The Chapter 7 Trustee in the Charles Paret involuntary bankruptcy case filed a Motion for Approval of Settlement Agreement Pursuant to Fed. R. Bankr. P. 9019. *See* ECF # 158 in 23-00217-ELG.

118. The Settlement Agreement involved the proposed resolution of claims in a Third Amended Complaint, in which it was alleged by the Chapter 7 Trustee, *inter alia,* that a partnership existed between Mr. Paret and Mr. Huertas involving fourteen different properties

24

and twenty-one limited liability companies.  *See* ECF #38 in 23-10025 (Line filing copy of the

Third Amended Complaint) at 8-9 (listing the properties) and 11-2 (listing the LLCs) (the "Paret

AP Case").

119.    Mr. Huertas, the WCP Fund, and the WCP contested the claims in the Paret AP

Case at every stage, denying, among other things, that any partnership existed,  *See, e.g.,* ECF ##

3, 15, and 41 in 23-10025 (multiple motions to dismiss fled by Mr. Huertas, the WCP Fund, and

the WCP).

120.    Despite vehemently contesting the partnership claims in the Paret AP Case, as

part of the proposed settlement, Mr. Huertas, the WCP Fund and the WCP propose giving Mr.

Paret a "limited partnership interest" in the two properties owned by the Borrowers and no other

properties.  *See* ECF # 158-1 in 23-00217-ELG (proposed Settlement Agreement), Sections 3-4.

121.    The Borrowers and four other parties in interest have filed an objection to the

proposed settlement.  *See* ECF ## 162-165 in 23-00217-ELG.

## F.    The Legal Standards for Dismissing A Petition Filed In Bad Faith

On a request by a party in interest, after notice and hearing, the Court may dismiss or

convert a chapter 11 case to a case under chapter 7, whichever is in the best interests of the

creditors and the estate for "cause".  11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) contains a non-

exhaustive list of circumstances that may constitute "cause" for dismissal.  *See* 11 U.S.C. §

1112(b)(4).  The Fourth Circuit has noted that courts are duty bound to conduct an inquiry, if

requested, to determine whether a petition has been filed in good faith.  *See In re United States*

*Optical, Inc.*, 1999 U.S. App. LEXIS 6960 at *15-16 (4th Cir. 1993) (involving an involuntary

petition).

8161\0002\4934-0098-3376.v1

There is no definition of "good faith" in the Bankruptcy Code; the finding is fact-specific.

*See In re Sawyer*, No. 07-10252 SSM, 2007 WL 1275627, at *5 (Bankr. E.D. Va. June 13,

2007), opinion corrected, No. 07-10252 SSM, 2007 WL 2110314 (Bankr. E.D. Va. July 17,

2007). While multiple bankruptcy courts have held that a bankruptcy petition can be dismissed

when the petition was filed in bad faith, the courts have used different, but similar, standards.

For the Court's convenience, and because the Borrowers could not find a D.C. Circuit decision

addressing the issue, the Borrowers have included a summary of the various standards that have

been used when considering whether to dismiss a petition filed in bad faith.

    1.    <u>The Prior Decisions From this Court.</u>

In *Franklin Mortg. & Inv. Co.,* 143 B.R. 295 (Bankr. D.D.C. 1992), Judge Martin S. Teel

noted that even though Chapter 11 does not contain a specific "good faith" requirement, "courts

have consistently imposed such a requirement by way of implication." *Franklin* 143 B.R. at 299

(Bankr. D.D.C. 1992) (collecting cases). The *Franklin* decision further noted that "[w]hether a

case was filed in bad faith generally cannot be determined by direct evidence, but it may be

inferred from surrounding circumstances. *Id.* In *Franklin*, the Debtor was formed prior to the

bankruptcy for the purpose of owning commercial real estate on Worth Avenue in Palm Beach,

Florida, which was subject to a foreclosure action by the secured lender. In granting the secured

lender's motion to dismiss, Judge Teel applied the eight factors evidencing bad faith established

by the Fifth Circuit in *Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir. 1986). *Id.*

The eight *Little Creek Development* factors include:

> (a) whether the debtor has one asset, (b) whether the asset is encumbered
> by secured liens, (c) whether the debtor has any business operations, (d)
> *whether the debtor has few unsecured creditors with small claims,* (e)
> *whether the debtor and one creditor had litigated to a standstill in state
> court,* (f) whether bankruptcy was the only viable way to forestall loss of
> the property, (g) *whether there were any allegations of wrongdoing by*

26

the debtor or its principals, and (h) *whether the debtor suffers from "new debtor syndrome."*

*Id.* pp. 299-300 (italic emphasis added).  The *Franklin* decision also cited to Section 1112(b).  *Id.* ("I agree that the broad 'for cause' language in section 1112(b) supports the view that a debtor's lack of good faith may constitute cause for dismissal of a chapter 11 petition").  *See also In re Blue Chip Cap., DC, LLC,* 600 B.R. 735, 736–38 (Bankr. D.D.C. 2019) (noting that "[T]he bankruptcy courts are inherently empowered to dismiss cases in order to protect their jurisdictional integrity" and finding that "[t]he evidence established cause for dismissing the case under 11 U.S.C. § 1112(b)(1)", which included a lack of good faith).

2. <u>The Second Circuit Test Used for Bad Faith</u>

The Second Circuit used a multi-factor test to determine bad faith in *In Re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d Cir. 1997), where it noted the following factors used in an analogous case:

> (1) the debtor has only one asset; (2) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default; (3) the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors; (4) *the timing of the filing evidences an intent to delay or frustrate legitimate collection efforts;* (5) *the debtor has little or no cash flow;* (6) the debtor cannot meet current expenses; (7) *the debtor has no employees.*

*C-TC 9th Ave. P'ship*, 113 F.3d at 1311 (italic emphasis added) (citing to the *Pleasant Pointe* factors used in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.,* 139 B.R. 828 (W.D. Ky. 1992).

3. <u>The Third Circuit Test Used for Bad Faith.</u>

*In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015) the third circuit applied a "totality of the circumstances" test to the involuntary petition context.  The factors the *Forever Green* court listed were:

27

> (1) whether the creditors satisfied the statutory criteria for filing the
> petition; (2) *whether the petition was meritorious*; (3) whether the
> creditors made reasonable inquiry into the relevant facts and pertinent
> law before filing; (4) whether there was evidence of preferential
> payments to certain creditors; (5) *whether the filing was motivated by ill
> will or a desire to harass;* (6) *whether the filing was used to obtain a
> disproportionate advantage*; (7) *whether the filing was used as a
> substitute for customary debt-collection procedures.*

*Forever Green*, 804 F.3d at 336 (collecting cases) (italic emphasis added). The determination of

bad faith is "a fact intensive determination better left to the discretion of a bankruptcy court."

*See, e.g.*, *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996) (applying a "totality of the circumstances"

standard for determining bad faith under 11 U.S.C § 303). More recently, the third circuit

announced a new rule that good-faith filing of a Chapter 11 petition requires the debtor to show

it is facing financial distress "immediate enough to justify filing." *In re LTL Mgt., LLC*, 64 F.4th

84 (3d Cir. 2023).

4.     The Fourth Circuit Test Used for Bad Faith.

In *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), in deciding whether to dismiss

or convert a Chapter 11 case, the fourth circuit looked at findings of objective futility and

subjective bad faith. The *Carolin Corp.* decision noted that courts presented with the question of

bad faith have uniformly held that: "[G]enerally, an implicit prerequisite to the right to file [a

Chapter 11 petition] is 'good faith' on the part of the debtor, the absence of which may constitute

cause for dismissal . . . ." *Carolin Corp.,* 886 F.2d at 698 (citing *In re Winshall Settlor's Trust*,

758 F.2d 1136, 1137 (6th Cir. 1985) and 2 L. King, *Collier on Bankruptcy* § 301.05[1] (15th ed.

1979). The *Carolin Court* further noted:

> We agree with the other courts that have so held and conclude that a
> good faith filing requirement is implicit in several specific provisions of
> the bankruptcy code, interpreted in light of established policy
> considerations underlying the code's provision of bankruptcy protection.
> …. [A] good faith requirement[:] *prevents abuse of the bankruptcy
> process by debtors whose overriding motive is to delay creditors without*

28

> *benefiting them in any way* or to achieve reprehensible purposes.
> Moreover, a good faith standard *protects the jurisdictional integrity of
> the bankruptcy courts* by rendering their powerful equitable weapons
> (i.e., avoidance of liens, discharge of debts, marshalling and turnover of
> assets) available only to those debtors and creditors with "clean hands."

*Id.* p. 698 (citing *Little Creek Development).* To make a finding of bad faith, no single factor is

considered determinative and any conceivable list of factors is not exhaustive. *Id.* p. 701 (citing

*In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir. 1987); *see also In re Dunes Hotel

Assocs.*, 188 B.R. 162, 169 (Bankr. D.S.C. 1995) ("In making a determination regarding

allegations of bad faith, the Court must examine the totality of the facts of the case.").

     5.    <u>The Fifth Circuit Test Used for Bad Faith.</u>

The *Franklin* decision correctly quoted the eight bad faith factors from the fifth circuit's

decision in *Little Creek Development,* so those factors will not be repeated here. *Little Creek

Development* not only noted the "clean hands" requirement for a debtor, but also noted "the

bankruptcy court's responsibility to enforce a standard of good faith":

> A court of equity may in its discretion in the exercise of the jurisdiction
> committed to it grant or deny relief upon performance of a condition
> which will safeguard the public interest . . . These principles are a part of
> the control which the court has over the whole process of formulation and
> approval of plans of composition or reorganization. . . .

*Little Creek Development*, 779 F.2d at 1072 (citing *American United Mut. Life Ins. Co. v. City of

Avon Park*, 311 U.S. 138, 145 (1940) (quoting *SEC v. United States Realty & Improvement Co.*,

310 U.S. 434, 455 (1940)).

     6.    <u>The Eleventh Circuit "Any Factors" Test Used for Bad Faith.</u>

In *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir. 1988), the eleventh circuit

chose not to include a list of bad faith factors, noting instead that:

> There is no particular test for determining whether a debtor has filed a
> petition in bad faith. Instead, the courts may consider any factors which
> evidence 'an intent to abuse the judicial process and the purposes of the

29

reorganization provisions' or, in particular, factors which evidence that
the petition was filed 'to delay or frustrate the legitimate efforts of
secured creditors to enforce their rights.'

*Phoenix Picadilly,* 849 F.2d at 1394, *(citing In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th

Cir.) at 674)).

       7.    <u>Additional Cases Addressing Bad Faith.</u>

     In *McDow v. Smith*, 295 B.R.69, 79-81 n. 22 (Bankr. E.D. Va. 2003) a bankruptcy judge

aggregated (from a combination of cases) the lists of bad faith factors that are typically

considered:

> (1) The debtor's concealment or misrepresentation of assets; (2) the
> debtor's lack of candor and completeness in his statements and
> schedules; (3) *whether the debtor has sufficient resources to repay his
> debts;* (4) *whether the debtor's motivation in filing is to avoid a large
> single debt incurred through conduct akin to fraud,* misconduct, or gross
> negligence; (5) *whether the debtor's petition is part of a deliberate and
> persistent pattern of evading a single creditor;* (6) *whether the debtor is
> overutilizing the protection of the Code to the detriment of his creditors*;
> (7) whether the debtor reduced his creditors to a single creditor prior to
> filing the petition; (8) *the debtor's lack of attempt to repay creditors;* (9)
> *the debtor's payment of debts to insider creditors;* (10) *the debtor's
> procedural gymnastics that have the effect of frustrating creditors;* and
> (11) *the unfairness of the debtor's use of the bankruptcy process.*

*McDow,* 295 B.R. at 79-81 (citing *Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931

F.2d 1124, 1126-27 (6th Cir. 1991), *In re Griffieth,* 209 B.R. 823 (N.D.N.Y. 1996), *In Re

Spagnolia,* 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995), and *In re Hammonds*, 139 B.R. 535, 541

(Bankr. D. Col. 1992)).

     The D.C. Court of Appeals has found that an involuntary petition was filed in bad faith

when it as filed "for the sole purpose of thwarting [Borrower's] rights to have its claims litigated

in the D.C. Superior Court." *See, e.g., Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave.

Coop.*, 441 A.2d 956, 962 (D.C. 1982); *see also Corto v. National Scenery Studios,* 705 A.2d

615, 620 (D.C. 1997) ("The filing of successive bankruptcy petitions [by the debtor's family members] with the clear intent of forestalling the legal proceeding constitutes bad faith.").

## G.  LEGAL ARGUMENT

Parties Cannot Collude to Create Federal Jurisdiction.

The longstanding principle that parties cannot manufacture federal jurisdiction over civil actions is codified in the U.S. Code.  Under 28 U.S.C. § 1359, federal courts do not have jurisdiction over civil actions "in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."  28 U.S.C. § 1359 (italic emphasis added).  In *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823 (1969), the U.S. Supreme Court outlined the history and purpose of this statute prohibiting collusion to create federal jurisdiction.  In *Kramer,* a contract between a Haitian company and a Panamanian company was assigned to a Texas attorney to create federal jurisdiction.  The *Kramer* court noted that:

> If federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties.  Such "manufacture of Federal jurisdiction" was the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors.

*Kramer,* 394 U.S. at 828-829 (italic emphasis added); *see also U.S.I. Props. Corp. v. M.D. Constr. Co.,* 860 F.2d 1, 6 (1st Cir. 1988) ("[P]arties may legitimately try to obtain the jurisdiction of federal courts, as long as they lawfully qualify under some of the grounds that allow access to this forum of limited jurisdiction.  On the other hand, using a strawman, *or sham transactions, solely for the creation of otherwise unobtainable jurisdiction, is clearly forbidden* both by statute and by the policies that underlie diversity jurisdiction.") (italic emphasis added).

31

Collusion by the WCP Fund, the WCP, Mr. Huertas, and SF NU to channel ordinary contract and tort litigation into a federal court is exactly what is going on here. They colluded to arrange for some of the Borrowers loan documents, by assignment, to be transferred to JPK NewCo, then created the "insolvency" of JPK NewCo for the express purposes of improperly invoking federal jurisdiction for tactical reasons – to avoid litigating purely state law claims pending in D.C. Superior Court.

<u>There are Numerous Indicators of Bad Faith Here</u>.

JPK NewCo was created, from its inception, with the understanding that there would eventually be a bankruptcy filing, whether voluntary or involuntary. Here, JPK NewCo's only creditor made a "loan" to JPK NewCo one month prior to the filing of *JPK NewCo I*. A bankruptcy filing by JPK NewCo was inevitable as the company existed only on paper and had no revenue and no business operations at the time the "loan" was made to it. In fact, the purported "business operations" of JPK NewCo appear to also have been manufactured. Part of the "loan" to Mr. Shariri was used to fund a loan by JPK NewCo to Energy Morocco. This loan appears to have been made in an veiled effort by JPK NewCo to give the appearance of having some business operations. JPK NewCo then consented to the an involuntary filing on August 6, 2024. This "friendly" involuntary filing was conveniently manufactured so the Lender Defendants could have an additional basis to argue that there was federal jurisdiction over the claims in the Consolidated Cases. Mr. VerStandig conceded that bankruptcy for JPK NewCo was contemplated in arguments he has made on behalf of WCP Fund, Mr. Huertas, the WCP, and SF NU in the Removed AP Case.

