# PLAINTIFFS' EXHIBIT 1

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $3,579,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of December 23, 2021, by and between **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street NW Suite 300, Washington, DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$3,579,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street NW Suite 300, Washington, DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees

that any such assignment will give rise to a direct obligation of Grantor to the Transferee and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and

remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any

collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

**GRANTOR:**

**DEVELOPER RE1 LLC,**
a District of Columbia Limited Liability Company

______________________(SEAL)
By: Mel Melaku Negussie
Its: Managing Member

COUNTY OF District of Columbia ) SS:
STATE OF City of Washington

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

______________________
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: ______________________

**EXHIBIT A**

**LEGAL DESCRIPTION**

# PLAINTIFFS' EXHIBIT 2

Doc #: 2022000482
01/03/2022 12:42 PM

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $524,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of December 23, 2021, by and between **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street NW Suite 300, Washington, DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$524,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness

or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise agreements, licenses, permits and certificates; (ix) tenements, hereditaments and

appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively, "Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or

additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated herein; and (b) the Note does,

and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall,

at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or which the Beneficiary or the Trustee may be or become a party by reason of this Deed of

Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge or security interest, or conditional sale or other title retention agreement, with respect to

the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs and expenses actually and reasonably incurred by the Beneficiary in connection with the

collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street NW Suite 300, Washington, DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees

that any such assignment will give rise to a direct obligation of Grantor to the Transferee and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and

remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any

collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

**GRANTOR:**

**DEVELOPER RE1 LLC,**
a District of Columbia Limited Liability Company

[signature] (SEAL)
By: Mel Melaku Negussie
Its: Managing Member

COUNTY OF District of Columbia ) SS:
STATE OF City of Washington )

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

[signature]
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: ____________

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

ROSA M. GREEN
NOTARY PUBLIC
DISTRICT OF COLUMBIA
EXP. 9-30-24

**EXHIBIT A**

**LEGAL DESCRIPTION**

# EXHIBIT "A"
## Property Description

**Closing Date:** **December 23, 2021**

**Borrower(s):** **Developer RE1 LLC**

**Property Address:** **5501 1st Street Northwest, Washington, DC 20011**

PROPERTY DESCRIPTION:

Property 1:
Lot 137 in Square 3389, in a subdivision made by 71 Kennedy ST Holdings LLC and 5505 1st ST Holdings LLC, as per plat recorded in Liber 215 at folio 65 among the Land Records of the Office of the Surveyor of the District of Columbia

Property 2:
Lots 71 and 72 in square numbered 3389, in the subdivision made by The Washington Land and Mortgage Company of part of a tract of land called 'CHILLUM CASTLE MANOR", now known as "CHILLUM CASTLE HEIGHTS", as per plat recorded in Liber 42 at folio 14 of the Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as part of Lot numbered 817 in Square numbered 3389.

Doc #: 2022000482
Filed & Recorded
01/03/2022 12:42 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $150.00 |
| SURCHARGE | $6.50 |
| RECORDATION TAX FEES | $13,100.00 |
| TOTAL: | $13,256.50 |

# PLAINTIFFS' EXHIBIT 3

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# COMMERCIAL DEED OF TRUST NOTE

**December 23, 2021** **$3,579,000.00**

**IMPORTANT NOTICE**

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

## 1. BORROWER'S PROMISE TO PAY

FOR VALUE RECEIVED, the undersigned, **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund 1 LLC,** a Delaware limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement (together with its successors and assigns, the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$3,579,000.00** (the "Loan Amount"), together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid. All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property"). Capitalized terms used in this Commercial Deed of Trust Note (this "Note") and not otherwise defined herein shall retain the meaning ascribed to such term in the Deed of Trust.

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property. So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property. However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked. **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan Amount memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion. Borrower further expressly and specifically agrees that interest shall accrue on the entire original principal balance of this Note from the date this Note is made,

until repaid. If the loan Amount memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note. **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan Amount memorialized by this Note **$107,012.10** to Lender as a loan Amount origination fee, **$0.00** to DP Capital LLC for a broker price opinion, and **$1,000.00** to Lender as processing fees and document prep fees. **[POINTS, FEES, AND COSTS]**

The final version of the loan Amount commitment between Borrower and Lender is incorporated herein by reference. In the event of any conflict between the aforementioned loan Amount commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

## 2. INTEREST

Interest shall accrue hereunder at the rate of **7.99%** per annum on the principal.

## 3. PAYMENTS

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **December 23, 2022** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

## 4. BORROWER'S RIGHT TO PREPAY

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

## 5. BORROWER'S FAILURE TO PAY AS REQUIRED

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become due and payable at the option of the Lender without further notice, if any of the following occurs:

a. If default be made in any payment due under this Note;
b. If default be made in the performance of any other covenant contained in this Note;
c. If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;
d. If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment. In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

## 6. OBLIGATIONS OF PERSONS UNDER THIS NOTE

**BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.**

**BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.**

**BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE THE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

## 7. WAIVERS

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8. GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1629 K Street NW Suite 300, Washington, DC 20006; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

**9. <u>SUCCESSORS AND ASSIGNS</u>**

(a) Notwithstanding anything to the contrary in this Note, (i) there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer its rights and obligations under this Note, and (ii) Lender may at any time assign all or a portion of this Note to one or more Persons (each a "Transferee") without providing notice to Borrower or obtaining Borrower's consent. Following any such assignment, (1) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Lender hereunder, and (2) the assigning Lender shall have no further rights hereunder with respect to the assigned portion of this Note. Borrower hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "Lender" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, this Note, Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(b) Any assignment pursuant to Section 9(a) above may be evidenced by a replacement note at the election of Lender. Upon written notice from Lender, Borrower shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Lender may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Lender and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(c) Lender shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "**Agent**"). Borrower acknowledges that Agent shall have the sole and exclusive authority under this Note and each Loan Document on behalf of the Lender, subject to the terms of any co-lending agreement. Borrower shall rely conclusively on the actions of Agent to bind the Lender, notwithstanding that the particular action in question may, pursuant to the Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Lender may resign or be replaced as Agent in accordance with the terms of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

**10. SEVERABILITY; RULES OF CONSTRUCTION**

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

Time is of the essence as to all provisions of this Note.

**CONFESSION OF JUDGMENT**

**IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION,FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN. WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS. THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS**

**LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

**BORROWER:**

**DEVELOPER RE1 LLC**,
a District of Columbia Limited Liability Company

_______________(SEAL)
By: Mel Melaku Negussie
Its: Managing Member

_______________(SEAL)
By: Solomone Abebaw Desta
Its: Member

COUNTY OF District of Columbia ss:
STATE OF City of Washington

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_______________
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: _______________

ROSA M. GREEN NOTARY PUBLIC DISTRICT OF COLUMBIA EXP. 9-30-24

# PLAINTIFFS' EXHIBIT 4

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# COMMERCIAL DEED OF TRUST NOTE

**December 23, 2021** **$524,000.00**

## IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

## 1. BORROWER'S PROMISE TO PAY

FOR VALUE RECEIVED, the undersigned, **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund 1 LLC,** a Delaware limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement (together with its successors and assigns, the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$524,000.00** (the "Loan Amount"), together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid. All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property"). Capitalized terms used in this Commercial Deed of Trust Note (this "Note") and not otherwise defined herein shall retain the meaning ascribed to such term in the Deed of Trust.

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property. So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property. However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked. **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan Amount memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion. Borrower further expressly and specifically agrees that interest shall accrue on the entire original principal balance of this Note from the date this Note is made,

until repaid. If the loan Amount memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note. **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan Amount memorialized by this Note **$15,667.60** to Lender as a loan Amount origination fee, **$0.00** to DP Capital LLC for a broker price opinion, and **$0.00** to Lender as processing fees and document prep fees. **[POINTS, FEES, AND COSTS]**

The final version of the loan Amount commitment between Borrower and Lender is incorporated herein by reference. In the event of any conflict between the aforementioned loan Amount commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

## 2. INTEREST

Interest shall accrue hereunder at the rate of **11.99%** per annum on the principal.

## 3. PAYMENTS

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **December 23, 2022** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

## 4. BORROWER'S RIGHT TO PREPAY

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

## 5. BORROWER'S FAILURE TO PAY AS REQUIRED

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become due and payable at the option of the Lender without further notice, if any of the following occurs:

a. If default be made in any payment due under this Note;
b. If default be made in the performance of any other covenant contained in this Note;
c. If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;
d. If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment. In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

## 6. OBLIGATIONS OF PERSONS UNDER THIS NOTE

**BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.**

**BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.**

**BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE THE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

## 7. WAIVERS

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8. GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1629 K Street NW Suite 300, Washington, DC 20006; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

## 9. SUCCESSORS AND ASSIGNS

(a) Notwithstanding anything to the contrary in this Note, (i) there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer its rights and obligations under this Note, and (ii) Lender may at any time assign all or a portion of this Note to one or more Persons (each a "Transferee") without providing notice to Borrower or obtaining Borrower's consent. Following any such assignment, (1) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Lender hereunder, and (2) the assigning Lender shall have no further rights hereunder with respect to the assigned portion of this Note. Borrower hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "Lender" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, this Note, Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(b) Any assignment pursuant to Section 9(a) above may be evidenced by a replacement note at the election of Lender. Upon written notice from Lender, Borrower shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Lender may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Lender and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(c) Lender shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "**Agent**"). Borrower acknowledges that Agent shall have the sole and exclusive authority under this Note and each Loan Document on behalf of the Lender, subject to the terms of any co-lending agreement. Borrower shall rely conclusively on the actions of Agent to bind the Lender, notwithstanding that the particular action in question may, pursuant to the Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Lender may resign or be replaced as Agent in accordance with the terms of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

**10. SEVERABILITY; RULES OF CONSTRUCTION**

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

Time is of the essence as to all provisions of this Note.

**CONFESSION OF JUDGMENT**

**IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION,FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN. WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS. THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS**

**LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

**BORROWER:**

**DEVELOPER RE1 LLC,**
a District of Columbia Limited Liability Company

_______________ (SEAL)
By: Mel Melaku Negussie
Its: Managing Member

COUNTY OF City of Washington) SS:
STATE OF District of Columbia)

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_______________
NOTARY PUBLIC

My commission expires: ROSA M. GREEN NOTARY PUBLIC DISTRICT OF COLUMBIA My Commission Expires September 30, 2024

DISTRICT OF COLUMBIA ROSA M. GREEN NOTARY PUBLIC EXP. 9-30-24

# PLAINTIFFS' EXHIBIT 5

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $8,689,693.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of March 31, 2022, by and between **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street, Suite 300, Washington DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$8,689,693.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street, Suite 300, Washington DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Grantor to the Transferee

and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

ARTICLE XII

STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

419-423 Kennedy St NW Washington DC
LOAN-006491
1st Trust

**GRANTOR:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

Mel Negussie (SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

for Mel Negussie (SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY~~ OF District of Columbia ) SS:
~~STATE~~ OF ______________________)

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

NOTARY PUBLIC

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

**EXHIBIT A**

**LEGAL DESCRIPTION**

# PLAINTIFFS' EXHIBIT 6

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $1,256,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of March 31, 2022, by and between **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street, Suite 300, Washington DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$1,256,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street, Suite 300, Washington DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Grantor to the Transferee

and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

419-423 Kennedy St NW Washington DC 20011
LOAN-006652
2nd Trust

**GRANTOR:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

________________________(SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

________________________(SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY OF~~ District of Columbia ) SS:
~~STATE OF~~ ____________________ )

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

________________________
NOTARY PUBLIC

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

# EXHIBIT A

## LEGAL DESCRIPTION

# EXHIBIT " A"
## Property Description

**Closing Date:** **March 31, 2022**

**Borrower(s):** **423 Kennedy St Holdings LLC**

**Property Address:** **419-423 Kennedy Street, NW, Washington, DC 20011**

PROPERTY DESCRIPTION:

Lots Fifty-Six (56) in Square numbered Thirty-Two Hundred Sixty (3260) in the subdivision made by Ashley Brown, as per plat thereof recorded in the Office of the Surveyor for the District of Columbia in Plat Book 214 at Page 78.

# PLAINTIFFS' EXHIBIT 7

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# COMMERCIAL DEED OF TRUST NOTE

**March 31, 2022** **$8,689,693.00**

## IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

## 1. BORROWER'S PROMISE TO PAY

FOR VALUE RECEIVED, the undersigned, **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund 1 LLC,** a Delaware limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement (together with its successors and assigns, the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$8,689,693.00** (the "Loan Amount"), together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid. All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property"). Capitalized terms used in this Commercial Deed of Trust Note (this "Note") and not otherwise defined herein shall retain the meaning ascribed to such term in the Deed of Trust.

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property. So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property. However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked. **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan Amount memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion. Borrower further expressly and specifically agrees that interest shall accrue on only the total amount of the original principal balance that is disbursed and

released from Lender to Borrower, until repaid. If the loan Amount memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note. **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan Amount memorialized by this Note **$217,242.33** to Lender as a loan Amount origination fee, **$0.00** to DP Capital LLC for a broker price opinion, and **$3,000.00** to Lender as processing fees and document prep fees. **[POINTS, FEES, AND COSTS]**

The final version of the loan Amount commitment between Borrower and Lender is incorporated herein by reference. In the event of any conflict between the aforementioned loan Amount commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

## 2. INTEREST

Interest shall accrue hereunder at the rate of **8.99%** per annum on the principal.

## 3. PAYMENTS

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **March 31, 2023** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

## 4. BORROWER'S RIGHT TO PREPAY

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

## 5. BORROWER'S FAILURE TO PAY AS REQUIRED

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become due and payable at the option of the Lender without further notice, if any of the following occurs:

a. If default be made in any payment due under this Note;
b. If default be made in the performance of any other covenant contained in this Note;
c. If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;
d. If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment. In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

**6. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

**BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.**

**BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.**

**BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE THE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

## 7. WAIVERS

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8. GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1140 3rd St NE 2nd Floor, Washington, DC 20002; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

## 9. SUCCESSORS AND ASSIGNS

(a) Notwithstanding anything to the contrary in this Note, (i) there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer its rights and obligations under this Note, and (ii) Lender may at any time assign all or a portion of this Note to one or more Persons (each a "Transferee") without providing notice to Borrower or obtaining Borrower's consent. Following any such assignment, (1) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Lender hereunder, and (2) the assigning Lender shall have no further rights hereunder with respect to the assigned portion of this Note. Borrower hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "Lender" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, this Note, Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(b) Any assignment pursuant to Section 9(a) above may be evidenced by a replacement note at the election of Lender. Upon written notice from Lender, Borrower shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Lender may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Lender and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(c) Lender shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "**Agent**"). Borrower acknowledges that Agent shall have the sole and exclusive authority under this Note and each Loan Document on behalf of the Lender, subject to the terms of any co-lending agreement. Borrower shall rely conclusively on the actions of Agent to bind the Lender, notwithstanding that the particular action in question may, pursuant to the Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Lender may resign or be replaced as Agent in accordance with the terms of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

## 10. SEVERABILITY; RULES OF CONSTRUCTION

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

Time is of the essence as to all provisions of this Note.

## CONFESSION OF JUDGMENT

**IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION,FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN. WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS. THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS**

**LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

**BORROWER:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

_______________(SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

_______________(SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY~~ OF District of Columbia ) SS:
~~STATE~~ OF ____________________)

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

_______________
NOTARY PUBLIC

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

# PLAINTIFFS' EXHIBIT 8

419-423 Kennedy St NW Washington DC 20011
LOAN-006652
2nd Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# COMMERCIAL DEED OF TRUST NOTE

**March 31, 2022** **$1,256,000.00**

## IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

## 1. BORROWER'S PROMISE TO PAY

FOR VALUE RECEIVED, the undersigned, **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund 1 LLC,** a Delaware limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement (together with its successors and assigns, the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$1,256,000.00** (the "Loan Amount"), together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid. All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property"). Capitalized terms used in this Commercial Deed of Trust Note (this "Note") and not otherwise defined herein shall retain the meaning ascribed to such term in the Deed of Trust.

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property. So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property. However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked. **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan Amount memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion. Borrower further expressly and specifically agrees that interest shall accrue on only the total amount of the original principal balance that is disbursed and

released from Lender to Borrower, until repaid. If the loan Amount memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note. **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan Amount memorialized by this Note **$43,960.00** to Lender as a loan Amount origination fee, **$0.00** to DP Capital LLC for a broker price opinion, and **$1,250.00** to Lender as processing fees and document prep fees. **[POINTS, FEES, AND COSTS]**

The final version of the loan Amount commitment between Borrower and Lender is incorporated herein by reference. In the event of any conflict between the aforementioned loan Amount commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

## 2. INTEREST

Interest shall accrue hereunder at the rate of **12%** per annum on the principal.

## 3. PAYMENTS

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **March 31, 2023** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

**4. <u>BORROWER'S RIGHT TO PREPAY</u>**

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

**5. <u>BORROWER'S FAILURE TO PAY AS REQUIRED</u>**

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become due and payable at the option of the Lender without further notice, if any of the following occurs:

a. If default be made in any payment due under this Note;
b. If default be made in the performance of any other covenant contained in this Note;
c. If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;
d. If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment. In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

**6. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

**BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.**

**BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.**

**BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE THE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

## 7. WAIVERS

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8. GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1140 3rd St NE 2nd Floor, Washington, DC 20002; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

## 9. SUCCESSORS AND ASSIGNS

(a) Notwithstanding anything to the contrary in this Note, (i) there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer its rights and obligations under this Note, and (ii) Lender may at any time assign all or a portion of this Note to one or more Persons (each a "Transferee") without providing notice to Borrower or obtaining Borrower's consent. Following any such assignment, (1) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Lender hereunder, and (2) the assigning Lender shall have no further rights hereunder with respect to the assigned portion of this Note. Borrower hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "Lender" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, this Note, Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(b) Any assignment pursuant to Section 9(a) above may be evidenced by a replacement note at the election of Lender. Upon written notice from Lender, Borrower shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Lender may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Lender and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(c) Lender shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "**Agent**"). Borrower acknowledges that Agent shall have the sole and exclusive authority under this Note and each Loan Document on behalf of the Lender, subject to the terms of any co-lending agreement. Borrower shall rely conclusively on the actions of Agent to bind the Lender, notwithstanding that the particular action in question may, pursuant to the Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Lender may resign or be replaced as Agent in accordance with the terms of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

**10. SEVERABILITY; RULES OF CONSTRUCTION**

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

Time is of the essence as to all provisions of this Note.

**CONFESSION OF JUDGMENT**

**IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION,FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN. WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS. THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS**

**LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

419-423 Kennedy St NW Washington DC 20011
LOAN-006652
2nd Trust

**BORROWER:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

_____________________(SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

_____________________(SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY~~ OF District of Columbia ) SS:
~~STATE~~ OF ____________________)

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

_____________________
NOTARY PUBLIC

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

# PLAINTIFFS' EXHIBIT 9

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

10/24/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC**

Amount Due: $6,015,335.18 as of 10/30/2022.

| | |
|---|---|
| Loan Principal: | $8,689,693.00 |
| Interest Owed (as of payoff date): | $276,849.94 |
| Interest Paid: | ($247,771.80) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($2,703,485.96) |
| Payoff Fee: | $50.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$6,015,335.18** |

**Payoff good through 10/30/2022. Per diem $1,494.89.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**2815 Hartland Road Suite 200**
**Falls Church, VA 22043**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006491 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

# PLAINTIFFS' EXHIBIT 10

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

10/24/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC 20011**

Amount Due: $1,268,610.00 as of 10/30/2022.

| | |
|---|---|
| Loan Principal: | $1,256,000.00 |
| Interest Owed (as of payoff date): | $89,594.68 |
| Interest Paid: | ($77,034.68) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$1,268,610.00** |

**Payoff good through 10/30/2022. Per diem $418.67.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**2815 Hartland Road Suite 200**
**Falls Church, VA 22043**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006652 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

# PLAINTIFFS' EXHIBIT 11

**Subject:** Payoff status of 5505 1st and Kennedy project
**Date:** Thursday, November 3, 2022 at 2:53:28 PM Eastern Daylight Time
**From:** Daniel Huertas
**To:** mel negussie
**CC:** Christina Araujo

Mel –

I hope all is well. I just tried calling you regarding the status of the payoffs of both loans. As you understand, we will not be working with you after the maturity of 5505 and also any draws regarding Kennedy.

5505 1st matures late December and it is only fair to ask the current status of your process.

Looking forward to your response.

Regards,

Daniel

# PLAINTIFFS' EXHIBIT 12

**Subject:** RE: Payoff status of 5505 1st and Kennedy project
**Date:** Tuesday, November 15, 2022 at 2:32:40 PM Eastern Standard Time
**From:** Daniel Huertas
**To:** mel negussie
**CC:** Christina Araujo

Hi Mel,

I hope all is well. Just following up on the refinance progress on both projects.

As you know we are unable to release any more draws.

Looking forward to your response.

Regards,

Daniel

---

**From:** mel negussie <mel@ntconstruction.net>
**Sent:** Thursday, November 3, 2022 3:04 PM
**To:** Daniel Huertas <daniel@wcp.team>
**Cc:** Christina Araujo <christina@wcp.team>
**Subject:** Re: Payoff status of 5505 1st and Kennedy project

Hi Daniel,

I am sorry I missed your call.

We are working to refinance out 5505 1st street and 423 Kennedy.

I will keep you posted as we make progress.

Thanks,
Mel

---

**From:** Daniel Huertas <daniel@wcp.team>
**Date:** Thursday, November 3, 2022 at 2:53 PM
**To:** mel negussie <mel@ntconstruction.net>
**Cc:** Christina Araujo <christina@wcp.team>
**Subject:** Payoff status of 5505 1st and Kennedy project

Mel –

I hope all is well. I just tried calling you regarding the status of the payoffs of both loans. As you understand, we will not be working with you after the maturity of 5505 and also any draws regarding Kennedy.

# PLAINTIFFS' EXHIBIT 13

**Subject:** Re: Payoff status of 5505 1st and Kennedy project
**Date:** Thursday, November 17, 2022 at 10:36:32 AM Eastern Standard Time
**From:** mel negussie
**To:** Daniel Huertas
**CC:** Christina Araujo

We are planning to refinance both with MainStreet Bank.

I will be asking for updated payoffs for 423 Kennedy shortly.

---

**From:** Daniel Huertas <daniel@wcp.team>
**Date:** Thursday, November 17, 2022 at 10:35 AM
**To:** mel negussie <mel@ntconstruction.net>
**Cc:** Christina Araujo <christina@wcp.team>
**Subject:** Re: Payoff status of 5505 1st and Kennedy project

Mel -

Can you please provide detail information including lender information please ?

What you just sent does not help us.
Thanks

Sent from my iPhone

> On Nov 17, 2022, at 10:33 AM, mel negussie <mel@ntconstruction.net> wrote:
>
> HI Daniel,
>
> My apologies for the delayed response.
>
> Yes, we are working and making progress to refinance both projects out of WCP.
>
> Regards,
> Mel

---

# PLAINTIFFS' EXHIBIT 14

WASHINGTON
CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

11/21/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC**

Amount Due: $6,031,153.71 as of 11/30/2022.

| | |
|---|---|
| Loan Principal: | $8,689,693.00 |
| Interest Owed (as of payoff date): | $323,191.50 |
| Interest Paid: | ($278,344.83) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($2,703,485.96) |
| Payoff Fee: | $100.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$6,031,153.71** |

**Payoff good through 11/30/2022. Per diem $1,494.89.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to: WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006491 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas
Leslie Calderas

# PLAINTIFFS' EXHIBIT 15

WASHINGTON
CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

10/24/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC 20011**

Amount Due: $1,268,610.00 as of 10/30/2022.

| | |
|---|---|
| Loan Principal: | $1,256,000.00 |
| Interest Owed (as of payoff date): | $89,594.68 |
| Interest Paid: | ($77,034.68) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$1,268,610.00** |

**Payoff good through 10/30/2022. Per diem $418.67.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**2815 Hartland Road Suite 200**
**Falls Church, VA 22043**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006652 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

# PLAINTIFFS' EXHIBIT 16

**Subject:** 71 Kennedy (5505 1st Street)
**Date:** Wednesday, November 30, 2022 at 11:58:47 AM Eastern Standard Time
**From:** mel negussie
**To:** Cara Farley, Leslie Calderas
**CC:** Darralyn Brown
**Priority:** High

HI Leslie/Cara,

Can you please send the payoffs for 5505 1st Street as soon as you are able?

Thanks,
Mel

# PLAINTIFFS' EXHIBIT 17

**Subject:** Re: 71 Kennedy (5505 1st Street)
**Date:** Wednesday, November 30, 2022 at 2:05:19 PM Eastern Standard Time
**From:** Cara Farley
**To:** mel negussie
**CC:** Leslie Calderas, Hailey Thomas, Darralyn Brown

Requests received. We will send it once approved.

Thanks!

---

**From:** mel negussie <mel@ntconstruction.net>
**Sent:** Wednesday, November 30, 2022 1:45 PM
**To:** Cara Farley <cfarley@wcp.team>
**Cc:** Leslie Calderas <lcalderas@wcp.team>; Hailey Thomas <hailey@wcp.team>; Darralyn Brown <darralyn@districttitle.com>
**Subject:** Re: 71 Kennedy (5505 1st Street)

December 23. Thanks

Mel Negussie
(202) 775-0457 w
(202) 271-5046 c

On Nov 30, 2022, at 1:38 PM, Cara Farley <cfarley@wcp.team> wrote:

Hi Mel,

Payoff requests received. What good through date would you like?

Thanks!

---

**From:** mel negussie <mel@ntconstruction.net>
**Sent:** Wednesday, November 30, 2022 11:58 AM
**To:** Cara Farley <cfarley@wcp.team>; Leslie Calderas <lcalderas@wcp.team>
**Cc:** Darralyn Brown <darralyn@districttitle.com>
**Subject:** 71 Kennedy (5505 1st Street)

HI Leslie/Cara,

Can you please send the payoffs for 5505 1st Street as soon as you are able?

Thanks,
Mel

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# PLAINTIFFS' EXHIBIT 18

**Subject:** Demand for Payoffs: 419-423 Kennedy St & 5505 1st St
**Date:** Thursday, December 8, 2022 at 6:56:23 PM Eastern Standard Time
**From:** Leslie Calderas
**To:** mel negussie
**CC:** Christina Araujo, Daniel Huertas, Cara Farley, Hailey Thomas
**Attachments:** image001.png, Notice of Default 5505 1st St NW.pdf, Payoff Statement -- 5505 1st St NW Washington DC 20011 2nd.pdf, Payoff Statement -- 5505 1st St NW Washington DC 20011 (1st).pdf, Payoff Statement -- 419-423 Kennedy St NW Washington DC 20011 2nd.pdf, Payoff Statement -- 419-423 Kennedy St NW Washington DC 1st (3).pdf, Notice of Default 419 Kennedy St NW # 423.pdf

Hello Mel,

Attached please find payoff statements and notice of default letters for both properties in reference. Let us know if you have any questions.

Best,

**Wire fraud is on the rise, so always call to confirm wiring instructions before sending.

**Please allow at least 5 business days for payoffs to be processed. There is a $50 fee for every payoff request. If you need a payoff within 5 business days, you can request expedited processing which is an additional $200 fee.

Leslie Calderas I Servicing Manager
Washington Capital Partners
www.washingtoncapitalpartners.com
8401 Greensboro Dr Suite 960
McLean, VA 22102
(703) 940-5190

WASHINGTON
CAPITAL PARTNERS

*This message, including any attachments, may contain confidential, proprietary, privileged, and/or private information from Washington Capital Partners. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

# PLAINTIFFS' EXHIBIT 19

WASHINGTON
CAPITAL PARTNERS

8401 Greensboro Dr, Suite 960
McLean, Virginia 22102
www.wcp.team

12/08/2022

**VIA EMAIL <mel@ntconstruction.net>**

Mel Negussie
1629 K Street NW Suite 300
Washintong DC 20006

Attn: Mel Negussie

Re: **NOTICE OF DEFAULT**

5505 1st St NW Washington, DC 20011

Dear Sir or Madam:

I am the Vice President of Finance for Washington Capital Partners. I'm writing to inform you that your business entity is presently in default for the Loan regarding the above captioned property, secured by that certain Deed of Trust, a copy of the first page of which is enclosed hereto as **Exhibit A.** Additionally, you signed a Guaranty for the Loan.

This is your last notice before our legal counsel commences foreclosure proceedings. Immediate payment is required to avoid foreclosure. Please contact me within 48 hours to obtain either a Payoff Statement or an amount to bring the loan current. Late fees at 10.00% have been assessed and the default interest at 24.00% per annum is accruing.

Furthermore, if you do not cure the a default or pay the Loan off immediately we will commence foreclosure proceedings for this Loan. All payoff requests must be made in writing.

As your lender, we will exercise all rights and remedies available at law and equity. My contact information is below, and should I not hear from you as noted above, and payment is not made immediately, then, as noted above, our legal counsel will commence foreclosure proceedings.

Best,
Washington Capital Partners

**Washington Capital Partners**
**Servicing Department**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**
**Office - (703)-348-0549 ext. 924**
**Email - servicing@wcp.team**

# PLAINTIFFS' EXHIBIT 20

WASHINGTON
CAPITAL PARTNERS

8401 Greensboro Dr, Suite 960
McLean, Virginia 22102
www.wcp.team

12/08/2022

**VIA EMAIL <mel@ntconstruction.net>**

Mel Negussie
1140 3rd St NE 2nd Floor
Washintong DC 20002

Attn: Mel Negussie

Re: **NOTICE OF DEFAULT**

419 Kennedy St NW # 423 Washington DC 20011

Dear Sir or Madam:

I am the Vice President of Finance for Washington Capital Partners. I'm writing to inform you that your business entity is presently in default for the Loan regarding the above captioned property, secured by that certain Deed of Trust, a copy of the first page of which is enclosed hereto as **Exhibit A.** Additionally, you signed a Guaranty for the Loan.

This is your last notice before our legal counsel commences foreclosure proceedings. Immediate payment is required to avoid foreclosure. Please contact me within 48 hours to obtain either a Payoff Statement or an amount to bring the loan current. Late fees at 10.00% have been assessed and the default interest at 24.00% per annum is accruing.

Furthermore, if you do not cure the a default or pay the Loan off immediately we will commence foreclosure proceedings for this Loan. All payoff requests must be made in writing.

As your lender, we will exercise all rights and remedies available at law and equity. My contact information is below, and should I not hear from you as noted above, and payment is not made immediately, then, as noted above, our legal counsel will commence foreclosure proceedings.

Best,
Washington Capital Partners

**Washington Capital Partners**
**Servicing Department**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**
**Office - (703)-348-0549 ext. 924**
**Email - servicing@wcp.team**

# PLAINTIFFS' EXHIBIT 21

WASHINGTON
CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

DEVELOPER RE1 LLC
1629 K Street NW
Washington, DC 20006

**Property Address: 5505 1st St NW Washington DC 20011**

Amount Due: $4,139,852.46 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $3,579,000.00 |
| Interest Owed (as of 8/30/22): | $198,584.79 |
| Default Interest Owed (as of payoff date): | $276,776.00 |
| Interest Paid: | ($272,458.33) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Default Penalty: | $357,900.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$4,139,852.46** |

**Payoff good through 12/23/2022. Per diem $2,386.00.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006120 and borrower DEVELOPER RE1 LLC.

Sincerely,
Leslie Calderas
Leslie Calderas

# PLAINTIFFS' EXHIBIT 22

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

DEVELOPER RE1 LLC
1629 K Street NW
Washington, DC 20006

**Property Address: 5505 1st St NW Washington DC 20011**

Amount Due: $599,947.92 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $524,000.00 |
| Interest Owed (as of 8/30/22): | $43,630.28 |
| Default Interest Owed (as of payoff date): | $40,522.67 |
| Interest Paid: | ($60,655.03) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Default Penalty: | $52,400.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$599,947.92** |

**Payoff good through 12/23/2022. Per diem $349.33.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006182 and borrower DEVELOPER RE1 LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

# PLAINTIFFS' EXHIBIT 23

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC**

Amount Due: $7,174,724.51 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $8,689,693.00 |
| Interest Owed (as of 8/30/22): | $185,661.72 |
| Default Interest Owed (as of payoff date): | $456,927.95 |
| Interest Paid: | ($323,191.50) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($2,703,485.96) |
| Payoff Fee: | $150.00 |
| Default Penalty: | $868,969.30 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$7,174,724.51** |

**Payoff good through 12/23/2022. Per diem $3,990.80.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006491 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

# PLAINTIFFS' EXHIBIT 24

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC 20011**

Amount Due: $1,439,944.65 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $1,256,000.00 |
| Interest Owed (as of 8/30/2022): | $63,637.33 |
| Default Interest Owed (as of payoff date): | $97,130.67 |
| Interest Paid: | ($102,573.35) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $150.00 |
| Default Penalty: | $125,600.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$1,439,944.65** |

**Payoff good through 12/23/2022. Per diem $837.33.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number: 056004445**
**Account Number: 81682881**

When sending the wire please reference our loan number, LOAN-006652 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas
Leslie Calderas

# PLAINTIFFS' EXHIBIT 25

**James D. Sadowski**

**From:** Russell S. Drazin <rdrazin@pardodrazin.com>
**Sent:** Friday, December 9, 2022 4:59 PM
**To:** James D. Sadowski
**Subject:** RE: Demand for Payoffs: 419-423 Kennedy St & 5505 1st St

**Importance:** High

Jim –

I represent WCP Fund I LLC, the noteholder and/or servicer in connection with the loans (collectively, the "Loans") encumbering the Properties (as defined in your below email).

This email amplifies and supersedes the Notices of Default issued yesterday (December 8, 2022).

----------------------------------------

**5501 1st Street, NW (Lot 138 in Square 3389) (formerly 67-71 Kennedy Street, NW (Lot 137 in Square 3389) and 5505 1st Street, NW (Lot 817 in Square 3389))**

There is a massive Water/Sewer balance due and owing to DC Water ($44,857.93). DC Water recorded an actual lien in the Land Records (Certificate of Delinquent Water/Sewer Charges dated August 29, 2022 and recorded on August 30, 2022 as Instrument No. 2022090397). The delinquent Water/Sewer balance is a lien superior to the liens of the Deeds of Trust encumbering 5501 1st Street, NW.

Second-Half 2022 Real Estate Taxes were due and payable no later than September 15, 2022. DEVELOPER RE1 LLC did not timely pay those Taxes. Payment was not made until October 16 and 19, 2022.

In the Notes and Deeds of Trust, DEVELOPER RE1 LLC agreed that any unpaid principal, accrued interest, and other charges would become immediately due and payable prior to the maturity date (*i.e.*, acceleration) in the event that DEVELOPER RE1 LLC defaulted under the Notes or Deeds of Trust prior to the maturity date. The Loans being commercial mortgage loans, neither District of Columbia law nor the Notes or Deeds of Trust provide DEVELOPER RE1 LLC with any right to notice of default and acceleration or any right to cure a default.

There is no right to cure. There is no right to deceleration. There is no right to reinstatement.

The Loans are in default and are accelerated.

Section 7.9 of the Deeds of Trust states that any default or breach of any other loans, obligations, etc. of Borrower *or Borrower's affiliates* is an Event of Default.

**423 Kennedy Street, NW (Lot 0056 in Square 3260)**

The District recorded a Certificate of Delinquent Fines dated November 17, 2022 and recorded on November 17, 2022 as Instrument No. 2022114185.

In the Notes and Deeds of Trust, 423 KENNEDY ST HOLDINGS LLC agreed that any unpaid principal, accrued interest, and other charges would become immediately due and payable prior to the maturity date (*i.e.*, acceleration) in the event that 423 KENNEDY ST HOLDINGS LLC defaulted under the Notes or Deeds of Trust prior to the maturity date. The Loans being commercial mortgage loans, neither District of Columbia law nor the Notes or Deeds of Trust provide 423 KENNEDY ST HOLDINGS LLC with any right to notice of default and acceleration or any right to cure a default.

There is no right to cure. There is no right to deceleration. There is no right to reinstatement.

The Loans are in default and are accelerated.

Section 7.9 of the Deeds of Trust states that any default or breach of any loans, obligations, etc. of Borrower *or Borrower's affiliates* is an Event of Default.

---------------------------------------

This is without waiver of or prejudice to any other Events of Default under the Loans.

---------------------------------------

Payment in full of the defaulted Loans (with all default interest, default penalties, etc.) is demanded.

---------------------------------------

I am adding you to my "notice list" for the notices of foreclosure sale.

---------------------------------------

Thank you.

Enjoy your weekend.

Russell

Russell S. Drazin
**pardo** I **drazin** LLC
4400 Jenifer Street, NW, Suite 2
Washington, DC 20015
(202) 223-7900 (main)
(202) 223-7901 (facsimile)
(202) 683-1562 (direct)
rdrazin@pardodrazin.com
www.pardodrazin.com

Privileged and Confidential Communication

This email may contain privileged and/or confidential information. If the reader of this email is not an intended recipient, you are

hereby notified that you have received this email in error and that any review, dissemination, or copying is strictly prohibited. If you have received this email in error, please notify me immediately and delete the email. Except in instances in which I have made direct reference above to redlining or "track changes" that are expressly conveyed for review, it is my intent to remove all metadata from the attachments to this email, and any metadata that may be found therein has been produced inadvertently and should not be reviewed.

---

**From:** James D. Sadowski [mailto:JDS@gdllaw.com]
**Sent:** Friday, December 9, 2022 1:50 PM
**To:** Russell S. Drazin <rdrazin@pardodrazin.com>
**Cc:** mel negussie <mel@ntconstruction.net>
**Subject:** RE: Demand for Payoffs: 419-423 Kennedy St & 5505 1st St

Mr. Drazin:

This law firm represents Developer RE1, LLC and 423 Kennedy St Holdings, LLC, the respective owners of 423 Kennedy Street, N,W., and 5501 1st Street, N.W., in Washington DC (the "Properties").

I have reviewed what purports to be a "Notice of Default" for each property, neither of which cites the basis for the alleged "default" under any Deed of Trust or other document. Copies of the "Notice of Default" that I have reviewed (for each property) are attached to this email.

According to our clients, there are no defaults of any kind under any of the loan documents for either of the Properties.

Please identify the factual basis for the alleged "defaults", which should include the reason that Washington Capital Partners ("WCP") has claimed that there is a "default". Your reply should include a citation to the provision(s) in the Deed of Trust (or any other loan document) that the WCP claims has been breached by our clients.

As you also know, the debt on the Properties is in the process of being refinanced, and the alleged "default" notices that were sent have already put those refinance transactions in jeopardy. As a result, our clients fully reserve any and all rights that they have to the extent that it is determined that the WCP has manufactured "defaults" under the loan documents to put either financial pressure, or any other, improper pressure, on our clients.

Please respond immediately, but not later than 4:00 pm today. I look forward to your prompt response.

Thanks.

Jim

James D. Sadowski, Esq.
Greenstein DeLorme & Luchs, P.C.
801 17th Street, N.W.
Suite 1000
Washington, D.C. 20006
Phone: 202.452.1400, x5407
Fax: 202.452.1410
E-mail: jds@gdllaw.com

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, MAY CONSTITUTE INSIDE INFORMATION, AND IS ONLY INTENDED FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE, OR COPYING IS STRICTLY PROHIBITED, AND MAY BE UNLAWFUL. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US AT THE FOLLOWING: administrator@gdllaw.com. THANK YOU. FOR MESSAGES TO CONSUMER DEBTORS: THIS MESSAGE, AND ALL OTHERS FROM THIS OFFICE, IS A COMMUNICATION FROM A DEBT COLLECTOR IN AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.

**From:** mel negussie <mel@ntconstruction.net>
**Sent:** Friday, December 9, 2022 1:08 PM
**To:** James D. Sadowski <JDS@gdllaw.com>
**Subject:** FW: Demand for Payoffs: 419-423 Kennedy St & 5505 1st St

---

**From:** Daniel Huertas <daniel@wcp.team>
**Date:** Friday, December 9, 2022 at 9:15 AM
**To:** mel negussie <mel@ntconstruction.net>
**Cc:** Christina Araujo <christina@wcp.team>, Leslie Calderas <lcalderas@wcp.team>, Russel Drazin <rdrazin@pardodrazin.com>
**Subject:** Fwd: Demand for Payoffs: 419-423 Kennedy St & 5505 1st St

Mel -

In this email I cc Russell Drazin, WCP's legal counsel. Please direct all questions related to your default to him. If you have legal representation please forward this email with his information.

Thank you

Daniel

Sent from my iPhone

Begin forwarded message:

> **From:** mel negussie <mel@ntconstruction.net>
> **Date:** December 8, 2022 at 9:11:40 PM EST
> **To:** Leslie Calderas <lcalderas@wcp.team>
> **Cc:** Christina Araujo <christina@wcp.team>, Daniel Huertas <daniel@wcp.team>, Cara Farley <cfarley@wcp.team>, Hailey Thomas <hailey@wcp.team>
> **Subject: Re: Demand for Payoffs: 419-423 Kennedy St & 5505 1st St**
>
> Dear Christina and Leslie,
>
> Can you please provide me the basis for the Notice of Default for both loans we have with WCP?
>
> Regards,
> Mel Negussie
>
> ---
>
> **From:** Leslie Calderas <lcalderas@wcp.team>
> **Date:** Thursday, December 8, 2022 at 6:57 PM
> **To:** mel negussie <mel@ntconstruction.net>
> **Cc:** Christina Araujo <christina@wcp.team>, Daniel Huertas <daniel@wcp.team>, Cara Farley <cfarley@wcp.team>, Hailey Thomas <hailey@wcp.team>
> **Subject:** Demand for Payoffs: 419-423 Kennedy St & 5505 1st St
>
> Hello Mel,

Attached please find payoff statements and notice of default letters for both properties in reference. Let us know if you have any questions.

Best,

****Wire fraud is on the rise, so always call to confirm wiring instructions before sending.**

****Please allow at least 5 business days for payoffs to be processed. There is a $50 fee for every payoff request. If you need a payoff within 5 business days, you can request expedited processing which is an additional $200 fee.**

**Leslie Calderas | Servicing Manager**

Washington Capital Partners
https://link.edgepilot.com/s/5491bd5f/BM5MUgnupE2wAw98b1FkKg?u=http://www.washingtoncapitalpartners.com/
8401 Greensboro Dr Suite 960
McLean, VA 22102
(703) 940-5190

WASHINGTON
CAPITAL PARTNERS

*This message, including any attachments, may contain confidential, proprietary, privileged, and/or private information from Washington Capital Partners. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# PLAINTIFFS' EXHIBIT 26

District of Columbia

**OFFICE OF ADMINISTRATIVE HEARINGS**
One Judiciary Square
441 Fourth Street, NW, Suite 450N
Washington, DC 20001-2714
TEL: (202) 442-9094 · FAX: (202) 442-4789 · EMAIL: oah.filing@dc.gov

**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, Petitioner,**

**v.**

**423 KENNEDY ST HOLDINGS LLC, Respondent.**

Case No.: 2021-DCRA-VR22-00182

**FINAL ORDER**

The Department of Consumer and Regulatory Affairs (the Government) mailed the attached Notice of Infraction (NOI) to Respondent on December 3, 2021. Respondent failed to answer the NOI. When a respondent fails to answer, an Administrative Law Judge may find the respondent in default and impose a fine and penalty if two conditions are met: The NOI must be valid on its face, and the Government must have submitted evidence that it properly served the NOI on Respondent.[1]

The NOI is valid on its face. The Government filed a certificate of service stating that the NOI was mailed to Respondent and filed an affidavit stating that the U.S. Postal Service has not returned the NOI undelivered. The Government also filed evidence of Respondent's last known home or business address. This administrative court concludes that Respondent had adequate notice of the charges.[2]

The deadline for Respondent's answer has expired.[3] The NOI states that a respondent who fails to answer by the deadline "**will be subject to a penalty equal to twice the amount of the fine, in**

---

[1] OAH Rule 2805.5.

[2] D.C. Official Code §§ 2-1802.01 and 2-1802.05; *see Kidd Int'l Home Care, Inc. v. Prince*, 917 A.2d 1083, 1086 (D.C. 2007) (due process requires notice "reasonably calculated to afford the party an opportunity to be heard"); *Dusenberry v. United States*, 534 U.S. 161, 170 (2002).

[3] D.C. Official Code §§ 2-1802.02(e) and 2-1802.05; OAH Rule 2812.5.

**addition to the fine itself, and the entry of a default order without additional notice**." The penalty is authorized by statute,[4] and the conditions for issuing a default order have been met.

Therefore, it is hereby:

**ORDERED**, that Respondent is in **DEFAULT** and is **LIABLE** for the violation charged in the NOI; it is further

**ORDERED**, that Respondent must pay fines and penalties in the total amount of **$1590** in accordance with the **Payment Instructions** below within 20 calendar days of the mailing date of this Order; it is further

**ORDERED**, that if Respondent fails to pay within 20 calendar days of the mailing date of this Order, interest shall accrue on the unpaid amount at the rate of 1½ % per month or portion thereof, starting 20 calendar days after the mailing date of this Order, pursuant to D.C. Official Code § 2-1802.03(i)(1); it is further

**ORDERED**, that failure to pay may result in additional sanctions, including the suspension of Respondent's licenses or permits, the placement of a lien on Respondent's real and personal property, and the sealing of Respondent's business premises or work sites, under D.C. Official Code § 2-1801.03; and it is further

**ORDERED,** that any party may ask for reconsideration or relief from this Order as stated below;[5] and it is further

**ORDERED,** that any party may appeal this Order as stated below.

---

[4] D.C. Official Code §§ 2-1801.04(a)(2) and 2-1802.02(f).

[5] Parties are encouraged to provide an email address with any filing. During the Mayor's Declaration of a Public Health Emergency, parties must file all documents by either email: oah.filing@dc.gov, fax: (202) 442-4789; or mail: OAH, 441 Fourth Street, NW, Suite 450 North, Washington, DC 20001-2714. The filing must state when and how copies were served on the other party.

**This Final Order is dated when it is served, as certified on the Certificate of Service found at the end of this decision.**

Claudia A. Crichlow
Principal Administrative Law Judge

## PAYMENT INSTRUCTIONS

**STARTING IMMEDIATELY ALL PAYMENTS MUST BE MADE DIRECTLY TO THE DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS.**

Online payment can be made with a credit or debit card only. If you wish to pay by check, please mail or bring the check with the Notice of Infraction / Special Assessment / Re-Inspection bill to DCRA Office of Civil Infractions, located at 1100 4th Street, SW, 2nd Floor, Washington DC, 20024. Make your check payable to "DC Treasurer." Please write your Notice of Infraction / Special Assessment / Re-Inspection number on the check.

**Online payment** can be made using the following link: **https://govservices.dcra.dc.gov/paymentportal**. Please enter the Notice of Infraction Number. When paying for multiple fines that have been consolidated, please enter the first number listed in the Final Order.

**Walk-In payment** is available at the **District of Columbia Office of the Chief Financial Officer's cashier's office at 1101 4th Street, S.W. STE. W1665, Washington, DC 20024 between the hours of 8:15-4:30.** The walk-in cashier's office requires payment be accompanied with a payment voucher that the respondent must secure from DCRA's Office of Civil Infractions. To request a payment voucher, please email DCRA.Civilinfractions@dc.gov with reference to the Notice of Infraction Number.

**Mail payment** to **Department of Consumer and Regulatory Affairs/Office of Civil Infractions (DCRA/OCI) 1100 4th Street, S.W. Suite E510, Washington, DC 20024.**

To ensure payments are applied accurately, record the Notice of Infraction number on the front of any check or money order and correspondence.

A $65.00 FINE WILL BE IMPOSED ON CHECKS DISHONORED BY THE BANK.

INTEREST
D.C. Official Code § 2-1802.03.(i)(1) provides that fines be paid in full with interest from the date levied. For each month or portion thereof that a fine and/or assessment remain unpaid interest is accrued at 1.5%. Interest begins 30 calendar days after the fine and/or assessment is levied.

District of Columbia
Office of Administrative Hearings
One Judiciary Square
441 Fourth Street, NW
Washington, DC 20001-2714

423 KENNEDY ST HOLDINGS LLC
1215 1ST ST NE
Washington, DC 20002-7935
cb@colomariver.com

---

**Certificate of Service:**

**By First-Class Mail (Postage Paid):**

423 KENNEDY ST HOLDINGS LLC
1215 1ST ST NE
Washington, DC 20002-7935
cb@colomariver.com

**By Email:**

Esther Yong McGraw
General Counsel
Dep't of Consumer and Regulatory Affairs
1100 4th Street, SW – 5th Floor
Washington, DC 20024
**Email:** oaheserve.dcra@dc.gov

I hereby certify that on September 7, 2022 this document was served upon the parties named on this page at the address(es) and by the means stated.

//s W. Green
___________________________________
Clerk / Deputy Clerk

## APPEAL RIGHTS

**After an administrative law judge has issued a Final Order, a party may ask the judge to change the Final Order and may ask the District of Columbia Court of Appeals to change the Final Order. There are important time limitations described below for doing so.**

**COVID-19 NOTICE:** The deadlines described below may be temporarily suspended or extended due to the COVID-19 pandemic. For up-to-date information about any changes to these deadlines, please visit the Office of Administrative Hearings website at https://oah.dc.gov and the D.C. Court of Appeals website at https://www.dccourts.gov/court-of-appeals.

### HOW TO REQUEST THE ADMINISTRATIVE LAW JUDGE TO CHANGE THE FINAL ORDER[6]

Under certain limited circumstances and within certain time limits, a party may file a written request with the Office of Administrative Hearings (OAH) asking the administrative law judge to change a final order. OAH Rule 2828 explains the circumstances under which such a request may be made. Rule 2828 and other OAH rules are available at https://oah.dc.gov and at OAH's office. Rule 2828 states that a request to change a final order "shall state whether an appeal [to the District of Columbia Court of Appeals] has been filed. If an appeal has been filed, OAH has no jurisdiction to decide" the request unless the Court of Appeals has remanded the case to OAH for that purpose.

A request to change a final order does not affect the party's obligation to comply with the final order and to pay any fine or penalty. If a request to change a final order is received at OAH **within 10 calendar days** of the date the Final Order was filed (**15 calendar days** if OAH mailed the final order to you), the period for filing an appeal with the District of Columbia Court of Appeals does not begin to run until the Administrative Law Judge rules on the request. **A request for a change in a final order will not be considered if it is received at OAH more than 120 calendar days of the date the Final Order was filed** (**125 calendar days** if OAH mailed the Final Order to you). **HOW TO APPEAL THE FINAL ORDER TO THE DISTRICT OF COLUMBIA COURT OF APPEALS**

Pursuant to D.C. Official Code § 2-1831.16(c)-(e), any party suffering a legal wrong or adversely affected or aggrieved by this Order may seek judicial review by filing a Petition for Review and six copies with the District of Columbia Court of Appeals at the following address:

Clerk
District of Columbia Court of Appeals
430 E Street, NW, Room 115
Washington, DC 20001

The Petition for Review (and required copies) may be mailed or delivered to the Court of Appeals, and must be received there within 30 calendar days of the mailing date of this Order, pursuant to D.C. App. R. 15(a)(2). There is a $100 fee for filing a Petition for Review. Persons who are unable to pay the filing fee may file a motion and affidavit to proceed without the payment of the fee when they file the Petition for Review. Information on petitions for review can be found in Title III of the Court of Appeals' Rules, which are available from the Clerk of the Court of Appeals, or at https://www.dccourts.gov/court-of-appeals.

---

[6] All parties must file all documents by either email: oah.filing@dc.gov, fax: (202) 442-4789; or mail: OAH, 441 Fourth Street, NW, Suite 450 North, Washington, DC 20001-2714. The filing must state when and how copies were served on the other party.

**IMPORTANT NOTICES:**

- **The amount of a lawfully imposed fine cannot be modified or reduced on appeal. D.C. Official Code § 2-1831.16(g).**
- **Filing an appeal does not stay (stop) the requirement to comply with a Final Order, including any requirement to pay a fine, penalty or other monetary sanction imposed by a Final Order. If you wish to request a stay, you must first file a written motion for a stay with the Office of Administrative Hearings. If the presiding Administrative Law Judge denies a stay, you then may seek a stay from the Court of Appeals or the Board as appropriate.**

dcra

Government of the District of Columbia
Department of Consumer and Regulatory Affairs
Office of Civil Infractions

**AFFIDAVIT THAT NOTICE OF INFRACTION HAS NOT BEEN RETURNED**

**Notice of Infraction Number: VR22-00182**

The Notice of Infraction referred to above was:

X Emailed to the Respondent on **December 3, 2021** using the email address(es) provided by the Respondent. The email included a delivery confirmation receipt,

and/or

☐ Mailed to the Repsondent on **N/A** First Class U.S. Mail Postage Prepaid to the address(es) recorded on the Certificate of Service. The evenlope(s) included the return address for the this agency.

At least 15 calendar days have passed since the email or mailing date described above. My review of DCRA records to determine whether or not the email was returned as undeliverable or whether the U.S. Postal Service has returned the mailing to this agency confirmed that the Notice of Infraction was not returned at any time subsequent to the the time it was either emailed or mailed to the respondent as reflected in the Certificate of Service.

I declare under penalty of perjury that this information is correct.

*Patrice Derricott* — Signature

**December 24, 2021** — Date

Patrice Derricott
Program Supports Speclist
Office of Civil Infractions
Department of Consumer and Regulatory Affairs
1100 4th St., SW, Suite E510
Washington, DC 20024

dcra

Government of the District of Columbia
Department of Consumer and Regulatory Affairs

Office of Civil Infractions

**Notice of Infraction Number: VR22-00182**

**CERTIFICATE OF SERVICE**

I hereby certify that the attached Notice of Infraction **VR22-00182** and accompanying exhibits were served via email and/or via first class U.S. Mail Postage Prepaid on the parties named on this page at the address(es) below on **December 3, 2021.**

**cb@colomariver.com**

*Patrice Derricott*
PATRICE DERRICOTT
PROGRAM SUPPORT SPECIALIST

dcra

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**

# NOTICE OF INFRACTION

Notice No. **VR22-00182**

**12-3-2021**

**Date of Service**

**Issuing Agency: D.C. Department of Consumer and Regulatory Affairs**

Location of Infraction: 423 KENNEDY ST NW

Type of Location: ☒ Vacant Lot/Property ☐ Construction Site ☐ Occupied ☐ Other ____

423 KENNEDY ST HOLDINGS LLC
CHAMPE V. THORNTON

Business/Company Name — Charge as Respondent (check): ☒ YES ☐ NO

Individual/Agent Name — Charge as Respondent (check): ☐ YES ☒ NO

1215 1ST ST NE — cb@colomariver.com

Mailing Address — Email Address

WASHINGTON — DC — 20002-7935

City — State — Zip Code

You are charged with violating the District of Columbia laws or regulations stated below. You MUST SIGN and RETURN this Notice WITHIN 15 CALENDAR DAYS (20 CALENDAR DAYS IF RECEIVED BY MAIL) of the date of service. You must also indicate below each infraction whether you ADMIT, ADMIT WITH EXPLANATION, or DENY. Instructions are on the reverse side of this Notice.

Note: If DCRA deems the violation to constitute a life-safety hazard, DCRA may reduce the allowable abatement period to one (1) day. If abatement is required, you must correct the violation, in addition to paying applicable fines. If you do not abate the violation, you may be required to pay the cost of abatement incurred by the Government of the District of Columbia, in addition to any fine or other penalty. For questions regarding this Notice of Infraction, please call DCRA Customer Service at (202) 442-4400 or email dcra@dc.gov.

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction | Penalty (if applicable) |
|---|---|---|
| 12G DCMR SUB-SECTION 302.4 | $530.00 | $ |

Nature of Infraction: PROHIBITIVE EXCESSIVE VEGETATIVE GROWTH

Date of Infraction: 10/13/2021 Time of Infraction: 07:37 AM Previous Infractions Committed: ☐ 1 ☐ 2 ☐ 3 ☐ 4

ANSWER: ☐ ADMIT (Pay Fine) ☐ DENY (Appear for a Hearing) ☐ ADMIT WITH EXPLANATION (See reverse side)

SIGNATURE: ____________________

**Abatement required? Yes _____ No_____**

| D.C. Official Code AND/OR D.C. Municipal Regulation Citation | Fine for Infraction | Statutory Penalty (if applicable) |
|---|---|---|
| | | $ |

Nature of Infraction:

Date of Infraction: Time of Infraction: _______ Previous Infractions Committed: ☐ 1 ☐ 2 ☐ 3 ☐ 4

ANSWER: ☐ ADMIT (Pay Fine) ☐ DENY (Appear for a Hearing) ☐ ADMIT WITH EXPLANATION (See reverse side)

SIGNATURE: ____________________

**Abatement required? Yes _____ No_____**

**Total Fines and Penalties $530.00**

**If you fail to answer each charge on this Notice within the required timeframe, you may be subject to a penalty equal to twice the amount of the fine, in addition to the fine set forth in this Notice.**

I personally declare under penalty of perjury that I observed and/or determined that the infraction(s) charged have been committed.
I further certify under penalty of perjury that:
☒ **I am unable to determine whether the respondent is in the military service of the United States.**

| DCRA Employee Signature | Print Name | Date | Badge/Identification Number |
|---|---|---|---|
| [signature] | GERARD ANDERSON | 10-13-2021 | 1018 |

**SEE REVERSE SIDE FOR INSTRUCTIONS**

## ANSWERING THIS NOTICE OF INFRACTION

**DEADLINE:** You must answer this Notice within 15 calendar days of the date of service listed on the top of the other side of this Notice (20 calendar days if you received this Notice by mail). If you do not answer within the required timeframe, you will be subject to an order finding you in default and assessing both the fine set forth in this Notice and an additional penalty equal to two times the amount of that fine. You also may be subject to other penalties and action allowed by law, including the cost of abating the infraction, suspension of any District of Columbia license or permit that you hold, the sealing of your business, and the placement of a lien on property that you own. You have a right to request a hearing on the infraction charged on this Notice. Your answer must be received by the deadline stated above.

**HOW TO ANSWER:** In your answer to each charge, you should either ADMIT, or ADMIT WITH EXPLANATION, or DENY. The instructions below give information about how to respond to this Notice. Provide your email address and phone number at the bottom of this page.

1. **Admit the Infraction.** You may admit the infraction and waive your right to a hearing by paying the fine.

- ONLINE by credit card at https://govservices.dcra.dc.gov/paymentportal.
- In person at the *District of Columbia Office of the Chief Financial Officer's cashier's office at 1101 4th Street, S.W. STE. W1665, Washington, DC 20024 between the hours of 8:15-4:30.* **The walk-in cashier's office requires payment be accompanied with a payment voucher that the customer must secure from DCRA's Office of Civil Infractions** by email at DCRA.Civilinfractions@dc.gov.
- Mail to *Department of Consumer and Regulatory Affairs/Office of Civil Infractions (DCRA/OCI) 1100 4th Street, S.W. Suite E510, Washington, DC 20024.*

2. **Admit the Infraction with Explanation.** If you wish to **admit the infraction but want to submit an explanation** which the administrative law judge may consider in deciding whether the fine should be reduced or suspended, sign on the other side of this Notice and check the **ADMIT WITH EXPLANATION** box. Do not send payment. Mail or bring this Notice along with your written explanation and any supporting documents, photographs or other materials to *the Office of Administrative Hearings, One Judiciary Square, 441 4th Street, N.W., Suite 450 N, Washington, D.C. 20001-2714;* telephone: (202) 442-9094; **or send electronically to OAH.Filing@dc.gov**.

3. **To Deny the Infraction.** If you wish to deny commission of the infraction, **you are requesting a hearing on the infraction charged in this Notice**. Sign on the other side of this Notice and check the **DENY** box. Do not send payment. Mail or bring this Notice to the *Office of Administrative Hearings, One Judiciary Square, 441 4th Street, N.W., Suite 450 N, Washington, D.C. 20001-2714;* telephone: 202-442-9094; **or send electronically to OAH.Filing@dc.gov.** A hearing on this Notice will be scheduled at which you must appear. You will receive a notice from the Office of Administrative Hearings with information about your hearing date.

Questions can be directed to DCRA Customer Service at (202) 442-4400 or dcra@dc.gov.

**EMAIL (print)** ______________________________

**PHONE** ______________________________

# PLAINTIFFS' EXHIBIT 27

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**

**Cover Sheet for Electronic Filing**

I am filing the attached papers at the Office of Administrative Hearings.

**1. Check one of the boxes below.**

☒The case number is: 2021-DCRA-VR22-00182 .

☐ This is a new case, and a case number has not yet been assigned.

**2. Briefly describe the paper that you are filing:**

Request to Change Final Order for Case # 2021-DCRA-VR22-00182

3. **My name, mailing address, telephone number, and e-mail address are:**

Name: Mel Negussie
Mailing Address:
1629 K St NW. Suite 300
City, State, Zip: Washington, DC 20006

Telephone: 202-271-5046
E-mail address: cbp@harkenbuilders.com
Representing: 423 Kennedy St Holdings LLC

I agree to receive documents from the court at my email address: **Yes** (circled) No

4. You should complete this form, save it to your computer, and then attach it to an e-mail, along with the papers you are filing. The e-mail address for filing papers at OAH is oah.filing@dc.gov. Papers sent to any other e-mail address will **not** be accepted for filing.

**I sent a copy of the attached papers to all other parties or their representatives as listed below.**

Person to Whom the Papers Were Sent:
______________________________
Address ______________________
City, State, Zip Code______________
Date the papers were sent:__________

Method of sending:
☐ Mail ☐ Commercial Carrier
☐ Fax (Give Fax number) ____________
☐ Hand delivery
☐ Email (only if the person has agreed; provide email address ____________________)

Person to Whom the Papers Were Sent:
______________________________
Address ______________________
City, State, Zip Code______________
Date the papers were sent:__________

Method of sending:
☐ Mail ☐ Commercial Carrier
☐ Fax (Give Fax number) ____________
☐ Hand delivery
☐ Email (only if the person has agreed; provide email address ____________________)

**If you sent the papers to more than two people, provide the above information for the additional people on a separate sheet.**

DISTRICT OF COLUMBIA
OFFICE OF ADMINISTRATIVE HEARINGS
One Judiciary Square
441 Fourth Street, NW, 450 North
Washington, DC 20001-2714
TEL: (202) 442-9094 FAX: (202) 442-9451

# REQUEST TO CHANGE A FINAL ORDER
## ("I want the decision changed")

You may use this form to ask the Administrative Law Judge to change a Final Order **after** it has been issued.

My Name: Mel Negussie My Case No.: 2021-DCRA-VR22-00182

My Address: 1629 K St NW. Suite 300 My Telephone No.: 202-271-5046

City/State/Zip Code: Washington, DC 20006 My Fax No.: ____________

If you lost because the Final Order said you did not file something (such as an answer to a Notice of Violation, an answer to a Notice of Infraction, or a Claims Examiner's Determination), explain why you did not file it.

We did not file it because we did not know that this infraction existed. The only notice we received was the Final Order via email. The mailing address on the notice was incorrect and was mailed to the old property owner.

Why do you think that the Final Order is wrong or unfair? Why should the Administrative Law Judge change the Final Order?

We did not get the notice and did not know that this case was still active. We also have been under construction for the past 12 months and have made improvements to the site and cleaned up the area that we were fined for.

The OAH Resource Center, which has a variety of tools to assist you, is open during regular OAH business hours. The OAH website is available at www.oah.dc.gov. It includes the text of the rules, forms, and other helpful information. The OAH Rules concerning requests for reconsideration and requests for relief from a final order can be found at OAH Rule 2828.

# PLAINTIFFS' EXHIBIT 28

**James D. Sadowski**

| | |
|---|---|
| **From:** | DOB/DLCP Payment Confirmation <DoNotReply-DCRA@dc.gov> |
| **Sent:** | Saturday, December 10, 2022 6:38 AM |
| **To:** | mel@ntconstruction.net |
| **Subject:** | Payment Confirmation for DOB Code Enforcement Fine |
| **Importance:** | High |

This email is generated automatically. Please do not reply.

**Your Payment has been accepted.**

---

Thank you for your recent payment submitted via online payment portal. Please make sure you keep a copy of this email for your records.

**Payment Details:**

| | |
|---|---|
| Notice of Infraction (NOI) Number: | VR22-00182 |
| Payment date: | 12/10/2022 |
| Amount Charged: | $ 1657.43 |
| Card number ending in: | 8755 |
| Transaction ID: | AP1C7F27E550 |

Thank you,
DOB/DLCP

---

DOB DLCP GOVERNMENT OF THE DISTRICT OF COLUMBIA DC MURIEL BOWSER, MAYOR

# PLAINTIFFS'
# EXHIBIT 29

OFFICE OF ADMINISTRATIVE HEARINGS
DEC 12 2022
DISTRICT OF COLUMBIA

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
One Judiciary Square
441 Fourth Street, NW
Washington, DC 20001-2714
TEL: (202) 442-9094
FAX: (202) 442-4789
oah.filing@dc.gov

| | |
|---|---|
| DISTRICT OF COLUMBIA DEPARTMENT OF BUILDINGS AS SUCCESSOR AGENCY TO THE DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS,[1]<br>Petitioner,<br><br>v.<br><br>423 KENNEDY ST HOLDINGS LLC,<br>Respondent. | Case No.: 2021-DCRA-VR22-00182<br>NOI No.: VR22-00182 |

**ORDER VACATING FINAL ORDER**
**AND**
**DISMISSING CASE WITHOUT PREJUDICE**

## I. Introduction

I issued a Final Order in this case, which was served on September 7, 2022, (the "Final Order"), finding Respondent in default for failing to answer Notice of Infraction No. VR22-00182 (the "NOI"). I imposed the authorized fine and late answer penalty. For the reasons set forth below, I now vacate the Final Order and dismiss Case No. 2021-DCRA-VR22-00182 and the NOI, each without prejudice.

[1] In accordance with the Department of Buildings Establishment Act of 2020, D.C. Code 10-561.01 et seq., OAH Rule 2816.6, and Mayor's Order 2022-149, OAH retains jurisdiction over the Department of Buildings and the Department of Licensing and Consumer Protection as successor agencies to the Department of Consumer and Regulatory Affairs (DCRA). This matter has been recaptioned to refer to the applicable successor agency to DCRA.

On December 12, 2022, the Petitioner, DOB, filed a Motion of Dismissal with the Office of Administrative Hearings.

*OAH rule 2817.1 The party initiating the case may move to dismiss the case at any time, and the Administrative Law Judge may grant the motion without waiting for a response from the opposing side.*

The District of Columbia Department of Buildings (the "Government") may, at its discretion and as authorized by law, issue a new Notice of Infraction and begin a new case before this administrative court, for the same alleged infraction(s).

It is therefore this 12th day of December, 2022:

**ORDERED**, that the Final Order is **VACATED** and of no further effect whatsoever; and it is further

**ORDERED**, that Notice of Infraction No. VR22-00182 is **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED**, that the appeal rights of any party aggrieved by this Order are stated below; and it is further

(s) Claudia A. Crichlow
Claudia A. Crichlow
Principal Administrative Law Judge

## Certificate of Service:

**By Email:**

Esther Yong McGraw
General Counsel
Department of Buildings
1100 4th Street, SW – 5th Floor
Washington, DC 20024
**Email:** oaheserve.dcra@dc.gov
dob.filing@dc.gov

**By First-Class Mail (Postage Paid) and Email:**

Chapman Paret
629 K St NW
Ste 300
Washington, DC 20006
ecbp@harkenbuilders.com

I hereby certify that on December 12, 2022, this document was served upon the parties named on this page at the address(es) and by the means stated.

*(s) Joseph Harrison*
Joseph Harrison
Paralegal Specialist

## APPEAL RIGHTS

**After an administrative law judge has issued a Final Order, a party may ask the judge to change the Final Order and may ask the District of Columbia Court of Appeals to change the Final Order. There are important time limitations described below for doing so.**

### HOW TO REQUEST THE ADMINISTRATIVE LAW JUDGE TO CHANGE THE FINAL ORDER[2]

Under certain limited circumstances and within certain time limits, a party may file a written request with the Office of Administrative Hearings (OAH) asking the administrative law judge to change a final order. OAH Rule 2828 explains the circumstances under which such a request may be made. Rule 2828 and other OAH rules are available at https://oah.dc.gov and at OAH's office. Rule 2828 states that a request to change a final order "shall state whether an appeal [to the District of Columbia Court of Appeals] has been filed. If an appeal has been filed, OAH has no jurisdiction to decide" the request unless the Court of Appeals has remanded the case to OAH for that purpose.

A request to change a final order does not affect the party's obligation to comply with the final order and to pay any fine or penalty. If a request to change a final order is received at OAH **within 10 calendar days** of the date the Final Order was filed (**15 calendar days** if OAH mailed the final order to you), the period for filing an appeal with the District of Columbia Court of Appeals does not begin to run until the Administrative Law Judge rules on the request. **A request for a change in a final order will not be considered if it is received at OAH more than 120 calendar days of the date the Final Order was filed** (**125 calendar days** if OAH mailed the Final Order to you).

### HOW TO APPEAL THE FINAL ORDER TO THE DISTRICT OF COLUMBIA COURT OF APPEALS

Pursuant to D.C. Official Code § 2-1831.16(c)-(e), any party suffering a legal wrong or adversely affected or aggrieved by this Order may seek judicial review by filing a Petition for Review and six copies with the District of Columbia Court of Appeals at the following address:

Clerk
District of Columbia Court of Appeals
430 E Street, NW, Room 115
Washington, DC 20001

The Petition for Review (and required copies) may be mailed or delivered to the Court of Appeals, and must be received there within 30 calendar days of the mailing date of this Order, pursuant to D.C. App. R. 15(a)(2). There is a $100 fee for filing a Petition for Review. Persons who are unable to pay the filing fee may file a motion and affidavit to proceed without the payment of the fee when they file the Petition for Review. Information on petitions for review can be found in Title III of the Court of Appeals' Rules, which are available from the Clerk of the Court of Appeals, or at https://www.dccourts.gov/court-of-appeals.

---

[2] All parties must file all documents by either email: oah.filing@dc.gov, fax: (202) 442-4789; or mail: OAH, 441 Fourth Street, NW, Suite 450 North, Washington, DC 20001-2714. The filing must state when and how copies were served on the other party.

# PLAINTIFFS' EXHIBIT 30

Please review the payment request information below for your payment to the District of Columbia Office of Tax and Revenue.

Your payment request confirmation number is **0-005-421-688**

| | |
|---|---|
| SSL: | 3389- -0138 |
| Amount Paid: | $16,522.89 |
| Submitted Date: | 16-Oct-2022 |

This is only the payment request. Please review you bank statement to confirm that this transaction was successful.

**OOPS?** If you want to make a change, it is not too late. While a payment is still pending, you can return to your account, cancel the payment, and make a new one.

Payments pending in MyTax.DC.gov can be cancelled before 7pm Eastern Standard Time of the payment date entered. Payments that have a status of *In Process* or *Completed* cannot be cancelled.

Contact Us:
(202) 759-1946
e-services.otr@dc.gov

**Subject:** Payment request submitted
**Date:** Wednesday, October 19, 2022 at 8:55:38 PM Eastern Daylight Time
**From:** DoNotReply_MyTax@dc.gov
**To:** mel negussie

Please review the payment request information below for your payment to the District of Columbia Office of Tax and Revenue.

Your payment request confirmation number is: **0-005-473-466**
Your request confirmation code is: **dmgcxd**

| | |
|---|---|
| Payment Amount: | $222.28 |
| Payment Date: | 19-Oct-2022 |
| Submitted Date: | 19-Oct-2022 |

This is only the payment request. Please review your bank statement to confirm that this transaction was successful.

Contact Us:
(202) 759-1946
e-services.otr@dc.gov

To subscribe to real property tax bill notifications, click here.

*Please do not reply to this email. If you have specific questions about your tax account(s), please log in to MyTax.DC.gov and send a secure message to the Office of Tax and Revenue's (OTR) e-Services Unit. To safeguard your identity and tax information, OTR will never ask for password information.*

# PLAINTIFFS' EXHIBIT 31

dc water is life
David L. Gadis, Chief Executive Officer
DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY | 1385 CANAL STREET, SE | WASHINGTON, DC 20003

September 22, 2022

Good Day,

DC Water values you as a customer and we are grateful for the opportunity to be of service. We are writing to inform you that we recently received the following dispute.

| | | | |
|---|---|---|---|
| Case Number: | 22-594546 | | |
| Account Name: | 2002583-9 | Account Number: | 2002583-9 |
| Service Address: | 5501 1st St NW | Bill Class: | Commercial |
| Dispute Date: | 09/22/22 | CCF: | 2,156.99 |
| Bill Period (Start): | 01/20/22 | Bill Period (End): | 06/16/22 |
| Meter Size: | 1" | Read Type: | Act |
| Bill Date(s): | 02/23/22, 03/18/22, 04/19/22, 05/18/22, 06/16/22 | | |

We regret to inform you that the dispute deadline date for these charges has expired; however, if you are still experiencing unusual water usage, please contact our Customer Service Department on (202) 354-3600 so that one of our Customer Care Associates may review your usage history and provide you with the most appropriate options to investigate your water consumption.

If you disagree with DC Water's decision and would like to present evidence that your dispute was received within the dispute deadline date, or other evidence to further your case, please complete the Petition for Administrative Hearing section below to request a hearing, and return a copy of this letter to Administrative.Hearings@dcwater.com.

Please note that your request for a hearing must be filed within 15 calendar days of the date of this notice. Additionally, submission of your request for a hearing does not constitute a continuous dispute of subsequent charges. **Future bills must be paid or disputed by their respective due dates**.

Best Regards,
Escalations Team

**PETITION FOR ADMINISTRATIVE HEARING**

**Indicate your relationship to the property:** Owner__ Legal/Rep__ ~~Tenant~~__ 3rd Party/Non-Occupant__ Mgt Company_
**Indicate the property occupancy status during the dispute period:** Vacant__ Occupied__(Number of Occupants ______)
**Daytime/Best Contact Phone Number:** 202-271-5046 **Email:** mel@ntconstruction.net

Please provide a statement of facts concerning the disputed charges. Include supporting data, facts, or evidence upon which you, the petitioner, rely as justification for challenging the charges. Please attach a copy of all documents (i.e., plumber's report, invoices, etc.) that are pertinent to the investigation.

We disagree with DC Water's decision that this dispute is untimely because: We never got the February to June 2022 invoices, including the last one dated June 16, 2022 (see attached invoices for this period).
We recently became aware that there is a large outstanding amount owed, and we quickly contacted DC Water Customer Service to address the matter. We purchased the property at the located at 5501 First St NW at the end of December 2021. Right after we purchased this property, we inspected the premises, and found no water leak. The building has not been occupied since the purchase. From the time of purchase up until recently, we never received an invoice. We discovered there was a leak in June 2022, and as soon as we discovered it, we had the water shut off at the property by a licensed plumber. Attached is the plumber's report/letter regarding discovery of the leak.
We respectfully request that the DC Water decision that the dispute is untimely be reversed because we never received the attached invoices until recently.

.com

Signature Mel Negussie Date 09/22/22

# PLAINTIFFS' EXHIBIT 32

Doc #: 2023048713
Filed & Recorded
06/12/2023 08:51 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

dc water is life

Customer Service 202-354-3750

**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY | 1385 Canal Street, SE | Washington, DC 20003**

## DELINQUENT ACCOUNTS SECTION

DC Water and Sewer Authority
vs.
DEVELOPER RE1 LLC
1629 K ST NW, STE 300
WASHINGTON, DC 20006

Date: 06/12/2023

Account No.: 2002583-9
Service Address: 5501 1ST ST NW
Square: 3389 Suffix: Lot: 0138

**RE: Document No: 2022090397**
**Date: August 29, 2022**

## RELEASE OF LIEN

This release of lien is filed pursuant to Title 34, Chapter 24, Section 2407.02, of the District of Columbia Code. (2001 ed.). The above referenced lien has been released for the reason listed below. Accordingly, the Recorder of Deeds of the District of Columbia may record this release of lien.

Reason for Release: **PAID IN FULL**

**Recommended By:**

Denise Page

Supervisor, Credit & Collections Department of Customer Service, DC Water & Sewer Authority

**Approved By:**

[signature]

Manager, Credit & Collections Department of Customer Service, DC Water & Sewer Authority

**Acknowledged By:**

**Recorder of Deeds**
**Government of the District of Columbia**

DEVELOPER RE1 LLC
C/O
1629 K ST NW, STE 300
WASHINGTON, DC 20006

# PLAINTIFFS' EXHIBIT 33

**Property: 5501 1st St NW Washington DC 20011-5207**

**Interest Payments**

| Date | DOT1 | DOT2 |
|---|---|---|
| 12/23/2021 | $ 7,149.05 | $ 1,570.69 |
| 2/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 3/1/2022 | $ 22,241.50 | $ 4,886.59 |
| 4/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 5/1/2022 | $ 23,830.18 | $ 5,235.63 |
| 6/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 7/1/2022 | $ 23,830.18 | $ 5,235.63 |
| 8/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 9/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 10/1/2022 | $ 23,830.18 | $ 5,235.63 |
| 11/1/2022 | $ 24,624.51 | $ 5,410.15 |
| 12/1/2022 | $ 23,830.18 | $ 5,235.63 |
| 1/1/2023 | $ 24,624.51 | $ 5,410.15 |
| **TOTAL** | **$ 297,082.84** | **$ 65,270.85** |

| | |
|---|---|
| **GRAND TOTAL** | **$ 362,353.69** |

WASHINGTON
CAPITAL PARTNERS

**1** Information
View payment information

**2** Payment Method
Select payment method

**3** Account Information
Select/Add bank account

**4** Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/hqbhzxi4xrsu3mcfdstuv25sem

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $1,570.69, Due Date: 12/23/2021

WASHINGTON CAPITAL PARTNERS

1 Information — View payment information | 2 Payment Method — Select payment method | 3 Account Information — Select/Add bank account | 4 Confirm Payment

**Borrower Information**

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

**Loan Information**

5505 1st St NW Washington, DC - District of Columbia 20011

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

**Payment Information**

Payment Due Date: 07/10/2023

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/wemncil6kzuufc2oho5fnlwrca

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $7,149.05, Due Date: 12/23/2021

WASHINGTON CAPITAL PARTNERS

1 Information — View payment information | 2 Payment Method — Select payment method | 3 Account Information — Select/Add bank account | 4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/f2q5h2herzzexmcuhjyifqmxly

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $5,410.15, Due Date: 02/01/2022

WASHINGTON CAPITAL PARTNERS

1 Information — View payment information
2 Payment Method — Select payment method
3 Account Information — Select/Add bank account
4 Confirm Payment

**Borrower Information**

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

**Loan Information**

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

**Payment Information**

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/ksvjeak4y55e7cxwx7xoozkb64

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $24,624.51, Due Date: 02/01/2022

WASHINGTON
CAPITAL PARTNERS

1 Information
View payment information

2 Payment Method
Select payment method

3 Account Information
Select/Add bank account

4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/gmzjptk7siauppgvqo47vxew5i

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $22,241.50, Due Date: 03/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off ●

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/lzgl67px4liufgacedaflcdkdu

**5505 1st St NW Washington DC 20011-5207** Paid ✓
Payment Amount: $4,886.59, Due Date: 03/01/2022

WASHINGTON
CAPITAL PARTNERS

**1** Information
View payment information

**2** Payment Method
Select payment method

**3** Account Information
Select/Add bank account

**4** Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off ●

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/yzpa3n44h5zejfqrsleyyhmrym

**5505 1st St NW Washington DC 20011-5207** Paid ✓
Payment Amount: $24,624.51, Due Date: 04/01/2022

WASHINGTON CAPITAL PARTNERS

1 Information — View payment information | 2 Payment Method — Select payment method | 3 Account Information — Select/Add bank account | 4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

## Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/d3w2fql27mfunejlkvllizumfm

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $5,410.15, Due Date: 04/01/2022

WASHINGTON CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/r6erh7x535yezhylap6ou3otiy

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $23,830.18, Due Date: 05/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/d2pcoslb46gutkikkqyxzbyvca

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $5,235.63, Due Date: 05/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off ●

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/y34iwxninxauporpzmnk2brfqm

**5505 1st St NW Washington DC 20011-5207** Paid ✓
Payment Amount: $5,410.15, Due Date: 06/01/2022

WASHINGTON
CAPITAL PARTNERS

1 Information
View payment information

2 Payment Method
Select payment method

3 Account Information
Select/Add bank account

4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/4xvy3ths7e7uxec57jkuh2544e

5505 1st St NW Washington DC 20011-5207
Payment Amount: $24,624.51, Due Date: 06/01/2022
Paid

WASHINGTON CAPITAL PARTNERS

1 Information View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

5505 1st St NW Washington, DC - District of Columbia 20011

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

Payment Due Date: 07/10/2023

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/e63qan2urxeehbykh6raialk44

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $23,830.18, Due Date: 07/01/2022

WASHINGTON CAPITAL PARTNERS

1 Information — View payment information
2 Payment Method — Select payment method
3 Account Information — Select/Add bank account
4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

5505 1st St NW Washington, DC - District of Columbia 20011

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

## Payment Information

Payment Due Date: 07/10/2023

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/kofddh4iisoelpiz7jgfpa2xim

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $5,235.63, Due Date: 07/01/2022

WASHINGTON
CAPITAL PARTNERS

1 Information
View payment information

2 Payment Method
Select payment method

3 Account Information
Select/Add bank account

4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/kofddh4iisoelpiz7jgfpa2xim

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $5,410.15, Due Date: 08/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off ●

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/pr5kz57aym4enmaunbtelaaoay

**5505 1st St NW Washington DC 20011-5207** Paid ✓
Payment Amount: $24,624.51, Due Date: 08/01/2022

WASHINGTON
CAPITAL PARTNERS

1 Information
View payment information

2 Payment Method
Select payment method

3 Account Information
Select/Add bank account

4 Confirm Payment

## Borrower Information

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

5505 1st St NW Washington, DC - District of Columbia 20011

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

Payment Due Date: 07/10/2023

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/72zj23dwy3befj2t3zmubm5q5y

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $24,624.51, Due Date: 09/01/2022

WASHINGTON CAPITAL PARTNERS

**1** Information — View payment information
**2** Payment Method — Select payment method
**3** Account Information — Select/Add bank account
**4** Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/lfj6ok6ibw4ebdueuaf25oq3pm

**5505 1st St NW Washington DC 20011-5207** — Paid
Payment Amount: $5,410.15, Due Date: 09/01/2022

WASHINGTON CAPITAL PARTNERS

| | | | |
|---|---|---|---|
| **1** Information<br>View payment information | **2** Payment Method<br>Select payment method | **3** Account Information<br>Select/Add bank account | **4** Confirm Payment |

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/gbn36foeqtbena46chwbddcc4u

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $23,830.18, Due Date: 10/01/2022

WASHINGTON
CAPITAL PARTNERS

**1** Information
View payment information

2 Payment Method
Select payment method

3 Account Information
Select/Add bank account

4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off ●

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/s3ojgka3odoubalqsvnfbazha4

5505 1st St NW Washington DC 20011-5207
Payment Amount: $5,235.63, Due Date: 10/01/2022

Paid ✓

WASHINGTON CAPITAL PARTNERS

1 Information View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

**Borrower Information**

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

**Loan Information**

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

**Payment Information**

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/g4vp4rd6blvutaqdul7uqcrtu4

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $5,410.15, Due Date: 11/01/2022

WASHINGTON
CAPITAL PARTNERS

| | | | |
|---|---|---|---|
| 1 Information<br>View payment information | 2 Payment Method<br>Select payment method | 3 Account Information<br>Select/Add bank account | 4 Confirm Payment |

**Borrower Information**

DEVELOPER RE1 LLC
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

**Loan Information**

5505 1st St NW Washington, DC - District of Columbia 20011

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

**Payment Information**

Payment Due Date: 07/10/2023

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/5meblfjkux6exb2vetchavxs44

5505 1st St NW Washington DC 20011-5207 — Paid
Payment Amount: $24,624.51, Due Date: 11/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/5tztzp34yqbupnd4zml3jkvvkm

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $23,830.18, Due Date: 12/01/2022

WASHINGTON CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/sxtrel2sudcuteqpdscyz4wj4m

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $5,235.63, Due Date: 12/01/2022

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

## Borrower Information

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

## Loan Information

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006120 |
| Loan Amount: | $3,579,000.00 |
| Interest Rate: | 7.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

### Payment Information

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/xk23at4ou5gedgfy7zmsatcely

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $24,624.51, Due Date: 01/01/2023

WASHINGTON
CAPITAL PARTNERS

1 **Information** View payment information | 2 Payment Method Select payment method | 3 Account Information Select/Add bank account | 4 Confirm Payment

**Borrower Information**

**DEVELOPER RE1 LLC**
Mel Negussie
1629 K Street NW Suite 300 Washington, DC 20006

**Loan Information**

**5505 1st St NW Washington, DC - District of Columbia 20011**

| | |
|---|---|
| Loan Name: | LOAN-006182 |
| Loan Amount: | $524,000.00 |
| Interest Rate: | 11.99% |
| Current Construction Balance: | $0.00 |
| Construction Disbursed To Date: | $0.00 |
| Pre-paid Interest Balance: | $0.00 |
| Maturity Date: | 12/23/2022 |
| Loan Servicer: | WCP Servicing |

Auto pay is off

**Payment Information**

**Payment Due Date: 07/10/2023**

**Current Status: Paid**
This payment was already marked scheduled.

Need to update your Borrower Information displayed here or do you have questions? Call us at (703) 940-5190 or email us at servicing@wcp.team.

https://payment-link.azurewebsites.net/p/o2wbn2jv7ktu5bujqmkfcihl6e

**5505 1st St NW Washington DC 20011-5207** Paid
Payment Amount: $5,410.15, Due Date: 01/01/2023

# PLAINTIFFS' EXHIBIT 34

**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202)727-5374**

## NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

(Pursuant to Public Low 90-566, approved October 12, 1968)

Square: 3260 Suffix: Lot: 0056

List Name and adress of each owner of the real property encumbered by said deed of trust, mortgage, or security instrument.)

TO: 423 KENNEDY ST HOLDINGS LLC
See Exhibit A

FROM: WCP Fund I LLC PHONE: (703) 727-5464

YOU ARE HEREBY NOTIFIED THAT IN ORDER TO SATISFY THE DEBT SECURED BY THE DEED OF TRUST, MORTGAGE, OR OTHER SECURITY INSTRUMENT, THE REAL PROPERTY OR CONDOMINIUM UNIT HEREIN DESCRIBED WILL BE SOLD AT A FORECLOSURE SALE TO BE HELD ON July 25, 20 23, AT THE OFFICE OF Harvey West Auctioneers, Inc. 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015 2:10 P.M. THIS SALE DATE IS SUBJECT TO POSTPONEMENT FOR A PERIOD NOT TO EXCED THIRTY (30) CALENDAR DAYS FROM THE ORIGINAL DATE OF FORECLOSURE SALE, AFTER WHICH THIS NOTICE OF FORECLOSURE SHALL EXPIRE.

Affidavit of Non-Residential Mortgage Foreclosure recorded on June 22, 2023 as Instrument No. 2023052260

Security Instrument recorded in the land records of the District of Columbia at the Recorder of Deed on April 8, 20 22.

Liber: Folio: Instrument No: 2022038745

Maker(s) of the Note secured by the instrument: 423 KENNEDY ST HOLDINGS LLC

Phone: See Exhibit A Last Known Address: See Exhibit A

Description of Property: Multi-Family Residential Building
(two-story brick, dwelling, apartment building, vacant lot condominium unit, etc.)

Address: 423 Kennedy Street, NW, Washington, DC 20011

Square: 3260 Lot: 0056 or Parcel No:

Holder of the Note (Name): WCP Fund I LLC
Phone: (703) 727-5464 Address: 8401 Greensboro Drive, Suite 960, McLean, VA 22102

Balance owed on the Note: $ 1,598,839.60 **
Minimum balance required to cure default obligation pursuant to D.C. Law 5-82 ìRight to Cure a Residential Mortgage Foreclosure DefaultAct of 1984.î
$ N/A commercial loan

Name of person to contact to stop foreclosure sale: Russell S. Drazin
Address: 4400 Jenifer Street, N.W., Suite 2, Washington DC 20015 Phone: (202) 223-7900

** as of June 23, 2023

# NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202)727-5374**

Square 3260 Suffix Lot 0056

I hereby certify that a Notice of Foreclosure Sale was sent to the present owner(s) of the real property encumbered by the said deed of trust, mortgage, or other security instrument described above, by certified mail, return receipt required on June 23 ,20 23 ; and I further certify that I understand that Public Law 90-566 prohibits any foreclosure sale under a power of sale provision contained in any deed of trust, mortgage, or other security instrument until after the owner(s) of the real property encumbered by the said deed of trust, mortgage, or security instrument has been given written notice of such sale, and the Recorder of Deeds, D.C. has received a copy of such notice at least 30 days in advance of such sale.

06/23/2023
Date

RD
(Signature of Noteholder or his agent)

I, Deborah A. Stewart , a Notary Public in and for the District of Columbia , DO HEREBY CERTIFY THAT Russell S. Drazin who is personally well known to me as a party(ies) to this Notice of Foreclosure Sale bearing on the 23rd day of June , 20 23 , personally appeared before me and executed the said Notice of Foreclosure Sale and acknowledged the same to be his act and deed.

Given under my hand and seal this 23rd day of June , 20 23 .

Deborah A Stewart
Notary Public

My Commission Expires: 09/30/2025
mmddyyyy

DEBORAH A. STEWART NOTARY PUBLIC MY COMMISSION EXPIRES 9/30/2025 DISTRICT OF COLUMBIA

# EXHIBIT A

Borrower, Grantor, Record Owner:

**423 KENNEDY ST HOLDINGS LLC**, a District of Columbia limited liability company

423 Kennedy Street, NW, Washington, DC 20011

1629 K Street, NW, Suite 300, Washington, DC 20006

3631 Upton Street, NW, Washington, DC 20008

1215 1st Street, NE, PHC, Washington, DC 20002

1140 3rd Street, NE, 2nd Floor, Washington, DC 20002

12359 Sunrise Valley Drive, #260, Reston, VA 20191

c/o Mel Negussie, Registered Agent, 1629 K Street, NW, Suite 300, Washington, DC 20006

c/o James D. Sadowski, attorney, Greenstein DeLorme & Luchs, P.C., 801 17th Street, NW, Suite 1000, Washington, DC 20006

c/o Brighton Capital LLC, 14905 Capricorn Lane, Charlotte, NC 28277

c/o Brighton Capital LLC, 3702 Brices Ford Court, Fairfax, VA 22033

c/o Brighton KSDC, LLC, 14905 Capricorn Lane, Charlotte, NC 28277

c/o Brighton KSDC, LLC, 3702 Brices Ford Court, Fairfax, VA 22033

(202) 775-0457
(202) 244-4245
(704) 957-3265
(704) 542-9084
(703) 587-0988
(703) 994-4490

**Pardo & Drazin, LLC**
**Russell S. Drazin, Attorney**
**4400 Jenifer Street, NW, Suite 2**
**Washington, DC 20015**
**202-223-7900**

**TRUSTEE'S SALE**
**OF REAL PROPERTY**

423 Kennedy Street, NW
Washington, DC 20011

Lot 0056 in Square 3260

Under a power of sale contained in a certain Deed of Trust ("Deed of Trust") dated March 31, 2022 and recorded on April 8, 2022 as Instrument No. 2022038745 from 423 Kennedy St Holdings LLC, as grantor, to Russell S. Drazin ("Trustee"), as trustee, for the benefit of WCP Fund I LLC, as beneficiary, securing that certain Commercial Deed of Trust Note dated March 31, 2022 in the principal amount of $1,256,000.00, default having occurred under the terms thereof, and following the mailing and recordation of an Affidavit of Non-Residential Mortgage Foreclosure and a Notice of Foreclosure Sale of Real Property or Condominium Unit, at the request of the current noteholder, Trustee will sell at public auction at the office of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015, on

**JULY 25, 2023 AT 2:10 PM**

ALL THAT LOT OF GROUND AND THE IMPROVEMENTS THEREON (if any) situated in the City of Washington, District of Columbia, known as 423 Kennedy Street, NW, Washington, DC 20011 (Lot 0056 in Square 3260), and more fully described in the Deed of Trust.

The property will be sold in an "AS IS" condition, with no warranty of any kind, and subject to conditions, restrictions, agreements, liens, and encumbrances of record affecting the same – except those encumbrances of record that are extinguished by operation of District of Columbia law by virtue of the foreclosure of the Deed of Trust. Without limitation, the property will be sold subject to that certain Deed of Trust dated March 31, 2022 and recorded on April 8, 2022 as Instrument No. 2022038744 from 423 Kennedy St Holdings LLC, as grantor, to Russell S. Drazin, as trustee, for the benefit of WCP Fund I LLC, as beneficiary, securing that certain Commercial Deed of Trust Note dated March 31, 2022 in the principal amount of $8,689,693.00.

Purchaser will take title to the property subject to all taxes, water and sewer charges, and other utility charges, if any. Purchaser assumes the risk of loss or damage to the property from the date of sale forward. Purchaser shall be responsible for obtaining physical possession of the property.

TERMS OF SALE: A deposit of $150,000.00 by cashier's check will be required of purchaser at the time and place of sale. Purchaser shall settle within thirty (30) days of sale. TIME SHALL BE OF THE ESSENCE WITH RESPECT TO SETTLEMENT BY PURCHASER. Balance of the purchase price to be paid in cash or certified funds at settlement. Interest to be paid on the unpaid purchase money from the date of sale to the date of settlement at the applicable interest rate set forth in the debt instrument secured by the Deed of Trust. Purchaser shall be responsible for payment of all settlement costs.

The noteholder and its affiliates, if a bidder, shall not be required to post a deposit or to pay interest.

In the event that purchaser does not settle as required for any reason, purchaser shall be in default. Upon such default, the deposit shall be forfeited to Trustee and all of the expenses of this sale (including legal fees and costs, and full commission on the gross sale price) shall be charged against and paid out of the forfeited deposit. Trustee may resell the property at the risk and expense of the defaulting purchaser. The defaulting purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property. Defaulting purchaser shall be liable to Trustee for legal fees and costs incurred by Trustee in connection with such default.

If Trustee is unable to settle as set forth herein, purchaser's sole remedy at law and in equity shall be limited to a refund of the deposit and the sale shall be considered null and void and of no effect whatsoever.

Trustee reserves the right, in Trustee's sole discretion, to reject any and all bids, to withdraw the property from sale at any time before or at the auction, to extend the time to receive bids, to waive or modify the deposit requirement, to waive or modify the requirement that interest be paid on the unpaid purchase money, and/or to extend the period of time for settlement.

Additional terms may be announced at the sale. The successful bidder will be required to execute and deliver to Trustee a memorandum or contract of the sale at the conclusion of bidding.

Russell S. Drazin, Trustee

---

JULY 11, 13, 17, 19, & 21, 2023
(THE WASHINGTON POST)

Doc # 2023052260
06/22/2023 09:01 AM

# AFFIDAVIT OF NON-RESIDENTIAL MORTGAGE FORECLOSURE

**Government of the**
**District of Columbia**
Office of Tax and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202) 727-5374**

423 KENNEDY ST HOLDINGS LLC
Property Owner's Last Name

Property Owner's First Name

Defaulted Borrower(s) Name
(If Different From Property Owner's Above)

0056/3260
Lot/Square Number:

I, Christina Araujo [name], Vice President of Finance [title]

of WCP Fund I LLC
[name of institution] ("Lender"), make oath and say that:

1. I have personal knowledge of the matters referred to herein.

2. The subject property is located at

423 Kennedy Street, NW, Washington, DC 20011

3. WCP Fund I LLC is the holder of the mortgage recorded as Instrument Number 2022038745 in the District of Columbia Recorder of Deeds ('Mortgage').

4. The subject property identified above is not secured by a residential mortgage as defined by D.C. Official Code § 42-815.01(a).

5. For the reason(s) set forth above, foreclosure of the Mortgage is not subject to mandatory mediation and, therefore, does not require a Mediation Certificate issued by the Mediation Administrator.

I declare and affirm under penalty of perjury that the statements made herein are true and correct to the best of my knowledge, information and belief.

SSL:
3260/0056

Signature: [signature]
Printed Name: Christina Araujo
Title: Vice President of Finance
Date: June 21, 2023
State of Virginia
County of Fairfax

Recording requested by:
Russell S. Drazin
Pardo & Drazin LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

When recorded mail to:
Russell S. Drazin
Pardo & Drazin, LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

This Affidavit of Non-Residential Mortgage Foreclosure was acknowledged before me on this 21st day of June, 20 23 by Christina Araujo (name of person) as Vice President of Finance (type of authority, e.g. officer, trustee, etc.) of WCP Fund I LLC (name of party on behalf of whom instrument was executed).

Notary Public [signature]
My Commission Expires:

MUHAMMAD T BILAL
NOTARY PUBLIC
REG. #7637841
MY COMMISSION EXPIRES
JUNE 30, 2023
COMMONWEALTH OF VIRGINIA

Doc #: 2023052260
Filed & Recorded
06/22/2023 09:01 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $25.00 |
| SURCHARGE | $6.50 |
| TOTAL: | $31.50 |

# PLAINTIFFS' EXHIBIT 35

**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202)727-5374**

## NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

(Pursuant to Public Low 90-566, approved October 12, 1968)

Square: 3389 Suffix: Lot: 0138

List Name and adress of each owner of the real property encumbered by said deed of trust, mortgage, or security instrument.)

TO: Developer RE1 LLC
See Exhibit A

FROM: SF NU, LLC PHONE: (703) 727-5464

YOU ARE HEREBY NOTIFIED THAT IN ORDER TO SATISFY THE DEBT SECURED BY THE DEED OF TRUST, MORTGAGE, OR OTHER SECURITY INSTRUMENT, THE REAL PROPERTY OR CONDOMINIUM UNIT HEREIN DESCRIBED WILL BE SOLD AT A FORECLOSURE SALE TO BE HELD ON July 25, 20 23, AT THE OFFICE OF Harvey West Auctioneers, Inc.
5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015
2:00 P.M. THIS SALE DATE IS SUBJECT TO POSTPONEMENT FOR A PERIOD NOT TO EXCED THIRTY (30) CALENDAR DAYS FROM THE ORIGINAL DATE OF FORECLOSURE SALE, AFTER WHICH THIS NOTICE OF FORECLOSURE SHALL EXPIRE.

Affidavit of Non-Residential Mortgage Foreclosure recorded on June 22, 2023 as Instrument No. 2023052259

Security Instrument recorded in the land records of the District of Columbia at the Recorder of Deed on January 3, 20 22.

Liber: Folio: Instrument No: 2022000482

Maker(s) of the Note secured by the instrument: Developer RE1 LLC

Phone: See Exhibit A Last Known Address: See Exhibit A

Description of Property: commercial building
(two-story brick, dwelling, apartment building, vacant lot condominium unit, etc.)

Address: 5501 1st Street, NW, Washington, DC 20011

Square: 3389 Lot: 0138 or Parcel No:

Holder of the Note (Name): SF NU, LLC
Phone: (703) 727-5464 Address: 8401 Greensboro Drive, Suite 960, McLean, VA 22102

Balance owed on the Note: $ 678,554.78 **

Minimum balance required to cure default obligation pursuant to D.C. Law 5-82 ìRight to Cure a Residential Mortgage Foreclosure DefaultAct of 1984.î
$ N/A commercial loan

Name of person to contact to stop foreclosure sale: Russell S. Drazin
Address: 4400 Jenifer Street, N.W., Suite 2, Washington DC 20015 Phone: (202) 223-7900

** as of June 23, 2023

# NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

**Government of the District of Columbia**
Office of Tax and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202)727-5374**

Square 3389 Suffix Lot 0138

I hereby certify that a Notice of Foreclosure Sale was sent to the present owner(s) of the real property encumbered by the said deed of trust, mortgage, or other security instrument described above, by certified mail, return receipt required on June 23 ,20 23 ; and I further certify that I understand that Public Law 90-566 prohibits any foreclosure sale under a power of sale provision contained in any deed of trust, mortgage, or other security instrument until after the owner(s) of the real property encumbered by the said deed of trust, mortgage, or security instrument has been given written notice of such sale, and the Recorder of Deeds, D.C. has received a copy of such notice at least 30 days in advance of such sale.

06/23/2023
Date

(Signature of Noteholder or his agent)

I, Deborah A. Stewart , a Notary Public in and for the District of Columbia , DO HEREBY CERTIFY THAT Russell S. Drazin who is personally well known to me as a party(ies) to this Notice of Foreclosure Sale bearing on the 23rd day of June , 20 23 , personally appeared before me and executed the said Notice of Foreclosure Sale and acknowledged the same to be his act and deed.

Given under my hand and seal this 23rd day of June , 20 23 .

Notary Public

My Commission Expires: 09/30/2025
mmddyyyy

DEBORAH A. STEWART NOTARY PUBLIC MY COMMISSION EXPIRES 9.30.2025 DISTRICT OF COLUMBIA

# EXHIBIT A

Borrower, Grantor, Record Owner:

**Developer RE1 LLC**, a District of Columbia limited liability company

5501 1st Street, NW, Washington, DC 20011

1629 K Street, NW, Suite 300, Washington, DC 20006

3631 Upton Street, NW, Washington, DC 20008

4600 S. Four Mile Run Drive, Apt. 227, Arlington, VA 22204

8922 Tonbridge Terrace, Hyattsville, MD 20783

c/o Mel Negussie, Registered Agent, 1629 K Street, NW, Suite 300, Washington, DC 20006

c/o James D. Sadowski, attorney, Greenstein DeLorme & Luchs, P.C., 801 17th Street, NW, Suite 1000, Washington, DC 20006

(202) 775-0457
(202) 244-4245
(571) 481-0289

**Pardo & Drazin, LLC**
**Russell S. Drazin, Attorney**
**4400 Jenifer Street, NW, Suite 2**
**Washington, DC 20015**
**202-223-7900**

**TRUSTEE'S SALE**
**OF REAL PROPERTY**

5501 1st Street, NW
Washington, DC 20011

Lot 0138 in Square 3389

Under a power of sale contained in a certain Deed of Trust ("Deed of Trust") dated December 23, 2021 and recorded on January 3, 2022 as Instrument No. 2022000482 from Developer RE1 LLC, as grantor, to Russell S. Drazin ("Trustee"), as trustee, for the benefit of WCP Fund I LLC, as beneficiary, securing that certain Commercial Deed of Trust Note dated December 23, 2021 in the principal amount of $524,000.00, default having occurred under the terms thereof, and following the mailing and recordation of an Affidavit of Non-Residential Mortgage Foreclosure and a Notice of Foreclosure Sale of Real Property or Condominium Unit, at the request of the current noteholder, Trustee will sell at public auction at the office of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015, on

**JULY 25, 2023 AT 2:00 PM**

ALL THAT LOT OF GROUND AND THE IMPROVEMENTS THEREON (if any) situated in the City of Washington, District of Columbia, known as 5501 1st Street, NW, Washington, DC 20011 (Lot 0138 in Square 3389), and more fully described in the Deed of Trust.

The property will be sold in an "AS IS" condition, with no warranty of any kind, and subject to conditions, restrictions, agreements, liens, and encumbrances of record affecting the same – except those encumbrances of record that are extinguished by operation of District of Columbia law by virtue of the foreclosure of the Deed of Trust. Without limitation, the property will be sold subject to that certain Deed of Trust dated December 23, 2021 and recorded on January 3, 2022 as Instrument No. 2022000481 from Developer RE1 LLC, as grantor, to Russell S. Drazin, as trustee, for the benefit of WCP Fund I LLC, as beneficiary, securing that certain Commercial Deed of Trust Note dated December 23, 2021 in the principal amount of $3,579,000.00.

Purchaser will take title to the property subject to all taxes, water and sewer charges, and other utility charges, if any. Purchaser assumes the risk of loss or damage to the property from the date of sale forward. Purchaser shall be responsible for obtaining physical possession of the property.

TERMS OF SALE: A deposit of $60,000.00 by cashier's check will be required of purchaser at the time and place of sale. Purchaser shall settle within thirty (30) days of sale. TIME SHALL BE OF THE ESSENCE WITH RESPECT TO SETTLEMENT BY PURCHASER. Balance of the purchase price to be paid in cash or certified funds at settlement. Interest to be paid on the unpaid purchase money from the date of sale to the date of settlement at

the applicable interest rate set forth in the debt instrument secured by the Deed of Trust. Purchaser shall be responsible for payment of all settlement costs.

The noteholder and its affiliates, if a bidder, shall not be required to post a deposit or to pay interest.

In the event that purchaser does not settle as required for any reason, purchaser shall be in default. Upon such default, the deposit shall be forfeited to Trustee and all of the expenses of this sale (including legal fees and costs, and full commission on the gross sale price) shall be charged against and paid out of the forfeited deposit. Trustee may resell the property at the risk and expense of the defaulting purchaser. The defaulting purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property. Defaulting purchaser shall be liable to Trustee for legal fees and costs incurred by Trustee in connection with such default.

If Trustee is unable to settle as set forth herein, purchaser's sole remedy at law and in equity shall be limited to a refund of the deposit and the sale shall be considered null and void and of no effect whatsoever.

Trustee reserves the right, in Trustee's sole discretion, to reject any and all bids, to withdraw the property from sale at any time before or at the auction, to extend the time to receive bids, to waive or modify the deposit requirement, to waive or modify the requirement that interest be paid on the unpaid purchase money, and/or to extend the period of time for settlement.

Additional terms may be announced at the sale. The successful bidder will be required to execute and deliver to Trustee a memorandum or contract of the sale at the conclusion of bidding.

Russell S. Drazin, Trustee

---

JULY 11, 13, 17, 19, & 21, 2023
(THE WASHINGTON POST)

Doc # 2023052259
06/22/2023 09:01 AM

# AFFIDAVIT OF NON-RESIDENTIAL MORTGAGE FORECLOSURE

**Government of the District of Columbia**
Office of Tax and Revenue
Recorder of Deeds
**1101 4th Street, SW**
**Washington, DC 20024**
**Phone (202) 727-5374**

Developer RE1 LLC
Property Owner's Last Name

Property Owner's First Name

Defaulted Borrower(s) Name
(If Different From Property Owner's Above)

0138/3389
Lot/Square Number:

I, Christina Araujo [name], Vice President of Finance [title]

of WCP Fund I LLC, as servicer to SF NU, LLC
[name of institution] ("Lender"), make oath and say that:

1. I have personal knowledge of the matters referred to herein.

2.The subject property is located at

5501 1st Street, NW, Washington, DC 20011

3. SF NU, LLC is the holder of the mortgage recorded as Instrument Number 2022000482 in the District of Columbia Recorder of Deeds ('Mortgage').

4. The subject property identified above is not secured by a residential mortgage as defined by D.C. Official Code § 42-815.01(a).

5. For the reason(s) set forth above, foreclosure of the Mortgage is not subject to mandatory mediation and, therefore, does not require a Mediation Certificate issued by the Mediation Administrator.

I declare and affirm under penalty of perjury that the statements made herein are true and correct to the best of my knowledge, information and belief.

SSL:
3389/0138

Signature: [signature]
Printed Name: Christina Araujo
Title: Vice President of Finance
Date: June 21, 2023
State of Virginia
County of Fairfax

Recording requested by:
Russell S Drazin
Pardo & Drazin LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

When recorded mail to:
Russell S. Drazin
Pardo & Drazin, LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

This Affidavit of Non-Residential Mortgage Foreclosure was acknowledged before me on this 21st day of June ,20 23 by Christina Araujo (name of person) as Vice President of Finance (type of authority, e.g. officer, trustee, etc.) of WCP Fund I LLC, as servicer to SF NU, LLC (name of party on behalf of whom instrument was executed).

Notary Public [signature]
My Commission Expires:

MUHAMMAD T BILAL
NOTARY PUBLIC
REG. #7637841
MY COMMISSION EXPIRES JUNE 30, 2023
COMMONWEALTH OF VIRGINIA

Doc #: 2023052259
Filed & Recorded
06/22/2023 09:01 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $25.00 |
| SURCHARGE | $6.50 |
| TOTAL: | $31.50 |

# PLAINTIFFS' EXHIBIT 36

# A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB Approval No 2502-0265

## B. Type of Loan

| | | | |
|---|---|---|---|
| 1. ☐ FHA 2. ☐ RHS 3. ☐ Conv. Unins. 4. ☐ VA 5. ☐ Conv Ins | 6. File No. 22-0210 | 7. Loan No. | 8. Mortgage Insurance Case No. |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | | |
|---|---|---|
| D. Name & Address of Borrower:<br>423 Kennedy St Holdings LLC<br>1629 K Street Northwest<br>Washington, DC 20006 | E. Name & Address of Seller: | F. Name & Address of Lender:<br>WCP Fund I, LLC<br>2815 Hartland Road<br>Suite 200<br>Falls Church, VA 22043 |
| G. Property Location:<br>419-423 Kennedy Street, NW<br>Washington, DC 20011<br>3260-0000-0056 | H. Settlement Agent:<br>District Title<br>Place of Settlement:<br>1775 I Street Northwest #560 Washington, DC 20006 | I. Settlement Date:<br>03/31/2022<br>Funding Date:<br>03/31/2022<br>Disbursement Date:<br>03/31/2022 |

## J. Summary of Borrower's Transaction

| | |
|---|---|
| **100. Gross Amount Due from Borrower** | |
| 101. Contract sales price | |
| 102. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $5,319,912.45 |
| 104. Payoff to Washington Capital Partners | $4,546,765.88 |
| 105. | |
| **Adjustment for items paid by seller in advance** | |
| 106. City/Town Taxes | |
| 107. County Taxes | |
| 108. Assessments | |
| 109. | |
| 110. | |
| 111. | |
| 112. | |
| **120. Gross Amount Due from Borrower** | $9,866,678.33 |
| **200. Amount Paid by or In Behalf of Borrower** | |
| 201. Deposit | |
| 202. Principal amount of new loan(s) | $8,689,693.00 |
| 203. Existing loan(s) taken subject to | |
| 204. Transfer from 22-0210A | $1,176,985.33 |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| **Adjustments for items unpaid by seller** | |
| 210. City/Town Taxes | |
| 211. County Taxes | |
| 212. Assessments | |
| 213. | |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| **220. Total Paid by/for Borrower** | $9,866,678.33 |
| **300. Cash at Settlement from/to Borrower** | |
| 301. Gross amount due from borrower (line 120) | $9,866,678.33 |
| 302. Less amounts paid by/for borrower (line 220) | $9,866,678.33 |
| 303. Cash ☐ From ☒ To Borrower | |

## K. Summary of Seller's Transaction

| | |
|---|---|
| **400. Gross Amount Due to Seller** | |
| 401. Contract sales price | |
| 402. Personal property | |
| 403. | |
| 404. | |
| 405. | |
| **Adjustment for items paid by seller in advance** | |
| 406. City/Town Taxes | |
| 407. County Taxes | |
| 408. Assessments | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| **420. Gross Amount Due to Seller** | |
| **500. Reductions in Amount Due to Seller** | |
| 501. Excess deposit (see instructions) | |
| 502. Settlement charges to seller (line 1400) | |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first mortgage loan | |
| 505. Payoff of second mortgage loan | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| **Adjustments for items unpaid by seller** | |
| 510. City/Town Taxes | |
| 511. County Taxes | |
| 512. Assessments | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| **520. Total Reduction Amount Due Seller** | |
| **600. Cash at Settlement to/from Seller** | |
| 601. Gross amount due to seller (line 420) | |
| 602. Less reductions in amounts due seller (line 520) | |
| 603. Cash ☒ To ☐ From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services; • Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

Certified True Copy

## L. Settlement Charges

| | | |
|---|---|---|
| 700. Total Real Estate Broker Fees | | |
| Division of commission (line 700) as follows : | | |
| 701. $ | | |
| 702. $ | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| 800. Items Payable in Connection with Loan | | |
| 801. Our origination charge payable to DP Capital, LLC | $217,242.33 | |
| 802. Your credit or charge (points) for the specific interest rate chosen | | |
| 803. Appraisal fee to CL Group LLC | $2,950.00 | |
| 804. Credit report | | |
| 805. Tax service | | |
| 806. Flood certification | | |
| 807. Construction Draw to WCP Fund I LLC | $4,650,000.00 | |
| 808. Loan Processing Fee to DP Capital LLC - POC by $1,000.00 | $2,000.00 | |
| 809. | | |
| 810. | | |
| 900. Items Required by Lender to be Paid in Advance | | |
| 901. Daily interest charges from 03/31/2022 to 04/01/2022 @ $1008.8000 /day | $1,008.80 | |
| 902. Mortgage insurance premium | | |
| 903. Homeowner's Insurance to Chenault Insurance Services, LLC | $22,185.00 | |
| 904. Prepaid interest to WCP Fund I LLC | $246,763.00 | |
| 1000. Reserves Deposited with Lender | | |
| 1001. Initial deposit for your escrow account | | |
| 1002. Homeowner's insurance | | |
| 1003. Mortgage insurance | | |
| 1004. Property taxes | | |
| 1005. | | |
| 1006. | | |
| 1007. Aggregate Adjustment $0.00 | | |
| 1100. Title Charges | | |
| 1101. Settlement or closing fee to District Title | | |
| 1102. Owner's title insurance to Fidelity National Title Insurance Company | | |
| 1103. Lender's title insurance to Fidelity National Title Insurance Company | $20,796.05 | |
| 1104. Lender's title policy limit $10,862,116.25 | | |
| 1105. Owner's title policy limit $ | | |
| 1106. Settlement Fee to District Title | $495.00 | |
| 1107. Title Commitment Fee to District Title | $738.56 | |
| 1108. Release Tracking Fee to Require | $38.49 | |
| 1109. E- Recording Fee to Simplifile | $5.02 | |
| 1110. Abstract Fee to Executive Abstracting Company | $160.00 | |
| 1111. Draw Fees 6 @ $100 to District Title | $600.00 | |
| 1112. CPL (Lender) to Fidelity National Title Insurance Company | $50.00 | |
| 1113. Notary Fees to Bancserv | $200.00 | |
| 1200. Government Recording and Transfer Charges | | |
| 1201. Recording fees: Deed $ Mortgage $156.50 Release $ to District of Columbia District Recording Office | $156.50 | |
| 1202. City/County tax/stamps Deed $ Mortgage $ | | |
| 1203. State tax/stamps Deed $0.00 Mortgage $116,250.00 to District of Columbia District Recording Office | $116,250.00 | |
| 1204. | | |
| 1300. Additional Settlement Charges | | |
| 1301. Property Taxes GT 04/01/2022 to DC Treasurer | $37,547.52 | |
| 1302. Special Assessment Due - A2200101 to DC Treasurer | $726.18 | |
| 1303. | | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1400. Total Settlement Charges (enter on lines 103 Section J and 502 Section K) | $5,319,912.45 | |

**See signature addendum**

Signature Addendum

423 Kennedy St Holdings LLC, a District of Columbia Limited Liability Company

By: ______________________ 3/31/2022
Date

Date

By: Mel Melaku Negussie, Manager

The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

______________________ 3/31/2022
Settlement Agent Date

# A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB Approval No 2502-0265

## B. Type of Loan

| | | | | |
|---|---|---|---|---|
| 1. [ ] FHA 2. [ ] RHS 3. [ ] Conv. Unins. 4. [ ] VA 5. [ ] Conv Ins. | 6. File No. 22-0210-A | 7. Loan No. | | 8. Mortgage Insurance Case No. |
| C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals. | | | | |
| D. Name & Address of Borrower: 423 Kennedy St Holdings LLC 1629 K Street Northwest Washington, DC 20006 | E. Name & Address of Seller: | | | F. Name & Address of Lender: WCP Fund I, LLC 2815 Hartland Road Suite 200 Falls Church, VA 22043 |
| G. Property Location: 419-423 Kennedy Street, NW Washington, DC 20011 3260-0000-0056 | H. Settlement Agent: District Title<br>Place of Settlement: 1775 I Street Northwest #560 Washington, DC 20006 | | | I. Settlement Date: 03/31/2022<br>Funding Date: 03/31/2022<br>Disbursement Date: 03/31/2022 |

## J. Summary of Borrower's Transaction

| 100. Gross Amount Due from Borrower | |
|---|---|
| 101. Contract sales price | |
| 102. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $79,014.67 |
| 104. Transfer to 22-0210 | $1,176,985.33 |
| 105. | |
| **Adjustment for items paid by seller in advance** | |
| 106. City/Town Taxes | |
| 107. County Taxes | |
| 108. Assessments | |
| 109. | |
| 110. | |
| 111. | |
| 112. | |
| **120. Gross Amount Due from Borrower** | $1,256,000.00 |
| **200. Amount Paid by or in Behalf of Borrower** | |
| 201. Deposit | |
| 202. Principal amount of new loan(s) | $1,256,000.00 |
| 203. Existing loan(s) taken subject to | |
| 204. | |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| **Adjustments for items unpaid by seller** | |
| 210. City/Town Taxes | |
| 211. County Taxes | |
| 212. Assessments | |
| 213. | |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| **220. Total Paid by/for Borrower** | $1,256,000.00 |
| **300. Cash at Settlement from/to Borrower** | |
| 301. Gross amount due from borrower (line 120) | $1,256,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | $1,256,000.00 |
| 303. Cash [ ] From [X] To Borrower | |

## K. Summary of Seller's Transaction

| 400. Gross Amount Due to Seller | |
|---|---|
| 401. Contract sales price | |
| 402. Personal property | |
| 403. | |
| 404. | |
| 405. | |
| **Adjustment for items paid by seller in advance** | |
| 406. City/Town Taxes | |
| 407. County Taxes | |
| 408. Assessments | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| **420. Gross Amount Due to Seller** | |
| **500. Reductions in Amount Due to Seller** | |
| 501. Excess deposit (see instructions) | |
| 502. Settlement charges to seller (line 1400) | |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first mortgage loan | |
| 505. Payoff of second mortgage loan | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| **Adjustments for items unpaid by seller** | |
| 510. City/Town Taxes | |
| 511. County Taxes | |
| 512. Assessments | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| **520. Total Reduction Amount Due Seller** | |
| **600. Cash at Settlement to/from Seller** | |
| 601. Gross amount due to seller (line 420) | |
| 602. Less reductions in amounts due seller (line 520) | |
| 603. Cash [X] To [ ] From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services; • Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

Certified True Copy

## L. Settlement Charges

| 700. Total Real Estate Broker Fees | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| Division of commission (line 700) as follows : | | |
| 701. $ | | |
| 702. $ | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. Items Payable in Connection with Loan** | | |
| 801. Our origination charge to DP Capital, LLC (3.5%) | $43,960.00 | |
| 802. Your credit or charge (points) for the specific interest rate chosen | | |
| 803. Appraisal fee | | |
| 804. Credit report | | |
| 805. Tax service | | |
| 806. Flood certification | | |
| 807. Processing Fee to DP Capital LLC | $1,250.00 | |
| 808. | | |
| 809. | | |
| 810. | | |
| **900. Items Required by Lender to be Paid in Advance** | | |
| 901. Daily interest charges from 03/31/2022 to 04/01/2022 @ $418.6667 /day | $418.67 | |
| 902. Mortgage insurance premium | | |
| 903. Homeowner's insurance | | |
| 904. | | |
| **1000. Reserves Deposited with Lender** | | |
| 1001. Initial deposit for your escrow account | | |
| 1002. Homeowner's insurance | | |
| 1003. Mortgage insurance | | |
| 1004. Property taxes | | |
| 1005. | | |
| 1006. | | |
| 1007. Aggregate Adjustment $0.00 | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee to District Title | | |
| 1102. Owner's title insurance to Fidelity National Title Insurance Company | | |
| 1103. Lender's title insurance to Fidelity National Title Insurance Company | $1,334.50 | |
| 1104. Lender's title policy limit $1,570,000.00 | | |
| 1105. Owner's title policy limit $ | | |
| 1106. Settement Fee to District Title | $495.00 | |
| 1107. | | |
| 1108. | | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. Recording fees: Deed $ Mortgage $156.50 Release $ to District of Columbia District Recording Office | $156.50 | |
| 1202. City/County tax/stamps Deed $ Mortgage $ | | |
| 1203. State tax/stamps Deed $ Mortgage $31,400.00 to District of Columbia District Recording Office | $31,400.00 | |
| 1204. | | |
| **1300. Additional Settlement Charges** | | |
| 1301. Property Taxes to DC Treasurer - POC by borrower $34263.90 | | |
| 1302. | | |
| 1303. | | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | $79,014.67 | |

**See signature addendum**

## Signature Addendum

423 Kennedy St Holdings LLC, a District of Columbia Limited Liability Company

By: ______________________ 3/31/2022 ______________________ Date

Date

By: Mel Melaku Negussie, Manager

The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

______________________ 3/31/2022

Settlement Agent Date

# PLAINTIFFS' EXHIBIT 37



423 Kennedy - 001



423 Kennedy - 002



423 Kennedy - 003



423 Kennedy - 004



423 Kennedy - 005



423 Kennedy - 006



423 Kennedy - 007



423 Kennedy - 008



423 Kennedy - 009



423 Kennedy - 010



423 Kennedy - 011



423 Kennedy - 012




423 Kennedy - 013



423 Kennedy - 014












423 Kennedy - 019



423 Kennedy - 020




423 Kennedy - 021



423 Kennedy - 022



423 Kennedy - 023





423 Kennedy - 025



423 Kennedy - 026









423 Kennedy - 030



423 Kennedy - 031





# PLAINTIFFS' EXHIBIT 38

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

________________________________

DEVELOPER RE1, LLC,

Plaintiff,

v. No.

DP CAPITAL, LLC d/b/a WASHINGTON 2022-CAB-005935

CAPITAL PARTNERS, et al.,

Defendants.

________________________________

DEPOSITION OF

DANIEL HUERTAS

DATE: Wednesday, July 19, 2023

TIME: 10:01 a.m.

LOCATION: Greenstein DeLorme & Luchs, PC

801 17th Street Northwest, Suite 1000

Washington, DC 20006

REPORTED BY: Matthew Yancey, Notary Public

JOB NO.: 6012872

PAGES 87-100, 105-222, 251-287 ARE CONFIDENTIAL

# PLAINTIFFS' EXHIBIT 39

CL GROUP LLC

February 23, 2022

Washington Capital Partners
2815 Hartland Road,
Suite 200
Falls Church, VA 22043

RE: Proposed 33-Unit Multi-Family Project
423 Kennedy Street, NW
Washington D.C. 20011

Dear Sir/ Madam:

In accordance with your request and for the purpose of providing an estimate of market value, the CL Group, LLC, has inspected the above captioned property and submits the following appraisal report.




The subject property under analysis consists of approximately 9,520± square feet of land currently under construction with a planned mixed-use building containing a total gross area of 37,564 square feet of space. The proposed improvements, which will contain thirty-three (33) residential units sold at market rates and 2,500 square feet of first floor commercial retail space, is projected to be completed September 1, 2022. Construction commenced on the subject site in January 2020. The total budget for the proposed improvements is $8,595,854. As of the date of inspection, approximately $4,443,679 or 51.7% had been spent toward the proposed development.

The subject property is located along the North side of Kennedy Street, NW, between 5th Street, NW to the West and 4th Street, NW to the East, in the Petworth neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject property is known as Lot 0056 of Square 3260 and contains approximately 9,520± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

The purpose of this appraisal, per the request of the client, is to estimate the "as completed" and "as is" market values of the subject's Fee Simple Interest as described herein. The function of the appraisal is to assist the client in real estate valuation. The definition of **"Market Value"**, as defined in the Dictionary of Real Estate Appraisal, 6th Edition, is as follows:

> *"the most probable price which a property should bring in competitive and open market under all condition requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus".*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*
- *both parties are well-informed or well-advised, and each acting in what he considers his own best interest;*
- *a reasonable time is allowed for exposure in the open market;*
- *payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable there to; and*
- *the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

**It is assumed that the subject property is in compliance with all applicable codes, rules and regulations.**

The subject property was inspected by the undersigned of the CL Group, LLC on February 21, 2022, which is considered the effective date of the appraisal.

After considering all of the known factors that affect the value of the subject property, as described herein, it is the opinion of the undersigned that the estimated market value as of February 21, 2022, subject to the Statements of Limiting Conditions, is as follows:

**GROSS RETAIL MARKET VALUE "AS COMPLETED"- SEPTEMBER 1, 2022**

**$17,891,000**

**SEVENTEEN MILLION EIGHT HUNDRED NINETY-ONE THOUSAND DOLLARS**

---

**MARKET VALUE "AS IS"- FEBRUARY 21, 2022**

**$10,023,000**

**TEN MILLION TWENTY-THREE THOUSAND DOLLARS**

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

*It is noted and emphasized that the estimated value does NOT include FF&E.*

---

***The coronavirus threat may be impacting market conditions. However, in most markets it is not yet clear to what extent, if any, market conditions are affected. Related, complicating factors include fluctuations in the stock market and changes in mortgage interest rates.***

Gregory R. Clucas is currently certified under the continuing education program of the Appraisal Institute. We have no interest in the property and our employment and compensation are not contingent upon the valuation. The appraisal report is hereto attached and made subject to the conditions and comments herein. This appraisal has been prepared in accordance with the current Uniform Standards of Professional Appraisal Practice (USPAP) as adopted by the Appraisal Foundation as mandated by the Office of Thrift Supervision and originated in conjunction with the Financial Institutions Reforms, Recovery and Enforcement Act of 1989 (FIRREA).

Respectfully submitted,

| | |
|---|---|
| **Gregory R. Clucas, MAI**<br>**DC Certified General Real Estate Appraiser No. GA10008** | **Greg Clucas, Jr., Associate** |

## EXECUTIVE SUMMARY OF SALIENT FACTS

PROPERTY LOCATION: The subject property is located along the North side of Kennedy Street, NW, between 5th Street, NW to the West and 4th Street, NW to the East, in the Petworth neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject property is known as Lot 0046 of Square 3260 and contains approximately 9,520± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

SUBJECT PROPERTY: The subject property under analysis consists of approximately 9,520± square feet of land currently under construction with a planned mixed-use building containing a total gross area of 37,564 square feet of space. The proposed improvements, which will contain thirty-three (33) residential units sold at market rates and 2,500 square feet of first floor commercial retail space, is projected to be completed September 1, 2022. Construction commenced on the subject site in January 2020. The total budget for the proposed improvements is $8,595,854. As of the date of inspection, approximately $4,443,679 or 51.7% had been spent toward the proposed development.

FUNCTION OF THE APPRAISAL: To assist the client in real estate valuation.

INTENDED USE/USERS: The intended use of the appraisal is for finance or subsequent transaction of a loan. The intended users of the report are Washington Capital Partners and their successors or assigns, and any participating financial institutions.

PURPOSE OF THE APPRAISAL: To estimate the “as completed” and “as is” Market Values as described herein.

EFFECTIVE DATE OF VALUATION: February 21, 2022.

DATE OF INSPECTIONS: The undersigned of the CL Group inspected the subject on February 21, 2022.

DATE OF COMPLETION: September 1, 2022.

| | |
|---|---|
| ZONING: | The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations. |
| HIGHEST AND BEST USE: | Proposed Development. |
| ESTIMATED MARKETING TIME: | Given the size of the subject property, an estimated marketing time of one year or less appears reasonable. In addition, a recent PwC Real Estate Investor Survey references a national average marketing time of approximately nine months for all property types. |

**FINAL VALUE ESTIMATES:**

**GROSS RETAIL MARKET VALUE "AS COMPLETED"- SEPTEMBER 1, 2022**

**$17,891,000**

**SEVENTEEN MILLION EIGHT HUNDRED NINETY-ONE THOUSAND DOLLARS**

---

**MARKET VALUE "AS IS"- FEBRUARY 21, 2022**

**$10,023,000**

**TEN MILLION TWENTY-THREE THOUSAND DOLLARS**

---

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

*It is noted and emphasized that the estimated value does NOT include FF&E.*

# TABLE OF CONTENTS

## INTRODUCTION


| | PAGE |
|---|---|
| LETTER OF TRANSMITTAL | 1 |
| STATEMENT OF LIMITING CONDITIONS | 7 |
| QUALIFICATIONS OF THE APPRAISERS | 10 |
| PHOTOGRAPHS OF THE SUBJECT PROPERTY | 13 |
| IDENTIFICATION OF THE SUBJECT | 18 |
| LEGAL DESCRIPTION | 18 |
| FUNCTION OF THE APPRAISAL/INTENDED USER | 18 |
| INTENDED USE | 18 |
| DATE OF INSPECTION | 19 |
| EFFECTIVE DATE OF THE APPRAISAL | 19 |
| PURPOSE OF THE APPRAISAL | 19 |
| PROPERTY RIGHTS APPRAISED | 19 |
| HISTORY OF THE SUBJECT | 19 |
| SCOPE OF THE APPRAISAL | 20 |
| MARKETING & EXPOSURE PERIODS | 21 |
| DEFINITIONS PERTINENT TO VALUE | 22 |


## DESCRIPTION & ANALYSIS


| | |
|---|---|
| WASHINGTON, D.C. | 26 |
| IMMEDIATE ENVIRONS | 36 |
| SITE DESCRIPTION | 40 |
| ZONING DISCUSSION | 42 |
| REAL ESTATE ASSESSMENTS | 43 |
| HIGHEST AND BEST USE | 48 |


## VALUATION


| | |
|---|---|
| APPROACHES TO VALUE | 52 |
| MARKET VALUE UPON COMPLETION | 55 |
| MARKET VALUE AS IS | 72 |
| FINAL VALUE ESTIMATES | 74 |
| CERTIFICATION | 75 |

## STATEMENT OF LIMITING CONDITIONS

This report is made subject to the following assumptions and limiting conditions.

1. The appraiser assumes no responsibility for legal matters nor does the appraiser render any opinion as to the Title, which is assumed to be good. All existing liens and encumbrances, unless specified in the report, have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management. Unless otherwise noted herein, it is assumed there are no encroachments, zoning or other violations of any regulations affecting the subject.

2. The Plot Plan, if contained herein, is included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumes no responsibility in connection with such matters.

3. Information that was furnished by others is so noted and is believed to be reliable, but the appraiser assumes no responsibility in connection with such matters.

4. The appraiser is not required to give testimony nor to appear in court by reason of this appraisal, with reference to the property in question, unless arrangements have been previously made.

5. The client will indemnify the appraiser and has agreed to promptly defend appraiser against any damage resulting from any claim or cause of action by any third party arising out of said use or dissemination of this appraisal report (or the contents thereof). This obligation to indemnify and defend shall not apply to the extent any such claim or cause of action arising out of the adjudicated negligence or willful misconduct of the appraiser in performing the appraisal. The appraiser has the right to approve any attorney employed by the client to defend against such claim or cause of action and has the right to approve any settlement or compromise of such claim or cause of action.

6. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

7. The improvements, and particularly the buildings, appear to be free of hazards. The appraiser does not warrant against the presence of asbestos, radon gas, PCB's, underground storage tanks and/or use of formaldehyde foam insulation within the building.

8. The appraiser assumes no liability for structural conditions not visible through ordinary, careful inspection or a review of the plans and specifications, if proposed.

9. Subsurface rights (mineral, gas and oil) were not considered in making this appraisal.

10. Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media, without the written consent and approval of the author, particularly as to valuation conclusions, the identity of the appraiser or its firm. This report may be shared with an organization other than the client only in its entirety.

11. Possession of this report, or a copy thereof, does not carry with it the right of publication, nor may it be used for any purpose by anyone but the client without the previous written consent of the appraiser and the client, and then only with proper qualification.

12. It is assumed that any proposed improvements are completed unless stipulated otherwise in this report; any construction is assumed to conform with the building plans and/or improvements descriptions provided the appraiser and summarized in this report.

13. Any future discovery of a concealed or unapparent deficiency in the real estate (such as substance, toxic waste, radon gas, asbestos, UFFI or other hazards) renders this report invalid.

14. It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless no compliance is stated, defined and considered in the appraisal report.

15. It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state, or national governmental or private entity or organization has been or can be obtained or renewed for any use on which the value estimate contained in this report is contingent.

16. The current (as of the date of appraisal) purchasing power of the dollar is the basis for the value estimates; no extreme fluctuations in economic cycles are anticipated.

17. The value estimate is based upon appropriate research and applicable appraisal techniques. By its nature the appraisal of real estate is not an exact science, and the end product is an opinion with which others may differ. The final estimate of the value is not guaranteed, and no warranty is implied or intended.

18. Acceptance of and/or use of this appraisal report constitutes an understanding and acceptance of the foregoing assumptions and limiting conditions.

19 The Americans with Disabilities Act took effect January 26, 1992. We have not considered any part of this act and how it impacts the subject property in terms of compliance and/or renovation costs. We, therefore, reserve the right to amend this report should a competent survey indicate changes may be required.

20. *It is assumed that the subject property is in compliance with all applicable codes, rules and regulations. It is also noted and emphasized that the estimated value does NOT include FF&E.*

21. *It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

Respectfully Submitted,

**Gregory R. Clucas, MAI**
**DC Certified General Real Estate Appraiser No. GA10008**

**Greg Clucas, Jr.,**
**Associate**

CL GROUP LLC

# CL GROUP, LLC

*Over 45 years of experience appraising commercial real estate in the Washington DC area.*

## GREGORY R. CLUCAS, MAI

**~ PRESIDENT ~**

### EDUCATION

- B.S. Degree – Marketing, minor in Economics
- University of Arizona, Tucson, Arizona
- Post Graduate Studies, Real Estate and Urban Development
- American University, Washington, D.C.
- Currently certified under the Continuing Education Program of the Appraisal Institute (through December 31, 2022)

### LICENSES/CERTIFICATIONS

- District of Columbia Certified General Real Estate Appraiser No. 10008
- Maryland Certified General Real Estate Appraiser No. 04-428
- Virginia Certified General Real Estate Appraiser No. 4001-000931
- West Virginia Certified General Real Estate Appraiser No. 316

### COMPLETED CERTIFICATION COURSES AND SEMINARS

- Business Practices and Ethics Standards of Professional Practice (2019)
- USPAP Update, 2021
- Partial Interest Valuation – Undivided
- Partial Interest Valuation – Divided
- Attacking & Defending an Appraisal in Litigation
- An Introduction to Valuing Green Buildings
- Analyzing Distressed Real Estate
- Appraisal of Residential Property Foreclosure
- Current Issues in Appraising
- Deriving and Supporting Adjustments
- Appraising and Analyzing Industrial and Flex Buildings for Mortgage Underwriting
- Curriculum Overview – General
- Curriculum Overview – Residential
- Analyzing Operating Expenses
- Appraisal of Land and Site Valuation
- Appraisal of Self Storage Facilities
- Appraisal of Fast Food Facilities
- West Virginia Appraisal Law
- Appraisal of Assisted Living Facilities
- The Income Approach, An Overview
- Advanced Hotel Appraising, Full Service Hotels
- Basic Hotel Appraising, Limited Service Hotels
- The Discounted Cash Flow Model: Concepts, Issues & Apps

*Numerous conferences and seminars conducted by various professional organizations including the Appraisal Institute.*

### PROFESSIONAL MEMBERSHIPS

- Member, Appraisal Institute (MAI)

### EXPERIENCE

Valuation and investment counselor to institutional investors, corporations, associations, attorneys, and government agencies. Qualified as an expert witness before the local and federal courts of record as well as numerous special boards and commissions. Scope of experience includes all types of urban and suburban properties.

www.candlgroup.com

CL Group, LLC
19620 Club House Rd.
Montgomery Village,
Maryland, 20886
Tel.: 301.258.1008
GClucas@aol.com

CL GROUP LLC

# CL GROUP, LLC

*Over 45 years of experience appraising commercial real estate in the Washington DC area.*

## REPRESENTATIVE CLIENTELE

- 1st Mariner Bank
- Abdo Development
- Allstate Appraisal
- American Bank
- American Investors Life Insurance Company
- American Military University
- Annapolis West United Partnership
- Atena, Inc.
- Banco Popular North America
- Bank Annapolis
- Branch Banking & Trust Company
- Broad Street
- Cardinal Bank
- Ciena Capital
- City of College Park, Maryland
- Colliers International
- Colombo Bank
- Chain Bridge Bank
- Columbia Bank
- Congressional Bank
- Curtis Property Management Comp.
- Damascus Community Bank
- Eagle Bank
- Earthtek
- Federal Deposit Insurance Corp.
- First Citizens Bank
- First Horizon Appraisal Division
- First Mariner Mortgage Corp.
- First National Bank
- First United Bank & Trust
- First Virginia Community Bank
- FNB
- Freedom Bank
- Fulton Financial
- Genworth North America Corp.
- Graystone Bank
- Great Point Investors
- Jackson Life Insurance Company
- John Marshall Bank
- Live Oak Bank
- Montgomery Dept. of Public Works
- Mainstreet Bank
- Mid-Atlantic Financial Partners
- Montgomery County Public Schools
- Monument Bank
- NIH Federal Credit Union
- Northmarq Capital
- Ohio Public Employees Retirement System
- Old Line Bank
- Orrstown Bank
- Penrose Financial Group
- People's Bank
- Phillips Realty Capital
- PNC Bank
- PPM Finance
- Premier Bank
- Prince George's Financial Services
- Quadrant-Financial
- Revere Bank
- Rivita Lending
- Sandy Spring Bank
- Small Business Administration of America
- Southern Farm Bureau
- Southstar
- Sovereign Bank, N.A.
- StanCorp Mortgage Investors
- Stanley Martin Homes
- State Employees Credit Unit of MD
- Symetra Life Insurace
- The Fauquier Bank
- The Old Point National Bank
- The Patapsco Bank
- The University of Maryland
- The Washington Savings Bank
- Town of Oakland, MD.
- Valley Bank
- Washington First
- Washington Metropolitan Area Transit Authority
- William A. Hazel, Incorporated
- Zurich American Insurance Company

## APPRAISAL ASSIGNMENTS

Mr. Clucas has performed appraisals on various property types including, but not limited to, shopping centers, apartment complexes, manufacturing plants, office buildings, residential and office condominium buildings, raw and developed land, office parks, motels, hotels and mixed use properties. Mr. Clucas is currently certified in the State of Virginia, the State of Maryland, the State of West Virginia and the District of Columbia as a General Real Estate Appraiser.



CERTIFICATE OF LICENSURE

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
Occupational and Professional Licensing Administration

*certifies that*

GREGORY CLUCAS

*has met all requirements by law and regulations and is hereby licensed as:*

APPRAISER CERTIFIED GENERAL
LICENSE#: GA10008

Issue Date: 3/1/2020
Expiration Date: 2/28/2022

*Director, Department of Consumer and Regulatory Affairs*

dcra

Serial #: 450739

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

## PHOTOGRAPHS OF THE SUBJECT




Exterior views of the subject property





Exterior views of the subject property





Interior views of the subject property





Interior views of the subject property



CL GROUP LLC

## LOCATION MAPS OF THE SUBJECT






## IDENTIFICATION OF THE SUBJECT

The subject property under analysis consists of approximately 9,520± square feet of land currently under construction with a planned mixed-use building containing a total gross area of 37,564 square feet of space. The proposed improvements, which will contain thirty-three (33) residential units sold at market rates and 2,500 square feet of first floor commercial retail space, is projected to be completed September 1, 2022. Construction commenced on the subject site in January 2020. The total budget for the proposed improvements is $8,595,854. As of the date of inspection, approximately $4,443,679 or 51.7% had been spent toward the proposed development.

The subject property is located along the North side of Kennedy Street, NW, between 5th Street, NW to the West and 4th Street, NW to the East, in the Petworth neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject property is known as Lots 0046 & 0047 of Square 3260 and contains approximately 9,520± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

## LEGAL DESCRIPTION

The subject property is legally described as Lots 0046 & 0047 of Square 3260.

## FUNCTION OF THE APPRAISAL

The function of the appraisal is for the internal utilization of the client, Washington Capital Partners, their successors or assigns, and any participating financial institutions. This valuation assignment was developed consistent with the scope specified. This specific appraisal is for the sole use of the client and may not be used for any other purpose without written consent from the appraiser.

## INTENDED USE

The intended use of this report is for a renewal, finance or subsequent transaction of a loan.

## DATE OF INSPECTION

The subject property was inspected by the undersigned of the CL Group, LLC on February 21, 2022.

## EFFECTIVE DATE OF THE APPRAISAL

The subject property was inspected by the undersigned of the CL Group, LLC on February 21, 2022, which is the effective date of this report.

## PURPOSE OF THE APPRAISAL

The purpose of the appraisal is to estimate the "as completed" and "as is" market values of the subject property.

## PROPERTY RIGHTS APPRAISED

The property rights appraised are those represented by the Fee Simple Interest. These property rights as defined in The Dictionary of Real Estate Appraisal, 6th Edition, are as follows:

**Fee Simple Interest:** *"Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation."*

## HISTORY OF THE SUBJECT

According to tax records, the subject is under the following ownership:

**423 KENNEDY ST HOLDINGS LLC**
**1215 1ST ST NE**
**WASHINGTON DC 20002-7935**

According to District of Columbia records, the subject property has not traded in the previous three years. Any trades on the subject have been off market transactions. It should be noted that the subject's lots have historically been identified as lots 0046 & 0047 but appear to have been combined and designated for tax purposes as lot 56.

## SCOPE OF THE APPRAISAL

**Scope of Work** is defined by the Uniform Standards of Professional Appraisal Practice (USPAP) 2020/2021 Edition, as *"the type and extent of research and analyses in an assignment." The Scope of Work must include the research and analyses that are necessary to develop credible assignment results*.

The subject property has been inspected and tax records have been reviewed. The property has been identified and characteristics that influence value are described. A description of the property follows. The highest and best use of the property is then analyzed. The methods used in the appraisal are explained in the "Valuation Procedure" section of this report.

In estimating the property's market value, market data was researched from the subject's market area. In addition, owners of the other properties and real estate brokers have provided market information. A sufficient amount of data is available from which to draw reliable conclusions as to the value of the subject property. The appraisers are not qualified to render opinions that are legal in nature; however apparent easements other than normal utility services and other restrictions, where known or observed, are noted.

The appraisers are not experts in matters concerning engineering or toxic wastes. Where some hazard is observed, it is described.

This appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation

A partial list of data sources is found below. To which aspect of the analysis they apply, your attention is invited to that specific portion of the report. Every attempt has been made to ensure the accuracy in the reporting of this information. As a result, it is our opinion that a third party can rely, as much as is reasonable, on the data communicated in this report.

A partial list of the data sources utilized in this appraisal is as follows:

- Metropolitan Regional Information Systems, Inc. (MRIS)

- CoStar Group, Inc. (www.CoStar.com)
- The District of Columbia
- Surveys and Tax Maps
- Real Estate Agents and Brokers
- Appraisers
- Mr. Mel Negussie – Subject Sponsor

## MARKETING & EXPOSURE PERIODS

According to Advisory Opinion G-7 from the Appraisal Standards Board of the Appraisal Foundation, the estimate of marketing time occurs after the effective date of the market value estimate. Marketing time is sensitive to price/value relationships, meaning that, for a given property, marketing time may increase with higher prices, and decrease with lower prices. The estimate of a reasonable marketing time assumes that the subject sells at or near the estimate of market value as presented in this appraisal report.

According to Statement of Appraisal Standards No. 6 (SMT-6) of the Appraisal Standards Board of the Appraisal Foundation, exposure time is defined as the estimated length of time the property appraised would have been on the market prior to the hypothetical assumption that it sold as of the effective date of the appraisal for the appraised amount. Thus, exposure time differs from marketing time as it is a retrospective estimate, based upon the analysis of past events leading up to the date of the appraisal, and is provided as a means of synthesizing actual market trends for the purposes of accurately anticipating the future in a marketing time estimate.

The basis for estimated exposure periods is found in statistical information about time on the market, gathered through sales verification, and interviews of market participants. Based upon the market value estimate provided in this report, the appraiser estimates that a reasonable exposure period of 12 months would have been required to sell the subject property as of the date of the appraisal. The appraiser estimates that a marketing time of one year or less from the date of the appraisal would be required in order to sell the subject property at the appraiser's market value estimate. This opinion is further substantiated by a recent PwC Investor Survey which references a national average marketing time of approximately nine months for all property types.

## DEFINITIONS PERTINENT TO VALUE

The definition of **"Market Value"**, as described within Attachment A of the engagement letter, is defined as follows:

> *"the most probable price which a property should bring in competitive and open market under all condition requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus".*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*
- *both parties are well-informed or well-advised, and each acting in what he considers his own best interest;*
- *a reasonable time is allowed for exposure in the open market;*
- *payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable there to; and*
- *the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

**"Hypothetical Condition"** is defined as:

> *"that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical condition assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property, such as market conditions or trends; or about the integrity of data used in an analysis.*

A hypothetical condition may be used in an assignment only if:

- *Use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;*
- *Use of the hypothetical condition results in a credible analysis; and*
- *The appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.*

**Market value "as is"** on appraisal date means an estimate of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical condition, assumption, or qualification as of the date of the appraisal is prepared.

**Market value "as if" complete** on appraisal date means the market value of a property with all proposed construction, conversion, or rehabilitation hypothetically complete, or under other specified hypothetical conditions as of the date of the appraisal.

With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value shall reflect the market value of the property as if completed and prepared for occupancy by tenants.

**Prospective future value upon completion of construction** means the prospective future value of a property on the date that construction is completed, based upon market conditions forecast to exist as of that completion date.

**Prospective future value upon reaching stabilized occupancy** means the prospective future value of a property at a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy.

## Other Terms and Definitions

**Retrospective Value Opinion**
"An opinion of value as of a specified historic date. A retrospective value opinion is most frequently sought in connection with appraisals for estate tax, condemnation, inheritance tax, and similar purposes."

**Extraordinary Assumption**
"An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions
external to the property such as market conditions or trends; or about the integrity of data used in an analysis.

**Fee Simple Interest**
"Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation."

**Leased Fee Estate**
An ownership interest held by a landlord with the landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor or the leased fee owner and leased fee are specified by contract terms contained within the lease.

**Cash Equivalent Value**
"A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts."

**Floor Area Ratio**
"The relationship between the above ground floor area of a building and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal; e.g., a total of 2.0 indicates that the floor area of a building is twice the total land."

**Discounted Cash Flow (DCF) Analysis**

"A set of procedures in which the quantity, variability, timing, and duration of periodic income, as well as the quantity and timing of reversions, are specified and discounted to a specific yield rate."

# DESCRIPTION & ANALYSIS

## WASHINGTON D.C.




Washington, D.C. covers more than 4,400 square miles of thriving businesses. As the center of the eighth largest metropolitan area in the nation, the mixture of people and purposes come together in Washington, D.C., making it an exciting place in which to live and work.

Streets and other public rights-of-way represent more than twenty-two percent of the District's land area. The city is divided into four quadrants, Northeast, Northwest, Southeast, and Southwest. The central point is the U.S. Capitol Building. Streets running east-west are lettered in alphabetical order. Numbered streets run north-south.

POPULATION

As of December 2021, the District's population was over 690,000 and continuing to increase. During the next ten years, the population in the District of Columbia is expected to remain stable.

INCOME

Traditionally one of America's richest urban centers, Washington area residents spend more money per household than residents in nearly every major U.S. city. This market has more college graduates per capita, it has more $60,000 and above household incomes than any other market, and it is one of the top affluent markets in the country. One out of every five Washingtonians is an affluent urban dweller.

EMPLOYMENT GROWTH

The Greater Washington has its share of large companies and major corporate headquarters. Perhaps not as well known, the region also provides a thriving environment for small company creation and growth. In fact, Greater Washington is home to the most Inc. 500 fastest-growing private businesses in the US - for the past 12 consecutive years. It is worth noting The Association of Foreign Investors in Real Estate ranked Washington the No. 1 global city for real estate investment, beating out London, New York, Tokyo, Shanghai, and San Francisco.

TRANSPORTATION

At the center of a transportation network, including three major airports, a regional rail and bus system, and a major road system with several major interstate routes, the District is responsible for transportation where the demand is highest and the use is most intense, within the city.

Public transportation in the District includes both rail and bus service and is operated by the Washington Metropolitan Area Transportation Authority. In addition to public transportation and commercial and private vehicles, more than 7,200 taxicabs and hundreds of tour buses must be considered in discussing an efficient system.

RAIL

The Metrorail system (known locally as "Metro") has plans for over 103 track miles and 85 stations on five lines, extending from the District to the surrounding suburban areas. Currently, there are 36 rail stations and 29.6 miles of rail service operating solely in the District.

In addition to Metro, AMTRAK services the District with both regional and national service from Union Station to all points in the nation. There is a Metrorail stop at Union Station which makes access to AMTRAK service convenient.

ROADS

Getting into the District is facilitated by the limited access roadways, which are part of the federal interstate highway system. The major interstate access into the Washington area is the Capital Beltway (I-495). It is a 62-mile highway that circles Washington, D.C. and connects with all interstate highways.

In addition, there is I-95, a major north-south interstate that uses the eastern half of the Beltway as its route around Washington. Also, I-295 and I-395 run from Maryland to Virginia through the District, and I-66 runs from Virginia into the District. Critical interurban extensions of I-66 and Dulles Airport Access Road from Capital Beltway through Arlington to downtown Washington were completed in 1984 and 1985 respectively.

Other major highways in the Washington Metropolitan area that are easily accessible from the District include: the George Washington Memorial Parkway, Routes 1, 236, 7, 50, 29/211, and 123 in Virginia, and Routes 29, 1, 97, 4 and 50, and the Baltimore-Washington Parkway in Maryland.

AIR

Washington, D.C. is served by three full-service commercial airports. Of the three, Reagan National Airport is closest to downtown Washington, less than five miles from the city center. Open to traffic in 1940 and recently renovated, National now accommodates approximately 16 million passengers a year, approximately 45,000 air travelers every day.

Washington Dulles International Airport is now the fastest growing airport in the United States. Its location near Chantilly, Virginia is 26 miles from the District. Baltimore/Washington International Airport is located about 30 miles northeast of Washington, and is one of the few major airports in the country accessible by rail service. BWI is linked to both Baltimore and Washington by its own AMTRAK Station. Access to and from all three airports is by way of private automobile, taxi, or airport bus service. The Washington Flyer, an airport bus service,

operates between major hotels in the area, and more than 70 points throughout the region, to provide a connection with Reagan National and Dulles Airports. The Airport Connection runs buses between downtown hotels and BWI. In addition, the Metro system has a stop at Reagan National Airport.

SUMMARY

Washington, D.C. is a city which continues to diversify while retaining the charm of its past and its important role in national government and politics. It is a city where opportunities abound, and where public and private sector cooperation is strong. Any well-located real estate property stands to benefit from this combination of strong consumer demand, the many excellent modes of transportation available, and a diversified economic base.

CL GROUP LLC

## HOUSING CONDITIONS JANUARY 2022

Washington D.C. | January 2022

# Home Demand Index

The Bright MLS | T3 Home Demand Index for the Washington Metro area fell by 29 percent in December to a reading of 69. The Limited demand in December reflected a decline from the Steady pace in November. The Index was slightly more than 23 percent lower than the level one year earlier.

Demand fell for each type of Washington Metro area home in December. Demand for higher-priced single-family and higher-priced condos decreased the most over the month, each dropping by more than one-third. Buyer interest in mid-priced single-family homes fell by 31 percent. The lower-priced and mid-priced single-family segments exhibited the weakest demand with both in the Limited demand category. All other types of homes recorded a Slow level of demand. Inventory levels ranged from just 0.8 months supply for mid-priced single-family homes to a 2.3 months supply for higher-priced condos. The month's supply was down slightly for all market segments due mostly to a decrease in the number of listings on the market.




Monthly Statistics for January 2022

| Home Demand Index | Home Demand Index from prior month | Home Demand Index from prior year | Index change from prior month | Index change from same time last year |
|---|---|---|---|---|
| 69 (Limited) | 97 | 90 | -28.9% | -23.3% |

Washington D.C. | January 2022

# Home Demand Index | Historical Year-over-Year Comparison

Demand for homes in the Washington Metro area decreased sharply in November and December, with the Index recording a cumulative decline of 45 percent over the period. The decrease followed several months in the summer and fall when buyer interest remained moderate. The two-month drop in the Index was greater than the decrease over the same period one year earlier. This suggests that in addition to the seasonal drop in buyer interest, other factors, including rising home prices, reduced affordability, and limited inventory, also sidelined some would-be buyers.



Washington D.C. | January 2022

## Demand and Inventory by Home Type

Demand fell for each type of Washington Metro area home in December. Demand for higher-priced single-family and higher-priced condos decreased the most over the month, each dropping by more than one-third. Buyer interest in mid-priced single-family homes fell by 31 percent. The lower-priced and mid-priced single-family segments exhibited the weakest demand with both in the Limited demand category. All other types of homes recorded a Slow level of demand. Inventory levels ranged from just 0.8 months supply for mid-priced single-family homes to a 2.3 months supply for higher-priced condos. The month's supply was down slightly for all market segments due mostly to a decrease in the number of listings on the market.




## Single Family Home $395k - $950k

Buyer interest in mid-priced single-family homes was Limited in December, decreasing from a Steady pace of demand in November. With only 0.8 months supply of homes available for sale, would-be buyers in the market were faced with a challenging search process likely curbing overall sales. The months supply was lower in December, largely attributable to a decline in listings.




Monthly Statistics for Single Family Home $395k - $950k

## Condo Below $570k

Buyer interest in lower-priced condos fell from a Moderate pace in November to a Slow pace in December. The Index, at 89, was down by 25 percent over the month and one-fourth lower than one year earlier. Along with a decrease in demand, the month's supply fell to 1.9 from 2.6 months in November.




Monthly Statistics for Condo Below $570k

| Home Demand Index | Home Demand Index from prior month | Home Demand Index from prior year | Months of Inventory | Average daily inventory last month | Inventory sold last month |
|---|---|---|---|---|---|
| 89 (Slow) | 118 | 117 | 1.9 | 1,818 | 968 |

## Condo Above $570k

Demand for higher-priced condos fell more than any other segment of the Washington Metro area market, according to the Bright MLS | T3 Home Demand Index. The Index, down by nearly 40 percent, moved from High to Slow buyer demand over the month as a result. The months supply fell from 3.3 in November to 2.3 in December, with virtually all of the decrease attributable to a drop in the number of listings.




Monthly Statistics for Condo Above $570k

| Home Demand Index | Home Demand Index from prior month | Home Demand Index from prior year | Months of Inventory | Average daily inventory last month | Inventory sold last month |
|---|---|---|---|---|---|
| 86 (Slow) | 140 | 118 | 2.3 | 384 | 164 |

## WASHINGTON DC HOUSING DATA NOVEMBER 2021

There was an increase in total units sold in November, with 858 sold this month in Washington DC Real Estate, an increase of 4%. This month's total units sold is similar compared to a year ago. Versus last year, the total number of homes available this month is lower by 191 units or 9%. The total number of active inventory this November was 1,841 compared to 2,032 in November 2020. This month's total of 1,841 is lower than the previous month's total supply of available inventory of 2,201, a decrease of 16%.

Last November, the median sale price for Washington DC Homes was $680,000. This November, the median sale price was $725,500, an increase of 7% or $45,500 compared to last year. The current median sold price is 3% higher than in October. In November, there was 2.1 months of supply available in Washington DC, compared to 2.4 in November 2020. That is a decrease of 10% versus a year ago.

This month there were 1,019 homes newly listed for sale in Washington DC compared to 1,048 in November 2020, a decrease of 3%. There were 860 current contracts pending sale this November compared to 766 a year ago. The number of current contracts is 12% higher than last November. In November, the average sale price in Washington DC was 99.8% of the average list price, which is similar compared to a year ago.

## IMMEDIATE ENVIRONS




The subject property is located along the North side of Kennedy Street, NW, between 5th Street, NW to the West and 4th Street, NW to the East, in the Petworth neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject property is known as Lots 0046 & 0047 of Square 3260 and contains approximately 9,520± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

For years, neighborhoods east of the Anacostia River and the zip code that encompasses most of Petworth have been prime locations for flipping homes and in 2020, that remains the case. In January 2022, Petworth home prices were up 4.5% compared to last year, selling for a median price of $785K. On average, homes in Petworth sell after 27 days on the market compared to 27 days last year. There were 86 homes sold in January this year, down from 112 last year.

The roughly mile-long stretch of Georgia Avenue from Lamont Street to Upshur Street that includes part of the Petworth and Park View neighborhoods has at least 13 multifamily projects in various stages of development and has welcomed at least 17 new bars and restaurants since the start of 2018, plus a gym, a hair salon and a clothing store.

The majority of developments underway are building within that zoning limit and not going through the lengthy process to achieve additional density, meaning most of the new buildings in the neighborhood are six stories or shorter and have fewer than 100 units.

Over a dozen developments are planned, under construction or have recently delivered on the 1-mile stretch of Georgia Avenue, a review of building permits shows. Most of them are mid-rise buildings that feature ground-floor retail, potentially ushering in a new wave of restaurants in the coming years.

The Holladay Corp. is working on one of the largest projects in the neighborhood, a three-building project totaling 225 units just off Georgia Avenue on Lamont Street. The first two buildings of 143 units and 77 units delivered in March and are already 40% to 50% leased, Holladay Corp. President Jessica Holladay Sterchi confirmed.

A nine-unit project with retail at 3225 Georgia Ave. NW from Brick Lane Real Estate received its certificate of occupancy July 19. The project, branded as The Lamont, is actively leasing.

Another nine-unit project with retail at 4016 Georgia Ave. NW from Lock 7 Development received its certificate of occupancy in April.

Murillo Mallnati Group has also received its building permit to construct a 15-unit project with ground-floor retail at 3831 Georgia Ave.

Two entities controlled by a team of Robert Wixson and Michael Taylor received building permits in June and July to build a pair of eight-unit condo buildings with retail at 3622 and 3626 Georgia Ave. NW.

A 10-unit condo project from IFG Group received its building permits in April 2018 and is now actively leasing.

## Washington DC Commercial Retail Space

Washington's retail real estate market is in full recovery mode. Leasing and capital investment speak to steadying demand, as deepening pandemic fatigue has pushed most retailers, consumers, and suppliers onto a "new normal" footing.

Vacancy topped out in most main shopping corridors by the end of 2021 and asking rents are corresponding with a slight lift. There is still a lot going on behind the lease negotiation scenes (free rent, outsized improvement concessions, percentage of sales terms), but average triple-net rents in Washington have returned to pre-pandemic levels and should top $30/SF at some point in 2022.

A local-mimics-national trend of shrinking leases sizes is at play as well. The average size deal in 2021 was around 3,600 SF; that's down from 4,600 SF in 2019 and 4400 SF in 2020. Entering the final quarter of 2021, the average size of retail leases nationwide had fallen to an all-time low of just 3,038 SF. CoStar data show the average lease size falling by more than 30% over the past 15 years.

While the metro area is subdivided between three distinct geographies, the uptake of vaccines has been fairly similar between D.C., Maryland, and Virginia. Each population was over 70% fully vaccinated by January 2022, and plus or minus 95% of all residents age 18 or older had at least one dose. While acute flare-ups have and may continue to lead individual counties or local governments to institute restrictions, the prevailing instinct to reopen and resume retail business is clear.

Vacancies for retail properties in Uptown were under the five-year average during the first quarter, and they compressed in the past year. The rate also comes in below the region's average. Meanwhile, retail rents have fallen on a year-over-year basis, dropping by -2.6%.

As for the pipeline, construction has returned to Uptown after a lull in net new supply over the past few years.

Uptown is a very liquid investment market, characterized by heavy trading, and those trends have largely held serve in the past 12 months. Compared to the overall Washington area, market pricing sits at $474/SF, which is well above the region's average pricing.

CL GROUP LLC

## DATA SET FOR 413 KENNEDY STREET NW

Key Metrics

| AVAILABILITY | PROPERTY | SUBMARKET 1-2 STAR | SUBMARKET |
|---|---|---|---|
| Market Rent/SF | $32.90 | $34.60 | $41.89 |
| Vacancy Rate | 0% | 1.9% | 3.4% |
| Vacant SF | 0 | 34.3K | 214K |
| Availability Rate | - | 2.4% | 3.8% |
| Available SF | - | 44.7K | 240K |
| Sublet SF | - | 0 | 10.2K |
| Months on Market | - | 7.6 | 11.6 |

| DEMAND | PROPERTY | SUBMARKET 1-2 STAR | SUBMARKET |
|---|---|---|---|
| 12 Mo Net Absorption SF | 0 | 6.9K | 75.6K |
| 6 Mo Leasing Probability | - | 48.8% | 38.6% |

| INVENTORY | PROPERTY | SUBMARKET 1-2 STAR | SUBMARKET |
|---|---|---|---|
| Existing Buildings | 1 | 604 | 1,151 |
| Inventory SF | 2.1K | 1.8M | 6.3M |
| Average Building SF | - | 3K | 5.5K |
| Under Construction SF | - | 0 | 1.8K |
| 12 Mo Delivered SF | - | 0 | 0 |

| SALES | PROPERTY | SUBMARKET 1-2 STAR | SUBMARKET |
|---|---|---|---|
| 12 Mo Transactions | - | 35 | 72 |
| Market Sale Price/SF | $378 | $435 | $474 |
| Average Market Sale Price | - | $1.3M | $2.6M |
| 12 Mo Sales Volume | - | $37.9M | $141M |
| Market Cap Rate | 5.8% | 5.4% | 5.0% |




## CONCLUSION

Based upon our analysis, both the Washington DC market and the subject's Petworth neighborhood are experiencing sustained growth with development up, prices increasing, and reduction in inventory. With additional urban growth planned it is anticipated that the current growth model should stable into the foreseeable future.

## SITE DESCRIPTION

| | |
|---|---|
| LOCATION: | 423 Kennedy Street, NW<br>Washington, DC 20011 |
| SIZE/ZONING: | According to District of Columbia tax records, the subject property is known as Lot 0056 of Square 3260 and contains approximately 9,520± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations. |
| TOPOGRAPHY: | The subject site is generally level to slightly sloping. |
| SHAPE AND FRONTAGE: | The site is rectangular in shape, with frontage on Kennedy Street, NW. |
| ACCESS: | Ingress and egress to the site is available via Kennedy Street, NW. |
| UTILITIES: | The subject site is serviced by all public utilities. |
| COVENANTS, EASEMENTS & RESTRICTIONS: | We have not researched deed restrictions and have not been provided with the covenants of title. Therefore, it is assumed that any deed covenants permit the existing development scheme. There are utility easements over the site; however, these have no adverse effect. The appraisers are unaware of any ground lease on the subject property. |
| SOIL CONDITIONS: | The appraisers have not been provided with the results of test borings, therefore, the only assumption made is that there are no obvious soil deficiencies. A visual examination of the site did not reveal any soil conditions that would adversely affect the current development. |
| FLOOD HAZARD: | The subject does not lie in a HUD designated 100-year flood area as identified on the Federal Emergency Management Agency Flood Insurance Rate Map Community Panel Number: 1100010010C dated September 27, 2010. |
| ENVIRONMENTAL SITE ASSESSMENT: | The appraisers have not been provided with any environmental report on the subject property. **The values indicated herein are predicated upon a non-contaminated site.** |
| SUMMARY: | In conclusion, based on the subject's size, shape, terrain, access, frontage and depth, availability of utilities, etc., the subject site is more than adequate to support the proposed development scheme. |

## TAX MAP

| Legend | Info |
|---|---|
| Real Property ID: | 3260 0056 |
| Premise Address: | 423 KENNEDY ST NW # 1 WASHINGTON DC 20011 |
| Land Area (sf): | 9,520 |
| Owner(s): | 423 KENNEDY ST HOLDINGS LLC |
| - &: | THORTON, CHAMPE V |
| Assessment Area: | 042 |
| - Subarea: | C |

This map is for general information purposes, is not a survey plat, and is not intended to be used for conveyance, legal boundary, or property title.

**Open Full Real Property Map HERE!**



## ZONING DISCUSSION




The subject property is located in the MU-4 (Mixed-Use) zoning area. The MU-4 zone is intended to:

> The Mixed-Use (MU) zones provide for mixed-use developments that permit a broad range of commercial, institutional, and multiple dwelling unit residential development at varying densities. The MU-4 zone is a mixed-use zone that is intended to be applied throughout the city consistent with the density designation of the Comprehensive Plan. A zone may be applied to more than 1 density designation.

Zoning Analysis Summary

The proposed improvements would have a 50' height maximum with 60% lot occupancy. Under the existing zoning designation, the proposed improvements appear to be conforming.

## REAL ESTATE ASSESSMENTS

Assessment and collection of annual ad valorem taxes on real and personal property is established each year - as of January 1 - by the Property Appraiser's Office. The tax due is computed according to annual millage rates established by the various taxing authorities. All real estate must be reassessed annually at 100% of fair market value. Based on historical assessments on the subject and nearby properties, this policy is being followed. However, due to equalization and other factors involved with the assessment process, actual assessments are usually less than 100% of market value. The assessments are effective January 1st of each year and taxes are payable (50%) by March 31st and (50%) on September 15th. The tax due is computed according to annual millage rates established by the various taxing authorities

The subject is assessed under the auspice of the District of Columbia Property Appraiser's Office. The following are the current real property tax rates in the District of Columbia.

Real Property Tax Rates

A tax rate is the amount of tax on each $100 of the assessed value of the property. Rates differ for each class of property. The rates are established by the Council of the District of Columbia and may change from year to year.

SSL : 3260- -0056
Premise Address : 423 KENNEDY ST NW # 1 WASHINGTON DC 20011

Make a Payment
Balance : $58,760.39

Details | Assessment | Tax Information | Map | Applications and Actions

Tax Summary | Tax History | Billing History | Payment History

Current Year

Help

2021 Second Half

| Description | Amount | Balance |
|---|---|---|
| Real Property Tax | $29,562.00 | $29,562.00 |

CURRENT REAL ESTATE TAX BURDEN
(CALLED) 58,761

Please note that the subject will be reassessed upon completion of the proposed improvements

CL GROUP LLC

## PROPOSED DEVELOPMENT BUDGET

| Hard Costs: | To Complete from Current | Final Total Budget |
|---|---|---|
| General Conditions | $ 50,740.00 | $ 125,000.00 |
| On Site Labor | $ 72,580.00 | $ 130,000.00 |
| Site Preparation | $ 0.00 | $ 125,000.00 |
| Site and Misc Management | $ 46,197.00 | $ 86,667.00 |
| Construction Management | $ 30,780.00 | $ 60,000.00 |
| Demolition | | $ 175,000.00 |
| Excavation, Erosion Control, Thermal Mositure, Shoring & Underpinning | $ 20,000.00 | $ 547,311.00 |
| Signage | $ 10,000.00 | $ 10,000.00 |
| Bike Racks | $ 10,000.00 | $ 10,000.00 |
| Foundation - Concrete & Masonary | $ - | $ 1,321,989.00 |
| Framing Materials | $ - | $ 407,039.40 |
| Framing Labor | $ - | $ 306,865.50 |
| Metal Framining (Materials & Labor) | $ 90,000.00 | $ 90,000.00 |
| Roof Materials and Labor | $ 85,000.00 | $ 85,000.00 |
| Structural Steel | $ - | $ 200,220.00 |
| Exterior Siding & Brick (aded brick for front) | $ 100,000.00 | $ 140,000.00 |
| Light Fixtures | $ 65,000.00 | $ 65,000.00 |
| Electrical Rough In | $ 350,000.00 | $ 350,000.00 |

CL GROUP LLC

| | | |
|---|---|---|
| Electrical Generator/Modeling | $ 25,000.00 | $ 25,000.00 |
| Electrical Heavy Up | | $ - |
| Roof Deck | $ 24,000.00 | $ 24,000.00 |
| Kitchen Cabinets | $ 165,000.00 | $ 165,000.00 |
| Vanity/Cabinets | $ 35,000.00 | $ 35,000.00 |
| Countertops | $ 135,000.00 | $ 135,000.00 |
| Bathroom fixtures / Kitchen | $ 82,500.00 | $ 82,500.00 |
| Plumbing | $ 165,052.50 | $ 198,000.00 |
| HVAC | $ 380,000.00 | $ 380,000.00 |
| Drywall | $ 210,000.00 | $ 210,000.00 |
| Sprinklers | $ 140,000.00 | $ 157,500.00 |
| Building Insulation | $ 120,000.00 | $ 120,000.00 |
| Finish Carpentry | $ 150,000.00 | $ 150,000.00 |
| Building Insulation | | $ - |
| Curtain Wall (Glass Front Door) | $ 110,000.00 | $ 110,000.00 |
| Doors, Frames & Hardware | | $ - |
| Interior Windows | | $ 146,305.35 |
| Exterior Windows | | $ 146,305.25 |
| Hardware Misc | $ 52,000.00 | $ 52,000.00 |
| Payment to Neighbhor | $ 2,499.00 | $ 14,000.00 |
| Solar Panels | $ 80,650.00 | $ 80,650.00 |
| Stair & Handrails | $ 200,000.00 | $ 200,000.00 |
| Exterior Doors | $ 10,000.00 | $ 10,000.00 |
| Interior Doors | $ 160,000.00 | $ 160,000.00 |
| Painting | $ 110,000.00 | $ 110,000.00 |
| Utilities/Water Service | $ - | $ 172,836.00 |
| Tile and Labor - Bathroom (Tile and Granite) | $ 150,000.00 | $ 150,000.00 |
| Wood Flooring | $ 150,000.00 | $ 150,000.00 |
| Appliances | $ 198,000.00 | $ 198,000.00 |

| | | |
|---|---|---|
| Granite Countertops (Kitchen/Bath) | | $ - |
| Elevator | $ 150,000.00 | $ 150,000.00 |
| Trash/Debris Removal/Final Cleaning | $ 35,000.00 | $ 57,500.00 |
| Site Security | | $ - |
| Intercom System | $ 35,000.00 | $ 35,000.00 |
| Brick Pavers | $ 40,000.00 | $ 40,000.00 |
| Landscaping | $ 40,000.00 | $ 40,000.00 |
| Equipment Rental | $ 2,500.00 | $ 7,500.00 |
| Contingency | $ 135,707.84 | $ 285,370.19 |
| GC Fee | $ 125,472.54 | $ 268,294.81 |
| SUB TOTAL | $ 4,348,678.88 | $ 8,500,853.50 |
| Working Capital | | |
| Architectural & Engineering | $ 5,000.00 | $ 5,000.00 |
| **TOTAL HARD COSTS** | **$ 4,353,678.88** | **$ 8,505,853.50** |
| **INTEREST PAYMENTS** | | |
| Filtration System | $ 90,000.00 | $ 90,000.00 |
| **TOTAL BUDGET WITH Filtration System** | **$ 4,443,678.88** | **$ 8,595,853.50** |

The proposed improvements will contain thirty -three (33) residential units averaging 855 square feet per unit for a total residential sellout of 28,209 square feet of space. In addition, the improvements will include 2,500 square feet of commercial retail space divided amongst two retail bays and sold at market prices.

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

**PARKING & FLOOR PLANS**


SECOND
GROUND
CELLAR
FIFTH
FOURTH
THIRD
Egress Analysis
A New Apartment House

## HIGHEST & BEST USE

As defined by the Appraisal institute, highest and best use is described as follows:

> That reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest value.

This definition applies specifically to the highest and best use of land. It is to be recognized that in cases in which a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use. The highest and best use analysis includes both an analysis of the property as if vacant site only and also as improved.

When analyzing the property as if vacant, the value of the land can be determined by potential, rather than actual use. The possibility of removing any existing improvements is the premise for this concept. The improvements can be changed but the basic physical characteristics of the site cannot. When analyzing the property as improved, the appraiser is investigating the use of the existing improvements that will provide maximum benefits.

In order for the site to fulfill its highest and best use, that use must meet four criteria: (1) it must be physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive.

The site is analyzed first as if vacant and then as improved.

PHYSICALLY POSSIBLE

The first criterion, addresses the physical characteristics of a property, as size, shape, topography and the availability of utilities are all determinants of a property's development potential. The subject is within a well-established neighborhood. The underlying site is rectangular in shape and well suited for development. There appears to be adequate drainage and it is not situated in a flood plain. In addition, the site is fully served by utilities and enjoys good access from Kennedy Street, NW. The width, depth and area of the site are sufficient to construct a project of reasonable size. There are no known soil conditions which would

adversely affect the property's development potential and there are no physical constraints to our knowledge which would preclude development.

LEGALLY PERMISSIBLE

The next step is to explore the legally permissible uses of the site. The zoning regulations, building codes, historical district controls, public and private restrictions and environmental regulations must be considered because they may preclude many possible highest and best uses. The most often encountered and widespread legal restriction is applicable zoning regulations, which may regulate the uses allowed on a site, limit allowable density, regulate building height, parking requirements, traffic circulation within a property, and other requirements that must be satisfied during development.

Depending upon the nature and location of a specific site, the other regulations mentioned herein may also have important consequences on highest and best use. In the case of the subject site, zoning regulations do indeed play a part in determining those uses that meet the second criterion, legally permitted.

The goal of the imposed zoning ordinances is to maintain a group of similar and compatible land uses within the specified classifications, as well as those land uses surrounding it. The result is usually a balanced and organized land development pattern which maintains or enhances value.

Based upon analysis of the MU-4 zoning regulations, the proposed development is a legal and permitted use.

FINANCIALLY FEASIBLE/MAXIMALLY PRODUCTIVE

Any use of the subject site which provides a financial return to the land in excess of the cost of the land defines the limit of such use which is financially feasible.

The optimum use of the subject site, if unimproved and available for development, would be that use which would generate the greatest net return on the property over the economic life of the proposed improvements.

In analyzing the highest and best use of the vacant site, careful consideration has been given to the following limitations imposed by neighborhood uses and market demands.

1. Examination of land use regulation that prescribe permitted development.
2. Compatibility of properties located in proximity to the subject. The appraisers have given careful consideration to the land use patterns established and the predominant types of development in the subject market area.
3. Analysis of the physical characteristics accepted by the market. The appraisers have investigated the size, density, layout, design, etc. of economically successful developments located within the subject market area.

In addition, given the subject's location, demand for residential properties within the subject market area continues to strengthen. Furthermore, the subject is located in an area surrounded by similar residential uses. This economic factor attests to the financially feasible/ maximally productive use of the subject property.

SUMMARY OF MARKET ANALYSIS

As detailed in our market analysis, the Petworth residential submarket and the Washington DC housing market appear to be stable, with increasing sales prices per unit/ square foot over the last five years. The subject immediate area represents an area which is beginning to see an increasing amount of renovation and redevelopment, as developable properties in the surrounding market areas, and closer to downtown become increasingly scarce. Given the strength of the subject's overall market and demand for residential space in the area, it is the opinion of the appraisers that the nature of the subject together with surrounding land uses lends support that the highest and best use is the proposed development scheme.

CONCLUSION - HIGHEST AND BEST USE

Pursuant to the analysis contained in this report, it is the appraiser's opinion that the highest and best use of the subject property is the proposed use and development scheme. The subject proposed renovation is consistent with the intended use of the site, per the District of Columbia and the site appears to be physically adaptable to such development. Finally, according to the analysis contained in this report, the development is considered to be a financially feasible undertaking.

# VALUATION

## VALUATION PROCEDURES

The valuation process is used to develop a well-supported estimate of a defined value, which is based on the consideration of all the pertinent general and specific data gathered. In appraising real estate for market value, the professional appraiser has three approaches to select from: the cost approach, the sales comparison approach, and the income capitalization approach.

### THE COST APPROACH

The cost approach is an estimation of market value developed by computing the current cost of replacing the improvements and subtracting any depreciation resulting from one or more of the following factors: physical deterioration, functional obsolescence and economic obsolescence. The value of the land is then added to the depreciated value of the improvements to produce a total value estimate. If entrepreneurial profit has been realized, it is added to the value indication.

The cost approach provides a reliable estimate of value for newly constructed properties. However, as buildings and other forms of improvements increase in age and begin to depreciate, the resultant loss in value becomes increasingly more difficult to accurately quantify.

### THE SALES COMPARISON APPROACH

The sales comparison approach estimates the value of a property by comparing it with similar properties recently sold in the open market. To obtain accurate estimate of value, the sales price of the comparable property must be adjusted to reflect any dissimilarities between it and the subject property. The sales are compared on the basis of:

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Market conditions
5. Location
6. Physical characteristics
7. Income-producing characteristics
8. Other characteristics (e.g., access, zoning, etc.)

Data such as income multipliers and income rates may also be extracted from the sales comparison analysis, but are generally applied to the income capitalization approach.

The Sales Comparison approach often provides a reliable estimate of value for real estate such as land and single-family homes where the properties are homogenous and adjustments are few in number and relatively simple to compute. For larger and more complex properties, such as shopping centers, office-industrial buildings and hotels, the adjustments may become numerous and, thus, become more difficult to accurately quantify.

THE INCOME CAPITALIZATION APPROACH

The income capitalization approach to value consists of methods, techniques, and mathematical procedures used to analyze the property's capacity to generate benefits (income and reversion) and convert these benefits into an indication of present value.

A property's income streams and its resale value are capitalized into a present value indication. This reflects a return on and a return of capital. The level of return needed to attract investment capital fluctuates with changes in the money markets and other alternative investments.

The appraiser investigates the property's gross income expectancy, the expected reduction in gross income due to vacancy and credit loss, the anticipated operating expenses, the pattern and duration of the income stream, and the anticipated resale value. After the income and expenses are estimated, they are converted to present value through capitalization or discounting. The rates used are derived from rates of returns for similar properties or investments.

The income capitalization approach is often selected as the preferred valuation approach for income-producing properties because it most closely reflects the investment thinking of knowledgeable buyers.

The accuracy of the income approach is dependent upon a sound evaluation of a project's future earning potential as well as an estimation of a capitalization rate that takes into account the various factors of risk.

While the appraiser must consider all three approaches to value, the inherent strengths of each approach and the nature of the subject property must be evaluated to determine which

of the three approaches will provide supportable estimates of market value. The appraiser is then free to select one or more of the appropriate approaches

## THE SALES COMPARISON APPROACH (MARKET VALUE UPON COMPLETION)

The underlying premise of the Sales Comparison Approach is the concept that the analysis of sales of reasonably similar properties provides an appraiser with empirical data from which observations and conclusions about the property being appraised can be made.

Proper application of the approach requires that in the selection of sales data to directly compare with the subject:

- Only market (or arm's length) transactions be weighed, and the factual data of each transaction be confirmed to the greatest extent possible.
- The degree of comparability of each sale to the subject be considered; that differences in physical, functional, and economic characteristics be noted; and adjustments for the differences be made.
- The value conclusion derived be consistent with the analysis of the sales data.

For a conveyance to qualify as a "market" transaction four factors must traditionally be present:

- The conveyance must be "arm's length"; that is, it must be between two non-related parties, each acting in self-interest.
- Neither the buyer nor the seller should have been under compulsion to act.
- The property should be available for a reasonable period of time to the class of purchasers best able to utilize the facility.
- The price must be expressed in cash, adjusted for any special financing, concessions, or special terms.

For any class of real estate, the area in which comparative data are searched must reflect the market area prospective purchasers would consider. Comparability is also a function of the physical character of the asset being appraised. Classes of real estate in which physical characteristics are standardized, or in which scale is small, and/or in which the commodity has achieved relatively uniform recognition require that the sales data closely resemble the appraised property. However, as specifications become more complex, as scale increases,

and/or as market recognition declines, the physical similarity of the sales data and the appraised property tends to decline.

To judge the degree of comparability that exists between the subject and the sales selected for direct comparison with the subject, several guidelines have been applied:

- Each sale must be in the same market as the subject. To the extent that a market is a meeting place for buyers and sellers of real estate of a given type, the boundaries of the market are set by the participants in merchandising and absorbing competitive properties. The boundaries of a market are consequently economic in character, and not purely physical or geographical.

- Physical characteristics of the subject and the sales must be similar in many regards although it is clear that a sale need not be identical to the subject to provide evidence of market activity.

- The functional adequacy of each sale property and the subject property must be competitive in terms of ability of each to support similar (although not identical) functions.

Subject revenue proceeds are derived from unit sales. Typically sale proceeds are estimated using the sales comparison approach. The following sales comparables are the most recent and relevant transactions that we could secure.

Please note that all sales were sourced in the subject's 20011 zip code. The appraisers have evaluated the sales on a per square foot basis.

CL GROUP LLC

LOCATION MAP OF COMPARABLE RESIDENTIAL SALES




SUMMARY OF COMPARABLE RESIDENTIAL SALES

| Sale | Address | Sale Date | Sale Price | Price/ SQ. FT. |
|---|---|---|---|---|
| 1 | 5110 Fort Totten Dr NE #6 | 2/22 | $450,000 | $562.50 |
| 2 | 529 Somerset Place, NW | 1/22 | $515,000 | $574.78 |
| 3 | 531 Kennedy St., NW | 11/21 | $505,000 | $601.19 |
| 4 | 4424 Georgia Ave., NW | 2/22 | $475,000 | $593.75 |

COMPARABLE RESIDENTIAL SALES

COMPARABLE NO. 1



LOCATION: 5110 Fort Totten Drive, NE #6
Washington, DC 20011

COMMENTS: Brookland. Two bedrooms and two full baths and a deceiving amount of space! This is a very well maintained top-floor condo, in a modern building with keyless entry, lots of sunlight (a skylight!), wide-plank wood floors, Nest Thermostat, and newer (2018) appliances. Living/dining area has recessed lighting on a dimmer switch. Plenty of shelving nooks and creative spaces all around. Primary bedroom has HUGE walk-in closet, en-suite bathroom, and bump-out Juliet balcony. The second bedroom leads to a full-sized balcony with access to rear of building.

SALES SUMMARY

| Unit Type (BR/BA) | Size (SF) | Sale Price | Sale Date | Price/SF |
|---|---|---|---|---|
| 2 BR, 2 BA | 800 | $450,000 | February 2022 | $562.50 |

COMPARABLE RESIDENTIAL SALES

COMPARABLE NO. 2



LOCATION: 529 Somerset Place
Washington, DC 20011

COMMENTS: Lovely 2 bedroom 1.5 bathroom home in the Brightwood neighborhood with lots of natural light. You will find polished hardwood floors on the first and second floors. The galley kitchen leads to a bonus area that can be used as a mudroom or a kitchen pantry. Upstairs you will find 2 nice sized bedrooms and a bathroom that has lovely subway tiling and an enclosed bathtub that is actually a clawfoot tub! Wooden wrap around deck

SALES SUMMARY

| Unit Type (BR/BA) | Size (SF) | Sale Price | Sale Date | Price/SF |
|---|---|---|---|---|
| 2 BR, 1 BA | 896 | $515,000 | January 2022 | $574.78 |

COMPARABLE RESIDENTIAL SALES

COMPARABLE NO. 3



LOCATION: 531 Kennedy St NW #10
Washington, DC 20011

COMMENTS: New 1 Bedroom + LOFT, 1.5 Bath pet-friendly condominium in the heart of Petworth. The open floor plan complete with the gorgeous kitchen with a big center island are just two of the things you'll LOVE about this condo. This modern and beautiful home offers a great contemporary kitchen, stainless steel appliances, fun spaces for entertaining, 1 wonderful bedroom, and 1.5 gorgeous baths with good closet space + Low condo fees. Just blocks to everything you need including coffee shops, restaurants, nightlife, transportation, and more!

SALES SUMMARY

| Unit Type (BR/BA) | Size (SF) | Sale Price | Sale Date | Price/SF |
|---|---|---|---|---|
| 2 BR, 1.5 BA | 840 | $505,000 | November 2021 | $601.19 |

COMPARABLE RESIDENTIAL SALES

COMPARABLE NO. 4



LOCATION: 4424 Georgia Ave NW #102
Washington, DC 20011

COMMENTS: The Allison is the newest project from local developer IFG Group. Unit 102 is an awesome 2 level, 1 bedroom, 1.5 bath in the heart of all the Petworth fun! The condo has an open living area on the main level with an awesome open kitchen with fabulous island, GREAT natural light from fabulous floor to ceiling windows, 1/2 bath for guests too! The second level has a great GINORMOUS bedroom and full bath. Washer/ dryer in unit. Low fees in a pet friendly building in the heart of Petworth.

SALES SUMMARY

| Unit Type (BR/BA) | Size (SF) | Sale Price | Sale Date | Price/SF |
|---|---|---|---|---|
| 1 BR, 1 BA | 800 | $475,000 | February 2022 | $593.75 |

**PROPOSED SUBJECT PROPERTY**




| Property Unit Summary | | | | | |
|---|---|---|---|---|---|
| | | Total Units | Avg SF | Median SF | Total SF |
| 1 Bedroom | 1 | 13 | 799 | 804 | 10,382 |
| 2 Bedroom | 2 | 17 | 793 | 798 | 13,483 |
| 3 Bedroom | 3 | 1 | 1,188 | 1,188 | 1,188 |
| 4 Bedroom | 4 | 2 | 1,578 | 1,578 | 3,156 |
| **Total Weight Avg.** | | **33** | **855** | **996** | **28,209** |

SUMMARY OF COMPARABLE RESIDENTIAL SALES

| Sale | Address | Sale Date | Sale Price | Price/ SQ. FT. |
|---|---|---|---|---|
| 1 | 5110 Fort Totten Dr NE #6 | 2/22 | $450,000 | $562.50 |
| 2 | 529 Somerset Place, NW | 1/22 | $515,000 | $574.78 |
| 3 | 531 Kennedy St., NW | 11/21 | $505,000 | $601.19 |
| 4 | 4424 Georgia Ave., NW | 2/22 | $475,000 | $593.75 |

As shown above and on the previous pages, comparable residential units in the subject market area range in average price per square foot from $563 per square foot to $601 per square foot. The appraisers have utilized similar square footage plans as well as very recent transactions for market comparables.

Typically, the sales comparison approach reflects the actions of buyers and sellers in the market place and serves as a parameter as to what a potential buyer would be willing to pay for the subject units. The comparables need to be adjusted to compensate for differences as compared to the subject. The adjustment factors are summarized on the following page.

## ADJUSTMENT FACTORS

Time/Market Conditions

Considering the prospective value is being estimated herein, as of September 2022, no adjustments will be made as the sales represent current market conditions.

Location

The adjustment for location is based on a site's proximity to major transportation routes, proximity to amenities, employment centers, and overall appeal. The subject and comparable

sales are located within the same market and have similar appeal to similar type of buyers. Sale 4 has a slightly better location and will be adjusted downward by 5%.

Units Size

Typically, smaller units sell at a higher rate per square foot of area than larger units. The subject building will include a gross floor area of 28,209 square feet. This equates to an average unit size of approximately 855 square feet. The market comparables range from 800 to 896 square feet of space. No adjustments are warranted.

Quality/Condition

Adjustments for the quality/condition of the comparables are made with regard to the quality of the improvements, age, general maintenance, etc. The subject units will be in new condition upon completion of the renovations as described herein. The market comparables are considered to be in similar condition. Sales 1 and 2 will be adjusted upward by 5%.

Shown below is the adjustment chart adjusting the price per square foot of each of the market comparable sales.

## COMPARABLE SALES ADJUSTMENT CHART

| COMP. # | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| UNIT AREA/(SQ.FT.) | 800 | 896 | 840 | 800 |
| SELLING PRICE | $450,000 | $515,000 | $505,000 | $475,000 |
| SALE DATE | 2/22 | 1/22 | 11/21 | 2/22 |
| UNIT PRICE/SQ.FT. | $562.50 | $574.78 | $601.19 | $593.75 |
| PROP. RIGHTS | 1.00 | 1.00 | 1.00 | 1.00 |
| FINAN./CASH EQUIV. | 1.00 | 1.00 | 1.00 | 1.00 |
| SALE CONDITIONS | 1.00 | 1.00 | 1.00 | 1.00 |
| MARKET CONDITIONS | 1.00 | 1.00 | 1.00 | 1.00 |
| INITIAL ADJ. | 1.00 | 1.00 | 1.00 | 1.00 |
| ADJ. BASE PRICE/SQ. FT. | $562.50 | $574.78 | $601.19 | $593.75 |
| LOCATION | 1.00 | 1.00 | 1.00 | .95 |
| UNIT SIZE | 1.00 | 1.00 | 1.00 | 1.00 |
| QUALITY/CONDITION | 1.05 | 1.05 | 1.00 | 1.00 |
| OTHER FEATURES | 1.00 | 1.00 | 1.00 | 1.00 |
| TOTAL ADJ. | 1.05 | 1.05 | 1.00 | .95 |
| | | | | |
| ADJ. UNIT SELLING PRICE/S.F. | $590.63 | $603.52 | $601.19 | $564.06 |

**AVERAGE: $589.85**

**MEDIAN: $595.91**

RECONCILIATION

Under the analysis of the comparable sales data, the appraisers have taken into account the location in relation to the subject, accessibility, visibility, general overall condition and appearance, etc. The comparable sales reflect an average adjusted price per square foot of $590 and a median price per square foot of $596. Predicated on this analysis, a sales price of $593 per square foot of space will be utilized.

TOTAL PROJECTED RESIDENTIAL REVENUE

28,209 Sq. Ft. x $593 Per Sq. Ft.= $16,727,937

(CALLED) $16,728,000

**GROSS RESIDENTIAL ACCUMULATIVE SELL-OUT VALUE AT COMPLETION (SEPTEMBER 2022)**

**$16,728,000**

# RETAIL COMMERCIAL SPACE

The subject property under analysis consists of approximately 9,520± square feet of land currently under construction. The subject is proposed to be developed into thirty-three (33) multi-family units in addition to 2,500 square feet of first floor retail space and sold or rented at market rates. Construction is proposed to be completed by September 2022.

As previously discussed herein, the average sales price for Retail properties within the subject's Washington DC market area is $474 per square foot. More specifically, the following market comparables have been utilized for the subject property:

| Sale | Address | Sale Date | Sale Price | Price/ SQ. FT. |
|---|---|---|---|---|
| 1 | 335 Pennsylvania Ave., SE | 5/21 | $1,438,255 | $558.76 |
| 2 | 6431 Georgia Ave., NW | 11/21 | $1,300,000 | $403.73 |
| 3 | 2620 Georgia Avenue, NW | 9/21 | $862,500 | $532.41 |

## Retail Sales Comparable 1

| | | | |
|---|---|---|---|
| Sale Date | May 19, 2021 | Price/AC Land | $47,934,497 |
| Sale Price | $1,438,255 | Price/SF Land | $1,100.42 |
| Price/SF | $558.76 | Transfer Tax | $150,000 |
| Price Status | Allocated | Recording Date | May 20, 2021 |
| Leased at Sale | 100% | | |
| Hold Period | 20+ Years | | |
| Sale Type | Investment | | |
| Financing | Down Payment of $900,000 (15%) | | |
| | Unknown: Private Lender | | |
| | Bal/Pmt: $5,100,000/- | | |
| Document # | 2021069429 | | |

## Retail Sales Comparable 2

| | | | |
|---|---|---|---|
| Sale Date | Nov 29, 2021 | Price/AC Land | $4,482,901 |
| Sale Price | $1,300,000 | Price/SF Land | $102.91 |
| Price/SF | $403.73 | Transfer Tax | $18,850 |
| Price Status | Full Value | Recording Date | Dec 8, 2021 |
| Leased at Sale | 100% | | |
| Hold Period | 119 Months | | |
| Sale Type | Investment | | |
| Document # | 2021159712 | | |

Retail Sales Comparable 3

| | | | |
|---|---|---|---|
| Sale Date | Sep 17, 2021 | Price/AC Land | $27,524,176 |
| Sale Price | $862,500 | Price/SF Land | $631.87 |
| Price/SF | $532.41 | Transfer Tax | $12,506 |
| Price Status | Confirmed | Recording Date | Oct 28, 2021 |
| Leased at Sale | 100% | | |
| Hold Period | 73 Months | | |

| | |
|---|---|
| Sale Type | Investment |
| Financing | Down Payment of $217,530 (25.22%) |
| | Unknown: Private Lender |
| | Bal/Pmt: $645,000/- |
| Document # | 2021143507 |

| COMP. # | 1 | 2 | 3 |
|---|---|---|---|
| LOCATION | Penn. Ave, SE | Georgia Ave., NW | Georgia Ave., NW |
| AREA (SQ. FT.) | 2,574 | 3,220 | 1,620 |
| SALE DATE | 5/21 | 11/21 | 9/21 |
| SALE PRICE | $1,438,255 | $1,300,000 | $862,500 |
| UNIT PRICE/SQ. FT. | $558.76 | $403.73 | $532.41 |
| PROP. RIGHTS | 1.00 | 1.00 | 1.00 |
| FINAN./CASH EQUIV. | 1.00 | 1.00 | 1.00 |
| SALE CONDITIONS | 1.00 | 1.00 | 1.00 |
| MARKET CONDITIONS | 1.00 | 1.00 | 1.00 |
| INITIAL ADJ. | 1.00 | 1.00 | 1.00 |
| ADJ. BASE PRICE | $558.76 | $403.73 | $532.41 |
| LOCATION | 0.85 | 0.90 | 0.80 |
| AREA (SQ. FT.) | 1.00 | 1.00 | 0.95 |
| QUALITY/CONDITION | 1.10 | 1.20 | 1.10 |
| OTHER | 1.00 | 1.00 | 1.00 |
| TOTAL ADJ. | 0.95 | 1.10 | 0.85 |
| **ADJ. UNIT PRICE/SQ. FT.** | **$530.82** | **$444.10** | **$452.55** |
| **AVG. PRICE/SQ. FT.** | **$475.82** | | |
| **MEDIAN PRICE/SQ. FT.** | **$452.55** | | |




RECONCILIATION

Under the analysis of the comparable sales data, the appraisers have taken into account the location in relation to the subject, accessibility, visibility, general overall condition and appearance, etc. The comparable sales reflect an average adjusted price per square foot of $476 and a median price per square foot of $453. Predicated on this analysis, a sales price of $465 per square foot of space will be utilized.

“AS COMPLETED” TOTAL PROJECTED COMMERCIAL RETAIL REVENUE

2,500 Sq. Ft. x $465 Per Sq. Ft.= $1,162,500

**(CALLED) $1,163,000**

**“AS COMPLETED” TOTAL GROSS SELLOUT VALUE**

**(CALLED) $17,891,000**

# MARKET VALUE "AS IS"

## DISCOUNTED CASH FLOW ANALYSIS (NET PRESENT VALUE)

DEDUCTIONS

From the gross sales over each period, certain expense items should be deducted. These include legal (1.5%), administration, overhead and taxes (3%), and sales (5.0%). Profit deduction has been estimated at 10.0 percent. These expense percentages have been based upon discussions with personnel at several mortgage lending institutions throughout the Washington, D.C. metropolitan area. In addition, the 2020 National Association of Home Builders pole concluded that the average sales commission paid per sale is currently 4.1%, the average profit per finished home is 10.7%, and general overhead runs approximately 5.1% per sale. While these numbers aren't exactly local Washington DC industry standards, they more than support the Net Present Model presented herein.

DISCOUNT RATE

For the purpose of the subject, the appraiser has employed a discount factor at a 9.00 percent annual rate. The discount rate employed within the present value analysis reflects typical yield rates in various money markets which provide alternate investment opportunities. This rate considers risks and premiums associated with the proposed development. This rate does NOT include entrepreneurial profit, which has been deducted separately.

| **MARKET VALUE "AS IS" FEBRUARY 21, 2022** | |
|---|---|
| GROSS RETAIL SELLOUT VALUE | $17,891,000 |
| | |
| EXPENSES | |
| REMAINING CONSTRUCTION | $4,152,175 |
| LEGAL (1.5%) | $268,365 |
| SALES (5.0%) | $894,550 |
| ADMIN. OVERHEAD, TAXES (3.0%) | $536,730 |
| **TOTAL EXPENSES** | **$5,851,820** |
| PROFIT (10%) | $1,789,100 |
| NET REVENUE | $10,250,080 |
| DISCOUNT FACTOR (9%) | .9778 |
| **DISCOUNTED PRESENT VALUE** | **$10,022,528** |
| | |

**"AS IS" DISCOUNTED NET PRESENT VALUE**

**(CALLED) $10,023,000**

*It is noted and emphasized that the estimated value does NOT include FF&E.*

## FINAL VALUE ESTIMATES

Predicated on our findings herein and after considering all of the known factors that affect the values of the subject property, it is the opinion of the undersigned that the estimated market values subject to the limiting conditions set forth herein, as of February 21, 2022, is as follows:

**GROSS RETAIL MARKET VALUE "AS COMPLETED"- SEPTEMBER 1, 2022**

**$17,891,000**

**SEVENTEEN MILLION EIGHT HUNDRED NINETY-ONE THOUSAND DOLLARS**

---

**MARKET VALUE "AS IS"- FEBRUARY 21, 2022**

**$10,023,000**

**TEN MILLION TWENTY-THREE THOUSAND DOLLARS**

*The market value indication does not include furniture, fixtures, or equipment.*

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

---

**The coronavirus threat may be impacting market conditions. However, in most markets it is not yet clear to what extent, if any, market conditions are affected. Related, complicating factors include fluctuations in the stock market and changes in mortgage interest rates.**

Respectfully submitted,

**Gregory R. Clucas, MAI**
**D. C. Certified General Real Estate Appraiser No. GA10008**

**Greg Clucas, Jr.**
**Associate**

## CERTIFICATION

We certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
- The analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Unifo1m Standards of Professional Appraisal Practice (USPAP) and the Appraisal Policies and Guidelines adopted by the client; this report and our actions relating to the report comply with the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Foundation.
- The undersigned has made a personal inspection of the property that is the subject of this report.
- We, the appraisers, have not previously appraised the subject property within the past three (3) years.
- No one provided significant professional assistance to the persons signing this report.
- As of the date of this report, Gregory R. Clucas, MAI has completed the continuing education program of the Appraisal Institute through December 31, 2022.

Respectfully submitted,

**Gregory R. Clucas, MAI**
**D. C. Certified General Real**
**Estate Appraiser No. GA10008**

**Greg Clucas, Jr.**
**Associate**

# PLAINTIFFS' EXHIBIT 40

CUSHMAN & WAKEFIELD

# APPRAISAL OF REAL PROPERTY

423 Kennedy Street
423 Kennedy Street
Washington, D.C. 20011

## IN AN APPRAISAL REPORT

As of November 3, 2022

## Prepared For:

Main Street Bank
10089 Fairfax Boulevard
Fairfax, VA 22030

## Prepared By:

Cushman & Wakefield of Washington, D.C., Inc.
Valuation & Advisory
2101 L Street NW, Suite 700
Washington, D.C. 20037
Cushman & Wakefield File ID: 22-26001-901338-001

CUSHMAN & WAKEFIELD OF WASHINGTON, D.C., INC.
2101 L STREET NW, SUITE 700
WASHINGTON, D.C. 20037



**423 Kennedy Street**

**423 Kennedy Street**

**Washington, D.C. 20011**

CUSHMAN & WAKEFIELD

2101 L Street NW, Suite 700
Washington, D.C. 20037
Tel +1 (202) 463-2100
cushmanwakefield.com

November 15, 2022

Sandra D'Angelo
Assistant Vice President
**Main Street Bank**
10089 Fairfax Boulevard
Fairfax, VA 22030

Re: Appraisal Report

**423 Kennedy Street**
423 Kennedy Street
Washington, D.C. 20011

Cushman & Wakefield File ID: 22-26001-901338-001

Dear Ms. D'Angelo:

In fulfillment of our agreement as outlined in the Letter of Engagement, we are pleased to transmit our appraisal of the above referenced property in the following Appraisal Report.

The subject, 423 Kennedy Street, is an under-construction 33-unit low-rise multifamily property situated on 0.22 acres. The property will consist of 1 building that is 4 stories in height. The property will total 36,512 square feet of gross building area and will total 28,209 square feet of net rentable along with 2,500 retail space on the ground level. Construction began in 2020, with completion estimated for March 2023.

The Commercial Real Estate (CRE) market is driven by investor demand and strong liquidity. Since its onset in March 2020, the COVID-19 pandemic has had a dramatic effect on both factors as the market navigated COVID's actual and perceived impacts. Either through empirical data or COVID fatigue, society and the market are perceiving that we are near the end of the pandemic. Still, varying degrees of uncertainty exist in most property types with regards to forecasted demand. As we have throughout the pandemic, Cushman & Wakefield is closely monitoring the latest developments resulting from the COVID-19 pandemic and recovery, as well as its effects on the subject and its market. Furthermore, we are monitoring the impacts of the Russian invasion of Ukraine, the Federal Reserve's interest rate hikes, inflation, and supply chain constraints. Please refer to the Investment Considerations section of this report for added details.

Based on the agreed-to Scope of Work, and as outlined in the report, we developed the following opinions:

**Value Conclusions**

| Appraisal Premise | Real Property Interest | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As-Is | Fee Simple | November 3, 2022 | $11,900,000 |
| Prospective Market Value Upon Completion | Fee Simple | March 1, 2023 | $15,700,000 |
| Prospective Market Value Upon Stabilization | Leased Fee | June 1, 2023 | $16,200,000 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan. This appraiser has no interest, direct or indirect, in the property or the transaction. The property appraised is not considered to be a special purpose asset.

## Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

It is assumed that the proposed improvements are constructed in a quality manner in accordance with the information communicated to us by the developer. If the design or quality differs from that which has been considered herein, the value conclusions could be impacted accordingly. Any undue delay in the construction timeline could materially impact the value conclusion reported herein.

The prospective market value estimate is based upon market participant attitudes and perceptions existing as of the effective date of our appraisal, and assumes the subject property is completed and/or achieves stabilization as of our prospective date. We assume no material change in the physical characteristics and condition of the subject property or in overall market conditions between the date of inspection and effective date of value, except for those identified within the report.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,



Chase Pike, MAI, CCIM
Executive Director
District of Columbia Certified General Appraiser
License No. GA12298
Chase.Pike@cushwake.com
202-407-8191 Office Direct

# Table of Contents


Summary of Salient Facts and Conclusions ....... 6
Scope of Work ....... 14
Overview ....... 14
Report Option Description ....... 14
Identification of Property ....... 15
Property Ownership and Recent History ....... 16
Dates of Inspection and Valuation ....... 16
Client, Intended Use and Users of the Appraisal ....... 17
Regional Analysis ....... 18
Local Area Analysis ....... 28
Location Overview ....... 28
The Parks at Walter Reed ....... 30
Access ....... 30
Land Use Changes / Growth Patterns ....... 31
Demographic Profile ....... 34
Conclusion ....... 35
Apartment Market Analysis ....... 36
Overview ....... 36
District Of Columbia Apartment Market Overview ....... 36
Competitive Properties Overview ....... 45
Conclusion ....... 47
Lease Up ....... 48
Property Analysis ....... 53
Site Description ....... 53
Improvements Description ....... 56
Real Property Taxes and Assessments ....... 60
Zoning ....... 63
Valuation ....... 66
Highest and Best Use ....... 66
Valuation Process ....... 68
Land Valuation ....... 70
Cost Approach ....... 76
Sales Comparison Approach ....... 82
Income Capitalization Approach ....... 90
Investment Considerations ....... **Error! Bookmark not defined.**
Reconciliation and Final Value Opinion ....... 114
Extraordinary Assumptions ....... 114
Hypothetical Conditions ....... 115
Assumptions and Limiting Conditions ....... 117
Certification ....... 119
Addenda Contents ....... 120

# Summary of Salient Facts and Conclusions

| BASIC INFORMATION | | |
|---|---|---|
| **Common Property Name:** | 423 Kennedy Street | |
| **Address:** | 423 Kennedy Street<br>Washington, District of Columbia 20011 | |
| **Property Ownership Entity:** | 423 Kennedy St Holdings LLC | |

| SITE INFORMATION | | |
|---|---|---|
| **Land Area:** | 9,520 Square Feet | 0.22 Acres |
| **Site Shape:** | Irregularly shaped | |
| **Site Topography:** | Level at street grade | |
| **Frontage:** | Good | |
| **Site Utility:** | Good | |
| **Flood Zone Status:** | | |
| **Flood Zone:** | X | |
| **Flood Map Number:** | 1100010010C | |
| **Flood Map Date:** | September 27, 2010 | |

| BUILDING INFORMATION (UPON COMPLETION) | |
|---|---|
| **Type of Property:** | Multi-Family |
| **Sub Type:** | Low/Mid-Rise |
| **Building Area:** | |
| **Number of Units:** | 33 Units |
| **Gross Building Area:** | 36,512 SF |
| **Net Rentable Area (Multifamily):** | 28,209 SF |
| **Net Leasable Area (Retail):** | 2,500 SF |
| **Land-to-Building Ratio:** | 0.26:1 |
| **Number of Buildings:** | 1 |
| **Number of Stories:** | 4 |
| **Quality:** | Good |
| **Year Built:** | 2023 |
| **Condition:** | Excellent |
| **Effective Age:** | 0 Years |
| **Remaining Economic Life:** | 55 Years |
| **Parking:** | |
| **Number of Parking Spaces:** | 10 |
| **Parking Ratio (Per Unit):** | 0.30 |
| **Parking Type:** | Surface |

## UNIT MIX

| No. | Plan | BR | BA | No. Units | Percent of Total | Unit (SF) | NRA (SF) |
|---|---|---|---|---|---|---|---|
| 1 | 1BR/1BA | 1 | 1.0 | 1 | 3.0% | 742 | 742 |
| 2 | 1BR/2BA Den | 1 | 2.0 | 12 | 36.4% | 803 | 9,639 |
| 3 | 2BR/1BA | 2 | 1.0 | 12 | 36.4% | 803 | 9,637 |
| 4 | 2BR/2BA | 2 | 2.0 | 4 | 12.1% | 762 | 3,047 |
| 5 | 3BR/1BA | 3 | 1.0 | 1 | 3.0% | 1,188 | 1,188 |
| 6 | 4BR/2BA | 4 | 2.0 | 1 | 3.0% | 1,580 | 1,580 |
| 7 | 2BR/1BA IZ | 2 | 2.0 | 1 | 3.0% | 798 | 798 |
| 8 | 4BR/2BA IZ | 4 | 2.0 | 1 | 3.0% | 1,576 | 1,576 |
| **TOTAL/AVERAGE** | | | | **33** | **100%** | **855** | **28,209** |

*All averages are weighted

## MUNICIPAL INFORMATION

**Assessment Information:**

| | |
|---|---|
| **Assessing Authority:** | District of Columbia |
| **Assessor's Parcel Identification:** | Square 3260 Lot 0056 |
| **Current Tax Year:** | 2022 |
| **Taxable Assessment:** | $1,213,520 |
| **Current Tax Liability:** | $10,315 |
| **Are taxes current?** | Taxes are current |

**Zoning Information:**

| | |
|---|---|
| **Current Zoning:** | MU-4 |
| **Is proposed use permitted?** | Yes |
| **Current Use Compliance:** | Complying use |

## HIGHEST & BEST USE

**As Though Vacant:**

An apartment or other form of multi-family development built to its maximum feasible building area as demand warrants.

**As Improved:**

Completion of construction of the subject multifamily building

| VALUATION INDICES | Market Value As-Is | Prospective Market Value Upon Completion | Prospective Market Value Upon Stabilization |
|---|---|---|---|
| **VALUE DATE** | **November 3, 2022** | **March 1, 2023** | **June 1, 2023** |
| **Land Value** | | | |
| Indicated Value: | $3,900,000 | --- | --- |
| Per Building Square Foot: | $106.81 | --- | --- |
| **COST APPROACH** | | | |
| Indicated Value: | $12,000,000 | $15,800,000 | $16,300,000 |
| Per Unit: | $363,636 | $478,788 | $493,939 |
| **SALES COMPARISON APPROACH** | | | |
| Indicated Value: | $11,500,000 | $15,300,000 | $15,800,000 |
| Per Unit: | $348,485 | $463,636 | $478,788 |
| **INCOME CAPITALIZATION APPROACH** | | | |
| **Direct Capitalization** | | | |
| Net Operating Income (stabilized): | --- | --- | $892,010 |
| Capitalization Rate: | --- | --- | 5.50% |
| Preliminary Value: | --- | --- | $16,218,369 |
| Value (Rounded): | --- | --- | $16,200,000 |
| LESS Lease Up Costs - Multifamily: | --- | ($170,000) | --- |
| LESS Lease Up Costs - Retail: | --- | ($350,000) | --- |
| Indicated Value: | --- | $15,680,000 | --- |
| Indicated Value Rounded: | --- | $15,700,000 | --- |
| LESS: Costs to Complete | ($3,800,000) | --- | --- |
| Indicated Value: | $11,900,000 | --- | --- |
| Indicated Value Rounded: | $11,900,000 | --- | --- |
| Per Unit: | $360,606 | $475,758 | $490,909 |
| **Income Capitalization Approach** | | | |
| Indicated Value: | $11,900,000 | $15,700,000 | $16,200,000 |
| Per Unit: | $360,606 | $475,758 | $490,909 |
| **FINAL VALUE CONCLUSION** | | | |
| Real Property Interest: | Fee Simple | Fee Simple | Leased Fee |
| Concluded Value: | $11,900,000 | $15,700,000 | $16,200,000 |
| Per Unit: | $360,606 | $475,758 | $490,909 |
| Implied Capitalization Rate: | N/A | N/A | 5.51% |
| **EXPOSURE AND MARKETING TIMES** | | | |
| Exposure Time: | | | 12 Months |
| Marketing Time: | | | 12 Months |

## Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

It is assumed that the proposed improvements are constructed in a quality manner in accordance with the information communicated to us by the developer. If the design or quality differs from that which has been considered herein, the value conclusions could be impacted accordingly. Any undue delay in the construction timeline could materially impact the value conclusion reported herein.

The prospective market value estimate is based upon market participant attitudes and perceptions existing as of the effective date of our appraisal, and assumes the subject property is completed and/or achieves stabilization as of our prospective date. We assume no material change in the physical characteristics and condition of the subject property or in overall market conditions between the date of inspection and effective date of value, except for those identified within the report.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

# Summary of Critical Observations

| SUMMARY OF CRITICAL OBSERVATIONS |
|---|

The strengths and weaknesses analysis applies both specifically (attributes internal or specific to the subject) and generally (external or economic considerations that influence the subject).

## Strengths

- The subject will be in new/good condition upon completion.
- The subject is located in an in-fill location with a minimal amount of developable land.

## Weaknesses

- Reis projects that an additional 705 units will be added to the Howard U./Mt. Pleasant/Brightwood submarket over the next five years, which could place downward pressure on occupancy rates.
- High inflation, the Federal Reserve's interest rate hikes, and continuing supply chain issues are contributing to market volatility. Industry participants are still trying to accurately determine the effects these events will, or have had, on the commercial real estate market.

## Conclusions

Based on the preceding strengths and weaknesses, the subject property's specific, long-term outlook is considered to be improving while the general outlook for the overall market is concluded to be improving over the long-term, but uncertain in the current economic environment.

# Property Photographs

**AERIAL PHOTOGRAPH**



**AS-IS PHOTO – EXTERIOR**



**AS-IS PHOTO – EXTERIOR**



**AS-IS PHOTO – EXTERIOR**



**AS-IS PHOTO – INTERIOR**



**AS-IS PHOTO – INTERIOR**



**STREET VIEW**



## RENDERING



# Scope of Work

## Overview

Scope of work is the type and extent of research and analyses involved in an assignment. To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and other pertinent factors. Our concluded scope of work is summarized below, and in some instances, additional scope details are included in the appropriate sections of the report:

### Research

- We inspected the property and its environs. Physical information on the subject was obtained from the property owner's representative, public records, and/or third-party sources.
- Regional economic and demographic trends, as well as the specifics of the subject's local area were investigated. Data on the local and regional property market (supply and demand trends, rent levels, etc.) was also obtained. This process was based on interviews with regional and/or local market participants, primary research, available published data, and other various resources.
- Other relevant data was collected, verified, and analyzed. Comparable property data was obtained from various sources (public records, third-party data-reporting services, etc.) and confirmed with a party to the transaction (buyer, seller, broker, owner, tenant, etc.) wherever possible. It is, however, sometimes necessary to rely on other sources deemed reliable, such as data reporting services.

### Analysis

- Based upon the subject property characteristics, prevailing market dynamics, and other information, we developed an opinion of the property's Highest and Best Use.
- We analyzed the data gathered using generally accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value.
- The results of each valuation approach are considered and reconciled into a reasonable value estimate.

Cushman & Wakefield of Washington, D.C., Inc. has an internal Quality Control Oversight Program. This Program mandates a "second read" of all appraisals. Assignments prepared and signed solely by designated members (MAIs) are read by another MAI who is not participating in the assignment. Assignments prepared, in whole or in part, by non-designated appraisers require MAI participation, Quality Control Oversight, and signature. For this assignment, Quality Control Oversight was provided by Travis Walsh, MAI.

This appraisal employs all three typical approaches to value: the Cost Approach, the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that all approaches would be considered meaningful and applicable in developing a credible value conclusion.

## Report Option Description

USPAP identifies two written report options: Appraisal Report and Restricted Appraisal Report. This document is prepared as an Appraisal Report in accordance with USPAP guidelines. The terms "describe," summarize," and "state" connote different levels of detail, with "describe" as the most comprehensive approach and "state" as the

least detailed. As such, the following provides specific descriptions about the level of detail and explanation included within the report:

- Describes the real estate and/or personal property that is the subject of the appraisal, including physical, economic, and other characteristics that are relevant
- States the type and definition of value and its source
- Describes the Scope of Work used to develop the appraisal
- Describes the information analyzed, the appraisal methods used, and the reasoning supporting the analyses and opinions; explains the exclusion of any valuation approaches
- States the use of the property as of the valuation date
- Describes the rationale for the Highest and Best Use opinion

## Identification of Property

| | |
|---|---|
| Common Property Name: | 423 Kennedy Street |
| Address: | 423 Kennedy Street, Washington, District of Columbia 20011 |
| Location: | The subject site is located west of Kansas Avenue NW and just south of Missouri Avenue NW. |
| Legal Description: | The legal description was provided as follows: |

Lot numbered 46 in Square numbered 3260 in a subdivision made by D.J. Dunigan, Inc. as per plat recorded in Liber No. 100 at folio 70 of the Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof, the above-described property is known for purposes of assessment and taxation as Square 3260 Lot 0046.

Which has a property address of: **419 Kennedy Street NW**
**Washington, DC 20011**

Title Insurer: **Chicago Title Insurance Company**

| | |
|---|---|
| Assessor's Parcel ID: | Square 3260 Lot 0056 |
| Property Overview: | The subject, 423 Kennedy Street, is an under-construction 33-unit low-rise multifamily property situated on 0.22 acres. The property will consist of 1 building that is 4 stories in height. The property will total 36,512 square feet of gross building area and will total 28,209 square feet of net rentable along with 2,500 retail space on the ground level. Construction began in 2020, with completion estimated for March 2023. |

## Property Ownership and Recent History

Current Ownership: 423 Kennedy St Holdings LLC

Sale History: To our knowledge, the property has not sold or transferred in the past three years. Other recent public record activity of note are as follows:

**NOTICE OF PENDENCY OF ACTION**
**(Notice of *Lis Pendens*)**

**NOTICE OF FILING OF ACTION REGARDING THE PROPERTY KNOWN AS 423 KENNEDY STREET, N.W., #1, WASHINGTON, D.C. 20011:**

1. **NAME OF COURT IN WHICH ACTION OR PROCEEDING HAS BEEN FILED:**

   Superior Court of the District of Columbia
   Moultrie Courthouse, 500 Indiana Avenue
   Washington, D.C. 20001

2. **TITLE OF ACTIONS:** GJC Private Lending, LLC v. Charles Paxton Paret, et. al.

3. **DOCKET NUMBER:** 2021 CA 001660 F

4. **DATE OF FILING:** May 5, 2021

5. **OBJECT OF FILING:** Collection action following the filing of a foreign judgment initially entered by the Circuit Court of Fairfax County, Virginia (Case No. CL20200016055).

6. **AMOUNT/NATURE OF CLAIM:**

   Monetary damages of $569,323.11, plus interest, costs and attorney's fees for default on promissory note.

7. **NAME OF PERSON WHOSE ESTATE IS TO BE AFFECTED THEREBY:**

   Charles Paret, member of 423 Kennedy St Holdings LLC, the entity presently holding an interest in the below-noted property. Debtor Paret's interest in 423 Kennedy St Holdings LLC is subject to potential foreclosure as part of the instant collection action.

Current Disposition: To the best of our knowledge, the property is not under contract of sale nor is it being marketed for sale.

## Dates of Inspection and Valuation

Effective Date(s) of Valuation:

- As Is: November 3, 2022
- Upon Completion: March 1, 2023
- Upon Stabilization: June 1, 2023

Date of Report: November 15, 2022

Date of Inspection: November 3, 2022

## Client, Intended Use and Users of the Appraisal

| | |
|---|---|
| Client: | Main Street Bank |
| Intended Use: | This appraisal is intended to provide an opinion of the market value. This report is not intended for any other use. |
| Intended User: | This appraisal report was prepared for the exclusive use of Main Street Bank. Use of this report by others is not intended by the appraiser. |

# Regional Analysis

**REGIONAL MAP**




## Introduction

Situated near the midpoint of the nation's Mid-Atlantic coast, the Washington, D.C. Core Based Statistical Area (CBSA) is the seventh most populous metropolitan area in the nation. The Washington, D.C. CBSA is positioned along the country's Eastern Seaboard centrally located between Norfolk, Virginia and New York City, New York. Spanning more than 5,627 square miles, the region is comprised of fifteen counties and six independent cities within the states of Maryland and West Virginia as well as the Commonwealth of Virginia. Situated along the banks

of the Potomac and Anacostia rivers, the District of Columbia (the District), is the nation's capital and anchor of the region. It encompasses approximately 61 square miles of land.

## Map

The following map highlights the Washington, D.C. CBSA:

**WASHINGTON-ARLINGTON-ALEXANDRIA, DC-VA-MD-WV**
**CORE BASED STATISTICAL AREA (CBSA)**




Source: Cushman & Wakefield Valuation & Advisory

## Current Trends

The Washington, D.C. CBSA continued to grow rapidly through its "late expansion" period behind strong job growth, particularly in private services, robust population expansion and favorable demographics. The regional economy benefits from the CBSA's position along the East Coast, with access to the nation's capital and many of the largest metro hubs. Despite its relatively high living and business costs, Washington, D.C.'s dense network of colleges and universities makes it a desirable landing spot for young professionals, fueling demographics and driving further tightening of the labor market. The region's reliance on government funding and public sector hiring makes it vulnerable to national economic volatility. Nonfarm payroll growth will be propelled through the near term by hiring in the financial services, professional & business services, and high-tech employment sectors, boosting regional incomes and consumer confidence. The CBSA will sustain its momentum through the near term with the support of rapid population growth, strong demographics, and diverse payroll expansion.

COVID-19 dealt a serious blow to the Washington, D.C. CBSA and the mayor of D.C. and the governors of Maryland and Virginia took the steps necessary to keep the region safe during this unprecedented time. Restrictions in some form remained in place until mid-year 2021 in D.C., Maryland, and Virginia. With restrictions lifted for a year, most businesses have resumed operations in some form, and many companies have brought employees back to the office in some capacity.

Notable trends and developments are discussed below:

- Over the past few years, metropolitan areas with an emphasis on high technology - such as San Francisco, Seattle, Houston, and Denver - have experienced robust gains in employment. Due to rising demand for high-technology services like cybersecurity and counterterrorism, coupled with an abundant young and highly educated workforce, tech companies are continuing to invest in the Washington, D.C. metro. In fact, according to the CompTIA's *Cyberstates 2022* report, the Washington D.C. CBSA ranks as the nation's second-most powerful technology hub, behind only New York City with the number of people employed in tech occupations.

The area also boasts the second-largest overall concentration of tech employment in the nation, with 9.2% of its workforce in tech, compared to the national average of 5.7%. The Interstate 270 Technology Corridor, which is located in Montgomery County, Maryland, is home to numerous software and biotechnology companies. In total, the corridor is home to over 200 IT companies and over 190 life sciences companies. Loudoun County was dubbed “Data Center Alley,” housing the largest concentration of data centers, with more than 25 million square feet in operation and millions more being planned or developed, according to Loudoun Virginia Economic Development. More than 70% of the world’s internet traffic passes through Loudoun’s digital infrastructure.

- The region has long been home to large-scale defense contractors, and one of Washington, D.C.’s largest employers, Boeing, announced in May 2022 that they will be moving their headquarters from Chicago to Arlington, where it plans to develop a research and technology hub. The move will place the company closer to its rival companies (General Dynamics, Lockheed Martin, and Northrop Grumman) as well as its largest customer, the Pentagon. Another major move coming to the area is the Biden administration’s decision to relocate the headquarters of Bureau of Land Management back to Washington, D.C., after the Trump administration moved the headquarters to Colorado in 2020, which resulted in approximately 300 employees resigning or taking early retirement.
- Amazon closed on the land sale in January 2020 that will make way for the first phase of Amazon’s HQ2 at National Landing. The eCommerce giant acquired 6.2 acres in Pentagon City from JBG Smith for roughly $155 million. Currently, two 22-story office towers are under construction with scheduled delivery by 2023. A 6.2-acre site of vacant warehouses and surface parking is being converted in a mixed-use development with almost 70,000 square feet for retail and parking as a part of Phase One of Amazon’s HQ2. Future phases of HQ2 will be delivered on a 10-acre site, Pen Place, that was a part of an April 2019 sale with JBG Smith, and the development plans include approximately 2.1 million square feet. Amazon currently leases 857,000 square feet of existing space in National Landing while the office towers are under construction, and the company expects to reach 25,000 employees at full capacity, of which they expect 12,000 by 2025. In April 2022, Arlington’s County Board approved construction on Amazon’s third building on the site, a spiraling tower known as “The Helix.”
- Virginia Tech is launching a $1 billion campus in Alexandria, with $250 million exclusively for the new campus. The university broke ground on its new 300,000 square foot academic building in third quarter 2021. The Virginia Tech Innovation Campus will help build the state’s tech workforce along with Amazon’s HQ2 in Arlington. The campus will be located in Potomac Yard and was part of Virginia’s pitch that landed Amazon in Northern Virginia. Potomac Yard sits on 65 acres and the school will occupy almost 15 acres with the remaining portion of land to be developed into 7.5 million square feet of office, multifamily housing, retail, and hotel uses. The site will initially house one academic building, with a second to be added; an incubator space for start-ups; research and development; offices for industry collaboration; and a parking garage.
- The Potomac Yard Metro station broke ground in December 2019 and was expected to open in early 2022 but has now been delayed till third quarter 2022, with scheduled opening for service in the fall. The station has been planned for over two decades, and the $320 million project will be located near the Virginia Tech Innovation Campus. In between the Ronald Reagan Washington National Airport and Braddock Road stations, the new metro stop will help to spur development in the area along with Virginia Tech’s new campus and position the region as a tech hub.

- The first phase of The Wharf—a $3.6 billion mixed-use project located on 24 acres of the Southwest Waterfront, spanning from the Municipal Fish Market to Fort McNair—opened in mid-October 2017. Phase I includes approximately 1.9 million square feet of condos, apartments, hotels, offices, and a 6,000-seat concert hall. Horizontal construction of Phase II began in mid-2018 and will include 1.2 million square feet of retail, office, apartments, and condos, as well as 450 marina slips. The target completion date of Phase II is set for year-end 2022, with a mix of retail, restaurant, and office tenants signed, including Williams & Connolly, The Atlantic and Freedom Forum.
- Phase 2 of The Yards began with the groundbreaking of the future headquarters of Chemonics on February 27, 2020. The first phase of Brookfield Properties' waterfront development began with Yards Park in 2010 and five multifamily buildings, a hotel and several retail offerings have followed. Chemonics plans to move into the new 300,000 square foot office building and anchor Yards West. The ten-story office building delivered in fourth quarter 2021. The next phase of The Yards development includes 400,000 square feet of retail space, 1.8 million square feet of office space and up to 3,400 residential units, when fully delivered in 2030.
- Another mixed-used development in Southwest DC will add a connection between The Wharf and The Yards. The area in Buzzard Point was once primarily occupied by industrial and government users, but in 2020, new residences began opening there. Phase 1 of the latest development in the neighborhood, The Stacks, broke ground in May 2022 and will feature three rental residential towers with 1,100 apartments and 35,000 square feet of retail. At its full build out, The Stacks will include 2,000 residence units, 80,000 square feet of restaurants and retail, up to two hotels, up to 250,000 square feet of office space, and a 15,000-square-foot park.

## Demographic Characteristics

The Washington, D.C. CBSA's demographics represent an affluent, well-educated population. A highly educated workforce, coupled with a healthy job market, allows the CBSA's residents to average high per capita incomes. The region's median annual household incomes outperform the nation's by approximately 60.1%, with 52.5% of the region's households earning an annual income of $100,000 or more. High educational attainment in the CBSA is bolstered by the region's network of education and healthcare facilities as well as the high concentration of high-wage employment opportunities, which often require advanced degrees. Approximately 50.4% of the regional population holds a bachelor's or advanced degree, and the CBSA's impressive labor pool will continue to drive economic growth through the near term.

The following chart compares the demographic characteristics of Washington, D.C. with those of the United States:

| Demographic Characteristics<br>Washington, DC CBSA vs. United States<br>2021 Estimates | | |
|---|---|---|
| Characteristic | Washington, DC CBSA | United States |
| Median Age (years) | 37 | 38 |
| Average Annual Household Income | $147,074 | $94,822 |
| Median Annual Household Income | $105,188 | $65,693 |
| *Households by Annual Income Level:* | | |
| <$25,000 | 10.0% | 18.5% |
| $25,000 to $49,999 | 12.2% | 20.1% |
| $50,000 to $74,999 | 13.1% | 17.5% |
| $75,000 to $99,999 | 12.3% | 13.4% |
| $100,000 plus | 52.5% | 30.5% |
| *Education Breakdown:* | | |
| < High School | 9.3% | 12.3% |
| High School Graduate | 18.4% | 27.2% |
| College < Bachelor Degree | 22.0% | 28.9% |
| Bachelor Degree | 25.8% | 19.5% |
| Advanced Degree | 24.6% | 12.1% |

Source: © 2021 Experian Marketing Solutions, Inc. •All rights reserved•
Cushman & Wakefield Valuation & Advisory

## Population

The Washington, D.C. regional population growth has beat national population growth, averaging 0.9% annually from 2011 through 2021. During the same time period, Washington, D.C.'s population growth has beat national population expansion by an average of 30 basis points and is forecast to decrease to an average annual growth rate of 0.6% through 2026.

The following chart compares population growth between Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Shaded bars represent forecasted values
Note: Light brown area indicate periods of recession

The following table shows Washington, D.C.'s annualized population growth:

**Annualized Population Growth**
**Washington, D.C.**
**2011-2026**

| Population (000's) | 2011 | 2021 | Forecast 2022 | Forecast 2026 | Compound Annual Growth Rate 11-21 | Compound Annual Growth Rate 22-26 |
|---|---|---|---|---|---|---|
| United States | 311,583.5 | 330,605.8 | 332,390.5 | 338,383.5 | 0.6% | 0.4% |
| **Washington, D.C.** | **5,769.2** | **6,337.5** | **6,383.3** | **6,548.4** | **0.9%** | **0.6%** |
| Fairfax, Fairfax City + Falls Church, VA | 1,138.6 | 1,194.8 | 1,198.0 | 1,209.0 | 0.5% | 0.2% |
| Montgomery County, MD | 991.2 | 1,067.3 | 1,076.6 | 1,111.6 | 0.7% | 0.8% |
| Prince George's County, MD | 874.4 | 908.1 | 908.4 | 907.6 | 0.4% | 0.0% |
| Prince William, Manassas + Manassas Park, VA | 473.3 | 536.5 | 541.6 | 559.3 | 1.3% | 0.8% |
| Loudoun County, VA | 326.3 | 424.7 | 433.6 | 464.9 | 2.7% | 1.8% |
| Frederick County, MD | 237.3 | 265.0 | 268.9 | 285.7 | 1.1% | 1.5% |
| Arlington County, VA | 216.0 | 239.8 | 241.7 | 248.4 | 1.1% | 0.7% |
| Spotsylvania + Fredericksburg, VA | 150.3 | 167.5 | 169.0 | 175.2 | 1.1% | 0.9% |
| Charles County, MD | 149.2 | 164.1 | 165.3 | 170.0 | 1.0% | 0.7% |
| Alexandria city, VA | 144.2 | 161.6 | 163.1 | 167.5 | 1.1% | 0.7% |
| Stafford County, VA | 132.2 | 156.1 | 158.5 | 168.2 | 1.7% | 1.5% |
| Calvert County, MD | 89.3 | 92.4 | 92.6 | 93.5 | 0.3% | 0.2% |
| Fauquier County, VA | 66.0 | 72.2 | 72.7 | 75.2 | 0.9% | 0.8% |
| Jefferson County, WV | 54.5 | 56.9 | 57.0 | 57.2 | 0.4% | 0.1% |
| Culpeper County, VA | 47.3 | 53.4 | 54.0 | 56.4 | 1.2% | 1.1% |
| Warren County, VA | 37.6 | 40.6 | 40.7 | 41.7 | 0.8% | 0.6% |
| Clarke County, VA | 14.2 | 14.7 | 14.8 | 15.1 | 0.3% | 0.5% |
| Rappahannock County, VA | 7.5 | 7.4 | 7.4 | 7.4 | -0.1% | 0.0% |

Source: Data Courtesy of Moody's Analytics, Cushman & Wakefield Valuation & Advisory

## Households

Generally, a region's household formation trends are directly tied to its overall population growth, as an increase in the population drives demand for real estate. From 2011 through 2021, the Washington, D.C. regional household formation growth rate has beat national expansion, averaging 1.1% annually. In the same ten-year period, Washington, D.C.'s household formation growth has beat national growth by an average of 30 basis points and is forecast to decrease to an average annual growth rate of 0.9% through 2026.

The chart below compares household formation growth between Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Shaded bars represent forecasted values
Note: Light brown area indicate periods of recession

## Gross Metro Product

Gross Metro Product (GMP) is defined as the market value of all final goods and services produced within a metropolitan area, and when compared to the nation's Gross Domestic Product (GDP), can determine shifting economic trends in a given region. Economic growth in Washington, D.C. has trailed national economic expansion over the decade, averaging 1.1% annually from 2011 through 2021. Over the decade, Washington, D.C. GMP has trailed national expansion by an average of 90 basis points and is forecast to increase to an average annual growth rate of 2.8% through 2026.

The chart below compares gross product growth by year for Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Shaded bars represent forecasted values
Note: Light brown area indicate periods of recession

## Employment Distribution

The Professional & Business Services sector dominates Washington, D.C. as the largest employment sector with roughly 24.4% of the regional workforce, compared to 14.5% on the national level. Washington, D.C. offers a diverse mix of industry employment with the Government and Education & Health Services sectors accounting for

22% and 13.2% of total employment, respectively. Together, these three industries comprise 59.6% of the region's share of employment.

The following chart compares non-farm employment sectors for Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory

## Major Employers

The following table lists Washington, D.C.'s largest employers:

**Largest Employers**
**Washington-Arlington-Alexandria, DC-VA-MD-WV**

| Company | No. of Employees | Business Type |
|---|---|---|
| District of Columbia Government | 25,551 | Local Government |
| Fairfax County Public Schools | 24,700 | Education |
| Montgomery County Public Schools | 24,589 | Education |
| Naval Support Activity Washington | 24,000 | Defense & Technology |
| Prince George's County Public Schools | 22,000 | Education |
| Inova Health System | 20,000 | Healthcare |
| Giant Food LLC | 19,172 | Retail Trade |
| MedStar Health | 17,236 | Healthcare |
| Joint Base Andrews-Naval Air Facility | 17,000 | Defense & Technology |
| Deloitte | 16,041 | Professional & Business Services |

Source: *Washington Business Journal* Book of Lists 2022,
U.S. Department of Defense, and Cushman & Wakefield Valuation & Advisory

## Employment Growth

From 2011 through 2021, the Washington, D.C. regional employment growth has trailed national expansion, averaging 0.6% annually. During the same time period, Washington, D.C.'s employment growth has trailed national expansion by an average of 40 basis points and is forecast to increase to an average annual growth rate of 0.9% through 2026.

The following chart illustrates employment growth for Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Shaded bars represent forecasted values
Note: Light brown area indicate periods of recession

## Unemployment

From 2011 through 2021, the Washington, D.C. regional unemployment rate decreased at an average annual rate of 2.3% compared to the nation's unemployment rate, which decreased at an average annual rate of 5%. Washington, D.C.'s unemployment rate is forecast to decrease by an average annual rate of 4% between 2022 and 2026. Based on preliminary data from the Bureau of Labor Statistics, unemployment in the region has declined significantly in the last 12 months, with the June 2022 unemployment rate, at 3.6%, two percentage points lower than the unemployment rate in June 2021.

The graph below illustrates unemployment rates for Washington, D.C. and the United States:




Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Dotted lines represent forecasted values
Note: Light brown area indicate periods of recession

## Conclusion

As the Washington, D.C. CBSA continues to improve behind the reopening of the economy, the region will benefit from several advantages to sustain economic growth over the next few years. GMP growth is estimated to rise 2.8% over the next five years, while employment is expected to climb at a rate of 0.9% over the same time period. Amazon's future presence in the region will create immense opportunity for job growth and improved demographics over the next several years. Additionally, developments like The Wharf, The Yards, and Buzzard Point will add more office space and retail opportunities to Southwest D.C. over the near term. The outlook for the region is positive, as the presence of the Federal Government, strong demographic characteristics, and above-average population growth will allow the region to sustain its position as a premier metropolitan area on the East Coast over the foreseeable future. Furthermore, regional market fundamentals are forecast to improve as most capacity restrictions have been lifted throughout the region. The increased pace of vaccinations has led to improved health metrics, and the region should expect to see increased hiring and economic activity.

# Local Area Analysis

**LOCAL AREA MAP**




## Location Overview

The subject is located in the Brightwood / Brightwood Park neighborhood of northeast Washington, DC. The Central Business District (CBD) of Washington, DC is located approximately six miles south.

### Neighborhood

The boundaries of the neighborhood are generally considered to be:

| | |
|---|---|
| *North:* | Aspen Street NW |
| *South:* | Emerson Street NW |
| *East:* | Kansas Avenue NW |
| *West:* | 16th Street NW |

Land uses in the area comprise a mix of commercial and residential development, as well as recreational amenities. Residential development consists primarily of single-family detached dwellings and multi-family apartments. According to Experian, 32 percent of all housing units comprise single-family detached dwellings, 14 percent comprise attached dwellings, and 54 percent multi-family dwellings. The apartment inventory tends to be older Class B and C garden, mid-rise and high-rise structures.

Approximately 9 percent of the housing units within a one-mile radius of the subject were constructed after 1989, indicating nominal residential growth within the past 25± years. The area contains a significant rental population, with 50 percent of all housing units being renter-occupied.

Commercial development is concentrated north of the subject along Georgia Avenue and northeast of the subject along New Hampshire Avenue (at its intersection with University Boulevard) and includes community and neighborhood shopping centers, fast food and sit-down restaurants, gasoline service stations, big box retailers, low-rise professional office buildings, and other freestanding retailers.

## Kennedy Street Revitalization Project

The Kennedy Street revitalization project commenced in June 2018. The project, led by DDOT, represents a $10 million investment in safety and neighborhood enhancements in the Ward 4 neighborhoods of Brightwood and South Manor Park, spanning Kennedy Street from Georgia Avenue to North Capitol Street, and includes:

- ADA compliant wheel chair ramps at crosswalks and businesses along Kennedy Street;
- traffic calming measures at the intersection of Kennedy Street, Missouri Avenue, and Second Street, NW;
- more than 13,000 square feet of green space;
- 280 boxed parking spaces along Kennedy Street;
- LED streetlights;
- three bioretention ponds;
- new traffic lights;
- 28 park benches
- a new Capital Bikeshare station;
- new trash receptacles; and
- new trees and a brick sidewalk.

The Kennedy Street Revitalization Project, is a collaborative effort that has improved pedestrian and traffic safety and increased green infrastructure

## The Parks at Walter Reed



The Walter Reed Army Medical Center (WRAMC) is a 110-acre campus that served as the site of the Army's primary medical activities for most of the twentieth century. WRAMC's military activities were ended in 2011 and, as part of the BRAC process, acres were made available for reuse. The entire site was designated in 2016 as the WRAMC Historic District and 66.57 acres were made available to the District of Columbia for reuse. The District selected TPWR Developer LLC, a joint venture partnership formed of Hines, Urban Atlantic, and Triden Development Group, to redevelop 66.25 acres of the site consistent with the unified plan established by the WRAMC Local Redevelopment Authority (LRA) and the DC Office of Planning's Small Area Plan (SAP). When fully developed, the site at The Parks at Walter Reed will contain over 3 million square feet of new construction and adaptive reuse of historic structures, including retail, for-rent and for-sale multifamily, townhomes, office, healthcare, a school, and a hotel.

The first building renovation at Walter Reed is already complete and in use. D.C. International School and Latin American Montessori Bilingual opened in the former Delano Hall at 16th and Aspen streets in early September 2017. Overall, the 3.1 million-square-foot Parks at Walter Reed is expected to be built out over 10 to 15 years. The project is planned for 1,560 apartments, 550 condos, 96 townhouses and 2-over-2 units; 200,000 square feet of office and medical space; 240,000 square feet of retail; a 200-room hotel; 30,000 square feet of arts and cultural space; and 20 acres of open space.

## Access

The streets within the area are arranged in a grid pattern running from east to west and north to south, with primary diagonal streets radiating outward from the downtown area. Missouri Avenue, 16th Street NW, Colorado Avenue,

Georgia Avenue, and Piney Branch Road are the primary roadways in the subject's immediate area. Regional roadways, which are easily accessible within the area, include the Capital Beltway (Interstate 495), Interstate 66, and Interstate 395. The Capital Beltway is a circumferential highway surrounding the District of Columbia, which provides convenient access to the surrounding metropolitan area. Interstate 66 provides access to Fairfax County, Virginia to the west. Interstate 395 provides access to Alexandria, Virginia to the south and connects to Interstate 95. Interstate 95 offers travel from Maine to Florida along the East Coast as well as access to the country's extensive interstate network.

Metrorail (Washington's subway system) is a benefit to this area, though not within convenient walking distance. The subject is located approximately 1.5-mile south of the Takoma Park metrorail station (Red Line, approximately 1.0-mile west of the Fort Totten metrorail station (Red Line), and approximately 1.5-mile north of the Petworth-Georgia Avenue metrorail station (Green/Yellow lines). Each provides convenient access for residents and employees to points throughout the city and the suburbs. There is a bus stop within 1 block of the subject.

The Metrobus system compliments rail travel with an extensive bus service within the area. In addition to subway and bus travel, commuter rail lines from suburban Virginia (Virginia Railway Express) and Maryland (Maryland Rail Commuter System) serve the downtown Washington, D.C. area. Amtrak also serves the downtown Washington, D.C. area.

The nearest airport is Ronald Reagan Washington National Airport, located approximately seven miles south of the subject via Metrorail.

## Land Use Changes / Growth Patterns

Below is a brief summary of recently completed, under construction and proposed properties located in the subject neighborhood.



**Project Name: 607 Kennedy Street**

Address: 607 Kennedy Street NW, Washington, DC

Status: Existing

Year Built: 2015

No. of Units: 4 units

Retail Component: 1,149 square feet



**Project Name: Todd A. Lee**

Address: 809 Kennedy Street NW, Washington, DC

Status: Existing

Year Built: 2021

No. of Units: 38 units of which 38 are affordable

Retail Component: 1,000 square feet



**Project Name: TBD**

Address: 930 Kennedy Street NW, Washington, DC

Status: Existing

Year Built: 2022

No. of Units: 11 units



**Project Name: TBD**

Address: 5508 7th Street NW, Washington, DC

Status: Under Construction

Anticipated Completion: 2023

No. of Units: 32 units

Parking: 14 garage spaces



**Project Name: 710-714 Kennedy Street NW**

Address: 710-714 Kennedy Street NW, Washington, DC

Status: Under Construction

Anticipated Completion: 2022

No. of units:30 units



**Project Name: TBD**

Address: 5500 Georgia Avenue, Washington, DC

Status: Under Construction

Anticipated Completion: 2023

No. of Units: 44 units of which 44 are affordable



**Project Name: TBD**

Address: 5756-5810 Georgia Avenue, Washington, DC

Status: Proposed

Anticipated Completion: 2024

No. of Units: 300 units



**Project Name: TBD**

Address: 414 Kennedy Street NW, Washington, DC

Status: Proposed

Anticipated Completion: 2024

No. of Units: 20 units



**Project Name: TBD**

Address: 1307 Longfellow Street NW, Washington, DC

Status: Proposed

Anticipated Completion: 2024

No. of Units: 12 units

Parking: 4 surface spaces



**Project Name: TBD**

Address: 4907 Georgia Avenue NW, Washington, DC

Status: Proposed

Anticipated Completion: 2024

No. of units: 20 units

A full list of recently completed, planned, and proposed projects can be found in the Market Analysis section.

## Demographic Profile

Understanding the demographics of a region helps to ascertain the underlying fundamentals of real estate supply and demand. We analyzed a primary demographic profile for the subject based upon a radius of 0.5-, 1.0-, and 1.5-mile concentric circles with a comparison to the CBSA, state, and the United States. The report on the following page presents this data.

**DEMOGRAPHIC SUMMARY**

| | 0.5-Mile Radius | 1.0-Mile Radius | 1.5-Mile Radius | Washington CBSA | District of Columbia | United States |
|---|---|---|---|---|---|---|
| **POPULATION STATISTICS** | | | | | | |
| 2000 | 13,881 | 38,662 | 75,701 | 4,837,020 | 571,309 | 281,422,025 |
| 2021 | 15,642 | 44,497 | 87,388 | 6,251,197 | 700,960 | 331,030,342 |
| 2026 | 15,881 | 45,352 | 89,130 | 6,508,021 | 732,677 | 342,471,025 |
| **Compound Annual Change** | | | | | | |
| 2000 - 2021 | 0.57% | 0.67% | 0.69% | 1.23% | 0.98% | 0.78% |
| 2021 - 2026 | 0.30% | 0.38% | 0.40% | 0.81% | 0.89% | 0.68% |
| **HOUSEHOLD STATISTICS** | | | | | | |
| 2000 | 5,532 | 15,107 | 30,153 | 1,815,047 | 248,143 | 105,480,443 |
| 2021 | 6,183 | 17,478 | 35,267 | 2,361,903 | 319,334 | 126,093,779 |
| 2026 | 6,349 | 18,044 | 36,332 | 2,472,581 | 338,958 | 131,168,645 |
| **Compound Annual Change** | | | | | | |
| 2000 - 2021 | 0.53% | 0.70% | 0.75% | 1.26% | 1.21% | 0.85% |
| 2021 - 2026 | 0.53% | 0.64% | 0.60% | 0.92% | 1.20% | 0.79% |
| **AVERAGE HOUSEHOLD INCOME** | | | | | | |
| 2000 | $48,144 | $52,854 | $54,428 | $80,506 | $64,426 | $56,675 |
| 2021 | $94,674 | $107,609 | $114,179 | $147,074 | $133,611 | $94,822 |
| 2026 | $100,408 | $113,539 | $120,788 | $152,498 | $140,873 | $99,827 |
| **Compound Annual Change** | | | | | | |
| 2000 - 2021 | 3.27% | 3.44% | 3.59% | 2.91% | 3.53% | 2.48% |
| 2021 - 2026 | 1.18% | 1.08% | 1.13% | 0.73% | 1.06% | 1.03% |
| **OCCUPANCY** | | | | | | |
| Owner Occupied | 58.65% | 55.55% | 52.90% | 63.01% | 40.98% | 63.90% |
| Renter Occupied | 41.35% | 44.45% | 47.10% | 36.99% | 59.02% | 36.10% |

SOURCE: © 2021 Experian Marketing Solutions, Inc. •All rights reserved

**DISTRIBUTION OF HOUSEHOLD INCOME**

| Category | 0.5-Mile Radius | 1.0-Mile Radius | 1.5-Mile Radius | Washington CBSA | District of Columbia | United States |
|---|---|---|---|---|---|---|
| $150,000 or more | 14.68% | 19.07% | 21.38% | 31.88% | 27.24% | 14.51% |
| $125,000 to $149,999 | 8.28% | 7.62% | 7.36% | 9.22% | 7.03% | 6.17% |
| $100,000 to $124,999 | 10.03% | 9.33% | 9.90% | 11.37% | 9.30% | 9.77% |
| $75,000 to $99,999 | 13.00% | 11.91% | 11.48% | 12.26% | 11.02% | 13.37% |
| $50,000 to $74,999 | 17.42% | 15.98% | 15.52% | 13.06% | 12.61% | 17.52% |
| $35,000 to $49,999 | 10.82% | 10.39% | 9.73% | 7.52% | 8.13% | 11.73% |
| $25,000 to $34,999 | 7.81% | 7.24% | 7.12% | 4.72% | 5.65% | 8.38% |
| $15,000 to $24,999 | 7.58% | 7.54% | 6.93% | 4.15% | 5.94% | 8.51% |
| Under $15,000 | 10.38% | 10.92% | 10.60% | 5.82% | 13.08% | 10.03% |

SOURCE: © 2021 Experian Marketing Solutions, Inc. •All rights reserved

## Conclusion

The subject property is located in a growing neighborhood within the District of Columbia. The area benefits from good access provided by a modern transportation system and has access to the major traffic arteries connecting the Central Business District to the surrounding metropolitan areas, as well as Metrorail. The near-term outlook for the neighborhood is for continued stability and growth through redevelopment.

# Apartment Market Analysis

## Overview

A variety of factors influence the performance of a property in the market. In this section we provide an in-depth analysis of both the market in which the subject property competes and its position within that market.

- We begin our analysis with a discussion of current market statistics such as supply, absorption, vacancy, effective rental rates and new and proposed construction.
- Next we provide analysis of competing local properties to determine the competitive inventory, occupancy rates, rent levels and concessions that might impact the market.
- We finish our analysis with an examination of the underlying demographic indices. Comparisons are made to larger study areas such as the CBSA, state and U.S. as a whole in order to place the historical and prospective performance of the subject trade area in context.

## District Of Columbia Apartment Market Overview

### Introduction

Data for the analysis of the District of Columbia Apartment market is provided by Reis, Inc., a leading provider of multifamily and commercial real estate market information since 1980. Their proprietary database includes trends, forecasts, news and analyses for approximately 200,000 multifamily and commercial properties in 232 metropolitan markets (4 property types multiplied by 58 metropolitan areas) and roughly 2,500 submarkets.

Current and historical figures are compiled by highly qualified industry analysts. Surveyors, as they are called, are responsible for gathering information on property availabilities, rents and lease terms, etc. by directly contacting owners, managers and leasing agents. Projected data is calculated using a suite of economic forecasting models developed by The Economic Research Group, a team led by Ph.D. economists.

Reis' data are released on a quarterly basis, and is widely recognized as a fundamental tool for appraisers throughout the country.

#### Submarket Snapshot

As of second quarter 2022 the District of Columbia Apartment market contains 127,844 rental units in 628 buildings, located in nine submarkets. Anacostia/Northeast DC is the largest submarket, with 24.8 percent of the region's total inventory. Foggy Bottom is the smallest submarket, comprising 4.7 percent of total inventory.

The following table presents the geographic distribution of inventory in the area, along with other statistical information for the most recent quarter.

| Geographic Distribution of Inventory | | | | | | |
|---|---|---|---|---|---|---|
| Submarket | No. Bldgs | Inventory (Units) | % Total | Vacancy Rate (%) | Free Rent (Months) | Asking Rent ($/Month) |
| Northwest D.C./Georgetown | 51 | 10,443 | 8.2% | 6.0 | 0.5 | $2,070 |
| Woodley Pk./Cleveland Pk./Van Ness | 57 | 11,583 | 9.1% | 2.8 | 0.4 | $2,334 |
| Foggy Bottom | 32 | 6,007 | 4.7% | 5.5 | 0.1 | $2,268 |
| Downtown/Logan Circle | 75 | 13,706 | 10.7% | 5.5 | 0.4 | $1,917 |
| Dupont Circle/Adams Morgan | 98 | 13,010 | 10.2% | 6.8 | 0.6 | $2,161 |
| Howard U./Mt. Pleasant/Brightwood | 81 | 13,640 | 10.7% | 7.6 | 0.7 | $2,026 |
| Brookland/Ft. Totten | 43 | 7,245 | 5.7% | 6.1 | 0.2 | $1,701 |
| Capitol Hill/Southwest | 76 | 20,537 | 16.1% | 15.0 | 0.7 | $2,528 |
| Anacostia/Northeast DC | 115 | 31,673 | 24.8% | 9.5 | 0.7 | $1,552 |
| **Market Total** | **628** | **127,844** | **100.0%** | **8.2** | **0.5** | **$2,016** |

Source:
© Reis, Inc. 2022
Reprinted with the permission of Reis, Inc.
All Rights reserved.

As of second quarter 2022, the overall vacancy rate for the region was 8.2 percent. Capitol Hill/Southwest has the highest vacancy rate of 15.0 percent, while Woodley Pk./Cleveland Pk./Van Ness has the lowest vacancy rate of 2.8 percent. The subject's Howard U./Mt. Pleasant/Brightwood submarket has a current vacancy rate of 7.6 percent.

The average quoted rental rate for all types of space within the region is $2,016 per month. Capitol Hill/Southwest has the highest average rent of $2,528 per month. Conversely, the lowest rents are achieved in Anacostia/Northeast DC at $1,552 per month. The subject's Howard U./Mt. Pleasant/Brightwood submarket has an average asking rental rate of $2,026 per month. In addition, free rent concessions are prevalent within the market and range from 0.1 to 0.7 months.

## Supply Analysis

### Vacancy Rates

The vacancy rate for the District of Columbia currently stands at 8.2 percent for second quarter 2022, which is down from year-end 2021 when vacancy was 8.9 percent. Reis projects that vacancy rates will decrease over the near term from an average of 8.1 percent 2022 to 6.7 percent in 2026.

The subject submarket is outperforming the market as a whole, with a current vacancy rate of 7.6 percent. Vacancy rates are projected to decrease over the next few years from 6.8 percent in 2022 to 6.3 percent in 2026.

The following table presents historical and projected vacancy for the region and subject submarket.

| Historical and Projected Vacancy Rates | | | | | | |
|---|---|---|---|---|---|---|
| | District of Columbia | | | Howard U./Mt. Pleasant/Brightwood | | |
| Year | Class A | Class B/C | Total | Class A | Class B/C | Total |
| 2017 | 8.8 | 4.5 | 6.7 | 5.8 | 4.6 | 5.2 |
| 2018 | 7.5 | 3.5 | 5.6 | 7.7 | 4.6 | 6.4 |
| 2019 | 8.8 | 4.0 | 6.6 | 7.7 | 3.7 | 6.1 |
| 2020 | 13.9 | 4.7 | 9.9 | 15.7 | 4.4 | 11.3 |
| 2021 | 12.5 | 4.1 | 8.9 | 13.4 | 2.7 | 9.4 |
| 2Q22 | 11.3 | 4.0 | 8.2 | 9.3 | 4.8 | 7.6 |
| 2022 | --- | --- | 8.1 | --- | --- | 6.8 |
| 2023 | --- | --- | 7.8 | --- | --- | 6.0 |
| 2024 | --- | --- | 7.5 | --- | --- | 6.2 |
| 2025 | --- | --- | 7.3 | --- | --- | 6.3 |
| 2026 | --- | --- | 6.7 | --- | --- | 6.3 |

Source: Reis, Inc.
Note: Reis does not differentiate between space that is available directly from the landlord or as a sublease. Any space that is available immediately for leasing (i.e. within 30 days) is considered vacant by Reis' standards.

As shown, Class A properties within the region are experiencing higher vacancies than the market as a whole at 11.3 percent, and Class B/C properties are experiencing lower vacancies of 4.0 percent. Within the Howard U./Mt. Pleasant/Brightwood submarket, Class A properties are experiencing higher vacancies than Class B/C properties.

### Construction Completions

The District of Columbia Apartment market experienced an annual average of 23,413 units completed between 2017 and 2021 or an average of 4,683 units per year. Over the next five years, Reis projects that an additional 11,698 units will be added to the District of Columbia market.

Between 2017 and 2021, the Howard U./Mt. Pleasant/Brightwood submarket experienced new construction of 2,554 units, or an average of 511 units per year. This accounts for approximately 10.9 percent of the region's total completions. Over the next five years, Reis projects that an additional 705 units will be added to the Howard U./Mt. Pleasant/Brightwood submarket.

The following table presents historical inventory for the region and subject submarket, as well as future projections.

| Historical & Projected Inventory (Units) | | | | | |
|---|---|---|---|---|---|
| | District of Columbia | | Howard U./Mt. Pleasant/Brightwood | | |
| Year | Inventory | Completions | Inventory | Completions | % Total |
| 2017 | 109,509 | 5,800 | 11,288 | 202 | 3.5% |
| 2018 | 113,359 | 3,850 | 11,894 | 606 | 15.7% |
| 2019 | 118,405 | 5,046 | 12,445 | 551 | 10.9% |
| 2020 | 123,278 | 4,873 | 13,136 | 691 | 14.2% |
| 2021 | 127,122 | 3,844 | 13,640 | 504 | 13.1% |
| 2Q22 | 127,844 | 550 | 13,640 | 0 | 0.0% |
| 2022 | 130,243 | 3,121 | 13,700 | 60 | 1.9% |
| 2023 | 132,702 | 2,459 | 13,700 | 0 | 0.0% |
| 2024 | 134,127 | 1,425 | 13,870 | 170 | 11.9% |
| 2025 | 136,989 | 2,862 | 14,109 | 239 | 8.4% |
| 2026 | 138,820 | 1,831 | 14,345 | 236 | 12.9% |
| **2017-2021** | | | | | |
| **Total Completions** | | **23,413** | | **2,554** | **10.9%** |
| **Annual Average** | | **4,683** | | **511** | |

Source: Reis, Inc.

## Demand Analysis

### Rental Rates

As shown in the following chart, average asking rents for the region have been trending upward, from an average of $1,827 per month in 2017 to an average of $1,985 per month in 2021, indicating a compound average growth rate (CAGR) of 2.1 percent. As of second quarter 2022, average asking rents increased to $2,016 per month. Over the past few years, concessions have been rising and currently stand at 4.7 percent of face rents. Over the next five years, average asking rents are expected to increase from $2,059 per month in 2022 to $2,408 per month in 2026.

Average asking rental rates in the Howard U./Mt. Pleasant/Brightwood submarket ranged from an average of $1,947 per month in 2017 to an average of $1,992 per month in 2021, demonstrating a CAGR of 0.6 percent. As of second quarter 2022, average rents increased to $2,026 per month. Over the next five years, average asking rents are projected to increase from $2,074 per month in 2022 to $2,485 per month in 2026. Concessions currently stand at 5.6 percent of face rents.

The following table presents historical and projected average asking rental rates for the region and submarket.

**Historical and Projected Average Asking Rental Rates**

| | District of Columbia | | | | | | Howard U./Mt. Pleasant/Brightwood | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Asking Rent $/Month | | | | % | Concessions | Asking Rent $/Month | | | | % | Concessions |
| Year | Class A | Class B/C | Total | Eff Rent | Change | % Face Rent | Class A | Class B/C | Total | Eff Rent | Change | % Face Rent |
| 2017 | $2,229 | $1,399 | $1,827 | $1,744 | 4.3 | 4.5 | $2,332 | $1,471 | $1,947 | $1,840 | -2.5 | 5.5 |
| 2018 | $2,329 | $1,471 | $1,925 | $1,817 | 4.2 | 5.6 | $2,389 | $1,503 | $2,013 | $1,900 | 3.3 | 5.6 |
| 2019 | $2,437 | $1,539 | $2,032 | $1,911 | 5.2 | 6.0 | $2,476 | $1,616 | $2,127 | $1,962 | 3.3 | 7.8 |
| 2020 | $2,237 | $1,413 | $1,880 | $1,771 | -7.3 | 5.8 | $2,213 | $1,393 | $1,898 | $1,745 | -11.1 | 8.1 |
| 2021 | $2,352 | $1,484 | $1,985 | $1,888 | 6.6 | 4.9 | $2,306 | $1,458 | $1,992 | $1,868 | 7.0 | 6.2 |
| 2Q22 | $2,375 | $1,520 | $2,016 | $1,921 | 2.0 | 4.7 | $2,348 | $1,477 | $2,026 | $1,912 | 2.3 | 5.6 |
| 2022 | --- | --- | $2,059 | $1,952 | 3.4 | 5.2 | --- | --- | $2,074 | $1,926 | 3.1 | 7.1 |
| 2023 | --- | --- | $2,134 | $2,024 | 3.7 | 5.2 | --- | --- | $2,160 | $2,007 | 4.2 | 7.1 |
| 2024 | --- | --- | $2,219 | $2,096 | 3.6 | 5.5 | --- | --- | $2,253 | $2,072 | 3.2 | 8.0 |
| 2025 | --- | --- | $2,306 | $2,183 | 4.2 | 5.3 | --- | --- | $2,356 | $2,190 | 5.7 | 7.0 |
| 2026 | --- | --- | $2,408 | $2,278 | 4.4 | 5.4 | --- | --- | $2,485 | $2,290 | 4.6 | 7.8 |
| **CAGR** | **1.35%** | **1.49%** | **2.10%** | **2.00%** | | | **-0.28%** | **-0.22%** | **0.57%** | **0.38%** | | |

### Absorption

Absorption measures change in the level of occupied space in a geographic region over a specific period of time. Absorption is not a measure of leasing activity. It reflects increasing, stable or decreasing demand for space. If the level of occupied space increases from one period to the next, demand has increased. If no change has occurred, demand is stable. If the level of occupied space is lower, demand has decreased. All things being equal, positive absorption lowers vacancy rates and negative absorption increases vacancy rates. A newly constructed building that enters the marketplace vacant will adversely affect the vacancy rate but have no bearing on absorption since it has not altered the level of occupancy.

Over the past few years, new construction within the region has outpaced absorption levels. As shown in the following table, an annual average of 23,413 new units were completed in the District of Columbia region between 2017 and 2021, while 17,123 new units were absorbed. As of second quarter 2022, a total of 550 new units were completed, while 918 new units were absorbed. This resulted in a decline in vacancy from 8.9 percent in 2021 to the current vacancy rate of 8.2 percent. Over the next five years, Reis projects that construction figures will trail absorption (new construction will total 11,698 units, and absorption will total 13,731 units).

New construction within the Howard U./Mt. Pleasant/Brightwood submarket has outpaced absorption levels, resulting in increased vacancy rates. Between 2017 and 2021, a total of 2,554 new units were completed, while 1,810 new units were absorbed. Over the next five years, Reis projects that 705 units will be added to the market, while 1,091 will be absorbed.

The following table presents historical and projected absorption levels for the region and subject submarket.

| Historical and Projected Net Absorption (units) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | District of Columbia | | | | Howard U./Mt. Pleasant/Brightwood | | | |
| Year | Class A | Class B/C | Total | Completions | Class A | Class B/C | Total | Completions |
| 2017 | 3,413 | 140 | 3,553 | 5,800 | 193 | (40) | 153 | 202 |
| 2018 | 3,959 | 871 | 4,830 | 3,850 | 437 | 0 | 437 | 606 |
| 2019 | 3,818 | (280) | 3,538 | 5,046 | 508 | 45 | 553 | 551 |
| 2020 | 914 | (376) | 538 | 4,873 | (4) | (36) | (40) | 691 |
| 2021 | 3,982 | 682 | 4,664 | 3,844 | 621 | 86 | 707 | 504 |
| 2Q22 | 1,175 | (257) | 918 | 550 | 315 | (140) | 175 | 0 |
| 2022 | --- | --- | 3,970 | 3,121 | --- | --- | 413 | 60 |
| 2023 | --- | --- | 2,577 | 2,459 | --- | --- | 111 | 0 |
| 2024 | --- | --- | 1,816 | 1,425 | --- | --- | 132 | 170 |
| 2025 | --- | --- | 2,897 | 2,862 | --- | --- | 208 | 239 |
| 2026 | --- | --- | 2,471 | 1,831 | --- | --- | 227 | 236 |
| **2017-2021** | | | | | | | | |
| **Total Absorption** | **16,086** | **1,037** | **17,123** | **23,413** | **1,755** | **55** | **1,810** | **2,554** |
| **Annual Average** | **3,217** | **207** | **3,425** | **4,683** | **351** | **11** | **362** | **511** |

Source: Reis, Inc.

## New Construction Activity

According to Reis, 5,622 units were completed within the District of Columbia region over the past few years in a total of 23 projects. There are currently 8,703 units under construction within 44 projects. An additional 16,713 units are planned within 110 projects for potential delivery in the next few years, along with 64 proposed buildings which would add another 12,822 units.

The following tables present new and proposed construction activity for the region.

| New Construction Activity - Complete | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | Location | City | Submarket | No. Units | Status | Completion | |
| 220 Water St. | 220 Water Street Southeast | Washington | Capitol Hill/Southwest | 216 | Complete | --- | --- |
| 1345 14Th St NW | 1345 14Th St NW | Washington | Downtown/Logan Circle | --- | Complete | --- | --- |
| Carver | 211 Elm St NW | Washington | Howard U./Mt. Pleasant/I | 62 | Complete | --- | --- |
| The Rushmore | 1230 Pennsylvania Ave SE | Washington | Capitol Hill/Southwest | 117 | Complete | January | 2021 |
| The Rushmore | 1230 Pennsylvania Ave SE | Washington | Capitol Hill/Southwest | 117 | Complete | January | 2021 |
| The Glover House | 2101 Wisconsin Ave NW | Washington | Woodley Pk./Cleveland I | 226 | Complete | January | 2021 |
| Coda At Bryant Street | 600 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 154 | Complete | March | 2021 |
| 1313 11Th St NW | 1313 11Th St NW | Washington | Downtown/Logan Circle | --- | Complete | March | 2021 |
| Union Heights East | 1676 Maryland Ave NE | Washington | Anacostia/Northeast DC | 325 | Complete | April | 2021 |
| Ledger Union Market | 1320 4Th St NE | Washington | Anacostia/Northeast DC | 134 | Complete | April | 2021 |
| 37 L St SE | 37 L St SE | Washington | Capitol Hill/Southwest | --- | Complete | April | 2021 |
| River Point | 2121 1St St SW | Washington | Capitol Hill/Southwest | 480 | Complete | April | 2021 |
| 410 Rhode Island Ave | 410 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | --- | Complete | May | 2021 |
| Press House At Union District | 331 N St NE | Washington | Anacostia/Northeast DC | 356 | Complete | July | 2021 |
| The Exchange | 3619 Georgia Ave | Washington | Howard U./Mt. Pleasant/I | --- | Complete | July | 2021 |
| 312 G St NE | 312 G St NE | Washington | Anacostia/Northeast DC | --- | Complete | August | 2021 |
| One 501 | 1501 Harry Thomas Way NE | Washington | Anacostia/Northeast DC | 327 | Complete | August | 2021 |
| The Chase At Bryant Street | 680 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 333 | Complete | August | 2021 |
| 4111 Kansas Ave NW | 4111 Kansas Ave NW | Washington | Howard U./Mt. Pleasant/I | --- | Complete | August | 2021 |
| 2027 Rhode Island Ave | 2027 Rhode Island Ave NE | Washington | Anacostia/Northeast DC | --- | Complete | September | 2021 |
| Gloriana | 150 S St NW | Washington | Howard U./Mt. Pleasant/I | 8 | Complete | September | 2021 |
| Judd And Weiler | 1611 Eckington Pl NE | Washington | Anacostia/Northeast DC | 457 | Complete | October | 2021 |
| 2118 14Th St NW | 2118 14Th St NW | Washington | Howard U./Mt. Pleasant/I | --- | Complete | October | 2021 |
| Collection 14 | 1400 W St NW | Washington | Howard U./Mt. Pleasant/I | 233 | Complete | October | 2021 |
| The Vale | 6800 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | 301 | Complete | October | 2021 |
| 550 Morse | 500-530 Morse St NE | Washington | Anacostia/Northeast DC | 270 | Complete | November | 2021 |
| The Burton | 200 Florida Ave NW | Washington | Anacostia/Northeast DC | 387 | Complete | December | 2021 |
| Rowan | 2607 Reed St NE | Washington | Brookland/Ft. Totten | 353 | Complete | December | 2021 |
| 1731 Kalorama Rd NW | 1731 Kalorama Rd NW | Washington | Dupont Circle/Adams Mc | --- | Complete | December | 2021 |
| The Silva | 1630 Columbia Rd NW | Washington | Dupont Circle/Adams Mc | 172 | Complete | March | 2022 |
| Park 27 | 2421 Minnesota Ave SE | Washington | Anacostia/Northeast DC | 26 | Complete | April | 2022 |
| 3709 New Hampshire Ave Nw. | 3709 New Hampshire Ave NW | Washington | Howard U./Mt. Pleasant/I | 17 | Complete | April | 2022 |
| The Gantry At Union Market | 300 Morse St NE | Washington | Anacostia/Northeast DC | 551 | Complete | June | 2022 |
| 4000 Wisconsin Ave. | 4000 Wisconsin Ave | Washington | Northwest D.C./Georgetc | --- | Complete | November | 2023 |
| **Total Complete** | | | | **5,622** | | | |

**New Construction Activity - Under Construction**

| Name | Location | City | Submarket | No. Units | Status | Completion | |
|---|---|---|---|---|---|---|---|
| 1928 Naylor Road SE | 1928 Naylorr Rd SE | Washington | Anacostia/Northeast DC | 20 | Under Constr. | --- | --- |
| 400 Florida | 400 Florida Ave NE | Washington | Anacostia/Northeast DC | 110 | Under Constr. | --- | --- |
| Armature Works Condominiums | 1200 3Rd St NE | Washington | Anacostia/Northeast DC | 172 | Under Constr. | --- | --- |
| Woodcrest Villas | 402 Woodcrest Dr SE | Washington | Anacostia/Northeast DC | 59 | Under Constr. | --- | --- |
| 1701 H St NE | 1701 H St NE | Washington | Anacostia/Northeast DC | 191 | Under Constr. | --- | --- |
| Ashton Park | 920 H Street Northeast | Washington | Anacostia/Northeast DC | 10 | Under Constr. | --- | --- |
| Armature Works Apartments | 1200 3Rd St NE | Washington | Anacostia/Northeast DC | 468 | Under Constr. | --- | --- |
| 40 Patterson | 40 Patterson St NE | Washington | Anacostia/Northeast DC | 310 | Under Constr. | --- | --- |
| 1200 Bladensburg Road Northeast | 1200 Bladensburg Rd NE | Washington | Anacostia/Northeast DC | 37 | Under Constr. | --- | --- |
| 1447 Maryland Avenue Northeast / | 1447 Maryland Ave NE | Washington | Anacostia/Northeast DC | 9 | Under Constr. | --- | --- |
| 2805 Jasper Street Southeast | 2805 Jasper St SE | Washington | Anacostia/Northeast DC | 8 | Under Constr. | --- | --- |
| Ozma | 44 M St NE | Washington | Anacostia/Northeast DC | 275 | Under Constr. | --- | --- |
| 1358 - 1360 Florida Avenue Northe | 1358-1360 Florida Ave NE | Washington | Anacostia/Northeast DC | 40 | Under Constr. | --- | --- |
| 1400 Montana Avenue Northeast | 1400 Montana Ave NE | Washington | Anacostia/Northeast DC | 108 | Under Constr. | --- | --- |
| 300 M | 300 M St NE | Washington | Anacostia/Northeast DC | 457 | Under Constr. | --- | --- |
| The 202 At Washington Gateway | 202 Florida Avenue Northeast | Washington | Anacostia/Northeast DC | 254 | Under Constr. | --- | --- |
| 1632 K St Ne. | 1632 K St NE | Washington | Anacostia/Northeast DC | --- | Under Constr. | --- | --- |
| 3619 12Th Street Northeast | 3619 12Th St NE | Washington | Brookland/Ft. Totten | 14 | Under Constr. | --- | --- |
| 1544 Rhode Island Avenue Northe | 1544 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 49 | Under Constr. | --- | --- |
| St. Paul'S College Townhomes | 3015 4Th St NE | Washington | Brookland/Ft. Totten | 78 | Under Constr. | --- | --- |
| Hill East | 326-350 19Th St SE | Washington | Capitol Hill/Southwest | 262 | Under Constr. | --- | --- |
| The Wharf Ph 2 - Parcel 8 | Water St SW & 7Th St SW | Washington | Capitol Hill/Southwest | 255 | Under Constr. | --- | --- |
| Navy Yard Chiller Plant Mixed Use | 41 L St SE | Washington | Capitol Hill/Southwest | 126 | Under Constr. | --- | --- |
| The Wharf Ph 2 Parcel 9 | Maine Ave SW & 7Th St SW | Washington | Capitol Hill/Southwest | 96 | Under Constr. | --- | --- |
| Buzzard Point Ph 1 | 1550 1St St SW | Washington | Capitol Hill/Southwest | 76 | Under Constr. | --- | --- |
| 9Th And M | 1126 9Th St NW | Washington | Downtown/Logan Circle | 15 | Under Constr. | --- | --- |
| Square 767 Condos | I NW St & 3Rd NW St | Washington | Downtown/Logan Circle | 120 | Under Constr. | --- | --- |
| Residences At City Market | 1336 8Th St NW | Washington | Downtown/Logan Circle | 84 | Under Constr. | --- | --- |
| The Cantata | 811 3Rd St NW | Washington | Downtown/Logan Circle | 275 | Under Constr. | --- | --- |
| Sursum Corda Redevelopment Fut | 1St St NW & L St NW | Washington | Downtown/Logan Circle | 964 | Under Constr. | --- | --- |
| The 9Th | 2133 9Th St NW | Washington | Howard U./Mt. Pleasant/I | 312 | Under Constr. | --- | --- |
| Cardinal House | 1458 Belmont St NW | Washington | Howard U./Mt. Pleasant/I | 14 | Under Constr. | --- | --- |
| The V At Georgia Avenue | 3557 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | 20 | Under Constr. | --- | --- |
| Congress Heigts Town Center | 3200 13Th St NW | Washington | Howard U./Mt. Pleasant/I | 200 | Under Constr. | --- | --- |
| 646 Newton Pl NW | 646 Newton Pl NW | Washington | Howard U./Mt. Pleasant/I | --- | Under Constr. | --- | --- |
| 531 Kennedy St NW | 531 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | --- | Under Constr. | --- | --- |
| 3219 Wisconsin Avenue Northwes | 3219 Wisconsin Ave NW | Washington | Northwest D.C./Georgetc | 8 | Under Constr. | --- | --- |
| Noma Cntr | 1005 First St NE | Washington | Anacostia/Northeast DC | 500 | Under Constr. | August | 2022 |
| Providence Place | 601 50Th St NE | Washington | Anacostia/Northeast DC | 93 | Under Constr. | September | 2022 |
| 1208 M Street Northwest | 1208 M Street NW | Washington | Downtown/Logan Circle | 14 | Under Constr. | September | 2022 |
| City Ridge | 3900 Wisconsin Ave NW | Washington | Northwest D.C./Georgetc | 687 | Under Constr. | September | 2022 |
| St. Elizabeth'S East Housing Ph 2 | 1000 Alabama Ave SE | Washington | Anacostia/Northeast DC | 88 | Under Constr. | October | 2022 |
| St. Elizabeth'S East Housing Futur | 1000 Alabama Ave SE | Washington | Anacostia/Northeast DC | 1,000 | Under Constr. | October | 2022 |
| 861 New Jersey Avenue Southeas | 861 New Jersey Ave SE | Washington | Capitol Hill/Southwest | 700 | Under Constr. | October | 2022 |
| 1214 - 1224 M Street Northwest | 1218 M St NW | Washington | Downtown/Logan Circle | 49 | Under Constr. | October | 2022 |
| 2220 11Th Street Northwest | 2220 11Th St NW | Washington | Howard U./Mt. Pleasant/I | 60 | Under Constr. | October | 2022 |
| 5900 Foote Street Northeast | 5900 Foote Street NE | Washington | Anacostia/Northeast DC | 16 | Under Constr. | December | 2022 |
| **Total Under Construction** | | | | **8,703** | | | |

**New Construction Activity - Planned**

| Name | Location | City | Submarket | No. Units | Status | Completion | |
|---|---|---|---|---|---|---|---|
| Skyland Town Center Ph 2 Block 4 | 2834 Alabama Avenue Southeast | Washington | Anacostia/Northeast DC | 180 | Planned | --- | --- |
| 12Th And Allison Rowhouses | Webster St NE @ 12Th St NE | Washington | Anacostia/Northeast DC | 79 | Planned | --- | --- |
| 1124-1126 Florida Ave NE | 1124-1126 Florida Ave NE | Washington | Anacostia/Northeast DC | 52 | Planned | --- | --- |
| Parkside Development Ph 1 | Hayes St NE & Parkside Pl NE | Washington | Anacostia/Northeast DC | 191 | Planned | --- | --- |
| Columbian Quarter Ph 1 Bldg C | Howard Rd SE & I-295 N | Washington | Anacostia/Northeast DC | 275 | Planned | --- | --- |
| Congress Place | 1109 Congress St NE | Washington | Anacostia/Northeast DC | 62 | Planned | --- | --- |
| Reunion Square Ph 1 | Martin Luther King Jr Ave SE & U St SE | Washington | Anacostia/Northeast DC | 413 | Planned | --- | --- |
| The Valvaere | 1611 Benning Rd NE | Washington | Anacostia/Northeast DC | 285 | Planned | --- | --- |
| Reunion Square Ph 2 | V St SE & Shannon Pl SE | Washington | Anacostia/Northeast DC | 133 | Planned | --- | --- |
| New City DC Ph 1A Bldg 3 | 1923 New York Ave NE | Washington | Anacostia/Northeast DC | 434 | Planned | --- | --- |
| Market Terminal Ph 2 Bldg D | 350 Morse St NE | Washington | Anacostia/Northeast DC | 159 | Planned | --- | --- |
| Market Terminal Ph 2 Bldg A2 | 340 Morse St NE | Washington | Anacostia/Northeast DC | 260 | Planned | --- | --- |
| Ivanhoe Street Southwest Apartme | 130 Ivanhoe St SW | Washington | Anacostia/Northeast DC | 30 | Planned | --- | --- |
| Columbian Quarter Ph 3 Bldg B | Howard Rd SE & I-295 N | Washington | Anacostia/Northeast DC | 425 | Planned | --- | --- |
| Shrimp Boat Plaza Redevelopmen | 4510 E Capitol St NE | Washington | Anacostia/Northeast DC | 18 | Planned | --- | --- |
| Howard Road Residential Develop | 1004-1018 Howard Rd SE | Washington | Anacostia/Northeast DC | 18 | Planned | --- | --- |
| 1324 North Capitol Street Northwe | 1324 N Capitol St NE | Washington | Anacostia/Northeast DC | 69 | Planned | --- | --- |
| Eden Place Ph 2 | 6100 Dix St NE | Washington | Anacostia/Northeast DC | 14 | Planned | --- | --- |
| 101 Q Street Northeast Apartments | 101 Q St NE | Washington | Anacostia/Northeast DC | 30 | Planned | --- | --- |
| Rhode Island Avenue Condos | 1001-1003 Rhode Island Avenue Northeast | Washington | Anacostia/Northeast DC | 23 | Planned | --- | --- |
| 1615 Good Hope Road Southeast | 1615 Good Hope Rd SE | Washington | Anacostia/Northeast DC | 86 | Planned | --- | --- |
| 2908 N Street Southeast | 2908 N St SE | Washington | Anacostia/Northeast DC | 8 | Planned | --- | --- |
| 818 Bladensburg Road Northeast | 818 Bladensburg Rd NE | Washington | Anacostia/Northeast DC | 32 | Planned | --- | --- |
| Union Market District Residential | 1325 5Th St NE | Washington | Anacostia/Northeast DC | 301 | Planned | --- | --- |
| New York Avenue Gateway | 401 New York Ave NE | Washington | Anacostia/Northeast DC | 366 | Planned | --- | --- |
| 1900 Fenwick Street Northeast Re | 1900 Fenwick St NE | Washington | Anacostia/Northeast DC | 123 | Planned | --- | --- |
| Airdome | 1101-1107 H St NE | Washington | Anacostia/Northeast DC | 53 | Planned | --- | --- |
| Capitol Point North Ph 1 | 55 & 75 New York Ave NE | Washington | Anacostia/Northeast DC | 500 | Planned | --- | --- |
| The Audra | 2711 13Th St NE | Washington | Anacostia/Northeast DC | 60 | Planned | --- | --- |
| 2326 Green Street Southeast | 2326 Green St SE | Washington | Anacostia/Northeast DC | 10 | Planned | --- | --- |
| 2400 And 2402 20Th Street Northe | 2400 & 2402 20Th St NE | Washington | Anacostia/Northeast DC | 20 | Planned | --- | --- |
| 440 Penn | 440 Penn St NE | Washington | Anacostia/Northeast DC | 300 | Planned | --- | --- |
| 2336 Green Street Southeast | 2336 Green St SE | Washington | Anacostia/Northeast DC | 14 | Planned | --- | --- |
| 2201 And 2207 Fourth Street North | 2201 & 2207 4Th St NE | Washington | Anacostia/Northeast DC | 38 | Planned | --- | --- |
| Capitol Point North Ph 2 | 55 & 75 New York Ave NE | Washington | Anacostia/Northeast DC | 305 | Planned | --- | --- |
| 4276 Sheriff Road Northeast | 4276 Sheriff Rd NE | Washington | Anacostia/Northeast DC | 12 | Planned | --- | --- |
| 7 New York Avenue Northwest | 7 New York Ave NW | Washington | Anacostia/Northeast DC | 116 | Planned | --- | --- |
| 6101 Sligo Mill Road Northeast | 6101 Sligo Mill Rd NE | Washington | Brookland/Ft. Totten | 50 | Planned | --- | --- |
| Rhode Island Flats | 1002 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 8 | Planned | --- | --- |
| 13Th Street And Rhode Island Ave | 13Th St & Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 240 | Planned | --- | --- |
| 2310 - 2312 4Th Street Northeast | 2310-2312 4Th St NE | Washington | Brookland/Ft. Totten | 29 | Planned | --- | --- |
| The Modern At Art Place Future Ph | Galloway St NE & S Dakota Ave NE | Washington | Brookland/Ft. Totten | 272 | Planned | --- | --- |
| 1818 Rhode Island Avenue Northe | 1818 Rhode Island Ave NE | Washington | Brookland/Ft. Totten | 10 | Planned | --- | --- |
| 901 Monroe Street | 901-925 Monroe St NE | Washington | Brookland/Ft. Totten | 213 | Planned | --- | --- |
| The Yards At DC Water | 1St St SE | Washington | Capitol Hill/Southwest | 600 | Planned | --- | --- |
| Randall School Redevelopment | 65 I St SW | Washington | Capitol Hill/Southwest | 485 | Planned | --- | --- |
| M Street Development Ph 2 | 1333 M St NE | Washington | Capitol Hill/Southwest | 133 | Planned | --- | --- |
| M Street Development Ph 3 | 1333 M St SE | Washington | Capitol Hill/Southwest | 234 | Planned | --- | --- |
| M Street Development Ph 4 | 1333 M St SE | Washington | Capitol Hill/Southwest | 88 | Planned | --- | --- |
| The Bard | 501 I St SW | Washington | Capitol Hill/Southwest | 136 | Planned | --- | --- |

New Construction Activity - Planned (Continued)

| Name | Location | City | Submarket | No. Units | Status | Completion | |
|---|---|---|---|---|---|---|---|
| Waterfront Station Mixed Use | 425 M Street Southwest | Washington | Capitol Hill/Southwest | 605 | Planned | --- | --- |
| 1330 Pennsylvania Aveue Southea | 1330 Pennsylvania Ave SE | Washington | Capitol Hill/Southwest | 10 | Planned | --- | --- |
| The Yards Ph 2 | 1St St SE & New Jersey Ave | Washington | Capitol Hill/Southwest | 1,200 | Planned | --- | --- |
| M Street Development Ph 1 | 1333 M St SE | Washington | Capitol Hill/Southwest | 218 | Planned | --- | --- |
| 716-718 L Street Southeast | 716-718 L St SE | Washington | Capitol Hill/Southwest | 18 | Planned | --- | --- |
| 1800 Half Street Southwest | 1800 Half St SW | Washington | Capitol Hill/Southwest | 344 | Planned | --- | --- |
| The Warring | 1319 S Capitol St | Washington | Capitol Hill/Southwest | 320 | Planned | --- | --- |
| Potomac Avenue Southwest And S | Potomac Ave SW & S St SW | Washington | Capitol Hill/Southwest | 352 | Planned | --- | --- |
| 201 F Street North West | 201 F St NW | Washington | Capitol Hill/Southwest | --- | Planned | --- | --- |
| 45 Q Street Southwest | 45 Q St SW | Washington | Capitol Hill/Southwest | 60 | Planned | --- | --- |
| Maryland Avenue And D Street | Maryland Ave & D St | Washington | Capitol Hill/Southwest | 353 | Planned | --- | --- |
| Cotton Annex Redevelopment | 300 12Th St SW | Washington | Capitol Hill/Southwest | 615 | Planned | --- | --- |
| 1318 9Th Street Northwest | 1318 9Th St NW | Washington | Downtown/Logan Circle | 9 | Planned | --- | --- |
| 33 - 45 P Street Northwest Redeve | 33-45 P Street NW | Washington | Downtown/Logan Circle | 12 | Planned | --- | --- |
| Square 669 And 670 | 32 New York Ave NW | Washington | Downtown/Logan Circle | 557 | Planned | --- | --- |
| 631 P Street Northwest | 631 P St NW | Washington | Downtown/Logan Circle | 230 | Planned | --- | --- |
| 1128 10Th Street NW | 1128 10Th Street Northwest | Washington | Downtown/Logan Circle | 24 | Planned | --- | --- |
| 925 5Th St NW | 925 5Th St NW | Washington | Downtown/Logan Circle | 47 | Planned | --- | --- |
| 901 5Th Street Northwest | 901 5Th St NW | Washington | Downtown/Logan Circle | 48 | Planned | --- | --- |
| Flats At Blagden Alley | 90-91 Blagden Alley NW | Washington | Downtown/Logan Circle | 121 | Planned | --- | --- |
| 1212-1214 4Th Street NW | 1212 4Th Street NW | Washington | Downtown/Logan Circle | 26 | Planned | --- | --- |
| Bladgen Alley | 917 M St NW | Washington | Downtown/Logan Circle | 123 | Planned | --- | --- |
| P St Residences | 2149 P St NW | Washington | Dupont Circle/Adams Mc | 66 | Planned | --- | --- |
| Embassy Gulf Service Station Red | 2200 P St NW | Washington | Dupont Circle/Adams Mc | 34 | Planned | --- | --- |
| Cobalt Bar Redevelopment | 1637 R St NW | Washington | Dupont Circle/Adams Mc | 18 | Planned | --- | --- |
| Masonic Temple Apartments | 1733 16Th Street NW | Washington | Dupont Circle/Adams Mc | 150 | Planned | --- | --- |
| 1328 16Th Street Northwest | 1328 16Th St NW | Washington | Dupont Circle/Adams Mc | 78 | Planned | --- | --- |
| Admo Heights Expansion | 1767-1771 Columbia Rd NW | Washington | Dupont Circle/Adams Mc | 40 | Planned | --- | --- |
| Effingham Apartments Redevelopr | 2711 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | 90 | Planned | --- | --- |
| Morse School Redevelopment | 440 R St NW | Washington | Howard U./Mt. Pleasant/I | 12 | Planned | --- | --- |
| 300 - 308 Carroll Street Northwest | 300 Carroll St NW | Washington | Howard U./Mt. Pleasant/I | 160 | Planned | --- | --- |
| 302 - 304 Florida Avenue Northwe: | 302-304 Florida Ave NW | Washington | Howard U./Mt. Pleasant/I | 13 | Planned | --- | --- |
| 1612 - 1616 Seventh Street Northv | 1612-1616 7Th St NW | Washington | Howard U./Mt. Pleasant/I | 9 | Planned | --- | --- |
| 1307 Longfellow Street Northwest | 1307 Longfellow St NW | Washington | Howard U./Mt. Pleasant/I | 13 | Planned | --- | --- |
| 2005 Eleventh | 2005 11Th St NW | Washington | Howard U./Mt. Pleasant/I | 39 | Planned | --- | --- |
| 2328 Georgia Avenue Northwest | 2328 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | 430 | Planned | --- | --- |
| 1250 U Street Northwest Redevelo | 1250 U Street NW | Washington | Howard U./Mt. Pleasant/I | 106 | Planned | --- | --- |
| 614 - 624 S Street Northwest | 614-624 S St NW | Washington | Howard U./Mt. Pleasant/I | 80 | Planned | --- | --- |
| Wonder Plaza Redevelopment | 2301 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | --- | Planned | --- | --- |
| 2467 Sherman Avenue Northwest | 2467 Sherman Ave NW | Washington | Howard U./Mt. Pleasant/I | 650 | Planned | --- | --- |
| The Thread | 1925 Vermont Ave NW | Washington | Howard U./Mt. Pleasant/I | 38 | Planned | --- | --- |
| 751 Columbia Road Northwest De | 751 Columbia Rd NW | Washington | Howard U./Mt. Pleasant/I | 12 | Planned | --- | --- |
| The Park Parcel Wxy | Aspen St NW & 14Th Pl NW | Washington | Howard U./Mt. Pleasant/I | 58 | Planned | --- | --- |
| 917 Kennedy Street | 917 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | 21 | Planned | --- | --- |
| 22-24 Kennedy Street Northwest | 22-24 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | 70 | Planned | --- | --- |
| 218 Cedar Street Northwest | 218 Cedar St NW | Washington | Howard U./Mt. Pleasant/I | 37 | Planned | --- | --- |
| Coloma River'S Kennedy Street Lo | 71 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | 46 | Planned | --- | --- |
| Project Espazio | 3831 Georgia Ave NW | Washington | Howard U./Mt. Pleasant/I | 20 | Planned | --- | --- |
| 2002 11Th Street NW | 2002 11Th St NW | Washington | Howard U./Mt. Pleasant/I | 30 | Planned | --- | --- |
| The Logic | 2105 10Th Street NW | Washington | Howard U./Mt. Pleasant/I | 40 | Planned | --- | --- |
| 3401 Water Street North West | 3401 Water St NW | Washington | Northwest D.C./Georget( | 54 | Planned | --- | --- |

New Construction Activity - Planned (Continued)

| Name | Location | City | Submarket | No. Units | Status | Completion | |
|---|---|---|---|---|---|---|---|
| The Ladybird | 4330 48Th St NW | Washington | Northwest D.C./Georget( | 236 | Planned | --- | --- |
| 1515 Wisconsin Avenue Northwes | 1515 Wisconsin Ave NW | Washington | Northwest D.C./Georget( | 8 | Planned | --- | --- |
| 3601 M | 3601-3607 M St NW | Washington | Northwest D.C./Georget( | 21 | Planned | --- | --- |
| Dancing Crab Redevelopment | 4615 Wisconsin Ave NW | Washington | Northwest D.C./Georget( | 41 | Planned | --- | --- |
| 2900 M Street Northwest Renovati | 2900-2924 M St NW | Washington | Northwest D.C./Georget( | 38 | Planned | --- | --- |
| Palisades Senior Apartments | 4865 Macarthur Blvd NW | Washington | Northwest D.C./Georget( | --- | Planned | --- | --- |
| 33 - 45 P Street Northwest Redeve | 33-45 P Street NW | Washington | Northwest D.C./Georget( | 43 | Planned | --- | --- |
| 3400 Connecticut Avenue Northwe | 3400 Connecticut Ave NW | Washington | Woodley Pk./Cleveland I | 26 | Planned | --- | --- |
| 301 Florida Avenue Northeast | 301 Florida Ave NE | Washington | Anacostia/Northeast DC | 56 | Planned | November | 2022 |
| 340 Morse Street Northeast | 340 Morse St NE | Washington | Anacostia/Northeast DC | 260 | Planned | January | 2023 |
| Vanguard Building Redevelopment | 1111 20Th St NW | Washington | Foggy Bottom | 161 | Planned | June | 2024 |
| Faircliff Plaza East Redevelopmen | 1350 Fairmont St NW | Washington | Howard U./Mt. Pleasant/I | 125 | Planned | November | 2024 |
| **Total Planned** | | | | **16,713** | | | |

**New Construction Activity - Proposed**

| Name | Location | City | Submarket | No. Units | Status | Completion | |
|---|---|---|---|---|---|---|---|
| 2495 Alabama Avenue SE | 2495 Alabama Ave SE | Washington | Anacostia/Northeast DC | 30 | Proposed | --- | --- |
| 327 S Street NE | 327 S St NE | Washington | Anacostia/Northeast DC | 330 | Proposed | --- | --- |
| 51 N | 51 N St NE | Washington | Anacostia/Northeast DC | 208 | Proposed | --- | --- |
| Bearden Arts | 1341 H St NE | Washington | Anacostia/Northeast DC | 9 | Proposed | --- | --- |
| Burnham Place At Union Station A | 100 Columbus Circle | Washington | Anacostia/Northeast DC | 1,300 | Proposed | --- | --- |
| Parkside Development Future Pha | Jay St NE & Rte 295 | Washington | Anacostia/Northeast DC | 72 | Proposed | --- | --- |
| Deanwood Metro Parking Lot Rede | 4880 Minnesota Ave NE | Washington | Anacostia/Northeast DC | 138 | Proposed | --- | --- |
| 616 50Th Street Northeast | 616 50Th St NE | Washington | Anacostia/Northeast DC | 10 | Proposed | --- | --- |
| 2604 29Th Street SE | 2604 29Th St SE | Washington | Anacostia/Northeast DC | 12 | Proposed | --- | --- |
| East River Park Redevelopment | 322 40Th St NE | Washington | Anacostia/Northeast DC | 280 | Proposed | --- | --- |
| 4243 Benning Road Northeast | 4243 Benning Rd NE | Washington | Anacostia/Northeast DC | 8 | Proposed | --- | --- |
| 1018 Bryant Street Northeast | 1018 Bryant St NE | Washington | Anacostia/Northeast DC | 9 | Proposed | --- | --- |
| 2836 Robinson Place Southeast | 2836 Robinson Pl SE | Washington | Anacostia/Northeast DC | 16 | Proposed | --- | --- |
| 1801 And 1805 Maryland Avenue I | 1801 & 1805 Maryland Ave NE | Washington | Anacostia/Northeast DC | 28 | Proposed | --- | --- |
| 1150 First Street | 1150 1St St NE | Washington | Anacostia/Northeast DC | 500 | Proposed | --- | --- |
| Northeast Heights Town Center Ea | Minnesota Ave NE & Benning Rd NE | Washington | Anacostia/Northeast DC | 855 | Proposed | --- | --- |
| 1430 Eastern Avenue Northeast | 1430 Eastern Ave NE | Washington | Anacostia/Northeast DC | 16 | Proposed | --- | --- |
| 1 Florida Avenue Northeast | 1 Florida Ave NE | Washington | Anacostia/Northeast DC | 388 | Proposed | --- | --- |
| Fletcher-Johnson Redevelopment | 4650 Benning Rd SE | Washington | Anacostia/Northeast DC | 816 | Proposed | --- | --- |
| The Clara | 2323 Martin Luther King Jr Ave SE | Washington | Anacostia/Northeast DC | --- | Proposed | --- | --- |
| Terrace Manor Redevelopment | 2276 Savannah St SE | Washington | Anacostia/Northeast DC | 130 | Proposed | --- | --- |
| 1351 Alabama Avenue Southeast | 1351 Alabama Ave SE | Washington | Anacostia/Northeast DC | 120 | Proposed | --- | --- |
| Gallaudet University Winning Desi | 800 Florida Ave NE | Washington | Anacostia/Northeast DC | 1,769 | Proposed | --- | --- |
| Two M Street Ph 3 | M St NE At N Capitol St NE | Washington | Anacostia/Northeast DC | 264 | Proposed | --- | --- |
| 1600 Good Hope Road Southeast | 1600 Good Hope Rd SE | Washington | Anacostia/Northeast DC | 35 | Proposed | --- | --- |
| 1219 Simms Place Redevelopmen | 1219 Simms Pl NE | Washington | Anacostia/Northeast DC | 8 | Proposed | --- | --- |
| Buena Vista Terrace Expansion | 2817 Buena Vista Terrace SE | Washington | Anacostia/Northeast DC | 12 | Proposed | --- | --- |
| Ainger Residence | 2340 Ainger Pl SE | Washington | Anacostia/Northeast DC | 21 | Proposed | --- | --- |
| 2917 Knox Place | 2917 Knox Pl SE | Washington | Anacostia/Northeast DC | 16 | Proposed | --- | --- |
| 1009 Bryant Street Northeast | 1009 Bryant St NE | Washington | Anacostia/Northeast DC | 10 | Proposed | --- | --- |
| Union Market Development | 1331 5Th St NE | Washington | Anacostia/Northeast DC | 650 | Proposed | --- | --- |
| Brookland Lanes | 3722 10Th St NE | Washington | Brookland/Ft. Totten | 321 | Proposed | --- | --- |
| John Mccormack Road And Taylor | John F Mccormack Rd NE & Taylor St NE | Washington | Brookland/Ft. Totten | --- | Proposed | --- | --- |
| Bryant Street Ph 4 Block 3 | Rhode Island Ave NE & 4Th St NE | Washington | Brookland/Ft. Totten | 355 | Proposed | --- | --- |
| Bryant Street Ph 5 Block 4 | Rhode Island Ave NE & 4Th St NE | Washington | Brookland/Ft. Totten | 193 | Proposed | --- | --- |
| Bryant Street Ph 3 Block 2A | Rhode Island Ave NE & 4Th St NE | Washington | Brookland/Ft. Totten | 282 | Proposed | --- | --- |
| Bryant Street Ph 6 Block 5A | Rhode Island Ave NE & 4Th St NE | Washington | Brookland/Ft. Totten | 149 | Proposed | --- | --- |
| Fort Totten Metro Development | 1St Pl NE | Washington | Brookland/Ft. Totten | 345 | Proposed | --- | --- |
| 5M Ph 2 | 5 M St SW | Washington | Capitol Hill/Southwest | 371 | Proposed | --- | --- |
| 1002 Rhode Island Avenue Northw | 1002 Rhode Island Ave NW | Washington | Downtown/Logan Circle | 3 | Proposed | --- | --- |
| 1313 L Street Northwest Redevelo | 1313 L St NW | Washington | Downtown/Logan Circle | 222 | Proposed | --- | --- |
| Museum Square Apartments | 401 K St NW | Washington | Downtown/Logan Circle | 302 | Proposed | --- | --- |
| Q Street Milestone | 4-12 Q St NW | Washington | Downtown/Logan Circle | 42 | Proposed | --- | --- |
| 6Th And K Residential | 6Th St NW | Washington | Downtown/Logan Circle | 154 | Proposed | --- | --- |
| Washington Global Trade Center A | I-395 S & K St NW | Washington | Downtown/Logan Circle | 200 | Proposed | --- | --- |
| Bethany Apartments | 1300 10Th St NW | Washington | Downtown/Logan Circle | 45 | Proposed | --- | --- |
| 1125 15Th Street Northwest | 1125 15Th St NW | Washington | Downtown/Logan Circle | 264 | Proposed | --- | --- |
| 1319 11Th Street Northwest Rede | 1319 11Th St NW | Washington | Downtown/Logan Circle | 9 | Proposed | --- | --- |
| Ontario Road Northwest Apartmen | 2338 Ontario Rd NW | Washington | Dupont Circle/Adams Mc | --- | Proposed | --- | --- |
| Meridian Hill Park | 2300-2350 16Th St NW | Washington | Dupont Circle/Adams Mc | 110 | Proposed | --- | --- |

**New Construction Activity - Proposed (Continued)**

| Name | Location | City | Submarket | No. | Status | Completion | |
|---|---|---|---|---|---|---|---|
| Harvard Hall Apartments Addition | 1650 Harvard St NW | Washington | Dupont Circle/Adams Mc | 40 | Proposed | --- | --- |
| 3315 11Th Street Northwest | 3315 11Th St NW | Washington | Howard U./Mt. Pleasant/I | 9 | Proposed | --- | --- |
| The Clifton | 1435 Clifton St NW | Washington | Howard U./Mt. Pleasant/I | 8 | Proposed | --- | --- |
| 421 T Street Northwest | 421 T St NW | Washington | Howard U./Mt. Pleasant/I | 11 | Proposed | --- | --- |
| North Capitol St Condominiums | 1600 N Capitol St NW | Washington | Howard U./Mt. Pleasant/I | 95 | Proposed | --- | --- |
| Mcmillan Sand Filtration Redevelo | 1St St NW & Michigan Ave NW | Washington | Howard U./Mt. Pleasant/I | 233 | Proposed | --- | --- |
| Red Rocks 11Th And Park Road N | 11Th St NW & Park Rd NW | Washington | Howard U./Mt. Pleasant/I | 26 | Proposed | --- | --- |
| 123 - 125 Kennedy Street Northwe | 123 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | 30 | Proposed | --- | --- |
| 429 - 431 Kennedy Street Northwe | 429 Kennedy St NW | Washington | Howard U./Mt. Pleasant/I | 35 | Proposed | --- | --- |
| 6950 Maple Street Northwest Rede | 6928 Maple St NW | Washington | Howard U./Mt. Pleasant/I | 66 | Proposed | --- | --- |
| Midcity 8Th Street Redevelopment | 1707 8Th St NW | Washington | Howard U./Mt. Pleasant/I | 317 | Proposed | --- | --- |
| 3801 Macomb Street Northwest Re | 3801 Macomb St NW | Washington | Northwest D.C./Georgetc | 8 | Proposed | --- | --- |
| 3300 Whitehaven Street Norhtwes | 3300 Whitehaven St NW | Washington | Northwest D.C./Georgetc | 279 | Proposed | --- | --- |
| 2208 Wisconsin Avenue Northwes | 2208 Wisconsin Ave NW | Washington | Northwest D.C./Georgetc | 40 | Proposed | --- | --- |
| K & 30Th Residential | K St NW @ 30Th St NW | Washington | Northwest D.C./Georgetc | 88 | Proposed | --- | --- |
| Georgetown West Heating Plant R | 1051-1055 29Th Street NW | Washington | Northwest D.C./Georgetc | 60 | Proposed | --- | --- |
| 3220 Prospect Street Northwest | 3220 Prospect St NW | Washington | Northwest D.C./Georgetc | 50 | Proposed | --- | --- |
| **Total Proposed** | | | | **12,822** | | | |

## Competitive Properties Overview

In order to examine the subject property in its proper context, an examination of the subject's most direct competition is necessary. Consideration is also given to the potential for new competition via proposed complexes.

**COMPARABLE RENTAL LOCATION MAP**



## COMPETITIVE APARTMENT PROJECTS

| No. | PROPERTY INFORMATION<br>PROPERTY NAME<br>ADDRESS, CITY, STATE | NUMBER OF UNITS | NET BUILDING AREA | AVERAGE UNIT SIZE | YEAR BUILT | OCCUPANCY RATE (%) | QUOTED MONTHLY RENT & CONCESSIONS<br>BEDS/ BATHS | UNIT SIZE (SF) Avg. | QUOTED RENT PER MONTH Avg. | QUOTED RENT $/SF/MONTH Avg. | QUOTED RENT $/SF/YEAR Avg. | CONCESSIONS | PROJECT AND UNIT AMENITIES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | **Subject Property** | 33 | 28,209 | 855 | 2023 | | | | | | | | |
| 1 | Aventine Fort Totten<br>5210 3rd St NE<br>Washington, DC | 308 | 305,674 | 992 | 2008 | 98.0% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA | 620<br>1,018<br>986 | $1,484<br>$2,593<br>$2,078 | $2.39<br>$2.55<br>$2.11 | $28.72<br>$30.57<br>$25.29 | 1/2 to 1 Mo. Free | Air Conditioning, Business Center, Clubhouse, Fitness Center, Laundry Facilities, Pool, Property Manager on Site, On-Site Retail, Package Service, Storage Space, Elevator, Maintenance on site, Sundeck, Window Coverings |
| 2 | Fort Totten Square<br>5661 3rd St NE<br>Washington, DC | 344 | 256,740 | 746 | 2015 | 91.8% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA | 536<br>687<br>1,043 | $1,567<br>$1,848<br>$2,407 | $2.92<br>$2.69<br>$2.31 | $35.08<br>$32.28<br>$27.69 | 1/2 to 1 Mo. Free | Air Conditioning, Controlled Access, Clubhouse, Concierge, Courtyard, Fitness Center, Pool, Property Manager on Site, Security System, Energy Star Labeled, Gameroom, Grill, On-Site Retail, Recycling, Smoke Free, Wi-Fi, Storage Space, Bicycle Storage, Community-Wide WiFi, Elevator, Grocery Service, Sundeck, Patio, Wheelchair Accessible (Rooms) |
| 3 | The Modern at Art Place<br>400 Galloway St NE<br>Washington, DC | 520 | 369,520 | 711 | 2017 | 96.9% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA | 455<br>635<br>973 | $1,548<br>$1,956<br>$2,553 | $3.40<br>$3.08<br>$2.62 | $40.83<br>$36.96<br>$31.49 | None | Air Conditioning, Business Center, Clubhouse, Concierge, Courtyard, Day Care, Fitness Center, Pool, Property Manager on Site, Dry Cleaning Service, Gameroom, Grill, On-Site Retail, Smoke Free, Roof Terrace, Bicycle Storage, Elevator, Lounge, Online Services, Zen Garden, Freezer, Wheelchair Accessible (Rooms), Window Coverings |
| 4 | The Swift at Petworth Metro<br>3828 Georgia Ave NW<br>Washington, DC | 218 | 165,368 | 759 | 2014 | 86.6% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA | 574<br>702<br>1,050 | $1,847<br>$2,119<br>$2,813 | $3.22<br>$3.02<br>$2.68 | $38.61<br>$36.22<br>$32.15 | 1/2 to 1 Mo. Free | Air Conditioning, Business Center, Controlled Access, Clubhouse, Concierge, Courtyard, Fitness Center, Picnic Area, Breakfast/Coffee Concierge, Disposal Chutes, Dry Cleaning Service, Gameroom, Grill, On-Site Retail, Package Service, Planned Social Activities, Recycling, Renters Insurance Program, Smoke Free, Bicycle Storage, Car Charging |
| 5 | Willow and Maple<br>6918 Willow St NW<br>Washington, DC | 102 | 85,512 | 838 | 2016 | 95.1% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA | 555<br>732<br>1,112 | $1,795<br>$2,290<br>$3,182 | $3.23<br>$3.13<br>$2.86 | $38.81<br>$37.54<br>$34.34 | None | Air Conditioning, Clubhouse, Fitness Center, Roof Terrace, Storage Space, Bicycle Storage, Sundeck, Patio, Wheelchair Accessible (Rooms) |
| 6 | The Clifton<br>1315 Clifton St NW<br>Washington, DC | 156 | 99,848 | 640 | 2019 | 93.7% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA<br>4BR/2BA | 413<br>559<br>823<br>1,044<br>1,405 | $2,224<br>$2,364<br>$3,687<br>$5,925<br>$6,679 | $5.38<br>$4.23<br>$4.48<br>$5.68<br>$4.75 | $64.62<br>$50.75<br>$53.76<br>$68.10<br>$57.04 | None | Fitness Center, Dry Cleaning Service, Grill, Roof Terrace, Bicycle Storage, Pet Washing Station, Den, Pantry, Vinyl Flooring |
| 7 | The Vale at The Parks<br>6800 Georgia Ave NW<br>Washington, DC | 301 | 222,627 | 740 | 2021 | 64.6% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA<br>4BR/2BA | 427<br>646<br>892<br>1,575 | $2,040<br>$2,130<br>$3,046<br>$4,496 | $4.78<br>$3.30<br>$3.41<br>$2.85 | $57.33<br>$39.57<br>$40.98<br>$34.26 | 1/2 to 1 Mo. Free | 24 Hour Access, Air Conditioning, Business Center, Courtyard, Fitness Center, Pool, Property Manager on Site, Walking/Biking Trails, Elevator, Online Services, Pet Washing Station, Freezer, Island Kitchen, Public Transportation |
| 8 | 901W<br>901 W St NW<br>Washington, DC | 161 | 134,989 | 838 | 2020 | 97.1% | Studio<br>1BR/1BA<br>2BR/2BA<br>3BR/2BA<br>4BR/2BA | <br>699<br>1,162<br>1,729<br>2,210 | <br>$2,514<br>$3,485<br>$6,192<br>$7,865 | <br>$3.60<br>$3.00<br>$3.58<br>$3.56 | <br>$43.16<br>$35.99<br>$42.98<br>$42.71 | None | 24 Hour Access, Controlled Access, Concierge, Fitness Center, Pool, Property Manager on Site, Security System, Grill, Bicycle Storage, Lounge, Online Services, Pet Care, Sundeck, Island Kitchen, Green Community |
| **STATISTICS** | | | | | | | | | | | | | |
| | Low: | 102 | 85,512 | 640 | 2008 | 64.6% | | | | | | | |
| | High: | 520 | 369,520 | 992 | 2021 | 98.0% | | | | | | | |
| | Average: | 264 | 205,035 | 783 | 2016 | 90.5% | | | | | | | |
| | Totals: | 2,110 | 1,640,278 | | | | | | | | | | |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

### Competitive Set Summary

In total, the micro market inventory, including the subject property, represents 2,110 units. The comparable projects were constructed between 2008 and 2021 and range in size from 102 to 520 units. Individual unit sizes range from 640 to 992 square feet. The comparable apartment projects revealed occupancy levels ranging from 64.6 percent to 98.0 percent, with an average of 90.5 percent.

Comparable Seven is currently in lease-up. The remaining comparables, which are generally stabilized, average 94.2 percent occupancy.

### Occupancy Conclusion

The subject property will contain 33 apartment units. The following table compares the vacancy rates of the regional market, the subject's submarket, and directly competing properties.

| VACANCY ANALYSIS | | |
|---|---|---|
| **Vacancy Statistics** | **Rate** | **Building Class and Market** |
| Regional Vacancy Statistics | 11.3% | Multi-Family - District of Columbia |
| Local Vacancy Statistics | 9.3% | Multi-Family - Howard U./Mt. Pleasant/Brightwood |
| Competitive Property Vacancy Statistics | 5.8% | Class A Stabilized Competitive Set |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

Based on the current vacancy in the market, and our perception of future market vacancy, we projected a global stabilized vacancy rate of 6.00 percent.

## Conclusion

Vacancy levels for the District of Columbia Apartment market are down over last year and are expected to decrease from 8.1 percent next year to 6.7 percent in 2026. Reis forecasts that construction will trail absorption in the near future, and that rental rates should increase over the same period. In Howard U./Mt. Pleasant/Brightwood vacancy levels are expected to decrease to 6.3 percent by 2026, and rental rates are forecast to increase from $2,074 per month in 2022 to $2,485 per month during the same period. Based on our analysis we concluded that the subject is well positioned within its market area and the prospect for net appreciation in real estate values is expected to be good over the medium- to long-term, with current market conditions being uncertain over the short-term.

## Lease Up

The stabilized occupancy for the subject is estimated to be 94.0 percent. In our analysis we have used an 8.0 percent concessions estimate of to reflect discounts offered during lease-up. The lease-up discount will be deducted as a line item from each approach in order to render a valuation upon completion.

### Absorption

In determining an absorption pace for the subject property, we examined the absorption rates for similar projects in the marketplace. According to Delta Associates Mid-Atlantic Class A Second Quarter 2022 Apartment Market Report, properties in the District of Columbia are achieving absorption rates of 3 to 23 units per month and an average of 9 units per month. Concessions range from 0 to 18 percent, with an average of 10 percent. Notable completed lease-ups in the market are as follows:

| ABSORPTION SUMMARY \| CLASS A APARTMENT PROJECTS<br>District of Columbia<br>Second Quarter 2019 Through Second Quarter 2022 | | | | | | |
|---|---|---|---|---|---|---|
| PROJECT NAME | TYPE OF PROJECT | TOTAL UNITS | DATE MARKETING BEGAN | DATE DELIVERED | DATE STABILIZED | OVERALL MONTHLY LEASE-UP PACE[1] |
| The Yards Collection - Guild | Mid-Rise | 153 | 4/19 | 4/19 | 9/21 | 5 |
| The Lockwood | Mid-Rise | 131 | 5/19 | 6/19 | 9/21 | 5 |
| The Clifton | Mid-Rise | 153 | 5/19 | 5/19 | 12/21 | 4 |
| 1331 | High-Rise | 373 | 5/19 | 11/19 | 6/22 | 10 |
| RESA | High-Rise | 326 | 6/19 | 6/19 | 9/21 | 12 |
| Liz | Mid-Rise | 64 | 7/19 | 8/19 | 5/20 | 6 |
| Boathouse | Mid-Rise | 228 | 7/19 | 10/19 | 3/22 | 7 |
| Carver | Low-Rise | 62 | 8/19 | 10/19 | 8/20 | 6 |
| Slowe | Low-Rise | 100 | 8/19 | 10/19 | 8/20 | 8 |
| The Glover House | High-Rise | 225 | 8/19 | 8/19 | 12/21 | 8 |
| Novel South Capitol East | High-Rise | 184 | 8/19 | 8/19 | 3/22 | 5 |
| i5 Union Market | High-Rise | 206 | 11/19 | 11/19 | 12/21 | 8 |
| Avec on H Street | High-Rise | 387 | 2/20 | 2/20 | 9/21 | 20 |
| 901W | High-Rise | 140 | 2/20 | 2/20 | 9/21 | 7 |
| The Kelvin | High-Rise | 312 | 2/20 | 2/20 | 9/21 | 16 |
| Estate at The Yards | High-Rise | 211 | 2/20 | 2/20 | 12/21 | 9 |
| 555 | High-Rise | 136 | 3/20 | 5/20 | 12/21 | 6 |
| The Maren | High-Rise | 241 | 3/20 | 5/20 | 6/22 | 9 |
| Blackbird | Mid-Rise | 154 | 5/20 | 8/20 | 12/21 | 7 |
| J Linea | Mid-Rise | 121 | 5/20 | 5/20 | 12/21 | 6 |
| 10K Hill South | High-Rise | 300 | 7/20 | 8/20 | 3/22 | 15 |
| The Shaw | Mid-Rise | 64 | 8/20 | 8/20 | 12/21 | 3 |
| The Garrett at The Collective | High-Rise | 375 | 8/20 | 8/20 | 12/21 | 23 |
| Everton | Mid-Rise | 158 | 10/20 | 2/21 | 6/22 | 7 |
| Coda at Bryant Street | Mid-Rise | 143 | 11/20 | 11/20 | 12/21 | 11 |
| Ledger | High-Rise | 123 | 12/20 | 12/20 | 6/22 | 6 |
| The Wray | Mid-Rise | 158 | 3/21 | 4/21 | 6/22 | 10 |
| The Rushmore | Low-Rise | 117 | 3/21 | 5/21 | 6/22 | 8 |
| **Average** | | **191** | | | | **9** |

Notable actively leasing projects are as follows:

**ABSORPTION SUMMARY | ACTIVELY LEASING CLASS A APARTMENT PROJECTS**
**District of Columbia**
**Second Quarter 2022**

| PROJECT NAME | TOTAL UNITS [1] | DATE LEASING BEGAN | DATE OF DELIVERY | UNITS ABSORBED | OVERALL LEASE-UP PACE SINCE MARKETING BEGAN | CURRENT CONCESS. AS A % OF FACE RENT |
|---|---|---|---|---|---|---|
| **MID-RISE APARTMENTS** | | | | | | |
| Union Heights Phase II | 301 | 9/20 | 12/20 | 279 | 13 | 0% |
| Beckert's Park | 296 | 10/20 | 11/20 | 271 | 14 | 8% |
| Park Kennedy | 231 | 11/20 | 2/21 | 221 | 12 | N/A |
| One 501 | 291 | 4/21 | 5/21 | 250 | 18 | N/A |
| Kiley Apartments | 296 | 4/21 | 5/21 | 280 | 20 | 8% |
| The Crest | 263 | 5/21 | 6/21 | 184 | 14 | N/A |
| The Chase at Bryant Street | 307 | 7/21 | 8/21 | 224 | 20 | 8% |
| The Vale | 301 | 8/21 | 2/22 | 87 | 9 | 15% |
| Collection 14 | 203 | 9/21 | 10/21 | 71 | 8 | N/A |
| Weiler at Quincy Lane | 168 | 1/22 | 2/22 | 49 | 10 | N/A |
| Rialto | 68 | 2/22 | 4/22 | 23 | 6 | 11% |
| Hanover 8th Street | 331 | 4/22 | 11/22 | 80 | 40 | N/A |
| Harwood Flats | 285 | 5/22 | 8/22 | 15 | 15 | N/A |
| Rise at Temple Courts | 71 | 5/22 | 8/22 | 19 | 19 | N/A |
| **HIGH-RISE APARTMENTS** | | | | | | |
| Union Place | 472 | 2/19 | 3/19 | 427 | 11 | 15% |
| The Batley | 395 | 2/19 | 5/19 | 370 | 9 | 13% |
| West Half Apartments | 454 | 8/19 | 8/19 | 409 | 12 | 8% |
| Meridian on First | 275 | 1/20 | 2/20 | 261 | 9 | 18% |
| Parc Riverside - Phase II (West) | 308 | 2/20 | 5/20 | 301 | 11 | N/A |
| The Wren | 301 | 5/20 | 11/20 | 272 | 11 | 0% |
| Watermark at Buzzard Point | 442 | 7/20 | 8/20 | 415 | 18 | 8% |
| Riverpoint | 487 | 7/20 | 11/20 | 350 | 15 | 14% |
| DC Crossing | 817 | 8/20 | 11/20 | 596 | 27 | 9% |
| The Gantry | 487 | 12/20 | 2/21 | 410 | 23 | 8% |
| Press House at Union District | 325 | 4/21 | 6/21 | 240 | 17 | N/A |
| Morse | 251 | 5/21 | 8/21 | 208 | 16 | N/A |
| The Silva | 157 | 6/21 | 8/21 | 121 | 10 | 9% |
| Judd at Quincy Lane | 249 | 8/21 | 11/21 | 225 | 23 | N/A |
| Rowan | 327 | 8/21 | 11/21 | 251 | 25 | N/A |
| Illume - Building 1 | 214 | 11/21 | 2/22 | 73 | 10 | 8% |
| The Burton | 357 | 12/21 | 11/21 | 109 | 18 | 17% |
| 1000 South Capitol Street | 244 | 2/22 | 5/22 | 84 | 21 | N/A |
| Tribeca | 99 | 3/22 | 5/22 | 65 | 22 | N/A |
| City Ridge | 634 | 4/22 | 8/22 | 34 | 17 | N/A |
| The Lanes | 96 | 4/22 | 8/22 | 30 | 15 | N/A |
| CODA on Half | 148 | 5/22 | 7/22 | 39 | 39 | N/A |
| Illume - Building 2 | 542 | 5/22 | 8/22 | 40 | 40 | N/A |
| The Tides | 119 | 5/22 | 8/22 | 17 | 17 | N/A |
| Revel | 500 | 6/22 | 8/22 | 2 | 4 | N/A |
| **Average** | **311** | **--** | **--** | **190** | **17** | **10%** |

Given the aforementioned, our projection for absorption is shown in the following table. At our projected absorption, the subject property should achieve stabilized occupancy by June 1, 2023.

| ABSORPTION | |
|---|---|
| Total No. Units | 33 |
| Stabilized Occupancy | 94% |
| Total Units at Stabilized Occupancy | 31 |
| Absorption (Units Per Month) | 8 |
| Absorption - Total Period (Months) | 4 |
| | |
| Construction Start | Jan-20 |
| Construction Completion | Mar-23 |
| Date of Stabilization | Jun-23 |

## Rent Concessions

Within the local marketplace, concessions are offered during the lease-up phase and during periods of slow leasing (i.e. winter months) and often on select unit types. Based on the concessions indicated by the absorption comparables, we estimated concessions at 8 percent of effective rental income during the lease-up phase.

## Total Costs

In determining the prospective value at completion, we must deduct (from the stabilized value estimate) the costs associated with lease-up of the vacant space between the date of completion and the date of stabilization. These costs include rent loss, concessions and entrepreneurial profit.

Based on our projected stabilized occupancy, the lease-up costs from the first deliveries through stabilization are estimated below.

**MULTIFAMILY LEASE UP COSTS**

| | Date | Units Leased | Units Remaining | Average Rent | Rent Loss | Units Leased | Concessions @ 8% | Total Lease-Up Costs |
|---|---|---|---|---|---|---|---|---|
| | Beginning Units | | 33 | | | | | |
| Pre-Leased | Feb-23 | 8 | 25 | $2,850 | $94,040 | $22,798 | $1,824 | $95,864 |
| | Mar-23 | 8 | 17 | $2,850 | $71,242 | $22,798 | $1,824 | $73,066 |
| | Apr-23 | 8 | 9 | $2,850 | $48,445 | $22,798 | $1,824 | $50,269 |
| | May-23 | 7 | 2 | $2,850 | $25,647 | $19,948 | $1,596 | $27,243 |
| | | Rent Loss | | | **$145,335** | **$65,543** | **$5,243** | **$150,578** |
| | | Profit @ 10% | | | | | | $15,058 |
| | | Total Rent Loss | | | | | | $165,636 |
| | | Rounded | | | | | | $170,000 |

As noted previously, the subject will contain a 2,500 square foot retail component. Our lease up discount estimate for this space is shown in the table below. Retail rent and reimbursement are discussed in the Income Capitalization section of this report.

| RETAIL LEASE UP DISCOUNT | | |
|---|---|---|
| | **Concluded Rate** | **%** |
| Rent Loss (9 Months) | $40.00 | $75,000 |
| Tenant Improvement Allowance | $75.00 | $187,500 |
| Reimbursements for Taxes and CAM (9mo.) | --- | $17,372 |
| Leasing Commissions (10 Yr. Lease Term) | 6.0% | $60,000 |
| Profit | 10.0% | $7,500 |
| Total | | $347,372 |
| **Rounded** | | **$350,000** |

Surveyed brokers note that a reasonable projection for in-line space is 6 to 12 months. Given the location, we have estimated a 9-month staggered lease up period, which is considered reasonable based on the comparables in the area.

# Property Analysis

## Site Description

Currently the subject site consists of surface parking.

| GENERAL | |
|---|---|
| Location: | 423 Kennedy Street<br>Washington, District of Columbia 20011<br>The subject site is located west of Kansas Avenue NW and just south of Missouri Avenue NW. |
| Shape: | Irregularly shaped |
| Topography: | Level at street grade |
| Land Area: | 0.22 acres / 9,520 gross square feet |
| Access, Visibility and Frontage: | The subject property has good access and good visibility. The frontage is rated as good. |
| Utilities: | All public utilities are available and deemed adequate. |
| Site Improvements: | Site improvements will include asphalt paved parking areas, curbing, signage, landscaping, yard lighting and drainage. |
| **SITE CONDITIONS** | |
| Soil Conditions: | No impairments to development are noted. We assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate. |
| Land Use Restrictions: | We were not provided a title report. There does not appear to be any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title expert's determination as to whether any adverse conditions exist. |
| Wetlands: | We were not given a wetlands survey to review. If subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a professional engineer with expertise in this field. |
| Hazardous Substances / Environmental Site Assessment (ESA): | We observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.<br>We were not provided an Environmental Site Assessment. We assume no environmental conditions that would impair marketability of the site. |

Flood Zone Description: The subject property is located in flood zone X (Areas determined to be outside the 500 year flood plain) as indicated by FEMA Map 1100010010C, dated September 27, 2010.




The flood zone determination and other related data are provided by a third-party vendor deemed to be reliable. If further details are required, additional research is required that is beyond the scope of this analysis.

## CONCLUSIONS

Overall Site Utility: The subject site is functional for its intended use.

Location Rating: Good

Summary: The subject site is considered well-suited to functionally support its proposed use. Overall, there are no known factors that may prevent the site from development to its highest and best use, as vacant, or adverse to the existing or intended use of the site.

## GIS MAP PARCEL



## Improvements Description

The subject's proposed unit mix is presented in the following table:

| UNIT MIX | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | Plan | BR | BA | No. Units | Percent of Total | Unit (SF) | NRA (SF) |
| 1 | 1BR/1BA | 1 | 1.0 | 1 | 3.0% | 742 | 742 |
| 2 | 1BR/2BA Den | 1 | 2.0 | 12 | 36.4% | 803 | 9,639 |
| 3 | 2BR/1BA | 2 | 1.0 | 12 | 36.4% | 803 | 9,637 |
| 4 | 2BR/2BA | 2 | 2.0 | 4 | 12.1% | 762 | 3,047 |
| 5 | 3BR/1BA | 3 | 1.0 | 1 | 3.0% | 1,188 | 1,188 |
| 6 | 4BR/2BA | 4 | 2.0 | 1 | 3.0% | 1,580 | 1,580 |
| 7 | 2BR/1BA IZ | 2 | 2.0 | 1 | 3.0% | 798 | 798 |
| 8 | 4BR/2BA IZ | 4 | 2.0 | 1 | 3.0% | 1,576 | 1,576 |
| **TOTAL/AVERAGE** | | | | **33** | **100%** | **855** | **28,209** |

*All averages are weighted

The following description of the proposed improvements is based on data provided by the developer.

### GENERAL DESCRIPTION

| | |
|---|---|
| Property Type: | Multi-Family (Garden/Low-Rise) |
| Year Built: | 2023 |
| Number of Units: | 33 |
| Number of Buildings: | 1 |
| Number of Stories: | 4 |
| Land to Building Ratio: | 0.26 to 1 |
| Gross Building Area: | 36,512 square feet |
| Net Rentable Area: | 28,209 square feet – multifamily |
| Net Leasable Area: | 2,500 square feet – retail |

### CONSTRUCTION DETAIL

| | |
|---|---|
| Basic Construction: | Wood frame |
| Foundation: | Poured concrete slab |
| Framing: | Wood post and beam |
| Floors: | Concrete slab |
| Exterior Walls: | Brick |
| Roof Type: | Flat with parapet walls |

| | |
|---|---|
| Roof Cover: | Built-up assemblies with tar and gravel cover |
| Windows: | Double pane glass panel with aluminum casing |
| Pedestrian Doors: | Wood and metal |
| **MECHANICAL DETAIL** | |
| Heat Source: | HVAC |
| Heating System: | Forced Air |
| Cooling: | Central HVAC |
| Cooling Equipment: | The cooling equipment will be roof mounted. |
| Plumbing: | The plumbing system is assumed to be adequate for the intended use and in compliance with local law and building codes. |
| Electrical Service: | It is assumed electricity for the building will be adequate for the intended use. |
| Electrical Metering: | Each unit will be separately metered. |
| Elevator Service: | The property will include a total of 1 elevator. |
| Utility Responsibility: | Per the developer, each unit will be individually metered for electrical usage and tenants will pay for all utilities. |
| Fire Protection: | 100 percent sprinklered. Each apartment will have a smoke detector in compliance with local code and there will be fire extinguishers in the common areas. |
| Security: | Secured key access. |
| **INTERIOR DETAIL** | |
| Layout: | The subject consists of 1 apartment building that is 4 stories in height. Upon completion, the property will be total 33 units with parking. |
| Build-Out: | The apartment building will be improved with typical multifamily finishes that meet market standards for comparable Class A space. |
| Floor Covering: | Faux Wood Vinyl, Carpet, Ceramic Tile |
| Walls: | Drywall |
| Ceilings: | Drywall |
| Lighting: | Fluorescent and Incandescent |
| Bathrooms: | The bathrooms will consist of a shower/tub kit with wall-mounted showerhead, toilet, sink, vinyl and ceramic tile floor covering. |
| **AMENITIES** | |
| Project Amenities: | Bike storage and ground floor retail. |

| | |
|---|---|
| Unit Amenities: | Stainless appliance package, gas range/oven, refrigerator, garbage disposal, dishwasher, and built-in microwave. Additionally, each unit will feature wood cabinets with granite/quartz countertops. Washer/dryer in each unit. Select units will include a private patio or balcony area. |

## OTHER IMPROVEMENTS

| | |
|---|---|
| Parking: | The property will contain a total of 10 parking spaces, reflecting a parking ratio of 0.30 spaces per unit. Given the proximity to on-street parking available, the parking spaces should adequately support the future residential users. |
| Onsite Landscaping: | It is assumed the site will be landscaped with a variety of trees, shrubbery and grass. |
| Other: | Site improvements will include curbs and walkways. |
| Personal Property/FF&E: | The subject property will contain the typical personal property associated with an apartment complex including refrigerators, range/ovens, washer/dryers, etc. While we recognize that there are various items of personal property associated with the operation of an apartment complex, buyers in the subject's market do not typically allocate a separate value for these items in their purchase decisions. Therefore, we have not allocated a separate value for these items, but do recognize that they are an integral part of an apartment operation. |

## ANALYSIS AND CONCLUSIONS (UPON COMPLETION)

| | |
|---|---|
| Condition: | Excellent |
| Quality: | Good |
| Effective Age: | 0 years – It is assumed the subject's improvements (both short and long-lived items) will be of good quality and in excellent condition upon completion of construction. |
| Expected Economic Life: | 55 years - The Marshall Valuation Services publication was relied on to estimate life expectancy of the subject's improvements. |
| Remaining Economic Life: | 55 years |
| Roof & Mechanical Inspections: | The appraisers are not qualified to render an opinion regarding the adequacy or condition of these components. The client is urged to retain an expert in this field if detailed information is needed. |
| Curable Physical Deterioration: | We assume there will be no physical deterioration at the completion of construction of the proposed improvements. |
| Functional Obsolescence: | We assume no functional obsolescence present at the completion of construction of the proposed improvements. |
| Summary: | After considering all of the physical characteristics of the subject, we have concluded that this property will have an overall rating that is good, when measured against other properties in this marketplace. |

## DEVELOPMENT BUDGET

The following chart shows a summary of the development budget. The detailed development budget is included in the Addenda of this report.

| DEVELOPMENT BUDGET | | | |
|---|---|---|---|
| **Cost Category** | **Total Costs** | **Costs/SF** | **Costs/Unit** |
| Total Hard Costs | $8,922,106 | $244.36 | $270,367 |
| Total Soft Costs | $532,655 | $14.59 | $16,141 |
| **Total Costs** | **$9,454,761** | **$258.95** | **$286,508** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

| COSTS TO COMPLETE | | | |
|---|---|---|---|
| **Cost Category** | **Total Costs** | **Costs/SF** | **Costs/Unit** |
| Costs Remaining | $3,302,000 | $90.44 | $100,061 |
| Plus Profit at 15% | $495,300 | $13.57 | $15,009 |
| *Total Costs Plus Profit* | *$3,797,300* | $104.00 | *$115,070* |
| **Total Costs Remaining (Rounded)** | **$3,800,000** | **$104.08** | **$115,152** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## RENDERING



# Real Property Taxes and Assessments

The property is subject to the taxing jurisdiction of the District of Columbia and is assessed by the Office of Tax and Revenue Real Property Tax Administration (RPTA). The District of Columbia operates on a fiscal year basis from October 1 to September 30. Real estate taxes are due semi-annually in March and September.

Real property in the District of Columbia is taxed based on its classification, which is a grouping of properties based on similar use. There are three classes of real property in the District of Columbia. Class 1 is residential real property including multifamily. Class 2 is commercial and industrial real property including hotels and motels. Class 3 is vacant real property. Class 4 is blighted real property. Properties in different classes are taxed at different rates. The current tax rates for the different classes are detailed below:

| TAX RATES – DISTRICT OF COLUMBIA | |
|---|---|
| **Tax Class** | **Tax Rate** |
| Class 1 (residential real property including multifamily) | $0.85 |
| Class 2 (commercial and industrial real property) | $1.65 up to 5.0 million; $1.77 for $5.0 million to $10.0 million; then $1.89 for assessments above $10.0 million |
| Class 3 (vacant real property) | $5.00 |
| Class 4 (blighted real property) | $10.00 |

### Current Assessment and Taxes

Per the local tax collector's office, taxes are current. According to the assessor's office, the sale of a property typically does not trigger a reassessment. The assessment and taxes for the property are detailed in the following table:

| PROPERTY ASSESSMENT INFORMATION | |
|---|---|
| Assessor's Parcel Number: | Square 3260 Lot 0056 |
| Assessing Authority: | District of Columbia |
| Current Tax Year: | 2022 |
| Assessment Ratio (% of market Value): | 100% |
| Are Taxes Current? | Taxes are current |
| **ASSESSMENT INFORMATION** | |
| **Assessed Value** | **Totals** |
| Land: | $934,480 |
| Improvements: | $279,040 |
| Total: | **$1,213,520** |
| **TAX LIABILITY** | |
| Tax Rate (Effective): | 0.85% |
| **Total Property Taxes:** | **$10,315** |
| Number of Units: | 33 |
| Property Taxes per Unit: | $313 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

Current total taxes for the property are $10,315.

## Tax Comparable Analysis

To determine a tax estimate for the proposed property, we examined the actual tax assessments of similar properties in the market. These tax comparables are illustrated in the following table, along with our tax assessment projection.

| TAX ASSESSMENT COMPARABLES | | | | |
|---|---|---|---|---|
| Property Name & Location | Units | Assessment Year | Assessment | Assess/Unit |
| *SUBJECT PROPERTY (APPRAISER PROJECTION)* | *33* | *2022* | *$14,025,000* | *$425,000* |
| Aventine Fort Totten | 308 | 2022 | $85,616,680 | $277,976 |
| The Modern at Art Place | 520 | 2022 | $147,601,440 | $283,849 |
| i5 Union Market | 318 | 2022 | $92,906,030 | $292,157 |
| Park Place at Petworth | 161 | 2022 | $60,504,450 | $375,804 |
| OSLO Atlas Co-Living Apartments | 10 | 2022 | $3,969,750 | $396,975 |
| 607 Kennedy St NW | 4 | 2022 | $1,512,200 | $378,050 |
| | | | | |
| Low: | 4 | | $1,512,200 | $277,976 |
| High: | 520 | | $147,601,440 | $396,975 |
| Average: | 220 | | $65,351,758 | $334,135 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

The comparable properties reflect assessed values ranging from $277,976 to $396,975 per unit with an average of $334,135 per unit. We have also analyzed multifamily properties in the District of Columbia which sold in recent years and were subsequently reassessed.

| TAX ASSESSMENT ANALYSIS - DISTRICT OF COLUMBIA (CLASS A) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sale Date | Property | Year Built | Recorded Sale Price | AV Prior to Sale | Tax Year | AV After Sale | % Change | % of Sale Price |
| Dec-21 | 2M Street | 2014 | $103,500,000 | $89,244,570 | 2022 | $91,510,790 | 2.5% | 88.4% |
| Dec-21 | The Betley | 2019 | $205,253,625 | $83,798,200 | 2022 | $83,798,200 | 0.0% | 40.8% |
| Sep-21 | The Ethel | 2022 | $7,100,000 | $2,136,330 | 2022 | $3,878,880 | 81.6% | 54.6% |
| Jul-20 | Griffin Apartments at Petworth Metro | 2011 | $19,125,000 | $19,177,220 | 2021 | $19,685,790 | 2.7% | 102.9% |
| Jan-20 | The Woodley | 2014 | $180,250,000 | $177,257,410 | 2021 | $175,910,580 | -0.8% | 97.6% |
| Dec-19 | F1RST Residences | 2017 | $160,500,000 | $134,275,960 | 2021 | $139,007,680 | 3.5% | 86.6% |
| Jun-19 | RESA | 2019 | $141,550,000 | $86,646,300 | 2021 | $90,504,160 | 4.5% | 63.9% |
| Aug-19 | 1301 Thomas Circle | 2008 | $184,000,000 | $186,891,060 | 2021 | $195,005,670 | 4.3% | 106.0% |
| Apr-19 | Highline Union Market | 2019 | $123,000,000 | $104,363,060 | 2021 | $108,164,920 | 3.6% | 87.9% |
| Sep-18 | Takoma Central | 2014 | $50,600,000 | $30,955,690 | 2020 | $31,712,670 | 2.4% | 62.7% |
| Mar-18 | The Barton at Woodley | 2002 | $106,500,000 | $184,714,350 | 2020 | $124,013,630 | -32.9% | 116.4% |
| Mar-18 | The Ellington | 2004 | $118,600,000 | $105,576,850 | 2020 | $97,033,500 | -8.1% | 81.8% |
| Oct-17 | The Aspen | 2016 | $50,500,000 | $35,759,920 | 2019 | $47,114,420 | 31.8% | 93.3% |
| Feb-17 | 1600 Penn | 2015 | $26,500,000 | $24,440,230 | 2019 | $27,395,900 | 12.1% | 103.4% |
| Mar-16 | Flats at Atlas | 2012 | $77,875,000 | $58,733,760 | 2018 | $74,946,460 | 27.6% | 96.2% |
| Dec-15 | Jefferson Marketplace | 2014 | $141,000,000 | $93,210,270 | 2017 | $128,787,390 | 38.2% | 91.3% |
| Nov-15 | Ashton Judiciary | 2011 | $41,000,000 | $36,331,510 | 2017 | $40,386,470 | 11.2% | 98.5% |
| Aug-15 | The Shay | 2015 | $82,237,450 | $79,867,330 | 2017 | $79,867,330 | 0.0% | 97.1% |
| Jul-15 | The Gale | 2013 | $213,000,000 | $164,212,990 | 2017 | $250,464,690 | 52.5% | 117.6% |
| Nov-14 | 450 K Street, NW | 2014 | $106,500,000 | $79,394,530 | 2016 | $102,735,910 | 29.4% | 96.5% |
| Aug-14 | Park Place at Petworth Metro | 2009 | $62,000,000 | $42,029,390 | 2016 | $61,713,170 | 46.8% | 99.5% |
| Jun-14 | The Woodley | 2014 | $195,000,000 | $185,319,750 | 2016 | $185,319,750 | 0.0% | 95.0% |
| Jun-14 | Louis at 14th/U | 2014 | $176,500,000 | $174,273,010 | 2016 | $174,273,010 | 0.0% | 98.7% |
| | | | | | | Minimum % of Sale Price: | | 40.8% |
| | | | | | | Maximum % of Sale Price: | | 117.6% |
| | | | | | | Average: | | 90.3% |
| | | | | | | Median: | | 96.4% |

The tax assessment analysis table indicates that assessments were raised from 40.8 to 117.6 percent of the sale price with an average of 90.3 percent.

## Real Property Tax Conclusion

Based on the assessments of the competitive properties, we estimate the following assessment and taxes for the subject property.

| PROJECTED REAL ESTATE TAXES | |
|---|---|
| Assessment $/Unit | $425,000 |
| No. Units | 33 |
| Total Assessment | $14,025,000 |
| Tax Rate | 0.850% |
| Estimated Taxes | $119,213 |
| | |
| $/Unit | $3,613 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

This assessment represents 88 percent of the as-stabilized market value estimate derived in this report (as of today's dollars). The real estate tax liability is grown at the expense rate discussed within the Income Capitalization Approach of this report.

# Zoning

## General Information

The property is zoned MU-4 by the District of Columbia.

| ZONING | |
|---|---|
| **Municipality Governing Zoning:** | District of Columbia |
| **Current Zoning:** | MU-4 Mixed Use |
| **Is current use permitted:** | See Comments |
| **Permitted Uses:** | Permit moderate-density mixed-use development; provide facilities for shopping and business needs, housing, and mixed uses for large segments of the District of Columbia outside of the central core; and be located in low- and moderate-density residential areas with access to main roadways or rapid transit stops, and include office employment centers, shopping centers, and moderate bulk mixed-use centers. |
| **Zoning Change Applied For:** | Not to our knowledge |
| **ZONING REQUIREMENTS** | **CODE** |
| **Minimum Lot Area:** | n/a |
| **Maximum Building Height:** | 50 feet |
| **Maximum Floor Area Ratio (FAR):** | 1.5 Non-residential; 2.5 Residential |
| **Inclusionary Zoning (IZ)** | 0.5 Bonus FAR for IZ for total of 3.0 residential FAR |
| **Maximum Lot Coverage (% of lot area):** | 60% (75% with IZ bonus) |
| **Green Area Ratio** | 0.3 |
| **Minimum Setbacks:** | |
| **Front (feet):** | n/a |
| **Rear (feet):** | 15 |
| **Side (feet):** | n/a |
| **Required On-Site Parking:** | Multifamily - 1 per 3 dwelling units |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Zoning Compliance

Property value is affected by whether or not an existing or proposed improvement complies with zoning regulations, as discussed below.

### Complying Uses

An existing or proposed use that complies with zoning regulations implies that there is no legal risk and that the existing improvements could be replaced “as-of-right.”

### Pre-Existing, Non-Complying Uses

In many areas, existing buildings pre-date the current zoning regulations. When this is the case, it is possible for an existing building that represents a non-complying use to still be considered a legal use of the property. Whether or not the rights of continued use of the building exist depends on local laws. Local laws will also determine if the existing building may be replicated in the event of loss or damage.

### Non-Complying Uses

A proposed non-complying use to an existing building might remain legal via variance or special use permit. When appraising a property that has such a non-complying use, it is important to understand the local laws governing this use.

## Other Restrictions

We do not know of any deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. We recommend a title examination to determine if any such restrictions exist.

## Zoning Conclusions

Detailed zoning studies are typically performed by a zoning or land use expert, including attorneys, land use planners, or architects. The depth of our study correlates directly with the scope of this assignment, and it considers all pertinent issues that have been discovered through our due diligence. We note that this appraisal is not intended to be a detailed determination of compliance, as that determination is beyond the scope of this real estate appraisal assignment.

We analyzed the zoning requirements in relation to the subject property, and considered the compliance of the proposed use. We are not experts in the interpretation of complex zoning ordinances but based on our review of public information, the subject proposed property appears to be a complying use.

## ZONING MAP



# Valuation

## Highest and Best Use

### Highest and Best Use Definition

*The Dictionary of Real Estate Appraisal*, Sixth Edition (2015), a publication of the Appraisal Institute, defines the highest and best use as:

> The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

To determine the highest and best use we typically evaluate the subject site under two scenarios: as vacant land and as presently improved. In both cases, the property's highest and best use must meet the four criteria described above.

### Highest and Best Use of Site as Vacant

#### Legally Permissible

The zoning regulations in effect at the time of the appraisal determine the legal permissibility of a potential use of the subject site. As described in the Zoning section, the subject site is zoned MU-4. The legally permissible uses were discussed in the Site Analysis and Zoning Sections.

#### Physically Possible

The physical possibility of a use is dictated by the size, shape, topography, availability of utilities, and any other physical aspects of the site. The subject site contains 0.22 acres, or 9,520 square feet. The site is irregularly shaped and level at street grade. It has good frontage, good access, and good visibility. The subject site is adequately served by utilities. Overall, the site is considered adequate to accommodate most permitted development possibilities.

#### Financially Feasible and Maximally Productive

In order to be seriously considered, a use must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible. Financially feasible uses are those uses that can generate a profit over and above the cost of acquiring the site, and constructing the improvements. Of the uses that are permitted, possible, and financially feasible, the one that will result in the maximum value for the property is considered the highest and best use.

### Conclusion

We considered the legal issues related to zoning and legal restrictions. We also analyzed the physical characteristics of the site to determine what legal uses would be possible, and considered the financial feasibility of these uses to determine the use that is maximally productive. Considering the subject site's physical characteristics and location, as well as the state of the local market, it is our opinion that the Highest and Best Use of the subject site as vacant is for development with an apartment or other form of multi-family development built to its maximum feasible building area as demand warrants.

## Highest and Best Use of Property as Improved

As improved, the subject property is currently under construction. Based on the analysis presented within this report—including site analysis, zoning approvals, and financial feasibility, the subject proposed development of a 33-unit low/mid-rise multifamily property, represents the highest and best use as improved. Thus, the highest and best use as improved represents completion of construction of the subject multifamily development.

## Most Likely Buyer

The most likely buyer of the subject property, in our opinion, would be a developer or a speculative investor that would have the financial wherewithal to pursue such an investment and accept a higher than normal level of risk commensurate with land investments relative to investments in alternative income producing properties.

# Valuation Process

## Methodology

There are three generally accepted approaches to developing an opinion of value: Cost, Sales Comparison and Income Capitalization. We considered each in this appraisal to develop an opinion of the market value of the subject property. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach depends on the availability and comparability of market data as well as the motivation and thinking of purchasers.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.

We considered each approach in developing our opinion of the market value of the subject property. We discuss each approach below and conclude with a summary of their applicability to the subject property.

### Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements which represent the Highest and Best Use of the land; or when relatively unique or specialized improvements are located on the site for which there are few improved sales or leases of comparable properties.

In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciating them to reflect any value loss from physical, functional and external causes. Land value, entrepreneurial profit and depreciated improvement costs are then added, resulting in an opinion of value for the subject property.

### Sales Comparison Approach

In the Sales Comparison Approach, sales of comparable properties are adjusted for differences to estimate a value for the subject property. A unit of comparison such as price per square foot of building area or effective gross income multiplier is typically used to value the property. When developing an opinion of land value the analysis is based on recent sales of sites of comparable zoning and utility, and the typical units of comparison are price per square foot of land, price per acre, price per unit, or price per square foot of potential building area. In each case, adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive an opinion of value for the subject property.

### Income Capitalization Approach

In the Income Capitalization Approach the income-producing capacity of a property is estimated by using contract rents on existing leases and by estimating market rent from rental activity at competing properties for the vacant space. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Yield Capitalization Method. In this method periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted

to a present value using an internal rate of return that is determined by analyzing current investor yield requirements for similar investments.

## Summary

This appraisal employs all three typical approaches to value: the Cost Approach, the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that all approaches would be considered meaningful and applicable in developing a credible value conclusion.

# Land Valuation

We used the Sales Comparison Approach to develop an opinion of land value. We examined current offerings and analyzed prices buyers have recently paid for comparable sites. The most widely used and market-oriented unit of comparison for properties with characteristics similar to those of the subject is price per square foot of potential building area. All transactions used in this analysis are based on the most appropriate method used in the local market.

The major elements of comparison used to value the subject site include the property rights conveyed, the financial terms incorporated into the transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its utility and the physical characteristics of the property.

The comparables and our analysis are presented on the following pages. Comparable land sale data sheets are presented in the Addenda of this report.

**LAND SALE LOCATION MAP**



### Discussion of Comparable Land Sale One

This comparable represents the sale of a 40,589-square foot site located at 4330 48th Street NW in Washington, D.C. The site is zoned MU-4. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse). Valor Development has approval to deliver approximately 200 apartment units across two buildings, with 12 percent of units set aside as affordable. Plans include approximately 270,000 square feet of apartments and 13,000 square-foot grocer.

### Discussion of Comparable Land Sale Two

This comparable represents the sale of a 5,575-square foot site located at 300 Carroll Street NW in Washington, D.C. At the time of sale the property was improved with hospitality property that contributed no value to the site. The site is zoned MU-4 and there were no entitlements at the time of sale. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse). This was part of an assemblage. The buyer, an affiliate of SGA Companies, subsequently purchased the adjacent property in April 2021 for $4.25 million.

### Discussion of Comparable Land Sale Three

This comparable represents the sale of a 5,183-square foot site located at 4907 Georgia Avenue Northwest in Washington, D.C. The site is zoned MU-4 and there were no entitlements at the time of sale. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse).

## SUMMARY OF LAND SALES

| PROPERTY INFORMATION | | | | | | | TRANSACTION INFORMATION | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | Location | Size (SF) | Building Area | Proposed Use | Zoning | Public Utilities | Grantor | Grantee | Sale Date | Sale Price | $/SF Build. |
| S | Subject Property | 9,520 | 36,512 | Residential-Multi-Family | MU-4 | All available | | | | | |
| 1 | Proposed The Ladybird Apartments<br>4330 48th Street NW<br>Washington, DC | 79,593 | 270,616 | Residential-Multi-Family | MU-4 | All Available | Apex Real Estate Company | Ladybird Apartments LLC | Dec-21 | $24,150,000 | $89.24 |
| 2 | 300 Carroll Street Northwest<br>300 Carroll Street Northwest<br>Washington, DC | 10,000 | 34,000 | Residential-Multi-Family | MU-4 | All Available | Judith H & James F Brockett | 325 Vine Street LLC | Mar-21 | $3,750,000 | $110.29 |
| 3 | 4907 Georgia Avenue Northwest<br>4907 Georgia Avenue Northwest<br>Washington, DC | 5,183 | 17,622 | Residential-Multi-Family | MU-4 | All Available | 4907 Georgia Ave Nw LLC LLC | 4907 Georgia Ave NW Condo NW LLC | Jan-21 | $2,000,000 | $113.49 |
| | **STATISTICS** | | | | | | | | | | |
| Low | | 5,183 | 17,622 | | | | | | Jan-21 | $2,000,000 | $89.24 |
| High | | 79,593 | 270,616 | | | | | | Dec-21 | $24,150,000 | $113.49 |
| Average | | 31,592 | 107,413 | | | | | | Jun-21 | $9,966,667 | $104.34 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## LAND SALE ADJUSTMENT GRID

| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | Price PSF of Building | Property Rights Conveyed | Conditions of Sale | Financing | Market Conditions | PSF of Building Subtotal | Location | Size | Utility | Zoning / Entitlements | Other | Adj. Price PSF of Building |
| 1 | **$89.24** | Fee Simple | Arm's-Length | None | Inferior | **$90.18** | Superior | Larger | Similar | Inferior | Similar | **$112.72** |
| | 12/21 | 0.0% | 0.0% | 0.0% | 1.1% | 1.1% | -15.0% | 20.0% | 0.0% | 20.0% | 0.0% | 25.0% |
| 2 | **$110.29** | - | Arm's-Length | None | Inferior | **$113.90** | Superior | Smaller | Similar | Inferior | Similar | **$116.75** |
| | 3/21 | 0.0% | 0.0% | 0.0% | 3.3% | 3.3% | -15.0% | -2.5% | 0.0% | 20.0% | 0.0% | 2.5% |
| 3 | **$113.49** | Fee Simple | Arm's-Length | None | Inferior | **$117.48** | Superior | Similar | Similar | Inferior | Similar | **$135.10** |
| | 1/21 | 0.0% | 0.0% | 0.0% | 3.5% | 3.5% | -5.0% | 0.0% | 0.0% | 20.0% | 0.0% | 15.0% |
| | **$89.24** | **- Low** | | | | | | | | | **Low -** | **$112.72** |
| | **$113.49** | **- High** | | | | | | | | | **High -** | **$135.10** |
| | **$104.34** | **- Average** | | | | | | | | | **Average -** | **$121.52** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

**Market Conditions Adjustment Footnote**

See Variable Growth Rate Assumptions Table
Date of Value (for adjustment calculations): 11/3/22

**Utility Footnote**

Utility includes shape, access, frontage and visibility.

| **Variable Growth Rate Assumptions** | |
|---|---|
| Starting Growth Rate: | 3.0% |
| Inflection Point 1 (IP1): | **3/1/2020** |
| Change After IP1: | 0.0% |
| Inflection Point 2 (IP2): | **3/1/2021** |
| Change After IP2: | 3.0% |
| Inflection Point 3 (IP3): | **5/1/2022** |
| Change After IP3: | 0.0% |

## Analysis of Comparable Data – Economic Adjustments

### Property Rights Conveyed

The property rights conveyed in a transaction typically have an impact on the sale price of a property. Acquiring the fee simple interest implies that the buyer is acquiring the full bundle of rights. Acquiring a leased fee interest typically means that the property being acquired is encumbered by at least one lease, which is a binding agreement transferring rights of use and occupancy to the tenant. A leasehold interest involves the acquisition of a lease, which conveys the rights to use and occupy the property to the buyer for a finite period of time. At the end of the lease term, there is typically no reversionary value to the leasehold interest. No adjustment is warranted for property rights conveyed.

### Conditions of Sale

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices.

All sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments are warranted for condition of sale.

### Financial Terms

The financial terms of a transaction can have an impact on the sale price of a property. A buyer who purchases an asset with favorable financing might pay a higher price, as the reduced cost of debt creates a favorable debt coverage ratio. A transaction involving above-market debt will typically involve a lower purchase price tied to the lower equity returns after debt service. We analyzed all of the transactions to account for atypical financing terms.

To the best of our knowledge, all of the sales used in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments are warranted.

### Market Conditions

The sales that are included in this analysis occurred between January 2021 and December 2021, which were adjusted to the date of value using inflection points. Please refer to the adjustment grid for details on these assumptions.

## Analysis of Comparable Data – Property Characteristic Adjustments

### Comparable Land Sale One

As compared to the subject, this sale is generally similar with respect to utility. With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property has a larger potential building area than the subject, requiring an upward adjustment. The property is inferior to the subject with regard to zoning restrictions, warranting an upward adjustment.

### Comparable Land Sale Two

As compared to the subject, this sale is generally similar with respect to utility, . With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property has a smaller potential building area than the subject, requiring a downward adjustment. The property is inferior to the subject with regard to zoning restrictions, warranting an upward adjustment.

### Comparable Land Sale Three

As compared to the subject, this sale is generally similar with respect to size, utility, . With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property is inferior to the subject with regard to zoning restrictions, warranting an upward adjustment.

## Conclusion of Site Value

The adjustments applied to the comparable sales in the Land Sale Adjustment Chart reflect what we determined is appropriate in the marketplace. Despite the subjectivity, the adjustments were considered reasonable and were applied consistently.

We placed similar weight on each sale. We concluded that the indicated land value by the Sales Comparison Approach is:

| LAND VALUE CONCLUSION | Price Per Build. SF |
|---|---|
| Indicated Value | $121.00 |
| Building Area Measure | x 32,368 |
| Indicated Fee Simple Value | $3,916,528 |
| Rounded to nearest $100,000 | $3,900,000 |
| $/Building Area Basis | $120.49 |
| | |
| **LAND VALUE CONCLUSION** | **$3,900,000** |
| $/Building Area Basis | $120.49 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

It is noted the we have used the building square feet based on by-right FAR, including Inclusionary Zoning bonus.

# Cost Approach

## Methodology

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. The steps in this approach have been outlined in the Valuation Process section of this report. We previously developed an opinion of land value for the subject site of $3,900,000.

## Replacement Cost New

The Marshall Valuation Service is used to determine the replacement cost of the subject building. These costs include labor, materials, supervision, contractor's profit and overhead, architect's plans and specifications, sales taxes and insurance. Base costs are provided by the Marshall and Swift (M&S) Square Foot Commercial Methodology. These costs are refined, if applicable, for differences in heating/cooling costs, and the presence of sprinklers and elevators. The refined base costs are then further adjusted, if applicable, to account for building height, interior wall height, building perimeter, current costs, location variations, and prospective value multipliers. Beyond the base building costs, specialty components or site improvements are provided by the segregated cost sections of the M&S Commercial Cost Explorer.

Our estimates of Replacement Cost New (RCN), Indirect Costs, Entrepreneurial Profit, and Depreciation for the subject property are summarized on the following pages.

### Indirect Costs

Indirect costs (soft costs) not included in our Base Costs are developer overhead, property taxes, permanent loan fees, legal costs, developer fees, contingencies, and lease-up and marketing costs.

An average property in the subject market requires an allowance for indirect costs of between 15.0 and 40.0 percent of Base Costs. We have estimated 30.0 percent for the Building Improvements (Structures) and 30.0 percent for the Site Improvements in our analysis.

### Entrepreneurial Profit

Typically, an allowance for entrepreneurial profit would be added when preparing the cost approach. This allowance provides a prospective developer with the incentive to develop a property, especially one of a speculative nature.

Based on our discussions with developers in the local market, this figure tends to range between 15.0 and 30.0 percent of Base Building, Site Improvement and Other Indirect Costs. Based on the characteristics of the subject as well as the risk associated with the proposed development, we have selected a rate of 20.0 percent in our analysis.

## Depreciation

There are several methods for capturing the loss in value attributable to depreciation: The market extraction method, the age-life method, and the breakdown method. Our Cost Approach utilizes the fundamental components of the age-life method. In some situations, the impact of certain items of depreciation on value is known or is easily estimated. In the most common variation of the age-life method the cost to cure certain curable items (physical and functional) is known and can be deducted before the age-life ratio is applied; a process that mirrors what typical purchasers consider as part of the investment decision. Once processed, incurable items (physical and functional) can be estimated via the age-life ratio. In situations where External Obsolescence is present it, too, can be analyzed

either as a residual to the market value conclusion or via an estimate of capitalized rent loss attributable to the external condition.

### Physical Deterioration

The *Marshall & Swift CCE* defines physical deterioration as:

> The wearing out of the improvement through the combination of wear and tear of use, the effects of the aging process and physical decay, action of the elements, structural defects, etc. It is typically divided into two types, curable and incurable, which may be individually estimated by the component breakdown method using some type of age/life approach. Physical deterioration may be further categorized as deferred maintenance, generally requiring immediate attention and treated separately based on the items' cost to repair.

Curable physical deterioration is generally associated with individual short-lived items such as paint, floor and roof covers, hot-water heaters, etc., requiring periodic replacement or renewal, or modification continuously over the normal life span of the improvement. Our calculation of Physical Curable Deterioration is based upon observable components, owner's proposed capital expenditures, and our own estimates of replacement costs where appropriate.

Incurable physical deterioration is generally associated with the residual group of long-lived items such as floor and roof structures, mechanical supply systems and foundations. Such basic structural items are not normally replaced in a typical maintenance program and are usually incurable except through major reconstruction. Physical Incurable Obsolescence will be calculated using a modified age-life method.

### Functional Obsolescence

According to the *Appraisal Institute*, functional obsolescence can be caused by changes in market conditions that have made some aspect of a structure, material or design obsolete by current market standards. Functional obsolescence may also be curable or incurable.

To be curable, the cost to correct the deficiency must be equal to or less than the anticipated increase in value. There are three subcategories of curable functional obsolescence: (1) deficiency requiring addition, (2) deficiency requiring substitution and (3) superadequacy. A deficiency requiring addition is measured by how much the cost of the addition exceeds the cost of the item if it were installed new during construction. A deficiency requiring substitution is measured as the cost of the existing component less physical deterioration already charged against the component and salvage value, plus the cost to remove the existing component and the added cost of installation. A superadequacy is measured as the current reproduction cost of the item minus any physical deterioration already charged plus the cost of removal, less the salvage value. A superadequacy is curable if correcting it on the date of the appraisal is economically feasible.

The subject improvements were constructed using modern materials and techniques. Furthermore, the design and layout of the property are consistent with current market standards. Our estimate of functional curable obsolescence, if applicable, is presented later in this section.

To the extent Functional Incurable Obsolescence exists, it is treated using methods prescribed by the Appraisal Institute.

### External Obsolescence

External obsolescence is the adverse effect on value resulting from influences outside the property. External obsolescence may be the result of lagging rental rates, high inflation, excessive construction costs, access to

highways, the lack of an adequate labor force, changing land use patterns and market conditions, or proximity to an objectionable use or condition.

The subject does not suffer from any discernable external obsolescence.

## Replacement Cost New (Structures)

A breakdown of each building component is presented by the following table. A separate analysis of each component allows for a consideration of the unique cost differences of each component. The following table summarizes the replacement cost new of the building improvements (structures).

| COST APPROACH SUMMARY | | | |
|---|---|---|---|
| **IMPROVEMENTS (STRUCTURES)** | | | |
| **DESCRIPTION** | | Retail | Multi-Family |
| Marshall & Swift - Improvement Type | | - | Apartments |
| Construction Class | | B | D |
| Quality of Construction | | Good | Good/Excellent |
| Marshall & Swift - Section | | Section 13 | Section 12 |
| Marshall & Swift - Page | | Page 26 | Page 16 |
| Number of Stories | | 1 | 4 |
| **Base SF Cost** | | $133.00 | $149.00 |
| **SQUARE FOOT REFINEMENTS** | | | |
| HVAC Refinements | | $0.00 | $0.00 |
| Sprinklers | | $2.00 | $2.00 |
| Appliances (@ $2,500 unit) | | $0.00 | $2.43 |
| **Adjusted Base Cost** | | $135.00 | $153.43 |
| **HEIGHT AND SIZE REFINEMENTS** | | | |
| Number of Stories | | 1.000 | 1.005 |
| Height Per Story | | 1.000 | 1.000 |
| Perimeter | | 1.000 | 1.000 |
| **Adjusted Base Cost** | | $135.00 | $154.19 |
| **FINAL CALCULATIONS** | | | |
| Current Cost Multiplier | | 1.300 | 1.320 |
| Local Area Multiplier | | 1.070 | 1.030 |
| **Adjusted SF Cost** | | $187.79 | $209.64 |
| TIMES: SF for Replacement Cost Purposes | | 2,500 | 34,012 |
| **Adjusted Cost** | | **$469,463** | **$7,130,291** |
| PLUS: Indirect Costs | 30.0% | $140,839 | $2,139,087 |
| **Adjusted Cost (MVS)** | | $610,301 | $9,269,378 |
| **Total Direct and Indirect Costs** | | | **$9,879,680** |

## Depreciation (Structures)

As previously discussed, our analysis of depreciation reflects physical and functional curable prior to consideration of physical and functional incurable items, which are treated as components of the modified age-life method. If applicable, economic obsolescence is independently estimated and deducted. The subject will be excellent/new upon completion with no depreciation estimate warranted.

## Replacement Cost New (Site Improvements)

Because site improvements can vary significantly and have a shorter typical age/life than the building components, a separate analysis was conducted. Site improvement costs include landscaping, asphalt paving, walkways, etc. We have estimated improvement costs of 2.5 percent of total hard costs.

## Summary (Site Improvements)

The following table provides a summary of the depreciated value of the site improvements.

| SITE IMPROVEMENTS | | | |
|---|---|---|---|
| **Cost New (Site Improvements)** | | | $178,257 |
| PLUS: Indirect Costs | 30.0% of Hard Costs | | $53,477 |
| Adjusted Cost | | | $231,734 |
| PLUS: Entrepreneurial Profit | 20.0% of Adjusted Costs | | $46,347 |
| **RCN (Site Improvements)** | | | **$278,081** |
| **DEPRECIATION ANALYSIS (SITE IMPROVEMENTS)** | | | |
| **RCN (Site Improvements)** | | | **$278,081** |
| LESS: Physical Curable | | | $0 |
| LESS: Functional Curable | | | $0 |
| Adjusted RCN (Site) | | | $278,081 |
| LESS: Age/Life Depreciation | | | $0 |
| Adjusted RCN (Site) | | | $278,081 |
| LESS: Economic Obsolescence (External): | | 0.0% | $0 |
| **Total Depreciated Value of Site Improvements** | | | **$278,081** |
| Site Area SF | | 9,520 | |
| Conclusion PSF of Land Area | | | **$29.21** |

## Comparable Construction Costs

Comparable cost information on a number of comparable properties is illustrated in the following table. The subject's construction costs were not provided.

## CONSTRUCTION COST COMPARABLES

| Cost Cateogry | 1 | 2 | 3 | 4 | Average | Subject Budget |
|---|---|---|---|---|---|---|
| GBA (SF) | 97,000 | 68,656 | 269,325 | 98,007 | 133,247 | 36,512 |
| No. Units | 108 | 95 | 293 | 84 | 145 | 33 |
| Construction Type | Low/Mid-Rise | Low/Mid-Rise | Low/Mid-Rise | Low/Mid-Rise | | Low/Mid-Rise |
| **Direct Costs** | **$22,409,438** | **$13,000,000** | **$63,178,547** | **$18,421,333** | **$29,252,330** | **$8,922,106** |
| Per SF | $231.03 | $189.35 | $234.58 | $187.96 | $219.53 | $244.36 |
| Per Unit | $207,495 | $136,842 | $215,626 | $219,302 | $201,740 | $270,367 |
| **Indirect Costs** | **$6,776,910** | **$5,403,538** | **$15,070,785** | **$9,923,616** | **$9,293,712** | **$532,655** |
| Per SF | $69.87 | $78.70 | $55.96 | $101.25 | $69.75 | $14.59 |
| Per Unit | $62,749 | $56,879 | $51,436 | $118,138 | $64,095 | $16,141 |
| As % Hard Costs | 30% | 42% | 24% | 54% | 32% | 6% |
| **Total Direct & Indirect Costs** | **$29,186,348** | **$18,403,538** | **$78,249,332** | **$28,344,949** | **$38,546,042** | **$9,454,761** |
| Per SF | $300.89 | $268.05 | $290.54 | $289.21 | $289.28 | $258.95 |
| Per Unit | $270,244 | $193,721 | $267,063 | $337,440 | $265,835 | $286,508 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

It is noted that construction costs generally rise; therefore, despite each of the comparables representing costs for multifamily projects within the past three years, these costs likely lag budgeted amounts for new construction as of today.

The indicated direct and indirect building costs for the subject are illustrated as follows:

## COST CONCLUSION

| Source | Subject Estimate | Per Unit | Per SF |
|---|---|---|---|
| MVS Cost Guide | $9,879,680 | $299,384 | $270.59 |
| Cost Comparables (Avg.) | n/a | $265,835 | $289.28 |
| Subject's Cost Est. | $9,454,761 | $286,508 | $258.95 |
| **C&W Estimate** | **$9,879,680** | **$299,384** | **$270.59** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

Given the Marshal & Swift Valuation Guide estimate, as well as the local cost comparables, we have estimated a total direct and indirect cost of $9,879,680. Our estimate is within the range of the comparables on a per unit basis and within the range of cost comparables on a per square foot basis.

*It is noted the subject construction budget appears to be below market.*

As noted previously, based on the characteristics of the subject as well as the risk associated with the proposed development, we have selected an entrepreneurial profit rate of 20.0 percent in our analysis.

| | | |
|---|---|---|
| **Total Direct and Indirect Costs - Appraiser Estimate** | | **$9,879,680** |
| PLUS: Total Entrepreneurial Profit (Structures) | | $1,975,936 |
| **Total RCN** | | **$11,855,616** |
| Total GBA (SF) | 36,512 | |
| PSF of GBA | | $324.70 |
| Per Unit | | $359,261 |

*Total includes all component / building costs as detailed above*

## Conclusion

As a culmination to the Cost Approach, we reiterate the conclusions from each portion of this analysis. Please refer to the following table for our Cost Approach summary.

| COST APPROACH VALUE SUMMARY | | |
|---|---|---|
| **MARKET VALUE TYPE** | | **Prospective Market Value Upon Stabilization** |
| **COST SOURCE** | | Marshall & Swift (Commercial Cost Explorer) |
| | | |
| **IMPROVEMENTS (Structures)** | | |
| Adjusted Costs | | **$9,879,680** |
| PLUS: Entrepreneurial Profit | | $1,975,936 |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS (Structures)** | | **$11,855,616** |
| | | |
| **IMPROVEMENTS (Site)** | | |
| Cost New | | **$178,257** |
| PLUS: Indirect Costs | | $53,477 |
| PLUS: Entrepreneurial Profit | | $46,347 |
| LESS: Total Depreciation | | $0 |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS (Site)** | | **$278,081** |
| | | |
| **SUMMARY (ALL IMPROVEMENTS)** | | |
| Adjusted Costs/Cost New | | $10,057,937 |
| PLUS: Total Indirect Costs | | $53,477 |
| PLUS: Total Entrepreneurial Profit | | $2,022,283 |
| **TOTAL REPLACEMENT COST NEW** | | **$12,133,697** |
| LESS: Total Depreciation | | $0 |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS** | | **$12,133,697** |
| PLUS: Land Value | | $3,900,000 |
| **PROSPECTIVE VALUE UPON STABILIZATION (TODAY'S DOLLARS)** | | $16,033,697 |
| Rounded to the Nearest | $100,000 | $16,000,000 |
| **PROSPECTIVE VALUE UPON STABILIZATION (INFLATED)** | | $16,309,879 |
| Rounded to the Nearest | $100,000 | **$16,300,000** |
| LESS: Lease Up Costs - Multifamily | | ($170,000) |
| **PROSPECTIVE MARKET VALUE UPON COMPLETION** | | $15,780,000 |
| Rounded to the Nearest | $100,000 | **$15,800,000** |
| LESS: Costs to Complete | | ($3,800,000) |
| **MARKET VALUE AS IS** | | $12,000,000 |
| Rounded to the Nearest | $100,000 | **$12,000,000** |
| | | |
| **Conclusion Per Unit Upon Stabilization** | | **$493,939** |
| **Conclusion Per Unit Upon Completion** | | **$478,788** |

We have deducted the lease-up costs (determined in the market analysis section of this report) from the Cost Approach, Sales Approach, and Income Capitalization Approach to determine the prospective market value upon completion.

# Sales Comparison Approach

## Methodology

Using the Sales Comparison Approach, we developed an opinion of value by comparing the subject property to similar, recently sold properties in the surrounding or competing area. This approach relies on the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

- Research recent, relevant property sales and current offerings in the competitive area;
- Select and analyze properties that are similar to the subject property, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;
- Identify sales that include favorable financing and calculate the cash equivalent price;
- Reduce the sale prices to a common unit of comparison such as price per unit or effective gross income multiplier;
- Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the subject property; and
- Interpret the adjusted sales data and draw a logical value conclusion.

The most widely used and market-oriented unit of comparison for properties such as the subject is sales price per unit. All comparable sales were analyzed on this basis. The following contain a summary of the improved properties that we compared to the subject property, a map showing their locations, and the adjustment process.

Comparable improved sale data sheets are presented in the Addenda of this report.

## IMPROVED SALE LOCATION MAP



### Improved Sale One

This comparable represents the sale of Calvert Woodley Apartments, a 136-unit mid-rise apartment community located in Washington, DC. The property was built in 1962 and consists of masonry exterior. The project amenities include fitness center, business center, dry cleaning services, and laundry facilities. The unit interiors include stainless steel appliances, granite countertops, and walk-in closets. The tax assessment at the time of sale was 68 percent of the sale price. The capitalization rate of 4.39 percent is based on proforma income and includes taxes assessed at 85 percent of the sale price.

### Improved Sale Two

This comparable represents the sale of The Jennifer at Georgia Ave, a 10-unit mid-rise apartment community located in Washington, DC. The property was built in 2022 and consists of wood frame exterior. The project amenities include bike storage and unit interiors include stainless steel appliances, hardwood floors, and washer/dryer units. The tax assessment at the time of sale was 18 percent of the sale price. The capitalization rate of 5.49 percent is based on proforma income.

### Improved Sale Three

This comparable represents the sale of 1862 Mintwood Pl NW, a 17-unit mid-rise community located in Washington, DC. The property was built in 1916 and consists of masonry exterior. The unit interiors include white kitchen appliances, hardwood floors, and high ceilings. The tax assessment at the time of sale was 54 percent of the sale price. The capitalization rate of 5.63 percent is based on trailing income.

### Improved Sale Four

This comparable represents the sale of The Archie, a 40-unit mid-rise apartment community located in Washington, DC. The property was built in 2021 and consists of brick exterior. The unit interiors include stainless steel appliances, hardwood floors and walk-in closets. It is noted that although the buyer plans to operate this property as affordable apartment complex, the property e is not encumbered by affordable covenants and the sale price represents a market price.

### Improved Sale Five

This comparable represents the sale of Griffin at Petworth Metro, a 49-unit mid/high-rise multifamily property located in the Petworth neighborhood within the District of Columbia. The property is located one block from the Georgia Avenue-Petworth Metrorail station. There were several offers near the contract price. The overall capitalization is based on trailing income.

**SUMMARY OF IMPROVED SALES**

| | PROPERTY INFORMATION | | | | | | TRANSACTION INFORMATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | Property Name<br>Address, City, State | Building GBA | Property Type | Year Built | No. of Units | Average Unit Size | Grantor | Grantee | Value Interest | Sale Date | Sale Price | $/Unit | NOI/Unit | OAR | Occup. |
| S | Subject Property | 36,512 | Low/Mid-Rise | 2023 | 33 | 855 | | | | | | | $26,573 | | 94% |
| 1 | Calvert Woodley Apartments<br>2601 Woodley Place Northwest<br>Washington, DC | 152,000 | Mid/ High-Rise | 1962 | 136 | 974 | Smith Property Holdings Three DC | 2601 Woodley Place NW Washington LLC | Leased Fee | Sep-22 | $65,000,000 | $477,941 | $20,982 | 4.39% | 98% |
| 2 | The Jennifer at Georgia Ave<br>4014 Georgia Ave NW<br>Washington, DC | 9,411 | Mid/ High-Rise | 2022 | 10 | 784 | Georgia Ave Condos LLC | BB 4014 LLC | Leased Fee | Aug-22 | $4,025,000 | $402,500 | $22,097 | 5.49% | 100% |
| 3 | 1862 Mintwood Pl NW<br>1862 Mintwood Pl NW<br>Washington, DC | 25,000 | Mid/ High-Rise | 1916 | 17 | 1,100 | 1862 Mintwood LLC | 1862 Mintwood Owner LLC | Leased Fee | Jun-22 | $7,275,000 | $427,941 | $24,093 | 5.63% | 97% |
| 4 | The Archie<br>4111 Kansas Avenue Northwest<br>Washington, DC | 37,000 | Mid/ High-Rise | 2021 | 40 | 825 | Warehouse Condo Project LLC | Some, Inc. | Leased Fee | May-22 | $16,300,000 | $407,500 | - | - | 84% |
| 5 | Griffin Apartments at Petworth Metro<br>3801 Georgia Ave NW<br>Washington, DC | 58,220 | Mid/ High-Rise | 2011 | 49 | 851 | 3801 Georgia Ave LLC | 3801 Georgia LLC | Leased Fee | Jul-20 | $19,125,000 | $390,306 | $18,735 | 4.80% | 92% |
| | **STATISTICS** | | | | | | | | | | | | | | |
| **Low** | | 9,411 | | 1916 | 10 | 784 | | | | Jul-20 | $4,025,000 | $390,306 | $18,735 | 4.39% | 84% |
| **High** | | 152,000 | | 2022 | 136 | 1,100 | | | | Sep-22 | $65,000,000 | $477,941 | $24,093 | 5.63% | 100% |
| **Average** | | 56,326 | | 1986 | 50 | 907 | | | | Feb-22 | $22,345,000 | $421,238 | $21,477 | 5.08% | 94% |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

**IMPROVED SALE ADJUSTMENT GRID**

| | ECONOMIC ADJUSTMENTS (CUMULATIVE) | | | | | | | PROPERTY CHARACTERISTIC ADJUSTMENTS (ADDITIVE) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | $/Sqft & Date | $/Unit & Date | Property Rights Conveyed | Conditions of Sale | Financing | Market [(1)] Conditions | Per Unit Subtotal | Location | Number of Units (Size) | Age/ Quality/ Condition | Average Unit Size | Amenities | Retail/ Parking Income | Economic | Occupancy | Other | Adj. $/Unit | Overall |
| 1 | **$427.63** | **$477,941** | Leased Fee | Arm's-Length | None | Similar | **$477,941** | Superior | Larger | Inferior | Superior | Similar | Inferior | Similar | Similar | Inferior | **$561,581** | Inferior |
| | 9/22 | 9/22 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -15.0% | 2.5% | 15.0% | -5.0% | 0.0% | 5.0% | 0.0% | 0.0% | 15.0% | 17.5% | |
| 2 | **$427.69** | **$402,500** | Leased Fee | Arm's-Length | None | Similar | **$402,500** | Similar | Similar | Similar | Inferior | Similar | Inferior | Similar | Similar | Similar | **$442,750** | Inferior |
| | 8/22 | 8/22 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 5.0% | 0.0% | 5.0% | 0.0% | 0.0% | 0.0% | 10.0% | |
| 3 | **$291.00** | **$427,941** | Leased Fee | Arm's-Length | None | Similar | **$427,941** | Superior | Similar | Inferior | Superior | Similar | Inferior | Similar | Similar | Inferior | **$492,132** | Inferior |
| | 6/22 | 6/22 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -15.0% | 0.0% | 20.0% | -10.0% | 0.0% | 5.0% | 0.0% | 0.0% | 15.0% | 15.0% | |
| 4 | **$440.54** | **$407,500** | Leased Fee | Arm's-Length | None | Similar | **$407,500** | Similar | Similar | Inferior | Similar | Similar | Inferior | Similar | Inferior | Similar | **$448,250** | Inferior |
| | 5/22 | 5/22 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 0.0% | 0.0% | 5.0% | 0.0% | 2.5% | 0.0% | 10.0% | |
| 5 | **$328.50** | **$390,306** | Leased Fee | Arm's-Length | None | Inferior | **$394,118** | Superior | Similar | Inferior | Similar | Similar | Inferior | Similar | Similar | Similar | **$453,235** | Inferior |
| | 7/20 | 7/20 | 0.0% | 0.0% | 0.0% | 1.0% | 1.0% | -5.0% | 0.0% | 15.0% | 0.0% | 0.0% | 5.0% | 0.0% | 0.0% | 0.0% | 15.0% | |
| | STATISTICS | **STATISTICS** | | | | | | | | | | | | | | | | |
| | $291.00 | $390,306 | **- Low** | | | | | | | | | | | | | **Low -** | $442,750 | |
| | $440.54 | $477,941 | **- High** | | | | | | | | | | | | | **High -** | $561,581 | |
| | $383.07 | $421,238 | **- Average** | | | | | | | | | | | | | **Average -** | $479,590 | |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

[(1)] **Market Conditions Adjustment**

See Variable Growth Rate Assumptions Table

Date of Value (for adjustment calculations): 6/1/23

## Variable Growth Rate Assumptions

| | |
|---|---|
| Starting Growth Rate: | 3.0% |
| Inflection Point 1 (IP1): | **3/1/2020** |
| Change After IP1: | 0.0% |
| Inflection Point 2 (IP2): | **1/1/2022** |
| Change After IP2: | 3.0% |
| Inflection Point 3 (IP3): | **5/1/2022** |
| Change After IP3: | 0.0% |

## Analysis of Comparable Data – Economic Adjustments

### Adjustment Process

The sales that we used were the best available comparables to the subject property. The major points of comparison for this type of analysis include the property rights conveyed, the financial terms incorporated into the transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

The first adjustment made to the market data takes into account differences between the subject property and the comparable property sales with regard to the legal interest transferred. Advantageous financing terms or atypical conditions of sale are then adjusted to reflect a normal market transaction. Next, changes in market conditions must be accounted for, thereby creating a time adjusted price. Lastly, adjustments for location, physical traits and the economic characteristics of the market data are made in order to generate the final adjusted unit rate for the subject property.

We made a downward adjustment to those comparables considered superior to the subject and an upward adjustment to those comparables considered inferior. Where expenditures upon sale exist, we included them in the sales price.

### Property Rights Conveyed

The property rights conveyed in a transaction typically have an impact on the price that is paid. Acquiring the fee simple interest implies that the buyer is acquiring the full bundle of rights. Acquiring a leased fee interest typically means that the property being acquired is encumbered by at least one lease, which is a binding agreement transferring rights of use and occupancy to the tenant. A leasehold interest involves the acquisition of a lease, which conveys the rights to use and occupy the property to the buyer for a finite period of time. At the end of the lease term, there is typically no reversionary value to the leasehold interest. No adjustment for property rights conveyed is warranted.

### Conditions of Sale

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arm’s-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments are required.

### Financial Terms

The financial terms of a transaction can have an impact on the sale price of a property. A buyer who purchases an asset with favorable financing might pay a higher price, as the reduced cost of debt creates a favorable debt coverage ratio. A transaction involving above-market debt will typically involve a lower purchase price tied to the lower equity returns after debt service. We analyzed all of the transactions to account for atypical financing terms. To the best of our knowledge, all of the sales used in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments are required.

### Market Conditions

The sales that are included in this analysis occurred between July 2020 and September 2022. Adjustments for market conditions are applied accordingly.

## Analysis of Comparable Data – Property Characteristic Adjustments

### Improved Sale One

As compared to the subject, this sale is generally similar with respect to and amenities. With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property has a smaller average unit size than the subject, requiring an upward adjustment. The property is inferior with respect to age/quality/condition, requiring an upward adjustment. The property has a larger average unit size than the subject, requiring a downward adjustment. Based on our analysis of this property, an upward adjustment is warranted for inferior retail/parking income. An additional upward adjustment is warranted as this property is subject to rent control regulations.

### Improved Sale Two

As compared to the subject, this sale is generally similar with respect to location, number of units (size), age/ quality/ condition, and amenities. The property has a smaller average unit size than the subject, requiring an upward adjustment. Based on our analysis of this property, an upward adjustment is warranted for inferior retail/parking income.

### Improved Sale Three

As compared to the subject, this sale is generally similar with respect to location, and amenities. With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property is inferior with respect to age/quality/condition, requiring an upward adjustment. The property has a larger average unit size than the subject, requiring a downward adjustment. Based on our analysis of this property, an upward adjustment is warranted for inferior retail/parking income. An additional upward adjustment is warranted as this property is subject to rent control regulations.

### Improved Sale Four

As compared to the subject, this sale is generally similar with respect to location, number of units (size), average unit size, and amenities. The property is inferior with respect to age/quality/condition, requiring an upward adjustment. Based on our analysis of this property, an upward adjustment is warranted for inferior retail/parking income. Unlike the subject, the property contains affordable units, which negatively impacts net income. Therefore, an upward adjustment is required.

### Improved Sale Five

As compared to the subject, this sale is generally similar with respect to number of units (size), average unit size, and amenities. With respect to location, the property is located in a submarket that achieves higher rents than the subject, requiring a downward adjustment. The property is inferior with respect to age/quality/condition, requiring an upward adjustment. Based on our analysis of this property, an upward adjustment is warranted for inferior retail/parking income.

### Summary of Percentage Adjustment Method

We used the Sales Comparison Approach to estimate the Prospective Market Value Upon Stabilization of the subject property. Prior to adjustments the comparable improved sales reflect unit prices ranging from $390,306 to $477,941 per unit with an average pre adjusted price of $421,238 per unit. After adjustments the comparable improved sales reflect unit prices ranging from $442,750 to $561,581 per unit with an average adjusted price of $479,590 per unit.

We have placed similar weight on each sale.

We conclude that the indicated value by the Percentage Adjustment Method is:

| PERCENT ADJUSTMENT METHOD SUMMARY | | |
|---|---|---|
| **Prospective Market Value Upon Stabilization** | | **Per Unit** |
| Indicated Value per Unit | | $480,000 |
| Num of Units | | x 33 |
| Preliminary Value | | $15,840,000 |
| **Rounded to Nearest $100,000** | | **$15,800,000** |
| Per Unit | | $478,788 |

| APPLICATION TO SUBJECT | | |
|---|---|---|
| **Prospective Value Upon Completion** | | |
| **Prospective Market Value Upon Stabilization** | | **$15,800,000** |
| **LESS** | Lease Up Costs - Multifamily | ($170,000) |
| **LESS** | Lease Up Costs - Retail | ($350,000) |
| Adjusted Value | | $15,280,000 |
| **Rounded to Nearest $100,000** | | **$15,300,000** |
| Per Square Foot | | |
| Per Unit | | $463,636 |

| APPLICATION TO SUBJECT | | |
|---|---|---|
| **Market Value As-Is** | | |
| **Prospective Value Upon Completion** | | **$15,300,000** |
| **LESS** | Costs to Complete | ($3,800,000) |
| Adjusted Value | | $11,500,000 |
| **Rounded to Nearest $100,000** | | **$11,500,000** |
| Per Square Foot | | |
| Per Unit | | $348,485 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

We have deducted the multifamily lease-up costs (determined in the market analysis section of this report) from the Cost Approach, Sales Approach, and Income Capitalization Approach to determine the prospective market value upon completion.

# Income Capitalization Approach

## Methodology

The Income Capitalization Approach is based on the principle that the value of a property is indicated by the net return to the property, or what is also known as the present worth of future benefits. The future benefits of income-producing multifamily properties is net income before debt service and depreciation, derived by a projection of income and expense, along with any expected reversionary proceeds from a sale.

The two most common methods of converting net income into value are direct capitalization and discounted cash flow analysis. In direct capitalization, net operating income is divided by an overall rate extracted from the market to indicate a value. In the discounted cash flow method, anticipated future net income streams and a reversionary value are discounted to provide an opinion of net present value at a chosen yield rate (internal rate of return or discount rate).

Based on the market for multifamily assets in the subject's area, we have forecast future apartment revenue for the subject property, which was detailed in a previous section of this report. In this section of the report, we provide an analysis of the subject's historical performance, the performance of comparable properties, and industry averages, in order to forecast all other revenues and expenses for the subject property.

Prospective purchasers of this asset type would utilize Direct Capitalization as the primary tool in evaluating the property. The overall rate used is derived from recent market transactions and then compared to current surveyed data. Thus, we have place sole reliance on the Direct Capitalization method.

## Apartment Unit Rental Income Analysis

Earlier in the report we discussed the competitive market for apartment properties in the local area. Before we revisit the competitive properties, we will discuss certain aspects of the subject property, namely its occupancy and the quoted rent levels of its various unit types.

### Subject Quoted Rental Rates

The subject property will offer units ranging in size from 742 to 1,580 square feet, with an average size of 855 square feet. Quoted rents range from $2,200 to $4,250 per month.

| SUBJECT PROPERTY - OWNER'S QUOTED RENTS | | | | | | |
|---|---|---|---|---|---|---|
| No. | Plan | BR | BA | Unit (SF) | Average Quoted Rent (Monthly) | Average Monthly Quoted Rent $/SF |
| 1 | 1BR/1BA | 1 | 1.0 | 742 | $2,200 | $2.96 |
| 2 | 1BR/2BA Den | 1 | 2.0 | 803 | $2,705 | $3.37 |
| 3 | 2BR/1BA | 2 | 1.0 | 803 | $2,845 | $3.54 |
| 4 | 2BR/2BA | 2 | 2.0 | 762 | $2,945 | $3.87 |
| 5 | 3BR/1BA | 3 | 1.0 | 1,188 | $3,850 | $3.24 |
| 6 | 4BR/2BA | 4 | 2.0 | 1,580 | $4,250 | $2.69 |
| 7 | 2BR/1BA IZ | 2 | 2.0 | 798 | $2,290 | $2.87 |
| 8 | 4BR/2BA IZ | 4 | 2.0 | 1,576 | $3,070 | $1.95 |
| **Minimum** | | | | 742 | $2,200 | $1.95 |
| **Maximum** | | | | 1,580 | $4,250 | $3.87 |
| **Average** | | | | 855 | $2,850 | $3.33 |

*All averages are weighted

In order to ascertain if the developer's estimated rents are market oriented, we will analyze rent levels at competing apartment complexes.

### Establishing Market Rental Rates

In an effort to estimate market rent achievable for the subject's units, we surveyed several competitive apartment complexes. In the following table we present a summary of the competitive properties.

**RENT COMPARABLE SUMMARY**

| No. | Project Name | Year Built | Total Units | NRA | Average Unit Size (SF) | Occupancy Rate (%) |
|---|---|---|---|---|---|---|
| 1 | Aventine Fort Totten | 2008 | 308 | 305,674 | 992 | 98.0% |
| 2 | Fort Totten Square | 2015 | 344 | 256,740 | 746 | 91.8% |
| 3 | The Modern at Art Place | 2017 | 520 | 369,520 | 711 | 96.9% |
| 4 | The Swift at Petworth Metro | 2014 | 218 | 165,368 | 759 | 86.6% |
| 5 | Willow and Maple | 2016 | 102 | 85,512 | 838 | 95.1% |
| 6 | The Clifton | 2019 | 156 | 99,848 | 640 | 93.7% |
| 7 | The Vale at The Parks | 2021 | 301 | 222,627 | 740 | 64.6% |
| 8 | 901W | 2020 | 161 | 134,989 | 838 | 97.1% |
| | **Subject Property** | **2023** | **33** | **28,209** | **855** | **0.0%** |
| **STATISTICS** | | | | | | |
| | Low: | 2008 | 102 | 85,512 | 640 | 64.6% |
| | High: | 2021 | 520 | 369,520 | 992 | 98.0% |
| | Unweighted Average: | 2016 | 264 | 205,035 | 783 | 90.5% |
| | **Totals:** | | **2,143** | **1,668,487** | | |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

The competitive market contains 2,110 units. The comparable projects were constructed between 2008 and 2021 and range in size from 102 to 520 units. The comparables exhibit occupancy levels ranging from 64.6 percent to 98.0 percent, with an unweighted average of 90.5 percent.

Comparable Seven is currently in lease-up. The remaining comparables, which are generally stabilized, average 94.2 percent occupancy.

## Discussion of the Rent Comparables

Each of the rent comparables are considered to compete directly with the subject for prospective tenants. While we note that some of the comparables may be similar, slightly superior or slightly inferior to the subject with regard to specific characteristics, each comparable represents a unique combination of specific location, amenities, unit sizes, floor plans, etc. which drives the per unit and per square foot rental rates at each property. Thus, the subject's market rental rates are expected to be generally within the range of the competitive set. Although we have not assigned an overall qualitative adjustment to each comparable as a whole, we have considered the unique factors of each comparable in our analysis on a floor-plan by floor-plan basis.

## Analysis by Unit Type

In order to estimate the market rates for the various floor plans, the subject unit types have been compared with similar units in the comparable projects. The following is a discussion of each unit type.

## Analysis of One Bedroom Units

The quoted rents for one-bedroom units in the marketplace are depicted in the following table:

| COMPETITIVE RENTAL SUMMARY | | | | |
|---|---|---|---|---|
| **One Bedroom Units** | | | | |
| | | | **Quoted Rents** | |
| **Name** | **BEDS/ BATHS** | **AVE. UNIT SIZE** | **Average Quoted Rent (Month)** | **Average Quoted Rent Per SF/Month** |
| **Subject - Owner Quoted Rents** | **1BR/1BA** | **742** | **$2,200** | **$2.96** |
| **Subject - Owner Quoted Rents** | **1BR/2BA Den** | **803** | **$2,705** | **$3.37** |
| Aventine Fort Totten | 1BR/1BA | 1,018 | $2,593 | $2.55 |
| Fort Totten Square | 1BR/1BA | 687 | $1,848 | $2.69 |
| The Modern at Art Place | 1BR/1BA | 635 | $1,956 | $3.08 |
| The Swift at Petworth Metro | 1BR/1BA | 702 | $2,119 | $3.02 |
| Willow and Maple | 1BR/1BA | 732 | $2,290 | $3.13 |
| The Clifton | 1BR/1BA | 559 | $2,364 | $4.23 |
| The Vale at The Parks | 1BR/1BA | 646 | $2,130 | $3.30 |
| 901W | 1BR/1BA | 699 | $2,514 | $3.60 |
| **Low** | | 559 | $1,848 | $2.55 |
| **High** | | 1,018 | $2,593 | $4.23 |
| **Average** | | 710 | $2,227 | $3.20 |

The developer's projected rental rates are within the range indicated by the rent comparables. Considering the available data, monthly market rent for the subject units is estimated at pro forma rents.

## Analysis of Two Bedroom Units

The quoted rents for two-bedroom units in the marketplace are depicted following table:

| COMPETITIVE RENTAL SUMMARY | | | | |
|---|---|---|---|---|
| **Two Bedroom Units** | | | | |
| | | | **Quoted Rents** | |
| **Name** | **BEDS/ BATHS** | **AVE. UNIT SIZE** | **Average Quoted Rent (Month)** | **Average Quoted Rent Per SF/Month** |
| **Subject - Owner Quoted Rents** | **2BR/1BA** | **803** | **$2,845** | **$3.54** |
| **Subject - Owner Quoted Rents** | **2BR/2BA** | **762** | **$2,945** | **$3.87** |
| Fort Totten Square | 2BR/2BA | 1,043 | $2,407 | $2.31 |
| The Modern at Art Place | 2BR/2BA | 973 | $2,553 | $2.62 |
| The Swift at Petworth Metro | 2BR/2BA | 1,050 | $2,813 | $2.68 |
| Willow and Maple | 2BR/2BA | 1,112 | $3,182 | $2.86 |
| The Clifton | 2BR/2BA | 823 | $3,687 | $4.48 |
| The Vale at The Parks | 2BR/2BA | 892 | $3,046 | $3.41 |
| 901W | 2BR/2BA | 1,162 | $3,485 | $3.00 |
| **Low** | | 823 | $2,407 | $2.31 |
| **High** | | 1,162 | $3,687 | $4.48 |
| **Average** | | 1,008 | $3,025 | $3.05 |

The developer's projected rates are within the range indicated by the rent comparables. Considering the available data, monthly market rent for the subject units is estimated at pro forma rents.

## Analysis of Three Bedroom Units

The quoted rents for three-bedroom units in the marketplace are depicted following table:

| COMPETITIVE RENTAL SUMMARY | | | | |
|---|---|---|---|---|
| **Three Bedroom Units** | | | | |
| | | | **Quoted Rents** | |
| **Name** | **BEDS/ BATHS** | **AVE. UNIT SIZE** | **Average Quoted Rent (Month)** | **Average Quoted Rent Per SF/Month** |
| **Subject - Owner Quoted Rents** | **3BR/1BA** | **1,188** | **$3,850** | **$3.24** |
| The Clifton | 3BR/2BA | 1,044 | $5,925 | $5.68 |
| The Vale at The Parks | 3BR/2BA | 1,575 | $4,496 | $2.85 |
| 901W | 3BR/2BA | 1,729 | $6,192 | $3.58 |
| **Low** | | 1,044 | $4,496 | $2.85 |
| **High** | | 1,729 | $6,192 | $5.68 |
| **Average** | | 1,449 | $5,538 | $4.04 |

The developer's projected rental rates are within the range of the comparable on a per square foot basis. Considering the available data, monthly market rent for the subject units is estimated at pro forma rents.

## Analysis of Four Bedroom Units

The quoted rents for four-bedroom units in the marketplace are depicted following table:

| COMPETITIVE RENTAL SUMMARY | | | | |
|---|---|---|---|---|
| **Four Bedroom Units** | | | | |
| | | | **Quoted Rents** | |
| **Name** | **BEDS/ BATHS** | **AVE. UNIT SIZE** | **Average Quoted Rent (Month)** | **Average Quoted Rent Per SF/Month** |
| **Subject - Owner Quoted Rents** | **4BR/2BA** | **1,580** | **$4,250** | **$2.69** |
| The Clifton | 4BR/2BA | 1,405 | $6,679 | $4.75 |
| 901W | 4BR/2BA | 2,210 | $7,865 | $3.56 |
| **Low** | | 1,405 | $6,679 | $3.56 |
| **High** | | 2,210 | $7,865 | $4.75 |
| **Average** | | 1,808 | $7,272 | $4.16 |

This bedroom type is limited in the market. The developer's projected rents are understandably lower than The Clifton and 901W, due to inferior location. Considering the available data, monthly market rent for the subject units is estimated at pro forma rents.

### Potential Rental Income

We determined market rent for each of the subject's unit types as follows.

| CUSHMAN & WAKEFIELD - PROJECTED MARKET RENTS & POTENTIAL MARKET RENT (ALL UNITS) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No. | Plan | BR | BA | Total Units | Unit (SF) | Total SF | Cushman & Wakefield Market Rent Estimate | Potential Gross Rent (Before Concessions) | Potential Average Monthly Rent $/SF |
| 1 | 1BR/1BA | 1 | 1.0 | 1 | 742 | 742 | $2,200 | $26,400 | $2.96 |
| 2 | 1BR/2BA Den | 1 | 2.0 | 12 | 803 | 9,639 | $2,705 | $389,520 | $3.37 |
| 3 | 2BR/1BA | 2 | 1.0 | 12 | 803 | 9,637 | $2,845 | $409,680 | $3.54 |
| 4 | 2BR/2BA | 2 | 2.0 | 4 | 762 | 3,047 | $2,945 | $141,360 | $3.87 |
| 5 | 3BR/1BA | 3 | 1.0 | 1 | 1,188 | 1,188 | $3,850 | $46,200 | $3.24 |
| 6 | 4BR/2BA | 4 | 2.0 | 1 | 1,580 | 1,580 | $4,250 | $51,000 | $2.69 |
| 7 | 2BR/1BA IZ | 2 | 2.0 | 1 | 798 | 798 | $2,290 | $27,480 | $2.87 |
| 8 | 4BR/2BA IZ | 4 | 2.0 | 1 | 1,576 | 1,576 | $3,070 | $36,840 | $1.95 |
| **TOTAL/AVERAGE** | | | | **33** | **855** | **28,209** | **$2,850** | **$1,128,480** | **$3.33** |

*All averages are weighted

The gross rental revenue for the entire property is projected to be $1,128,480.This equates to an average monthly rent of $2,850 per unit or $3.33 per square foot per month.

## Affordable Dwelling Units from Inclusionary Zoning (IZ)

Inclusionary Zoning (IZ) is a land use technique for developing diverse mixed-income communities by requiring that each new residential development make a percentage of the new units affordable to targeted incomes. It often lets developers build more units through a "density bonus" along with other incentives. IZ is used in cities across the country and states have made it part of their law.

The District of Columbia's IZ program requires new residential development projects of ten or more units, and rehabilitation projects that are expanding an existing building by 50 percent or more and adding ten or more units, to set-aside a percentage of the residential floor area for affordable units. Projects required to meet the affordability requirement may receive up to a 20 percent increase in Floor Area Ratio (FAR). In order to achieve the bonus density, lot occupancy and height limits for inclusionary developments have been adjusted in certain zone districts. The Board of Zoning Adjustment (BZA) can allow some or all of the units to be located off-site in the case of economic hardship or other feasibility challenges.

Maximum rents are calculated utilizing the Maximum Household Income Limits associated with the Area Median Income for the Washington MSA for a family of four as published by the US Department of Housing and Urban Development, and are adjusted for household size. Developers may charge up to the maximum rent from the Rent Price Schedule published at the time of the building permit application, or the Notice of Availability.

The following chart depicts the District of Columbia's Inclusionary Zoning schedule.

**Multi-Family Developments**

Note: IZ units currently exist only at the 50%, 60%, and 80% MFI levels.

| | 30% of MFI Units | | 50% of MFI Units | | 60% of MFI Units | |
|---|---|---|---|---|---|---|
| Bedrooms | Max. Rent | Max. Purchase Price | Max. Rent | Max. Purchase Price | Max. Rent | Max. Purchase Price |
| Co-Living | 500 | - | 830 | - | 1,010 | - |
| Studio | 680 | 54,600 | 1,110 | 128,000 | 1,350 | 164,600 |
| 1 | 720 | 50,200 | 1,190 | 128,800 | 1,440 | 168,100 |
| 2 | 850 | 36,900 | 1,440 | 131,200 | 1,730 | 178,300 |
| 3 | 1,010 | 45,100 | 1,680 | 155,100 | 2,020 | 210,100 |
| 4 | 1,140 | 62,500 | 1,910 | 188,300 | 2,290 | 251,100 |

| | 80% of MFI Units | | 100% of MFI Units | | 120% of MFI Units | |
|---|---|---|---|---|---|---|
| Bedrooms | Max. Rent | Max. Purchase Price | Max. Rent | Max. Purchase Price | Max. Rent | Max. Purchase Price |
| Co-Living | 1,350 | - | 1,680 | - | 2,020 | - |
| Studio | 1,790 | 238,000 | 2,240 | 311,300 | 2,690 | 384,600 |
| 1 | 1,910 | 246,600 | 2,400 | 325,200 | 2,880 | 403,800 |
| 2 | 2,290 | 272,600 | 2,880 | 366,900 | 3,450 | 461,200 |
| 3 | 2,690 | 320,100 | 3,350 | 430,100 | 4,030 | 540,100 |
| 4 | 3,070 | 376,800 | 3,840 | 502,600 | 4,600 | 628,300 |

The subject's in-place rents for Inclusionary Zoning units is within the range of the maximum allowable rents; therefore, our rent conclusions are in line with the quoted rents.

### Loss to Lease

Within the local market, buyers and sellers typically recognize a reduction in potential rental income due to the difference between market and contract rental rates. In this market, lease rates are typically flat and are anticipated to roll to market every twelve months on average. As a result, actual collections typically lag behind market rates by approximately twelve months. Additionally, some leases may not be marked to market as an incentive for higher retention.

No loss to lease estimate is warranted.

### Concessions

Rental concessions are defined as a discount or other benefit offered by a landlord to induce a prospective tenant to enter into a lease. Rental concessions are typically features of slow rental markets and tend to disappear as the market tightens. As indicated in the analysis of quoted rents and concessions for the subject and comparable

properties above, where concessions exist it is necessary to deduct the concessions from the full market rents to arrive at an effective market rent.

The majority of comparables in the market use daily revenue pricing systems (LRO, Rent Maximizer, etc.) which update rents daily based on a matrix including local market conditions and unit availability. The systems include rent premiums and concessions in the daily pricing and results in rent fluctuations.

The developer does not project concessions on a stabilized basis; though burn off of lease-up concessions is expected for a short period after stabilization. Based on rent comparables, we have included no concession estimate on a stabilized basis.

### Non-Revenue Units

Non-revenue units can include model units, and employee units, and units that are out of service. Given the size of the subject, no non-revenue unit allowance is estimated.

### Forecast Rental Revenue – Apartment Units

The following table summarizes the potential gross income anticipated in year one for the apartment units at the subject property.

**FORECAST RENTAL REVENUE - APARTMENT UNITS**

| Rental Revenue and Adjustments | | Annual Rent |
|---|---|---|
| Potential Year One Rental Income | | $1,128,480 |
| Less: Loss to Lease | 0.0% | $0 |
| Potential Gross Rental Revenue | | $1,128,480 |
| Less: Concessions | 0.0% | $0 |
| Less: Non-Revenue Units | | $0 |
| **Forecast Adjusted Gross Rental Revenue** | | $1,128,480 |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Revenue & Expense Analysis

We developed an opinion of the property's annual income and operating expenses after reviewing the developer's pro forma and the operating performance of similar buildings. We analyzed each item of expense and developed an opinion regarding what an informed investor would consider typical. Our expense forecast is presented in the following table.

| REVENUE AND EXPENSE ANALYSIS | SUBJECT PROPERTY | | | | | |
|---|---|---|---|---|---|---|
| | Developer Pro Forma (Untrended) | | Cushman & Wakefield Forecast (Today's Dollars) | | Cushman & Wakefield Forecast (Upon Stabilization) | |
| **REVENUE** | **Total** | **Per Unit** | **Total** | **Per Unit** | **Total** | **Per Unit** |
| Potential Gross Rental Revenue | $1,128,480 | $34,196 | $1,128,480 | $34,196 | $1,147,918 | $34,785 |
| **Base Rent Adjustments** | | | | | | |
| Less: Model/Employee Units | $0 | $0 | $0 | $0 | $0 | $0 |
| Less: Concessions | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Adjusted Rental Revenue** | $1,128,480 | $34,196 | $1,128,480 | $34,196 | $1,147,918 | $34,785 |
| RUBS/Utility Income | $0 | $0 | $0 | $0 | $0 | $0 |
| **Income Item** | | | | | | |
| Commercial Rental Income | $120,000 | $3,636 | $95,000 | $2,879 | $96,636 | $2,928 |
| Commercial Reimbursement | $0 | $0 | $23,163 | $702 | $23,562 | $714 |
| **Other Income** | | | | | | |
| Parking | $24,000 | $727 | $17,100 | $518 | $17,395 | $527 |
| Other Income | $0 | $0 | $6,600 | $200 | $6,714 | $203 |
| **Total Other Income** | $24,000 | $727 | $23,700 | $718 | $24,108 | $731 |
| **POTENTIAL GROSS REVENUE** | $1,272,480 | $38,560 | $1,270,343 | $38,495 | $1,292,224 | $39,158 |
| Vacancy (Rental Revenue Only) | ($101,798) | ($3,085) | ($67,709) | ($2,052) | ($68,875) | ($2,087) |
| Collection Loss (Rental Revenue Only) | ($2,500) | ($76) | ($11,285) | ($342) | ($11,479) | ($348) |
| **Total Vacancy and Collection Loss** | ($104,298) | ($3,161) | ($78,994) | ($2,394) | ($80,354) | ($2,435) |
| **EFFECTIVE GROSS REVENUE** | $1,168,182 | $35,399 | $1,191,349 | $36,101 | $1,211,870 | $36,723 |
| **OPERATING EXPENSES** | | | | | | |
| Property Insurance | $9,500 | $288 | $11,550 | $350 | $11,749 | $356 |
| Utilities | $50,730 | $1,537 | $51,150 | $1,550 | $52,031 | $1,577 |
| Repairs & Maintenance | $30,550 | $926 | $31,350 | $950 | $31,890 | $966 |
| Management Fees | $1,172 | $36 | $71,481 | $2,166 | $72,712 | $2,203 |
| Payroll & Benefits | $5,000 | $152 | $0 | $0 | $0 | $0 |
| Advertising & Marketing | $3,500 | $106 | $6,600 | $200 | $6,714 | $203 |
| General & Administrative | $14,000 | $424 | $13,200 | $400 | $13,427 | $407 |
| Replacement Reserves | $17,543 | $532 | $9,900 | $300 | $10,071 | $305 |
| **Total Operating Expenses** | $131,995 | $4,000 | $195,231 | $5,916 | $198,594 | $6,018 |
| Real Estate Taxes | $106,711 | $3,234 | $119,213 | $3,613 | $121,266 | $3,675 |
| **TOTAL EXPENSES** | $238,706 | $7,234 | $314,443 | $9,529 | $319,860 | $9,693 |
| **NET OPERATING INCOME** | **$929,476** | **$28,166** | **$876,906** | **$26,573** | **$892,010** | **$27,031** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Discussion of Revenue Items

We analyzed each revenue item in making our forecast, with our conclusions summarized on the previous table. Our forecast is based on analysis of the developer's pro forma and market comparables.

### Total Adjusted Rental Revenue

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $34,196 | $1,128,480 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$34,196** | **$1,128,480** |
| **C&W - Stabilized Year 1 (Prospective)** | **$34,785** | **$1,147,918** |

Our estimate is generally in line with the developer's pro forma projections.

### RUBS/Utility Income

The contractual lease obligations of the tenants specify that certain operating expenses are reimbursed to the landlord via a Resident Utility Billing System (RUBS). It is our understanding that tenants will pay directly for all utilities.

### Commercial Income

#### Retail Rent

The subject will contain 2,500 square feet of ground-level, retail/commercial space. Rent comparables are shown in the following tables.

| Sign Date | Start Date | Address | City | SF Leased | Rent/SF/Yr | Services |
|---|---|---|---|---|---|---|
| Jan 2022 | Feb 2022 | 7305 Georgia Ave NW | Washington | 1,100 | $41.00 | NNN |
| Jun 2021 | Sep 2021 | 5735-5815 Eastern Ave | Hyattsville | 2,656 | $40.27 | NNN |
| Mar 2021 | Mar 2021 | 120-124 Kennedy St NW | Washington | 861 | $30.00 | NNN |
| Jan 2021 | Jan 2021 | 6204 Georgia Ave NW | Washington | 1,100 | $33.00 | NNN |
| Feb 2020 | Mar 2020 | 4602 14th St NW | Washington | 1,050 | $32.00 | NNN |
| Dec 2019 | Jan 2020 | 4620 14th St NW | Washington | 750 | $30.00 | NNN |
| Feb 2019 | Mar 2019 | 5516 Colorado Ave NW | Washington | 750 | $45.00 | NNN |
| Jan 2019 | Mar 2019 | 845 Upshur St NW | Washington | 1,300 | $48.90 | NNN |
| Nov 2018 | Dec 2018 | 6829-6837 4th St NW | Washington | 959 | $39.50 | NNN |
| Nov 2018 | Dec 2018 | 6829-6837 4th St NW | Washington | 863 | $39.50 | NNN |
| Nov 2018 | Nov 2018 | 4526-4532 Georgia Ave NW | Washington | 1,250 | $43.20 | NNN |
| Sep 2018 | Jun 2019 | 6239 Georgia Ave NW | Washington | 2,250 | $35.00 | NNN |
| Aug 2018 | Sep 2018 | 5885 Colorado Ave NW | Washington | 2,973 | $36.33 | NNN |

Given the subject's location, we have estimated a rental rate of $40.00 per square foot on a triple net basis on a triple net basis, with a 5.0 percent vacancy allowance applied. Our estimate is generally in line with the developer's projections. The commercial rental income projection is presented as follows.

| RETAIL UNIT MIX | | | | | |
|---|---|---|---|---|---|
| Type | SF | Rent $/SF | Annual PGI | Vacancy @ 5.0% | EGI |
| Retail Space | 2,500 | $40.00 | $100,000 | ($5,000) | $95,000 |
| **Total/Average** | **2,500** | **$40.00** | **$100,000** | **($5,000)** | **$95,000** |

| Years | Per Unit | Totals |
|---|---|---|
| Developer Pro Forma (Untrended) | $3,636 | $120,000 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$2,879** | **$95,000** |
| **C&W - Stabilized Year 1 (Prospective)** | **$2,928** | **$96,636** |

The developer included retail income and recoveries in one line. However, we have broken out into a separate line item.

Retail Recoveries

The retail leases are written on a triple net basis, with the tenants liable for a prorate share of CAM and real estate taxes. The following table shows the pro rata real estate tax expense that is recoverable.

| RETAIL TAX REIMBURSEMENT INCOME | | |
|---|---|---|
| | Total | % |
| Gross Building Area (Multi-Family) | 34,012 SF | 93.2% |
| Gross Leaseable Area (Retail) | 2,500 SF | 6.8% |
| Total Net Rentable Area | 36,512 SF | 100.0% |
| Pro-Forma Tax Expense | $119,213 | |
| **Retail Tax Reimbursement** | **$8,163** | **6.8%** |

CAM reimbursements range $4.00 to $8.00 for similar properties. The following table shows our total estimate for retail recoveries for real estate taxes.

| RETAIL RECOVERIES | | |
|---|---|---|
| | Total | $/SF |
| Common Area Maintenace (CAM) | $15,000 | $6.00 |
| Retail Tax Reimbursement | $8,163 | $3.27 |
| **Total Reimbursement Income** | **$23,163** | **$9.27** |

The developer’s projected commercial reimbursement income, as well as our projection, is presented below.

| Years | Per Unit | Totals |
|---|---|---|
| Developer Pro Forma (Untrended) | $0 | $0 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$702** | **$23,163** |
| **C&W - Stabilized Year 1 (Prospective)** | **$714** | **$23,562** |

The developer did not break out reimbursement income.

**Parking Income**

Based on information provided by the developer, the subject will contain a total of 10 surface parking spaces. The developer is projecting parking revenue of $200 per month. Other properties operating in the area and offering

surface parking charge a rate of $100 to $150 per space. Given the market parameters and comparables, we have estimated parking income of $150 per month per space.

The effective gross income estimate derived from current parking rates is presented below.

| Parking Income | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Type | No. Spaces | X | Rent $/Space | = | Monthly Income | Annual PGI | Vacancy @ 5.00% | EGI |
| Surface | 10 | | $150 | | $1,500 | $18,000 | ($900) | $17,100 |

The subject's projected parking income is provided below.

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $727 | $24,000 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$518** | **$17,100** |
| **C&W - Stabilized Year 1 (Prospective)** | **$527** | **$17,395** |

### Other Income

This is a non-rental income category, which typically includes late fees, application fees, laundry and vending income, forfeited security deposit, termination fees, miscellaneous revenue, bad check charges, etc.

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $0 | $0 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$200** | **$6,600** |
| **C&W - Stabilized Year 1 (Prospective)** | **$203** | **$6,714** |

Other income for smaller assets similar to the subject generally ranges from 1.0 to 4.0 percent of effective rental income, excluding parking, storage, commercial income and utility reimbursements. Other income for similar local properties range from $150 to $500 per unit. Our projection is within market parameters and considered reasonable.

## Vacancy and Collection Loss

Vacancy and collection loss is a function of the interrelationship between absorption, lease expiration, renewal probability, estimated downtime between leases, and a collection loss factor based on the relative stability and credit of the subject's tenant base. Earlier in the report we discussed the vacancy rates for the market in which the subject property is located. We also discussed the subject's occupancy level, which conversely represents its current vacancy level.

Based on the current vacancy in the market, and our perception of future market vacancy, we projected a global stabilized vacancy rate of 6.00 percent. We deducted a collection loss of 1.00 percent. After accounting for all factors, the total vacancy and collection loss is calculated as 7.00 percent. For the subject property vacancy and collection loss are applied against rental revenue only. In year one, vacancy and collection loss is projected to be $78,994.

## Effective Gross Income

The subject's effective gross income is detailed as follows:

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $35,399 | $1,168,182 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$36,101** | **$1,191,349** |
| **C&W - Stabilized Year 1 (Prospective)** | **$36,723** | **$1,211,870** |

Our estimate is near the developer’s pro forma projections.

## Operating Expense Comparables

The following table illustrates detailed expense levels for the buildings that have varying degrees of similarity with the subject property in terms of age, size, tenancy and quality.

| | SUBJECT PROPERTY | COMPARABLES REVENUE AND EXPENSE ANALYSIS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Property MSA** | Washington DC | Washington DC | Washington DC | Washington DC | Washington DC | Washington DC | Washington DC | Washington DC | |
| **Building Size (Units)** | 33 | 145 | 60 | 158 | 79 | 117 | 45 | 100 | Min, Max and Average |
| **Year Built** | 2023 | 2019 | 2021 | 2020 | 2021 | 2020 | 2021 | 2022 | |
| **Property Sub-Type** | Garden/Low-Rise | Mid/High Rise | Low/Mid-Rise | Mid/High Rise | Mid/High Rise | Mid/High Rise | Low/Mid-Rise | Low/Mid-Rise | |
| **Year of Record** | - | 2020 Budget | 2020 Pro Forma | 2021 Pro Forma | 2020 Pro Forma | 2020 Pro Forma | 2020 Pro Forma | 2020 Pro Forma | |

| | Cushman & Wakefield Forecast Stabilized (1) | | Comp1 | | Comp2 | | Comp3 | | Comp 4 | | Comp 5 | | Comp 6 | | Comp 7 | | Min | Max | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | % EGI | Per Unit | Per Unit | Per Unit |
| **EFFECTIVE GROSS REVENUE** | $36,101 | 100.00% | $29,209 | 100.00% | $28,582 | 100.00% | $34,373 | 100.00% | $38,799 | 100.00% | $29,119 | 100.00% | $29,735 | 100.00% | $37,305 | 100.00% | $28,582 | $38,799 | $32,446 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | |
| Property Insurance | $350 | 0.97% | $590 | 2.02% | $425 | 1.49% | $316 | 0.92% | $197 | 0.51% | $300 | 1.03% | $362 | 1.22% | $400 | 1.07% | $197 | $590 | $370 |
| Utilities | $1,550 | 4.29% | $1,030 | 3.53% | $550 | 1.92% | $753 | 2.19% | $960 | 2.47% | $773 | 2.66% | $756 | 2.54% | $1,500 | 4.02% | $550 | $1,500 | $903 |
| Repairs & Maintenance | $950 | 2.63% | $1,526 | 5.22% | $1,150 | 4.02% | $848 | 2.47% | $1,563 | 4.03% | $676 | 2.32% | $948 | 3.19% | $1,200 | 3.22% | $676 | $1,563 | $1,130 |
| Management Fees | $2,166 | 6.00% | $711 | 2.43% | $1,000 | 3.50% | $848 | 2.47% | $970 | 2.50% | $953 | 3.27% | $712 | 2.39% | $1,119 | 3.00% | $711 | $1,119 | $902 |
| Payroll & Benefits | $0 | 0.00% | $4,103 | 14.05% | $1,667 | 5.83% | $1,234 | 3.59% | $2,167 | 5.59% | $1,622 | 5.57% | $1,893 | 6.37% | $0 | 0.00% | $0 | $4,103 | $1,812 |
| Advertising & Marketing | $200 | 0.55% | $884 | 3.03% | $500 | 1.75% | $316 | 0.92% | $1,083 | 2.79% | $250 | 0.86% | $305 | 1.03% | $0 | 0.00% | $0 | $1,083 | $477 |
| General & Administrative | $400 | 1.11% | $760 | 2.60% | $0 | 0.00% | $323 | 0.94% | $541 | 1.40% | $175 | 0.60% | $305 | 1.03% | $600 | 1.61% | $0 | $760 | $386 |
| Other Expenses | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | $0 | $0 |
| **Total Operating Expenses** | $5,916 | 16.39% | $9,603 | 32.88% | $5,292 | 18.12% | $4,639 | 15.88% | $7,480 | 25.61% | $4,749 | 16.31% | $5,281 | 17.76% | $4,819 | 12.92% | $4,639 | $9,603 | $5,981 |
| Real Estate Taxes | $3,613 | 10.01% | $3,603 | 12.34% | $2,350 | 8.22% | $3,133 | 9.11% | $2,805 | 7.23% | $3,549 | 12.19% | $3,711 | 12.48% | $3,223 | 8.64% | $2,350 | $3,711 | $3,196 |
| **TOTAL EXPENSES** | $9,529 | 26.39% | $13,206 | 45.21% | $7,642 | 26.74% | $7,772 | 22.61% | $10,285 | 26.51% | $8,298 | 28.50% | $8,992 | 30.24% | $8,042 | 21.56% | $7,642 | $13,206 | $9,177 |
| **NET OPERATING INCOME** | **$26,573** | | **$16,003** | | **$20,940** | | **$26,601** | | **$28,514** | | **$20,821** | | **$20,743** | | **$29,263** | | **$16,003** | **$29,263** | **$23,269** |

(1) Fiscal Year Beginning 6/01/2023
Fiscal Year Ending: 5/31/2024

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Discussion of Expenses

We thoroughly analyzed the developer's pro forma as well as the expense comparables to make our projections. The developer's pro forma operating expenses, as well as operating expense comparisons, are presented in the following table.

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $4,000 | $131,995 |
| Expense Comparable Low | $4,639 | - |
| Expense Comparable Average | $5,981 | - |
| Expense Comparable High | $9,603 | - |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$5,916** | **$195,231** |
| **C&W - Stabilized Year 1 (Prospective)** | **$6,018** | **$198,594** |

The seven expense comparables reflect operating expenses (excluding real estate taxes) ranging from $4,639 to $9,603 with an average of $5,981 per unit. Our forecast is within the range of the expense comparables but above the developer's projections as we have estimated market-oriented management/payroll for the subject.

Based on our analysis of the expense levels at comparable properties, we concluded that there is adequate support for our pro forma operating expense conclusions.

## Net Operating Income

The subject's net operating income is detailed as follows:

| Years | Per Unit | Totals |
|---|---|---|
| | | |
| Developer Pro Forma (Untrended) | $28,166 | $929,476 |
| **C&W - Stabilized Year 1 (Today's Dollars)** | **$26,573** | **$876,906** |
| **C&W - Stabilized Year 1 (Prospective)** | **$27,031** | **$892,010** |

## Income and Expense Pro Forma (Today's Dollars)

The following chart summarizes our opinion of income and expenses for year one, which is the first stabilized year in this analysis.

| SUMMARY OF REVENUE AND EXPENSES | | | | |
|---|---|---|---|---|
| **Stabilized Year For Direct Capitalization:** | | **Year One** | | |
| **REVENUE** | **Adjustments** | **Annual** | **$/Per Unit** | **% of EGI** |
| Base Rental Revenue | | $1,128,480 | $34,196 | |
| **Base Rent Adjustments** | | | | |
| Less: Model/Employee Units | | $0 | $0 | |
| Less: Concessions | | $0 | $0 | |
| **Total Base Rent Adjustments** | | $1,128,480 | $34,196 | |
| RUBS/Utility Income | | $0 | $0 | |
| Commercial Rental Income | | $95,000 | $2,879 | |
| Commercial Reimbursement | | $23,163 | $702 | |
| **Other Income** | | | | |
| Parking | | $17,100 | $518 | |
| Other Income | | $6,600 | $200 | |
| Other Income | | $23,700 | $718 | |
| **POTENTIAL GROSS REVENUE** | | **$1,270,343** | **$38,495** | |
| Vacancy (Rental Revenue Only) | 6.00% | ($67,709) | ($2,052) | |
| Collection Loss (Rental Revenue Only) | 1.00% | ($11,285) | ($342) | |
| **EFFECTIVE GROSS REVENUE** | | **$1,191,349** | **$36,101** | **100.00%** |
| **OPERATING EXPENSES** | | | | |
| Property Insurance | | $11,550 | $350 | 0.97% |
| Utilities | | $51,150 | $1,550 | 4.29% |
| Repairs & Maintenance | | $31,350 | $950 | 2.63% |
| Management Fees | | $71,481 | $2,166 | 6.00% |
| Payroll & Benefits | | $0 | $0 | 0.00% |
| Advertising & Marketing | | $6,600 | $200 | 0.55% |
| General & Administrative | | $13,200 | $400 | 1.11% |
| Replacement Reserves | | $9,900 | $300 | 0.83% |
| **Total Operating Expenses** | | **$195,231** | **$5,916** | **16.39%** |
| Real Estate Taxes | | $119,213 | $3,613 | 10.01% |
| **TOTAL EXPENSES** | | **$314,443** | **$9,529** | **26.39%** |
| **NET OPERATING INCOME** | | **$876,906** | **$26,573** | **73.61%** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Income and Expense Pro Forma (Prospective Date of Stabilization)

The following chart summarizes our opinion of income and expenses for year one, which is the first stabilized year in this analysis. Income and expenses are grown from the effective date of this report to the date of stabilization at a rate of 3.0 percent for income items and 3.0 percent for expense items.

| SUMMARY OF REVENUE AND EXPENSES | | | | |
|---|---|---|---|---|
| **Stabilized Year For Direct Capitalization:** | | **Year One** | | |
| **REVENUE** | **Adjustments** | **Annual** | **$/Per Unit** | **% of EGI** |
| Base Rental Revenue | | $1,147,918 | $34,785 | |
| **Base Rent Adjustments** | | | | |
| Less: Model/Employee Units | | $0 | $0 | |
| Less: Concessions | | $0 | $0 | |
| **Total Base Rent Adjustments** | | $1,147,918 | $34,785 | |
| RUBS/Utility Income | | $0 | $0 | |
| Commercial Rental Income | | $96,636 | $2,928 | |
| Commercial Reimbursement | | $23,562 | $714 | |
| **Other Income** | | | | |
| Parking | | $17,395 | $527 | |
| Other Income | | $6,714 | $203 | |
| Other Income | | $24,108 | $731 | |
| **POTENTIAL GROSS REVENUE** | | **$1,292,224** | **$39,158** | |
| Vacancy (Rental Revenue Only) | 6.00% | ($68,875) | ($2,087) | |
| Collection Loss (Rental Revenue Only) | 1.00% | ($11,479.18) | ($348) | |
| **EFFECTIVE GROSS REVENUE** | | **$1,211,870** | **$36,723** | **100.00%** |
| **OPERATING EXPENSES** | | | | |
| Property Insurance | | $11,749 | $356 | 0.97% |
| Utilities | | $52,031 | $1,577 | 4.29% |
| Repairs & Maintenance | | $31,890 | $966 | 2.63% |
| Management Fees | | $72,712 | $2,203 | 6.00% |
| Payroll & Benefits | | $0 | $0 | 0.00% |
| Advertising & Marketing | | $6,714 | $203 | 0.55% |
| General & Administrative | | $13,427 | $407 | 1.11% |
| Replacement Reserves | | $10,071 | $305 | 0.83% |
| **Total Operating Expenses** | | **$198,594** | **$6,018** | **16.39%** |
| Real Estate Taxes | | $121,266 | $3,675 | 10.01% |
| **TOTAL EXPENSES** | | **$319,860** | **$9,693** | **26.39%** |
| **NET OPERATING INCOME** | | **$892,010** | **$27,031** | **73.61%** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

## Investment Considerations

Before determining the appropriate risk rate(s) to apply to the subject, a review of recent market conditions, particularly in the financial markets, is warranted. The following subsection provides review of these trends, ending with a summary of the investment considerations impacting the subject property. The trends are based upon the appraiser's market research, discussions with participants in the market, and the relative position of the subject property within its market.

The Commercial Real Estate (CRE) market is driven by investor demand and strong liquidity. Since its onset in March 2020, the COVID-19 pandemic has had a dramatic effect on both factors as the market navigated actual and perceived impact. We observed asset classes experiencing various impacts, both positive and negative. We observed that asset values can fall significantly in short periods of time if either demand or liquidity, often in conjunction with many other factors, change significantly. In spite of the threat of new variants, the uncertainty of the early months of the pandemic has been replaced with clearer expectations and forecasts of asset class and individual property performance. Of course, some uncertainty exists in most property types in terms of forecast demand, to varying degrees. As we have throughout the pandemic, Cushman & Wakefield is closely monitoring the latest developments resulting from the COVID-19 pandemic and recovery and its effect on the subject and its market.

### Current Trends and Economic Conditions

The U.S. economy is wrestling with high inflation and rising interest rates. In response, the Federal Reserve is working aggressively to subdue wage and price pressures as rates surge higher and financial conditions tighten. In addition to this, we are in the throes of a bear market, mortgage rates have more than doubled, credit spreads continue to widen, and value of the dollar continues to strengthen against most currencies. That being said, the economy continues to display impressive job numbers and unemployment remains low. Further, third quarter advanced estimates by the Bureau of Economic Analysis, show that gross domestic product (GDP) increased 0.6% in third quarter of 2022, following two consecutive quarters of decline, and increased 2.6% on an annual rate.

Despite the first half of the year showing declines in GDP and growth in the second half of the year starting off slow, we are not in a recession. A recession is officially determined by the Business Cycle Dating Committee of the National Bureau of Economics (NBER), and GDP is only one of several variables used to determine whether the economy is in a downturn. Nevertheless, stresses are mounting, and the financial system is vulnerable to anything that may not go as anticipated. There have been several recent threats, such as the British pound's collapse, the financial crisis in the U.K., and the quickly falling housing prices in the U.S., however, so far none of these have been serious enough to precipitate a financial crisis or recession.

Provided the war in Ukraine or the COVID-19 pandemic do not suddenly take a sudden and dark turn, or another unforeseen or unpredictable event rattles the markets, a recession is avoidable. While it is true that the economy is struggling, and that growth is weak, unemployment remains low and payroll employment gains exceeded 250,000 in September 2022, more than double what is needed to keep unemployment stable. Additionally, the Federal Reserve, albeit arguably late to the game, is taking strong measures to tamp down inflation by cooling the job market and raising interest rates.

The following graph displays historical and projected U.S. real GDP percentage change (annualized on a quarterly basis) from first quarter 2012 through fourth quarter 2025:




Source: Historical Data Courtesy of the Bureau of Economic Analysis, Forecast Data Courtesy of Moody's Analytics, and Cushman & Wakefield Valuation & Advisory

The current wave of inflation began in 2021, immediately following pandemic in 2020. Its rise has been largely attributed to various causes, including pandemic-related fiscal and monetary stimulus, shortages in the global supply chain, price gouging, and as of 2022, the Russian invasion of Ukraine. Currently, the Bureau of Labor Statistics (BLS) states that consumer prices rose 0.4% in September 2022 and was up 8.2% from the same time last year. The core CPI (minus food and energy) saw an acceleration of 0.6% over August 2022, and 6.6% from September 2021; the highest yearly gain for the core since August 1982.

In early 2022, the Federal Reserve was holding the federal funds rate at around zero. They were buying billions of dollars of bonds every month to stimulate the economy, but various measures of inflation kept inching up and reaching 40-year highs. To combat inflation, the Federal Reserve has employed multiple increases to the effective federal funds rate in 2022. The most recent increase of 0.75% of November 2, 2022, follows increases at each of the previous five 2022 Federal Reserve meetings. The last four consecutive Federal Reserve meetings, including the November 2022 meeting, have each concluded with an increase to the federal funds rate of 0.75%. Currently, the effective federal funds rate is up to a range of 3.75-4.00%; its highest since January 2008.

The following table displays when the Federal Open Market Committee met, Federal Reserve rate hikes, and the effective federal funds rates:

| Federal Reserve Rate Hike History | | |
|---|---|---|
| **FOMC Meeting Date** | **% Change** | **Federal Funds Rate** |
| March 17, 2022 | +25 | 0.25% to 0.50% |
| May 5, 2022 | +50 | 0.75% to 1.00% |
| June 16, 2022 | +75 | 1.50% to 1.75% |
| July 27, 2022 | +75 | 2.25% to 2.50% |
| September 21, 2022 | +75 | 3.00% to 3.25% |
| November 2, 2022 | +75 | 3.75% to 4.00% |

Source: Federal Reserve and Cushman & Wakefield Valuation & Advisory

The Effective Federal Funds Rate is an interest rate that calculates the effective median interest rate of overnight federal funds transactions from the previous day and is published daily by the Federal Reserve Bank of New York. The current effective federal funds rate is now targeted between 3.75% and 4.00%. This rate, and all interest rates, tend to move in the same direction as inflation, however they typically lag because they are also

the primary tool used by central banks to manage inflation. Conversely, when inflation is falling and economic growth is slowing, central banks may lower interest rates to stimulate the economy.

The Federal Reserve generally shoots for the dual objective of maximum employment and stable inflation near 2%. Currently, the former objective has been satisfied, the unemployment rate was at a 50-year low of 3.5% in September—while the latter is the chief concern. In other words, the Federal Reserve's focus will be squarely on raising interest rates until it is clear inflation is heading back toward target. There are signs inflation is moderating, but there will be a bit of a wait before we should expect interest rates to pause or reverse course. The downside of this is that GDP growth and employment are likely to experience below-average growth rates in the interim.

The following graph compares CPI, Core CPI with the Federal Funds Rate from January 2017 through November 2022:




## U.S. Real Estate Market Implications

Total deal volume, as tracked by MSCI Real Capital Analytics, fell 21% since the same time last year to a total of $1.72 billion. While volume was down across all sectors, the sharpest quarterly decline was in portfolio sales, where activity was down 42% from third quarter 2021. Deals involving individual assets fell 24%, a pace that closely matched the overall market, and the retail sector saw the smallest year-over-year decline at 9% with a total sales volume of $18.2 billion for third quarter 2022.

At the beginning of the pandemic, decline in deal activity was largely the result of confidence in future income streams for assets. Investors were concerned that tenants may not be able to pay rents and buyers moved to the sidelines until the Federal Reserve and the CARES Act intervened to lend a helping hand. Those support mechanisms are now gone, and deal volume is in retreat once again.

Further compounding the decline are the higher costs of capital as rising interest rates have pushed a coupon on a 7/10 year fixed-rate mortgage from 3.5% in September of 2021, to 5.4% in early third quarter 2022. Despite rising costs and falling deal volume, investment activity remained elevated. For comparison, going back five years prior to the pandemic, deal volume averaged $141.7 billion during third quarter periods, or about 19% lower than deal volume for third quarter 2022.

The following graph compares national transaction volume by property type from 2012 through third quarter 2022:




Source: MSCI Real Capital Analytics and Cushman & Wakefield Valuation & Advisory

According to the PricewaterhouseCoopers (PwC) Real Estate Investor Survey, average cap rates for all property types increased in 23 survey markets, decreased in six, and held steady in six during third quarter 2022 (in a quarterly comparison). When compared to the previous year, 71% of the market averages are lower today than they were a year ago, with 20 markets posting double-digit decreases. Additionally, for all markets, the average cap rate change is a nine basis-point decline over last quarter.

Over the next six months, surveyed investors foresee overall cap rates increases in 16 markets, while cap rates are expected to hold steady in 13 markets. Cap rates tend to remain lower in Central Business District (CBD) environments, especially when compared to their suburban counterparts. This is mostly due to the higher barriers to entry and lack of available land. As such, CBD markets generally retain higher rental rates and occupancy levels. Given the current economic environment, however, it is not surprising that many experts are anticipating cap rates in some markets and property types start to inch up. Nevertheless, they are expected to remain relatively low in the near term and increases are expected to be moderate. In an environment with rising finance costs and interest rates, this may limit the benefits of leverage for investors seeking new acquisitions.

The following chart displays an overall cap rate analysis of six distinct property classes during third quarter 2022, and compares them to the same time last year:

| Overall Cap Rate Analysis | | | |
|---|---|---|---|
| Third Quarter 2022 | | | |
| Asset Class | Q3 2022 | Q3 2021 | Basis Point Change |
| CBD Office | 5.70% | 5.80% | -10 |
| Suburban Office | 5.97% | 6.07% | -10 |
| National Warehouse | 4.29% | 4.43% | -14 |
| National Apartment | 4.75% | 4.59% | 16 |
| National Regional Mall | 7.23% | 7.40% | -17 |
| National Net Lease | 6.13% | 6.23% | -10 |

Source: PwC Real Estate Investor Survey and Cushman & Wakefield Valuation & Advisory

According to a recent Moody's Analytics study, the recent interest rate hikes and upward cap rate movement have put a strain on the Commercial mortgage-backed securities (CMBS) market. In third quarter 2022, about $5.5 billion, or 28% of new CMBS issuance suffered negative leverage, meaning the cost of debt exceeds the projected returns on investment. For comparison, the amount of CMBS exhibiting negative leverage was just 8% last quarter. While jumps were seen across all asset classes, industrial and multifamily experienced the largest by share count at 35.9% and 30.8%, respectively.

## Conclusion

While we are not in a recession and can still avoid one, economic growth is slowing. Right now, the Federal Reserve is in a difficult position where they must raise interest rates high and fast enough to curb inflation – but not so high or fast that it will push the economy into a recession. Any misstep could be economically disastrous. Further, as interest rates climb, deal volume is slowing; however, volume remains elevated and is at pre-pandemic levels. In a similar vein, cap rates are expected to move up, but increases are expected to be moderate.

| INVESTMENT CONSIDERATIONS | |
|---|---|
| **Real Estate Market Trends:** | Real estate market trends have a significant bearing on the value of real property. The real estate market in which the subject property is located is currently moderate. |
| **Property Rating:** | After considering all of the physical characteristics of the subject, we have concluded that this property will have an overall rating that is good, when measured against other properties in this marketplace. |
| **Location Rating:** | After considering all of the locational aspects of the subject, including regional and local accessibility as well as overall visibility, we have concluded that the location of this property is good. |
| **Overall Investment Appeal:** | There are many factors that are considered prior to investing in this type of property. After considering all of these factors, we conclude that this property has good overall investment appeal. |

## Investor Survey Trends

Historic trends in real estate investment help us understand the current and future direction of the market. Investors' return requirements are a benchmark by which real estate assets are bought and sold. The following graph shows the historic trends for the subject's asset class spanning a period of four years as reported in the PwC Real Estate Investor Survey published by PricewaterhouseCoopers.

**INVESTOR SURVEY HISTORICAL RESULTS**

| Survey: | PwC | End Quarter: |
|---|---|---|
| Property Type: | REGIONAL APARTMENT MID-ATLANTIC | 3Q 22 |

| Quarter | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20 | 3Q 20 | 4Q 20 | 1Q 21 | 2Q 21 | 3Q 21 | 4Q 21 | 1Q 22 | 2Q 22 | 3Q 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OAR (average) | 5.04% | 5.20% | 5.20% | 5.13% | 5.13% | 5.13% | 5.43% | 5.43% | 5.38% | 5.05% | 5.03% | 5.03% | 4.58% | 4.55% | 4.80% | 4.70% |
| Terminal OAR (average) | 5.48% | 5.48% | 5.48% | 5.53% | 5.53% | 5.53% | 5.80% | 5.80% | 5.73% | 5.25% | 5.28% | 5.28% | 4.93% | 4.90% | 4.90% | 4.90% |
| IRR (average) | 7.18% | 7.18% | 7.18% | 7.18% | 7.18% | 7.18% | 7.80% | 7.80% | 7.58% | 7.43% | 7.41% | 7.41% | 6.58% | 6.58% | 6.38% | 6.38% |




Source: PwC Real Estate Investor Survey

## Capitalization Rate Analysis

On the following pages we discuss the process of how we determine an appropriate overall capitalization rate to apply to the subject's forecast net income.

## Capitalization Rate from Investor Surveys

We considered data extracted from the Investor Survey for institutional grade assets. Earlier in the report, we presented historical capitalization rates for the prior four-year period. The most recent information from this survey is listed in the following table:

**CAPITALIZATION RATES**

| Survey | Date | Range | Average |
|---|---|---|---|
| PwC Institutional | Third Quarter 2022 | 3.75% - 6.50% | 4.70% |

PwC Institutional - Refers to Regional Apartment Mid-Atlantic market regardless of class or occupancy

## Comparable Sales Analysis

| CAPITALIZATION RATE SUMMARY | | | |
|---|---|---|---|
| **No.** | **Name and Location** | **Sale Date** | **Capitalization Rate** |
| 1 | Calvert Woodley Apartments<br>2601 Woodley Place Northwest<br>Washington, DC | 9/2022 | 4.39% |
| 2 | The Jennifer at Georgia Ave<br>4014 Georgia Ave NW<br>Washington, DC | 8/2022 | 5.49% |
| 3 | 1862 Mintwood Pl NW<br>1862 Mintwood Pl NW<br>Washington, DC | 6/2022 | 5.63% |
| 4 | The Archie<br>4111 Kansas Avenue Northwest<br>Washington, DC | 5/2022 | - |
| 5 | Griffin Apartments at Petworth Metro<br>3801 Georgia Ave NW<br>Washington, DC | 7/2020 | 4.80% |
| **STATISTICS** | | | |
| Sample Size | | | 4 |
| Low | | | 4.39% |
| High | | | 5.63% |
| Median | | | 5.15% |
| Average | | | 5.08% |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

We considered OARs indicated by sales of comparable properties, national investor surveys, and the opinions of brokers, owners, and prospective purchasers. The indications from these various sources are:

| CAPITALIZATION RATE SUMMARY | | | |
|---|---|---|---|
| Comparable Sales | | 4.39% - | 5.63% |
| PwC Institutional | | | 4.70% |
| Market Participants | National Brokerage | 5.25% | 5.50% |
| Conclusion | | | 5.50% |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

We believe that data derived from our discussions with market participants most clearly reflects current market parameters. Given the property attributes and prevailing market return rates, we conclude that a 5.50 percent OAR is applicable to the subject NOI forecast. The rate selected is near the upper end of the investor survey and near the mid to upper end of the recent sales comparables identified.

## Market Participant Interviews

We have interviewed market participants and included the most pertinent comments that impact value as follows:

- Sales brokers of investment and non-investment grade properties interviewed note a capitalization rate range of 5.25 to 5.50 percent for new smaller Class A product in the subject's submarket.
- Management of comparable properties note a typical lease up pace of 7 to 10 units for smaller low/mid-rise style properties in the surrounding area.

## Direct Capitalization Method Conclusion

In the Direct Capitalization Method, we developed an opinion of market value by dividing year one net operating income by our selected overall capitalization rate. Our conclusion using the Direct Capitalization Method is as follows:

### Market Value Upon Completion and Stabilization

| DIRECT CAPITALIZATION METHOD | | |
|---|---|---|
| **Prospective Market Value Upon Stabilization** | | |
| **NET OPERATING INCOME** | **$892,010** | **$27,031** |
| **Sensitivity Analysis (0.25% OAR Spread)** | **Value** | **$/Per Unit** |
| Based on Low-Range of 5.25% | $16,990,672 | $514,869 |
| Based on Most Probable Range of 5.50% | $16,218,369 | $491,466 |
| Based on High-Range of 5.75% | $15,513,223 | $470,098 |
| **Indicated Value** | $16,218,369 | $491,466 |
| **Rounded to Nearest $100,000** | **$16,200,000** | **$490,909** |

| APPLICATION TO SUBJECT | | |
|---|---|---|
| **Prospective Value Upon Completion** | | |
| **Hypothetical Market Value Upon Stabilization** | **$16,200,000** | **$490,909** |
| **LESS** Lease Up Costs - Multifamily | ($170,000) | ($5,152) |
| **LESS** Lease Up Costs - Retail | ($350,000) | ($10,606) |
| Indicated Value | $15,680,000 | $475,152 |
| **Rounded to Nearest $100,000** | **$15,700,000** | **$475,758** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

We have deducted the multifamily lease-up costs (determined in the market analysis section of this report) from the cost approach, sales approach, and income approach to determine the prospective market value upon completion.

# Reconciliation and Final Value Opinion

## Valuation Methodology Review and Reconciliation

This appraisal employs all three typical approaches to value: the Cost Approach, the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that all approaches would be considered meaningful and applicable in developing a credible value conclusion.

The approaches indicated the following:

**FINAL VALUE RECONCILIATION**

| | Market Value As-Is | Per Unit | Prospective Market Value Upon Completion | Per Unit | Prospective Market Value Upon Stabilization | Per Unit |
|---|---|---|---|---|---|---|
| **Date of Value** | November 3, 2022 | | March 1, 2023 | | June 1, 2023 | |
| **Land Valuation** | | | | | | |
| Land Value | $3,900,000 | $120.49 | --- | --- | --- | --- |
| **Cost Approach** | | | | | | |
| Conclusion | $12,000,000 | $363,636 | $15,800,000 | $478,788 | $16,300,000 | $493,939 |
| **Sales Comparison Approach** | | | | | | |
| Conclusion | $11,500,000 | $348,485 | $15,300,000 | $463,636 | $15,800,000 | $478,788 |
| **Income Capitalization Approach** | | | | | | |
| Conclusion | $11,900,000 | $360,606 | $15,700,000 | $475,758 | $16,200,000 | $490,909 |
| **Final Value Conclusion** | **$11,900,000** | **$360,606** | **$15,700,000** | **$475,758** | **$16,200,000** | **$490,909** |

*Compiled by Cushman & Wakefield of Washington, D.C., Inc.*

The cost approach typically gives a reliable value indication when there is strong support for the replacement cost estimate and when there is minimal depreciation. Considering the amount of depreciation present in the property, the reliability of the cost approach is considered good. Therefore, the cost approach is considered applicable to the subject, but has been given secondary emphasis in the final value reconciliation.

In the sales comparison approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known. The sales used in this analysis are considered comparable to the subject, and the required adjustments were based on reasonable and well-supported rationale. In addition, market participants are currently analyzing purchase prices on investment properties as they relate to available substitutes in the market. Therefore, the sales comparison approach is considered to provide a reliable value indication, but has been given secondary emphasis in the final value reconciliation.

We gave most weight to the Income Capitalization Approach because this mirrors the methodology used by purchasers of this property type (i.e., an income-producing property). The quantity and quality of the data for the Income Capitalization Approach is considered very good to excellent. This includes the presence of multiple, similar quality apartment properties in the subject area, utilized for our rental estimates, and data regarding occupancy and expenses extracted from similar properties throughout the market. Investment rates of return used for converting net income into value were derived via extraction from recent sales of similar apartments in the area, investor surveys (national), discussions with local market participants. The value from the Income Capitalization Approach is well supported by the value indicated by the secondary approaches to values – the Sales Comparison Approach and Cost Approach.

# Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

It is assumed that the proposed improvements are constructed in a quality manner in accordance with the information communicated to us by the developer. If the design or quality differs from that which has been considered herein, the value conclusions could be impacted accordingly. Any undue delay in the construction timeline could materially impact the value conclusion reported herein.

The prospective market value estimate is based upon market participant attitudes and perceptions existing as of the effective date of our appraisal, and assumes the subject property is completed and/or achieves stabilization as of our prospective date. We assume no material change in the physical characteristics and condition of the subject property or in overall market conditions between the date of inspection and effective date of value, except for those identified within the report.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

### Exposure Time and Marketing Time

Based on our review of national investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been approximately twelve (12) months. This assumes an active and professional marketing plan would have been employed by the current owner.

We believe, based on the assumptions employed in our analysis, as well as our selection of investment parameters for the subject, that our value conclusion represents a price achievable within twelve (12) months.

**Tenants Opportunity to Purchase Act (TOPA)**

The subject is located in the District of Columbia and, if offered for sale while leased, would be subject to the regulations stipulated by the Tenant Opportunity to Purchase Act (TOPA). Under these regulations, residents of rental housing in the District of Columbia have the opportunity to purchase that property when the owner offers it for sale, or obtain cash payments if they choose not to do so. The following process must be followed in order to comply with TOPA regulations:

1) The owner gives each tenant a Notice of Sale and Opportunity to Purchase ("TOPA notice") on a form provided by the District of Columbia, which describes the tenants' rights and the time periods for exercise of the rights.

2) The tenants must form a Tenant Association to act as the entity for purposes of negotiation and contracting. The Tenant Organization then has 30 days (if an association already exists) or 45 days (if the tenants must form an association) within which to send the owner (and the District of Columbia) a statement of interest.

3) The Tenant Association then has at least 120 days to negotiate a contract and up to 240 days to obtain financing. The Tenant Association also has a 15-day right of first refusal to match a third party contract.

4) Prior to closing, owners are required to provide proof of compliance with TOPA in order for the purchaser (and purchaser's lender) to obtain title insurance on the sale.

Tenants may exercise their rights directly, or assign their rights to another person or entity. The owner may not require as a pre-condition of contracting disclosure by the tenant (or the assignee) of income or credit worthiness.

Lastly, an owner may not ask a tenant to waive any right under TOPA "except in exchange for consideration which the tenant, in the tenant's sole discretion, finds acceptable."

The process associated with TOPA extends the time required to sell and close the sale of a property in the District of Columbia, making the overall exposure/marketing time difficult to predict. Multifamily properties in the greater region, similar to the subject, located in the Maryland or Virginia suburbs, as well as vacant multifamily properties in the District of Columbia, generally sell in 1 to 3 months in current market conditions. Given TOPA regulations, the subject exposure and marketing time, on a stabilized basis, is estimated to be up to 12 months.

# Assumptions and Limiting Conditions

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"Cushman & Wakefield" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of Cushman & Wakefield who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.
- The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor Cushman & Wakefield shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of Cushman & Wakefield any inaccuracies or errors that it believes are contained in the Report.
- The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions in the Report.
- The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of Cushman & Wakefield is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without Cushman & Wakefield's prior written consent .Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by Cushman & Wakefield in writing to use or rely thereon, hereby agrees to indemnify and hold Cushman & Wakefield, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).
- Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.
- The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.
- The physical condition of the improvements considered by the Report is based on visual inspection by the Appraiser or other person identified in the Report. Cushman & Wakefield assumes no responsibility for the soundness of structural components or for the condition of mechanical equipment, plumbing or electrical components.
- The forecasted potential gross income referred to in the Report may be based on lease summaries provided by the owner or third parties. The Report assumes no responsibility for the authenticity or completeness of lease information provided by others. Cushman & Wakefield recommends that legal advice be obtained regarding the interpretation of lease provisions and the contractual rights of parties.

- The forecasts of income and expenses are not predictions of the future. Rather, they are the Appraiser's best opinions of current market thinking on future income and expenses. The Appraiser and Cushman & Wakefield make no warranty or representation that these forecasts will materialize. The real estate market is constantly fluctuating and changing. It is not the Appraiser's task to predict or in any way warrant the conditions of a future real estate market; the Appraiser can only reflect what the investment community, as of the date of the Report, envisages for the future in terms of rental rates, expenses, and supply and demand.
- Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. Cushman & Wakefield recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value
- Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. Cushman & Wakefield recommends that an expert in this field be employed to determine the compliance of the Property with the requirements of the ADA and the impact of these matters on the opinion of value.
- If the Report is submitted to a lender or investor with the prior approval of Cushman & Wakefield, such party should consider this Report as only one factor, together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.
- If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and Cushman & Wakefield, its employees and the Appraiser have no liability to such recipients. Cushman & Wakefield disclaims any and all liability to any party other than the party that retained Cushman & Wakefield to prepare the Report.
- Any estimate of insurable replacement cost/insurable value, if included within the agreed upon scope of work and presented within this report, is based upon figures derived from a national cost estimating service and is developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage for replacing any structure. This analysis should not be relied upon to determine insurance coverage. Furthermore, we make no warranties regarding the accuracy of this estimate.
- Unless otherwise noted, we were not given a soil report to review. However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate.
- Unless otherwise noted, we were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist.
- Unless otherwise noted, we were not given a wetlands survey to review. If subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a professional engineer with expertise in this field.
- Unless otherwise noted, we observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.
- Unless otherwise noted, we did not inspect the roof nor did we make a detailed inspection of the mechanical systems. The appraisers are not qualified to render an opinion regarding the adequacy or condition of these components. The client is urged to retain an expert in this field if detailed information is needed.
- By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

## Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- Chase Pike, MAI, CCIM did make a personal inspection of the property that is the subject of this report.
- We have performed services, as appraisers, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- Matthew J. Foreman provided significant real property appraisal assistance to the person signing this report. This includes research regarding the property real estate assessments and taxes, zoning, demographic analysis, rent comparables, expense comparables and improved sales, as well as data entry and graphics.
- As of the date of this report, Chase Pike, MAI, CCIM has completed the continuing education program for Designated Members of the Appraisal Institute.



Chase Pike, MAI, CCIM
Executive Director
District of Columbia Certified General Appraiser
License No. GA12298
Chase.Pike@cushwake.com
202-407-8191 Office Direct

# Addenda Contents

Addendum A: Glossary of Terms & Definitions
Addendum B: Client Satisfaction Survey
Addendum C: Engagement Letter
Addendum D: Comparable Land Sale Data Sheets
Addendum E: Rent Comparable Data Sheets
Addendum F: Comparable Improved Sale Data Sheets
Addendum G: Supplied Information
Addendum H: Qualifications of the Appraiser

# Addendum A:
# Glossary of Terms & Definitions

The following definitions of pertinent terms are taken from *The Dictionary of Real Estate Appraisal*, Sixth Edition (2015), published by the Appraisal Institute, Chicago, IL, as well as other sources.

## As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Proposed Interagency Appraisal and Evaluation Guidelines, OCC-4810-33-P 20%)

## Band of Investment

A technique in which the capitalization rates attributable to components of a capital investment are weighted and combined to derive a weighted-average rate attributable to the total investment.

## Cash Equivalency

An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash.

## Depreciation

1. In appraising, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. 2. In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method.

## Disposition Value

The most probable price that a specified interest in real property is likely to bring under all of the following conditions:

- Consummation of a sale will occur within a limited future marketing period specified by the client.
- The actual market conditions currently prevailing are those to which the appraised property interest is subject.
- The buyer and seller is each acting prudently and knowledgeably.
- The seller is under compulsion to sell.
- The buyer is typically motivated.
- Both parties are acting in what they consider their best interest.
- An adequate marketing effort will be made in the limited time allowed for the completion of a sale.
- Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.
- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Note that this definition differs from the definition of market value. The most notable difference relates to the motivation of the seller. In the case of Disposition value, the seller would be acting under compulsion within a limited future marketing period.

## Ellwood Formula

A yield capitalization method that provides a formulaic solution for developing a capitalization rate for various combinations of equity yields and mortgage terms. The formula is applicable only to properties with stable or stabilized income streams and properties with income streams expected to change according to the J- or K-factor pattern. The formula is
RO = [YE – M (YE + P 1/Sn¬ – RM) – ΔO 1/S n¬] / [1 + ΔI J]
where
RO = Overall Capitalization Rate
YE = Equity Yield Rate
M = Loan-to-Value Ratio
P = Percentage of Loan Paid Off
1/S n¬ = Sinking Fund Factor at the Equity Yield Rate
RM =Mortgage Capitalization Rate
ΔO = Change in Total Property Value
ΔI = Total Ratio Change in Income

J = J Factor
Also called mortgage-equity formula.

## Exposure Time

1. The time a property remains on the market. 2. The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. See also marketing time.

## Extraordinary Assumption

An assignment-specific assumption, as of the effective date regarding uncertain information used in an analysis, which, if found to be false, could alter the appraiser's opinions or conclusions.

Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis.

## Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

## Highest and Best Use

The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

## Highest and Best Use of Property as Improved

The use that should be made of a property as it exists. An existing improvement should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.

## Hypothetical Conditions

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

## Insurable Replacement Cost/Insurable Value

A type of value for insurance purposes.

## Intended Use

The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment.

## Intended User

The client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment.

## Leased Fee Interest

A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease).

## Leasehold Interest

The tenant's possessory interest created by a lease. See also negative leasehold; positive leasehold.

## Liquidation Value

The most probable price that a specified interest in real property is likely to bring under all of the following conditions:

- Consummation of a sale will occur within a severely limited future marketing period specified by the client.
- The actual market conditions currently prevailing are those to which the appraised property interest is subject.
- The buyer is acting prudently and knowledgeably.
- The seller is under extreme compulsion to sell.
- The buyer is typically motivated.
- The buyer is acting in what he or she considers his or her best interest.
- A limited marketing effort and time will be allowed for the completion of a sale.
- Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.
- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Note that this definition differs from the definition of market value. The most notable difference relates to the motivation of the seller. Under market value, the seller would be acting in his or her own best interests. The seller would be acting prudently and knowledgeably, assuming the price is not affected by undue stimulus or atypical motivation. In the case of liquidation value, the seller would be acting under extreme compulsion within a severely limited future marketing period.

## Market Rent

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

## Market Value

As defined in the Agencies' appraisal regulations, the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.

Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

## Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.) See also exposure time.

## Mortgage-Equity Analysis

Capitalization and investment analysis procedures that recognize how mortgage terms and equity requirements affect the value of income-producing property.

## Operating Expenses

**Other Taxes, Fees & Permits** - Personal property taxes, sales taxes, utility taxes, fees and permit expenses.

**Property Insurance** – Coverage for loss or damage to the property caused by the perils of fire, lightning, extended coverage perils, vandalism and malicious mischief, and additional perils.

**Management Fees** - The sum paid for management services. Management services may be contracted for or provided by the property owner. Management expenses may include supervision, on-site offices or apartments for resident managers, telephone service, clerical help, legal or accounting services, printing and postage, and advertising. Management fees may occasionally be included among recoverable operating expenses

**Total Administrative Fees** – Depending on the nature of the real estate, these usually include professional fees and other general administrative expenses, such as rent of offices and the services needed to operate the property. Administrative expenses can be provided either in the following expense subcategories or in a bulk total. 1) Professional Fees – Fees paid for any professional services contracted for or incurred in property operation; or 2) Other Administrative – Any other general administrative expenses incurred in property operation.

---

[1] "Interagency Appraisal and Evaluation Guidelines." Federal Register 75:237 (December 10, 2010) p. 77472.

**Heating Fuel -** The cost of heating fuel purchased from outside producers. The cost of heat is generally a tenant expense in single-tenant, industrial or retail properties, and apartment projects with individual heating units. It is a major expense item shown in operating statements for office buildings and many apartment properties. The fuel consumed may be coal, oil, or public steam. Heating supplies, maintenance, and workers' wages are included in this expense category under certain accounting methods.

**Electricity -** The cost of electricity purchased from outside producers. Although the cost of electricity for leased space is frequently a tenant expense, and therefore not included in the operating expense statement, the owner may be responsible for lighting public areas and for the power needed to run elevators and other building equipment.

**Gas** - The cost of gas purchased from outside producers. When used for heating and air conditioning, gas can be a major expense item that is either paid by the tenant or reflected in the rent.

**Water & Sewer -** The cost of water consumed, including water specially treated for the circulating ice water system, or purchased for drinking purposes. The cost of water is a major consideration for industrial plants that use processes depending on water and for multifamily projects, in which the cost of sewer service usually ties to the amount of water used. It is also an important consideration for laundries, restaurants, taverns, hotels, and similar operations.

**Other Utilities** - The cost of other utilities purchased from outside producers.

**Total Utilities** - The cost of utilities net of energy sales to stores and others. Utilities are services rendered by public and private utility companies (e.g., electricity, gas, heating fuel, water/sewer and other utilities providers). Utility expenses can be provided either in expense subcategories or in a bulk total.

**Repairs & Maintenance -** All expenses incurred for the general repairs and maintenance of the building, including common areas and general upkeep. Repairs and maintenance expenses include elevator, HVAC, electrical and plumbing, structural/roof, and other repairs and maintenance expense items. Repairs and Maintenance expenses can be provided either in the following expense subcategories or in a bulk total. 1) Elevator - The expense of the contract and any additional expenses for elevator repairs and maintenance. This expense item may also include escalator repairs and maintenance. 2) HVAC – The expense of the contract and any additional expenses for heating, ventilation and air-conditioning systems. 3) Electrical & Plumbing - The expense of all repairs and maintenance associated with the property's electrical and plumbing systems. 4) Structural/Roof - The expense of all repairs and maintenance associated with the property's building structure and roof. 5) Pest Control – The expense of insect and rodent control. 6). Other Repairs & Maintenance - The cost of any other repairs and maintenance items not specifically included in other expense categories.

**Common Area Maintenance -** The common area is the total area within a property that is not designed for sale or rental, but is available for common use by all owners, tenants, or their invitees, e.g., parking and its appurtenances, malls, sidewalks, landscaped areas, recreation areas, public toilets, truck and service facilities. Common Area Maintenance (CAM) expenses can be entered in bulk or through the sub-categories. 1) Utilities – Cost of utilities that are included in CAM charges and passed through to tenants. 2) Repair & Maintenance – Cost of repair and maintenance items that are included in CAM charges and passed through to tenants. 3) Parking Lot Maintenance – Cost of parking lot maintenance items that are included in CAM charges and passed through to tenants. 4) Snow Removal – Cost of snow removal that are included in CAM charges and passed through to tenants. 5) Grounds Maintenance – Cost of ground maintenance items that are included in CAM charges and passed through to tenants. 6) Other CAM expenses are items that are included in CAM charges and passed through to tenants.

**Painting & Decorating -** This expense category is relevant to residential properties where the landlord is required to prepare a dwelling unit for occupancy in between tenancies.

**Cleaning & Janitorial** - The expenses for building cleaning and janitorial services, for both daytime and night-time cleaning and janitorial service for tenant spaces, public areas, atriums, elevators, restrooms, windows, etc. Cleaning and Janitorial expenses can be provided either in the following subcategories or entered in a bulk total. 1) Contract Services - The expense of cleaning and janitorial services contracted for with outside service providers. 2) Supplies, Materials & Misc. - The cost any cleaning materials and any other janitorial supplies required for property cleaning and janitorial services and not covered elsewhere. 3) Trash Removal - The expense of property trash and rubbish removal and related services. Sometimes this expense item includes the cost of pest control and/or snow removal .4) Other Cleaning/Janitorial - Any other cleaning and janitorial related expenses not included in other specific expense categories.

**Advertising & Promotion -** Expenses related to advertising, promotion, sales, and publicity and all related printing, stationary, artwork, magazine space, broadcasting, and postage related to marketing.

**Professional Fees** - All professional fees associated with property leasing activities including legal, accounting, data processing, and auditing costs to the extent necessary to satisfy tenant lease requirements and permanent lender requirements.

**Total Payroll** - The payroll expenses for all employees involved in the ongoing operation of the property, but whose salaries and wages are not included in other expense categories. Payroll expenses can be provided either in the following subcategories or entered in a bulk total. 1) Administrative Payroll - The payroll expenses for all employees involved in on-going property administration. 2) Repair & Maintenance Payroll - The expense of all employees involved in on-going repairs and maintenance of the property. 3) Cleaning Payroll - The expense of all employees involved in providing on-going cleaning and janitorial services to the property 4) Other Payroll - The expense of any other employees involved in providing services to the property not covered in other specific categories.

**Security -** Expenses related to the security of the Lessees and the Property. This expense item includes payroll, contract services and other security expenses not covered in other expense categories. This item also includes the expense of maintenance of security systems such as alarms and closed circuit television (CCTV), and ordinary supplies necessary to operate a security program, including batteries, control forms, access cards, and security uniforms.

**Roads & Grounds -** The cost of maintaining the grounds and parking areas of the property. This expense can vary widely depending on the type of property and its total area. Landscaping improvements can range from none to extensive beds, gardens and trees. In addition, hard-surfaced public parking areas with drains, lights, and marked car spaces are subject to intensive wear and can be costly to maintain.

**Other Operating Expenses** - Any other expenses incurred in the operation of the property not specifically covered elsewhere.

**Real Estate Taxes -** The tax levied on real estate (i.e., on the land, appurtenances, improvements, structures and buildings); typically by the state, county and/or municipality in which the property is located.

## Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

## Prospective Value upon Reaching Stabilized Occupancy

The value of a property as of a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long-term occupancy. At such point, all capital outlays for tenant improvements, leasing commissions, marketing costs and other carrying charges are assumed to have been incurred.

## Special, Unusual, or Extraordinary Assumptions

Before completing the acquisition of a property, a prudent purchaser in the market typically exercises due diligence by making customary enquiries about the property. It is normal for a Valuer to make assumptions as to the most likely outcome of this due diligence process and to rely on actual information regarding such matters as provided by the client. Special, unusual, or extraordinary assumptions may be any additional assumptions relating to matters covered in the due diligence process, or may relate to other issues, such as the identity of the purchaser, the physical state of the property, the presence of environmental pollutants (e.g., ground water contamination), or the ability to redevelop the property.

# Addendum B:
# Client Satisfaction Survey

Survey Link: https://www.surveymonkey.com/r/LQKCGLF?c=22-26001-901237-001
Cushman & Wakefield File ID: 22-26001-901237-001
Fax Option: (716) 852-0890

1. Based on the scope and complexity of the assignment, please rate the development of the appraisal relative to the adequacy and relevance of the data, the appropriateness of the techniques used, and the reasonableness of the analyses, opinions, and conclusions:

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:______________________________________________________________

________________________________________________________________________

________________________________________________________________________

2. Please rate the appraisal report on clarity, attention to detail, and the extent to which it was presentable to your internal/external users without revisions:

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:______________________________________________________________

________________________________________________________________________

________________________________________________________________________

3. The appraiser communicated effectively by listening to your concerns, showed a sense of urgency in responding, and provided convincing support of his/her conclusions:

___ Not Applicable

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:____________________________________________

____________________________________________

____________________________________________

4. The report was on time as agreed, or was received within an acceptable time frame if unforeseen factors occurred after the engagement:

___ Yes
___ No

Comments:____________________________________________

____________________________________________

____________________________________________

5. Please rate your overall satisfaction relative to cost, timing, and quality:

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:____________________________________________

____________________________________________

____________________________________________

6. Any additional comments or suggestions you feel our National Quality Control Committee should know?

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

7. Would you like a representative of our National Quality Control Committee to contact you?

___ Yes
___ No

Name & Phone (if contact is desired):

______________________________________________________________________

______________________________________________________________________

# Addendum C:
# Engagement Letter

MainStreetBank

10089 Fairfax Blvd.
Fairfax, Virginia 22030

Tuesday, October 25, 2022

Cushman & Wakefield, INC
2101 L Street NW
Ste 700 District of Columbia, DC 20007

Dear Tom:

This letter is to confirm your assignment to prepare an appraisal of the property described below, conforming to the specifications below and in accordance with the definitions of value and appraisal standards stated herein.

| | |
|---|---|
| Property Address: | 423 Kennedy St, Washington, DC 20011 |
| Contact Person: | Joey Musmar |
| Phone Number: | 703.437.8877 ext.117 |
| Contact Email: | joeym@millermusmar.cpa |
| Purpose of Appraisal: | To Establish Market Value |
| Legal Description: | |
| Appraisal Type: | Full |
| Additional Comments: | The property is under construction with a mixed used. 33 units plus 1 commercial space. |
| Valuation Method: | As-Is;As Completed;As Stabilized |
| Type of report format: | -☐ **Self-Contained** or ☒ **Summary** or ☐ **Restricted** |
| Date expected: | 11/15/2022 |
| Price: | |

All appraisals should include the following:

- Conform to the generally accepted appraisal standards as evidence by the Uniform Standards of Professional Appraisal Practice (USPAP) promulgated by the Appraisal Standards Board (ASB) of the Appraisal Foundation.
- Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction.
- Analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units.
- Include a disclosure or a rationale for the omission of a particular valuation approach.
- Include analysis and reconciliation of the information from the valuation approaches used to arrive at the estimated market value.

- Include a discussion of market conditions, including relevant information on property value trends, demand and supply factors, and exposure time.
- Analysis of the property's sale history and an opinion as to the highest and best use of the property.
- Disclosure whether or not the property was inspected and whether anyone provided significant assistance to the appraiser who signed the appraisal report
- Be based upon the definition of **Market Value**: the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of this title from seller to buyer under conditions whereby:

   1. Buyer and seller are typically motivated;
   2. Both parties are well informed or well advised and acting in what they consider their own best interest;
   3. A reasonable time is allowed for exposure in the open market;
   4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto, and
   5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concession granted by anyone associated with the sale.

- A State Certified Appraiser is required for the following:

   A) All transactions of $1 million or more;
   B) Nonresidential and residential transactions (except 1-to-4 family properties) in the amount of $250,000 or more;
   C) "Complex" 1-to-4 family residential transactions in the amount $250,000 or more. An appraisal is considered "complex" if the appraised property, the form of ownership, or market conditions are atypical. Factors may include age of improvements, size of improvements, architectural style, size of lot, potential environmental hazard liability, and leasehold interests.

   A State Licensed appraiser is required for all 1-to-4 family residential, non-complex transactions between $250,000 and $999,999.99.

You may provide us with an electronic copy at appraisals@mstreetbank.com. If an electronic version is not available, please provide two copies. Your certification must include the following language: "The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan. This appraiser has no interest, direct or indirect, in the property or the transaction". You must also indicate whether the property appraised is considered to be a special purpose asset.

The appraisal report should be addressed to MainStreet Bank, 10089 Fairfax Blvd. Fairfax, VA 22030.. The bank reserves the right at its option or in accordance with state and federal law to provide a copy of or to disclose information contained in the appraisal to the borrower or other persons.

If you agree with the foregoing, please sign and return the enclosed copy of this letter. If you have any questions, please contact me at (703) 481-4549 or sdangelo@mstreetbank.com. .

Sincerely,

*Sandra J. D'Angelo*

Sandra J. D'Angelo
Assistant Vice President
Portfolio and Appraisal Manager

Accepted and acknowledged this 25th day of October, 2022.

By: ____________________

# Addendum D:
# Comparable Land Sale Data Sheets

# LAND SALE COMPARABLE 1



| | |
|---|---|
| Property Name: | Proposed The Ladybird Apartments |
| Address: | 4330 48th Street NW |
| City, State, Zip: | Washington DC 20016-2402 |
| Jurisdiction: | District of Columbia County |
| MSA: | Washington |
| Submarket: | |
| Property Type: | Land |
| Property Subtype: | Residential (Multi-Family) For Rent |
| Classification: | N/A |
| ID: | 682790 |
| Tax Number(s): | 1499-0807 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 1.8272 | Public Utilities: | All Available |
| Site Area (Sq.Ft.): | 79,593 | Electricity: | Yes |
| Zoning: | MU-4 | Water: | Yes |
| Utility: | N/A | Sewer: | Yes |
| Access: | N/A | Gas: | N/A |
| Frontage: | N/A | Proposed Use: | Residential-Multi-Family |
| Visibility: | N/A | Maximum FAR: | 3.40 |
| Shape: | Irregular | Potential Building Area: | 270,616 |
| Topography: | Level | Potential Units: | 200 |
| Entitlements: | No | | |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Closed Sale | OAR: | N/A |
| Sale Date: | 12/2021 | NOI: | N/A |
| Sale Price: | $24,150,000 | Price per Sq.Ft.: | $303.42 |
| Value Interest: | Fee Simple | Price per Acre: | $13,216,944 |
| Grantor: | Apex Real Estate Company | Price per Potential Building Area: | $89.24 |
| Grantee: | Ladybird Apartments LLC | Price per Potential Units: | $120,750 |
| Financing: | 2021167637 | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group

## COMMENTS

This comparable represents the sale of a 40,589-square foot site located at 4330 48th Street NW in Washington, D.C. The site is zoned MU-4. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse). Valor Development has approval to deliver approximately 200 apartment units across two buildings, with 12 percent of units set aside as affordable. Plans include approximately 270,000 square feet of apartments and 13,000 square-foot grocer.

# LAND SALE COMPARABLE 2



| | |
|---|---|
| Property Name: | 300 Carroll Street Northwest |
| Address: | 300 Carroll Street Northwest |
| City, State, Zip: | Washington DC 20012 |
| Jurisdiction: | District of Columbia County |
| MSA: | Washington |
| Submarket: | |
| Property Type: | Land |
| Property Subtype: | Residential (Multi-Family) For Rent |
| Classification: | N/A |
| ID: | 635753 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.2296 | Public Utilities: | All Available |
| Site Area (Sq.Ft.): | 10,000 | Electricity: | Yes |
| Zoning: | MU-4 | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Unknown |
| Frontage: | Good | Proposed Use: | Residential-Multi-Family |
| Visibility: | Good | Maximum FAR: | 3.40 |
| Shape: | Rectangular | Potential Building Area: | 34,000 |
| Topography: | Gently Sloping | Potential Units: | N/A |
| Entitlements: | No | | |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Closed Sale | OAR: | N/A |
| Sale Date: | 3/2021 | NOI: | N/A |
| Sale Price: | $3,750,000 | Price per Sq.Ft.: | $375.00 |
| Value Interest: | N/A | Price per Acre: | $16,332,753 |
| Grantor: | Judith H & James F Brockett | Price per Potential Building Area: | $110.29 |
| Grantee: | 325 Vine Street LLC | Price per Potential Units: | N/A |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group, Broker

## COMMENTS

This comparable represents the sale of a 5,575-square foot site located at 300 Carroll Street NW in Washington, D.C. At the time of sale the property was improved with hospitality property that contributed no value to the site. The site is zoned MU-4 and there were no entitlements at the time of sale. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse). This was part of an assemblage. The buyer, an affiliate of SGA Companies, subsequently purchased the adjacent property in April 2021 for $4.25 million.

# LAND SALE COMPARABLE 3



| | |
|---|---|
| Property Name: | 4907 Georgia Avenue Northwest |
| Address: | 4907 Georgia Avenue Northwest |
| City, State, Zip: | Washington DC 20011 |
| Jurisdiction: | District of Columbia County |
| MSA: | Washington |
| Submarket: | |
| Property Type: | Land |
| Property Subtype: | Residential (Multi-Family) For Rent |
| Classification: | N/A |
| ID: | 635749 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.1190 | Public Utilities: | All Available |
| Site Area (Sq.Ft.): | 5,183 | Electricity: | Yes |
| Zoning: | MU-4 | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Unknown |
| Frontage: | Good | Proposed Use: | Residential-Multi-Family |
| Visibility: | Good | Maximum FAR: | 3.40 |
| Shape: | Rectangular | Potential Building Area: | 17,622 |
| Topography: | Level | Potential Units: | 20 |
| Entitlements: | No | | |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | N/A |
| Deed Reference: | 2021017825 | NOI: | N/A |
| Sale Date: | 1/2021 | Price per Sq.Ft.: | $385.88 |
| Sale Price: | $2,000,000 | Price per Acre: | $16,806,723 |
| Value Interest: | Fee Simple | Price per Potential Building Area: | $113.49 |
| Grantor: | 4907 Georgia Ave Nw LLC LLC | Price per Potential Units: | $100,000 |
| Grantee: | 4907 Georgia Ave NW Condo NW LLC | | |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group

## COMMENTS

This comparable represents the sale of a 5,183-square foot site located at 4907 Georgia Avenue Northwest in Washington, D.C. The site is zoned MU-4 and there were no entitlements at the time of sale. The proposed building square footage is based on the maximum allowed under the current zoning (with IZ and penthouse).

# Addendum E:
# Rent Comparable Data Sheets

# Property Summary Report

## 5210 3rd St NE - Aventine Fort Totten

Washington, DC 20011 - Fort Totten Submarket



### BUILDING

| | |
|---|---|
| Type | 4 Star Mid-Rise Apartments |
| Year Built | Aug 2008 |
| Units | 308 |
| GBA | 288,516 SF |
| Stories | 4 |
| Metering | Individually Metered |
| Construction | Wood Frame |
| Rent Type | Market |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 2.40 AC |
| Zoning | MU-28, MU-29 |
| Parcels | 3766-0803, 3767-0006, 3768-0003 |

### EXPENSES

| | |
|---|---|
| Taxes | $2,389.43/Unit (2021) |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Dishwasher
- Microwave
- Walk-In Closets
- Washer/Dryer
- Window Coverings

Site Amenities

- Business Center
- Clubhouse
- Elevator
- Fitness Center
- Laundry Facilities
- Maintenance on site
- On-Site Retail
- Package Service
- Pool
- Property Manager on Site
- Storage Space
- Sundeck

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All Studios | 620 | 9 | 2.9% | 0 | 0.0% | $1,484 | $2.39 | $1,478 | $2.38 | 0.4% |
| All 1 Beds | 1,018 | 165 | 53.6% | 9 | 5.5% | $2,593 | $2.55 | $2,583 | $2.54 | 0.4% |
| All 2 Beds | 986 | 134 | 43.5% | 10 | 7.5% | $2,078 | $2.11 | $2,070 | $2.10 | 0.4% |
| **Totals** | **992** | **308** | **100.0%** | **19** | **6.2%** | **$2,337** | **$2.35** | **$2,327** | **$2.34** | **0.4%** |


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 5210 3rd St NE - Aventine Fort Totten

Washington, DC 20011 - Fort Totten Submarket

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 562 | 1 | 0.3% | 0 | 0.0% | $1,488 | $2.65 | $1,482 | $2.64 | 0.4% |
| Studio | 1 | 585 | 6 | 1.9% | 0 | 0.0% | $1,411 | $2.41 | $1,406 | $2.40 | 0.4% |
| Studio | 1 | 735 | 1 | 0.3% | 0 | 0.0% | $1,620 | $2.20 | $1,614 | $2.20 | 0.4% |
| Studio | 1 | 771 | 1 | 0.3% | 0 | 0.0% | $1,778 | $2.31 | $1,771 | $2.30 | 0.4% |
| 1 | 1 | 576 | 1 | 0.3% | 0 | 0.0% | $1,468 | $2.55 | $1,462 | $2.54 | 0.4% |
| 1 | 1 | 624 | 10 | 3.2% | 1 | 10.0% | $1,784 | $2.86 | $1,777 | $2.85 | 0.4% |
| 1 | 1 | 628 | 2 | 0.6% | 0 | 0.0% | $1,538 | $2.45 | $1,532 | $2.44 | 0.4% |
| 1 | 1 | 630 | 8 | 2.6% | 0 | 0.0% | $1,649 | $2.62 | $1,642 | $2.61 | 0.4% |
| 1 | 1 | 634 | 20 | 6.5% | 3 | 15.0% | $1,719 | $2.71 | $1,712 | $2.70 | 0.4% |
| 1 | 1 | 693 | 3 | 1.0% | 0 | 0.0% | $2,050 | $2.96 | $2,042 | $2.95 | 0.4% |
| 1 | 1 | 709 | 2 | 0.6% | 1 | 50.0% | $1,719 | $2.42 | $1,712 | $2.41 | 0.4% |
| 1 | 1 | 752 | 24 | 7.8% | 0 | 0.0% | $1,853 | $2.46 | $1,846 | $2.45 | 0.4% |
| 1 | 1 | 755 | 20 | 6.5% | 3 | 15.0% | $1,990 | $2.64 | $1,982 | $2.63 | 0.4% |
| 1 | 1 | 782 | 10 | 3.2% | 0 | 0.0% | $2,045 | $2.62 | $2,037 | $2.61 | 0.4% |
| 1 | 1 | 785 | 5 | 1.6% | 0 | 0.0% | $1,999 | $2.55 | $1,991 | $2.54 | 0.4% |
| 1 | 1 | 787 | 20 | 6.5% | 0 | 0.0% | $2,200 | $2.80 | $2,191 | $2.78 | 0.4% |
| 1 | 1 | 854 | 1 | 0.3% | 0 | 0.0% | $2,125 | $2.49 | $2,116 | $2.48 | 0.4% |
| 1 | 1 | 869 | 4 | 1.3% | 0 | 0.0% | $2,154 | $2.48 | $2,145 | $2.47 | 0.4% |
| 1 | 1 | 877 | 9 | 2.9% | 1 | 11.1% | $2,183 | $2.49 | $2,174 | $2.48 | 0.4% |
| 1 | 1 | 908 | 1 | 0.3% | 0 | 0.0% | $1,686 | $1.86 | $1,679 | $1.85 | 0.4% |
| 1 | 1 | 972 | 1 | 0.3% | 0 | 0.0% | $2,109 | $2.17 | $2,101 | $2.16 | 0.4% |
| 1 | 1 | 2,665 | 24 | 7.8% | 0 | 0.0% | $6,475 | $2.43 | $6,449 | $2.42 | 0.4% |
| 2 | 1 | 932 | 11 | 3.6% | 0 | 0.0% | $2,004 | $2.15 | $1,996 | $2.14 | 0.4% |
| 2 | 1 | 987 | 2 | 0.6% | 0 | 0.0% | $1,776 | $1.80 | $1,769 | $1.79 | 0.4% |
| 2 | 2 | 946 | 6 | 1.9% | 1 | 16.7% | $2,064 | $2.18 | $2,056 | $2.17 | 0.4% |
| 2 | 2 | 953 | 3 | 1.0% | 1 | 33.3% | $2,120 | $2.22 | $2,111 | $2.22 | 0.4% |
| 2 | 2 | 963 | 4 | 1.3% | 0 | 0.0% | $2,129 | $2.21 | $2,120 | $2.20 | 0.4% |
| 2 | 2 | 966 | 6 | 1.9% | 1 | 16.7% | $2,110 | $2.18 | $2,102 | $2.18 | 0.4% |
| 2 | 2 | 969 | 26 | 8.4% | 1 | 3.9% | $2,064 | $2.13 | $2,056 | $2.12 | 0.4% |
| 2 | 2 | 976 | 2 | 0.6% | 2 | 100.0% | $1,894 | $1.94 | $1,886 | $1.93 | 0.4% |
| 2 | 2 | 981 | 4 | 1.3% | 0 | 0.0% | $2,272 | $2.32 | $2,263 | $2.31 | 0.4% |
| 2 | 2 | 984 | 2 | 0.6% | 0 | 0.0% | $2,338 | $2.38 | $2,329 | $2.37 | 0.4% |
| 2 | 2 | 987 | 20 | 6.5% | 0 | 0.0% | $2,031 | $2.06 | $2,023 | $2.05 | 0.4% |
| 2 | 2 | 990 | 18 | 5.8% | 0 | 0.0% | $2,037 | $2.06 | $2,029 | $2.05 | 0.4% |
| 2 | 2 | 1,001 | 4 | 1.3% | 0 | 0.0% | $2,402 | $2.40 | $2,393 | $2.39 | 0.4% |
| 2 | 2 | 1,005 | 4 | 1.3% | 1 | 25.0% | $2,125 | $2.11 | $2,117 | $2.11 | 0.4% |
| 2 | 2 | 1,007 | 2 | 0.6% | 0 | 0.0% | $2,288 | $2.27 | $2,279 | $2.26 | 0.4% |
| 2 | 2 | 1,008 | 6 | 1.9% | 1 | 16.7% | $1,943 | $1.93 | $1,935 | $1.92 | 0.4% |

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 5210 3rd St NE - Aventine Fort Totten

★★★★☆

Washington, DC 20011 - Fort Totten Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 2 | 2 | 1,024 | 3 | 1.0% | 0 | 0.0% | $2,097 | $2.05 | $2,088 | $2.04 | 0.4% |
| 2 | 2 | 1,034 | 3 | 1.0% | 0 | 0.0% | $2,057 | $1.99 | $2,049 | $1.98 | 0.4% |
| 2 | 2 | 1,101 | 2 | 0.6% | 1 | 50.0% | $2,079 | $1.89 | $2,071 | $1.88 | 0.4% |
| 2 | 2 | 1,109 | 6 | 1.9% | 1 | 16.7% | $2,247 | $2.03 | $2,238 | $2.02 | 0.4% |

### FEES

Admin Fee $200

Application Fee $50

### PET POLICY

Cats Allowed - $250 Deposit, $50/Mo, 2 Maximum, Maximum Weight 50 lb, One-Time Fee: $300

Dogs Allowed - $250 Deposit, $50/Mo, 2 Maximum, Maximum Weight 50 lb, One-Time Fee: $300

Others Allowed - $0 Deposit, $0/Mo, 2 Maximum, Maximum Weight 50 lb,

### SALE

| | |
|---|---|
| Sold Price | $81,060,000 ($263,182/Unit) |
| Date | May 2016 |
| Sale Type | Investment |
| Cap Rate | 5.60% |
| Financing | Down Payment of $29,659,770 (36.59%)<br>Unknown: Santander Bank |

### TRANSPORTATION

| | |
|---|---|
| Parking | 150 available (Surface);52 available (Covered);Ratio of 0.66/Unit |
| Transit/Subway | 2 min drive to Fort Totten Transit Stop (Green, Red, Yellow Lines) |
| Commuter Rail | 9 min drive to Silver Spring Commuter Rail (Brunswick Line) |
| Airport | 21 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Somewhat Walkable (66) |
| Transit Score® | Excellent Transit (74) |

### TENANTS

| | |
|---|---|
| Greystar - Aventine Fort Totten Station Apartments | 3,000 SF |
| Hanger | 1,200 SF |
| 7-Eleven | 2,700 SF |

# Property Summary Report

## 5210 3rd St NE - Aventine Fort Totten

Washington, DC 20011 - Fort Totten Submarket

### PROPERTY CONTACTS

| | |
|---|---|
| True Owner | Greystar Real Estate Partners<br>465 Meeting St<br>Charleston, SC 29403<br>(843) 579-9400 (p) |
| Recorded Owner | GSIC Totten Property Owner, LLC |
| Previous True Owner | Greystar Investment Group, LLC<br>465 Meeting St<br>Charleston, SC 29403<br>(843) 579-9400 (p) |
| Property Manager | Greystar - Aventine Fort Totten Station Apartments<br>5210 3rd St NE<br>Washington, DC 20011<br>(202) 269-1120 (p)<br>(202) 269-2174 (f) |
| True Owner | Ivanhoé Cambridge<br>1001 du Square-Victoria Rue<br>Montréal, QC H2Z 2B5<br>1 (514) 841-7600 (p)<br>1 (514) 841-7762 (f) |
| Previous True Owner | Rockwood Capital LLC<br>140 E 45th St<br>New York, NY 10017<br>(212) 402-8500 (p)<br>(914) 761-3100 (f) |
| Previous True Owner | Clark Enterprises, Inc.<br>7500 Old Georgetown Rd<br>Bethesda, MD 20814<br>(301) 657-7100 (p)<br>(301) 657-7263 (f) |

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 5661 3rd St NE - Fort Totten Square

Washington, DC 20011 - Lamond Riggs Submarket




### BUILDING

| | |
|---|---|
| Type | 5 Star Mid-Rise Apartments |
| Year Built | Jun 2015 |
| Units | 344 |
| GBA | 384,956 SF |
| Stories | 5 |
| Metering | Individually Metered |
| Construction | Wood Frame |
| Rent Type | Market |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 4.62 AC |
| Parcels | 3748-0000-0808 |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Dishwasher
- Kitchen
- Oven
- Range
- Tub/Shower
- Washer/Dryer
- Balcony
- Granite Countertops
- Microwave
- Patio
- Refrigerator
- Walk-In Closets
- Wheelchair Accessible (Rooms)

Site Amenities

- Bicycle Storage
- Community-Wide WiFi
- Controlled Access
- Elevator
- Fitness Center
- Green Community
- Grocery Service
- Pool
- Public Transportation
- Security System
- Storage Space
- Wi-Fi
- Clubhouse
- Concierge
- Courtyard
- Energy Star Labeled
- Gameroom
- Grill
- On-Site Retail
- Property Manager on Site
- Recycling
- Smoke Free
- Sundeck

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| **Totals** | **Avg SF** | **Units** | **Mix %** | **Units** | **Percent** | **Per Unit** | **Per SF** | **Per Unit** | **Per SF** | **%** |
| All Studios | 536 | 44 | 12.8% | 2 | 4.6% | $1,567 | $2.92 | $1,553 | $2.90 | 0.9% |
| All 1 Beds | 687 | 224 | 65.1% | 13 | 5.8% | $1,848 | $2.69 | $1,832 | $2.67 | 0.9% |
| All 2 Beds | 1,043 | 76 | 22.1% | 3 | 4.0% | $2,407 | $2.31 | $2,386 | $2.29 | 0.9% |
| **Totals** | **746** | **344** | **100.0%** | **18** | **5.2%** | **$1,936** | **$2.59** | **$1,919** | **$2.57** | **0.9%** |

# Property Summary Report

## 5661 3rd St NE - Fort Totten Square

Washington, DC 20011 - Lamond Riggs Submarket

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 414 | 1 | 0.3% | 1 | 100.0% | $1,540 | $3.72 | $1,526 | $3.69 | 0.9% |
| Studio | 1 | 437 | 5 | 1.5% | 0 | 0.0% | $1,370 | $3.14 | $1,358 | $3.11 | 0.9% |
| Studio | 1 | 439 | 1 | 0.3% | 0 | 0.0% | $1,395 | $3.18 | $1,383 | $3.15 | 0.9% |
| Studio | 1 | 444 | 2 | 0.6% | 0 | 0.0% | $1,510 | $3.40 | $1,497 | $3.37 | 0.9% |
| Studio | 1 | 472 | 1 | 0.3% | 0 | 0.0% | $1,585 | $3.36 | $1,571 | $3.33 | 0.9% |
| Studio | 1 | 506 | 1 | 0.3% | 0 | 0.0% | $1,490 | $2.94 | $1,477 | $2.92 | 0.9% |
| Studio | 1 | 533 | 2 | 0.6% | 0 | 0.0% | $1,380 | $2.59 | $1,368 | $2.57 | 0.9% |
| Studio | 1 | 542 | 7 | 2.0% | 0 | 0.0% | $1,470 | $2.71 | $1,457 | $2.69 | 0.9% |
| Studio | 1 | 548 | 5 | 1.5% | 0 | 0.0% | $1,690 | $3.08 | $1,675 | $3.06 | 0.9% |
| Studio | 1 | 560 | 8 | 2.3% | 1 | 12.5% | $1,730 | $3.09 | $1,715 | $3.06 | 0.9% |
| Studio | 1 | 572 | 1 | 0.3% | 0 | 0.0% | $1,345 | $2.35 | $1,333 | $2.33 | 0.9% |
| Studio | 1 | 584 | 4 | 1.2% | 0 | 0.0% | $1,652 | $2.83 | $1,637 | $2.80 | 0.9% |
| Studio | 1 | 586 | 3 | 0.9% | 0 | 0.0% | $1,635 | $2.79 | $1,621 | $2.77 | 0.9% |
| Studio | 1 | 643 | 3 | 0.9% | 0 | 0.0% | $1,620 | $2.52 | $1,606 | $2.50 | 0.9% |
| 1 | 1 | 503 | 1 | 0.3% | 0 | 0.0% | $1,805 | $3.59 | $1,789 | $3.56 | 0.9% |
| 1 | 1 | 526 | 2 | 0.6% | 1 | 50.0% | $1,725 | $3.28 | $1,710 | $3.25 | 0.9% |
| 1 | 1 | 563 | 4 | 1.2% | 0 | 0.0% | $1,826 | $3.24 | $1,810 | $3.21 | 0.9% |
| 1 | 1 | 565 | 3 | 0.9% | 0 | 0.0% | $1,865 | $3.30 | $1,849 | $3.27 | 0.9% |
| 1 | 1 | 598 | 2 | 0.6% | 0 | 0.0% | $1,590 | $2.66 | $1,576 | $2.64 | 0.9% |
| 1 | 1 | 622 | 1 | 0.3% | 0 | 0.0% | $1,931 | $3.10 | $1,914 | $3.08 | 0.9% |
| 1 | 1 | 630 | 7 | 2.0% | 0 | 0.0% | $1,615 | $2.56 | $1,601 | $2.54 | 0.9% |
| 1 | 1 | 635 | 4 | 1.2% | 0 | 0.0% | $1,840 | $2.90 | $1,824 | $2.87 | 0.9% |
| 1 | 1 | 640 | 24 | 7.0% | 1 | 4.2% | $1,855 | $2.90 | $1,839 | $2.87 | 0.9% |
| 1 | 1 | 650 | 3 | 0.9% | 0 | 0.0% | $1,793 | $2.76 | $1,778 | $2.73 | 0.9% |
| 1 | 1 | 659 | 2 | 0.6% | 0 | 0.0% | $2,089 | $3.17 | $2,071 | $3.14 | 0.9% |
| 1 | 1 | 665 | 4 | 1.2% | 0 | 0.0% | $1,790 | $2.69 | $1,774 | $2.67 | 0.9% |
| 1 | 1 | 671 | 89 | 25.9% | 5 | 5.6% | $1,720 | $2.56 | $1,705 | $2.54 | 0.9% |
| 1 | 1 | 684 | 1 | 0.3% | 0 | 0.0% | $1,775 | $2.60 | $1,759 | $2.57 | 0.9% |
| 1 | 1 | 697 | 1 | 0.3% | 1 | 100.0% | $1,865 | $2.68 | $1,848 | $2.65 | 0.9% |
| 1 | 1 | 709 | 24 | 7.0% | 0 | 0.0% | $1,970 | $2.78 | $1,953 | $2.75 | 0.9% |
| 1 | 1 | 716 | 3 | 0.9% | 0 | 0.0% | $1,786 | $2.49 | $1,771 | $2.47 | 0.9% |
| 1 | 1 | 717 | 2 | 0.6% | 0 | 0.0% | $1,965 | $2.74 | $1,948 | $2.72 | 0.9% |
| 1 | 1 | 723 | 1 | 0.3% | 0 | 0.0% | $2,065 | $2.86 | $2,047 | $2.83 | 0.9% |
| 1 | 1 | 725 | 1 | 0.3% | 0 | 0.0% | $1,875 | $2.59 | $1,858 | $2.56 | 0.9% |
| 1 | 1 | 727 | 11 | 3.2% | 0 | 0.0% | $2,100 | $2.89 | $2,082 | $2.86 | 0.9% |
| 1 | 1 | 738 | 4 | 1.2% | 0 | 0.0% | $1,880 | $2.55 | $1,864 | $2.53 | 0.9% |
| 1 | 1 | 739 | 2 | 0.6% | 0 | 0.0% | $2,294 | $3.10 | $2,274 | $3.08 | 0.9% |
| 1 | 1 | 749 | 3 | 0.9% | 1 | 33.3% | $2,035 | $2.72 | $2,017 | $2.69 | 0.9% |

# Property Summary Report

## 5661 3rd St NE - Fort Totten Square

Washington, DC 20011 - Lamond Riggs Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 1 | 1 | 763 | 3 | 0.9% | 0 | 0.0% | $1,995 | $2.61 | $1,977 | $2.59 | 0.9% |
| 1 | 1 | 769 | 5 | 1.5% | 1 | 20.0% | $1,985 | $2.58 | $1,968 | $2.56 | 0.9% |
| 1 | 1 | 795 | 4 | 1.2% | 0 | 0.0% | $2,180 | $2.74 | $2,161 | $2.72 | 0.9% |
| 1 | 1 | 801 | 1 | 0.3% | 0 | 0.0% | $2,161 | $2.70 | $2,142 | $2.67 | 0.9% |
| 1 | 1 | 816 | 3 | 0.9% | 0 | 0.0% | $2,125 | $2.60 | $2,106 | $2.58 | 0.9% |
| 1 | 1 | 830 | 2 | 0.6% | 0 | 0.0% | $2,270 | $2.73 | $2,250 | $2.71 | 0.9% |
| 1 | 1 | 846 | 4 | 1.2% | 2 | 50.0% | $2,050 | $2.42 | $2,032 | $2.40 | 0.9% |
| 1 | 1 | 904 | 1 | 0.3% | 0 | 0.0% | $2,045 | $2.26 | $2,027 | $2.24 | 0.9% |
| 1 | 1 | 933 | 1 | 0.3% | 1 | 100.0% | $2,120 | $2.27 | $2,101 | $2.25 | 0.9% |
| 1 | 2 | 991 | 1 | 0.3% | 0 | 0.0% | $2,224 | $2.24 | $2,204 | $2.22 | 0.9% |
| 2 | 2 | 878 | 1 | 0.3% | 0 | 0.0% | $2,315 | $2.64 | $2,294 | $2.61 | 0.9% |
| 2 | 2 | 923 | 1 | 0.3% | 0 | 0.0% | $2,464 | $2.67 | $2,442 | $2.65 | 0.9% |
| 2 | 2 | 938 | 1 | 0.3% | 1 | 100.0% | $2,405 | $2.56 | $2,384 | $2.54 | 0.9% |
| 2 | 2 | 943 | 3 | 0.9% | 0 | 0.0% | $2,315 | $2.45 | $2,295 | $2.43 | 0.9% |
| 2 | 2 | 984 | 2 | 0.6% | 0 | 0.0% | $2,315 | $2.35 | $2,295 | $2.33 | 0.9% |
| 2 | 2 | 1,026 | 1 | 0.3% | 0 | 0.0% | $2,580 | $2.51 | $2,558 | $2.49 | 0.9% |
| 2 | 2 | 1,027 | 29 | 8.4% | 0 | 0.0% | $2,385 | $2.32 | $2,364 | $2.30 | 0.9% |
| 2 | 2 | 1,037 | 3 | 0.9% | 1 | 33.3% | $2,330 | $2.25 | $2,310 | $2.23 | 0.9% |
| 2 | 2 | 1,038 | 8 | 2.3% | 0 | 0.0% | $2,430 | $2.34 | $2,409 | $2.32 | 0.9% |
| 2 | 2 | 1,050 | 3 | 0.9% | 0 | 0.0% | $2,437 | $2.32 | $2,416 | $2.30 | 0.9% |
| 2 | 2 | 1,052 | 1 | 0.3% | 0 | 0.0% | $2,452 | $2.33 | $2,431 | $2.31 | 0.9% |
| 2 | 2 | 1,056 | 3 | 0.9% | 0 | 0.0% | $2,490 | $2.36 | $2,468 | $2.34 | 0.9% |
| 2 | 2 | 1,060 | 7 | 2.0% | 0 | 0.0% | $2,303 | $2.17 | $2,283 | $2.15 | 0.9% |
| 2 | 2 | 1,072 | 3 | 0.9% | 0 | 0.0% | $2,410 | $2.25 | $2,389 | $2.23 | 0.9% |
| 2 | 2 | 1,114 | 4 | 1.2% | 0 | 0.0% | $2,500 | $2.24 | $2,478 | $2.22 | 0.9% |
| 2 | 2 | 1,147 | 3 | 0.9% | 1 | 33.3% | $2,470 | $2.15 | $2,448 | $2.13 | 0.9% |
| 2 | 2 | 1,197 | 3 | 0.9% | 0 | 0.0% | $2,665 | $2.23 | $2,642 | $2.21 | 0.9% |

### FOR LEASE

| | |
|---|---|
| Smallest Space | 1,750 SF |
| Max Contiguous | 3,870 SF |
| # of Spaces | 2 |
| Vacant | 5,620 SF |
| Rent | Withheld |

| | |
|---|---|
| Retail Avail | 5,620 SF |



©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 5661 3rd St NE - Fort Totten Square

Washington, DC 20011 - Lamond Riggs Submarket

★★★★★

### AVAILABLE SPACES

| Floor | Suite | Use | Type | SF Available | Flr Contig | Bldg Contig | Rent | Occupancy | Term |
|---|---|---|---|---|---|---|---|---|---|
| P 1st | | Retail | Sublet | 3,870 | 3,870 | 3,870 | Withheld | Vacant | Thru Jan 2027 |
| P 1st | | Retail | Direct | 1,750 | 1,750 | 1,750 | Withheld | Vacant | Negotiable |

### FEES

Amenity Fee $500

Application Fee $50

### PET POLICY

Cats Allowed - $0 Deposit, $0/Mo, 2 Maximum,

Dogs Allowed - $0 Deposit, $0/Mo, 2 Maximum,

### TRANSPORTATION

| | |
|---|---|
| Parking | 300 available (Covered);Ratio of 0.88/Unit |
| Transit/Subway | 3 min drive to Fort Totten Transit Stop (Green, Red, Yellow Lines) |
| Commuter Rail | 8 min drive to Silver Spring Commuter Rail (Brunswick Line) |
| Airport | 20 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Very Walkable (74) |
| Transit Score® | Excellent Transit (72) |

### TENANTS

| | | | |
|---|---|---|---|
| Walmart | 121,196 SF | A&D Nursing Institute | 3,302 SF |
| JBGS - Fort Totten Square | 3,302 SF | Subway | 2,848 SF |
| Culture Coffee | 1,750 SF | Mary's Beauty Salon | 1,100 SF |

### PROPERTY CONTACTS

True Owner
JBG SMITH Properties
4747 Bethesda Ave
Bethesda, MD 20814
(240) 333-3600 (p)
(240) 333-3610 (f)

Previous True Owner
The JBG Companies
4445 Willard Ave
Chevy Chase, MD 20815
(240) 333-3600 (p)
(240) 333-3610 (f)

Architect
Hickok Cole Architects
301 N St NE
Washington, DC 20002
(202) 667-9776 (p)
(202) 667-2260 (f)

Recorded Owner
Fort Totten North LLC
4445 Willard Ave
Chevy Chase, MD 20815

Developer
The JBG Companies
4445 Willard Ave
Chevy Chase, MD 20815
(240) 333-3600 (p)
(240) 333-3610 (f)

Property Manager
JBGS - Fort Totten Square
5661 3rd St NE
Washington, DC 20011
(202) 832-0705 (p)

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 400 Galloway St NE - The Modern at Art Place

Washington, DC 20011 - Fort Totten Submarket



### BUILDING

| | |
|---|---|
| Type | 5 Star Mid-Rise Apartments |
| Year Built | 2017 |
| Units | 520 |
| GBA | 416,000 SF |
| Stories | 6 |
| Metering | Individually Metered |
| Construction | Reinforced Concrete |
| Rent Type | Market/Affordable |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 4.97 AC |
| Zoning | RA-1 |
| Parcels | 3765-0005 |

### EXPENSES

| | |
|---|---|
| Taxes | $3,283.33/Unit (2021) |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Carpet
- Dishwasher
- Freezer
- Granite Countertops
- Hardwood Floors
- Heating
- Kitchen
- Microwave
- Oven
- Refrigerator
- Stainless Steel Appliances
- Tub/Shower
- Walk-In Closets
- Washer/Dryer
- Wheelchair Accessible (Rooms)
- Window Coverings

Site Amenities

- Bicycle Storage
- Business Center
- Clubhouse
- Concierge
- Courtyard
- Day Care
- Dry Cleaning Service
- Elevator
- Fitness Center
- Gameroom
- Grill
- Lounge
- On-Site Retail
- Online Services
- Pool
- Property Manager on Site
- Public Transportation
- Roof Terrace
- Smoke Free
- Zen Garden

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All Studios | 455 | 82 | 15.8% | 0 | 0.0% | $1,548 | $3.40 | $1,541 | $3.38 | 0.4% |
| All 1 Beds | 635 | 278 | 53.5% | 7 | 2.5% | $1,956 | $3.08 | $1,946 | $3.06 | 0.5% |

# Property Summary Report

## 400 Galloway St NE - The Modern at Art Place

Washington, DC 20011 - Fort Totten Submarket

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All 2 Beds | 973 | 160 | 30.8% | 7 | 4.4% | $2,553 | $2.62 | $2,540 | $2.61 | 0.5% |
| **Totals** | **711** | **520** | **100.0%** | **14** | **2.7%** | **$2,075** | **$2.92** | **$2,065** | **$2.91** | **0.5%** |

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 415 | 22 | 4.2% | 0 | 0.0% | $1,527 | $3.68 | $1,520 | $3.66 | 0.4% |
| Studio | 1 | 459 | 22 | 4.2% | 0 | 0.0% | $1,495 | $3.26 | $1,488 | $3.24 | 0.4% |
| Studio | 1 | 474 | 26 | 5.0% | 0 | 0.0% | $1,572 | $3.32 | $1,565 | $3.30 | 0.4% |
| Studio | 1 | 481 | 10 | 1.9% | 0 | 0.0% | $1,628 | $3.39 | $1,621 | $3.37 | 0.4% |
| Studio | 1 | 492 | 1 | 0.2% | 0 | 0.0% | $1,653 | $3.36 | $1,645 | $3.34 | 0.5% |
| Studio | 1 | 494 | 1 | 0.2% | 0 | 0.0% | $1,653 | $3.35 | $1,645 | $3.33 | 0.5% |
| 1 | 1 | 525 | 10 | 1.9% | 0 | 0.0% | $1,830 | $3.48 | $1,821 | $3.47 | 0.5% |
| 1 | 1 | 528 | 15 | 2.9% | 0 | 0.0% | $1,807 | $3.42 | $1,798 | $3.41 | 0.5% |
| 1 | 1 | 578 | 15 | 2.9% | 0 | 0.0% | $1,635 | $2.83 | $1,627 | $2.81 | 0.5% |
| 1 | 1 | 588 | 7 | 1.3% | 0 | 0.0% | $1,883 | $3.20 | $1,874 | $3.19 | 0.5% |
| 1 | 1 | 619 | 1 | 0.2% | 0 | 0.0% | $1,776 | $2.87 | $1,767 | $2.85 | 0.5% |
| 1 | 1 | 631 | 29 | 5.6% | 1 | 3.5% | $1,971 | $3.12 | $1,961 | $3.11 | 0.5% |
| 1 | 1 | 633 | 13 | 2.5% | 2 | 15.4% | $1,864 | $2.95 | $1,855 | $2.93 | 0.5% |
| 1 | 1 | 637 | 7 | 1.3% | 0 | 0.0% | $1,787 | $2.81 | $1,778 | $2.79 | 0.5% |
| 1 | 1 | 638 | 30 | 5.8% | 1 | 3.3% | $2,006 | $3.14 | $1,996 | $3.13 | 0.5% |
| 1 | 1 | 639 | 60 | 11.5% | 0 | 0.0% | $2,036 | $3.19 | $2,026 | $3.17 | 0.5% |
| 1 | 1 | 641 | 15 | 2.9% | 0 | 0.0% | $2,236 | $3.49 | $2,225 | $3.47 | 0.5% |
| 1 | 1 | 645 | 2 | 0.4% | 1 | 50.0% | $1,847 | $2.86 | $1,838 | $2.85 | 0.5% |
| 1 | 1 | 652 | 5 | 1.0% | 0 | 0.0% | $1,834 | $2.81 | $1,826 | $2.80 | 0.5% |
| 1 | 1 | 653 | 5 | 1.0% | 1 | 20.0% | $1,981 | $3.03 | $1,971 | $3.02 | 0.5% |
| 1 | 1 | 654 | 1 | 0.2% | 0 | 0.0% | $2,172 | $3.32 | $2,162 | $3.31 | 0.5% |
| 1 | 1 | 658 | 9 | 1.7% | 0 | 0.0% | $1,783 | $2.71 | $1,774 | $2.70 | 0.5% |
| 1 | 1 | 660 | 1 | 0.2% | 1 | 100.0% | $1,747 | $2.65 | $1,738 | $2.63 | 0.5% |
| 1 | 1 | 663 | 1 | 0.2% | 0 | 0.0% | $1,982 | $2.99 | $1,973 | $2.98 | 0.5% |
| 1 | 1 | 695 | 50 | 9.6% | 0 | 0.0% | $2,008 | $2.89 | $1,998 | $2.87 | 0.5% |
| 1 | 1 | 706 | 1 | 0.2% | 0 | 0.0% | $1,792 | $2.54 | $1,783 | $2.53 | 0.5% |
| 1 | 1 | 770 | 1 | 0.2% | 0 | 0.0% | $2,052 | $2.66 | $2,041 | $2.65 | 0.5% |
| 2 | 2 | 803 | 1 | 0.2% | 0 | 0.0% | $2,253 | $2.81 | $2,242 | $2.79 | 0.5% |
| 2 | 2 | 829 | 1 | 0.2% | 1 | 100.0% | $2,455 | $2.96 | $2,442 | $2.95 | 0.5% |
| 2 | 2 | 840 | 3 | 0.6% | 2 | 66.7% | $2,481 | $2.95 | $2,469 | $2.94 | 0.5% |
| 2 | 2 | 841 | 1 | 0.2% | 0 | 0.0% | $2,873 | $3.42 | $2,859 | $3.40 | 0.5% |
| 2 | 2 | 843 | 1 | 0.2% | 0 | 0.0% | $2,331 | $2.77 | $2,319 | $2.75 | 0.5% |

# Property Summary Report

## 400 Galloway St NE - The Modern at Art Place

Washington, DC 20011 - Fort Totten Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 2 | 2 | 845 | 10 | 1.9% | 0 | 0.0% | $2,255 | $2.67 | $2,244 | $2.66 | 0.5% |
| 2 | 2 | 868 | 1 | 0.2% | 0 | 0.0% | $2,414 | $2.78 | $2,402 | $2.77 | 0.5% |
| 2 | 2 | 870 | 3 | 0.6% | 0 | 0.0% | $2,526 | $2.90 | $2,514 | $2.89 | 0.5% |
| 2 | 2 | 876 | 1 | 0.2% | 0 | 0.0% | $2,473 | $2.82 | $2,460 | $2.81 | 0.5% |
| 2 | 2 | 902 | 1 | 0.2% | 0 | 0.0% | $2,375 | $2.63 | $2,363 | $2.62 | 0.5% |
| 2 | 2 | 913 | 1 | 0.2% | 0 | 0.0% | $2,285 | $2.50 | $2,274 | $2.49 | 0.5% |
| 2 | 2 | 918 | 1 | 0.2% | 1 | 100.0% | $2,678 | $2.92 | $2,664 | $2.90 | 0.5% |
| 2 | 2 | 933 | 1 | 0.2% | 1 | 100.0% | $2,604 | $2.79 | $2,591 | $2.78 | 0.5% |
| 2 | 2 | 935 | 1 | 0.2% | 0 | 0.0% | $2,517 | $2.69 | $2,504 | $2.68 | 0.5% |
| 2 | 2 | 936 | 1 | 0.2% | 0 | 0.0% | $2,763 | $2.95 | $2,749 | $2.94 | 0.5% |
| 2 | 2 | 945 | 1 | 0.2% | 0 | 0.0% | $2,470 | $2.61 | $2,458 | $2.60 | 0.5% |
| 2 | 2 | 947 | 3 | 0.6% | 0 | 0.0% | $2,650 | $2.80 | $2,637 | $2.78 | 0.5% |
| 2 | 2 | 957 | 1 | 0.2% | 0 | 0.0% | $2,679 | $2.80 | $2,666 | $2.79 | 0.5% |
| 2 | 2 | 958 | 22 | 4.2% | 0 | 0.0% | $2,624 | $2.74 | $2,611 | $2.73 | 0.5% |
| 2 | 2 | 963 | 2 | 0.4% | 0 | 0.0% | $2,432 | $2.53 | $2,420 | $2.51 | 0.5% |
| 2 | 2 | 964 | 1 | 0.2% | 0 | 0.0% | $2,616 | $2.71 | $2,604 | $2.70 | 0.5% |
| 2 | 2 | 965 | 1 | 0.2% | 0 | 0.0% | $2,891 | $3.00 | $2,876 | $2.98 | 0.5% |
| 2 | 2 | 985 | 20 | 3.8% | 0 | 0.0% | $2,453 | $2.49 | $2,441 | $2.48 | 0.5% |
| 2 | 2 | 987 | 20 | 3.8% | 0 | 0.0% | $2,623 | $2.66 | $2,611 | $2.64 | 0.5% |
| 2 | 2 | 995 | 1 | 0.2% | 0 | 0.0% | $2,751 | $2.76 | $2,737 | $2.75 | 0.5% |
| 2 | 2 | 999 | 1 | 0.2% | 0 | 0.0% | $2,428 | $2.43 | $2,416 | $2.42 | 0.5% |
| 2 | 2 | 1,015 | 20 | 3.8% | 1 | 5.0% | $2,679 | $2.64 | $2,666 | $2.63 | 0.5% |
| 2 | 2 | 1,017 | 4 | 0.8% | 0 | 0.0% | $2,610 | $2.57 | $2,597 | $2.55 | 0.5% |
| 2 | 2 | 1,018 | 29 | 5.6% | 0 | 0.0% | $2,515 | $2.47 | $2,503 | $2.46 | 0.5% |
| 2 | 2 | 1,026 | 1 | 0.2% | 0 | 0.0% | $2,380 | $2.32 | $2,368 | $2.31 | 0.5% |
| 2 | 2 | 1,044 | 1 | 0.2% | 0 | 0.0% | $2,558 | $2.45 | $2,545 | $2.44 | 0.5% |
| 2 | 2 | 1,058 | 1 | 0.2% | 0 | 0.0% | $2,985 | $2.82 | $2,971 | $2.81 | 0.5% |
| 2 | 2 | 1,062 | 1 | 0.2% | 0 | 0.0% | $2,769 | $2.61 | $2,756 | $2.60 | 0.5% |
| 2 | 2 | 1,127 | 1 | 0.2% | 0 | 0.0% | $2,492 | $2.21 | $2,480 | $2.20 | 0.5% |
| 2 | 2 | 1,189 | 1 | 0.2% | 1 | 100.0% | $2,854 | $2.40 | $2,840 | $2.39 | 0.5% |

### FOR LEASE

| | |
|---|---|
| Smallest Space | 1,456 SF |
| Max Contiguous | 2,075 SF |
| # of Spaces | 2 |
| Vacant | 3,531 SF |
| Rent | Withheld |

| | |
|---|---|
| Retail Avail | 3,531 SF |

# Property Summary Report

## 400 Galloway St NE - The Modern at Art Place

Washington, DC 20011 - Fort Totten Submarket

★★★★★

### AVAILABLE SPACES

| Floor | Suite | Use | Type | SF Available | Flr Contig | Bldg Contig | Rent | Occupancy | Term |
|---|---|---|---|---|---|---|---|---|---|
| P 2nd | A3-B | Retail | Direct | 2,075 | 2,075 | 2,075 | Withheld | Vacant | Negotiable |
| P 2nd | A2-C | Retail | Direct | 1,456 | 1,456 | 1,456 | Withheld | Vacant | Negotiable |

### FEES

Admin Fee $450

Application Fee $50

### PET POLICY

Birds Allowed - 2 Maximum,

Cats Allowed - $500 Deposit, $50/Mo, 2 Maximum,

Dogs Allowed - $500 Deposit, $50/Mo, 2 Maximum, One-Time Fee: $500

Fishes Allowed - 2 Maximum,

Reptiles Allowed - 2 Maximum,

Others Allowed - $500 Deposit, $50/Mo, 2 Maximum,

### TRANSPORTATION

| | |
|---|---|
| Parking | 300 available (Covered);Ratio of 0.58/Unit |
| Transit/Subway | 2 min drive to Fort Totten Transit Stop (Green, Red, Yellow Lines) |
| Commuter Rail | 9 min drive to Silver Spring Commuter Rail (Brunswick Line) |
| Airport | 21 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Somewhat Walkable (67) |
| Transit Score® | Excellent Transit (74) |

### TENANTS

| | | | |
|---|---|---|---|
| Bozzuto - The Modern at Art Place | 3,000 SF | DC Public Library | 2,075 SF |
| T-mobile | 1,200 SF | Mbi Health Service | 500 SF |
| Ramdass Pharmacy | 500 SF | Design Milieu LLC | - |

### PROPERTY CONTACTS

True Owner

THE MORRIS & GWENDOLYN CAFRITZ FOUNDATION

Morris-gwendolyn Cafritz Foundation
1825 K St NW
Washington, DC 20006
(202) 223-3100 (p)
(202) 862-6895 (f)

Developer

THE MORRIS & GWENDOLYN CAFRITZ FOUNDATION

Morris-gwendolyn Cafritz Foundation
1825 K St NW
Washington, DC 20006
(202) 223-3100 (p)
(202) 862-6895 (f)

Recorded Owner

THE MORRIS & GWENDOLYN CAFRITZ FOUNDATION

Art Place at Ft Totten WH-A LLC
1825 K St NW
Washington, DC 20006

Property Manager

Bozzuto - The Modern at Art Place
400 Galloway St NE
Washington, DC 20011
(202) 830-2294 (p)

### BUILDING NOTES

# Property Summary Report

## 400 Galloway St NE - The Modern at Art Place

Washington, DC 20011 - Fort Totten Submarket

The bed-bath mix, unit counts and sizes are estimated with management

In 2019, this building was awarded LEED certification by the U.S. Green Building Council.

# Property Summary Report

## 3828 Georgia Ave NW - The Swift at Petworth Metro

Washington, DC 20011 - Petworth Submarket




### BUILDING

| | |
|---|---|
| Type | 5 Star Mid-Rise Apartments Condo |
| Year Built | Jul 2014 |
| Units | 218 |
| GBA | 312,515 SF |
| Stories | 5 |
| Construction | Reinforced Concrete |
| Rent Type | Market/Affordable |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 1.19 AC |
| Parcels | 2905-0809 |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Balcony
- Carpet
- Deck
- Dining Room
- Dishwasher
- Disposal
- Double Pane Windows
- Eat-in Kitchen
- Freezer
- Hardwood Floors
- Heating
- Ice Maker
- Island Kitchen
- Kitchen
- Linen Closet
- Microwave
- Office
- Oven
- Pantry
- Patio
- Range
- Recreation Room
- Refrigerator
- Tub/Shower
- Views
- Walk-In Closets
- Window Coverings

Site Amenities

- Bicycle Storage
- Breakfast/Coffee Concierge
- Business Center
- Car Charging Station
- Clubhouse
- Concierge
- Controlled Access
- Courtyard
- Disposal Chutes
- Dry Cleaning Service
- Elevator
- Fitness Center
- Gameroom
- Grill
- Lounge
- Maintenance on site
- Multi Use Room
- On-Site ATM
- On-Site Retail
- Online Services
- Package Service
- Picnic Area
- Planned Social Activities
- Recycling
- Renters Insurance Program
- Smoke Free
- Sundeck

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All Studios | 574 | 26 | 11.9% | 4 | 15.4% | $1,847 | $3.22 | $1,829 | $3.19 | 1.0% |
| All 1 Beds | 702 | 147 | 67.4% | 9 | 6.1% | $2,119 | $3.02 | $2,097 | $2.99 | 1.0% |
| All 2 Beds | 1,050 | 45 | 20.6% | 3 | 6.7% | $2,813 | $2.68 | $2,785 | $2.65 | 1.0% |


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 3828 Georgia Ave NW - The Swift at Petworth Metro

Washington, DC 20011 - Petworth Submarket

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| **Totals** | **758** | **218** | **100.0%** | **16** | **7.3%** | **$2,230** | **$2.94** | **$2,207** | **$2.91** | **1.0%** |

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 558 | 16 | 7.3% | 3 | 18.8% | $1,865 | $3.34 | $1,846 | $3.31 | 1.0% |
| Studio | 1 | 559 | 1 | 0.5% | 0 | 0.0% | $1,800 | $3.22 | $1,782 | $3.19 | 1.0% |
| Studio | 1 | 596 | 5 | 2.3% | 1 | 20.0% | $1,931 | $3.24 | $1,912 | $3.21 | 1.0% |
| Studio | 1 | 611 | 4 | 1.8% | 0 | 0.0% | $1,685 | $2.76 | $1,668 | $2.73 | 1.0% |
| 1 | 1 | 604 | 6 | 2.8% | 1 | 16.7% | $2,000 | $3.31 | $1,980 | $3.28 | 1.0% |
| 1 | 1 | 646 | 36 | 16.5% | 2 | 5.6% | $2,030 | $3.14 | $2,010 | $3.11 | 1.0% |
| 1 | 1 | 672 | 5 | 2.3% | 1 | 20.0% | $2,210 | $3.29 | $2,188 | $3.26 | 1.0% |
| 1 | 1 | 695 | 21 | 9.6% | 1 | 4.8% | $2,131 | $3.07 | $2,109 | $3.04 | 1.0% |
| 1 | 1 | 699 | 5 | 2.3% | 0 | 0.0% | $2,116 | $3.03 | $2,094 | $3.00 | 1.0% |
| 1 | 1 | 702 | 23 | 10.6% | 0 | 0.0% | $2,016 | $2.87 | $1,996 | $2.84 | 1.0% |
| 1 | 1 | 703 | 2 | 0.9% | 1 | 50.0% | $2,180 | $3.10 | $2,158 | $3.07 | 1.0% |
| 1 | 1 | 712 | 25 | 11.5% | 3 | 12.0% | $2,125 | $2.98 | $2,104 | $2.95 | 1.0% |
| 1 | 1 | 733 | 5 | 2.3% | 0 | 0.0% | $2,162 | $2.95 | $2,141 | $2.92 | 1.0% |
| 1 | 1 | 735 | 1 | 0.5% | 0 | 0.0% | $2,175 | $2.96 | $2,153 | $2.93 | 1.0% |
| 1 | 1 | 770 | 4 | 1.8% | 0 | 0.0% | $2,365 | $3.07 | $2,341 | $3.04 | 1.0% |
| 1 | 1 | 774 | 4 | 1.8% | 0 | 0.0% | $2,254 | $2.91 | $2,231 | $2.88 | 1.0% |
| 1 | 1 | 883 | 5 | 2.3% | 0 | 0.0% | $2,582 | $2.92 | $2,556 | $2.89 | 1.0% |
| 1 | 1 | 893 | 5 | 2.3% | 0 | 0.0% | $2,352 | $2.63 | $2,329 | $2.61 | 1.0% |
| 2 | 2 | 985 | 5 | 2.3% | 0 | 0.0% | $2,775 | $2.82 | $2,748 | $2.79 | 1.0% |
| 2 | 2 | 987 | 4 | 1.8% | 1 | 25.0% | $2,589 | $2.62 | $2,563 | $2.60 | 1.0% |
| 2 | 2 | 1,057 | 27 | 12.4% | 1 | 3.7% | $2,773 | $2.62 | $2,745 | $2.60 | 1.0% |
| 2 | 2 | 1,081 | 4 | 1.8% | 1 | 25.0% | $3,075 | $2.84 | $3,044 | $2.82 | 1.0% |
| 2 | 2 | 1,099 | 5 | 2.3% | 0 | 0.0% | $3,035 | $2.76 | $3,005 | $2.73 | 1.0% |

### FEES

Application Fee $75

### PET POLICY

Cats Allowed - $0 Deposit, $0/Mo, 2 Maximum, One-Time Fee: $500

Dogs Allowed - $0 Deposit, $0/Mo, 2 Maximum, One-Time Fee: $500

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 3828 Georgia Ave NW - The Swift at Petworth Metro

Washington, DC 20011 - Petworth Submarket

### SALE

| | |
|---|---|
| Sold Price | $75,000,000 ($344,037/Unit) |
| Date | Jul 2014 |
| Sale Type | Investment |
| Cap Rate | 5.20% |

### TRANSPORTATION

| | |
|---|---|
| Parking | 221 available (Covered);Ratio of 1.01/Unit |
| Transit/Subway | 1 min drive to Georgia Ave-Petworth Transit Stop (Green, Yellow Lines) |
| Commuter Rail | 10 min drive to Union Station Commuter Rail (Brunswick, Camden, |
| Airport | 17 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Walker's Paradise (96) |
| Transit Score® | Excellent Transit (71) |

### TENANTS

| | |
|---|---|
| Polinger - The Swift at Petworth Metro | 29,188 SF |

### PROPERTY CONTACTS

| | |
|---|---|
| True Owner | Principal Global Investors, Inc<br>801 Grand Ave<br>Des Moines, IA 50309<br>(800) 533-1390 (p)<br>(866) 850-4022 (f) |
| Developer | Duball LLC<br>11710 Plaza America Dr<br>Reston, VA 20190<br>(703) 860-0901 (p) |
| Property Manager | Polinger - The Swift at Petworth Metro<br>3828 Georgia Ave NW<br>Washington, DC 20011<br>(202) 541-9120 (p) |
| Previous True Owner | Duball LLC<br>11710 Plaza America Dr<br>Reston, VA 20190<br>(703) 860-0901 (p) |
| Architect | Torti Gallas + Partners<br>1923 Vermont Ave NW<br>Washington, DC 20001<br>(301) 588-4800 (p)<br>(301) 650-2255 (f) |


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 6918 Willow St NW - Willow and Maple

Washington, DC 20012 - Takoma DC Submarket



### BUILDING

| | |
|---|---|
| Type | 4 Star Low-Rise Apartments |
| Year Built | May 2016 |
| Units | 102 |
| GBA | 110,388 SF |
| Stories | 3 |
| Construction | Masonry |
| Rent Type | Market/Affordable |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 2.01 AC |
| Parcels | 3357-0062 |

### EXPENSES

| | |
|---|---|
| Taxes | $1,635.45/Unit (2021) |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Balcony
- Disposal
- Hardwood Floors
- Kitchen
- Patio
- Stainless Steel Appliances
- Washer/Dryer
- Wheelchair Accessible (Rooms)

Site Amenities

- Bicycle Storage
- Clubhouse
- Fitness Center
- Roof Terrace
- Storage Space
- Sundeck

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| **Totals** | **Avg SF** | **Units** | **Mix %** | **Units** | **Percent** | **Per Unit** | **Per SF** | **Per Unit** | **Per SF** | **%** |
| All Studios | 555 | 16 | 15.7% | 1 | 6.3% | $1,795 | $3.24 | $1,782 | $3.21 | 0.7% |
| All 1 Beds | 732 | 50 | 49.0% | 3 | 6.0% | $2,290 | $3.13 | $2,274 | $3.11 | 0.7% |
| All 2 Beds | 1,112 | 36 | 35.3% | 2 | 5.6% | $3,182 | $2.86 | $3,168 | $2.85 | 0.5% |
| **Totals** | **838** | **102** | **100.0%** | **6** | **5.9%** | **$2,528** | **$3.01** | **$2,512** | **$3.00** | **0.6%** |

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beds** | **Baths** | **Avg SF** | **Units** | **Mix %** | **Units** | **Percent** | **Per Unit** | **Per SF** | **Per Unit** | **Per SF** | **%** |


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 6918 Willow St NW - Willow and Maple

Washington, DC 20012 - Takoma DC Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 513 | 10 | 9.8% | 1 | 10.0% | $1,739 | $3.39 | $1,726 | $3.37 | 0.7% |
| Studio | 1 | 624 | 6 | 5.9% | 0 | 0.0% | $1,889 | $3.03 | $1,875 | $3.01 | 0.7% |
| 1 | 1 | 552 | 2 | 2.0% | 0 | 0.0% | $1,839 | $3.33 | $1,826 | $3.31 | 0.7% |
| 1 | 1 | 575 | 2 | 2.0% | 0 | 0.0% | $1,934 | $3.36 | $1,920 | $3.34 | 0.7% |
| 1 | 1 | 647 | 3 | 2.9% | 0 | 0.0% | $1,914 | $2.96 | $1,900 | $2.94 | 0.7% |
| 1 | 1 | 648 | 4 | 3.9% | 0 | 0.0% | $2,219 | $3.42 | $2,203 | $3.40 | 0.7% |
| 1 | 1 | 654 | 1 | 1.0% | 0 | 0.0% | $1,864 | $2.85 | $1,850 | $2.83 | 0.8% |
| 1 | 1 | 669 | 2 | 2.0% | 0 | 0.0% | $2,044 | $3.06 | $2,030 | $3.03 | 0.7% |
| 1 | 1 | 698 | 2 | 2.0% | 0 | 0.0% | $2,184 | $3.13 | $2,169 | $3.11 | 0.7% |
| 1 | 1 | 706 | 4 | 3.9% | 1 | 25.0% | $2,173 | $3.08 | $2,158 | $3.06 | 0.7% |
| 1 | 1 | 733 | 6 | 5.9% | 0 | 0.0% | $2,328 | $3.18 | $2,312 | $3.15 | 0.7% |
| 1 | 1 | 754 | 10 | 9.8% | 0 | 0.0% | $2,373 | $3.15 | $2,356 | $3.13 | 0.7% |
| 1 | 1 | 761 | 4 | 3.9% | 0 | 0.0% | $2,348 | $3.09 | $2,332 | $3.06 | 0.7% |
| 1 | 1 | 772 | 2 | 2.0% | 0 | 0.0% | $2,353 | $3.05 | $2,337 | $3.03 | 0.7% |
| 1 | 1 | 792 | 1 | 1.0% | 0 | 0.0% | $2,398 | $3.03 | $2,381 | $3.01 | 0.7% |
| 1 | 1 | 887 | 5 | 4.9% | 2 | 40.0% | $2,674 | $3.01 | $2,655 | $2.99 | 0.7% |
| 1 | 1 | 929 | 2 | 2.0% | 0 | 0.0% | $2,889 | $3.11 | $2,869 | $3.09 | 0.7% |
| 2 | 1 | 961 | 16 | 15.7% | 0 | 0.0% | $2,804 | $2.92 | $2,791 | $2.90 | 0.5% |
| 2 | 1 | 962 | 5 | 4.9% | 0 | 0.0% | $2,789 | $2.90 | $2,776 | $2.89 | 0.5% |
| 2 | 1 | 979 | 6 | 5.9% | 0 | 0.0% | $3,244 | $3.31 | $3,229 | $3.30 | 0.5% |
| 2 | 1 | 1,030 | 4 | 3.9% | 1 | 25.0% | $3,424 | $3.32 | $3,408 | $3.31 | 0.5% |
| 2 | 1 | 1,450 | 1 | 1.0% | 1 | 100.0% | $4,200 | $2.90 | $4,180 | $2.88 | 0.5% |
| 2 | 1 | 2,100 | 4 | 3.9% | 0 | 0.0% | $4,600 | $2.19 | $4,579 | $2.18 | 0.5% |

### FEES

Application Fee $50

### PET POLICY

Cats Allowed - $100/Mo, 2 Maximum, Maximum Weight 75 lb, One-Time Fee: $500 - 1K

Dogs Allowed - $100/Mo, 2 Maximum, Maximum Weight 75 lb, One-Time Fee: $500 - 1K

### TRANSPORTATION

| | |
|---|---|
| Transit/Subway | 2 min drive to Takoma Transit Stop (Red Line) |
| Commuter Rail | 7 min drive to Silver Spring Commuter Rail (Brunswick Line) |
| Airport | 24 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Very Walkable (86) |
| Transit Score® | Excellent Transit (70) |

# Property Summary Report

## 6918 Willow St NW - Willow and Maple

Washington, DC 20012 - Takoma DC Submarket

### PROPERTY CONTACTS

| | |
|---|---|
| True Owner | Douglas Development Corporation<br>655 New York Ave NW<br>Washington, DC 20001<br>(202) 638-6300 (p)<br>(202) 638-0303 (f) |
| Developer | Douglas Development Corporation<br>655 New York Ave NW<br>Washington, DC 20001<br>(202) 638-6300 (p)<br>(202) 638-0303 (f) |
| Property Manager | Greystar - Willow and Maple<br>6918 Willow St NW<br>Washington, DC 20012<br>(202) 568-6447 (p) |
| Recorded Owner | Jemals TP Land LLC |
| Architect | GTM Architects, Inc.<br>7735 Old Georgetown Rd<br>Bethesda, MD 20814<br>(240) 333-2000 (p)<br>(240) 333-2001 (f) |

# Property Summary Report

## 1315 Clifton St NW - The Clifton

Washington, DC 20009 - Columbia Heights DC Submarket



### BUILDING

| | |
|---|---|
| Type | 4 Star Mid-Rise Apartments |
| Year Built | May 2019 |
| Units | 156 |
| GBA | 136,000 SF |
| Stories | 6 |
| Rent Type | Market/Affordable |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 0.68 AC |
| Zoning | RA-2 |
| Parcels | 2866-0831, 2866-0838 |

### SPACE FEATURES

Unit Amenities

- Den
- Dishwasher
- Disposal
- Kitchen
- Microwave
- Oven
- Pantry
- Refrigerator
- Stainless Steel Appliances
- Tub/Shower
- Vinyl Flooring

Site Amenities

- Bicycle Storage
- Dry Cleaning Service
- Fitness Center
- Grill
- Pet Washing Station
- Roof Terrace

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All Studios | 413 | 24 | 15.4% | 3 | 12.5% | $2,224 | $5.38 | $2,208 | $5.34 | 0.7% |
| All 1 Beds | 559 | 83 | 53.2% | 11 | 13.3% | $2,364 | $4.23 | $2,347 | $4.20 | 0.7% |
| All 2 Beds | 823 | 41 | 26.3% | 1 | 2.4% | $3,687 | $4.48 | $3,660 | $4.45 | 0.7% |
| All 3 Beds | 1,044 | 4 | 2.6% | 0 | 0.0% | $5,925 | $5.68 | $5,881 | $5.63 | 0.7% |
| All 4 Beds | 1,405 | 4 | 2.6% | 0 | 0.0% | $6,679 | $4.76 | $6,629 | $4.72 | 0.7% |
| **Totals** | **640** | **156** | **100.0%** | **15** | **9.6%** | **$2,892** | **$4.52** | **$2,871** | **$4.49** | **0.7%** |

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |

# Property Summary Report

## 1315 Clifton St NW - The Clifton

Washington, DC 20009 - Columbia Heights DC Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 378 | 7 | 4.5% | 2 | 28.6% | $2,325 | $6.15 | $2,308 | $6.11 | 0.7% |
| Studio | 1 | 428 | 17 | 10.9% | 1 | 5.9% | $2,182 | $5.10 | $2,166 | $5.06 | 0.7% |
| 1 | 1 | 550 | 64 | 41.0% | 8 | 12.5% | $2,325 | $4.23 | $2,308 | $4.20 | 0.7% |
| 1 | 1 | 588 | 19 | 12.2% | 3 | 15.8% | $2,495 | $4.24 | $2,477 | $4.21 | 0.7% |
| 2 | 1 | 618 | 5 | 3.2% | 0 | 0.0% | $2,495 | $4.04 | $2,477 | $4.01 | 0.7% |
| 2 | 1 | 726 | 16 | 10.3% | 0 | 0.0% | $3,625 | $4.99 | $3,599 | $4.96 | 0.7% |
| 2 | 1 | 786 | 7 | 4.5% | 1 | 14.3% | $3,997 | $5.09 | $3,968 | $5.05 | 0.7% |
| 2 | 1 | 1,142 | 2 | 1.3% | 0 | 0.0% | $5,373 | $4.70 | $5,334 | $4.67 | 0.7% |
| 2 | 2 | 1,023 | 11 | 7.1% | 0 | 0.0% | $3,814 | $3.73 | $3,786 | $3.70 | 0.7% |
| 3 | 2 | 1,044 | 4 | 2.6% | 0 | 0.0% | $5,925 | $5.68 | $5,881 | $5.63 | 0.7% |
| 4 | 2 | 1,408 | 2 | 1.3% | 0 | 0.0% | $6,614 | $4.70 | $6,565 | $4.66 | 0.7% |
| 4 | 3 | 1,401 | 2 | 1.3% | 0 | 0.0% | $6,744 | $4.81 | $6,694 | $4.78 | 0.7% |

### FEES

Admin Fee $600

Application Fee $75

### PET POLICY

Cats Allowed - $0 Deposit, $60/Mo, 2 Maximum, Maximum Weight 35 lb, One-Time Fee: $500

Dogs Allowed - $0 Deposit, $60/Mo, 2 Maximum, Maximum Weight 75 lb, One-Time Fee: $500

### TRANSPORTATION

| | |
|---|---|
| Parking | 36 available (Covered);Ratio of 0.23/Unit |
| Transit/Subway | 2 min drive to Columbia Heights Transit Stop (Green, Yellow Lines) |
| Commuter Rail | 8 min drive to Union Station Commuter Rail (Brunswick, Camden, Penn Lines) |
| Airport | 15 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Walker’s Paradise (90) |
| Transit Score® | Excellent Transit (81) |

### TENANTS

| | |
|---|---|
| Clifton Street Acquisition | 500 SF |

# Property Summary Report

## 1315 Clifton St NW - The Clifton

Washington, DC 20009 - Columbia Heights DC Submarket

### PROPERTY CONTACTS

| | |
|---|---|
| True Owner | Aria Development Group<br>821 Broadway<br>New York, NY 10003<br>(212) 400-0500 (p)<br>(212) 355-3066 (f) |
| Developer | Aria Development Group<br>821 Broadway<br>New York, NY 10003<br>(212) 400-0500 (p)<br>(212) 355-3066 (f) |
| Property Manager | Aria - The Clifton<br>1315 Clifton St NW<br>Washington, DC 20009<br>(202) 892-6950 (p) |
| Recorded Owner | Clifton Street Acquisition Llc |
| Architect | Cunningham & Quill Architects, PLLC<br>1054-1066 31st St NW<br>Washington, DC 20007<br>(202) 337-0090 (p)<br>(202) 337-0092 (f) |

### BUILDING NOTES

The bed-bath mix, unit counts and sizes are estimated per property management.

# Property Summary Report

## 6800 Georgia Ave NW - The Vale at The Parks

Washington, DC 20012 - Takoma DC Submarket




### BUILDING

| | |
|---|---|
| Type | 4 Star Mid-Rise Apartments |
| Year Built | Aug 2021 |
| Units | 301 |
| GBA | 247,494 SF |
| Stories | 5 |
| Rent Type | Market |
| Market Segment | All |

### LAND

| | |
|---|---|
| Land Acres | 2.23 AC |
| Zoning | WR-3 |
| Parcels | 2950-0819, 2950-7011, 2950-7012 |

### EXPENSES

| | |
|---|---|
| Taxes | $422.18/Unit (2021) |

### SPACE FEATURES

Unit Amenities

- Air Conditioning
- Balcony
- Freezer
- Heating
- Island Kitchen
- Kitchen
- Microwave
- Oven
- Range
- Refrigerator
- Stainless Steel Appliances
- Tub/Shower

Site Amenities

- 24 Hour Access
- Business Center
- Courtyard
- Elevator
- Fitness Center
- Online Services
- Pet Washing Station
- Pool
- Property Manager on Site
- Public Transportation
- Walking/Biking Trails

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All Studios | 427 | 56 | 18.6% | 0 | 0.0% | $2,040 | $4.77 | $1,972 | $4.61 | 3.4% |
| All 1 Beds | 646 | 150 | 49.8% | 11 | 7.3% | $2,130 | $3.29 | $2,058 | $3.18 | 3.4% |
| All 2 Beds | 892 | 70 | 23.3% | 12 | 17.1% | $3,046 | $3.42 | $2,944 | $3.30 | 3.4% |
| All 3 Beds | 1,575 | 25 | 8.3% | 1 | 4.0% | $4,496 | $2.85 | $4,345 | $2.76 | 3.4% |
| **Totals** | **740** | **301** | **100.0%** | **24** | **8.0%** | **$2,523** | **$3.41** | **$2,438** | **$3.30** | **3.4%** |

# Property Summary Report

## 6800 Georgia Ave NW - The Vale at The Parks

Washington, DC 20012 - Takoma DC Submarket

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| Studio | 1 | 381 | 29 | 9.6% | 0 | 0.0% | $1,999 | $5.25 | $1,932 | $5.07 | 3.4% |
| Studio | 1 | 476 | 25 | 8.3% | 0 | 0.0% | $2,109 | $4.43 | $2,039 | $4.28 | 3.4% |
| Studio | 1 | 492 | 2 | 0.7% | 0 | 0.0% | $1,777 | $3.61 | $1,718 | $3.49 | 3.3% |
| 1 | 1 | 417 | 5 | 1.7% | 0 | 0.0% | $1,855 | $4.45 | $1,792 | $4.30 | 3.4% |
| 1 | 1 | 444 | 5 | 1.7% | 0 | 0.0% | $2,015 | $4.54 | $1,947 | $4.39 | 3.4% |
| 1 | 1 | 470 | 5 | 1.7% | 0 | 0.0% | $2,061 | $4.38 | $1,991 | $4.24 | 3.4% |
| 1 | 1 | 485 | 5 | 1.7% | 0 | 0.0% | $2,075 | $4.28 | $2,005 | $4.13 | 3.4% |
| 1 | 1 | 532 | 5 | 1.7% | 0 | 0.0% | $2,081 | $3.91 | $2,011 | $3.78 | 3.4% |
| 1 | 1 | 553 | 5 | 1.7% | 0 | 0.0% | $2,025 | $3.66 | $1,957 | $3.54 | 3.4% |
| 1 | 1 | 569 | 5 | 1.7% | 0 | 0.0% | $2,008 | $3.53 | $1,940 | $3.41 | 3.4% |
| 1 | 1 | 578 | 5 | 1.7% | 0 | 0.0% | $2,121 | $3.67 | $2,050 | $3.55 | 3.4% |
| 1 | 1 | 588 | 10 | 3.3% | 0 | 0.0% | $2,048 | $3.48 | $1,979 | $3.37 | 3.4% |
| 1 | 1 | 597 | 5 | 1.7% | 0 | 0.0% | $2,045 | $3.43 | $1,976 | $3.31 | 3.4% |
| 1 | 1 | 617 | 5 | 1.7% | 0 | 0.0% | $2,025 | $3.28 | $1,957 | $3.17 | 3.4% |
| 1 | 1 | 627 | 5 | 1.7% | 0 | 0.0% | $2,005 | $3.20 | $1,937 | $3.09 | 3.4% |
| 1 | 1 | 636 | 5 | 1.7% | 0 | 0.0% | $1,978 | $3.11 | $1,911 | $3.01 | 3.4% |
| 1 | 1 | 652 | 5 | 1.7% | 0 | 0.0% | $2,009 | $3.08 | $1,942 | $2.98 | 3.4% |
| 1 | 1 | 654 | 5 | 1.7% | 0 | 0.0% | $2,229 | $3.41 | $2,154 | $3.29 | 3.4% |
| 1 | 1 | 658 | 5 | 1.7% | 0 | 0.0% | $2,040 | $3.10 | $1,971 | $3.00 | 3.4% |
| 1 | 1 | 680 | 5 | 1.7% | 0 | 0.0% | $2,214 | $3.26 | $2,140 | $3.15 | 3.4% |
| 1 | 1 | 684 | 5 | 1.7% | 0 | 0.0% | $2,174 | $3.18 | $2,101 | $3.07 | 3.4% |
| 1 | 1 | 700 | 5 | 1.7% | 0 | 0.0% | $2,031 | $2.90 | $1,962 | $2.80 | 3.4% |
| 1 | 1 | 703 | 5 | 1.7% | 1 | 20.0% | $2,435 | $3.46 | $2,353 | $3.35 | 3.4% |
| 1 | 1 | 708 | 5 | 1.7% | 3 | 60.0% | $2,235 | $3.16 | $2,160 | $3.05 | 3.4% |
| 1 | 1 | 711 | 5 | 1.7% | 0 | 0.0% | $2,060 | $2.90 | $1,991 | $2.80 | 3.4% |
| 1 | 1 | 747 | 5 | 1.7% | 3 | 60.0% | $2,255 | $3.02 | $2,179 | $2.92 | 3.4% |
| 1 | 1 | 754 | 5 | 1.7% | 0 | 0.0% | $2,060 | $2.73 | $1,991 | $2.64 | 3.4% |
| 1 | 1 | 757 | 5 | 1.7% | 0 | 0.0% | $2,419 | $3.20 | $2,337 | $3.09 | 3.4% |
| 1 | 1 | 764 | 5 | 1.7% | 0 | 0.0% | $2,055 | $2.69 | $1,985 | $2.60 | 3.4% |
| 1 | 1 | 792 | 5 | 1.7% | 2 | 40.0% | $2,415 | $3.05 | $2,334 | $2.95 | 3.4% |
| 1 | 1 | 852 | 5 | 1.7% | 2 | 40.0% | $2,525 | $2.96 | $2,440 | $2.86 | 3.4% |
| 1 | 1 | 875 | 5 | 1.7% | 0 | 0.0% | $2,350 | $2.69 | $2,270 | $2.59 | 3.4% |
| 2 | 2 | 764 | 5 | 1.7% | 1 | 20.0% | $2,955 | $3.87 | $2,855 | $3.74 | 3.4% |
| 2 | 2 | 785 | 5 | 1.7% | 0 | 0.0% | $2,963 | $3.77 | $2,863 | $3.65 | 3.4% |
| 2 | 2 | 805 | 5 | 1.7% | 2 | 40.0% | $2,925 | $3.63 | $2,826 | $3.51 | 3.4% |
| 2 | 2 | 809 | 5 | 1.7% | 0 | 0.0% | $3,112 | $3.85 | $3,007 | $3.72 | 3.4% |
| 2 | 2 | 831 | 5 | 1.7% | 3 | 60.0% | $2,905 | $3.50 | $2,807 | $3.38 | 3.4% |
| 2 | 2 | 833 | 5 | 1.7% | 0 | 0.0% | $3,517 | $4.22 | $3,398 | $4.08 | 3.4% |

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 6800 Georgia Ave NW - The Vale at The Parks

Washington, DC 20012 - Takoma DC Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 2 | 2 | 858 | 5 | 1.7% | 0 | 0.0% | $2,980 | $3.47 | $2,879 | $3.36 | 3.4% |
| 2 | 2 | 873 | 5 | 1.7% | 3 | 60.0% | $2,885 | $3.30 | $2,788 | $3.19 | 3.4% |
| 2 | 2 | 895 | 5 | 1.7% | 1 | 20.0% | $2,925 | $3.27 | $2,826 | $3.16 | 3.4% |
| 2 | 2 | 913 | 5 | 1.7% | 1 | 20.0% | $2,895 | $3.17 | $2,797 | $3.06 | 3.4% |
| 2 | 2 | 920 | 5 | 1.7% | 0 | 0.0% | $3,353 | $3.64 | $3,240 | $3.52 | 3.4% |
| 2 | 2 | 971 | 5 | 1.7% | 1 | 20.0% | $2,765 | $2.85 | $2,672 | $2.75 | 3.4% |
| 2 | 2 | 1,016 | 5 | 1.7% | 0 | 0.0% | $2,954 | $2.91 | $2,855 | $2.81 | 3.4% |
| 2 | 2 | 1,210 | 5 | 1.7% | 0 | 0.0% | $3,517 | $2.91 | $3,398 | $2.81 | 3.4% |
| 3 | 3 | 1,018 | 5 | 1.7% | 0 | 0.0% | $3,619 | $3.55 | $3,497 | $3.43 | 3.4% |
| 3 | 3 | 1,619 | 5 | 1.7% | 0 | 0.0% | $4,661 | $2.88 | $4,504 | $2.78 | 3.4% |
| 3 | 3 | 1,628 | 5 | 1.7% | 0 | 0.0% | $4,772 | $2.93 | $4,612 | $2.83 | 3.4% |
| 3 | 3 | 1,784 | 5 | 1.7% | 1 | 20.0% | $4,691 | $2.63 | $4,533 | $2.54 | 3.4% |
| 3 | 3 | 1,828 | 5 | 1.7% | 0 | 0.0% | $4,738 | $2.59 | $4,578 | $2.50 | 3.4% |

### FOR LEASE

| | |
|---|---|
| Smallest Space | 1,694 SF |
| Max Contiguous | 1,694 SF |
| # of Spaces | 1 |
| Vacant | 1,694 SF |
| Rent | Withheld |

| | |
|---|---|
| Retail Avail | 1,694 SF |

### AVAILABLE SPACES

| Floor | Suite | Use | Type | SF Available | Flr Contig | Bldg Contig | Rent | Occupancy | Term |
|---|---|---|---|---|---|---|---|---|---|
| P 1st | | Retail | Direct | 1,694 | 1,694 | 1,694 | Withheld | Vacant | Negotiable |

### PET POLICY

Others Allowed - $0 Deposit, $50/Mo, 2 Maximum, One-Time Fee: $500

### SALE

| | |
|---|---|
| Sold Price | $126,250,000 ($419,435/Unit) |
| Date | Jul 2021 |
| Sale Type | Investment |
| Financing | Down Payment of $55,244,666 (43.76%)<br>Unknown: Athene Annuity and Life Company (Acquisition & Develop- |

# Property Summary Report

## 6800 Georgia Ave NW - The Vale at The Parks

Washington, DC 20012 - Takoma DC Submarket

### TRANSPORTATION

| | |
|---|---|
| Parking | 316 available (Covered);Ratio of 1.05/Unit |
| Transit/Subway | 3 min drive to Takoma Transit Stop (Red Line) |
| Commuter Rail | 5 min drive to Silver Spring Commuter Rail (Brunswick Line) |
| Airport | 22 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Somewhat Walkable (68) |
| Transit Score® | Excellent Transit (70) |

### TENANTS

| | |
|---|---|
| Primrose Schools | 16,576 SF |

### PROPERTY CONTACTS

| | |
|---|---|
| True Owner | CIM Group, LP<br>4700 Wilshire Blvd<br>Los Angeles, CA 90010<br>(323) 860-4900 (p)<br>(323) 860-4901 (f) |
| Previous True Owner | Urban Atlantic<br>7735 Old Georgetown Rd<br>Bethesda, MD 20814<br>(301) 280-6600 (p)<br>(301) 280-6639 (f) |
| Previous True Owner | PGIM, Inc.<br>7 Giralda Farms<br>Madison, NJ 07940<br>(973) 734-1300 (p)<br>(973) 683-1790 (f) |
| Previous True Owner | Triden Development Group<br>700 12th St<br>Washington, DC 20005<br>(202) 904-2442 (p) |
| Property Manager | Bozzuto - The Vale<br>6800 Georgia Ave<br>Washington, DC 20012<br>(301) 220-0100 (p) |
| Recorded Owner | 6800 Georgia Ave. NW (DC) Owner, LLC<br>4700 Wilshire Blvd<br>Los Angeles, CA 90010 |
| Previous True Owner | Hines<br>555 13th St NW<br>Washington, DC 20004<br>(202) 347-6337 (p)<br>(202) 347-2802 (f) |
| Previous True Owner | Hines<br>2800 Post Oak Blvd<br>Houston, TX 77056<br>(713) 621-8000 (p)<br>(713) 966-2636 (f) |
| Developer | Triden Development Group<br>700 12th St<br>Washington, DC 20005<br>(202) 904-2442 (p) |

# Property Summary Report

## 901 W St NW - 901W

Washington, DC 20001 - Howard University Submarket




### BUILDING

| | |
|---|---|
| Type | 4 Star Mid-Rise Apartments |
| Year Built | Jan 2020 |
| Units | 161 |
| GBA | 157,767 SF |
| Stories | 10 |
| Metering | Individually Metered |
| Rent Type | Market/Affordable |
| Market Segment | All |

### LAND

| | |
|---|---|
| Zoning | MU-10 |
| Parcels | 2873-0000-0876, 2873-0000-0877, 2873-0000-0878 |

### EXPENSES

| | |
|---|---|
| Taxes | $4,685.30/Unit (2020) |

### SPACE FEATURES

Unit Amenities

- Balcony
- Ceiling Fans
- Disposal
- Kitchen
- Oven
- Refrigerator
- Tub/Shower
- Washer/Dryer
- Carpet
- Dishwasher
- Island Kitchen
- Microwave
- Range
- Stainless Steel Appliances
- Views

Site Amenities

- 24 Hour Access
- Concierge
- Fitness Center
- Grill
- Online Services
- Pool
- Security System
- Bicycle Storage
- Controlled Access
- Green Community
- Lounge
- Pet Care
- Property Manager on Site
- Sundeck

### BEDROOM SUMMARY

| Models | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|
| Totals | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| All 1 Beds | 699 | 116 | 72.0% | 3 | 2.6% | $2,514 | $3.60 | $2,503 | $3.58 | 0.5% |
| All 2 Beds | 1,162 | 43 | 26.7% | 3 | 7.0% | $3,485 | $3.00 | $3,468 | $2.99 | 0.5% |
| All 3 Beds | 1,729 | 1 | 0.6% | 0 | 0.0% | $6,192 | $3.58 | $6,161 | $3.56 | 0.5% |
| All 4 Beds | 2,210 | 1 | 0.6% | 0 | 0.0% | $7,865 | $3.56 | $7,826 | $3.54 | 0.5% |
| **Totals** | **838** | **161** | **100.0%** | **6** | **3.7%** | **$2,830** | **$3.38** | **$2,816** | **$3.36** | **0.5%** |


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Property Summary Report

## 901 W St NW - 901W

Washington, DC 20001 - Howard University Submarket

### UNIT MIX

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 1 | 1 | 595 | 8 | 5.0% | 0 | 0.0% | $2,125 | $3.57 | $2,115 | $3.55 | 0.5% |
| 1 | 1 | 596 | 8 | 5.0% | 0 | 0.0% | $2,275 | $3.82 | $2,265 | $3.80 | 0.5% |
| 1 | 1 | 613 | 1 | 0.6% | 0 | 0.0% | $2,305 | $3.76 | $2,294 | $3.74 | 0.5% |
| 1 | 1 | 631 | 12 | 7.5% | 0 | 0.0% | $2,270 | $3.60 | $2,259 | $3.58 | 0.5% |
| 1 | 1 | 664 | 1 | 0.6% | 0 | 0.0% | $2,340 | $3.52 | $2,329 | $3.51 | 0.5% |
| 1 | 1 | 666 | 1 | 0.6% | 0 | 0.0% | $2,480 | $3.72 | $2,468 | $3.71 | 0.5% |
| 1 | 1 | 667 | 6 | 3.7% | 0 | 0.0% | $2,337 | $3.50 | $2,326 | $3.49 | 0.5% |
| 1 | 1 | 670 | 2 | 1.2% | 0 | 0.0% | $2,579 | $3.85 | $2,567 | $3.83 | 0.5% |
| 1 | 1 | 674 | 6 | 3.7% | 0 | 0.0% | $2,290 | $3.40 | $2,279 | $3.38 | 0.5% |
| 1 | 1 | 675 | 1 | 0.6% | 0 | 0.0% | $2,210 | $3.27 | $2,199 | $3.26 | 0.5% |
| 1 | 1 | 676 | 2 | 1.2% | 1 | 50.0% | $2,495 | $3.69 | $2,484 | $3.67 | 0.5% |
| 1 | 1 | 680 | 1 | 0.6% | 0 | 0.0% | $2,560 | $3.76 | $2,548 | $3.75 | 0.5% |
| 1 | 1 | 682 | 1 | 0.6% | 1 | 100.0% | $2,560 | $3.75 | $2,548 | $3.74 | 0.5% |
| 1 | 1 | 683 | 8 | 5.0% | 0 | 0.0% | $2,460 | $3.60 | $2,449 | $3.59 | 0.5% |
| 1 | 1 | 691 | 2 | 1.2% | 0 | 0.0% | $2,396 | $3.47 | $2,385 | $3.45 | 0.5% |
| 1 | 1 | 701 | 9 | 5.6% | 0 | 0.0% | $2,450 | $3.50 | $2,439 | $3.48 | 0.5% |
| 1 | 1 | 736 | 7 | 4.3% | 0 | 0.0% | $2,465 | $3.35 | $2,454 | $3.33 | 0.5% |
| 1 | 1 | 741 | 7 | 4.3% | 1 | 14.3% | $2,990 | $4.04 | $2,976 | $4.02 | 0.5% |
| 1 | 1 | 744 | 7 | 4.3% | 0 | 0.0% | $2,740 | $3.68 | $2,727 | $3.67 | 0.5% |
| 1 | 1 | 749 | 7 | 4.3% | 0 | 0.0% | $2,625 | $3.50 | $2,613 | $3.49 | 0.5% |
| 1 | 1 | 755 | 8 | 5.0% | 0 | 0.0% | $2,555 | $3.38 | $2,543 | $3.37 | 0.5% |
| 1 | 1 | 778 | 2 | 1.2% | 0 | 0.0% | $2,726 | $3.50 | $2,714 | $3.49 | 0.5% |
| 1 | 1 | 847 | 7 | 4.3% | 0 | 0.0% | $3,226 | $3.81 | $3,211 | $3.79 | 0.5% |
| 1 | 1 | 848 | 1 | 0.6% | 0 | 0.0% | $2,971 | $3.50 | $2,957 | $3.49 | 0.5% |
| 1 | 1 | 898 | 1 | 0.6% | 0 | 0.0% | $3,146 | $3.50 | $3,132 | $3.49 | 0.4% |
| 2 | 2 | 929 | 6 | 3.7% | 0 | 0.0% | $3,046 | $3.28 | $3,032 | $3.26 | 0.5% |
| 2 | 2 | 1,016 | 1 | 0.6% | 0 | 0.0% | $2,965 | $2.92 | $2,951 | $2.90 | 0.5% |
| 2 | 2 | 1,081 | 8 | 5.0% | 0 | 0.0% | $3,115 | $2.88 | $3,100 | $2.87 | 0.5% |
| 2 | 2 | 1,109 | 4 | 2.5% | 0 | 0.0% | $3,569 | $3.22 | $3,552 | $3.20 | 0.5% |
| 2 | 2 | 1,112 | 4 | 2.5% | 1 | 25.0% | $3,395 | $3.05 | $3,379 | $3.04 | 0.5% |
| 2 | 2 | 1,148 | 1 | 0.6% | 1 | 100.0% | $3,465 | $3.02 | $3,448 | $3.00 | 0.5% |
| 2 | 2 | 1,174 | 1 | 0.6% | 0 | 0.0% | $3,550 | $3.02 | $3,532 | $3.01 | 0.5% |
| 2 | 2 | 1,210 | 7 | 4.3% | 0 | 0.0% | $3,775 | $3.12 | $3,757 | $3.10 | 0.5% |
| 2 | 2 | 1,297 | 2 | 1.2% | 0 | 0.0% | $3,316 | $2.56 | $3,300 | $2.54 | 0.5% |
| 2 | 2 | 1,298 | 5 | 3.1% | 0 | 0.0% | $3,720 | $2.87 | $3,702 | $2.85 | 0.5% |
| 2 | 2 | 1,319 | 1 | 0.6% | 0 | 0.0% | $3,820 | $2.90 | $3,801 | $2.88 | 0.5% |
| 2 | 2.5 | 1,602 | 1 | 0.6% | 0 | 0.0% | $4,732 | $2.95 | $4,709 | $2.94 | 0.5% |
| 2 | 3 | 1,497 | 1 | 0.6% | 1 | 100.0% | $4,315 | $2.88 | $4,294 | $2.87 | 0.5% |

CUSHMAN & WAKEFIELD

©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

CoStar™

# Property Summary Report

## 901 W St NW - 901W

Washington, DC 20001 - Howard University Submarket

| Models | | | Counts | | Units Available | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beds | Baths | Avg SF | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | % |
| 2 | 3 | 1,545 | 1 | 0.6% | 0 | 0.0% | $4,301 | $2.78 | $4,280 | $2.77 | 0.5% |
| 3 | 3 | 1,729 | 1 | 0.6% | 0 | 0.0% | $6,192 | $3.58 | $6,161 | $3.56 | 0.5% |
| 4 | 4 | 2,210 | 1 | 0.6% | 0 | 0.0% | $7,865 | $3.56 | $7,826 | $3.54 | 0.5% |

### FEES

Application Fee $50

### PET POLICY

Cats Allowed - $0 Deposit, $0/Mo, 2 Maximum,

Dogs Allowed - $0 Deposit, $0/Mo, 2 Maximum,

### TRANSPORTATION

| | |
|---|---|
| Transit/Subway | 1 min drive to U Street Transit Stop (Green, Yellow Lines) |
| Commuter Rail | 6 min drive to Union Station Commuter Rail (Brunswick, Camden, Penn Lines) |
| Airport | 14 min drive to Ronald Reagan Washington National Airport |
| Walk Score® | Walker's Paradise (98) |
| Transit Score® | Excellent Transit (75) |

### TENANTS

| | | | |
|---|---|---|---|
| Corepower Yoga | 5,000 SF | Row House | 2,000 SF |

### PROPERTY CONTACTS

True Owner
JBG SMITH Properties
4747 Bethesda Ave
Bethesda, MD 20814
(240) 333-3600 (p)
(240) 333-3610 (f)

Developer
JBG SMITH Properties
4747 Bethesda Ave
Bethesda, MD 20814
(240) 333-3600 (p)
(240) 333-3610 (f)

Property Manager
JBGS - 901 W
901 W St NW
Washington, DC 20001
(240) 333-3600 (p)

Recorded Owner
Florida Avenue Residential LLC
4445 Willard Ave
Chevy Chase, MD 20815
(240) 333-3600 (p)

Architect
Eric Colbert & Associates
717 5th St NW
Washington, DC 20001
(202) 289-6800 (p)
(202) 289-6810 (f)


©2022 CoStar Group - Licensed to Cushman & Wakefield - 1229342

# Addendum F:
# Comparable Improved Sale Data Sheets

# IMPROVED SALE COMPARABLE 1



| | |
|---|---|
| Property Name: | Calvert Woodley Apartments |
| Address: | 2601 Woodley Place Northwest |
| City, State, Zip: | Washington DC 20008 |
| MSA: | Washington |
| Jurisdiction: | District of Columbia |
| Submarket: | |
| Property Type: | Multi-Family |
| Property Subtype: | Mid/ High-Rise |
| Classification: | N/A |
| ID: | 693752 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.88 | Number of Units: | 136 |
| Site Area (Sq.Ft.): | 38,333 | Average Unit Size: | 974 |
| Gross Bldg Area: | 152,000 | Number of Buildings: | 1 |
| Net Bldg Area: | 132,464 | Number of Stories: | 6 |
| Year Built: | 1962 | Class: | N/A |
| Last Renovation: | N/A | Number of Parking Spaces: | 120 |
| Quality: | N/A | Parking Ratio: | 0.88:1,000 |
| Condition: | N/A | Resident Type: | Market Rate |
| Density (Units/Acre): | 154.55 | Retail Space | N/A |

## COMMON AMENITIES

Common Amenities: Fitness center, business center, dry cleaning services, and laundry facilities

## UNIT AMENITIES

Unit Amenities: Stainless steel appliances, granite countertops, and walk-in closets

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | 4.39% |
| Deed Reference: | 2022096539 | Cap Rate Type: | Pro Forma |
| Sale Date: | 9/2022 | NOI: | $2,853,500 |
| Sale Price: | $65,000,000 | NOI per Sq.Ft.: | $18.77 |
| Price per Unit: | $477,941 | NOI per Unit: | $20,982 |
| Value Interest: | Leased Fee | Occupancy: | 97.80% |
| Grantor: | Smith Property Holdings Three DC | Expense Ratio: | 34.66% |
| Grantee: | 2601 Woodley Place NW Washington LLC | EGIM: | 14.89 |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group, Buyer

## COMMENTS

This comparable represents the sale of Calvert Woodley Apartments, a 136-unit mid-rise apartment community located in Washington, DC. The property was built in 1962 and consists of masonry exterior. The project amenities include fitness center, business center, dry cleaning services, and laundry facilities. The unit interiors include stainless steel appliances, granite countertops, and walk-in closets. The tax assessment at the time of sale was 68 percent of the sale price. The capitalization rate of 4.39 percent is based on proforma income and includes taxes assessed at 85 percent of the sale price.

# IMPROVED SALE COMPARABLE 2



| | |
|---|---|
| Property Name: | The Jennifer at Georgia Ave |
| Address: | 4014 Georgia Ave NW |
| City, State, Zip: | Washington DC 20011-5857 |
| MSA: | Washington |
| Jurisdiction: | District of Columbia |
| Submarket: | |
| Property Type: | Multi-Family |
| Property Subtype: | Mid/ High-Rise |
| Classification: | N/A |
| ID: | 700060 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.05 | Number of Units: | 10 |
| Site Area (Sq.Ft.): | 2,288 | Average Unit Size: | 784 |
| Gross Bldg Area: | 9,411 | Number of Buildings: | 1 |
| Net Bldg Area: | 7,840 | Number of Stories: | 4 |
| Year Built: | 2022 | Class: | B |
| Last Renovation: | N/A | Number of Parking Spaces: | 1 |
| Quality: | N/A | Parking Ratio: | 0.10:1,000 |
| Condition: | N/A | Resident Type: | Market Rate |
| Density (Units/Acre): | 200.00 | Retail Space | N/A |

## COMMON AMENITIES

Common Amenities: Bike storage

## UNIT AMENITIES

Unit Amenities: Stainless steel appliances, hardwood floors, and washer/dryer units

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | 5.49% |
| Deed Reference: | 2022082655 | Cap Rate Type: | Pro Forma |
| Sale Date: | 8/2022 | NOI: | $220,973 |
| Sale Price: | $4,025,000 | NOI per Sq.Ft.: | $23.48 |
| Price per Unit: | $402,500 | NOI per Unit: | $22,097 |
| Value Interest: | Leased Fee | Occupancy: | 100.00% |
| Grantor: | Georgia Ave Condos LLC | Expense Ratio: | N/A |
| Grantee: | BB 4014 LLC | EGIM: | N/A |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group

## COMMENTS

This comparable represents the sale of The Jennifer at Georgia Ave, a 10-unit mid-rise apartment community located in Washington, DC. The property was built in 2022 and consists of wood frame exterior. The project amenities include bike storage and unit interiors include stainless steel appliances, hardwood floors, and washer/dryer units. The tax assessment at the time of sale was 18 percent of the sale price. The capitalization rate of 5.49 percent is based on proforma income.

# IMPROVED SALE COMPARABLE 3



| | |
|---|---|
| Property Name: | 1862 Mintwood Pl NW |
| Address: | 1862 Mintwood Pl NW |
| City, State, Zip: | Washington DC 20009 |
| MSA: | Washington |
| Jurisdiction: | District of Columbia |
| Submarket: | |
| Property Type: | Multi-Family |
| Property Subtype: | Mid/ High-Rise |
| Classification: | N/A |
| ID: | 700061 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.26 | Number of Units: | 17 |
| Site Area (Sq.Ft.): | 11,334 | Average Unit Size: | 1,100 |
| Gross Bldg Area: | 25,000 | Number of Buildings: | 1 |
| Net Bldg Area: | 18,700 | Number of Stories: | 4 |
| Year Built: | 1916 | Class: | B |
| Last Renovation: | N/A | Number of Parking Spaces: | N/A |
| Quality: | N/A | Parking Ratio: | 0.00:1,000 |
| Condition: | N/A | Resident Type: | Market Rate |
| Density (Units/Acre): | 65.38 | Retail Space | N/A |

## COMMON AMENITIES

Common Amenities: N/A

## UNIT AMENITIES

Unit Amenities: White kitchen appliances, hardwood floors, and high ceilings

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | 5.63% |
| Deed Reference: | 2022067926 | Cap Rate Type: | Trailing |
| Sale Date: | 6/2022 | NOI: | $409,583 |
| Sale Price: | $7,275,000 | NOI per Sq.Ft.: | $16.38 |
| Price per Unit: | $427,941 | NOI per Unit: | $24,093 |
| Value Interest: | Leased Fee | Occupancy: | 96.60% |
| Grantor: | 1862 Mintwood LLC | Expense Ratio: | N/A |
| Grantee: | 1862 Mintwood Owner LLC | EGIM: | N/A |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group

## COMMENTS

This comparable represents the sale of 1862 Mintwood Pl NW, a 17-unit mid-rise community located in Washington, DC. The property was built in 1916 and consists of masonry exterior. The unit interiors include white kitchen appliances, hardwood floors, and high ceilings. The tax assessment at the time of sale was 54 percent of the sale price. The capitalization rate of 5.63 percent is based on trailing income.

# IMPROVED SALE COMPARABLE 4



| | |
|---|---|
| Property Name: | The Archie |
| Address: | 4111 Kansas Avenue Northwest |
| City, State, Zip: | Washington DC 20011 |
| MSA: | Washington |
| Jurisdiction: | District of Columbia |
| Submarket: | |
| Property Type: | Multi-Family |
| Property Subtype: | Mid/ High-Rise |
| Classification: | N/A |
| ID: | 681802 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.18 | Number of Units: | 40 |
| Site Area (Sq.Ft.): | 7,767 | Average Unit Size: | 825 |
| Gross Bldg Area: | 37,000 | Number of Buildings: | 1 |
| Net Bldg Area: | 33,000 | Number of Stories: | 4 |
| Year Built: | 2021 | Class: | N/A |
| Last Renovation: | N/A | Number of Parking Spaces: | N/A |
| Quality: | N/A | Parking Ratio: | 0.00:1,000 |
| Condition: | N/A | Resident Type: | Market Rate |
| Density (Units/Acre): | 222.22 | Retail Space | N/A |

## COMMON AMENITIES

Common Amenities: N/A

## UNIT AMENITIES

Unit Amenities: N/A

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | N/A |
| Deed Reference: | 2022059304 | Cap Rate Type: | N/A |
| Sale Date: | 5/2022 | NOI: | N/A |
| Sale Price: | $16,300,000 | NOI per Sq.Ft.: | N/A |
| Price per Unit: | $407,500 | NOI per Unit: | N/A |
| Value Interest: | Leased Fee | Occupancy: | 84.10% |
| Grantor: | Warehouse Condo Project LLC | Expense Ratio: | N/A |
| Grantee: | Some, Inc. | EGIM: | N/A |
| Financing: | N/A | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group

## COMMENTS

This comparable represents the sale of The Archie, a 40-unit mid-rise apartment community located in Washington, DC. The property was built in 2021 and consists of brick exterior. The unit interiors include stainless steel appliances, hardwood floors and walk-in closets. It is noted that although the buyer plans to operate this property as affordable apartment complex, the property e is not encumbered by affordable covenants and the sale price represents a market price.

# IMPROVED SALE COMPARABLE 5



| | |
|---|---|
| Property Name: | Griffin Apartments at Petworth Metro |
| Address: | 3801 Georgia Ave NW |
| City, State, Zip: | Washington DC 20011-5897 |
| MSA: | Washington |
| Jurisdiction: | District of Columbia |
| Submarket: | |
| Property Type: | Multi-Family |
| Property Subtype: | Mid/ High-Rise |
| Classification: | N/A |
| ID: | 502036 |
| Tax Number(s): | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.22 | Number of Units: | 49 |
| Site Area (Sq.Ft.): | 9,583 | Average Unit Size: | 851 |
| Gross Bldg Area: | 58,220 | Number of Buildings: | 1 |
| Net Bldg Area: | 41,699 | Number of Stories: | 6 |
| Year Built: | 2011 | Class: | A |
| Last Renovation: | N/A | Number of Parking Spaces: | 19 |
| Quality: | Good | Parking Ratio: | 0.39:1,000 |
| Condition: | Good | Resident Type: | Market Rate |
| Density (Units/Acre): | 222.73 | Retail Space | N/A |

## COMMON AMENITIES

Common Amenities: Rooftop terrace

## UNIT AMENITIES

Unit Amenities: Washer/Dryer, hardwood floors, stainless steel appliances

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | OAR: | 4.80% |
| Deed Reference: | 2020088328 | Cap Rate Type: | Trailing |
| Sale Date: | 7/2020 | NOI: | $918,000 |
| Sale Price: | $19,125,000 | NOI per Sq.Ft.: | $15.77 |
| Price per Unit: | $390,306 | NOI per Unit: | $18,735 |
| Value Interest: | Leased Fee | Occupancy: | 91.80% |
| Grantor: | 3801 Georgia Ave LLC | Expense Ratio: | N/A |
| Grantee: | 3801 Georgia LLC | EGIM: | N/A |
| Financing: | Not available | | |
| Condition of Sale: | Arm's Length | | |

## VERIFICATION COMMENTS

Public Record, CoStar Group, Broker

## COMMENTS

This comparable represents the sale of Griffin at Petworth Metro, a 49-unit mid/high-rise multifamily property located in the Petworth neighborhood within the District of Columbia. The property is located one block from the Georgia Avenue-Petworth Metrorail station. There were several offers near the contract price. The overall capitalization is based on trailing income.

# Addendum G:
# Supplied Information

DC Office of Tax and Revenue

MyTax DC

Home

# Property Details

SSL : 3260- -0056

Premise Address : 423 KENNEDY ST NW # 1
WASHINGTON DC 20011

Make a Payment

**Balance** :

Details | Assessment | Tax Information | Map | Applications and A

## Assessment Information

| | | | |
|---|---|---|---|
| Tax Type | : Taxable | Land Area | : 9,520 |
| Tax Class | : 3 - Vacant | Appraiser | : Leighton Jones |

## Assessment Values

Help

2023

| I( | Land Value | Building Value | Assessment Value | Total Taxable | ⁻ |
|---|---|---|---|---|---|
| | $934,480.00 | $279,040.00 | $1,213,520.00 | $1,213,520.00 | I |
| | $934,480.00 | $279,040.00 | $1,213,520.00 | $1,213,520.00 | I |

2022

| I( | Land Value | Building Value | Assessment Value | Total Taxable | ⁻ |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| $934,480.00 | $207,650.00 | $1,142,130.00 | $1,142,130.00 | I |
| $934,480.00 | $207,650.00 | $1,142,130.00 | $1,142,130.00 | I |

## 2021

| I( | Land Value | Building Value | Assessment Value | Total Taxable | T |
|---|---|---|---|---|---|
| | $934,480.00 | $248,000.00 | $1,182,480.00 | $1,182,480.00 | I |
| | $934,480.00 | $248,000.00 | $1,182,480.00 | $1,182,480.00 | I |

## 2020

| I( | Land Value | Building Value | Assessment Value | Total Taxable | T |
|---|---|---|---|---|---|
| | $849,560.00 | $337,970.00 | $1,187,530.00 | $1,187,530.00 | I |
| | $849,560.00 | $337,970.00 | $1,187,530.00 | $1,187,530.00 | I |

## 2019

| I( | Land Value | Building Value | Assessment Value | Total Taxable | T |
|---|---|---|---|---|---|
| | $772,360.00 | $415,170.00 | $1,187,530.00 | $1,187,530.00 | I |
| | $772,360.00 | $415,170.00 | $1,187,530.00 | $1,187,530.00 | I |

*For more historical data, please contact OTR Customer Service at (202) 727-4TAX.*

**423 Kennedy Construction Budget to Finish**

| Line Item Description | Balance to Finish |
|---|---|
| General Conditions | $20,000.00 |
| Permit & Utility Fees | $3,500.00 |
| Equipment Rental | $5,000.00 |
| Site Security (During Consruction) | $9,000.00 |
| On Site Labor | $42,000.00 |
| Site and Misc Management | $62,000.00 |
| Construction Management | $47,000.00 |
| Signage | $10,000.00 |
| Bike Racks | $7,500.00 |
| Exterior Siding Hardyboard, Metal & Brick | $130,000.00 |
| Light Fixtures | $65,000.00 |
| Electrical | $130,000.00 |
| Roof Deck | $32,000.00 |
| Kitchen/Vanity Cabinets (material & labor) | $215,000.00 |
| Countertops (Kitchen/bathroom) & Installation | $120,000.00 |
| Bathroom fixtures / Kitchen | $65,000.00 |
| Plumbing | $60,000.00 |
| HVAC | $198,000.00 |
| Drywall | $140,000.00 |
| Sprinklers | $60,000.00 |
| Building Insulation (labor & materials) | $55,000.00 |
| Finish Carpentry | $65,000.00 |
| Curtain Wall (Glass Front Door) (labor & materials) | $60,000.00 |
| Hardware material and labor/doors Installation | $130,000.00 |
| Solar Panels | $5,000.00 |
| Stair & Handrails (labor & materials) | $104,000.00 |
| Exterior Doors | $10,000.00 |
| Interior Doors | $126,000.00 |
| Painting | $120,000.00 |
| Tile and Labor - Bathroom (Tile and Granite) | $100,000.00 |
| Wood Flooring | $165,000.00 |
| Appliances | $205,000.00 |
| Elevator | $110,000.00 |
| Trash/Debris Removal | $15,000.00 |
| Intercom System | $20,000.00 |
| Brick Pavers + Landscaping | $90,000.00 |
| Filtration System | $104,000.00 |
| Punch Out/Final Cleaning | $27,000.00 |
| Contingency | $100,000.00 |
| Inspections & Final CO | $3,000.00 |
| **SUB TOTAL** | **$3,035,000.00** |
| Architectural & Engineering | $5,000.00 |
| Commissioning | $12,000.00 |
| **TOTAL** | **$3,052,000.00** |

**Assumption**

| | |
|---|---|
| | 423 Kennedy St NW. |
| Property Name | Washington, DC 20011 |
| Number of Units | 34 |
| Total Development Cost | $12,554,271 |
| Going Cap Rate | 5.50% |

**Debt**

| | |
|---|---|
| Loan Amount | $ 10,043,416.91 |
| Interest Rate | 6.5% |
| Amortization | 360 months |
| Monthly Payment | $63,481 |
| LTV | 80% |

**Rent Roll**

| Type | Units | Mo. Rent |
|---|---|---|
| 4BD/2BA | 1 | $4,250 |
| 4BD/2BA (IZ) | 1 | $3,070 |
| 2BD/1BA | 12 | $2,845 |
| 1BD/1BA | 1 | $2,200 |
| 3BD/1BA | 1 | $3,850 |
| 1BD+1Den/2BA | 6 | $2,945 |
| 1BD+1Den/2BA (Type 'A' Unit) | 1 | $2,500 |
| 1BD+1Den/2BA (IZ)(Type 'A' Unit) | 1 | $2,290 |
| 2BD/1BA (IZ) | 1 | $2,290 |
| 1BD+1Den/2BA(Type 'A' Unit) | 4 | $2,500 |
| 2BD/2BA | 4 | $2,945 |
| **Total Residential Units** | **33** | **$94,040** |
| Commercial | 1 | $10,000 |
| Parking | 10 | $200 |

**Residual Value**

| | |
|---|---|
| Terminal Cap Rate | 4.0% |
| Selling Costs | 1.5% |

**Summary of Risk and Returns**

| | | | |
|---|---|---|---|
| **Unlevered IRR** | **14.93%** | **Avg. Free and Clear** | **8.41%** |
| **Unlevered Emx** | **3.21X** | **Avg. Cash-on Cash** | **11.69%** |
| **Levered IRR** | **28.47%** | **Min DSCR** | **1.22X** |
| **Levered EMx** | **16.04X** | **Min DY** | **9.36%** |

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income | Inflation | *0.0%* | *4.0%* | *3.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| Residential Rent | | $1,128,480 | $1,173,619 | $1,208,828 | $1,233,004 | $1,257,664 | $1,282,818 | $1,308,474 | $1,334,644 | $1,361,336 | $1,388,563 | $1,416,334 |
| Commercial Rent | | $120,000 | $124,800 | $128,544 | $131,115 | $133,737 | $136,412 | $139,140 | $141,923 | $144,761 | $147,657 | $150,610 |
| Parking | | $24,000 | $24,960 | $25,709 | $26,223 | $26,747 | $27,282 | $27,828 | $28,385 | $28,952 | $29,531 | $30,122 |
| Recoveries | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Potential Gross Income** | | **$1,272,480** | **$1,323,379** | **$1,363,081** | **$1,390,342** | **$1,418,149** | **$1,446,512** | **$1,475,442** | **$1,504,951** | **$1,535,050** | **$1,565,751** | **$1,597,066** |
| | Vacancy | *8.0%* | *8.0%* | *7.0%* | *7.0%* | *6.0%* | *6.0%* | *6.0%* | *6.0%* | *6.0%* | *6.0%* | *6.0%* |
| Vacancy | | $101,798 | $105,870 | $95,416 | $97,324 | $85,089 | $86,791 | $88,527 | $90,297 | $92,103 | $93,945 | $95,824 |
| **Effective Gross Income** | | **$1,170,682** | **$1,217,509** | **$1,267,665** | **$1,293,018** | **$1,333,060** | **$1,359,721** | **$1,386,916** | **$1,414,654** | **$1,442,947** | **$1,471,806** | **$1,501,242** |
| Expenses | Inflation | *0.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| Marketing | | $3,500 | $3,570 | $3,641 | $3,714 | $3,789 | $3,864 | $3,942 | $4,020 | $4,101 | $4,183 | $4,266 |
| Payroll | | $5,000 | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $5,631 | $5,743 | $5,858 | $5,975 | $6,095 |
| Repairs and Maintenance | | $22,500 | $22,950 | $23,409 | $23,877 | $24,355 | $24,842 | $25,339 | $25,845 | $26,362 | $26,890 | $27,427 |
| Insurance | | $9,500 | $9,690 | $9,884 | $10,081 | $10,283 | $10,489 | $10,699 | $10,913 | $11,131 | $11,353 | $11,580 |
| Management Fees | | $1,172 | $1,195 | $1,219 | $1,244 | $1,268 | $1,294 | $1,320 | $1,346 | $1,373 | $1,400 | $1,428 |
| Electricity (Common) | | $3,000 | $3,060 | $3,121 | $3,184 | $3,247 | $3,312 | $3,378 | $3,446 | $3,515 | $3,585 | $3,657 |
| Common Water and Sewage | | $43,500 | $44,370 | $45,257 | $46,163 | $47,086 | $48,028 | $48,988 | $49,968 | $50,967 | $51,987 | $53,026 |
| Bad Debt Expense | | $2,500 | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $2,815 | $2,872 | $2,929 | $2,988 | $3,047 |
| Legal | | $12,500 | $12,750 | $13,005 | $13,265 | $13,530 | $13,801 | $14,077 | $14,359 | $14,646 | $14,939 | $15,237 |
| Trash & Recycling | | $4,230 | $4,315 | $4,401 | $4,489 | $4,579 | $4,670 | $4,764 | $4,859 | $4,956 | $5,055 | $5,156 |
| Grounds/Landscaping | | $5,000 | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $5,631 | $5,743 | $5,858 | $5,975 | $6,095 |
| Pest Control | | $1,800 | $1,836 | $1,873 | $1,910 | $1,948 | $1,987 | $2,027 | $2,068 | $2,109 | $2,151 | $2,194 |
| Snow Removal | | $1,250 | $1,275 | $1,301 | $1,327 | $1,353 | $1,380 | $1,408 | $1,436 | $1,465 | $1,494 | $1,524 |
| Taxes, Licenses, Permits, Fees | | $1,500 | $1,530 | $1,561 | $1,592 | $1,624 | $1,656 | $1,689 | $1,723 | $1,757 | $1,793 | $1,828 |
| OPEX Reserve | | $17,543 | $17,894 | $18,251 | $18,617 | $18,989 | $19,369 | $19,756 | $20,151 | $20,554 | $20,965 | $21,385 |
| Prop. Taxes | | $106,711 | $108,846 | $111,022 | $113,243 | $115,508 | $117,818 | $120,174 | $122,578 | $125,029 | $127,530 | $130,080 |
| **Operating Expenses** | | **$241,206** | **$246,030** | **$250,951** | **$255,970** | **$261,089** | **$266,311** | **$271,637** | **$277,070** | **$282,611** | **$288,263** | **$294,029** |
| **Net Operating Income** | | **$929,476** | **$971,479** | **$1,016,714** | **$1,037,049** | **$1,071,971** | **$1,093,411** | **$1,115,279** | **$1,137,584** | **$1,160,336** | **$1,183,543** | **$1,207,214** |
| CapEx | | $15,000 | $15,300 | $15,606 | $15,918 | $16,236 | $16,561 | $16,892 | $17,230 | $17,575 | $17,926 | |
| **Cash Flow from Operations** | | **$914,476** | **$956,179** | **$1,001,108** | **$1,021,131** | **$1,055,735** | **$1,076,849** | **$1,098,386** | **$1,120,354** | **$1,142,761** | **$1,165,616** | |
| Debt Service | | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | $761,775 | |
| Mortgage Insurance Premium (0.5% of Loan) | | | | | | | | | | | | |
| **Before Tax Cash Flow** | | **$152,701** | **$194,404** | **$239,334** | **$259,356** | **$293,960** | **$315,075** | **$336,612** | **$358,579** | **$380,986** | **$403,842** | |

| **Risk** | **Year 0** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** | **Year 7** | **Year 8** | **Year 9** | **Year 10** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan Balance | | ($9,931,159) | ($9,811,383) | ($9,683,586) | ($9,547,229) | ($9,401,741) | ($9,246,509) | ($9,080,880) | ($8,904,160) | ($8,715,604) | ($8,514,420) |
| DSCR | | 1.22X | 1.28X | 1.33X | 1.36X | 1.41X | 1.44X | 1.46X | 1.49X | 1.52X | 1.55X |
| Debt Yield | | 9.36% | 9.90% | 10.50% | 10.86% | 11.40% | 11.83% | 12.28% | 12.78% | 13.31% | 13.90% |

| **Returns** | **Year 0** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** | **Year 7** | **Year 8** | **Year 9** | **Year 10** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | ($12,554,271) | | | | | | | | | | |
| Cash Flow from Operations | | $914,476 | $956,179 | $1,001,108 | $1,021,131 | $1,055,735 | $1,076,849 | $1,098,386 | $1,120,354 | $1,142,761 | $1,165,616 |
| Sale | | | | | | | | | | | $30,180,339 |
| Selling Costs | | | | | | | | | | | ($452,705) |
| **Total Unlevered Cash Flow** | **($12,554,271)** | **$914,476** | **$956,179** | **$1,001,108** | **$1,021,131** | **$1,055,735** | **$1,076,849** | **$1,098,386** | **$1,120,354** | **$1,142,761** | **$30,893,250** |
| **Free and Clear Return** | **8.41%** | **7.28%** | **7.62%** | **7.97%** | **8.13%** | **8.41%** | **8.58%** | **8.75%** | **8.92%** | **9.10%** | **9.28%** |
| **Unlevered IRR** | **14.93%** | | | | | | | | | | |
| **Unlevered Equity Multiple** | **3.21X** | | | | | | | | | | |
| Purchase | ($12,554,271) | | | | | | | | | | |
| Loan Funding | $10,043,417 | | | | | | | | | | |
| Before Tax Cash Flow | | $152,701 | $194,404 | $239,334 | $259,356 | $293,960 | $315,075 | $336,612 | $358,579 | $380,986 | $403,842 |
| Sale | | | | | | | | | | | $30,180,339 |
| Loan Payoff | | | | | | | | | | | ($8,514,420) |
| Selling Costs | | | | | | | | | | | ($452,705) |
| **Total Levered Cash Flow** | **($2,510,854)** | **$152,701** | **$194,404** | **$239,334** | **$259,356** | **$293,960** | **$315,075** | **$336,612** | **$358,579** | **$380,986** | **$21,617,056** |
| **Cash-on-Cash Return** | **11.69%** | **6.08%** | **7.74%** | **9.53%** | **10.33%** | **11.71%** | **12.55%** | **13.41%** | **14.28%** | **15.17%** | **16.08%** |
| **Levered IRR** | **28.47%** | | | | | | | | | | |
| **Levered Equity Multiple** | **16.04X** | | | | | | | | | | |

**423 Kennedy**
**Unit Summary**

| Floor | Unit Count | Type | Net Rentable Square Feet |
|---|---|---|---|
| C1 | A001 | 4BD/2BA | 1580.237 |
| | A002 | 4BD/2BA (IZ) | 1576.013 |
| 1st | A101 | 2BD/1BA | 852.762 |
| | A102 | 1BD/1BA | 742.452 |
| | A103 | 3BD/1BA | 1188.187 |
| 2nd | A201 | 2BD/1BA | 793.803 |
| | A202 | 2BD/1BA | 800.136 |
| | A203 | 1BD+1Den/2BA | 803.333 |
| | A204 | 1BD+1Den/2BA | 804.755 |
| | A205 | 2BD/1BA | 799.369 |
| | A206 | 2BD/1BA | 797.4 |
| | A207 | 1BD+1Den/2BA (Type 'A' Unit) | 803.73 |
| | A208 | 1BD+1Den/2BA (IZ) (Type 'A' Unit) | 804.349 |
| 3rd | A301 | 2BD/1BA (IZ) | 798.026 |
| | A302 | 2BD/1BA | 798.94 |
| | A303 | 1BD+1Den/2BA | 804.4 |
| | A304 | 1BD+1Den/2BA | 799.248 |
| | A305 | 2BD/1BA | 799.945 |
| | A306 | 2BD/1BA | 798.593 |
| | A307 | 1BD+1Den/2BA (Type 'A' Unit) | 803.456 |
| | A308 | 1BD+1Den/2BA (Type 'A' Unit) | 805.026 |
| 4th | A401 | 2BD/1BA | 798.183 |
| | A402 | 2BD/1BA | 798.347 |
| | A403 | 1BD+1Den/2BA (Type 'A' Unit) | 805.842 |
| | A404 | 1BD+1Den/2BA (Type 'A' Unit) | 798.404 |
| | A405 | 2BD/1BA | 800.386 |
| | A406 | 2BD/1BA | 799.575 |
| | A407 | 1BD+1Den/2BA | 801.318 |
| | A408 | 1BD+1Den/2BA | 805.214 |
| 5th | A501 | 2BD/2BA | 762.521 |
| | A502 | 2BD/2BA | 764.184 |
| | A503 | 2BD/2BA | 762.933 |
| | A504 | 2BD/2BA | 757.637 |

| | |
|---|---|
| **Total / Wght Avg** | **28,209** |
| **Residential** | **28,209** |
| **Comerical** | **2,500.** |

| **Property Ur** |
|---|
| 1 Bedroom |
| 2 Bedroom |
| 3 Bedroom |
| 4 Bedroom |
| Commerical |
| **Total Weigh** |

**it Summary**

| | | Total Units | Avg SF | Median SF | Total SF |
|---|---|---|---|---|---|
| | 1 | 13 | 799 | 804 | 10,387 |
| | 2 | 17 | 793 | 798 | 13,481 |
| | 3 | 1 | 1,188 | 1,188 | 1,188 |
| | 4 | 2 | 1,578 | 1,578 | 3,156 |
| Space - 2,500 sq. ft | | | | | |
| **it Avg.** | | **33** | **855** | **996** | **28,212** |

| | | |
|---|---|---|
| 4BD/2BA | 1580.237 | 1 |
| 4BD/2BA (IZ) | 1576.013 | 1 |
| 2BD/1BA | 9637.439 | 12 |
| | | |
| 1BD/1BA | 742.452 | 1 |
| | | |
| 3BD/1BA | 1188.187 | 1 |
| 1BD+1Den/2BA | 4818.268 | 6 |
| 1BD+1Den/2BA (Type 'A' Unit) | 803.73 | 1 |
| 1BD+1Den/2BA (IZ)(Type 'A' Unit) | 804.349 | 1 |
| 2BD/1BA (IZ) | 798.026 | 1 |
| 1BD+1Den/2BA(Type 'A' Unit) | 3212.728 | 4 |
| 2BD/2BA | 3047.275 | 4 |

**423 Kennedy St NW. Washington, DC 20011**

| | |
|---|---|
| **Lot Size:** | 9,520 |
| **Gross SF:** | 36,512 |
| **Address:** | 423 Kennedy St NW |
| **City, Zip:** | Washington, DC 20011 |

| | | 72,764 | 44 |
|---|---|---|---|
| **Construction Loan/ Sales Transaction Costs** | **$** | **$/GSF** | **$/Unit** |
| Land Value | 2,899,394 | 39.85 | 65,895 |
| Recordation Tax | 147,963 | 2.03 | 3,363 |
| Transfer Tax on Sales | 52,153 | 0.72 | 1,185 |
| Title Charges (Insurance & Settlement Fees) | 24,913 | 0.34 | 566 |
| Appraisal | 2,950 | 0.04 | 67 |
| Lender Origination Fee | 217,242 | 2.99 | 4,937 |
| Senior Loan Fee | | - | - |
| **Total Acquisition / Transaction Costs** | **3,344,615** | **45.97** | **76,014** |

| **Hard Costs** | **$** | **$/GSF** | **$/Unit** |
|---|---|---|---|
| Construction | 8,899,921 | 122.31 | 202,271 |
| Total Cost of the Work | 8,899,921 | 122.31 | 202,271 |
| Insurance | 22,185 | 0.30 | 504 |
| **Total Contract** | **8,922,106** | **122.62** | **202,775** |
| | | | |
| **Total Hard Costs** | **8,922,106** | **122.62** | **202,775** |
| **RESIDENTIAL ONLY $/GSF** | | **122.62** | |

| **Soft Costs** | **$** | **$/GSF** | **$/Unit** |
|---|---|---|---|
| Architectual | 8,500 | 0.12 | 193 |
| Condo Docs | 6,500 | 0.09 | 148 |
| Real Estate Taxes During Construction | 25,787 | 0.35 | 586 |
| **Total Soft Costs** | **40,787** | **0.56** | **927** |
| | | | |
| **Total Development Costs Before Interest** | **12,307,508** | **169.14** | **279,716** |

| **Interest Reserves** | **$** | **$/GSF** | **$/Unit** |
|---|---|---|---|
| Interest Reserve | 246,763 | 3.39 | 5,608 |
| **Total Interest Reserves** | **246,763** | **3.39** | **5,608** |
| | | | |
| **Total Development Costs** | **12,554,271** | **172.53** | **285,324** |

# Addendum H:
# Qualifications of the Appraiser

CUSHMAN & WAKEFIELD



**Chase Pike, MAI, CCIM** Executive Director

Valuation & Advisory
Practice Group Member | Multifamily
Cushman & Wakefield of Washington, DC, Inc.

## Professional Expertise

Chase Pike is an Executive Director in Cushman & Wakefield's Valuation & Advisory Group in the firm's Washington, DC office. Mr. Pike oversees the DC Multifamily Specialty Practice, which is responsible for valuing multifamily assets throughout the region for lending, reporting, and investment purposes. Property types include existing and proposed rental communities, for-sale condominium developments, mobile home communities, development sites, and air rights.

Prior to joining Cushman & Wakefield, Mr. Pike was a Vice President at CBRE as part of the Multifamily Valuation Group. While there, he valued over $5 billion in multifamily and mixed-use assets. Before CBRE, he was an Asset Manager at Gates Hudson in Fairfax, Virginia where he was primarily responsible for the analysis of new acquisitions totaling over $1.5 billion in value. Additionally, he assisted in monitoring and evaluating operating financials in support of the existing 11,000-unit multifamily portfolio. Prior to this position, Mr. Pike was a Senior Associate with Joseph J. Blake & Associates in Washington, D.C. Mr. Pike began his career in valuation as an Associate at The Benfield Group in Charlotte, NC.

## Memberships, Licenses, Professional Affiliations and Education

- Designated Member, Appraisal Institute. As of the current date, Chase Pike, MAI has completed the requirements of the continuing education program of the Appraisal Institute
- Designee, CCIM Institute
- Certified General Real Estate Appraiser in the following states:
  - Commonwealth of Virginia – 4001017400
  - District of Columbia – GA122298
  - Maryland – 32719
  - North Carolina – A8694
  - South Carolina – 8183
  - Tennessee – 6276
- Master of Professional Studies, Real Estate, Georgetown University
- Bachelor of Science, Finance and Economics, University of Alabama

## DISTRICT OF COLUMBIA

The Department of Consumer and Regulatory Affairs grants this license, in support of and under the authority of the:

### District of Columbia Real Estate Appraisers

to: CHASE PIKE

as a: Appraiser Certified General



| license number: | effective date: | expiration date: |
|---|---|---|
| GA12298 | 8/26/2016<br>3/1/2022 | 2/28/2024 |

Director
Department of Consumer and Regulatory Affairs

dcra

## MARYLAND

DLLR

LICENSE * REGISTRATION * CERTIFICATION * PERMIT

STATE OF MARYLAND

DEPARTMENT OF LABOR, LICENSING AND REGULATION

COMMISSION OF RE APPRAISERS & HOME INSPECTORS

CERTIFIES THAT:

CHASE BRANDON PIKE

IS AN AUTHORIZED: 04 - CERTIFIED GENERAL

| LIC/REG/CERT | EXPIRATION | EFFECTIVE | CONTROL NO. |
|---|---|---|---|
| 32714 | 07-31-2022 | 06-06-2014 | 5365823 |

Signature of Bearer

Acting Secretary DLLR

WHERE REQUIRED BY LAW THIS MUST BE CONSPICUOUSLY DISPLAYED IN OFFICE TO WHICH IT APPLIES

## COMMONWEALTH OF VIRGINIA


COMMONWEALTH of VIRGINIA
Department of Professional and Occupational Regulation
9960 Mayland Drive, Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

EXPIRES ON
07-31-2024

NUMBER
4001017400

REAL ESTATE APPRAISER BOARD

CERTIFIED GENERAL REAL ESTATE APPRAISER

CHASE BRANDON PIKE

DPOR

Demetrios J. Melis, Director

Status can be verified at http://www.dpor.virginia.gov

## NORTH CAROLINA

## SOUTH CAROLINA



State of South Carolina
Real Estate Appraisers Board

CHASE BRANDON PIKE
8183

Having Satisfied The Qualifications Of The South Carolina Real Estate Appraisers Board And Having Complied With The Requirements Prescribed By Law, Is Hereby Entitled To Practice As A

CERTIFIED GENERAL APPRAISER

In Witness Thereof, The State Of South Carolina Real Estate Appraisers Board By Virtue Of The Authority Vested In It By Chapter 60, Title 40, Code Of Laws Of South Carolina Has Caused This Document To Be Issued With Its Seal Imprinted Hereon.

Administrator

Property of South Carolina Real Estate Appraisers Board

## TENNESSEE



13093376

State of Tennessee

TENNESSEE REAL ESTATE APPRAISER COMMISSION
CERTIFIED GENERAL REAL ESTATE APPRAISER
MR. CHASE PIKE

*This is to certify that all requirements of the State of Tennessee have been met.*

ID NUMBER: 6276
LIC STATUS: ACTIVE
EXPIRATION DATE: July 31, 2024

IN-1313
DEPARTMENT OF
COMMERCE AND INSURANCE

Maryland
DEPARTMENT OF LABOR

# Results for Active Licensed Real Estate Appraisers and Home Inspectors: 1

| Name | City | State | Zip | Expiration | Category | Reg. # |
|---|---|---|---|---|---|---|
| CHASE BRANDON PIKE | WASHINGTON | DC | 20037 | 2025-07-31 | CERTIFIED GENERAL | 32719 |

[NEW SEARCH FOR ACTIVE LICENSED INDIVIDUALS]

[Home] [Return to Licensing Queries]

# PLAINTIFFS' EXHIBIT 41

GDL
GREENSTEIN DELORME & LUCHS, P.C.

801 17th STREET, N.W., SUITE 1000
WASHINGTON, D.C. 20006
tel (202) 452-1400 fax (202) 452-1410
www.gdllaw.com

JAMES D. SADOWSKI
JDS@GDLLAW.COM
DIRECT DIAL: (202) 785-5407

July 12, 2023

***BY EMAIL AND FIRST-CLASS MAIL***

Maurice "Mac" VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, MD 20854
mac@mbvesq.com

Re: Demand that Russell S. Drazin Resign as Trustee Due to His Conflict of Interest, and Demand for Withdrawal of Foreclosure Notices

Re: *Developer RE1, LLC v. DP Capital, LLC d/b/a Washington Capital Partners, et al.*; Case No. 2022-CAB-0059935

Re: *423 Kennedy St Holdings LLC v. DP Capital d/b/a Washington Capital Partners, et al.*; Case No. TBD

Dear Mac:

As you know, this law firm represents Developer RE1, LLC in the above-referenced case and 423 Kennedy St Holdings LLC. As you also know based upon part of what we discussed at yesterday's meet and confer session, and as Russell Drazin is presumed to know as a D.C. attorney, Mr. Drazin has had, and continues to have, a conflict of interest with respect to his simultaneous representation of the Lender Defendants (DP Capital, LLC d/b/a Washington Capital Partners, The WCP Fund I, LLC and Daniel Huertas) while also serving as Trustee under the deeds of trust signed by our clients as borrowers.

Under well-established case law in the District, as a trustee Mr. Drazin has fiduciary duties *to both the borrowers and the lenders* under the deeds of trust. *Perry v. Virginia Mortg. & Inv. Corp.*, 412 A 2d 1194 (D.C. 1980). It is not possible for Mr. Drazin to be faithful to his fiduciary duty owed to our clients as borrowers while at the same time consulting exclusively with, and being counsel to, the Lender Defendants. Case law in the District further holds that "[w]hen it is shown that a fiduciary has conflicting interests, ancient principles require him to bear the burden of proving that he has been faithful to his trust." *Sheridan v. Perpetual Building*

*Assoc.*, 299 F.2d 463, 465 (1962) (en banc) (*Sheridan I*); *accord*, *Johnson v. Inter-City Mortg. Corp.*, D.C. App., 366 A.2d 435, 437 (1976) and *Sheridan v. Perpetual Building Assoc.*, 322 F.2d 418, 420 (1963) (*Sheridan II*). In fact, the *Sheridan I* decision recommended, in clear and express terms, that a substitute trustee should be appointed whenever a trustee that has an obvious conflict of interest gets involved in issues seriously affecting a borrower's rights such as a foreclosure, as is the case here. *Sheridan I,* 299 F 2d. at 465, n.4 ("We think that the [burden shifting] rule applies wherever a trustee with conflicting interests takes action, such as foreclosure, seriously affecting the borrower's interests. Substitution of independent trustees *prior to the taking of any such action* would seem to offer a measure of protection to all concerned.") (italic emphasis added).

While it is now too late for Mr. Drazin to immunize himself from the prior, improper actions that he took as Trustee when he had an undeniable, actual conflict of interest, there is still time for him to not make matters worse and to not put the Lender Defendants' positions in further jeopardy of being found to be improper due to his conflict of interest.

For the foregoing reasons, by this letter our clients demand that:

- Mr. Drazin immediately resign from his role as Trustee under all of the deeds of trust with our clients; and

- that an independent, substitute trustee be designated to replace Mr. Drazin under the deeds of trust; and

- that the Foreclosure Notices dated June 23, 2023 that were sent to our clients be either immediately withdrawn or suspended until such time as Mr. Drazin meets his burden of proving that he has been faithful to his fiduciary duties to both the borrowers and to the lender.

Our clients believe that withdrawal of the Foreclosure Notices is the only available option since Mr. Drazin will be unable to meet his burden of proof. Mr. Drazin has already demonstrated a callous disregard for the rights of the borrowers. He has also consulted extensively -- and exclusively -- with the Lender Defendants, either in his role as counsel or in his role as Trustee.[1] And Mr. Drazin was, and still is, counsel to the Lender Defendants. In our view, a court will easily find that Mr. Drazin has been controlled and dominated by the Lender

[1] At yesterday's meet and confer session, you represented that you believed that nearly all of Mr. Drazin's communications with the Lender Defendants are privileged, which further confirms the actual conflict -- and that Mr. Drazin has at all times been acting solely on behalf of the Lender Defendants.

Defendants, so any act that he has taken to date as Trustee will be overturned as improper given his conflict of interest, including his decision to issue the Foreclosure Notices.

Please let me know immediately whether these required steps will be taken. Our clients further reserve any and all rights that they have to pursue claims against Mr. Drazin for breach of his fiduciary duties to them as borrowers.

Sincerely,

James D. Sadowski

cc: Developer RE1, LLC (by email)
423 Kennedy St Holdings, LLC (by email)
Richard W. Luchs, Esq. (by email)
Alex J. Smith, Esq. (by email)