The Court must "preserve its jurisdictional integrity". *Little Creek Development*, 779 F.2d at 1072 (internal citations omitted). Collusive conduct to manufacture federal jurisdiction,

forum shop, and delay pending litigation should not be condoned, but rather should be condemned, by this Court, whose very foundation rests on enforcing equitable principles. *Id.*; s*ee also In re Silberkraus*, 253 B.R. 890, 905 (C.D. Cal. Bankr. Ct. 2000) ("[I]t constitutes bad faith to file bankruptcy to impede, delay, *forum shop,* or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum – whether that nonbankruptcy forum is a state court or a federal district court.") (italic emphasis added); *In re Meltzer*, 516 B.R. 504, 516 (Bankr. N.D. Ill. 2014) ("The filing of an involuntary case shortly before a hearing in related litigation strongly suggests the case was filed only to stall the hearing.").

The WCP Fund, the WCP, SF NU, and Mr. Huertas are all bad actors here. They transferred loan documents for no consideration with the understanding that JPK NewCo would first use those transfers to as a basis for dismissal, then later file for bankruptcy at some point when it suited their objectives. The collusion to manufacture federal jurisdiction was orchestrated to frustrate the Borrowers' from pursuing their claims in the Consolidated Cases in the forum of their choice. To give the protections and benefits of Chapter 11 -- especially the benefits of subchapter V -- to JPK NewCo under these circumstances would be an abuse of the purposes of the Bankruptcy Code. The underlying purpose of Chapter 11 is to rehabilitate the debtor and offer a fresh start. JPK NewCo is not a legitimate debtor with a business that needs a fresh start -- it is an alter ego of the WCP Fund, the WCP, Mr. Huertas, and SF NU that was created to try to prevent the Borrowers' claims from being decided in D.C. Superior Court. There is no legitimate bankruptcy purpose here. JPK NewCo has no legitimate business operations to reorganize.

<u>The Burden Has Shifted to JPK NewCo.</u>

Because the Borrowers have established a prima facie case that "cause" exists to dismiss this case, the burden shifts to JPK NewCo to demonstrate that "unusual circumstances" exist that

33

establish that dismissing the case is not in the best interests of creditors. *See* 11 U.S.C. § 1112(b)(2). For the Section 1112(b)(2) exception to apply, the Court must find and specifically identify unusual circumstances establishing that dismissing the case is not in the best interests of creditors and the estate. *Id.* The Borrowers do not believe that any unusual circumstances can be found here. This was a collusive bankruptcy case filed to try to gain a tactical advantage and to try to deny the Borrowers from having their claims adjudicated in D.C. Superior Court. This filing was designed to benefit the participants in the scheme and no one else.

    The Court Could Liken The Consolidated Cases to a Two-Party Dispute.

    While the Borrowers are separate companies, their claims are nearly identical, with the sole difference being that 423 Kennedy has a breach of contract claim due to the failure to fund construction draws. The claims in the two cases were also consolidated, and the interests of the Borrowers are aligned. The Lender Defendants are also all controlled by Mr. Huertas and the WCP Fund, and their interests, too, are aligned. Bankruptcy courts are not supposed to be deciding what are effectively two-party disputes in state court. *In re G–2 Realty Trust*, 6 B.R. 549, 552–53 (Bankr. D. Mass. 1980); *In re Serfass,* 325 B.R. 901, 906 (Bankr. M.D. Fla. 2005) ("Generally, the courts do not condone the use of Chapter 11 to resolve two-party disputes in the bankruptcy court when such litigation *is still pending* in a non-bankruptcy forum prior to the commencement of the case.") (italic emphasis added).

## H.    CONCLUSION

    JPK NewCo was formed, and filed the instant petition, for improper, bad faith purposes. There is no valid reason for this case to continue under Chapter 11. For these reasons, and for any reasons that may be advanced at the evidentiary hearing to be set on this motion, the

Borrowers respectfully request that this case be dismissed, with prejudice, for cause as being filed in bad faith.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: June 23, 2025

/s/ James D. Sadowski
James D. Sadowski, VSB No. 38326
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400; Fax: (202) 452-1410
Emails: jds@gdllaw.com
*Counsel for Creditors Developer RE1, LLC*
*and 423 Kennedy St Holdings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of June, 2025, a true copy of the foregoing Motion to Dismiss Chapter 11 Petition Filed in Bad Faith was served electronically and a Notice of Electronic filing should be sent to all persons receiving notices via the Court's CM/ECF system.

/s/ James D. Sadowski
James D. Sadowski

35

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLUMBIA

|                |     |                       |
|----------------|-----|-----------------------|
| In re:         | )   | Case No. 25-200-ELG   |
|                | )   | (Chapter 11)          |
| JPK NEWCO LLC  | )   |                       |
|                | )   |                       |
| Debtor.        | )   |                       |

**OPPOSITION OF WCP FUND I LLC TO
DEVELOPER RE1, LLC'S AND 423 KENNEDY ST. HOLDINGS,
LLC'S MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH**

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com
*Counsel for WCP Fund I LLC*

# <u>TABLE OF CONTENTS</u>

I.     Introduction ................................................................................................ 1

II.    Statement of Relevant Facts ..................................................................... 4

     a.   Real Estate Loans and Defaults ................................................ 4

     b.   Litigation & Mediation ............................................................ 4

     c.   Formation of a Special Purpose Entity .................................... 6

     d.   JPK Business Operations .......................................................... 7

     e.   2024 Bankruptcy ...................................................................... 8

     f.   Litigation ................................................................................. 8

III.   Argument: This is Not a Bad Faith Bankruptcy ...................................... 9

     a.   Adoption of the Fourth Circuit Standard Would Require the Motion be Denied ...... 11

          i.   This Case is Not Objectively Futile ...................................... 13

          ii.   This Case is Not a Byproduct of Subjective Bad Faith ......................... 14

          iii.   This Court Should Adopt the *Bestwall* Standard ................................... 16

     b.   Adoption of the Third Circuit Standard Would Also Require the Motion be Denied ................................................................................ 18

     c.   A Totality of Circumstances Analysis Would Also Require the Motion be Denied ................................................................................ 21

IV.   Conclusion ............................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*,
    589 F.3d 605 (3d Cir. 2009) .................................................................................. 19

*Carolin Corp. v. Miller*,
    886 F.2d 693 (4th Cir. 1989) ....................................................................... *passim*

*Coleman v. Cmty. Tr. Bank (In re Coleman)*,
    426 F.3d 719 (4th Cir. 2005) .............................................................................. 17

*Duggan v. Highland-First Ave. Corp.*,
    25 B.R. 955 (Bankr. C.D. Cal. 1982) ................................................................. 22

*Emp. v. AIG Fin. Prods. Corp. (In re AIG Fin. Prods. Corp.)*,
    2024 U.S. Dist. LEXIS 155142 (D. Del. Aug. 28, 2024) .............................. 20, 21

*In re Aldrich Pump LLC*,
    2023 Bankr. LEXIS 3043 (Bankr. W.D.N.C. Dec. 28, 2023) .............................. 14

*In re Little Creek Dev. Co.*,
    779 F.2d 1068 (5th Cir. 1986) ............................................................................ 22

*In re LTL Mgmt. LLC*,
    2024 U.S. App. LEXIS 18437 (3d Cir. July 25, 2024)........................... 18, 20, 21

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999)................................................................................ 20

*In re Thirtieth Place, Inc.*,
    30 B.R. 503 (9th Cir. BAP 1983)....................................................................... 15

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*,
    64 F.4th 84, 108 (3d Cir. 2023) ................................................................. *passim*

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004)................................................................................ 19

*Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*,
    52 F.3d 127 (6th Cir. 1995) ................................................................................ 22

*U.S.I. Props. Corp. v. M.D. Constr. Co.*,
    860 F.2d 1 (1st Cir. 1988) ........................................................................................... 12

**Statutes**
11 U.S.C. § 362 ............................................................................................................... 9

28 U.S.C. § 1334 ............................................................................................................ 12

**Rules**
Federal Rule of Evidence 408 ........................................................................................ 5

Comes now WCP Fund I LLC ("WCP"), the largest equity holder of JPK NewCo LLC ("JPK" or the "Debtor"), by and through undersigned counsel, in opposition to Developer RE1, LLC's and 423 Kennedy St. Holdings, LLC's Motion to Dismiss Chapter 11 Petition Filed in Bad Faith (the "Motion," as found at DE #19, with the proponents thereof being known as "DRL" and "423 Kennedy" and being collectively known as the "Movants"), and states as follows:

## I.    Introduction

Commencing on page 31 of the Motion's 35 pages,[1] the Movants finally turn to making a legal argument—one that ultimately spans a grand total of four pages. Therein, after a lengthy and frequently pejorative regurgitation of an oft-immaterial litigation history, DRL and 423 Kennedy urge that (i) JPK has colluded to create federal jurisdiction; (ii) JPK bears indicia of being a bad faith debtor under a hybrid application of factors from various courts; (iii) JPK and its principals are reprehensible entities that ought to be treated as such; (iv) a burden shift has occurred under Section 1112 of Title 11 of the United States Code (the "Bankruptcy Code"); and (v) this is a two-party dispute. The Movants are uniformly errant in connection with each and every one of these contentions.[2]

The Movants' jurisdictional attack misses that precedent well establishes the filing of a bankruptcy petition, and correlative commencement (or removal) of litigation, is *not* an improper creation of federal jurisdiction. To the contrary, and as explained in some detail by the Fourth Circuit in *Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168

---

[1] Page number references are to those imprinted on the foot of each page, not those found in the ECF-generated header.

[2] While the former three arguments are discussed in detail throughout this brief, the latter two are only touched upon in this introductory section insofar as scant ink is devoted to these contentions by the Movants in their Motion.

(4th Cir. 2023), the filing of a bankruptcy petition—and exercise of jurisdiction attendant thereto—is nothing more than the exercise of rights already extant under controlling law. Holding otherwise would be to not merely greatly reduce the scope of bankruptcy courts' work but, too, to plainly ignore jurisdictional grants expressly made by Congress in Title 28 of the United States Code.

Nor is JPK a bad faith debtor based on any of the cited factors or any combination thereof. The Movants manifestly mischaracterize the operations of the Debtor, suggesting that being a noteholder and lender is not sufficient to warrant being recognized as an entity conducting legitimate business affairs. And, with no small quotient of irony, the Movants' broadside premised upon "new debtor syndrome" seems to miss that, due almost exclusively to the Movants' own dilatory tactics, JPK was well more aged than most supermarket cabernets before initiating this chapter 11 case.

Similarly, while caged as part of the larger "bad faith" argument, it merits notation that the assault of 423 Kennedy and DRL, on the principals and affiliates of JPK, is fervently misplaced. Two entities that refuse to pay their debts as they come due, that have vibrant histories of missing promissory note payments, that struggle to tend to the barest obligations of property ownership, and that seem to prize suing an attorney in furtherance of a pronounced effort to scorch earth, are accusing well-regarded members of the local community of being "bad actors." Motion, DE #19, at p. 33. Worse, these claims are being made without the adornment of any allegations that, if true, would come anywhere near supporting such. That the Movants dislike the Debtor and its affiliates is assuredly unsurprising; that the Movants feel the need to propagate playground insults on a federal docket is unfortunate.

As to the burden shift suggested by the Movants, such is assuredly never reached insofar as the Motion comes well shy of establishing cognizable statutory "cause." Yet, even if, *arguendo*,

such a shift were to occur, the Motion's scant—if not non-existent—attention to salient points is noteworthy: this is a case in which it is overwhelmingly likely that a plan will be timely confirmed; where such confirmation will be to the benefit of "creditors and the estate," 11 U.S.C. § 1112(b)(2); where there are no ills necessitating a timely cure; and where JPK's actions are more than reasonably justified.

Equally, neither is this case a two party dispute nor is the existence of a two party dispute grounds upon which to dismiss a bankruptcy case. That there are two movants—who show no indicia of wishing to assume status as one another's alter ego—is sufficiently dispositive here; the existence of at least one other creditor makes the reality all the more manifest. Yet, equally, the bemoaning of a "two party dispute" is not something that has ever much gained traction in this Honorable Court or most other bankruptcy courts for a simplistic reason oft-recited by a neighboring judge: if two-party disputes were improper fodder for bankruptcy, the overwhelming majority of chapter 13 cases would be summarily dismissed.

More macroscopically, it bears observation that the Movants urge a legitimately formed entity, holding promissory notes and deeds of trust, and engaged in both lending and borrowing activity, ought not be permitted to seek bankruptcy protection. Such is an extraordinary assertion by any estimation and, notably, one that no other party in interest has cared to advance in this case. And, at the core of this assertion appears to be little more than a pronounced dislike for the prospect of claims concerning the debtor/creditor relationship being adjudicated by a court topically expert in the adjudication of claims concerning the debtor/creditor relationship. This is, no doubt, a woeful and troubling proposition, with DRL and 423 Kennedy seemingly suggesting that neither the Bankruptcy Code nor vast collections of case law thereunder ought to apply when, as here, two creditors really, really do not want to see their claims administered by a bankruptcy court.

3

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Motion be denied.

## II.      Statement of Relevant Facts

### a.  Real Estate Loans and Defaults

1.      In December 2021, WCP loaned $4,103,000.00 to DRL, with the subject loan being memorialized by two promissory notes in the respective sums of $3,579,000.00 and $524,000.00 (the "DRL Notes").

2.      The DRL Notes are both secured by deeds of trust (the "DRL Deeds of Trust") on the real property commonly known as 5501-5505 1st Street, NW, Washington, DC 20011 (the "DRL Property").

3.      Similarly, in March 2022, WCP loaned $9,945,693.00 to 423 Kennedy, with the subject loan being memorialized by two promissory notes in the respective sums of $8,689,693.00 and $1,256,000.00 (the "423 Kennedy Notes")

4.      The 423 Kennedy Notes are secured by deeds of trust (the "423 Kennedy Deeds of Trust") on the entity's eponymous property (the "423 Kennedy Property").

5.      Both DRL and 423 Kennedy repeatedly defaulted under their respective notes and deeds of trust by, *inter alia*, allowing senior liens to accrue on the entities' properties, failing to make interest payments in a timely manner, and failing to pay any of the four—let alone all four—notes at maturity.

### b.  Litigation & Mediation

6.      DRL and 423 Kennedy do not believe their various breaches were sufficiently severe to warrant defaults being declared and foreclosures being scheduled, so they each brought

suit to enjoin those foreclosures, alleging the declared defaults to have amounted to tortious interference with their business relations.

7. The two respective complaints are colorful in nature, with one expressly alleging that "Money is the Root of All Evil," and one accusing WCP of corruption.

8. In light of the two complaints and correlative motions for injunctive relief, the District of Columbia Superior Court entered injunctions prohibiting the defendants from foreclosing on the DRL Deeds of Trust and the 423 Kennedy Deeds of Trust.

9. Following the entry of these injunctions, all parties agreed to mediate before a retired Superior Court judge, with DRL and 423 Kennedy sharing a common principal (albeit not having purely overlapping equity membership).

10. During the course of two formal mediation sessions, certain potential resolutions were discussed whereby 423 Kennedy and/or DRL would release claims in exchange for participating in a share of loan profits.[3]

11. As part of the aforesaid negotiations, WCP introduced the idea of transferring certain promissory notes into a so-called "special purpose entity," so ownership interests in the negotiable instruments could be ultimately divided pursuant to a settlement agreement without (i) having to sever the notes themselves into multiple pieces; and/or (ii) needing to offer DRL and/or 423 Kennedy an ownership interest in WCP or any of its co-defendants.

12. The two formal mediation sessions were held with a retired judge on January 9, 2024 and January 25, 2024.

---

[3] For the avoidance of doubt, this statement is *not* offered to "prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408(a), and, to the contrary, WCP and WCP's co-defendants in the subject litigation strongly deny any and all liability. Rather, these discussions are shared to offer a complete contextual understanding of how JPK came into existence.

### c. Formation of a Special Purpose Entity

13.     Shortly following the second mediation session, WCP and SF NU, LLC ("SNL") formally created JPK, with the entity being registered on February 1, 2024.

14.     JPK was created on the advice of counsel, with then-present cognizance the entity could be used to either facilitate an amicable resolution to the pending litigation and/or as a mechanism of siloing troubled assets so as to remove those assets, and their accompanying putative liabilities, from the balance sheets of WCP and SNL.

15.     Specifically, insofar as a good faith analysis of the claims in the Superior Court litigation reveals relief to be sought in the form of an *in rem* setoff against liability due and owing on the four promissory notes, transferring the two junior notes into a separate entity effectively serves to firewall any liability from reaching WCP or its various co-defendants.

16.     While WCP and its co-defendants remain liable for any damages that may exceed a setoff of the two notes held by JPK, reasoned analysis of the subject litigation suggests it is exceedingly unlikely liability could extend to such a level.

17.     At the time JPK was formed, there existed a cognizance that the entity may seek bankruptcy protection should settlement efforts fail.

18.     JPK is not a Texas limited liability company and was not formed pursuant to a so-called "divisional merger" of WCP and/or SNL, but JPK's creation does resemble what is colloquially known as a "Texas Two Step" insofar as JPK absorbed assets carrying alleged *in rem* liability and thereby siloed the likely reach of the subject claims from the balance sheets of WCP and SNL.

### d. JPK Business Operations

19.     JPK was capitalized by WCP and SNL through contribution of the two junior promissory notes and assignment of the correlative deeds of trust, with membership interests being given as consideration for the contribution of the promissory notes.

20.     The formation and capitalization of JPK is reflected in the entity's operating agreement.

21.     Following its formation, JPK needed funds to engage counsel and operate, with the expectation JPK would be joined in the litigation pending in the Superior Court.

22.     To procure such funds, JPK borrowed $50,000.00 from a third party.

23.     The third party lender was advised that JPK may use part or all of the loan proceeds to engage counsel, including the potential engagement of insolvency counsel; the third party was not misled as to the very distinct potential of JPK seeking to reorganize in bankruptcy.

24.     A portion of the loan proceeds were transferred to the IOLTA account of WCP's litigation counsel, to be held pending anticipated engagement to represent JPK in the litigation.

25.     The remaining loan proceeds were loaned to an unrelated third party in an effort to make a profit from interest (as a company owned by lenders would be wont to do).

26.     JPK's borrowing funds from a third party, and lending funds to a third party, were both done on the advice of counsel, albeit with JPK's manager exercising discretion as to the third parties with whom said transactions were undertaken.

27.     Should JPK recover monies from the loan extended to a third party, or the two secured promissory notes with which JPK was capitalized by WCP and SNL, JPK would be able to use such funds in future business operations, including through the making of new loans to third parties in the District of Columbia metropolitan area.

**e. 2024 Bankruptcy**

28.    In July 2024, an involuntary petition for chapter 11 relief was filed against JPK by

a friendly creditor, with JPK thereafter being adjudicated a debtor in August 2024 and the case

being dismissed, by consent, in February 2025. *See In re JPK NewCo LLC*, Case No. 24-262-ELG

(Bankr. D.D.C. 2024).

29.    The dismissal of JPK's original bankruptcy case stemmed from a niche dispute

concerning the payment of quarterly fees to the United States Trustee where a case is commenced

as a "traditional" chapter 11 proceeding but thereafter converted to one under Subchapter V. *Id.* at

DE #85.

30.    The dismissal of JPK's original bankruptcy was expressly without prejudice and,

in setting forth certain administrative deadlines related to the closure of affairs in that case, the

dismissal order specifically noted such deadlines "shall not be construed as a bar to the Debtor

sooner petitioning for Chapter 11 relief should the Debtor so elect." *Id.*

**f. Litigation**

31.    The Movants' claims against JPK, WCP, SNL and others are currently pending in

the District of Columbia Superior Court, where the action has been stayed by the presiding judge

on account of JPK's bankruptcy filing. *See Developer RE1 LLC, et al. v. DP Capital LLC, et al.*,

Case No. 2022-CAB-005935 (D.C. Sup. Ct. 2022); Order, attached hereto as Exhibit A.

32.    As of the filing of this opposition brief, the Movants have not sought relief from

the automatic stay enshrined in Section 362 of the Bankruptcy Code so as to allow the Superior

Court litigation to proceed. *See* Docket, *passim*.

33.    The Debtor has, however, commenced an adversary proceeding, in this Honorable

Court, aimed at effectuating the efficient and expedient resolution of the Movants' core claims.

*See JPK NewCo LLC, et al. v. Developer RE1 LLC, et al.*, Case No. 25-10015-ELG (Bankr. D.D.C. 2025).

34.     As of the filing of this brief, the Movants have not docketed a responsive pleading in the adversary proceeding, despite their time to do so having long-since elapsed, and, rather, have filed a motion to stay and suspend deadlines. *Id.* at DE #5. As noted *passim*, this appears to be part of a pattern and practice whereby the Movants habitually seek to stay or continue matters that could lead to the adjudication of their claims, creating an unusual (albeit not unheard of) paradigm whereby it is the Debtor—not the impacted creditor base—that is looking to have creditor claims promptly adjudicated through the bankruptcy process.

## III.     Argument: This is Not a Bad Faith Bankruptcy

Dozens of times each year, this Honorable Court is confronted with the chapter 11 case of a single asset real estate entity facing imminent foreclosure. For better or worse, such cases— alongside closely-related proceedings concerning single asset landlords committed to Superior Court receivership—form a vibrant majority of the local reorganization docket. Yet, with a few particularly-colorful exceptions normally involving the outright forging of documents (or manufacture of doors that open only to brick walls), these matters are scantly—if ever—challenged as bad faith filings, even when a debtor has acquired real estate with the proceeds of a short term loan and promptly defaulted thereupon. Of course a single asset real estate entity is permitted to seek bankruptcy relief; Section 362 of the Bankruptcy Code even provides special provisions for the temporal obligations of such debtors. So it necessarily strikes as problematic for the Movants to now suggest that a lender—holding not one but three separate loans, made to three separate entities—ought not be permitted access to the same reorganizational toolbox. That the lender in

9

question has been in existence for far longer than many single asset real estate entities only makes the Motion all the more befuddling.

The core thesis of the Motion is that an entity holding quantitatively few assets, with but only three creditors, must suffer some ill-defined probationary period—of seemingly at least fifteen months—before petitioning for bankruptcy relief and affording itself of the protections associated therewith. In so contending, the Movants—notably without ever invoking the actual verbiage—appear to take aim at so-called "Texas Two Step" bankruptcies, suggesting an entity enmeshed in potentially-costly litigation ought not be permitted to spin off the impacted assets into a new company that will likely avail itself of the synergies and efficiencies of bankruptcy protection. Yet case law is plain that such a maneuver is entirely permissible, no matter the standard applied. While certain such cases have failed and been found to be exercises in bad faith, the failures have never been attributable to (i) the underlying corporate divestiture or (ii) a young entity not being permitted entry into bankruptcy court; the failures, rather, have almost always been idiosyncratically tied to the financial health of the petitioning debtors.

Identifying the appropriate standard, however, is somewhat more difficult. It has been 33 years since this Honorable Court spoke to the onus requisite to dismiss a chapter 11 case as a bad faith filing, in the context of a published opinion. That opinion— *In re Franklin Mortg. & Inv. Co*., 143 B.R. 295 (Bankr. D.D.C. 1992)—is neither a district nor circuit-level holding and predates the recent wave of Third and Fourth Circuit holdings addressing fact patterns more analogous to what is instantly manifest. So while review of JPK's case under the *Franklin Mortgage* standard is most certainly addressed herein, this brief will first address the more modern holdings of nearby circuits, with those holdings appearing more temporally influential than a one-

10

off opinion released by Judge Teel the day before Michael Jordan, Larry Bird, and David Robinson

led the "Dream Team" to victory over Germany in the group stage of the Barcelona Olympics.

### a. Adoption of the Fourth Circuit Standard Would Require the Motion be Denied

Scantly two years ago, the Fourth Circuit reaffirmed a longstanding and well-settled

doctrine providing that in order for a chapter 11 case to be dismissed on bad faith grounds, "the

complaining party must show both 'subjective bad faith' and the 'objective futility of any possible

reorganization.'" *Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71

F.4th 168, 182 (4th Cir. 2023) (quoting *LTL I*, 64 F.4th at 98 n.8 (quoting *Carolin Corp. v. Miller*,

886 F.2d 693, 694 (4th Cir. 1989))). In so holding, the appellate court addressed the case of an

entity formed pursuant to a so-called "Texas Two Step" for the transparent purposes of abiding a

divisional merger counterparty's "desire to pursue its non-asbestos-related business apart from

asbestos-related litigation or a bankruptcy proceeding while keeping its assets available to satisfy

any asbestos-related liabilities, if required." *Bestwall*, 71 F.4th at 183.

*Bestwall* may actually be the precedent most analogous to the instant case. While JPK

certainly is not in the asbestos business, and is not being actively accused of contributing to tens

of thousands of deaths and chronic illnesses, JPK is being accused of being the byproduct of a

transaction aimed at allowing a spun off entity, holding troubled assets, to avail itself of the

jurisdictional protections of the Bankruptcy Code. In *Bestwall*, creditors asserted such an effort to

be improper, urging asbestos litigation to belong in the courts in which it was commenced and to

be outside the purview of the bankruptcy court. *Id.* at 180 ("The Claimant Representatives also

assert that Old GP impermissibly sought to manufacture jurisdiction in the bankruptcy court which

could prevent this Court from exercising 'related to' jurisdiction. We disagree with the Claimant

Representatives' argument and the dissent's acceptance of that argument.").

11

The Fourth Circuit, confronted with this strenuous objection to the propriety of garnering bankruptcy jurisdiction through a strategic corporate split, roundly rejected the creditors' argument by observing bankruptcy jurisdiction to have been available to the original, pre-merger entity and to have simply passed, through the corporate split, to the new company:

> . . . Old GP, New GP, and Bestwall did not manufacture jurisdiction via their Texas divisional merger. This is evident because without the restructuring, the asbestos claims would have remained with Old GP. And, if Old GP had filed for bankruptcy, the bankruptcy court would have had jurisdiction over those claims as it does over the same claims here.

> Thus, as Bestwall and New GP point out, "the corporate restructuring leaves the jurisdictional result the *same*."

*Id.* at 181 (citing 28 U.S.C. § 1334(b); *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 6 (1st Cir. 1988)) (internal citation omitted) (emphasis in original).

This is a critical point insofar as it appears to undermine the Movants' working theory that JPK has worked to "manufacture federal jurisdiction." Motion, DE #19, at p. 31. The Motion posits that "[c]ollusion by the WCP Fund, the WCP, Mr. Huertas, and SF NU to channel ordinary contract and tort litigation into a federal court is exactly what is going on here." *Id.* at p. 32. Yet this contention misses that (i) the Superior Court litigation has been stayed; (ii) as of present, the Superior Court litigation has not been removed (though it certainly may later be removed); and (iii) WCP or SNL could have removed the Superior Court litigation to this Honorable Court had either entity itself filed for bankruptcy protection, as highlighted by the *Bestwall* Court.

Indeed, as in *Bestwall*, jurisdiction in this Honorable Court was not *manufactured*; jurisdiction that was invokable by both WCP and SNL was merely passed to JPK through capitalization of the new entity with the transfer of promissory notes bearing alleged *in rem* liability. When JPK received putatively troubled assets from its two equity holders, JPK received, too, the jurisdictional rights and entitlements that come with holding putatively troubled assets.

12

These rights and entitlements flowed with the promissory notes in a manner no different than the correlative deeds of trust or the rights to be paid by the obligors thereunder. The jurisdictional rights and entitlements cannot be severed from the assets to which they attach and, accordingly, necessarily flow with ownership.

### i. This Case is Not Objectively Futile

Using the *Bestwall* test, the first conjunctive rigor of a bad faith finding is objective futility. This prong traces back to *Carolin Corp.*, where the Fourth Circuit observed that ". . . even if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found." *Carolin Corp.* 886 F.2d at 701.

Here, the JPK bankruptcy is most certainly not objectively futile. The Debtor holds three promissory notes: an unsecured note for slightly more than $50,000.00 and two secured notes that total over $3 million. While JPK's debt to one creditor is not disputed, the Debtor's *in rem* obligations on the two secured notes are heavily disputed. If JPK prevails *at all* in in its claims against DRL and 423 Kennedy (claims that are currently being litigated through an adversary proceeding in this Honorable Court and that may also play out through the claims objection process), JPK will be able to pay all of its debts in cash and/or kind, emerging from chapter 11 as a healthy company.

Moreover, and without seeking to prematurely adjudicate the merits, *vel non*, of the adversary claims brought by JPK, there is good reason to believe JPK will prevail. DRL and 423 Kennedy do not dispute failing to pay the at-issue promissory notes at maturity, nor do they seem to dispute having failed to make numerous interest payments in a timely fashion, nor do they seem to dispute that their failure to pay taxes and other municipal obligations caused senior liens to accrue upon their respective properties in contravention of the deeds of trust. DRL and 423

13

Kennedy are certainly welcome to continue to argue that these breaches were too slight to give rise to defaults, and that the terms of commercial debt instruments should be construed with the same borrower-friendly allowances as those of consumer debt instruments. But it is genuinely difficult to posit that DRL and 423 Kennedy have so great a chance of ultimately succeeding on these contentions as to leave JPK, in turn, with liabilities that wholly exceed the value of JPK's assets and thereby render JPK unable to reorganize.

JPK needs only a modest return on the two secured notes to successfully emerge from bankruptcy; the unsecured note will, in time, produce a return of both principal and interest capable of getting JPK on the proverbial right foot. So while JPK certainly believes it is entitled to every single dollar of the secured notes on which DRL and 423 Kennedy are obligated, the conservative reality is that if JPK were to collect only $100,000.00—a sum less than 1/31st the scheduled value of those assets—JPK would, in turn, be comfortably able to pay all claims in full and successfully reorganize with a so-called "100% plan."

### ii. This Case is Not a Byproduct of Subjective Bad Faith

Insofar as there can be no finding of objective futility, analysis of subjective bad faith is immaterial given the conjunctive nature of the two prongs of the *Bestwall* test. *See, e.g.*, *In re Aldrich Pump LLC*, 2023 Bankr. LEXIS 3043, at *64 (Bankr. W.D.N.C. Dec. 28, 2023) (". . . a Chapter 11 case may be dismissed as a bad faith filing only when the bankruptcy reorganization is both (i) objectively futile and (ii) filed in subjective bad faith.") (emphasis in original). Yet even if inquiry were made into this realm, the facts *sub judice* certainly do not evidence subjective bad faith, instead pointing to an honest lending company that is seeking to reorganize in the court that, somewhat ironically, is so frequently called upon to lend aid to lenders' counterparties in their hours of greatest need.

14

The Fourth Circuit has explained, of the subjective bad faith standard, that the rigor's aim

is to:

> . . . determine whether the petitioner's real motivation is "to abuse the
> reorganization process" and "to cause hardship or to delay creditors by resort to the
> Chapter 11 device merely for the purpose of invoking the automatic stay, without
> an intent or ability to reorganize his financial activities."

*Carolin Corp.*, 886 F.2d at 702 (quoting *In re Thirtieth Place, Inc*., 30 B.R. 503, 505 (9th Cir. BAP

1983)).

If the emphasis on an intent or ability to actually reorganize appears redundant to the

inquiry focused on objective futility, such is neither coincidence nor folly: "Evidence of subjective

bad faith in filing may tend to prove objective futility, and *vice versa*. Indeed it could be that some

of the courts ostensibly holding that dismissal is warranted upon a finding of either have considered

that proof of either implicitly proves both." *Carolin Corp.*, 886 F.2d at 701.

JPK most certainly has both an intent and an ability to reorganize its financial activities, as

discussed above. Equally tellingly, however, the JPK bankruptcy has scantly invited any delay or

harm to its putative creditors. While the consolidated Superior Court cases have only marginally

advanced over the past year (with a duo of rulings on motions to dismiss), the lion's share of the

delay has been directly occasioned by the Movants' own seemingly kneejerk insistence on

consistently demanding stays and continuances. Yes, the automatic stay has now caused the

Superior Court litigation to be sidelined for just over a month, but (i) JPK has been working to

address the underlying issues through an adversary proceeding (which, counterproductively, the

Movants are seeking to have indefinitely stayed); and (ii) either or both of the Movants would, of

course, be free to simply remove the Superior Court litigation to this Honorable Court and

accordingly be rid of any delays occasioned by the automatic stay.

To be sure, any objective review of the docket herein and the Superior Court docket reveals that it is JPK—not the Movants—that has been endeavoring, time and again, to advance adjudication of the Movants' theories of relief. JPK is a Subchapter V debtor that wants nothing more than to be rid of these Damoclean swords. DRL and 423 Kennedy, by contrast, have repetitively sought continuances, moved for stays, and insisted that the subject claims should not and ought not be adjudicated unless and until DRL and 423 Kennedy think the time and locale right.

### iii.  This Court Should Adopt the *Bestwall* Standard

Familiarly, that this Honorable Court is surrounded by the Fourth Circuit, much as the Vatican is surrounded by Rome, does not render this Honorable Court subject to Fourth Circuit precedent. And one need not look beyond questions of corporate small business debtors receiving a discharge from liabilities that would otherwise hang like an anvil around the neck of a natural person, or of a bankruptcy court's ability to entertain moot proceedings devoid of a case or controversy, to find fertile ground to question the Fourth Circuit's guidance on emerging hot button insolvency issues. But the line of cases commenced with *Carolin* and following through *Bestwall* stands in necessary distinction to these more infamous pronouncements for the simple reason that the policy rationale is both compelling and sound. While adoption of *any* of the standards discussed herein would result in the Motion being denied, it does seem the *Bestwall* standard is that best suited for the District of Columbia Circuit.

Core to *Carolin* and *Bestwall* is the requirement that a case be both objectively futile *and* brought in subjective bad faith for dismissal to be granted on bad faith grounds. There is a compelling bankruptcy-centric rationale for this two-pronged rigor:

> Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort

16

so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging its futility at the threshold. We believe that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith in filing.

*Carolin Corp.*, 886 F.2d at 701. *See also Coleman v. Cmty. Tr. Bank (In re Coleman)*, 426 F.3d 719, 727 (4th Cir. 2005) (reaffirming the policy rationale).

This case exemplifies the soundness of the Fourth Circuit's reasoning. Where, as here, a motion to dismiss on bad faith grounds is lodged at the outset of a case, suspicions and innuendo have a tendency to supplant facts and reality. A challenge to plan confirmation can be rooted in the provisions of a plan of reorganization and the record established during a bankruptcy case's pendency; an out-of-the-gate motion to dismiss is rooted in little more than raw speculation, so often fomented by the creditor(s) most angered by a debtor's election to invoke chapter 11 protections in the first instance. And, as is all-too-familiar to this Honorable Court, ever scarce are the creditors who delight in being notified that a bankruptcy case has been commenced.

Here, the facts proffered by the Movants—an almost-cynically one-sided recitation of their ongoing efforts to avoid repaying loans whilst continuing to enjoy the collateral posted as security for those same loans—are actually immaterial to the Motion. The merits, *vel non*, of DRL and 423 Kennedy's contentions concerning WCP and other entities do not meaningful bear on the eligibility of JPK to seek to reorganize in chapter 11. But the hyperbolically skewed, and wantonly selective retelling of recent history speaks to why it is that case law so firmly admonishes such matters are to be considered at the confirmation stage—and not in the earliest days—of a reorganization case.

Indeed, *Carolin*, *Bestwall*, and *Coleman* seemingly contemplate this very situation: if there exists conflict amongst interested parties, and so much as a colorable possibility of a debtor

17

succeeding in reorganizing through chapter 11, why should such efforts be stymied at the behest of those interested parties who wish otherwise? If there is a cognizable path forward, why should aspersions cast in the earliest days of a case prematurely doom that path? Parties in interest will have the full cadre of arguments available at the time of confirmation and, especially in a Subchapter V case such as this, that time is not too far into the future. Assuredly a debtor deserves at least the opportunity to enshrine a theory of reorganization into the body of a plan and permit that plan to be balloted.

### b. Adoption of the Third Circuit Standard Would Also Require the Motion be Denied

In two intimately-related—and much-analyzed—cases, the Third Circuit has recently had occasion to establish (and then refine) its position on Texas Two Step bankruptcies. From a conglomerate no less ubiquitous than Johnson & Johnson has come *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 108 (3d Cir. 2023) ("LTL I") and *In re LTL Mgmt. LLC*, 2024 U.S. App. LEXIS 18437 (3d Cir. July 25, 2024) ("LTL II"). Both of these cases address that blue chip entity's efforts to spin off talc-centric liabilities through a divisional merger and then place the resulting entity in chapter 11. And while both efforts have failed, the reasoning behind such failures is of particular import, as the Third Circuit has crafted a standard that might keep one particular debtor out of bankruptcy but that, if applied to the instant case, would assuredly permit JPK to reorganize.

In creating LTL Management, "J&J's stated goal was to isolate the talc liabilities in a new subsidiary so that entity could file for Chapter 11 without subjecting Old Consumer's entire operating enterprise to bankruptcy proceedings." *LTL I*, 64 F.4th at 93. The divisional merger was accomplished in October 2021, *id.* at 95, with a bankruptcy filing ensuing a scant two days later, *id.* at 97.

18

In addressing the ensuing motion to dismiss LTL's first bankruptcy on bad faith grounds, the Third Circuit found a two prong inquiry to control:

> "[T]wo inquiries . . . are particularly relevant": "(1) whether the petition serves a valid bankruptcy purpose[;] and (2) whether [it] is filed merely to obtain a tactical litigation advantage." Valid bankruptcy purposes include "preserv[ing] a going concern" or "maximiz[ing] the value of the debtor's estate." Further, a valid bankruptcy purpose "assumes a debtor in financial distress."

*LTL I*, 64 F.4th at 100-01 (quoting *15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119-20 (3d Cir. 2004));[4] *Integrated Telecom*, 384 F.3d at 128).

The problem in *LTL I* was not that the debtor was formed two days before seeking bankruptcy relief, or even that the debtor was holding assets alleged to have contributed to the death of thousands of people. The problem, rather, was the funding agreement underlying the divisional merger at the heart of LTL's inception: the debtor had "roughly $61.5 billion" in assets and, as such, did not suffer from the scantest of financial distress. *LTL I*, 64 F.4th at 108. Indeed, ". . . LTL, at the time of its filing, was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *Id.*

The Third Circuit did, however, expressly address the propriety of the transaction that created LTL: "No one doubts that the state-law divisional merger passed talc liabilities to LTL. Why in bankruptcy would we recognize the effectiveness of this state-law transaction, but at the same time ignore others that augment LTL's assets, such as its birth gift of the Funding Agreement?" *Id.* at 105.

---

[4] This is not a typographical error; "NMSBPCSLDHB, L.P." is the actual name of the lead party to the cited case.

Stated otherwise: that LTL was created with the intent of entering bankruptcy in 48 hours was not—and is not—an issue. Indeed, the Third Circuit even ". . . recognize[d] the Code contemplates 'the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.'" *LTL I*, 64 F.4th at 102 (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999)). Rather, that LTL had $61.5 billion of assets, and no cognizable liabilities that would cause that enormous liquid reserve to be depleted, was the problem.

Notably, however, even that concern would be walked back somewhat by the Third Circuit in *LTL II*. There, after seeing its first bankruptcy dismissed, LTL restructured its funding agreement so the company would only have access to a meager $30 billion. *LTL II*, 2024 U.S. App. LEXIS 18437, at *7. And while the Third Circuit found this was still far too much available cash for a debtor that did not face litigation posing an existential threat or a realistic prospect of inviting a liability in excess of this amount, the court did nonetheless hedge its previous ruling: "when future insolvency is a realistic possibility based on meaningful evidence—not just the result of a highly speculative 'worst-case' scenario—a mass-tort defendant has a viable case for bankruptcy." *Id.* at *14.

With this foundation, the United States District Court for the District of Delaware reaffirmed, less than a year ago, that ". . . a company need not wait 'until after a massive judgment has been entered against it' before filing for bankruptcy." *Emp. v. AIG Fin. Prods. Corp. (In re AIG Fin. Prods. Corp.)*, 2024 U.S. Dist. LEXIS 155142, at *25 (D. Del. Aug. 28, 2024) (citing *SGL*, 200 F.3d at 164). The *EMP* holding—from a court within the Third Circuit, on the heels of the two LTL cases—is particularly noteworthy, as it reaffirms not merely that a solvent debtor can seek bankruptcy protection when confronted with ominous litigation but, too, that seeking to

20

combine the expenses of litigation defense with the expenses of bankruptcy administration can be fodder enough to establish a "valid reorganizational purpose" sufficient to overcome allegations of bad faith, *id.* at *28, even if the bankruptcy is otherwise motivated by efforts to "obtain tactical advantages" in ongoing litigation, *id.* at *30.

JPK, of course, does not have $61.5 billion, or even $30 billion. JPK has $935.00 in a checking account and a little over $20,000 in a lawyer's trust account. JPK is assuredly not highly solvent with cash. In fact, JPK is facing litigation seeking *in rem* relief that, if afforded, would decimate the two largest assets of JPK and leave JPK without any realistic prospects of being able to pay its debts or operate on a go-forward basis.

So, unlike in *LTL I* and *LTL II*, the Debtor here is not flush with cash. And unlike in those cases, the Debtor here is already facing litigation that poses an existential risk; there is not merely a highly-speculative concern that such litigation might be filed years down the road. Rather, JPK enters bankruptcy with a "valid reorganizational purpose:" resolving the Movants' claims in a manner that permits JPK to foreclose on its collateral and apply the proceeds thereof to the retirement of debts in accord with the priority scheme established by the Bankruptcy Code.

Just as this Honorable Court is not in the Fourth Circuit, this Honorable Court is, too, not in the Third Circuit. Yet even if the *LTL* standard were applied, this case would not meet the criteria of being a bad faith filing and the Motion would merit denial.

### c. A Totality of Circumstances Analysis Would Also Require the Motion be Denied

DRL and 423 Kennedy note that there is also a "totality of the circumstances," or "surrounding circumstances," test that has been utilized by some courts. Motion, DE #19, at pp. 26-27. This is the test adopted by this Honorable Court during the aforementioned Barcelona Olympiad, when a dormant District of Columbia company was suddenly quit-claimed a Florida

real estate asset so as to dirty the chain of title and frustrate efforts to record a pocket deed. *Franklin Mortg. & Inv. Co.*, 143 B.R. at 297.

The "totality of the circumstances" test is an eight prong, disjunctive analysis used to assess the motivations of a debtor entering chapter 11:

> [1.] The debtor has one asset, such as a tract of undeveloped or developed real property.
>
> [2.] The secured creditors' liens encumber this tract.
>
> [3.] There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or make adequate protection payments . . . .
>
> [4.] Typically, there are only a few, if any, unsecured creditors whose claims are relatively small.
>
> [5.] The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation . . . .
>
> [6.] Bankruptcy offers the only possibility of forestalling loss of the property.
>
> [7.] There are sometimes allegations of wrongdoing by the debtor or its principals.
>
> [8.] The 'new debtor syndrome,' in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies . . . bad faith cases.

*Franklin Mortg. & Inv. Co.*, 143 B.R. at 299-300 (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986); *Duggan v. Highland-First Ave. Corp.*, 25 B.R. 955, 961 (Bankr. C.D. Cal. 1982)). *Compare Franklin Mortg. & Inv. Co.*, 143 B.R. at 299-300 *with Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995) (showing the *Franklin Mortgage* factors to be largely—albeit not entirely—the same as those used by another court applying the "totality of the circumstances" test).

Here, JPK does not have just one asset; the Debtor has three assets of cognizable value, all of which are promissory notes and none of which are real estate assets (though two of the notes

22

are secured by real estate assets). The Debtor also has an admittedly-*de minimis* amount of cash. So the first prong of the totality of the circumstances test is plainly not satisfied.

Similarly, this is not a case where there are any secured creditors (except to the extent DRL and 423 Kennedy have *in rem* relief against two of the three promissory notes). So it cannot be said that any liens are encumbering any tracts of land owned by JPK; to the contrary, it is the liens of JPK that encumber tracts of land (and the improvements thereupon) owned by third parties.

As for the third prong, there is very much an available stream of cash that can be used to sustain a plan of reorganization: as soon as JPK can foreclose on the deeds of trust securing two of the three promissory notes, JPK will have access to monies to pay creditors. Similarly, JPK will have additional cash flow when the unsecured promissory note is collected upon (something it is believed JPK is actively endeavoring to do). These are funds that JPK can use to make payments in accord with the governing priority scheme, to reorganize, and to assess potential future lending opportunities as a reorganized debtor.

Concerning the fourth criterion, this is not a case involving small claims. DRL and 423 Kennedy are asserting *in rem* claims the Movants seem to value at more than $3 million. Even an undisputed noteholder is due north of $55,000.00, which is a noteworthy sum of money in the prism of a Subchapter V bankruptcy proceeding.

The fifth prong also militates against a finding of bad faith. Not only is there no property to be foreclosed in this case, but the Superior Court litigation is not between JPK and "one creditor." There are, rather, two distinct entities making claims against JPK's assets; the two entities may share common counsel, and a common principal, but are backed by separate investors, own property at separate locations, have different construction-centric aspirations, and have gone

out of their way—in myriad court filings—to insist they are absolutely *not* affiliates of one another.[5]

The sixth consideration is, likewise, resolved in favor of the Debtor. Bankruptcy is not the sole means through which JPK can forestall a loss of property. Rather, quite plainly, JPK can defend the Movants' claims on the merits. DRL and 423 Kennedy are endeavoring to apply consumer lending rigors to commercial loans, to upend decades of well-settled case law on the role of trustees under deeds of trust, and to urge that their myriad payment-centric and lien-centric defaults ought to be forgiven because someone allegedly got mad during a phone call—months *after* the first several defaults occurred.

As for the seventh factor, there are not actually allegations of wrongdoing against JPK (aside from having the temerity to embrace chapter 11). The allegations of wrongdoing against JPK's two members are, as discussed above, tenuous and legally-troubled. DRL and 423 Kennedy are trying to impose consumer lending standards on commercial transactions and suggesting a commercial lender is not only forbade from declaring defaults upon late payments and the accrual of senior liens but, indeed, engages in acts of tortious interference by making such declarations. These may well suffice as "allegations" of wrongdoing, but it is difficult to credit them as much more.

Finally, this is also not a case where there is so-called "new debtor syndrome," since JPK plainly fails the qualifying test of being a "a one-asset entity." *Franklin Mortg. & Inv. Co.*, 143

---

[5] Lest this point appear contextually obtuse: DRL, 423 Kennedy, and a third entity under common control, are all cognizant that relevant loan documents provide a default by one affiliate constitutes a default by related affiliates. DRL and 423 Kennedy are not in a position to deny each other's defaults, let alone to deny the defaults of a third related entity, so they have steadily insisted that they are not actually affiliates. The point is largely immaterial given the abundance of other defaults under the at-issue loan documents, but it is one that does prove meritorious in showing the creditors in this case are well estopped from suggesting the existence of a two-party dispute.

B.R. at 300. Equally, JPK existed for well over a year before this case was filed. Anecdotally, the

Debtor is of an age well more advanced than many of the single asset real estate entities that so

often petition for chapter 11 relief in this Honorable Court.

Indeed, *none* of the *Franklin Mortgage* factors weigh in favor of finding this case to be a

bad faith bankruptcy filing. To the contrary, the "totality of the circumstances" test reveals only

that JPK does not fall into any of the notable categories traditionally encompassing bad faith

debtors and, rather, presents as the variety of debtor whose chapter 11 case ought not raise concerns

at the outset.

## IV.     Conclusion

WHEREFORE, WCP respectfully prays this Honorable Court (i) deny the Motion; and (ii)

afford such other and further relief as may be just and proper.

*[Signature and Certificate of Service on Following Page]*

Respectfully submitted,

Dated: July 23, 2025          By:    /s/ Maurice B. VerStandig
                                     Maurice B. VerStandig, Esq.
                                     Bar No. MD18071
                                     The VerStandig Law Firm, LLC
                                     9812 Falls Road, #114-160
                                     Potomac, Maryland 20854
                                     Phone: (301) 444-4600
                                     mac@mbvesq.com
                                     *Counsel for WCP Fund I LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of July, 2025, a copy of the foregoing was

served electronically upon filing via the ECF system.

                                     /s/ Maurice B. VerStandig
                                     Maurice B. VerStandig

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

IN RE:                                        *

JPK NewCo, LLC                          *      Case No. 25-00200-ELG
                                               (Chapter 11 - Subchapter V)
                Debtor                  *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DEBTOR'S OPPOSITION OF TO
### DEVELOPER RE1, LLC'S AND 423 KENNEDY ST. HOLDINGS,
### LLC'S MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH

JPK NewCo, LLC, Debtor and Debtor-in-Possession (the "Debtor"), by JEFFREY M.

ORENSTEIN and WOLFF & ORENSTEIN, LLC, joins in the Opposition of WCP Fund I LLC

to Developer RE1, LLC's and 423 Kennedy St. Holdings, LLC's Motion To Dismiss Chapter 11

Petition Filed In Bad Faith (the "Opposition") and adopts the arguments set forth in the

Opposition.


Respectfully submitted,


 \s\ Jeffrey M. Orenstein
JEFFREY M. ORENSTEIN (#428335)
Wolff, & Orenstein, LLC
15245 Shady Grove Road
North Lobby, Suite 465
Rockville, Maryland  20850
(301) 250-7232
jorenstein@wolawgroup.com

Attorneys for JPK NewCo, LLC

1

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that on the 24th day of July, 2025, a copy of the foregoing was
sent via the Court's CM/ECF system to:

Kristen S. Eustis, Esq.
Office of the United States Trustee
1725 Duke Street,
Suite 650
Alexandria, VA 22314
Kristen.S.Eustis@usdoj.gov

Stephen A. Metz, Subchapter V Trustee
Offit Kurman, P.A.
7501 Wisconsin Ave, Suite 1000W
Bethesda, MD 20814
smetz@offitkurman.com

Kristen E. Burgers, Esq.
Hirschler Fleischer
1676 International Drive, Suite 1350
Tysons, VA 22102
kburgers@hirschlerlaw.com

Maurice Belmont VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, MD 20854
mac@mbvesq.com

James D. Sadowski, Esq.
Greenstein Delorme & Luchs, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
jds@gdllaw.com

                                        \s\ Jeffrey M. Orenstein
                                        Jeffrey M. Orenstein

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Attorneys for JPK NewCo, LLC

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

IN RE:                                          *

JPK NewCo, LLC                                  *      Case No. 25-00200-ELG
                                                       (Chapter 11 Subchapetr V)
                 Debtor                         *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>DEBTOR'S CHAPTER 11, SUBCHAPTER V PLAN OF REORGANIZATION</u>

JPK NewCo, LLC (the "Debtor") the debtor in possession herein, proposes the following

Chapter 11, Subchapter V, Plan of Reorganization (the "Plan") pursuant to §1190 and §1191 of

Title 11 of the United States Code (the "Bankruptcy Code"). A brief history of the Debtor's

formation and operations is attached hereto as **Appendix A**.

**All Creditors and Interest Holders should refer to Articles I through III of this Plan**

**for information regarding the precise treatment of their Claims. Your rights may be**

**affected. You should read these papers carefully and discuss them with your attorney, if**

**you have one.  If you do not have an attorney, you may wish to consult one. This Plan is a**

**proposal by the Debtor and is subject to Bankruptcy Court approval after opportunity for**

**objections and a hearing. Please refer to a Scheduling Order to be entered by the**

**Bankruptcy Court for important information regarding Plan voting and objection**

**deadlines.**

<u>DEFINITIONS AND RULES OF CONSTRUCTION</u>

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy

Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan,

and they are supplemented by the following definitions:

A.      Definitions

Unless the context otherwise specifies or requires, the following terms shall have the

meanings herein specified, such definitions to be applicable equally to the singular and plural

forms of such terms and to all genders:

423 Kennedy shall mean 423 Kennedy St Holdings LLC.

423 Kennedy Note shall mean the Commercial Deed of Trust Note in the original

principal amount of $1,256,000.00 executed by 423 Kennedy on or about March 31, 2022.

Administrative Expense Claim shall mean any Claim which is entitled to administrative

priority status pursuant to §§ 503(b), 507(a)(2) and 1192(e) of the Bankruptcy Code, including,

without limitation, any Claim arising from the assumption of an executory contract or unexpired

lease under § 365 of the Bankruptcy Code, fees and expenses of the Subchapter V Trustee and

any Professionals employed by the Debtor, and any taxes incurred during the pendency of this

Bankruptcy Case.

Allowed with respect to any Claim shall mean: (i) a Claim against the Debtor that has

been listed on the Debtor's Schedules, as such Schedules may be amended from time to time

pursuant to Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and

for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim

was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan,

the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance is made

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

2

by the Debtor or a party in interest or as to which any objection has been determined by a Final

Order to the extent such objection is determined in favor of the respective Holder or (iii) any

Claim expressly Allowed by a Final Order or pursuant to the Plan. Any Claim that has been or is

hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof

of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective

Date without further action by the Debtor and without any further notice to or action, order or

approval of the Bankruptcy Court.

Adversary Proceeding shall mean the litigation filed in this Court captioned as JPK

NewCo LLC, et al. v. Developer RE1, LLC, et al. Adversary Proceeding No. 25-10015-ELG..

Bankruptcy Code shall mean the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., and any

amendments thereto.

Bankruptcy Court shall mean the United States Bankruptcy Court for the District of

Columbia or any other court having jurisdiction over the Debtor's Chapter 11 case or any

proceeding arising under this Chapter 11 Case.

Bankruptcy Rules shall mean (i) the Federal Rules of Bankruptcy Procedure and the

Official Bankruptcy Forms, as amended and promulgated under § 2075 of Title 28 of the United

States Code, (ii) the Federal Rules of Civil Procedure, as amended and promulgated under

§ 2072 of Title 28 of the United States Code, (iii) the Local Rules of the Bankruptcy Court, and

(iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to this case or proceedings herein, as the case may be.

Chapter 11 Case shall mean the above-captioned Subchapter V bankruptcy proceeding initiated by the filing of the Debtor's Petition.

Claim shall have the meaning ascribed to such term in § 101(5) of the Bankruptcy Code.

Class shall mean any class in which Allowed Claims are classified pursuant to Articles II and III of this Plan.

Confirmation Date shall mean the date the entry of the Confirmation Order becomes a Final Order.

Confirmation Order shall mean the Order of the Bankruptcy Court in this Chapter 11 Case confirming the Plan pursuant to § 1129 and other applicable sections of the Bankruptcy Code.

Creditor shall mean the Holder of a Claim, within the meaning of § 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Claims, and Priority Tax Claims.

Debtor shall mean JPK NewCo, LLC, the debtor in possession in this Chapter 11 Case.

Developer RE1 shall mean Developer RE1 LLC.

Developer RE1 Note shall mean the Commercial Deed of Trust Note in the original principal amount of $524,000.00 executed by Developer RE1 on or about December 24, 2021.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

4

DIP shall mean debtor in possession which in this Case is JPK NewCo, LLC, as it has continued in possession of its assets and operated its business during the course of this Chapter 11 Case.

DIP Financing shall mean the advance of funds that, with the approval of the Bankruptcy Court, the Debtor may receive from WCP as a revolving line of credit in the maximum amount of $100,000.00, with interest accruing at the rate of Prime plus three percent (3%), and secured by a 1st priority lien on all of the Debtor's assets.

Disposable Income shall mean the income or other receipts received or to be received by the Debtor that is not reasonably necessary to be expended for the payment of amounts necessary for the continuation, preservation, operation, or litigation efforts of the business of the Debtor.

Effective Date shall mean the first business day following the date that is thirty (30) days after the entry of the Confirmation Order.

Energy Morocco shall mean Energy Morocco LLC.

Energy Morocco Note shall mean the Commercial Promissory Note in the original principal amount of $26,000.00 executed by Energy Morocco on or about June 24, 2024.

Executory Contracts shall mean all contracts and unexpired leases to which the Debtor is a party and which are executory within the meaning of § 365 of the Bankruptcy Code.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

5

Final Order shall mean an order or judgment of the Bankruptcy Court which has not been

reversed, stayed, modified or amended and as to which the time to appeal or seek reconsideration

or rehearing thereof or file a petition for certiorari has expired.

Holder shall mean (a) as to any Claim, (i) the owner or Holder of such Claim as such is

reflected on the Proof of Claim filed with respect to such Claim, (ii) if no Proof of Claim has

been filed with respect to such Claim, the owner or Holder of such Claim as such is reflected on

the Schedules or the books and records of the Debtor or as otherwise determined by order of the

Bankruptcy Court, (iii) if the owner or Holder of such Claim has assigned or transferred the

Claim to a third party and the Debtor has received sufficient written evidence of such assignment

or transfer, the assignee or transferee; or (iv) any subrogee of a Holder of a Secured Claim; and

(b) as to any interest, the record owner or Holder of such interest as of the Effective Date.

Impaired shall mean any Claim or Interest that is impaired within the meaning of § 1124

Interests shall mean, to the extent applicable to this Chapter 11 Case, the interest of any

Holder of stock or membership interests in the Debtor.

Mr. Sariri shall mean Shheen Sariri.

Note Litigation shall mean the litigation filed in the Superior Court of the District of

Columbia captioned as Developer RE1, LLC v. DP Capital, LLC, et al. and 423 Kennedy St

Holdings, LLC v. DP Capital, LLC, et al. that was subsequently consolidated as Case No. 2022-

CAB-005935.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

Notes shall mean the 423 Kennedy Note and the Developer RE1 Note that are the subject

of the Note Litigation.

Petition shall mean the Voluntary Petition filed by the Debtor on May 27, 2025 .

Petition Date shall mean May 27, 2025.

Plan shall mean this Chapter 11, Subchapter V Plan of Reorganization in its present form

or as it hereafter may be modified, amended or supplemented.

Post-Petition shall mean any event occurring on or after the Petition Date.

Pre-Petition shall mean any event occurring before the Petition Date.

Priority Claim shall mean any Allowed Claim of a person holding a Claim entitled to

priority pursuant to Bankruptcy Code §507(a) other than an Allowed Claim of a governmental

unit pursuant to Bankruptcy Code § 507(a)(8).

Priority Tax Claim shall mean any Allowed Claim of a governmental unit pursuant to

Bankruptcy Code § 507(a)(8); provided, however, any Claims for penalties asserted by

governmental units shall not be a Priority Tax Claim.

Professionals shall mean persons, including attorneys, accountants, the Trustee, and other

professionals, retained or appointed in the Chapter 11 case or to be compensated pursuant to

§§ 327, 328, 330, 503(b) and 1103 of the Bankruptcy Code and order of the Bankruptcy Court.

Secured Claim shall mean a secured Claim pursuant to § 506 of the Bankruptcy Code,

and shall mean an Allowed Claim in an amount equal to the present value of the applicable

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

Creditor's interest in the Debtor's interest in the Property, or in the amount subject to setoff, as may be established by this Plan, the Confirmation Order, or separate Order of the Bankruptcy Court.

SF NU shall mean SF NU, LLC.

Trustee shall mean Stephen Metz, the Subchapter V trustee appointed in this Chapter 11 case pursuant to § 1183 of the Bankruptcy Code.

Unsecured Claim shall mean any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, or a Secured Claim, including (i) any Claim arising from the rejection of an executory contract or unexpired lease under § 365 of the Bankruptcy Code, (ii) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the estate's interest in the Debtor's property securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to § 506(a) of the Bankruptcy Code, (iii) any Claim arising from the provision of goods or services to the Debtor prior to the Petition Date, and (iv) any Claim designated as an Unsecured Claim elsewhere in the Plan.

WCP shall mean WCP Fund I LLC.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

8

B.       Terms of Construction

Capitalized terms used in this Plan shall have the meaning set forth herein. In the event a

capitalized term is not defined herein, then it shall have the meaning given in the Bankruptcy

Code or the Bankruptcy Rules. In the event a capitalized term is not defined in the Plan, the

Bankruptcy Code, or the Bankruptcy Rules, then it shall have the meaning such term has in

ordinary usage and if one or more meaning for such term exists in ordinary usage, then it shall

have the meaning which is most consistent with the purposes of this Plan and the Bankruptcy

Code. The terms of this Plan shall not be construed against any person but shall be given a

reasonable construction, consistent with the purposes hereof and of the Bankruptcy Code.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to

this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

ARTICLE I
TREATMENT OF ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims

and Priority Tax Claims have not been classified in the Plan.  Except with respect to Cure Claims

pursuant to § 365 of the Bankruptcy Code, which shall be provided for in the Plan, any party

claiming an Administrative Expense Claim shall file an application to approve its asserted

Administrative Claim for services provided through the Confirmation Date not later than thirty

(30) days after the Effective Date. *For the avoidance of doubt, and unless stated otherwise in this*

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

9

Case 25-10308-ELG Doc 318-1 Filed 07/20/25 Entered 07/20/25 23:18:22 Desc Main
Exhibit Redacted Document Page 10 of 34

Case 25-10308-ELG Doc 318-1 Filed 07/20/25 Entered 07/20/25 23:18:22 Desc Main
Exhibit Redacted Document Page 464 of 496

*Plan, no Claim described herein shall be entitled to treatment as an Administrative Expense*

*Claim unless (1) the Claim is on account of assumption of an executory contract or unexpired*

*lease; (2) the Bankruptcy Court previously entered a Final Order granting administrative*

*expense status to such Claim; or (3) the Claimant files an application to approve its asserted*

*Administrative Claim priority status and the Bankruptcy Court enters a Final Order with respect*

*to such application after notice and an opportunity for hearing.*

    1.1.   <u>Administrative Expense Claims</u>. Pursuant to § 1191(e) of the Bankruptcy Code,

and subject to entry of Orders allowing Administrative Expense Claims, each Holder of an

Allowed Administrative Expense Claim shall receive distributions on account of their Allowed

Administrative Claim. All fees and expenses requested by the Holder of an Allowed

Administrative Expense Claim for services provided through the Effective Date are subject to

review and approval by the Bankruptcy Court under §§ 329 and 330 of the Bankruptcy Code.

For services provided after the Confirmation Date, a notice shall be filed with the Bankruptcy

Court setting out fees and expenses incurred with a copy served on all parties in interest (the

'Notice").  Absent an objection filed within thirty (30) days of the Notice, or an agreement

between the Debtor and the administrative claimant to pay the Allowed Administrative Claim at

a later time, such amounts shall be paid by the Debtor (or the Trustee) within thirty (30) days of

the expiration of the thirty (30) day objection period or, in the event of the filing of an objection,

within thirty (30) days of the resolution of the objection.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

1.2.    <u>Estimated Amount of Administrative Expense Claims and Treatment</u>. As of the

filing of this Plan, the Debtor estimates that it will have the following Administrative Expense

Claims (without altering the requirement of parties to seek Bankruptcy Court approval of all

Administrative Expense Claims): (a) legal fees for Debtor's counsel, Wolff & Orenstein, LLC of

an estimated $25,000.00; (b) fees for the Subchapter V Trustee of an estimated $15,000.00; (b)

legal fees for Debtor's special counsel, The VerStandig Law Firm, LLC of an estimated

$30,000.00[1] and (d) and other Administrative Expense Claims estimated to be less than

$5,000.00. Administrative professional fees incurred prior to the Effective Date shall be paid on

the later of the Effective Date, or upon approval by the Bankruptcy Court, from funds held by the

Debtor.  Amounts due to Wolff & Orenstein, LLC will be paid, in part, from the Fifteen

Thousand Four Hundred Sixty-Two Dollars ($15,462.00) held in its trust account and from other

funds held or acquired by the Debtor.  Each Allowed Administrative Expenses Claim shall be

paid within thirty days of the entry of an Order approving the Administrative Expense Claim

unless other arrangements are agreed to between the Debtor and the Administrative Expense

Claimant.

---

[1]    The VerStandig Law Firm, LLC will primarily be involved in issues related to the Note
Litigation and the Adversary Proceeding; however, because of its knowledge of the history of the
Note litigation, The VerStandig Law Firm, LLC, likely will be involved in other aspects of the
case as well.  It is anticipated that the fees for services provided by The VerStandig Law Firm,
LLC will substantially exceed $30,000 because The VerStandig Law Firm, LLC, will be
representing parties other than the Debtor.  The $30,000.00 estimate is the share of the total fees
that are anticipated being charged to the Debtor for services providing a benefit to the Debtor.
Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

1.3.    Priority Tax Claims. Each Holder of an Allowed Priority Tax Claim shall receive from the Debtor, on account of such Allowed Priority Tax Claim, distributions that total the aggregate amount of the Allowed Priority Tax Claim, which distributions shall be made in equal quarterly payments with the first distribution to be made on the first day of the month following the Effective Date[2] and every three months thereafter until paid in full, which shall occur not later than five (5) years from the Petition Date, which shall be July 23, 2029; or (b) under such other terms as may be agreed upon by both the Holder of such Priority Tax Claim and the Debtor or (c) as otherwise ordered by a Final Order of the Bankruptcy Court. There are no known Priority Tax Claims.

ARTICLE II
CLASSIFICATION OF CLAIMS AND INTERESTS

2.1.    General Overview. The Debtor has classified all Claims and Interests in accordance with §§ 1122, 1123 and 1190 of the Bankruptcy Code. A chart detailing each Class of Claims or Interests under the Plan, and the Debtor's proposed treatment for each is attached hereto as **Appendix B**. A Claim is in a particular Class for purposes of voting on, and of receiving distributions pursuant to the Plan only to the extent such Claim has not been paid, released or otherwise settled prior to the Effective Date. The table in Section 2.2 below

---

[2]    For example, if the Effective Date is October 23, 2025, the first payment would be due November 1, 2025.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

identifies each Class of Claims under the Plan and whether such Class is Impaired or

Unimpaired.

  2.2.  Designation of Classes. This Plan provides for the establishment of the following

Classes of Claims or Interests as provided in § 1122 of the Bankruptcy Code:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Allowed General Unsecured Claims | Impaired | Yes |
| 2 | Equity Interests | Unimpaired | No |

ARTICLE III
TREATMENT OF CLAIMS AND INTERESTS

  3.1  Class 1 – Allowed General Unsecured Claims: In full and complete satisfaction,

discharge and release of the Class 1 Claims, the Debtor shall pay the Holders of Allowed Class 1

Claims, without interest, their pro-rata shares of all available projected disposable income, paid

semi-annually beginning sixty (60) days after the Effective Date and continuing during the term

of this Plan.  Pending resolution of the Note Litigation, payments to Holders of Allowed Class 1

Claims shall total no less than $5,000.00 each semi-annual period and will be paid by drawing on

the DIP Financing if other funds are not then available.  Class 1 General Unsecured Claims that

are undisputed total $55,172.43 as of the Petition Date.  In addition, there are two scheduled

general unsecured claims that have not been assigned a value because they are disputed and

unliquidated.  Holders of Class 1 General Unsecured Claims are expected to receive one hundred

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

percent (100%) of the principal amount of their Allowed Claims with interest at the contract rate, but only if the Debtor is successful in the Note Litigation. Class 1 is impaired and therefore the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

3.2     Class 2 – Equity Interests:  On the Effective Date, the legal, equitable and contractual rights of the Debtor in its assets and properties shall be retained unaltered. Class 2 is Unimpaired.  As a result, pursuant to § 1126(f) of the Bankruptcy Code, the holders of the equity interests in the Debtor are conclusively deemed to have accepted the Plan and, therefore, are not entitled to vote to accept or reject the Plan.


ARTICLE IV
EXECUTION AND IMPLEMENTATION OF PLAN

4.1.     Vesting of Property in the Debtor Free and Clear. Except as otherwise provided in this Plan or the Confirmation Order, all property of the Debtor's estate shall, pursuant to §§ 1141(b) and 1141(c) of the Bankruptcy Code, vest in the Debtor as of the Effective Date free and clear of any Claim of any Creditor provided for by this Plan.

4.2.     Corporate Governance. Upon the Effective Date, the day-to-day operations of the Debtor shall continue to be overseen by its Members.  To the extent applicable to a case under Subchapter V, the Debtor will amend its governing documents to comply with the provisions of Section 1123(a)(6) of the Bankruptcy Code.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

4.3. <u>Source of Payments</u>. The sources and value of funds and assets for distribution is as follows:

(a)     The collection of the amounts due under the Energy Morocco Note.

(b)     The collection of the amounts due under the Notes **which shall be pursued through the Note Litigation and, to the extent necessary, removal of litigation in the District of Columbia Superior Court that has been stayed by operation of this bankruptcy case and Order of the Superior Court. Specifically, the Debtor will pursue collection upon the notes through one or more adversary proceedings and, simultaneously, work with related parties in interest to defend any attacks upon the notes or upon the ability of the Debtor to foreclosure.**

**(c)**     DIP Financing. WCP shall make advances to the Debtor from time to time with existing balances not to exceed $100,000.00 at any time. The amounts advanced shall accrue interest at the rate of Prime plus 3% per annum and shall be secured by a first-priority lien on and against all of the Debtor's assets. The liens and security interests granted to WCP under this Plan shall become and are duly perfected without the necessity for the execution, filing or recording of financing statements, security agreements and other documents which might otherwise be required pursuant to applicable non-bankruptcy law for the creation or perfection of such liens and security interests. Notwithstanding the foregoing, WCP may, in its sole discretion, file such financing statements, security agreements, mortgages, deeds of trust, notices

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

15

of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages consistent with this Plan, and all such documents shall be deemed to have been filed or recorded at the time of and on the Effective Date.

4.4.    <u>Plan Term</u>. Except as otherwise set forth in the Plan, the term of the Plan begins on the Effective Date and ends on the sixtieth (60th) month subsequent to that date.

4.5.    <u>Disposable Income and Plan Funding</u>. The Debtor's regular disposable income is not calculable at this time because, it substantially depends upon the results of the Note Litigation.  As addressed in Section 4.3 above, the sources of funds are the collection of the amounts due under the Energy Morocco Note and the Notes, and will be supplemented by DIP Financing to the extent necessary to make the required $5,000.00 in total semi-annual payments to Holders of Allowed Class 1 Claims.

4.6.    <u>Option to Pay Claims Sooner Than Projected</u>. In the event that the Debtor obtains funds that are sufficient to satisfy its obligations under this Plan sooner than projected, the Debtor may opt to pay any or all creditors early.

ARTICLE V
<u>DISTRIBUTIONS UNDER THE PLAN</u>

5.1.    <u>General</u>. If the Debtor is able to recover the amounts due under the Notes, Unsecured Creditors holding Allowed Claims will receive payment of their Claims in full.  If the Debtor is unable to recover the amounts due under the Notes, Holders of Allowed Claims will be paid pro rata from the Debtor's Disposable Income in accordance with the priorities set forth in

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

16

the Bankruptcy Code and this Plan.  In either event, the Debtor's Plan provides that creditors will

not receive less in this Chapter 11 Case than they would have received if this Chapter 11 Case

was converted to Chapter 7 because the Debtor's only assets are the Notes which would be

collected and distributed in either Chapter 7 or under this Plan, and because there would be no

DIP Financing supplement in Chapter 7.  In addition, the amounts to be distributed under

Chapter 7 would be reduced to the extent of the Chapter 7 Trustee's legal fees and commissions.

5.2.     Delivery of Distributions and Time Bar to Payment.  The Bankruptcy Code

provides, among other things, that if the Plan is approved on a consensual basis, the Debtor shall

make distributions provided for in the Plan.  In the event the Plan is approved on a non-

consensual basis, however, the Bankruptcy Code requires that, unless otherwise provided in the

Plan or order of the Bankruptcy Court, the Trustee shall make disbursements under the Plan.

Because disbursements by a Trustee (or other third party) increase the administrative costs under

or in connection with the Plan, the Debtor intends to seek approval of the Bankruptcy Court to

self-disburse distributions to Holders of Allowed Claims, whether confirmed on a consensual or

non-consensual basis. To the extent the Bankruptcy Court requires the Trustee disburse

distributions under the Plan, distributions to Holders of General Unsecured Claims could

potentially be reduced on account of estimated administrative costs.  Further, in the event the

Bankruptcy Court directs the Trustee to make distributions to Holders of Allowed Claims,

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

17

Holders of Allowed Claims must provide the Trustee a Form W-9 form before such distributions commence.

The Debtor (or the Trustee if applicable) shall stop payment on any distribution check that is not cleared through the account upon which such check is drawn within ninety (90) days of the date of distribution. Distribution checks shall be mailed to the addresses given in Proofs of Claim filed herein, or, as to those Creditors who did not file a Proof of Claim, to the addresses listed in the Debtor's Schedules, unless the Debtor receives other instructions in writing from such Creditor(s). All funds which are not distributed as a result of stopped checks shall become property of the Debtor for use in subsequent distributions. It shall be the obligation of each Creditor to provide written notice to the Debtor of any change of the Creditor's address.

    5.3.   <u>Disputed Claims</u>.

    (a)   A disputed Claim is a Claim that has not been Allowed or that has been disallowed by Final Order and, either:

    (i)   A Proof of Claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

    (ii)   No Proof of Claim has been filed, and the Debtor has scheduled such Claim as disputed, contingent or unliquidated.

    (b)   Delay of Distribution on a Disputed Claim. No distribution will be made on a disputed Claim unless the Claim is Allowed by a Final Order.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

(c)     Settlement of Disputed Claims. The Debtor shall have the power and
authority to settle and compromise a disputed Claim with Bankruptcy Court approval and
compliance with the Bankruptcy Rule 9019.

## ARTICLE VI
## PAYMENTS TO CREDITORS UNDER THE PLAN

Unless otherwise provided in the Plan, funds received by the Debtor or otherwise
included in this Plan shall be used to pay the following Claims in the priority indicated:

6.1.     Except as provided in § 1191(e) of the Bankruptcy Code, all Claims entitled to
priority under § 507 of the Bankruptcy Code shall be paid in accordance with § 1129(a)(9) of the
Bankruptcy Code and as set forth in Article I, Article III and **Appendix B**.

6.2.     Pursuant to § 1191(e) of the Bankruptcy Code, the payment of Claims entitled to
priority under § 507(a)(2) and § 507(a)(3) of the Bankruptcy Code shall be paid under the Plan
as set forth Article I and **Appendix B**.

6.3.     All Secured Claims, if any, shall be paid in accordance with § 1129(b)(2)(A),
§ 1191(b), and § 1191(c) of the Bankruptcy Code, as set forth in Article III and **Appendix B**.

6.4.     *Parra-passu* with the foregoing Claims, sums received by the Debtor shall be
paid, on a pro-rata basis, to Allowed General Unsecured Claims as set forth in Article III and
**Appendix B**.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

6.4.    In accordance with § 1191 of the Bankruptcy Code and the terms of the Plan, the holders of equity interests in the Debtor shall retain their interests in the Debtor as set forth in Article III and **Appendix B**.

ARTICLE VII
TRUSTEE COMPENSATION

The Trustee shall be paid for services rendered in this Chapter 11 Case as a Holder of an Administrative Expense Claim under § 507 of the Bankruptcy Code, and shall be paid by the Debtor as set forth in Section 1.2.  All fees and expenses requested by the Trustee are subject to review and approval by the Bankruptcy Court under §§ 329 and 330 of the Bankruptcy Code. The Debtor, Creditors, and any party-in-interest reserve the right to object to the extent and amount of the Trustee Compensation.  Debtor estimates the Administrative Expense Claim in favor of the Trustee will be approximately $10,000.00.

For services provided after the Confirmation Date, the Trustee shall file a Notice and serve a copy the Notice on all parties in interest. Absent an objection filed within thirty (30) days of the Notice, such amounts shall be paid by the Debtor (or the Trustee) within thirty (30) days of the expiration of the thirty (30) day objection period or, in the event of the filing of an objection, within thirty (30) days of the resolution of the objection.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

20

ARTICLE VIII
COMPENSATION TO DEBTOR'S PROFESSIONALS

8.1     The Debtor's attorney, Wolff & Orenstein, LLC, shall be paid for the services rendered to the Debtor herein as an Administrative Expense Claim under § 507 of the Bankruptcy Code and pursuant to Section 1.2 of this Plan. All fees and expenses requested by the Debtor's attorney are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.  Debtor estimates the Administrative Expense Claim in favor of Wolff & Orenstein, LLC to be approximately $25,000.00.

For services provided after the Confirmation Date, Wolff & Orenstein, LLC shall file the Notice and serve a copy the Notice on all parties in interest. Absent an objection filed within thirty (30) days of the Notice, such amounts shall be paid by the Debtor (or the Trustee) within thirty (30) days of the expiration of the thirty (30) day objection period or, in the event of the filing of an objection, within thirty (30) days of the resolution of the objection.

8.2     The Debtor's special counsel, The VerStandig Law Firm, LLC, primarily charged with representing the Debtor in the Note Litigation and issues relating to the Note Litigation, shall be paid for the services rendered to the Debtor herein as an Administrative Expense Claim under § 507 of the Bankruptcy Code and pursuant to Section 1.2 of this Plan. All fees and expenses requested by the Debtor's special counsel, are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.  Debtor estimates the Administrative Expense Claim in favor of The VerStandig Law Firm, LLC to be approximately $30,000.00.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

21

For services provided after the Confirmation Date, The VerStandig Law Firm, LLC, shall file the Notice and serve a copy the Notice on all parties in interest. Absent an objection filed within thirty (30) days of the Notice, such amounts shall be paid by the Debtor (or the Trustee) within thirty (30) days of the expiration of the thirty (30) day objection period or, in the event of the filing of an objection, within thirty (30) days of the resolution of the objection.

ARTICLE IX
LIQUIDATION ANALYSIS

Section 1190(1)(B) of the Bankruptcy Code dictate that the Debtor provide a liquidation analysis of its assets. On their face, and as reflected in the Schedules filed by the Debtor in this case, the amounts due under the Energy Morocco Note and the Notes that are the subject of the Note Litigation exceed $2,400,000.00. Because the amounts due under the Notes are tied up in, and impacted by the Note Litigation, it is difficult to determine what amounts will ultimately be realized from the Notes. In Chapter 11 or in a case under Chapter 7 where the Notes would be liquidated by a Chapter 7 Trustee, the value of the Notes would be determined only as a result of the Note Litigation. The Debtor presently has no other assets. In addition, semi-annual minimum payment will be provided through the DIP Financing which would not be available in a case under Chapter 7. The Debtor proposes to pay allowed Claims in full and, for that reason, Creditors will not receive less under this Plan than they would receive in a case under Chapter 7 of the Bankruptcy Code.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

22

# ARTICLE X
## EXECUTORY CONTRACTS

10.1.   <u>Rejection</u>. Pursuant to § 365 of the Bankruptcy Code, the Debtor rejects each

executory contract and unexpired lease, effective upon the Effective Date of this Plan, unless

(i) it has been previously assumed by Order of the Bankruptcy Court, (ii) is listed by the Debtor

as an assumed lease or executory contract, or (iii) is otherwise assumed in this Plan.  The Debtor

is not aware of the existence of any executory contracts or unexpired leases, does not intend to

assume any executory contracts or unexpired leases, and for that reason, rejects and executory

contracts or unexpired leases that may be determined to exist.

10.2.   <u>Rejection Damages</u>. Any Claim for damages against the Debtor arising from the

rejection by the Debtor of any executory contract or unexpired lease pursuant to this Article or

during the pendency of the Debtor's Chapter 11 Case shall be forever barred and shall not be

enforceable against the Debtor or its property or interests in property, and no Holder of any such

Claim shall participate in any distribution under the Plan with respect to such Claim, unless a

proper Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease

under the Plan is filed with the Bankruptcy Court and served on the Trustee and the Debtor no

later than thirty (30) days after the Effective Date and the Claim is Allowed. Any Allowed

rejection damage Claim shall be treated as a Class 1 General Unsecured Claim.


Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

ARTICLE XI
GENERAL PROVISIONS

11.1.  Effect of Confirmation.

(a)  Binding on Debtor and Creditors. Except as provided in §§ 1141 or 1192 of the Bankruptcy Code, as applicable, the provisions of this Plan shall, upon the Confirmation Date, bind the Debtor, each and every Creditor of this estate and each party in interest, whether or not the Claim of such Creditor or party is provided for by the Plan and whether or not such Creditor or party has accepted or has rejected the Plan.

(b)  Injunction against Interference with Plan. Upon entry of the Confirmation Order, all Holders of a Claim along with their respective present or former assignees, employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

(c)  Default. An event of default under the Plan shall occur if the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan, for more than ten (10) days after the time specified in the Plan for such payment or other performance. Upon the occurrence of default, the United States Trustee or Creditor affected by the default shall provide Debtor's attorney, with a copy to the Trustee, of a written notice of default and a ten (10) day opportunity to cure or to move to obtain from the Bankruptcy Court an extension of time to cure the default, or a determination that no default occurred. In the event the Debtor fails to cure the default or seek and obtain an extension to cure from the

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

24

Bankruptcy Court, either or both of which shall constitute an "Event of Default," the affected

Creditor shall be entitled to enforce its/their state court rights and remedies under applicable state

law.

        (d)    <u>Injunction against Certain Actions</u>. Except upon an Event of Default under

this Plan or, in the case of an Allowed Secured Claim, the governing loan documents, as of the

Confirmation Date, all Holders of a Claim are permanently enjoined, from: (a) commencing,

conducting or continuing in any manner, directly or indirectly, any suit, action or other

proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral,

administrative or other forum) to enforce the Claim against the Debtor, or any of its property or

any direct or indirect successor in interest to the Debtor or any property of any such successor;

(b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment),

collecting or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree or order relating to the Claim against the Debtor or any of its property

or any direct or indirect successor in interest to the Debtor or any property of any such successor;

and (c) acting or proceeding in any manner, in any place whatsoever, that does not conform to or

comply with the provisions of this Plan to the fullest extent permitted by applicable law.

        (e)    <u>Rights of Action</u>. On and after the Confirmation Date, the Debtor shall

have the right and standing to enforce for the benefit of the Debtor and its Creditors, any and all

present or future rights, claims or causes of action against any person and rights of the Debtor

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

that arose before or after the Petition Date, including, but not limited to, rights, claims, causes of action, avoiding powers, suits and proceedings arising under §§ 510, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code.

11.2.  <u>Discharge</u>. If the Plan is confirmed as a consensual plan pursuant to 11 U.S.C. § 1191(a), on the Confirmation Date of this Plan, and subject to the occurrence of the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, but the Debtor will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Bankruptcy Rule 4007(c); or (iii) of a kind specified in § 1141(d)(6)(B).  However, if the Plan is confirmed on a non-consensual basis pursuant to 11 U.S.C. § 1191(b), the Debtor will receive its discharge upon the payment of its final distribution in accordance with §1192.

11.3.  <u>Waiver of Certain Fees</u>. Except as otherwise set forth in this Plan, all Holders of Allowed Unsecured or Allowed Priority Tax Claims, waive all penalties, default interest and/or late fees that may have accrued on their Claims.

11.4.  <u>Professional Fees and Expenses</u>. Except as otherwise provided herein, all fees for services rendered and expenses incurred after the Confirmation Date by Professionals engaged by the Debtor shall be paid by the Debtor in the ordinary course of business without the necessity of filing fee applications or seeking approval of the Bankruptcy Court.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

26

11.5. <u>Setoffs</u>. The Debtor reserves all rights to offset a mutual debt owed to any Creditor against such Creditor's Allowed Claim or against any distribution required to be made by the Debtor to such Creditor with respect to an Allowed Claim.

11.6. <u>Modification of Plan</u>. The Debtor reserves the right, in accordance with § 1193 the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan.

11.7. <u>Withdrawal or Revocation</u>. The Debtor may withdraw or revoke this Plan at any time prior to the Confirmation Date. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, or if the Confirmation Date does not occur for any reason, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim or Interest by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

11.8. <u>Notices</u>. Any notices to or requests of the Debtor or the Trustee by parties in interest under or in connection with this Plan shall be in writing and occur by electronic mail and served either by (i) regular first-class mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

The Debtor:

JPK NewCo, LLC
c/o Daniel Huertas
8401 Greensboro Drive
Suite 960
McLean, Virginia 221002

with copies to:

Jeffrey M. Orenstein, Esq.
Wolff & Orenstein, LLC
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
jorenstein@wolawgroup.com

The Trustee:

Stephen A. Metz, Subchapter V Trustee
Offit Kurman, P.A.
7501 Wisconsin Ave, Suite 1000W
Bethesda, MD 20814

    11.9.  <u>Severability.</u> If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

    11.10.  <u>Binding Effect.</u> The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

11.11.  <u>Appendices</u>. The Appendices attached to the Plan are incorporated into the Plan by reference as if the same were fully rewritten herein.

11.12.  <u>Captions</u>. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

11.13.  <u>Controlling Effect</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Bankruptcy Rules), the laws of the District of Columbia govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise providing in this Plan.

11.14.  <u>Notice of Effective Date</u>. The Debtor will file a Notice of Effective Date within seven days of the Effective Date.

11.15.  <u>Substantial Consummation</u>. Not later than 14 days after the Plan of the Debtor is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve on the Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

11.16.  <u>Progress Reports</u>. As required under Local Rule 3022-1(d), the Debtor will file, and serve upon the U.S. Trustee, a progress report six (6) months after the entry of the confirmation order and every six (6) months thereafter, each report detailing the progress made towards full administration of the Plan, to include distributions made to-date and any other substantial activities that would impede full administration.

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

ARTICLE XII
PLAN PROPOSED IN GOOD FAITH

The Debtor represents that it is within the Debtor's ability to carry out this Plan, and the

Plan is submitted in good faith.

ARTICLE XIII
JURISDICTION OF THE BANKRUPTCY COURT

13.1    The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising

under, arising out of, or related to, this Chapter 11 case and this Plan pursuant to, and for the

purposes of §§ 105(a) and 1142 of the Bankruptcy Code and for, among other things the

following purposes until such time as the Debtor's obligations under the Plan are fully

discharged:

(a)    To hear and determine any motions for the assumption or rejection of

Executory Contracts, and the allowance of any Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and

contested matters;

(c)    To hear and determine any objection to any Claims;

(d)    To liquidate or estimate damages or determine the manner and time for

such liquidation or estimation in connection with any contingent or unliquidated Claim;

(e)    To adjudicate all Claims to any lien on any of the Debtor's assets or any

proceeds thereof;

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

30

(f)    To enter and implement such orders as may be appropriate in the event the

Confirmation Order is for any reason stayed, revoked, modified or vacated, and/or if the

Effective Date never occurs;

(g)    To issue such orders in aid of execution of this Plan to the extent

authorized by § 1142 of the Bankruptcy Code;

(h)    To consider any modifications of this Plan, to cure any defect or omission,

or reconcile any inconsistency in any order of the Bankruptcy Court, including, without

limitation, the Confirmation Order;

(i)    To hear and determine all applications for compensation and

reimbursement of expenses of Professionals under §§ 330, 331 and 503(b) of the Bankruptcy

Code;

(j)    To enforce and interpret the Plan and to hear and determine any dispute or

any other matter arising out of or related to this Plan;

(k)    To recover all assets of the Debtor and property of the estate, wherever

located;

(l)    To hear and determine matters concerning state, local and federal taxes in

accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

(m)    To enforce and interpret the discharge of Claims and Interests affected by

this Plan and to enter and implement such orders as may be appropriate with regard thereto;

Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

(n)     To hear any other matter consistent with the provisions of the Bankruptcy

Code;

(o)     To enter a final decree closing this Chapter 11 case; and

(p)     To hear and determine such other issues as the Bankruptcy Court deems

necessary and reasonable to carry out the intent and purposes of this Plan.


DATED: July 28, 2025                    JPK NewCo, LLC



                              \s\ Daniel Huertas
                         By: Daniel Huertas, Manager



                          \s\ Jeffrey M. Orenstein
                         JEFFREY M. ORENSTEIN (#428335)
                         Wolff, & Orenstein, LLC
                         15245 Shady Grove Road
                         North Lobby, Suite 465
                         Rockville, Maryland  20850
                         (301) 250-7232
                         jorenstein@wolawgroup.com

                         Counsel for JPK NewCo, LLC




Wolff & Orenstein, LLC
Jeffrey M. Orenstein, Esq.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstein@wolawgroup.com
Proposed attorneys for JPK NewCo, LLC

APPENDIX A
(Debtor's History)

1.  <u>General Background</u>

    A.    Debtor's Business and Commercial Activities.

    i.    <u>Formation of the Debtor</u>

The Debtor was formed on February 1, 2024, when its Articles of Organization were filed with the Corporations Division of the District of Columbia. At the time of its formation, WCP Fund I LLC ("WCP") and SF NU, LLC ("SFNU") were the Debtor's sole owners and remain its sole owners today. As addressed in more detail below, the Debtor was created on the advice of counsel, with then-present cognizance the Debtor might be used to either facilitate an amicable resolution to the pending litigation involving WCP and SFNU, and/or as a mechanism of siloing troubled assets so as to remove those assets, and their accompanying putative liabilities, from the balance sheets of WCP and SFNU.

JPK was capitalized by WCP and SFNU through contribution of two junior promissory notes held by WCP and SFNU respectively, and assignment of the correlative deeds of trust, with membership interests in the Debtor being given to WCP and SFNU as consideration for the contribution of the promissory notes. The formation and capitalization of the Debtor is reflected in its Operating Agreement.

    ii.    <u>The Contributed Notes</u>

In December 2021, WCP loaned $4,103,000.00 to Developer RE1 LLC ("DRL"), with the subject loan being memorialized by two promissory notes in the respective sums of $3,579,000.00 and $524,000.00 (the "DRL Notes"). The DRL Notes are both secured by deeds of trust (the "DRL Deeds of Trust") on the real property commonly known as 5501-5505 1st Street, NW, Washington, DC 20011 (the "DRL Property"). Similarly, in March 2022, WCP loaned $9,945,693.00 to 423 Kennedy St Holdings LLC ("423 Kennedy"), with the subject loan being memorialized by two promissory notes in the respective sums of $8,689,693.00 and $1,256,000.00 (the "423 Kennedy Notes"). The 423 Kennedy Notes are secured by deeds of trust (the "423 Kennedy Deeds of Trust") on the entity's eponymous property (the "423 Kennedy Property"). Both DRL and 423 Kennedy repeatedly defaulted under their respective notes and deeds of trust by, inter alia, allowing senior liens to accrue on the entities' properties, failing to make interest payments in a timely manner, and failing to pay any of the four - let alone all four - notes at maturity. As a result, both DRL and 423 Kennedy were advised that foreclosure would be pursued.

    iii.    <u>Pre-Petition Litigation & Mediation</u>

DRL and 423 Kennedy asserted that they did not believe that their various breaches were sufficiently severe to warrant defaults being declared and foreclosures being scheduled. As a result, they each brought suit in the District of Columbia Superior Court (the "Superior Court")

to enjoin those foreclosures, alleging the declared defaults to have amounted to tortuous interference with their business relations. The two cases were captioned Developer RE1, LLC v. DP Capital, LLC, et al. (the "DRL Litigation") and 423 Kennedy St Holdings, LLC v. DP Capital, LLC, et al. (the "423 Kennedy Litigation") and were consolidated in the Superior Court as Case No. 2022-CAB-005935 (the "Note Litigation"). The respective complaints are colorful in nature, with one expressly alleging that "Money is the Root of All Evil," and one accusing WCP of corruption. In the course of the Note Litigation, the Superior Court entered injunctions prohibiting the defendants from foreclosing on the DRL Deeds of Trust and the 423 Kennedy Deeds of Trust. Following the entry of these injunctions, the parties to the Note Litigation agreed to mediate before a retired Superior Court judge. During the course of two formal mediation sessions, certain potential resolutions were discussed whereby 423 Kennedy and/or DRL would release claims in exchange for participating in a share of loan profits. As part of the aforesaid negotiations, WCP introduced the idea of transferring certain promissory notes into a so-called "special purpose entity," so ownership interests in the negotiable instruments could be ultimately divided pursuant to a settlement agreement without (i) having to sever the notes themselves into multiple pieces; and/or (ii) needing to offer DRL and/or 423 Kennedy an ownership interest in WCP or any of its co-defendants. Shortly after the conclusion of the second mediation session , and consistent with those discussions, the Debtor was formed as that "special purpose entity." The Note Litigation has been stayed by Order of the Superior Court.

iv.     The Debtor's Business Operations

Following its formation, the Debtor needed funds to engage counsel and to operate, with the expectation the Debtor would be joined in the Note Litigation. To procure such funds, the Debtor borrowed $50,000.00 from Shaheen Sariri ("Mr. Sariri"). At the time the loan was made, Mr. Sariri was advised that the Debtor may use part or all of the loan proceeds to engage counsel, including the potential engagement of insolvency counsel. A portion of the loan proceeds were transferred to the IOLTA account of The VerStandig Law Firm, LLC (VLF"), WCP's litigation counsel, to be held pending VLF's anticipated engagement to represent the Debtor in the litigation. The Debtor loaned the remaining proceeds to Energy Morocco LLC ("EM"), an unrelated third party, in an effort to make a profit from interest on the loan. The funds that were deposited with VLF were subsequently transferred to Wolff & Orenstein, LLC ("W&O") as a retainer in the Debtor's prior bankruptcy case and were consumed in that bankruptcy case. The loan from EM has come due, but has not yet been paid. The Debtor has made demand upon EM for payment of the amounts due. Until the amounts due are collected, the Debtor does not have available funds to make additional loans at this time and required a capital contribution from WCP in order to fund the retainer for the present bankruptcy case.

B.     The Motion to Dismiss

On June 23, 2025, DRL and 423 Kennedy filed a Motion to dismiss this Chapter 11 case (the "Dismissal Motion") A hearing on the Dismissal Motion has been set for July 30, 2025 and a response to the Dismissal Motion is due on or before July 25, 2025. At the Debtor's Section 341 meeting that was conducted on June 30, 2025, counsel for the Movants indicated his intention to conduct discovery, and has now served Requests for Production of Documents and Interrogatories. A hearing on the Motion to Dismiss is scheduled for July 30, 2025.

C.      The Debtor's Adversary Proceeding

On May 28, 2025, the Debtor, along with WCP, SF NU, and Russell Drazin, filed its own Complaint against DRL and 423 Kennedy to initiate Adversary Proceeding No. 25-10015-ELG (the "Adversary Proceeding").  As addressed in more detail below, the Debtor's Plan will primarily provide for repayment to creditors from the proceeds of the Notes that it holds.  Thus, the more it is able to collect from DLR and 423 Kennedy, the more it will be able to pay its own creditors.  DLR and 423 Kennedy have asserted that the Debtor is not the proper holder of the Notes that evidence the indebtedness from those parties.  For the Debtor to effectively reorganize, the Debtor (i) must establish that it properly holds both promissory notes, with all attendant rights under the correlative deeds of trust; (ii) must establish that neither promissory note is burdened by any claims for setoff; (iii) and must remove the cloud placed upon the quality and enforceability of these debt instruments.  It is for this reason that, seeking relief under 11 U.S.C. § 542 of the Bankruptcy Code and other equitable relief, the Debtor filed the Complaint to initiate the Adversary Proceeding.  The Court issued its Summons on May 29, 2025, and the Summons and Complaint were duly served.  With the deadline for filing an Answer coming due, DRL and 423 Kennedy filed a Motion to stay the Adversary Proceeding.  That motion remains pending before the Court.

D.      The Debtor's Prospects for Reorganization

The Debtor has no tax obligations, no priority debt, and no secured debt.  Pre-Petition, the Debtor's only liabilities were the liability to Mr. Sariri, and unliquidated in rem claims asserted by the plaintiffs in the Note Litigation.  The loan the Debtor made to EM has come due but has not yet been paid.  The Debtor has made demand for payment and anticipates being able to collect those amounts from EM.  The Debtor will be able to use the funds received from EM to satisfy, in whole or in part, the administrative claims in this bankruptcy case and to use any balance to fund its payment to unsecured creditors.  The Debtor's ability to repay the balance of the amounts due to creditors is a factor of its ability to collect the amounts due on the Notes and, for that reason, is wholly dependent on the results of the Note Litigation.  The degree of success in the Note Litigation will determine what portion, up to 100%, the Debtor will be able to pay to its unsecured creditors.  The Debtor is confident that it will be able to maintain operations during the course of the Note Litigation and that it will complete its reorganization as proposed in this Plan.

APPENDIX B
(Classification and Treatment of Claims)

| Class No. | Description of Claims In Class | Total Amount of Claims In Class | Proposed Treatment Under Plan (Including Whether Impaired | Estimated Percentage Recovery |
|---|---|---|---|---|
| 1 | Allowed General Unsecured Claims | $55,172.43 | Paid from disposable income - semi-annual distributions commencing 60 days after the Effective Date - Impaired | 100% |
| 2 | Equity Interests | $0 | Retained - Unimpaired | n/a |
| - | Post-Confirmation Administrative Claims | undetermined | Paid pursuant to 30-Day notice provision Set forth in Plan | 100% |

**KUTAK ROCK LLP**
Jeremy S. Williams (DC 994825)
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Co-Counsel for Developer RE1, LLC and*
*423 Kennedy St Holdings, LLC*

**GREENSTEIN DELORME & LUCHS, P.C.**
James D. Sadowski (VSB No. 38326)
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| JPK NEWCO, LLC, | ) | Case No. 25-00200 (ELG) |
|  | ) |  |
| Debtor. | ) | Subchapter V |
|  | ) |  |

## OBJECTION TO PLAN OF REORGANIZATION

Developer RE1, LLC and 423 Kennedy St Holdings, LLC (collectively, the "Claimants"), by counsel, object to the confirmation of the *Debtor's Chapter 11, Subchapter V Plan of Reorganization* dated July 28, 2025 [Dkt No. 31] (the "Plan") filed by JPK NewCo, LLC ("JPK") pursuant to 11 U.S.C § 1129 and Rule 3020(b)(1) and Rule 9014 of the Federal Rules of Bankruptcy Procedure, as more fully set forth below (the "Objection"), and in support thereof states as follows:

### Background

1. The factual and procedural background is well known to this Court from certain prior cases and is hereby incorporated by reference.[1] Additional background is available in the *Motion to Dismiss Chapter 11 Petition Filed In Bad Faith* [Dkt. No. 19] and the *Motion of Developer RE1, LLC's and 423 Kennedy St Holdings, LLC for Abstention and to Dismiss or Stay Proceedings* [Dkt. No. 48].

---

[1] *See* Case No. 24-00262-ELG and Adv. Proc. No. 24-10023-ELG.

2.     On May 27, 2025, JPK initiated the above-captioned proceeding under Subchapter V, of Chapter 11 of the Bankruptcy Code (the "Bankruptcy") after its prior bankruptcy case was dismissed.  [Case No. 24-00262; Dkt. No. 85].  Almost immediately, thereafter, JPK, among others, initiated an adversary proceeding against the Claimants [Adv. Proc. No. 25-10015] (the "Adversary") which Adversary is premised on the exact same issues which are currently before the D.C. Superior Court in two-related actions (the "Consolidated Superior Court Cases" or the "Notes Litigation").

3.     On July 28, 2025, JPK filed its Plan which, in pertinent part, provides in Article IV that the Plan will be funded by (a) the collection of the amounts due under the Commercial Promissory Note in the original principal amount of $26,000 executed by Energy Morocco LLC ("Energy Morocco") on or about June 24, 2024 (the "Energy Morocco Note"), (b) the collection of the amounts due under the Commercial Deed of Trust Note in the original principal amount of $1,256,000 executed by 423 Kennedy St Holdings LLC on or about March 31, 2022 and the Commercial Deed of Trust Note in the original principal amount of $524,000 executed by Developer RE1 LLC on or about December 24, 2021 (collectively, the "Notes") which shall be pursued through the Note Litigation and/or the Adversary; and (c) the advance of funds that the Debtor may receive from WCP Fund I LLC ("WCP") as a revolving line of credit in the maximum amount of $100,000 (the "DIP Financing").

4.     At this point, the Notes Litigation remains pending and it is unclear if the Debtor will recover any funds in connection therewith.  In fact, the Claimants may very well be creditors of the Debtor.  Absent clarity on the outcome of the Notes Litigation which will swing the terms and appropriateness of the Plan wildly, confirmation is not only premature, but simply unfeasible at this time.

2

**Objection to the Plan**

5.        "The burden of demonstrating feasibility under § 1129(a)(11) rests with the

debtor, who must show that is it more likely than not that the debtor's plan will not be followed

by the 'the liquidation, or the need for further financial reorganization, of the debtor or any

successor to the debtor under the plan. . . .'"  *In re Walkabout Creek Ltd. Dividend Hous. Ass'n*

*Ltd. P'ship*, 460 B.R. 567, 581 (Bankr. D.D.C. 2011). "To establish feasibility, the debtor must

present proof through reasonable projections, which are not speculative, conjectural or

unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *In*

*re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (citing *Pan Am. Corp.*

*v. Delta Air Lines, Inc.*, 175 B.R. 438, 508 (S.D.N.Y.1994)); *see also In re Multiut Corp.*, 449

B.R. 323, 347 (Bankr. N.D. Ill. 2011) (citing *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247,

255 (D. Wyo. 1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995)) ("The feasibility requirement mandates

that the plan proponent offers concrete evidence of sufficient cash flow to fund and maintain

both its operations and its obligations under the plan.")

6.        Put differently, the feasibility standard is whether the plan offers a reasonable

assurance of success.  *In re Lupton Consulting LLC*, 633 B.R. 844, 866 (Bankr. E.D. Wis. 2021);

*see In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012) (quoting *In*

*re G–I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J. 2009)) ("The central inquiry is 'whether there is

a reasonable probability the provisions of the plan can be performed.'").  Sheer optimism or

hopefulness regarding the outcome of litigation is not sufficient to establish feasibility.  *See In re*

*Curiel*, 651 B.R. 548, 565 (2023); *see also In re Biz as Usual, LLC*, 627 B.R. 122, 130-31

(Bankr. E.D. Pa. 2021) (citing *In re W.R. Grace & Co.*, 729 F.3d 332, 348-49 (3d Cir. 2013) (a

3

plan is not feasible if it "hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.")

7.    With respect to the Debtor's Plan in the present case, the Plan should not be confirmed because it is not feasible, it is merely speculative in its projections for funding the Plan, and there is not even a slight assurance of success under the Plan let alone a reasonable assurance of success.   Pursuant to Article IV of the Plan, the Plan will be funded by (1) the collection of the amounts due under the Energy Morocco Note, (2) collection of the amounts due under the Notes which will be pursued through the Note Litigation, and (3) DIP Financing from WCP with existing balances not to exceed $100,000.  The Liquidation Analysis in Article IX of the Plan states that the amounts due under the Energy Morocco Note and the Notes that are the subject of the Note Litigation exceed $2,400,000.  The Energy Morocco Note has a principal amount of $26,000.   Therefore, the overwhelming majority of the $2,400,00 amount is attributable to the Notes Litigation.

8.    Accordingly, the funding of the Plan is almost entirely contingent on the outcome of the Notes Litigation, for which the Debtor is but one party.  In fact, the D.C. Superior Court could determine that the assignor of the Notes breached the loan documents and that the Claimants have no liability or reduced liability to the Debtor.   If that is the ruling in the Consolidated Superior Court Cases, such ruling would likely supersede any ruling in connection with pending adversary proceeding filed by the Debtor because the Debtor took those Notes subject to any defenses.   In such outcome, there is not only no recovery for the Debtor, but the Claimants could become the largest creditor in these proceedings.

9.    Aside from the impracticability of the Debtor's push to confirm a plan, from a legal perspective, the Debtor's intention to use the uncertain outcome of the Notes Litigation to

4

almost completely fund their Plan is much too attenuated to meet the feasibility standard of §
1129(a)(11). The outcome of the Notes Litigation and the reliance on the possible proceeds
pursuant to that litigation is certainly not concrete evidence of sufficient cash flow nor is it
anything beyond mere speculation. The Debtor is placing the entire probability of its success
under the Plan on the outcome of the Notes Litigation.

10.     While it is true that for the Plan to be feasible, success need not be guaranteed,
there is still the requirement that the Plan must offer a reasonable assurance of success. The
Debtor cannot possibly state in good faith that there is a reasonable assurance of success with
respect to the Notes Litigation at this stage. Litigation is unpredictable and the outcome of
success can change during the course of the litigation as new facts come to light and
intermediary issues are determined by the judge. Therefore, the basis of funding for the Debtor's
Plan is nothing more than a speculative hope that the Notes Litigation will be resolved in its
favor.

11.     What is even more interesting, however, is that absent whatever debt may be
deemed due and owing to the Claimants, the DIP Financing and the funds from the Energy
Morocco Note would seemingly satisfy the Debtor's sole remaining creditor – Mr. Sariri – in
full. Of course, such claims are exclusive of the ongoing administrative expenses incurred by the
Debtor in these proceedings.

12.     The simple fact is - the failure of the Debtor to show that there will be sufficient
cash flow to fund the Plan and the failure to propose a Plan that offers a reasonable assurance of
success, warrants the conclusion that the Debtor's Plan is not feasible absent resolution of the
Notes Litigation and the Plan therefore fails to meet the requirements under § 1129(a)(11).

5

**WHEREFORE,** the Claimants request the Court deny the confirmation of the Plan and

award any further relief the Court deems proper.

Dated: September 2, 2025

**DEVELOPER RE1, LLC AND
423 KENNEDY ST HOLDINGS, LLC,**

*/s/ Jeremy S. Williams*
Jeremy S. Williams (DC 994825)
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: jeremy.williams@kutakrock.com

and

James D. Sadowski (VSB No. 38326)
GREENSTEIN DELORME & LUCHS, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: (202) 452-1400
Fax: (202) 452-1410
Email: jds@gdllaw.com

*Co-Counsel for Developer RE1, LLC and
423 Kennedy St Holdings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Local Rules of this Court, I hereby certify under penalty of perjury that on
September 2, 2025, a true and correct copy of the foregoing was served via the Court's
CM/ECF system to all necessary parties.

*/s/ Jeremy S. Williams*
Counsel

4898-2545-9811.3