Doc #: 2022000481
01/03/2022 12:42 PM

WCP EX. A

This deed of trust pays off instrument number 2018030043 in the amount of $1312500 and instrument number 2017031372 with an amount of $750000.00 and a total principal balance of $3200923.90 leaving a total balance of $378076.10

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $3,579,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of December 23, 2021, by and between **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street NW Suite 300, Washington, DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$3,579,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street NW Suite 300, Washington, DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees

that any such assignment will give rise to a direct obligation of Grantor to the Transferee and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and

remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any

collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006120
1st Trust

**GRANTOR:**

**DEVELOPER RE1 LLC,**
a District of Columbia Limited Liability Company

_________________________(SEAL)
By: Mel Melaku Negussie
Its: Managing Member

COUNTY OF District of Columbia ) SS:
STATE OF City of Washington

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_________________________
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: _________________________

ROSA M. GREEN NOTARY PUBLIC DISTRICT OF COLUMBIA EXP. 9-30-24

**EXHIBIT A**

**LEGAL DESCRIPTION**

# EXHIBIT "A"
## Property Description

**Closing Date:** **December 23, 2021**

**Borrower(s):** **Developer RE1 LLC**

**Property Address:** **5501 1st Street Northwest, Washington, DC 20011**

PROPERTY DESCRIPTION:

Property 1:
Lot 137 in Square 3389, in a subdivision made by 71 Kennedy ST Holdings LLC and 5505 1st ST Holdings LLC, as per plat recorded in Liber 215 at folio 65 among the Land Records of the Office of the Surveyor of the District of Columbia

Property 2:
Lots 71 and 72 in square numbered 3389, in the subdivision made by The Washington Land and Mortgage Company of part of a tract of land called 'CHILLUM CASTLE MANOR", now known as "CHILLUM CASTLE HEIGHTS", as per plat recorded in Liber 42 at folio 14 of the Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as part of Lot numbered 817 in Square numbered 3389.

Doc #: 2022000481
Filed & Recorded
01/03/2022 12:42 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $150.00 |
| SURCHARGE | $6.50 |
| RECORDATION TAX FEES | $9,451.90 |
| TOTAL: | $9,608.40 |

Doc #: 2022000482
01/03/2022 12:42 PM
WCP EX. B

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $524,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of December 23, 2021, by and between **DEVELOPER RE1 LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street NW Suite 300, Washington, DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$524,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness

or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

ARTICLE I

DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise agreements, licenses, permits and certificates; (ix) tenements, hereditaments and

appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively, "Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or

5501 1st St NW Washington DC 20011


additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated herein; and (b) the Note does,

and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall,

at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or which the Beneficiary or the Trustee may be or become a party by reason of this Deed of

Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge or security interest, or conditional sale or other title retention agreement, with respect to

the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs and expenses actually and reasonably incurred by the Beneficiary in connection with the

collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street NW Suite 300, Washington, DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees

that any such assignment will give rise to a direct obligation of Grantor to the Transferee and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and

remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any

collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

ARTICLE XII

STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

5505 1st St NW Washington DC 20011
5501 1st St NW Washington DC 20011
LOAN-006182
2nd Trust

**GRANTOR:**

**DEVELOPER RE1 LLC,**
a District of Columbia Limited Liability Company

(SEAL)
By: Mel Melaku Negussie
Its: Managing Member

COUNTY OF District of Columbia ) SS:
STATE OF City of Washington

I hereby certify on this 24 day of December, 2021, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: ______________

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

DISTRICT OF COLUMBIA
EXP. 9-30-24
ROSA M. GREEN NOTARY PUBLIC

**EXHIBIT A**

**LEGAL DESCRIPTION**

# EXHIBIT "A"
## Property Description

**Closing Date:** **December 23, 2021**

**Borrower(s):** **Developer RE1 LLC**

**Property Address:** **5501 1st Street Northwest, Washington, DC 20011**

PROPERTY DESCRIPTION:

Property 1:
Lot 137 in Square 3389, in a subdivision made by 71 Kennedy ST Holdings LLC and 5505 1st ST Holdings LLC, as per plat recorded in Liber 215 at folio 65 among the Land Records of the Office of the Surveyor of the District of Columbia

Property 2:
Lots 71 and 72 in square numbered 3389, in the subdivision made by The Washington Land and Mortgage Company of part of a tract of land called 'CHILLUM CASTLE MANOR", now known as "CHILLUM CASTLE HEIGHTS", as per plat recorded in Liber 42 at folio 14 of the Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as part of Lot numbered 817 in Square numbered 3389.

Doc #: 2022000482
Filed & Recorded
01/03/2022 12:42 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $150.00 |
| SURCHARGE | $6.50 |
| RECORDATION TAX FEES | $13,100.00 |
| TOTAL: | $13,256.50 |

Doc #: 2022038744 1st Trust
04/08/2022 08:41 AM

WCP EX. C

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

This Deed of trust Pays off [illegible] 2021170282

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $8,689,693.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of March 31, 2022, by and between **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street, Suite 300, Washington DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$8,689,693.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street, Suite 300, Washington DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Grantor to the Transferee

and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

419-423 Kennedy St NW Washington DC
LOAN-006491
1st Trust

**GRANTOR:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

Mel Negussie (SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

for Mel Negussie (SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY~~ OF District of Columbia ) SS:
~~STATE~~ OF ________________ )

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

[signature]
NOTARY PUBLIC

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

**EXHIBIT A**

**LEGAL DESCRIPTION**

# Exhibit "A"
## Property Description

Lots Fifty-Six (56) in Square numbered Thirty-Two Hundred Sixty (3260) in the subdivision made by Ashley Brown, as per plat thereof recorded in the Office of the Surveyor for the District of Columbia in Plat Book 214 at Page 78.

Doc #: 2022038744
Filed & Recorded
04/08/2022 08:41 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $150.00 |
| SURCHARGE | $6.50 |
| RECORDATION TAX FEES | $64,917.33 |
| TOTAL: | $65,073.83 |

LOAN 006652
2nd Trust
WCP EX. D

Prepared by and return to:
Washington Capital Partners
2815 Hartland Road, Suite 200
Falls Church, VA 22043
Attn: Victoria Junkins, Esq.

Doc #: 2022038745
04/08/2022 08:41 AM

# DEED OF TRUST

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $1,256,000.00. An explicit statement of the rights and obligations of the borrower (i.e., grantor) and the consequences of default are set forth herein.

**THIS DEED OF TRUST**, made effective as of March 31, 2022, by and between **423 Kennedy St Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1629 K Street, Suite 300, Washington DC 20006, and **Russell S. Drazin**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015.

WHEREAS, Grantor is justly indebted to **WCP Fund 1 LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, in its capacity as Agent (as hereinafter defined) under any co-lending agreement, for money borrowed in the amount of **$1,256,000.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary (the "Note"); and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Beneficiary, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in

equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Leases - all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Grantor demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter executed.

(i) Mortgaged Property - The Land, the Improvements. , the Personal Property, all development rights transferred or appurtenant to the Land, all easements and other rights now or hereafter made appurtenant to the Land, all additions and accretions to the Land, all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Land in which Grantor has an interest, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements associated with the Land; and all proceeds of any of the foregoing.

(j) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(k) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(l) Person - shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

(m) Personal Property -- all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Grantor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Land (whether or not subsequently removed from the Land), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers; (viii) Leases, lease guarantees, contracts, contract rights, franchise

agreements, licenses, permits and certificates; (ix) tenements, hereditaments and appurtenances; (x) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xi) management agreements, service contracts, supply contracts or other contracts or agreements; (xii) warranties; (xiii) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xiv) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xv) deposits made with or other security given to utility companies by Grantor with respect to the Mortgaged Property and/or Improvements; (xvi) advance payments of insurance premiums made by Grantor with respect to, and all claims or demands with respect to, insurance; (xvii) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xviii) condemnation awards; and (xix) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements.

(n) Trustee - The parties hereinabove designated as such, their successors and substitutes.

## ARTICLE II

## GRANT

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively,

"Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever

upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement

of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or

which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge

or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs

and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they

become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness

and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

## ARTICLE VIII

## DEFAULT AND FORECLOSURE

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or

enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1629 K Street, Suite 300, Washington DC 20006**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3Successors and Assigns.

(a) All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee, and all persons claiming under or through any of them.

(b)Notwithstanding anything to the contrary in this Deed of Trust, (i) there shall be no limitation or restriction on Beneficiary's ability to assign, pledge or otherwise transfer the Indebtedness or other Obligations, and (ii) Beneficiary may at any time assign all or a portion of the Indebtedness and other Obligations to one or more Persons (each a "Transferee") without providing notice to Grantor or obtaining Grantor's consent. Following any such assignment, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as the Beneficiary hereunder, and (ii) the assigning Beneficiary shall have no further rights hereunder with respect to the assigned portion of Indebtedness and other Obligations. Grantor hereby acknowledges and agrees that any such assignment will give rise to a direct obligation of Grantor to the Transferee

and that the Transferee shall be considered to be a "Beneficiary" hereunder. Each Transferee shall have all of the rights, obligations and benefits with respect to the Indebtedness, Obligations, Note, Mortgaged Property and/or Loan Documents held by it as fully as if the original holder thereof. Agent (as hereinafter defined) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

(c)Any assignment pursuant to Section 11.3(b) above may be evidenced by a note, at the election of Beneficiary. Upon written notice from Beneficiary, Grantor shall promptly (and in any event within three (3) business days after any such request) execute and deliver to Agent any such documents as Beneficiary may require to confirm such assignment, evidence the Indebtedness, and/or to otherwise effectuate such assignment including, without limitation, original replacement notes in form and substance satisfactory to Agent and payable to the order of Beneficiary and/or a Transferee in an aggregate principal amount equal to the stated principal amount of the Loan.

(d) Beneficiary shall act as initial administrative noteholder for itself and any Transferee (together with any successor administrative noteholder, the "Agent"). Grantor acknowledges that Agent shall have the sole and exclusive authority to execute and perform this Deed of Trust and each Loan Document on behalf of the Beneficiary, subject to the terms of any co-lending agreement. Grantor shall rely conclusively on the actions of Agent to bind the Beneficiary, notwithstanding that the particular action in question may, pursuant to this Deed of Trust or any co-lending agreement be subject to the consent or direction of another Person. Beneficiary may resign or be replaced as Agent in accordance with the term of any co-lending agreement and upon such removal or resignation, a successor Agent shall be appointed in accordance with the terms of any co-lending agreement.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases, rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Assignment of Contracts

Grantor hereby irrevocably and unconditionally assigns its right, title, and interest in and to all contracts executed in connection with the Mortgaged Property and all contract rights arising therefrom. So long as no default or Event of Default exist under this Deed of Trust, the Note or any other Loan Documents, Beneficiary grants a license to Grantor to use the contracts and contract rights for the benefit of the Mortgaged Property. However, upon a default or Event of Default Deed of Trust, Grantor's license shall immediately and automatically be revoked, and Beneficiary, at its option, may assume the contracts; provided, however, Beneficiary shall not be liable for any amounts due under the contracts prior to the effective date of such assumption. Such assignment shall not impose upon Beneficiary any duty to assume or otherwise perform under such contracts.

11.13 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all Personal Property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other Personal Property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

**GRANTOR:**

**423 Kennedy St Holdings LLC,**
a District of Columbia Limited Liability Company

______________(SEAL)
By: Mel Melaku Negussie
Its: Member-Manager

By: Brighton - KSDC, LLC
Its: Member-Manager

By: Brighton Capital LLC
Its: Managing Member

______________(SEAL)
By: Mel Melaku Negussie
Its: Authorized Signer, on behalf of Balakrishnarao Sure and Naveen Vavilala, Members

~~COUNTY~~ OF District of Columbia ) SS:
~~STATE~~ OF ______________ )

I hereby certify on this 31st day of March, 2022, before me in the jurisdiction aforesaid, did personally appear Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

JEFFREY DARRAH NOTARY PUBLIC MY COMMISSION EXPIRES 5/14/2025 DISTRICT OF COLUMBIA

______________
NOTARY PUBLIC

My commission expires: 5/14/2025

Jeffrey Darrah
Notary Public, District of Columbia
My Commission Expires 5/14/2025

**EXHIBIT A**

**LEGAL DESCRIPTION**

# EXHIBIT " A"
## Property Description

**Closing Date:** **March 31, 2022**

**Borrower(s):** **423 Kennedy St Holdings LLC**

**Property Address:** **419-423 Kennedy Street, NW, Washington, DC 20011**

PROPERTY DESCRIPTION:

Lots Fifty-Six (56) in Square numbered Thirty-Two Hundred Sixty (3260) in the subdivision made by Ashley Brown, as per plat thereof recorded in the Office of the Surveyor for the District of Columbia in Plat Book 214 at Page 78.

Doc #: 2022038745
Filed & Recorded
04/08/2022 08:41 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $150.00 |
| SURCHARGE | $6.50 |
| RECORDATION TAX FEES | $18,212.00 |
| TOTAL: | $18,368.50 |

WCP EX. E

| Name | Status Reason | Payment Due On | Days Past Due C | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late F | Amount Due (Default Int | Amount Due (Pri | Amount Due (Total) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-111556 | Unpaid | 7/1/2023 | -11 | | | Defaulted | 23830.18 | 0.00 | 47749.83 | | 71580.01 |
| LPAY-109715 | Unpaid | 6/1/2023 | 19 | | | Defaulted | 24624.51 | 0.00 | 49341.49 | | 73966.00 |
| LPAY-108082 | Unpaid | 5/1/2023 | 50 | | | Defaulted | 23830.18 | 0.00 | 47749.83 | | 71580.01 |
| LPAY-106199 | Unpaid | 4/1/2023 | 80 | | | Defaulted | 24624.51 | 0.00 | 49341.49 | | 73966.00 |
| LPAY-104916 | Unpaid | 3/1/2023 | 111 | | | Defaulted | 22241.50 | 0.00 | 44566.50 | | 66808.00 |
| LPAY-103841 | Unpaid | 2/1/2023 | 139 | | | Defaulted | 24624.51 | 0.00 | 49341.49 | | 73966.00 |
| LPAY-102278 | Paid | 1/1/2023 | 170 | 12/23/2022 8:00 | Wire | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-100256 | Paid | 12/1/2022 | 201 | 12/6/2022 0:07 | Wire | Late (5-15 Days) | 23830.18 | 2383.02 | 0.00 | | 26213.20 |
| LPAY-098044 | Paid | 11/1/2022 | 231 | 11/9/2022 8:00 | Wire | Late (5-15 Days) | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-096801 | Paid | 10/1/2022 | 262 | 10/6/2022 0:15 | Stripe | Late (5-15 Days) | 23830.18 | 2383.02 | 0.00 | | 26213.20 |
| LPAY-092932 | Paid | 9/1/2022 | 292 | 9/3/2022 13:35 | Stripe | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-090157 | Paid | 8/1/2022 | 323 | 8/5/2022 15:05 | Stripe | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-088108 | Paid | 7/1/2022 | 354 | 7/14/2022 8:00 | Stripe | Late (5-15 Days) | 23830.18 | 0.00 | 0.00 | | 23830.18 |
| LPAY-085019 | Paid | 6/1/2022 | 384 | 6/1/2022 0:00 | Pre-Paid Interest | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-083297 | Paid | 5/1/2022 | 415 | 5/1/2022 0:00 | Pre-Paid Interest | Current | 23830.18 | 0.00 | 0.00 | | 23830.18 |
| LPAY-080803 | Paid | 4/1/2022 | 445 | 4/1/2022 0:00 | Pre-Paid Interest | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-080088 | Paid | 3/1/2022 | 476 | 3/1/2022 0:00 | Pre-Paid Interest | Current | 22241.50 | 0.00 | 0.00 | | 22241.50 |
| LPAY-078249 | Paid | 2/1/2022 | 504 | 2/1/2022 0:00 | Pre-Paid Interest | Current | 24624.51 | 0.00 | 0.00 | | 24624.51 |
| LPAY-075494 | Paid | 12/23/2021 | 544 | 12/23/2021 0:00 | HUD | Originated | 7149.05 | 0.00 | 0.00 | | 7149.05 |

| Name | Amount Paid (Interest) | Amount Paid (Interest) Prepaid | Amount Paid (Late Fee) | Amount Paid (Default Int | Amount Paid (Pr | Amount Paid (Total) | Beginning Princi | Ending Principal | Cumulative Inte | Unapplied Funds | Principal Paydov | Balance (Total) | Scheduled Payment Stat | balance (no late |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-111556 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 71580.01 | Unscheduled | 71580.01 |
| LPAY-109715 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 73966.00 | Unscheduled | 73966.00 |
| LPAY-108082 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 71580.01 | Unscheduled | 71580.01 |
| LPAY-106199 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 73966.00 | Unscheduled | 73966.00 |
| LPAY-104916 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 66808.00 | Unscheduled | 66808.00 |
| LPAY-103841 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 73966.00 | Unscheduled | 73966.00 |
| LPAY-102278 | 24624.51 | 0.00 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-100256 | 23830.18 | 0.00 | 0.00 | 0.00 | 0.00 | 23830.18 | | | | 0.00 | 0.00 | 2383.02 | ACH - Cleared | 0.00 |
| LPAY-098044 | 24624.51 | 0.00 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-096801 | 23830.18 | 0.00 | 0.00 | 0.00 | 0.00 | 23830.18 | | | | 0.00 | 0.00 | 2383.02 | ACH - Cleared | 0.00 |
| LPAY-092932 | 24624.51 | 0.00 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-090157 | 24624.51 | 0.00 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-088108 | 615.39 | 23214.79 | 0.00 | 0.00 | 0.00 | 23830.18 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-085019 | 0.00 | 24624.51 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-083297 | 0.00 | 23830.18 | 0.00 | 0.00 | 0.00 | 23830.18 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-080803 | 0.00 | 24624.51 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-080088 | 0.00 | 22241.50 | 0.00 | 0.00 | 0.00 | 22241.50 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-078249 | 0.00 | 24624.51 | 0.00 | 0.00 | 0.00 | 24624.51 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-075494 | 7149.05 | 0.00 | 0.00 | 0.00 | 0.00 | 7149.05 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |

| Name | Status Reason | Payment Due On | Days Past Due Ca | Payment Paid On | Payment Method | Servicing Status |
|---|---|---|---|---|---|---|
| LPAY-111556 | Unpaid | 7/1/2023 | -11 | | | Defaulted |
| LPAY-109715 | Unpaid | 6/1/2023 | 19 | | | Defaulted |
| LPAY-108082 | Unpaid | 5/1/2023 | 50 | | | Defaulted |
| LPAY-106199 | Unpaid | 4/1/2023 | 80 | | | Defaulted |
| LPAY-104916 | Unpaid | 3/1/2023 | 111 | | | Defaulted |
| LPAY-103841 | Unpaid | 2/1/2023 | 139 | | | Defaulted |
| LPAY-102278 | Paid | 1/1/2023 | 170 | 12/23/2022 8:00 | Wire | Current |
| LPAY-100256 | Paid | 12/1/2022 | 201 | 12/6/2022 0:07 | Wire | Late (5-15 Days) |
| LPAY-098044 | Paid | 11/1/2022 | 231 | 11/9/2022 8:00 | Wire | Late (5-15 Days) |
| LPAY-096801 | Paid | 10/1/2022 | 262 | 10/6/2022 0:15 | Stripe | Late (5-15 Days) |
| LPAY-092932 | Paid | 9/1/2022 | 292 | 9/3/2022 13:35 | Stripe | Current |
| LPAY-090157 | Paid | 8/1/2022 | 323 | 8/5/2022 15:05 | Stripe | Current |
| LPAY-088108 | Paid | 7/1/2022 | 354 | 7/14/2022 8:00 | Stripe | Late (5-15 Days) |
| LPAY-085019 | Paid | 6/1/2022 | 384 | 6/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-083297 | Paid | 5/1/2022 | 415 | 5/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-080803 | Paid | 4/1/2022 | 445 | 4/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-080088 | Paid | 3/1/2022 | 476 | 3/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-078249 | Paid | 2/1/2022 | 504 | 2/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-075494 | Paid | 12/23/2021 | 544 | 12/23/2021 0:00 | HUD | Originated |

*Excerpted from previous page to provide zoomed-in depiction of pertinent portion of Exhibit

WCP EX. F

| Name | Status Reason | Payment Due On | Days Past Due C | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late F | Amount Due (Default Int | Amount Due (Pri | Amount Due (Total) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-111505 | Unpaid | 7/1/2023 | -11 | | | Defaulted | 5235.63 | 0.00 | 5244.37 | | 10480.00 |
| LPAY-109659 | Unpaid | 6/1/2023 | 19 | | | Defaulted | 5410.15 | 0.00 | 5419.18 | | 10829.33 |
| LPAY-108017 | Unpaid | 5/1/2023 | 50 | | | Defaulted | 5235.63 | 0.00 | 5244.37 | | 10480.00 |
| LPAY-106129 | Unpaid | 4/1/2023 | 80 | | | Defaulted | 5410.15 | 0.00 | 5419.18 | | 10829.33 |
| LPAY-104825 | Unpaid | 3/1/2023 | 111 | | | Defaulted | 4886.59 | 0.00 | 4894.74 | | 9781.33 |
| LPAY-103733 | Unpaid | 2/1/2023 | 139 | | | Defaulted | 5410.15 | 0.00 | 5419.18 | | 10829.33 |
| LPAY-102163 | Paid | 1/1/2023 | 170 | 12/23/2022 8:00 | Wire | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-100101 | Paid | 12/1/2022 | 201 | 12/6/2022 0:06 | Wire | Late (5-15 Days) | 5235.63 | 523.56 | 0.00 | | 5759.19 |
| LPAY-098596 | Paid | 11/1/2022 | 231 | 11/10/2022 10:10 | Stripe | Late (5-15 Days) | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-096608 | Paid | 10/1/2022 | 262 | 10/6/2022 0:15 | Stripe | Late (5-15 Days) | 5235.63 | 523.56 | 0.00 | | 5759.19 |
| LPAY-092751 | Paid | 9/1/2022 | 292 | 9/3/2022 13:35 | Stripe | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-090635 | Paid | 8/1/2022 | 323 | 8/5/2022 15:05 | Stripe | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-087911 | Paid | 7/1/2022 | 354 | 7/14/2022 8:00 | Stripe | Late (5-15 Days) | 5235.63 | 0.00 | 0.00 | | 5235.63 |
| LPAY-085369 | Paid | 6/1/2022 | 384 | 6/1/2022 0:00 | Pre-Paid Interest | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-083035 | Paid | 5/1/2022 | 415 | 5/1/2022 0:00 | Pre-Paid Interest | Current | 5235.63 | 0.00 | 0.00 | | 5235.63 |
| LPAY-081105 | Paid | 4/1/2022 | 445 | 4/1/2022 0:00 | Pre-Paid Interest | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-079815 | Paid | 3/1/2022 | 476 | 3/1/2022 0:00 | Pre-Paid Interest | Current | 4886.59 | 0.00 | 0.00 | | 4886.59 |
| LPAY-078246 | Paid | 2/1/2022 | 504 | 2/1/2022 0:00 | Pre-Paid Interest | Current | 5410.15 | 0.00 | 0.00 | | 5410.15 |
| LPAY-075596 | Paid | 12/23/2021 | 544 | 12/23/2021 0:00 | HUD | Originated | 1570.69 | 0.00 | 0.00 | | 1570.69 |

| Name | Amount Paid (Interest) | Amount Paid (Interest) Prepaid | Amount Paid (Late Fee) | Amount Paid (Default Int | Amount Paid (Pr | Amount Paid (Total) | Beginning Princi | Ending Principal | Cumulative Inte | Unapplied Funds | Principal Paydov | Balance (Total) | Scheduled Payment Stat | balance (no late |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-111505 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 10480.00 | Unscheduled | 10480.00 |
| LPAY-109659 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 10829.33 | Unscheduled | 10829.33 |
| LPAY-108017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 10480.00 | Unscheduled | 10480.00 |
| LPAY-106129 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 10829.33 | Unscheduled | 10829.33 |
| LPAY-104825 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 9781.33 | Unscheduled | 9781.33 |
| LPAY-103733 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 10829.33 | Unscheduled | 10829.33 |
| LPAY-102163 | 5410.15 | 0.00 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-100101 | 6029.96 | 0.00 | 0.00 | 0.00 | 0.00 | 6029.96 | | | | 0.00 | 0.00 | -270.77 | ACH - Cleared | |
| LPAY-098596 | 5410.15 | 0.00 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-096608 | 5235.63 | 0.00 | 0.00 | 0.00 | 0.00 | 5235.63 | | | | 0.00 | 0.00 | 523.56 | ACH - Cleared | 0.00 |
| LPAY-092751 | 5410.15 | 0.00 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-090635 | 5410.15 | 0.00 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-087911 | 148.30 | 5087.33 | 0.00 | 0.00 | 0.00 | 5235.63 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-085369 | 0.00 | 5410.15 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-083035 | 0.00 | 5235.63 | 0.00 | 0.00 | 0.00 | 5235.63 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-081105 | 0.00 | 5410.15 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-079815 | 0.00 | 4886.59 | 0.00 | 0.00 | 0.00 | 4886.59 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-078246 | 0.00 | 5410.15 | 0.00 | 0.00 | 0.00 | 5410.15 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-075596 | 1570.69 | 0.00 | 0.00 | 0.00 | 0.00 | 1570.69 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |

| Name | Status Reason | Payment Due On | Days Past Due Ca | Payment Paid On | Payment Method | Servicing Status |
|---|---|---|---|---|---|---|
| LPAY-111505 | Unpaid | 7/1/2023 | -11 | | | Defaulted |
| LPAY-109659 | Unpaid | 6/1/2023 | 19 | | | Defaulted |
| LPAY-108017 | Unpaid | 5/1/2023 | 50 | | | Defaulted |
| LPAY-106129 | Unpaid | 4/1/2023 | 80 | | | Defaulted |
| LPAY-104825 | Unpaid | 3/1/2023 | 111 | | | Defaulted |
| LPAY-103733 | Unpaid | 2/1/2023 | 139 | | | Defaulted |
| LPAY-102163 | Paid | 1/1/2023 | 170 | 12/23/2022 8:00 | Wire | Current |
| LPAY-100101 | Paid | 12/1/2022 | 201 | 12/6/2022 0:06 | Wire | Late (5-15 Days) |
| LPAY-098596 | Paid | 11/1/2022 | 231 | 11/10/2022 10:10 | Stripe | Late (5-15 Days) |
| LPAY-096608 | Paid | 10/1/2022 | 262 | 10/6/2022 0:15 | Stripe | Late (5-15 Days) |
| LPAY-092751 | Paid | 9/1/2022 | 292 | 9/3/2022 13:35 | Stripe | Current |
| LPAY-090635 | Paid | 8/1/2022 | 323 | 8/5/2022 15:05 | Stripe | Current |
| LPAY-087911 | Paid | 7/1/2022 | 354 | 7/14/2022 8:00 | Stripe | Late (5-15 Days) |
| LPAY-085369 | Paid | 6/1/2022 | 384 | 6/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-083035 | Paid | 5/1/2022 | 415 | 5/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-081105 | Paid | 4/1/2022 | 445 | 4/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-079815 | Paid | 3/1/2022 | 476 | 3/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-078246 | Paid | 2/1/2022 | 504 | 2/1/2022 0:00 | Pre-Paid Interest | Current |
| LPAY-075596 | Paid | 12/23/2021 | 544 | 12/23/2021 0:00 | HUD | Originated |

*Excerpted from previous page to provide zoomed-in depiction of pertinent portion of Exhibit

WCP EX. G

| Name | Status Reason | Payment Due On | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late Fee) | Amount Due (Default Interest) | Amount Due (Total) |
|---|---|---|---|---|---|---|---|---|---|
| LPAY-113319 | Unpaid | 8/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 |
| LPAY-111607 | Unpaid | 7/1/2023 | | | Defaulted | 44,846.67 | - | 74,877.47 | 119,724.14 |
| LPAY-109740 | Unpaid | 6/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 |
| LPAY-108036 | Unpaid | 5/1/2023 | | | Defaulted | 44,846.67 | - | 74,877.47 | 119,724.14 |
| LPAY-106114 | Unpaid | 4/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 |
| LPAY-104722 | Unpaid | 3/1/2023 | | | Defaulted | 41,856.89 | - | 69,885.64 | 111,742.53 |
| LPAY-103615 | Unpaid | 2/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 |
| LPAY-102023 | Unpaid | 1/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 |
| LPAY-100623 | Paid | 12/1/2022 | 12/8/2022 8:00 | Wire | Late (5-15 Days) | 44,846.67 | - | - | 44,846.67 |
| LPAY-098385 | Paid | 11/1/2022 | 11/1/2022 8:00 | ACH | Current | 46,166.18 | - | - | 46,166.18 |
| LPAY-096363 | Paid | 10/1/2022 | 10/1/2022 0:00 | Pre-Paid Interest | Current | 43,025.07 | - | - | 43,025.07 |
| LPAY-093110 | Paid | 9/1/2022 | 9/1/2022 0:00 | Pre-Paid Interest | Current | 42,427.02 | - | - | 42,427.02 |
| LPAY-090197 | Paid | 8/1/2022 | 8/1/2022 0:00 | Pre-Paid Interest | Current | 40,014.28 | - | - | 40,014.28 |
| LPAY-087965 | Paid | 7/1/2022 | 7/1/2022 0:00 | Pre-Paid Interest | Current | 37,151.17 | - | - | 37,151.17 |
| LPAY-085266 | Paid | 6/1/2022 | 6/1/2022 0:00 | Pre-Paid Interest | Current | 36,924.24 | - | - | 36,924.24 |
| LPAY-083485 | Paid | 5/1/2022 | 5/1/2022 0:00 | Pre-Paid Interest | Current | 31,628.07 | - | - | 31,628.07 |
| LPAY-080468 | Paid | 3/31/2022 | 3/31/2022 0:00 | HUD | Originated | 1,008.80 | - | - | 1,008.80 |

| Name | Status Reason | Payment Due On | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late Fee) | Amount Due (Default Interest) | Amount Due (Total) | Amount Paid (Interest) | Amount Paid (Interest) Prepaid | Amount Paid (Late Fee) | Amount Paid (Default Interest) | Amount Paid (Principal) | Amount Paid (Total) | Balance (Total) | balance (no late fee) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-113319 | Unpaid | 8/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 | - | - | - | - | - | - | 123,714.95 | 123,714.95 |
| LPAY-111607 | Unpaid | 7/1/2023 | | | Defaulted | 44,846.67 | - | 74,877.47 | 119,724.14 | - | - | - | - | - | - | 119,724.14 | 119,724.14 |
| LPAY-109740 | Unpaid | 6/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 | - | - | - | - | - | - | 123,714.95 | 123,714.95 |
| LPAY-108036 | Unpaid | 5/1/2023 | | | Defaulted | 44,846.67 | - | 74,877.47 | 119,724.14 | - | - | - | - | - | - | 119,724.14 | 119,724.14 |
| LPAY-106114 | Unpaid | 4/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 | - | - | - | - | - | - | 123,714.95 | 123,714.95 |
| LPAY-104722 | Unpaid | 3/1/2023 | | | Defaulted | 41,856.89 | - | 69,885.64 | 111,742.53 | - | - | - | - | - | - | 111,742.53 | 111,742.53 |
| LPAY-103615 | Unpaid | 2/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 | - | - | - | - | - | - | 123,714.95 | 123,714.95 |
| LPAY-102023 | Unpaid | 1/1/2023 | | | Defaulted | 46,341.56 | - | 77,373.39 | 123,714.95 | - | - | - | - | - | - | 123,714.95 | 123,714.95 |
| LPAY-100623 | Paid | 12/1/2022 | 12/8/2022 8:00 | Wire | Late (5-15 Days) | 44,846.67 | - | - | 44,846.67 | 44,846.67 | - | - | - | - | 44,846.67 | - | |
| LPAY-098385 | Paid | 11/1/2022 | 11/1/2022 8:00 | ACH | Current | 46,166.18 | - | - | 46,166.18 | 30,573.03 | 15,593.15 | - | - | - | 46,166.18 | - | |
| LPAY-096363 | Paid | 10/1/2022 | 10/1/2022 0:00 | Pre-Paid Interest | Current | 43,025.07 | - | - | 43,025.07 | - | 43,025.07 | - | - | - | 43,025.07 | - | |
| LPAY-093110 | Paid | 9/1/2022 | 9/1/2022 0:00 | Pre-Paid Interest | Current | 42,427.02 | - | - | 42,427.02 | - | 42,427.02 | - | - | - | 42,427.02 | - | |
| LPAY-090197 | Paid | 8/1/2022 | 8/1/2022 0:00 | Pre-Paid Interest | Current | 40,014.28 | - | - | 40,014.28 | - | 40,014.28 | - | - | - | 40,014.28 | - | |
| LPAY-087965 | Paid | 7/1/2022 | 7/1/2022 0:00 | Pre-Paid Interest | Current | 37,151.17 | - | - | 37,151.17 | - | 37,151.17 | - | - | - | 37,151.17 | - | |
| LPAY-085266 | Paid | 6/1/2022 | 6/1/2022 0:00 | Pre-Paid Interest | Current | 36,924.24 | - | - | 36,924.24 | - | 36,924.24 | - | - | - | 36,924.24 | - | |
| LPAY-083485 | Paid | 5/1/2022 | 5/1/2022 0:00 | Pre-Paid Interest | Current | 31,628.07 | - | - | 31,628.07 | - | 31,628.07 | - | - | - | 31,628.07 | - | |
| LPAY-080468 | Paid | 3/31/2022 | 3/31/2022 0:00 | HUD | Originated | 1,008.80 | - | - | 1,008.80 | 1,008.80 | - | - | - | - | 1,008.80 | - | |

WCP EX. H

| Name | Status Rea: | Payment Due On | Days Past I | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late Fee) | Amount Due (Default Interest) |
|---|---|---|---|---|---|---|---|---|---|
| LPAY-113012 | Unpaid | 8/1/2023 | -13 | | | REO | 12978.67 | 0.00 | 12978.67 |
| LPAY-111259 | Unpaid | 7/1/2023 | 18 | | | Defaulted | 12560.00 | 0.00 | 12560.00 |
| LPAY-109379 | Unpaid | 6/1/2023 | 48 | | | Defaulted | 12978.67 | 0.00 | 12978.67 |
| LPAY-108293 | Unpaid | 5/1/2023 | 79 | | | Defaulted | 12560.00 | 0.00 | 12560.00 |
| LPAY-106376 | Unpaid | 4/1/2023 | 109 | | | Defaulted | 12978.67 | 0.00 | 12978.67 |
| LPAY-104932 | Unpaid | 3/1/2023 | 140 | | | Defaulted | 11722.67 | 0.00 | 11722.67 |
| LPAY-103819 | Unpaid | 2/1/2023 | 168 | | | Defaulted | 12978.67 | 0.00 | 12978.67 |
| LPAY-102228 | Unpaid | 1/1/2023 | 199 | | | Defaulted | 12978.67 | 0.00 | 12978.67 |
| LPAY-100115 | Paid | 12/1/2022 | 230 | 12/8/2022 8:00 | Wire | Late (5-15 Days) | 12560.00 | 0.00 | 0.00 |
| LPAY-098554 | Paid | 11/1/2022 | 260 | 11/4/2022 14:05 | Stripe | Current | 12978.67 | 0.00 | 0.00 |
| LPAY-096476 | Paid | 10/1/2022 | 291 | 9/26/2022 8:00 | Wire | Current | 12560.00 | 0.00 | 0.00 |
| LPAY-093144 | Paid | 9/1/2022 | 321 | 9/1/2022 8:00 | ACH | Current | 12978.67 | 0.00 | 0.00 |
| LPAY-090203 | Paid | 8/1/2022 | 352 | 8/1/2022 8:00 | Wire | Current | 12978.67 | 0.00 | 0.00 |
| LPAY-087896 | Paid | 7/1/2022 | 383 | 7/14/2022 8:00 | Wire | Late (5-15 Days) | 12560.00 | 0.00 | 0.00 |
| LPAY-085179 | Paid | 6/1/2022 | 413 | 7/14/2022 8:00 | Wire | Delinquent (30-60 D | 12978.67 | 0.00 | 0.00 |
| LPAY-083482 | Paid | 5/1/2022 | 444 | 7/14/2022 8:00 | Wire | Delinquent (60-90 D | 12560.00 | 0.00 | 0.00 |
| LPAY-082525 | Paid | 3/31/2022 | 475 | 3/31/2022 0:00 | HUD | Originated | 418.67 | 0.00 | 0.00 |

| Name | Status Reason | Payment Due On | Days Past Due ( | Payment Paid On | Payment Method | Servicing Status | Amount Due (Interest) | Amount Due (Late | Amount Due (Default In | Amount Due (P | Amount Due (Total) | Amount Paid (Interest) | Amount Paid (Interest) Prepaid | Amount Paid (Late Fee) | Amount Paid (Default Ir | Amount Paid (F | Amount Paid (Total) | Beginning Princ | Ending Principa | Cumulative Int | Unapplied Func | Principal Paydo | Balance (Total) | Scheduled Payment Sta | balance (no late |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAY-113012 | Unpaid | 8/1/2023 | -13 | | | REO | 12978.67 | 0.00 | 12978.67 | | 25957.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25957.34 | Unscheduled | 25957.34 |
| LPAY-111259 | Unpaid | 7/1/2023 | 18 | | | Defaulted | 12560.00 | 0.00 | 12560.00 | | 25120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25120.00 | Unscheduled | 25120.00 |
| LPAY-109379 | Unpaid | 6/1/2023 | 48 | | | Defaulted | 12978.67 | 0.00 | 12978.67 | | 25957.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25957.34 | Unscheduled | 25957.34 |
| LPAY-108293 | Unpaid | 5/1/2023 | 79 | | | Defaulted | 12560.00 | 0.00 | 12560.00 | | 25120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25120.00 | Unscheduled | 25120.00 |
| LPAY-106376 | Unpaid | 4/1/2023 | 109 | | | Defaulted | 12978.67 | 0.00 | 12978.67 | | 25957.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25957.34 | Unscheduled | 25957.34 |
| LPAY-104932 | Unpaid | 3/1/2023 | 140 | | | Defaulted | 11722.67 | 0.00 | 11722.67 | | 23445.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 23445.34 | Unscheduled | 23445.34 |
| LPAY-103819 | Unpaid | 2/1/2023 | 168 | | | Defaulted | 12978.67 | 0.00 | 12978.67 | | 25957.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25957.34 | Unscheduled | 25957.34 |
| LPAY-102228 | Unpaid | 1/1/2023 | 199 | | | Defaulted | 12978.67 | 0.00 | 12978.67 | | 25957.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 | 0.00 | 25957.34 | Unscheduled | 25957.34 |
| LPAY-100115 | Paid | 12/1/2022 | 230 | 12/8/2022 8:00 | Wire | Late (5-15 Days) | 12560.00 | 0.00 | 0.00 | | 12560.00 | 12560.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12560.00 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-098554 | Paid | 11/1/2022 | 260 | 11/4/2022 14:05 | Stripe | Current | 12978.67 | 0.00 | 0.00 | | 12978.67 | 12978.67 | 0.00 | 0.00 | 0.00 | 0.00 | 12978.67 | | | | 0.00 | 0.00 | 0.00 | ACH - Cleared | |
| LPAY-096476 | Paid | 10/1/2022 | 291 | 9/26/2022 8:00 | Wire | Current | 12560.00 | 0.00 | 0.00 | | 12560.00 | 12560.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12560.00 | | | | 0.00 | 0.00 | 0.00 | ACH - Failed | |
| LPAY-093144 | Paid | 9/1/2022 | 321 | 9/1/2022 8:00 | ACH | Current | 12978.67 | 0.00 | 0.00 | | 12978.67 | 12978.67 | 0.00 | 0.00 | 0.00 | 0.00 | 12978.67 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-090203 | Paid | 8/1/2022 | 352 | 8/1/2022 8:00 | Wire | Current | 12978.67 | 0.00 | 0.00 | | 12978.67 | 12978.67 | 0.00 | 0.00 | 0.00 | 0.00 | 12978.67 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-087896 | Paid | 7/1/2022 | 383 | 7/14/2022 8:00 | Wire | Late (5-15 Days) | 12560.00 | 0.00 | 0.00 | | 12560.00 | 12560.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12560.00 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-085179 | Paid | 6/1/2022 | 413 | 7/14/2022 8:00 | Wire | Delinquent (30-60 Days) | 12978.67 | 0.00 | 0.00 | | 12978.67 | 12978.67 | 0.00 | 0.00 | 0.00 | 0.00 | 12978.67 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-083482 | Paid | 5/1/2022 | 444 | 7/14/2022 8:00 | Wire | Delinquent (60-90 Days) | 12560.00 | 0.00 | 0.00 | | 12560.00 | 12560.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12560.00 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |
| LPAY-082525 | Paid | 3/31/2022 | 475 | 3/31/2022 0:00 | HUD | Originated | 418.67 | 0.00 | 0.00 | | 418.67 | 418.67 | 0.00 | 0.00 | 0.00 | 0.00 | 418.67 | | | | 0.00 | 0.00 | 0.00 | Unscheduled | |

WCP EX. I

**Subject:** Demand for Payoffs: 419-423 Kennedy St & 5505 1st St
**Date:** Thursday, December 8, 2022 at 6:56:23 PM Eastern Standard Time
**From:** Leslie Calderas
**To:** mel negussie
**CC:** Christina Araujo, Daniel Huertas, Cara Farley, Hailey Thomas
**Attachments:** image001.png, Notice of Default 5505 1st St NW.pdf, Payoff Statement -- 5505 1st St NW Washington DC 20011 2nd.pdf, Payoff Statement -- 5505 1st St NW Washington DC 20011 (1st).pdf, Payoff Statement -- 419-423 Kennedy St NW Washington DC 20011 2nd.pdf, Payoff Statement -- 419-423 Kennedy St NW Washington DC 1st (3).pdf, Notice of Default 419 Kennedy St NW # 423.pdf

Hello Mel,

Attached please find payoff statements and notice of default letters for both properties in reference. Let us know if you have any questions.

Best,

**Wire fraud is on the rise, so always call to confirm wiring instructions before sending.

**Please allow at least 5 business days for payoffs to be processed. There is a $50 fee for every payoff request. If you need a payoff within 5 business days, you can request expedited processing which is an additional $200 fee.

Leslie Calderas I Servicing Manager
Washington Capital Partners
www.washingtoncapitalpartners.com
8401 Greensboro Dr Suite 960
McLean, VA 22102
(703) 940-5190

WASHINGTON
CAPITAL PARTNERS

*This message, including any attachments, may contain confidential, proprietary, privileged, and/or private information from Washington Capital Partners. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

WASHINGTON
CAPITAL PARTNERS

8401 Greensboro Dr, Suite 960
McLean, Virginia 22102
www.wcp.team

12/08/2022

**VIA EMAIL <mel@ntconstruction.net>**

Mel Negussie
1629 K Street NW Suite 300
Washintong DC 20006

Attn: Mel Negussie

Re: **NOTICE OF DEFAULT**

5505 1st St NW Washington, DC 20011

Dear Sir or Madam:

I am the Vice President of Finance for Washington Capital Partners. I'm writing to inform you that your business entity is presently in default for the Loan regarding the above captioned property, secured by that certain Deed of Trust, a copy of the first page of which is enclosed hereto as **Exhibit A.** Additionally, you signed a Guaranty for the Loan.

This is your last notice before our legal counsel commences foreclosure proceedings. Immediate payment is required to avoid foreclosure. Please contact me within 48 hours to obtain either a Payoff Statement or an amount to bring the loan current. Late fees at 10.00% have been assessed and the default interest at 24.00% per annum is accruing.

Furthermore, if you do not cure the a default or pay the Loan off immediately we will commence foreclosure proceedings for this Loan. All payoff requests must be made in writing.

As your lender, we will exercise all rights and remedies available at law and equity. My contact information is below, and should I not hear from you as noted above, and payment is not made immediately, then, as noted above, our legal counsel will commence foreclosure proceedings.

Best,
Washington Capital Partners

**Washington Capital Partners**
**Servicing Department**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**
**Office - (703)-348-0549 ext. 924**
**Email - servicing@wcp.team**

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

DEVELOPER RE1 LLC
1629 K Street NW
Washington, DC 20006

**Property Address: 5505 1st St NW Washington DC 20011**

Amount Due: $4,139,852.46 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $3,579,000.00 |
| Interest Owed (as of 8/30/22): | $198,584.79 |
| Default Interest Owed (as of payoff date): | $276,776.00 |
| Interest Paid: | ($272,458.33) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Default Penalty: | $357,900.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$4,139,852.46** |

**Payoff good through 12/23/2022. Per diem $2,386.00.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number:** [redacted]
**Account Number:** [redacted]

When sending the wire please reference our loan number, LOAN-006120 and borrower DEVELOPER RE1 LLC.

Sincerely,

Leslie Calderas
Leslie Calderas

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

DEVELOPER RE1 LLC
1629 K Street NW
Washington, DC 20006

**Property Address: 5505 1st St NW Washington DC 20011**

Amount Due: $599,947.92 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $524,000.00 |
| Interest Owed (as of 8/30/22): | $43,630.28 |
| Default Interest Owed (as of payoff date): | $40,522.67 |
| Interest Paid: | ($60,655.03) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $50.00 |
| Default Penalty: | $52,400.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$599,947.92** |

**Payoff good through 12/23/2022. Per diem $349.33.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number:** [redacted]
**Account Number:** [redacted]

When sending the wire please reference our loan number, LOAN-006182 and borrower DEVELOPER RE1 LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

WASHINGTON
CAPITAL PARTNERS

8401 Greensboro Dr, Suite 960
McLean, Virginia 22102
www.wcp.team

12/08/2022

**VIA EMAIL <mel@ntconstruction.net>**

Mel Negussie
1140 3rd St NE 2nd Floor
Washintong DC 20002

Attn: Mel Negussie

Re: **NOTICE OF DEFAULT**

419 Kennedy St NW # 423 Washington DC 20011

Dear Sir or Madam:

I am the Vice President of Finance for Washington Capital Partners. I'm writing to inform you that your business entity is presently in default for the Loan regarding the above captioned property, secured by that certain Deed of Trust, a copy of the first page of which is enclosed hereto as **Exhibit A.** Additionally, you signed a Guaranty for the Loan.

This is your last notice before our legal counsel commences foreclosure proceedings. Immediate payment is required to avoid foreclosure. Please contact me within 48 hours to obtain either a Payoff Statement or an amount to bring the loan current. Late fees at 10.00% have been assessed and the default interest at 24.00% per annum is accruing.

Furthermore, if you do not cure the a default or pay the Loan off immediately we will commence foreclosure proceedings for this Loan. All payoff requests must be made in writing.

As your lender, we will exercise all rights and remedies available at law and equity. My contact information is below, and should I not hear from you as noted above, and payment is not made immediately, then, as noted above, our legal counsel will commence foreclosure proceedings.

Best,
Washington Capital Partners

**Washington Capital Partners**
**Servicing Department**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**
**Office - (703)-348-0549 ext. 924**
**Email - servicing@wcp.team**

WASHINGTON CAPITAL PARTNERS

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC**

Amount Due: $7,174,724.51 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $8,689,693.00 |
| Interest Owed (as of 8/30/22): | $185,661.72 |
| Default Interest Owed (as of payoff date): | $456,927.95 |
| Interest Paid: | ($323,191.50) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($2,703,485.96) |
| Payoff Fee: | $150.00 |
| Default Penalty: | $868,969.30 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$7,174,724.51** |

**Payoff good through 12/23/2022. Per diem $3,990.80.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number:** [redacted]
**Account Number:** [redacted]

When sending the wire please reference our loan number, LOAN-006491 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas

Leslie Calderas

GREAT SERVICE
BETTER RATES
FASTER CLOSINGS

# Payoff Statement

12/08/2022

423 Kennedy St Holdings LLC
1140 3rd St NE
Washington, DC 20002

**Property Address: 419-423 Kennedy St NW Washington DC 20011**

Amount Due: $1,439,944.65 as of 12/23/2022.

| | |
|---|---|
| Loan Principal: | $1,256,000.00 |
| Interest Owed (as of 8/30/2022): | $63,637.33 |
| Default Interest Owed (as of payoff date): | $97,130.67 |
| Interest Paid: | ($102,573.35) |
| Unpaid Late Fees: | $0.00 |
| Construction Draw Balance: | ($0.00) |
| Payoff Fee: | $150.00 |
| Default Penalty: | $125,600.00 |
| Pre-Paid Interest Balance: | ($0.00) |
| **Amount Due:** | **$1,439,944.65** |

**Payoff good through 12/23/2022. Per diem $837.33.**

**YOU MUST COLLECT ALL FEES AND COSTS ASSOCIATED WITH RECORDING THE CERTIFICATE OF SATISFACTION ON THE HUD-1. ONCE THE CERTIFICATE OF SATISFACTION HAS BEEN RECORDED BY YOUR OFFICE, PLEASE EMAIL US A COPY FOR OUR RECORDS AT postclosing@wcp.team.**

**Payable to:** **WCP Servicing LLC**
**8401 Greensboro Dr Suite 960**
**McLean, VA 22102**

**Bank Name: United Bank**
**Routing Number:** [redacted]
**Account Number:** [redacted]

When sending the wire please reference our loan number, LOAN-006652 and borrower 423 Kennedy St Holdings LLC.

Sincerely,

Leslie Calderas
Leslie Calderas

Doc #: 2022098397
Filed & Recorded
08/30/2022 10:15 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

WCP EX. J

dc water is life

Customer Service
202-354-3750

**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY | 1385 Canal Street, SE | Washington, DC 20003**

## DELINQUENT ACCOUNTS SECTION

DC Water and Sewer Authority
Vs
DEVELOPER RE1 LLC
1629 K ST NW, STE 300
WASHINGTON, DC 20006

Date: 2022-08-29
Account No.: 2002583-9
Service Address: 5501 1ST ST NW
Square: 3389
Suffix:
Lot: 0138

**Amount Due (including penalties, if any): $43,956.32**

## CERTIFICATE OF DELINQUENT WATER/SEWER CHARGES

This is to certify that, pursuant to D.C. Official Code, 2001, Section 34-2407.02 and Section 34-2110, the Water and Sewer Authority has a continuing lien for delinquent water/sewer service charges upon the land and the improvements thereon at the above service address. From the date of its filing, this certificate shall have the force and effect of a lien created by a judgment entered by the Superior Court of the District of Columbia and will remain in force and effect until the water/sewer charges, plus any interest and penalties thereon, shall have been fully paid by cash, certified check or money order to the Water and Sewer Authority.

**By:** [signature]

Manager, Credit & Collections Customer Service Department DC Water and Sewer Authority.

## ACKNOWLEDGEMENT

This is to acknowledge that the foregoing certificate was filed with the Recorder of Deeds of the District of Columbia on the ____________________.

**By:** ____________
Recorder of Deeds Government of the District of Columbia

DEVELOPER RE1 LLC
C/O
1629 K ST NW, STE 300
WASHINGTON, DC 20006

WCP EX. K

Certified True Copy

# A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB Approval No 2502-0265

B. Type of Loan

| | | | |
|---|---|---|---|
| 1. ☐ FHA 2. ☐ RHS 3. ☐ Conv. Unins. 4. ☐ VA 5. ☐ Conv Ins. | 6. File No. 21-1983 | 7. Loan No. | 8. Mortgage Insurance Case No. |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | | |
|---|---|---|
| D. Name & Address of Borrower: Developer RE1 LLC, 1629 K Street NW, Suite 300, Washington, DC 20006 | E. Name & Address of Seller: | F. Name & Address of Lender: WCP Fund I LLC, 2815 Hartland Road, Suite 200, Falls Church, VA 22043 |
| G. Property Location: 5501 1st Street Northwest, Washington, DC 20011; 5505 1st Street Northwest, Washington, DC 20011 | H. Settlement Agent: District Title<br>Place of Settlement: 1775 I Street Northwest #560 Washington, DC 20006 | I. Settlement Date: 12/23/2021<br>Funding Date: 12/23/2021<br>Disbursement Date: 12/23/2021 |

J. Summary of Borrower's Transaction

| | |
|---|---|
| **100. Gross Amount Due from Borrower** | |
| 101. Contract sales price | |
| 102. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $423,134.06 |
| 104. Payoff to WCP Servicing LLC | $1,467,526.00 |
| 105. Payoff to Welch Family Limited Partnership I | $55,000.00 |
| Ad. See Addendum for Additional Mortgage Payoffs | $2,269,004.77 |
| **Adjustment for items paid by seller in advance** | |
| 106. City/Town Taxes | |
| 107. County Taxes | |
| 108. Assessments | |
| 109. | |
| 110. | |
| 111. | |
| 112. | |
| 120. Gross Amount Due from Borrower | $4,214,664.83 |
| 200. Amount Paid by or in Behalf of Borrower | |
| 201. Deposit | |
| 202. Principal amount of new loan(s) | $3,579,000.00 |
| 203. Existing loan(s) taken subject to | |
| 204. | |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| **Adjustments for items unpaid by seller** | |
| 210. City/Town Taxes | |
| 211. County Taxes | |
| 212. Assessments | |
| 213. Transfer from 21-1983 | $458,419.94 |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| 220. Total Paid by/for Borrower | $4,037,419.94 |
| 300. Cash at Settlement from/to Borrower | |
| 301. Gross amount due from borrower (line 120) | $4,214,664.83 |
| 302. Less amounts paid by/for borrower (line 220) | $4,037,419.94 |
| 303. Cash ☒ From ☐ To Borrower | $177,244.89 |

K. Summary of Seller's Transaction

| | |
|---|---|
| **400. Gross Amount Due to Seller** | |
| 401. Contract sales price | |
| 402. Personal property | |
| 403. | |
| 404. | |
| 405. | |
| Ad. | |
| **Adjustment for items paid by seller in advance** | |
| 406. City/Town Taxes | |
| 407. County Taxes | |
| 408. Assessments | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| 420. Gross Amount Due to Seller | |
| **500. Reductions in Amount Due to Seller** | |
| 501. Excess deposit (see instructions) | |
| 502. Settlement charges to seller (line 1400) | |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first mortgage loan | |
| 505. Payoff of second mortgage loan | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| **Adjustments for items unpaid by seller** | |
| 510. City/Town Taxes | |
| 511. County Taxes | |
| 512. Assessments | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| 520. Total Reduction Amount Due Seller | |
| 600. Cash at Settlement to/from Seller | |
| 601. Gross amount due to seller (line 420) | |
| 602. Less reductions in amounts due seller (line 520) | |
| 603. Cash ☒ To ☐ From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services; • Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

## L. Settlement Charges

| 700. Total Real Estate Broker Fees | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| Division of commission (line 700) as follows : | | |
| 701. $ | | |
| 702. $ | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. Items Payable in Connection with Loan** | | |
| 801. Our origination charge to DP Capital, LLC | $107,012.10 | |
| 802. Your credit or charge (points) for the specific interest rate chosen | | |
| 803. Appraisal fee to CL Group | $2,950.00 | |
| 804. Credit report | | |
| 805. Tax service | | |
| 806. Flood certification | | |
| 807. Loan Processing Fee to DP Capital LLC | $1,000.00 | |
| 808. | | |
| 809. | | |
| 810. | | |
| **900. Items Required by Lender to be Paid in Advance** | | |
| 901. Daily interest charges from 12/23/2021 to 01/01/2022 @ $794.3392 /day | $7,149.05 | |
| 902. Mortgage insurance premium | | |
| 903. Homeowner's insurance | | |
| 904. Prepaid interest to WCP Fund I LLC | $143,160.00 | |
| **1000. Reserves Deposited with Lender** | | |
| 1001. Initial deposit for your escrow account | | |
| 1002. Homeowner's insurance | | |
| 1003. Mortgage insurance | | |
| 1004. Property taxes | | |
| 1005. | | |
| 1006. | | |
| 1007. Aggregate Adjustment $0.00 | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee to District Title | | |
| 1102. Owner's title insurance to Fidelity National Title Insurance Company | | |
| 1103. Lender's title insurance to Fidelity National Title Insurance Company | $14,859.65 | |
| 1104. Lender's title policy limit $4,473,750.00 | | |
| 1105. Owner's title policy limit $ | | |
| 1106. Settlement Fee to District Title | $995.00 | |
| 1107. Title Commitment Fee to District Title | $495.00 | |
| 1108. Title- Release Coordination Fee @ 150 x7 to District Title | $1,050.00 | |
| 1109. E- Recording Fee to Simplifile | $30.12 | |
| 1110. Abstract Fee to Executive Abstracting Company | $750.00 | |
| 1111. Survey to Duley Associates | $460.00 | |
| 1112. Deed Preparation Fee x2 (including 2 EID) to District Title | $600.00 | |
| 1113. CPL (Lender) to Fidelity National Title Insurance Company | $50.00 | |
| 1114. Notary Fee to Bancserv | $350.00 | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. Recording fees: Deed $63.00 Mortgage $156.50 Release $31.50 to District of Columbia District Recording Office | $251.00 | |
| 1202. City/County tax/stamps Deed $26,045.05 Mortgage $ to District of Columbia District Recording Office | $26,045.05 | |
| 1203. State tax/stamps Deed $26,045.05 Mortgage $9,451.90 to District of Columbia District Recording Office | $35,496.95 | |
| 1204. Recordation/ Transfer Tax on EID to District of Columbia District Recording Office | $43,500.00 | |
| 1205. Deed of Economic Interest x2 to District of Columbia District Recording Office | $63.00 | |
| **1300. Additional Settlement Charges** | | |
| 1301. Property Taxes - 5501 1st - EST to DC Treasurer | $25,297.86 | |
| 1302. Property Taxes - 5505 1st - EST to DC Treasurer | $8,619.28 | |
| 1303. LLC buyout fee | | |
| 1304. Appraisal Payment reimbursement to CL Group LLC | $2,950.00 | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | $423,134.06 | |

**See signature addendum**

## Mortgage Payoff Addendum

| To | Amount |
|---|---|
| Payoff to WCP Servicing LLC | $728,195.92 |
| Payoff to WCP Servicing LLC | $806,415.68 |
| Payoff to WCP Servicing LLC | $734,393.17 |
| Total | $2,269,004.77 |

Signature Addendum

Developer RE1 LLC, a District of Columbia Limited Liability Company

_____________________ Date

By: [signature] 12/24/2021
Date
Mel Negussie, Managing Member

By: [signature] for 12/24/2021
Date
Solomon Abebaw Desta, Managing Member

The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

[signature] 12/23/21
Settlement Agent Date

# A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB Approval No 2502-0265

## B. Type of Loan

| | | |
|---|---|---|
| 1. [ ] FHA 2. [ ] RHS 3. [ ] Conv. Unins. 4. [ ] VA 5. [ ] Conv Ins. | 6. File No. 21-1983-A | 7. Loan No. |
| | | 8. Mortgage Insurance Case No. |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Developer RE1 LLC<br>925 H Street Northwest<br>Suite 801<br>Washington, DC 20002 | | WCP Fund I LLC<br>2815 Hartland Road<br>Suite 200<br>Falls Church, VA 22043 |

| G. Property Location: | H. Settlement Agent: | I. Settlement Date: |
|---|---|---|
| 5501 1st Street Northwest, Washington, DC 20011<br>5505 1st Street Northwest, Washington, DC 20011 | District Title<br>Place of Settlement:<br>1775 I Street Northwest #560 Washington, DC 20006 | 12/23/2021<br>Funding Date:<br>12/23/2021<br>Disbursement Date:<br>12/23/2021 |

## J. Summary of Borrower's Transaction

| 100. Gross Amount Due from Borrower | |
|---|---|
| 101. Contract sales price | |
| 102. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $65,580.06 |
| 104. | |
| 105. | |
| Adjustment for items paid by seller in advance | |
| 106. City/Town Taxes | |
| 107. County Taxes | |
| 108. Assessments | |
| 109. Transfer to 21-1983 | $458,419.94 |
| 110. | |
| 111. | |
| 112. | |
| 120. Gross Amount Due from Borrower | $524,000.00 |
| 200. Amount Paid by or in Behalf of Borrower | |
| 201. Deposit | |
| 202. Principal amount of new loan(s) | $524,000.00 |
| 203. Existing loan(s) taken subject to | |
| 204. | |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| Adjustments for items unpaid by seller | |
| 210. City/Town Taxes | |
| 211. County Taxes | |
| 212. Assessments | |
| 213. | |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| 220. Total Paid by/for Borrower | $524,000.00 |
| 300. Cash at Settlement from/to Borrower | |
| 301. Gross amount due from borrower (line 120) | $524,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | $524,000.00 |
| 303. Cash [ ] From [X] To Borrower | |

## K. Summary of Seller's Transaction

| 400. Gross Amount Due to Seller | |
|---|---|
| 401. Contract sales price | |
| 402. Personal property | |
| 403. | |
| 404. | |
| 405. | |
| Adjustment for items paid by seller in advance | |
| 406. City/Town Taxes | |
| 407. County Taxes | |
| 408. Assessments | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| 420. Gross Amount Due to Seller | |
| 500. Reductions in Amount Due to Seller | |
| 501. Excess deposit (see instructions) | |
| 502. Settlement charges to seller (line 1400) | |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first mortgage loan | |
| 505. Payoff of second mortgage loan | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| Adjustments for items unpaid by seller | |
| 510. City/Town Taxes | |
| 511. County Taxes | |
| 512. Assessments | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| 520. Total Reduction Amount Due Seller | |
| 600. Cash at Settlement to/from Seller | |
| 601. Gross amount due to seller (line 420) | |
| 602. Less reductions in amounts due seller (line 520) | |
| 603. Cash [X] To [ ] From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services; • Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

Certified True Copy

## L. Settlement Charges

| 700. Total Real Estate Broker Fees | [illegible] | [illegible] |
|---|---|---|
| Division of commission (line 700) as follows : | | |
| 701. $ | | |
| 702. $ | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. Items Payable in Connection with Loan** | | |
| 801. Our origination charge | $15,667.60 | |
| 802. Your credit or charge (points) for the specific interest rate chosen | | |
| 803. Appraisal fee | | |
| 804. Credit report | | |
| 805. Tax service | | |
| 806. Flood certification | | |
| 807. | | |
| 808. | | |
| 809. | | |
| 810. | | |
| **900. Items Required by Lender to be Paid in Advance** | | |
| 901. Daily interest charges from 12/23/2021 to 01/01/2022 @ $174.5211 /day | $1,570.69 | |
| 902. Mortgage insurance premium | | |
| 903. Homeowner's insurance | | |
| 904. Prepaid Interest to WCP Fund I LLC | $31,440.00 | |
| **1000. Reserves Deposited with Lender** | | |
| 1001. Initial deposit for your escrow account | | |
| 1002. Homeowner's insurance | | |
| 1003. Mortgage insurance | | |
| 1004. Property taxes | | |
| 1005. | | |
| 1006. | | |
| 1007. Aggregate Adjustment $0.00 | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee to District Title | | |
| 1102. Owner's title insurance to Fidelity National Title Insurance Company | | |
| 1103. Lender's title insurance to Fidelity National Title Insurance Company | $2,611.50 | |
| 1104. Lender's title policy limit $655,000.00 | | |
| 1105. Owner's title policy limit $ | | |
| 1106. Settement Fee to District Title | $495.00 | |
| 1107. Title Commitment Fee to District Title | $495.00 | |
| 1108. Release Tracking Fee to District Title - POC by $0.00 | $39.00 | |
| 1109. E-Recording Fee to Simplifile | $4.77 | |
| 1110. Title- Abstract Fee to Executive Abstracting Company (DC) | | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. Recording fees: Deed $ Mortgage $156.50 Release $ to District of Columbia District Recording Office | $156.50 | |
| 1202. City/County tax/stamps Deed $ Mortgage $ | | |
| 1203. State tax/stamps Deed $ Mortgage $13,100.00 to District of Columbia District Recording Office | $13,100.00 | |
| 1204. | | |
| **1300. Additional Settlement Charges** | | |
| 1301. Property Taxes - 5501 1st to DC Treasurer - POC by borrower $10178.77 | | |
| 1302. Property Taxes - 5505 1st to DC Treasurer - POC by borrower $4996.04 | | |
| 1303. | | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | $65,580.06 | |

**See signature addendum**

Signature Addendum

MN DEVELOPER RE 1 LLC
~~Kennedy Mosaic LLC,~~ a District of Columbia Limited Liability Company

Date

By: [signature] 12/24/2021
Mel Negussie, Managing Member Date

The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

[signature] 12/23/21
Settlement Agent Date

Doc #: 2022114185
Filed & Recorded
11/17/2022 05:07 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

WCP EX. L

DOB DC DEPARTMENT OF BUILDINGS

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
DC DEPARTMENT OF BUILDINGS
OFFICE OF CIVIL INFRACTIONS

**CERTIFICATE OF DELINQUENT FINES**
FOR FAILURE TO PAY FINES AND PENALTIES ASSESSED PURSUANT TO THE CIVIL INFRACTIONS ACT OF 1985, AS AMENDED

DISTRICT OF COLUMBIA
vs.
423 KENNEDY ST HOLDINGS LLC
Owner of Record
1629 K ST NW STE 300
Washington, DC 20006

Date: 11/17/2022
Square: 3260 Suffix: Lot: 0056
NOI No. : VR22-00182
Address of Premises:
423 KENNEDY ST NW

**This Certificate is filed under the authority of and pursuant to Section 2-1802.03(i)(1) of the D.C. Code, which establishes a continuing lien upon the real property (including improvements) and personal property of an owner in the District of Columbia who fails to pay all outstanding fines, penalties or other costs associated with a final adjudication of a Notice of Infraction issued pursuant to the Civil Infractions Act of 1985, as amended.**

**This Certificate, from the date of its filing, has the force and effect, as against the aforesaid delinquent party or parties, of a lien created by a judgment granted by the Superior Court of the District of Columbia. This lien remains in force and effect until the entire assessed amount set forth below, together with penalties and other costs (including, but not limited to, court costs and administrative fees) are paid. Failure to pay the outstanding amount within ninety (90) days after the date to appeal the final decision and order, if no appeal has been filed, may result in the sale of the owner's property for costs at the next tax sale in the same manner and under the same conditions as property sold for delinquent general taxes.**

**Document No: 1** **Assessed Amount: $1590.00**

By: [signature]

Elizabeth Harshaw
Office of Civil Infractions
DC Department of Buildings

 WCP EX. M

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue
1101 4th Street, SW
Washington, DC 20024

DEVELOPER RE1 LLC
1629 K ST NW STE 300
WASHINGTON DC 20006-1631

COPY

***Below are instructions for individuals with limited English Proficiency who need assistance. All others please turn to the next page for important information from the Office of Tax and Revenue.***

**Language Assistance**

Si necesita ayuda en Español, por favor llame al **(202) 727-4829** para proporcionarle un intérprete **de manera gratuita**.

Nếu quý vị cần giúp đỡ về tiếng Việt, xin gọi **(202) 727-4829** để chúng tôi thu xếp có thông dịch viên đến giúp quý vị **miễn phí**.

Si vous avez besoin d'aide en Français appelez-le **(202) 727-4829** et l'assistance d'un interprète vous sera **fournie gratuitement**.

**በአማርኛ እርዳታ ከፈለጉ በ (202) 727-4829 ይደውሉ። የነፃ አስተርጓሚ ይመደብልዎታል።**

한국어로 언어 지원이 필요하신 경우 (202) 727-4829 로 연락을 주시면 **무료로** 통역이 제공됩니다.

如果您需要用(中文)接受幫助，請電洽 (202) 727-4829 將免费向您提供口譯員服務。

**Office of the Chief Financial Officer**
**Office of Tax & Revenue**
**Customer Service Administration**
**1101 4th Street, SW Suite W270**
**Washington, DC 20024**

COPY

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue

1101 4th Street, SW
Washington, DC 20024

Date of Notice: August 4, 2026

Notice Number: L0017028923

## PROPERTY TAX BILL

| Square | Suffix | Lot | Property Address | Bill Year | Assessment |
|---|---|---|---|---|---|
| 3389 | | 0138 | 5501 1ST ST NW | 2026 | $2,500,000 |

| Description | Class | Tax | Penalty | Interest | Credit | Total |
|---|---|---|---|---|---|---|
| 2026 Second Half Tax | 3 | $62,500.00 | $0.00 | $0.00 | $0.00 | $62,500.00 |
| 2026 First Half Tax | 3 | $62,500.00 | $6,250.00 | $4,687.50 | $0.00 | $73,437.50 |
| **Total** | | **$125,000.00** | **$6,250.00** | **$4,687.50** | **$0.00** | **$135,937.50** |
| **Amount Due By August 31, 2026** | | | | | | **$135,937.50** |
| **Amount Due By September 15, 2026** | | | | | | **$136,875.00** |

**Additional Information** (Please see reverse side for important information.)

- Real Property Tax is based on the Taxable Assessment of $2,500,000.00 at a rate of Class 3. Estimated annual tax amount $125,000.00.
- 23.40% of your Tax Year 2026 Real Property Tax is used to pay the General Obligation Bonds debt service requirement.

COPY

**Forecasted Amounts for Late Payments**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **If paid by:** | **Sep 16, 2026** | **Amount Due** | **$144,062.50** | **If paid by:** | **Oct 16, 2026** | **Amount Due** | **$145,937.50** |
| **If paid by:** | **Oct 1, 2026** | **Amount Due** | **$145,000.00** | **If paid by:** | **Nov 1, 2026** | **Amount Due** | **$146,875.00** |

RETURN THIS PORTION WITH YOUR REMITTANCE AND/OR CORRESPONDENCE

DEVELOPER RE1 LLC
1629 K ST NW STE 300
WASHINGTON DC 20006-1631

**Media Number:** 1581071
**Notice Number:** L0017028923
**Tax Type:** Real Property Tax
**Account ID:** 700-001484236
**SSL:** 3389- -0138
**Due Date:** 15-Sep-2026
**Amount Due:** $136,875.00

OFFICE OF TAX AND REVENUE
DC GOVERNMENT REAL PROPERTY TAXES
P.O. BOX 718095
PHILADELPHIA, PA 19171-8095

Amount Enclosed: $ ___ , ___ , ___ . ___

**Make check or money order payable to: DC TREASURER**
Please use the enclosed envelope and include your SSL and tax type on your payment

3389XXXX01380100000000158107170000148423600136875005

# TAX BILL INFORMATION

**PAYMENTS:**

**The real property tax payment due date for this tax bill is displayed on the reverse side within the tax liability table.** If the due date falls on a weekend or holiday, the payment will be due the next business day.

Pay Online

Make a secure **ACH** or **Credit Card** payment through the *MyTax.DC.gov* online portal:

1. From the *MyTax.DC.gov* homepage, click on the "Make a Real Property Payment" link and enter the Square, Suffix, Lot number, or Street Address.
2. Select the desired payment method (ACH or Credit Card).
3. Select the tax account for which you would like to make a payment.
4. Enter the appropriate information and submit the payment.
5. Retain the confirmation number for your records.

Pay by Check

1. Make your check payable to the "DC Treasurer."
2. To ensure your payment is recorded accurately, you **must** write your **Square, Suffix, Lot (SSL) number** on your check or money order.
3. If you are submitting payments for more than one property, you **must** include separate checks for each payment voucher.
4. Mail your check with the voucher at the bottom of this notice to: Office of Tax and Revenue DC Government Real Property Taxes, P.O. Box 718095, Philadelphia, PA 19171-8095.
   Payments must be received at that address by the due date to be credited as timely. The District cannot be responsible for delays in the mail.

COPY

**Please note:** OTR accepts MasterCard, Visa, American Express, and Discover cards for credit card payments made online. There is a 2.25 percent non-refundable convenience fee, charged by the processor, when making a credit card payment. The convenience fee does not apply to ACH payments. Also, the credit card payment amount is not to exceed $100,000.00 (inclusive of 2.25 percent non-refundable convenience fee) per transaction and is limited to a maximum of two (2) transactions per month.

**TAX SALE:**

Properties delinquent in the payment of real property tax, BID tax, vault rent, special assessments, or other certified liens may be subject to sale at the District's annual tax sale.

**PENALTY, INTEREST, AND FEES:**

The law provides that if your real property and/or BID tax is not paid in full by the due date on the tax bill, the Office of Tax and Revenue **must** charge a penalty equal to 10% of the delinquent tax, as well as interest at the rate of 1.5% per month (or part thereof) until paid in full. Furthermore, a $65 fee will be assessed for each dishonored payment. Waiver requests can be submitted via MyTax.DC.gov for consideration.

**BILL QUESTIONS:**

For assistance with billing related inquiries as well as MyTax.DC.gov, please contact our e-Services Unit at (202) 759-1946 or email e-services.otr@dc.gov, 8:15 am to 5:30 pm, Monday through Friday. For assistance with property classification III (3) and IV (4), please contact the Office of Residential Inspection Unit of the Department of Building at (202) 671-3500 or email vacantbuildings@dc.gov.

**TAX RATES:**

| **Class** | **Tax Rate per $100** | **Description** |
|---|---|---|
| 1A | $0.85 | Residential real property, including multifamily |
| 1B | $0.85/$1.00 | Residential real property with no more than 2 dwelling units, where first $2.558M is taxed at the lower rate and the amount above $2.558M is taxed at the higher rate |
| 2 | $1.65 | Commercial and industrial real property, including hotels and motels, if assessed value is not greater than $5 million |
| 2 | $1.77 | Commercial and industrial real property, including hotels and motels, if assessed value is greater than $5 million but not greater than $10 million |
| 2 | $1.89 | Commercial and industrial real property, including hotels and motels, if assessed value is greater than $10 million |
| 3 | $5.00 | Vacant real property |
| 4 | $10.00 | Blighted real property |

WCP EX. N

DC Office of Tax and Revenue

MyTax DC

Real Property Search

## Property Details

Make a Payment

SSL : 3389- -0138

Balance Due : $145,000.00

Premise Address : 5501 1ST ST NW WASHINGTON DC 20011-5258

Details Assessment Tax Information Map Applications and Actions

Tax Summary Tax History Billing History Payment History

### Tax Summary

Help

2026

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | $69,687.50 |
| First Half | Real Property Tax | $75,312.50 |

2025

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | $0.00 |
| First Half | Real Property Tax | $0.00 |

2024

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | $0.00 |
| First Half | Real Property Tax | $0.00 |

*For more historical data, please contact OTR Customer Service at (202) 727-4TAX.*

WCP EX. O

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue
1101 4th St, SW
Washington, DC 20024

MEL NEGUSSIE
423 KENNEDY ST HOLDINGS LLC
1629 K ST NW STE 300
WASHINGTON DC 20006-1631

COPY

***Below are instructions for individuals with limited English Proficiency who need assistance. All others please turn to the next page for important information from the Office of Tax and Revenue.***

**Language Assistance**

Si necesita ayuda en Español, por favor llame al **(202) 727-4829** para proporcionarle un intérprete **de manera gratuita**.

Nếu quý vị cần giúp đỡ về tiếng Việt, xin gọi **(202) 727-4829** để chúng tôi thu xếp có thông dịch viên đến giúp quý vị **miễn phí**.

Si vous avez besoin d'aide en Français appelez-le **(202) 727-4829** et l'assistance d'un interprète vous sera **fournie gratuitement**.

**በአማርኛ እርዳታ ከፈለጉ በ (202) 727-4829 ይደውሉ። የነፃ አስተርጓሚ ይመደብልዎታል።**

한국어로 언어 지원이 필요하신 경우 **(202) 727-4829** 로 연락을 주시면 **무료로** 통역이 제공됩니다.

如果您需要用(中文)接受幫助，請電洽 **(202) 727-4829** 將**免費**向您提供口譯員服務。

**Office of the Chief Financial Officer**
**Office of Tax & Revenue**
**Customer Service Administration**
**1101 4th Street, SW Suite W210**
**Washington, DC 20024**

COPY

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue

1101 4th Street, SW
Washington, DC 20024

Date of Notice: September 2, 2026

Notice Number: L0017352756

Square Suffix Lot (SSL): 3260- -0056
Premise Address:
423 KENNEDY ST NW # 1
WASHINGTON DC 20011

Owner(s): 423 KENNEDY ST HOLDINGS LLC & CHAMPE V THORTON

Case ID: 18930522

**ATTENTION: YOUR PROPERTY WAS SOLD AT TAX SALE**

COPY

**Premise Address:** 423 KENNEDY ST NW # 1 WASHINGTON DC 20011

**Subject Property:** 3260- -0056

**Tax Sale Date:** August 20, 2026

**If you do not pay all amounts due, the purchaser will have the right to file a lawsuit to foreclose on the property and you may lose title.**

According to the Mayor's tax roll, you own or may have an interest in the real property listed above. Please follow the below instructions to redeem your property from tax sale and prevent a foreclosure lawsuit.

To redeem your property from the tax sale, you must pay all taxes owed, as well as any legal fees and expenses that may become due.

A tax bill is mailed to you during the month of August. You should pay the bill in full and on time.

If you are receiving this notice after October 31, 2026, or if you have not already paid your tax bill in full, you should contact the Office of Tax and Revenue ("OTR") at (202) 727-4TAX (4829) for a current tax bill and up-to-date payoff amount.

After you have paid your taxes, you should call OTR to confirm that you have redeemed your property. Keep a copy of your proof of payment in case there is a later dispute about the payment.

If you have not paid all taxes within four months after the Tax Sale Date stated above, an additional $381.50 may be added to reimburse the purchaser for some costs.

If you do not redeem the property within six months of the Tax Sale Date stated above, the tax sale purchaser may file a lawsuit against you to obtain title to the property.

If the purchaser files a foreclosure lawsuit, you will be responsible for legal fees and expenses that may total thousands of dollars. You may also lose title to the property.

For further information on how to redeem, please read our Real Property Owner's Guide to the Tax Sale Redemption Process, available on our website at www.otr.cfo.dc.gov/page/real-property-tax-sale. You may also request a copy by visiting or writing to our Office of Tax and Revenue 1101 4th Street SW, Suite W550, Washington, DC 20024.

**YOU MAY BE ELIGIBLE FOR FREE LEGAL SERVICES OR OTHER ASSISTANCE. SEE THE NEXT PAGE FOR MORE INFORMATION.**

Should you have additional questions, please call OTR's Customer Service Center at (202) 727-4TAX (4829).

COPY

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue

1101 4th Street, SW
Washington, DC 20024

Notice Number: L0017352756

# RESOURCES FOR REAL PROPERTY TAX PAYERS IN THE DISTRICT OF COLUMBIA

**Real Property Tax Ombudsman**. Homeowners and other interested parties may be eligible for assistance from the Real Property Tax Ombudsman. If you need assistance with a tax sale or related property tax matters, contact the Real Property Tax Ombudsman at **(202) 727-1529** or via email to realpropertytax@dc.gov.

**Classification Disputes.** If your real property is classified as vacant or blighted and you believe this classification is incorrect, contact the Office of Residential Inspection Unit of the Department of Building at (202) 671-3500 or email vacantbuildings@dc.gov for information on how to appeal the property classification.

**Hardship Forbearance.** You may be eligible to defer, or postpone, payment of the past due amount. For information on how to apply for this deferral, please contact the Office of Tax and Revenue at (202) 727-4TAX (4829).

**Senior Citizen and Low-Income Tax Relief.** Senior citizens and low-income households may have additional rights to defer property taxes. If you think you may be eligible for this tax relief, please contact the Office of Tax and Revenue at (202) 727-4TAX (4829) for more information.

**Additional Legal Services.** Free and reduced-cost legal services may be available to low- and moderate-income households. You can get a list of service providers from the Real Property Tax Ombudsman (above).

**Housing Counseling Services.** The U.S. Department of Housing and Urban Development ("HUD") sponsors housing counseling agencies throughout the country that can provide advice on buying a home, renting, defaults, foreclosures, and credit issues. You can get a list of HUD-approved housing counseling agencies from the Real Property Tax Ombudsman (above).

COPY

COPY

WCP EX. P

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue
1101 4th Street, SW
Washington, DC 20024

MEL NEGUSSIE
423 KENNEDY ST HOLDINGS LLC
THORTON CHAMPE V.
1629 K ST NW STE 300
WASHINGTON DC 20006-1631

COPY

***Below are instructions for individuals with limited English Proficiency who need assistance. All others please turn to the next page for important information from the Office of Tax and Revenue.***

**Language Assistance**

Si necesita ayuda en Español, por favor llame al **(202) 727-4829** para proporcionarle un intérprete **de manera gratuita**.

Nếu quý vị cần giúp đỡ về tiếng Việt, xin gọi **(202) 727-4829** để chúng tôi thu xếp có thông dịch viên đến giúp quý vị **miễn phí**.

Si vous avez besoin d'aide en Français appelez-le **(202) 727-4829** et l'assistance d'un interprète vous sera **fournie gratuitement**.

**በአማርኛ እርዳታ ከፈለጉ በ (202) 727-4829 ይደውሉ። የነፃ አስተርጓሚ ይመደብልዎታል።**

한국어로 언어 지원이 필요하신 경우 **(202) 727-4829** 로 연락을 주시면 **무료로** 통역이 제공됩니다.

如果您需要用(中文)接受幫助，請電洽 **(202) 727-4829** 將免费向您提供口譯員服務。

**Office of the Chief Financial Officer**
**Office of Tax & Revenue**
**Customer Service Administration**
**1101 4th Street, SW Suite W270**
**Washington, DC 20024**

COPY

Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue

1101 4th Street, SW
Washington, DC 20024

Date of Notice: August 4, 2026 Notice Number: L0017214834

**PROPERTY TAX BILL**

| Square | Suffix | Lot | Property Address | Bill Year | Assessment |
|---|---|---|---|---|---|
| 3260 | | 0056 | 423 KENNEDY ST NW #1 | 2026 | $966,460 |

| Description | Class | Tax | Penalty | Interest | Credit | Total |
|---|---|---|---|---|---|---|
| 2026 Second Half Tax | 3 | $24,161.50 | $0.00 | $0.00 | $0.00 | $24,161.50 |
| 2026 First Half Tax | 3 | $24,161.50 | $2,416.15 | $1,812.10 | $0.00 | $28,389.75 |
| 2025 Tax | 3 | $49,973.50 | $4,997.36 | $10,494.40 | $0.00 | $65,465.26 |
| **Total** | | **$98,296.50** | **$7,413.51** | **$12,306.50** | **$0.00** | **$118,016.51** |
| **Amount Due By August 31, 2026** | | | | | | **$118,391.31** |
| **Amount Due By September 15, 2026** | | | | | | **$119,128.53** |

**Additional Information** (Please see reverse side for important information.)

- Real Property Tax is based on the Taxable Assessment of $966,460.00 at a rate of Class 3. Estimated annual tax amount $48,323.00.
- 23.40% of your Tax Year 2026 Real Property Tax is used to pay the General Obligation Bonds debt service requirement.

COPY

**Forecasted Amounts for Late Payments**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **If paid by:** | **Sep 16, 2026** | **Amount Due** | **$122,281.90** | **If paid by:** | **Oct 16, 2026** | **Amount Due** | **$123,756.34** |
| **If paid by:** | **Oct 1, 2026** | **Amount Due** | **$123,019.12** | **If paid by:** | **Nov 1, 2026** | **Amount Due** | **$124,493.56** |

RETURN THIS PORTION WITH YOUR REMITTANCE AND/OR CORRESPONDENCE

MEL NEGUSSIE
423 KENNEDY ST HOLDINGS LLC
THORTON CHAMPE V.
1629 K ST NW STE 300
WASHINGTON DC 20006-1631

**Media Number:** 1562729
**Notice Number:** L0017214834
**Tax Type:** Real Property Tax
**Account ID:** 700-001601555
**SSL:** 3260- -0056
**Due Date:** 15-Sep-2026
**Amount Due:** $119,128.53

OFFICE OF TAX AND REVENUE
DC GOVERNMENT REAL PROPERTY TAXES
P.O. BOX 718095
PHILADELPHIA, PA 19171-8095

Amount Enclosed: $ [ , , . ]

**Make check or money order payable to: DC TREASURER**
Please use the enclosed envelope and include your SSL and tax type on your payment

3260XXXX00560100000000156272970000160155500119128530

# TAX BILL INFORMATION

**PAYMENTS:**

**The real property tax payment due date for this tax bill is displayed on the reverse side within the tax liability table.** If the due date falls on a weekend or holiday, the payment will be due the next business day.

Pay Online

Make a secure **ACH** or **Credit Card** payment through the *MyTax.DC.gov* online portal:

1. From the *MyTax.DC.gov* homepage, click on the "Make a Real Property Payment" link and enter the Square, Suffix, Lot number, or Street Address.
2. Select the desired payment method (ACH or Credit Card).
3. Select the tax account for which you would like to make a payment.
4. Enter the appropriate information and submit the payment.
5. Retain the confirmation number for your records.

Pay by Check

1. Make your check payable to the "DC Treasurer."
2. To ensure your payment is recorded accurately, you **must** write your **Square, Suffix, Lot (SSL) number** on your check or money order.
3. If you are submitting payments for more than one property, you **must** include separate checks for each payment voucher.
4. Mail your check with the voucher at the bottom of this notice to: Office of Tax and Revenue DC Government Real Property Taxes, P.O. Box 718095, Philadelphia, PA 19171-8095.
   Payments must be received at that address by the due date to be credited as timely. The District cannot be responsible for delays in the mail.

COPY

**Please note:** OTR accepts MasterCard, Visa, American Express, and Discover cards for credit card payments made online. There is a 2.25 percent non-refundable convenience fee, charged by the processor, when making a credit card payment. The convenience fee does not apply to ACH payments. Also, the credit card payment amount is not to exceed $100,000.00 (inclusive of 2.25 percent non-refundable convenience fee) per transaction and is limited to a maximum of two (2) transactions per month.

**TAX SALE:**

Properties delinquent in the payment of real property tax, BID tax, vault rent, special assessments, or other certified liens may be subject to sale at the District's annual tax sale.

**PENALTY, INTEREST, AND FEES:**

The law provides that if your real property and/or BID tax is not paid in full by the due date on the tax bill, the Office of Tax and Revenue **must** charge a penalty equal to 10% of the delinquent tax, as well as interest at the rate of 1.5% per month (or part thereof) until paid in full. Furthermore, a $65 fee will be assessed for each dishonored payment. Waiver requests can be submitted via MyTax.DC.gov for consideration.

**BILL QUESTIONS:**

For assistance with billing related inquiries as well as MyTax.DC.gov, please contact our e-Services Unit at (202) 759-1946 or email e-services.otr@dc.gov, 8:15 am to 5:30 pm, Monday through Friday. For assistance with property classification III (3) and IV (4), please contact the Office of Residential Inspection Unit of the Department of Building at (202) 671-3500 or email vacantbuildings@dc.gov.

**TAX RATES:**

| Class | Tax Rate per $100 | Description |
|---|---|---|
| 1A | $0.85 | Residential real property, including multifamily |
| 1B | $0.85/$1.00 | Residential real property with no more than 2 dwelling units, where first $2.558M is taxed at the lower rate and the amount above $2.558M is taxed at the higher rate |
| 2 | $1.65 | Commercial and industrial real property, including hotels and motels, if assessed value is not greater than $5 million |
| 2 | $1.77 | Commercial and industrial real property, including hotels and motels, if assessed value is greater than $5 million but not greater than $10 million |
| 2 | $1.89 | Commercial and industrial real property, including hotels and motels, if assessed value is greater than $10 million |
| 3 | $5.00 | Vacant real property |
| 4 | $10.00 | Blighted real property |

WCP EX. Q

DC Office of Tax and Revenue

MyTax DC

Real Property Search

## Property Details

Make a Payment

SSL : 3260- -0056

Balance Due : $124,075.94

Premise Address : 423 KENNEDY ST NW # 1 WASHINGTON DC 20011

Details Assessment Tax Information Map Applications and Actions

Tax Summary Tax History Billing History Payment History

### Tax Summary

Help

2026 - Tax Sale Occurred on Aug 19, 2026

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | **$26,940.07** |
| First Half | Real Property Tax | **$29,114.59** |

2025

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | **$33,148.53** |
| First Half | Real Property Tax | **$34,872.75** |

2024

| Half | Tax Type | Balance |
|---|---|---|
| Second Half | Real Property Tax | **$0.00** |
| First Half | Real Property Tax | **$0.00** |

*For more historical data, please contact OTR Customer Service at (202) 727-4TAX.*

WCP EX. R

[redacted]

---

**From:** mel negussie <mel@ntconstruction.net>
**Sent:** Monday, April 20, 2026 2:08 AM
**To:** Rob Bloemker <rob@1sharpe.com>; David Niehaus <david@1sharpe.com>; Feng Wang <feng@1sharpe.com>
**Cc:** Bala Sure <balasure@gmail.com>
**Subject:** Re: 423 Kennedy (Washington DC) & 1Sharpe

Dear Rob, David, and Feng,

I hope you are all well. I am writing because the 423 Kennedy Street NW construction project has now been stalled for approximately 3.5 years, and the property is deteriorating as a result. This continued deterioration is not in the interest of 1Sharpe as conduit financier, nor of 423 Kennedy St Holdings LLC as the current owner of the property. I would welcome the opportunity to speak with you at your convenience regarding the email below.

Thank you,
Mel

---

**From:** mel negussie <mel@ntconstruction.net>
**Date:** Sunday, November 16, 2025 at 2:36 PM
**To:** rob@1sharpe.com <rob@1sharpe.com>, david@1sharpe.com <david@1sharpe.com>, feng@1sharpe.com <feng@1sharpe.com>
**Cc:** Bala Sure <balasure@gmail.com>
**Subject:** 423 Kennedy (Washington DC) & 1Sharpe

Dear Rob, David, and Feng,
We wanted to reach out regarding a matter that we believe 1Sharpe may not be receiving the full or accurate picture on.
WCP declared a "default" on the 423 Kennedy Street NW project—our understanding is that 1Sharpe was the conduit-financier—as well as another property, 71 Kennedy (Developer RE1). Although 1Sharpe is not the conduit financier for 71 Kennedy, both defaults were issued simultaneously, seemingly to leverage one project against the other in an attempt to recoup losses from an entirely unrelated WCP-funded venture.
The catalyst came when WCP's CEO, Daniel Huertas, abruptly declared both loans in default after Mel Negussie declined to cover a $700,000 shortfall on another unrelated project—2507 I Street NW—which has no connection to either 423 or 71 Kennedy. While 1Sharpe was not the conduit lender for 71 Kennedy, the same conduit investor was behind both 2507 I Street project and 71 Kennedy property. Because Mel Negussie was the common denominator among the three projects, WCP cut off construction draws for 423 Kennedy and issued default notices on both 423 and 71 Kennedy.
For 423 Kennedy, the supposed default was based on a $1,500 D.C. grass-cutting infraction—an issue resolved immediately upon receipt of notice. Despite the loan being fully current at the time, WCP attempted to foreclose on 423 Kennedy (a development with over $14 million in total project cost) over this minor matter, even though its own actions—cutting off draws and asserting baseless defaults—caused the disruption. Attached is the Amended Complaint documenting these facts.
Before the case was removed to bankruptcy court by WCP, the D.C. Superior Court validated our position. In *423 Kennedy St Holdings LLC v. DP Capital* (now consolidated with the 71 Kennedy matter), the Court granted an injunction halting WCP's foreclosure, finding that WCP's asserted default was a "pretext". The Court also found Mel Negussie to be "very credible" witness and concluded that WCP appeared to be attempting to "gain control" of the nearly completed 423 Kennedy project. The Court's Order is attached.
Following the Superior Court's ruling, WCP created a new entity, JPK NewCo, assigned its second deeds of trust for both the 423 Kennedy project and the 71 Kennedy property to this newly created entity, and then filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. This was the second bankruptcy filing involving JPK NewCo with these same properties within one year, the prior case having been dismissed.
WCP's conduct stands in sharp contrast to 1Sharpe Ventures' stated mission—to invest with integrity, create positive impact, and deliver meaningful value to all stakeholders. The 423 Kennedy project is supported not by

institutions but by 44 small individual investors. WCP's actions are inconsistent with the principles of fairness, partnership, and responsible investment that 1Sharpe promotes.

We genuinely believe 1Sharpe has not been receiving accurate information from WCP. We would welcome the opportunity to speak directly with you to ensure you have the complete and factual context.

Thank you for your time and consideration.

Sincerely,

*Mel Negussie & Bala Sure*
Managing Members – 423 Kennedy St Holdings LLC & Developer RE1 LLC
1629 K Street NW, Suite 300 | Washington, DC 20006-1631
Cell: (202) 271-5046

CAUTION: This sender is from outside your organization

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

423 KENNEDY ST HOLDINGS LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT, effective as of the date of signature set forth below, is entered into by and between Brighton KSDC, LLC (hereinafter "Brighton") and Mel Melaku Negussie (hereinafter "Negussie") each of which is referred to individually as "Member" and collectively as "Members." In consideration of the mutual promises contained in this Amended and Restated Operating Agreement (this, "Agreement"), the Members agree as follows:

## ARTICLE 1

## THE LIMITED LIABILITY COMPANY

Section 1.1 Formation. The Members hereby amend an existing limited liability company upon the terms and conditions provided in this Agreement, subject to the provisions of Title 13.1, Chapter 12, the District Of Columbia Limited Liability Company Act (the "Act"), as the same may be amended from time to time and any successor to such Act.

Section 1.2 Name. The name of the limited liability company shall be 423 KENNEDY ST HOLDINGS LLC (the "Company").

Section 1.3 Articles of Organization. On May 20, 2016 the Company caused Articles of Organization for 423 KENNEDY ST HOLDINGS LLC, a limited liability company under the laws of the District of Columbia, to be filed with the Commonwealth of District Of Columbia State Corporation Commission. In the future, the Members shall execute such further documents and take such further action as shall be appropriate or necessary to comply with the requirements of law for the formation and operation of a limited liability company in all jurisdictions where the Company elects to carry on its business.

Section 1.4 Business. The purposes for which the Company is organized are (i) the investment, ownership and management of real property, (ii) the investment, ownership and management of personal property, (iii) other lawful investments, (iv) to engage in all other lawful activities as are reasonably necessary to carry out the foregoing purposes of the Company and (v) to engage in all activities pursuant to and in accordance with §13.1-1008 of the District Of Columbia Limited Liability Act. Title to any property held by the Company may, by unanimous agreement of the Managers, be held by a nominee on behalf of the Company. The Company may sell or otherwise dispose of all or substantially all of its assets and any such sale or disposition shall be considered to be within the scope of the Company's business.

Section 1.5 Principal Office; Registered Agent. The principal office of the Company will be located at 1215 1st ST NE, PHC, Washington DC 20002. The name and address of the

initial agent for service of process of the Company is Charles Paret, 1140 3rd Street, NE, Washington DC 20002. The agent for service of process of the Company may be changed from time to time by the Managing Member (as defined below), subject to applicable law.

Section 1.6 Additional Members. Additional Members shall not be admitted to the Company without the prior written consent of all of the Members.

## ARTICLE 2

## DEFINITIONS

Section 2.1 Cash Flow. "Cash Flow" shall mean the excess of all cash receipts of the Company over all cash disbursements of the Company except that cash flow shall not include any amount that represents a return of the capital invested by the Company that is being held for reinvestment or for return to the Members under Section 4.2(a).

Section 2.2 Code. "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

Section 2.3 Manager or Managers. "Manager" or "Managers" shall mean a person or persons elected by the Members to manage the Company. The Managers shall be Brighton and Negussie.

Section 2.4 Profit or Loss. "Profit" or "Loss" shall mean the profit or loss of the Company as determined under the capital accounting rules of Treasury Regulation §1.704-1(b)(2)(iv) for purposes of adjusting the capital accounts of the Members, including, without limitation, the provisions of paragraphs (b), (f), and (g) of those regulations relating to the computation of items of income, gain, deduction, and loss.

Section 2.5 Total Cost and Investment. "Total Cost and Investment" shall mean, with respect to each project (a "Project"), the total expenditures to acquire, improve, develop, remodel, rehabilitate, hold, and otherwise prepare any property for sale including, without limitation, money used to purchase the property (including closing costs) and to renovate the property but does not include selling costs.

Section 2.6 Sharing Ratio. Except as may be indicated in any subsequent agreement to the contrary, the "Sharing Ratio" of each Member shall be as follows:

| | |
|---|---|
| Negussie | 50.0% |
| Brighton | 50.0% |

Section 2.7 Treasury Regulations. "Treasury Regulations" shall mean regulations promulgated by the Department of Treasury under the Code. Any reference to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations promulgated under the Code.

Section 2.8 Voting Interest. "Voting Interest" shall mean a number of votes equal to a Member's Sharing Ratio multiplied by 100.

Section 2.9 Indemnification. "Indemnify" Negussie shall defend and indemnify Brighton against all third party claims, actions, suits, demands, damages, non-fiscal obligations, losses, settlements, judgments, costs and expenses ( including without limitation reasonable attorneys' fees and costs) ("Claims") which arise out of or relate to the negligence or misconduct of any party (other than Brighton) associated with the redevelopment or sale of certain real property located at 419-423 Kennedy St. NW, Washington, DC.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

Section 3.1 Capital Contributions. Prior to the date of this Agreement, the Members or their predecessors in interest have made capital contributions to the Company in the following amounts:

Capital Contributions

| | | |
|---|---|---|
| Tranche 1 Acquisition - | Brighton | $2,500,000 |
| Tranche 1 Acquisition - | Negussie | $1,000,000 |

Section 3.2 Additional Capital Contributions. If additional capital contributions are required at any time, any of the following steps may be taken:

(a) the necessary amount may be contributed by one or more of the existing Members in such shares as they may agree upon and the Sharing Ratios may be adjusted accordingly;

(b) a new Member may be admitted to the Company and make part or all of the required contribution and the Sharing Ratios may be adjusted accordingly; or

(c) the funds may be borrowed from any source, including any existing Member or Members.

Section 3.3 Return of Capital Contributions. Capital contributions shall be expended in furtherance of the business of the Company. All costs and expenses of the Company shall be paid from its funds. No Manager shall have any personal liability for the repayment of any capital contribution to a Member.

## ARTICLE 4

## DISTRIBUTIONS

Section 4.1 Nonliquidating Distributions. Except as provided in Section 4.2 or otherwise agreed to by the Members, the Company shall make distributions of Cash Flow to the Members after each Project (reconciled annually) as follows:

(a) first to all Members until they have received their aggregate principal amount of their Capital Contributions; then

(b) any Cash Flow remaining after distributions have been made pursuant to Sections 4.1(a) shall be distributed as follows: 50.0% to Brighton , and 50.0% to Negussie.

Section 4.3 Liquidating Distributions. All distributions made in connection with the dissolution of the Company pursuant to Article 12, shall be made to the Members in the following order of priority:

(a) first, to the Members proportion to each Member's initial capital contributions set forth under Article 3, until each Member's capital contributions have been returned in full under this paragraph (a); then

(b) the balance, 50.0% to Brighton , 50.0% to Negussie.

## ARTICLE 5

## ALLOCATION OF PROFIT AND LOSS

Section 5.1 Determination of Profit and Loss. Profit or Loss shall be determined on an annual basis and for such other periods as may be required.

Section 5.2 Profit Allocation.

(a) Except as provided in Sections 5.2(b) and 5.4, Profit shall be allocated to Members as follows:

(i.) first, to the Members, until they have been allocated an amount of Profit under this clause (i) on a cumulative basis equal to the Losses previously allocated to them on a cumulative basis under Section 5.3; then

(ii.) the balance, to the Members in proportions equal to their membership in the company.

(b) Any Profit or Loss with respect to the sale, exchange or other disposition of all or substantially all of the Company's assets or with respect to the sale, exchange or other disposition of assets in connection with the liquidation of the Company shall be allocated among the Members, so as to cause the balance in each Member's capital account to equal the amount that Member would be entitled to receive under Section 4.2 if all the assets of the Company (after the payment of liabilities) were distributed to the Member under that Section (the "Target Amounts"). If the Profit or Loss allocable under this Section 5.2(b) is not sufficient to cause the balances in the Members' capital accounts to be the Target Amounts, then items of income, gain, deduction and loss making up such Profit or Loss shall be allocated among the Members in the manner that would most nearly (on an aggregate basis) bring the balances in the Member's capital accounts to the Target Amounts.

(c) For purposes of Section 5.2(b), the capital accounts of the Members shall be determined (i) before giving effect to distributions under Section 4.2, (ii) after allocating all other items of Profit and Loss, and (iii) after making all distributions pursuant to Section 4.1.

(d) If the Profit with respect to the sale of all or substantially all of the Company assets is reported on the installment sale method for federal income tax purposes, the portion of the Profit allocated to each Member under the provisions of paragraph 5.2(b) for each year shall be determined by the accountants for the Company under such reasonable standards, consistently applied, as will result in an allocation of the total Profit from the sale among the Members in accordance with the provisions of paragraph 5.2(b).

Section 5.3 Allocation of Losses. Except as provided in Section 5.2(b) and Section 5.4, all Losses shall be allocated among the Members in accordance with their Sharing Ratios.

Section 5.4 Regulatory Allocations and Curative Provision.

The "qualified income offset" provisions of Treasury Regulation section 1.704-1(b)(2)(ii)(d) are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

The "minimum gain" provisions of Treasury Regulation section 1.704-2 are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

Notwithstanding the provisions of Section 5.3, if during any fiscal year of the Company the allocation of any loss or deduction, net of any income or gain, to a Member would cause or increase a negative balance in a Member's capital account as of the end of that fiscal year, only the amount of such loss or deduction that reduces the balance to zero shall be allocated to the Member and the remaining amount shall be allocated to the other Members in accordance with their respective Sharing Ratios. For purposes of the preceding sentence, a capital account shall be reduced by the adjustments, allocations, and distributions described in Treasury Regulation

sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and increased by the amount, if any, of the negative balance in the Member's capital account that the Member is obligated to restore within the meaning of Treasury Regulation section 1.704-1(b)(2)(ii)(c) as of that time or is deemed obligated to restore under Treasury Regulation section 1.704-2(g)(1) or section 1.704-2(i)(5).

All allocations pursuant to the foregoing provisions of this Section 5.4 (the "Regulatory Allocations") shall be taken into account in computing allocations of other items under Sections 5.2 and 5.3, including, if necessary, allocations in subsequent fiscal years, so that the net amounts reflected in the Members' capital accounts and the character for income tax purposes of the taxable income recognized (for example, as capital or ordinary) will, to the extent possible, be the same as if no Regulatory Allocations had been given effect.

## ARTICLE 6

## ALLOCATION OF TAXABLE INCOME AND LOSS

Section 6.1 In General.

(a) Except as provided in paragraph 6.1(b) and Section 6.2, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for capital account purposes under Article 5.

(b) To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Company asset, the amount of any gain from such disposition allocated to (or recognized by) a Member (or its successor in interest) for federal income tax purposes shall be deemed to consist of recapture income to the extent such Member (or such Member's predecessor in interest) has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Company (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

Section 6.2 Allocation of Section 704(c) Items. The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulation section 1.704-1(b)(2)(iv)(f), there will be a difference between the agreed values or "carrying values" of such property at the time of contribution or revaluation and the adjusted tax basis of such property at that time. All items of tax depreciation, cost recovery, amortization, amount realized, and gain or loss with respect to such assets shall be allocated among the Members to take into account the book-tax disparities in

accordance with the provisions of sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections.

Section 6.3 Integration With Section 754 Election. All items of income, gain, loss, deduction, and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions of this Agreement, and all basis allocations to the Members, shall be determined without regard to any election under section 754 of the Code that may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by sections 734 and 743 of the Code.

Section 6.4 Allocation of Tax Credits. All tax credits with respect to the Company's expenditure of funds shall be allocated in the same manner as the allocation of Profit for the period during which the expenditures giving rise to the tax credit are incurred. If there is no Profit during such period, tax credits shall be allocated in accordance with the Members' respective Sharing Ratios.

## ARTICLE 7

## MANAGEMENT

Section 7.1 Management Authority.

(a) Management of the Company shall be vested in the Managers. The Managers shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions.

(b) Any document executed on behalf of the Company for the purpose of buying or selling properties on behalf of the Company must be signed by the Manager.

Section 7.2 Management Responsibilities. The Managers shall have the authority to manage the day-to-day operations of the Company including the renovation of properties owned by the Company.

Section 7.3 Duties. The Managers shall carry out its duties in good faith, in a manner that it believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. If the Manager so performs its duties, it shall not have any liability by reason of being or having been a Manager of the Company. The Manager shall devote such time to the business of the Company as the Manager, in its discretion, deems necessary for the efficient carrying on of the Company's business. The Manager shall at all times be free to engage in any business for its own account.

Section 7.4 Number. Initially, there shall be two Managers. The number of Managers may be increased or decreased by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%), but no decrease shall have the effect of shortening the term of any incumbent Manager.

Section 7.5 Tenure and Removal. The initial Managers shall be Negussie and Brighton. The initial Manager shall hold office until the first annual meeting of the Members and until a successor has been elected and qualified. At the first annual meeting of Members and at each annual meeting thereafter, the Members shall elect Managers to hold office until the next succeeding annual meeting. Each Manager shall hold office for the term for which it is elected and until its successor has been elected and qualified. At a properly called meeting, any Manager may be removed, with or without cause, by the vote of Members with aggregate Voting Interests of more than 50 percent.

Section 7.6 Reliance by Third Parties. No third party dealing with the Company shall be required to ascertain whether the Managers are acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Managers as binding the Company. The foregoing provisions shall not apply to third parties who are affiliates of a Member or the Manager. If a Manager acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

Section 7.7 Resignation. Either Manager may resign at any time by giving written notice of resignation to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt by the Members and the acceptance of the resignation shall not be necessary to make it effective.

Section 7.8 Newly Created Manager Positions and Vacancies. Newly created Manager positions resulting from an increase in the number of Managers shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until its successor has been elected and qualified. Vacancies occurring for any reason shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a vacancy shall be elected to hold office for the unexpired term of its predecessor.

Section 7.9 Transactions Between Company and Manager. Any Manager, on behalf of the Company, may contract and deal with itself and may cause any person or entity affiliated with the Manager to contract or deal with the Company; provided, however, that such contracts and dealings must be on terms comparable to and competitive with those available to the Company from others dealing at arm's length and must be approved in writing by all of the Members.

Section 7.10 Management Fees and Reimbursements. The Managers shall not be entitled to a management fee or salary for managing the operations of the Company. The Managers shall, however, be reimbursed by the Company for reasonable out-of-pocket costs incurred on behalf of the Company.

Section 7.11 Insurance. The Company shall maintain, for the protection of the Company and all of its Members, such insurance as the Managers, in their sole discretion, deems necessary for the operations being conducted.

Section 7.12 Exculpation. Except as may be indicated in Section 2.9 to the contrary, he Managers shall not be liable to the Company nor to any Member for any act or failure to act, nor for any errors of judgment, but only for willful misconduct or gross negligence. The Company shall indemnify and hold harmless the Managers and the agents and employees of the Managers against and from any personal loss, liability, or damage incurred as a result of any act or omission, or any error of judgment, unless such loss, liability, or damage results from such person's willful misconduct or gross negligence. Any such indemnification shall be paid only from the assets of the Company, and no Manager or third party shall have recourse against the personal assets of any Member for such indemnification.

## ARTICLE 8

## MEMBERS

Section 8.1 Participation. A Member, in its capacity as a Member, shall take no part in the control, management, direction, or operation of the affairs of the Company and shall have no power to bind the Company.

Section 8.2 Quorum. A majority of the outstanding Voting Interests, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. Each of the Members hereby consents and agrees that one or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of the majority of the Voting Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

Section 8.3 Informal Action. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by each Member entitled to vote. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Section 8.4 Annual Meeting. The annual meeting of the Members shall be held on the first Saturday in January beginning in 2020, at the hour of 1:00 PM, local time, or at such other time and on such other day within such month, as shall be fixed by the Managers, for the purpose of electing Managers and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of Managers shall not be held on the

day designated for an annual meeting of the Members, or at any adjournment thereof, the Managers shall cause the election to be held at a special meeting of the Members as soon as may be convenient.

Section 8.5 Special Meetings. Special meetings of the Members for any purpose or purposes may be called by either Manager or by holders of not less than one-tenth (1/10) of all Voting Interests.

Section 8.6 Place of Meeting. The Manager may designate the place of meeting for any annual meeting and the person calling a special meeting may designate the place for such special meeting. If no designation is made, the place of meeting shall be the registered office of the Company.

Section 8.7 Notice of Meeting. Written notice, given five (5) days in advance of a meeting, stating the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered either personally or by mail, by or at the direction of any Manager or other person calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed delivered as provided in the Act. Waiver of notice and actions taken at a meeting shall be effective as provided in the Act.

Section 8.8 Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. Such proxy shall be filed with any Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

Section 8.9 Conduct of Meeting. At each meeting of the Members, a Chairperson for that particular meeting shall be elected. The Chairperson shall be the Member in attendance who has received the vote of the majority of the Voting Interests represented at the meeting. The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting. Following each meeting, the minutes of the meeting shall be sent to the Managers and each Member.

Section 8.10 Tax Matters Partner. Pursuant to section 6231(a) of the Code, Brighton is hereby designated as the tax matters partner for the Company. Brighton is authorized to perform, on behalf of the Company or any Member, any act that may be necessary to make this designation effective.

## ARTICLE 9

## ACCOUNTING AND REPORTING

Section 9.1 Books. The Company shall maintain complete and accurate books of account at the registered office of the Company. The Company shall provide any Member any information requested relating to the business of the Company. During ordinary business hours,

any Member or that Member's authorized representative shall have access to all books, records, and materials regarding the Company and its activities.

Section 9.2 Capital Accounts. The Company shall maintain a separate capital account for each Member in accordance with the Treasury Regulations under section 704(b) of the Code and such other accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations.

Section 9.3 Transfers During Year. In order to avoid an interim closing of the Company's books, the share of profits and losses under Article 5 of a Member who transfers part or all of its interest in the Company during the Company's accounting year may be determined by taking the transferring Member's pro rata share of the amount of such profits and losses for the year. The proration shall be based on the portion of the Company's accounting year which has elapsed prior to the transfer, or may be determined under any other reasonable method; provided, however, that any gain or loss from the sale of Company assets shall be allocated to the owner of the transferred interest at the time of such sale. The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such interest.

Section 9.4 Reports. Within Forty-Five (45) days after the end of each calendar quarter (the "Prior Quarter") the Manager shall deliver to each Member a written report detailing the assets and liabilities of the Company as of the end of the Prior Quarter and setting forth the profits and losses of the Company for the Prior Quarter and for the Company year. The books of account shall be closed promptly after the end of each fiscal year. As soon as practicable thereafter, a Manager shall deliver a written report to each Member which shall include a statement of receipts, expenditures, profits, and losses for the year, a statement of each Member's capital account, and such additional statements with respect to the status of the Company's assets and the distribution of Company funds as are necessary to advise the Members properly about their investment in the Company. Prior to March 15th of each year, the Members shall also be provided with a copy of the Company federal income tax return (Form 1065) to be filed for the preceding year.

Section 9.5 Section 754 Election. If requested by a Member, the Company shall make the election provided for under section 754 of the Code. Any costs attributable to making such election shall be borne solely by the requesting Member.

## ARTICLE 10

## TRANSFERS – RIGHT OF FIRST REFUSAL

Section 10.1 Restrictions. Notwithstanding anything to the contrary contained in this Agreement, no Member shall sell, assign, pledge, or otherwise transfer or dispose of any portion of its interest in the Company without (i) complying with the terms of and procedures set forth in Sections 10.2 through 10.8 or (ii) first obtaining the prior written approval of all of the Members (which approval shall be within the sole and absolute discretion of each Member).

Section 10.2 Offer to Other Members. If at any time any Member proposes to sell, assign, or otherwise dispose of all or any portion of its interest in the Company, such Member ("Offeror") shall make a written offer to sell such interest (the "Offered Interest") to the other Members on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest. Such offer shall state the name of the proposed transferee and all of the terms and conditions of the proposed transfer, including the price to the proposed transferee.

Section 10.3 Acceptance of Offer. The other Members shall have the right for a period of 30 days after receipt of the offer from Offeror, or such longer period as may be required under Section 10.5, to elect to purchase all of the Offered Interest. In exercising their right to purchase, the other Members may divide the Offered Interest in any manner to which they all agree, and in the absence of agreement, the Offered Interest shall be divided among the Members in proportion to the relative Sharing Ratios of the Members who choose to participate. To exercise their rights to purchase, the participating Members shall give written notice to Offeror prior to the end of the period provided for in the first sentence of this Section 10.3. Upon the exercise of a right to purchase, and provided the right is exercised with respect to all of the Offered Interest, the purchase shall be closed and payment made on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest.

Section 10.4 Failure to Accept Offer. If the other Members do not elect to purchase all of the Offered Interest, Offeror may transfer the Offered Interest to the proposed transferee named in the offer delivered to the other Members. However, if that transfer is not made within 90 days after the end of the period provided for in Section 10.3, a new offer shall be made to the other Members and the provisions of Sections 10.1, 10.2, and 10.3 shall again apply.

Section 10.5 Cash Equivalents. If the proposed offer under Section 10.2 is for consideration other than cash or cash plus deferred payments of cash, the purchasing Members may pay the cash equivalent of such other consideration. The Offeror and the purchasing Members shall attempt to agree upon a cash equivalent of such other consideration. If they cannot agree within Twenty (20) days after the beginning of the 30-day period under Section 10.3, any of such Members may, by five days' written notice to the others, initiate arbitration proceedings for determination of the cash equivalent without regard to income tax consequences to the Offeror as a result of receiving cash rather than the other consideration. The purchasing Members may elect to purchase the interest at the determined cash equivalent by notice of such election to the Offeror within ten days after the arbitrator's decision.

Section 10.6 Direct and Indirect Transfers. For purposes of this Agreement, restrictions upon the sale, assignment, or other disposition of a Member's interest shall extend to any direct or indirect transfer including, without limitation, an involuntary transfer (such as a transfer pursuant to a foreclosure sale) or a transfer resulting by operation of law.

Section 10.7 Substitution of a Member.

(a) No assignee, legatee, or transferee (by conveyance, operation of law, or otherwise) of the whole or any portion of a Member's interest in the Company shall have the right to become a substituted Member without

the prior written consent of all of the Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member. A substituted Member shall succeed to all the rights and interest of its assignor in the Company. An assignee of a Member who is not admitted as a Member shall be entitled only to the distributions to which its assignor would otherwise be entitled.

(b) With the exception of the Managing Member, if a Member shall die, the executor, administrator, or trustee of such Member, or if a Member shall be adjudicated insane or incompetent, the committee, conservator, or representative of such Member, or if a Member shall be dissolved, merged, or consolidated, the successor in interest to such Member, shall have the same rights and obligations that such Member would have had if such Member had not died, been adjudicated insane or incompetent, or been dissolved, merged, or consolidated, except that the executor, administrator, trustee, committee, conservator, representative, or successor (as the case may be) shall not become a substituted Member without the prior written consent of all of the other Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member.

(c) No transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest transferred and shall have agreed to be bound by all the terms and conditions of this Agreement, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.

Section 10.8 Conditions to Substitution. With the exception of the Managing Member, as conditions to its admission as a Member, (i) any assignee, legatee, transferee, or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary and (ii) such assignee, legatee, transferee, or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

## ARTICLE 11

## TERM

Section 11.1 Events of Dissolution. The Company shall continue until dissolved by any of the following events:

(a) the unanimous written consent of all of the Members;

(b) the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

(c) any other event causing dissolution of a limited liability company under the Act.

Section 11.2 Continuity of Company. Notwithstanding the foregoing provisions of Section 11.1, upon the occurrence of an event described in Section 11.1(b), the remaining Members shall have the right to continue the business of the Company. Such right may be exercised only if a majority in interest of the remaining Members consent in writing, within 90 days after the occurrence of the event described in Section 11.1(b), to continue the business of the Company. If a majority in interest of the remaining Members do not consent to continue the Company, the right of the Members to continue the business of the Company shall expire, the Manager shall file a statement of intent to dissolve, and the Company's affairs shall be wound up as provided in Article 12.

## ARTICLE 12

## DISSOLUTION AND TERMINATION

Section 12.1 Final Accounting. In the event of the dissolution of the Company, a proper accounting shall be made as provided in Section 9.4 from the date of the last previous accounting to the date of dissolution.

Section 12.2 Liquidation. Upon the dissolution of the Company, any Manager, or if either Manager is unable to act, some person selected by the Members whose Sharing Ratios comprise 51 percent or more of the Sharing Ratios of the Members, shall act as liquidator to wind up the Company. The liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority: (i) to the payment of debts and liabilities of the Company and the expenses of liquidation; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Company; and (iii) to the Members in accordance with Article 4.

Section 12.3 Distribution in Kind. If the liquidator shall determine that a Company asset should be distributed in kind, the liquidator shall obtain an independent appraisal of the fair market value of the asset as of a date reasonably close to the date of liquidation. Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Members (in accordance with the provisions of Article 5, assuming that the asset was sold for the appraised value) and taken into consideration in determining the balance in the Members' capital accounts as of the date of liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Section 12.2. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in

distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.4. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.5 Waiver of Right to Court Decree of Dissolution. The Members agree that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each of the Members accepts the provisions of this Agreement as its sole entitlement on termination of its membership in the Company. Each Member hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

Section 12.6 Articles of Dissolution. Upon the completion of the distribution of Company assets as provided in this Article 12, the Company shall be terminated and the person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

Section 13.1 Method of Notices. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective upon receipt or, if mailed, upon the earlier of (i) the date set forth on the return receipt of registered or certified mail or (ii) the fifth day after mailing.

Section 13.2 Computation of Time. In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## ARTICLE 14

## INVESTMENT REPRESENTATIONS

Section 14.1 Investment Purpose. In acquiring an interest in the Company, each Member represents and warrants that it is acquiring such interest for its own account for investment and not with a view to sale or distribution. Each Member recognizes that investments such as those contemplated by the Company are speculative and involve substantial risk. Each Member further represents and warrants that the Manager has not made any guaranty or

representation upon which it has relied concerning the possibility or probability of profit or loss as a result of its acquisition of an interest in the Company.

Section 14.2 Investment Restriction. Each Member recognizes that: (i) the membership interests have not been registered under the Securities Act of 1933, as amended, in reliance upon an exemption from such registration, (ii) a Member may not sell, offer for sale, transfer, pledge, or hypothecate all or any part of its interest in the Company in the absence of an effective registration statement covering such interest under the Securities Act unless such sale, offer of sale, transfer, pledge, or hypothecation is exempt from registration under the Securities Act of 1933, as amended, (iii) the Manager has no obligation to register any Member's interest for sale, or to assist in establishing an exemption from registration for any proposed sale, and (iv) the restrictions on transfer may severely affect the liquidity of a Member's investment.

## ARTICLE 15

## ADDITIONAL COVENANTS

Section 15.1 Additional Covenants by Negussie. Negussie, on behalf of his development company, NT Construction, ("NT") covenants and agrees to provide to the Company, for no additional consideration, the development services set forth in Exhibit A (the "Services") for each Project of the Company. Negussie's predecessor in interest Charles Paret, LLC ("Coloma") and Brighton are parties to that certain Membership Purchase Agreement (the "Purchase Agreement") dated November 27, 2018 wherein Coloma made additional covenants and agreements for the benefit of the Company and Brighton (as the case may be). Subsequent or simultaneous to the execution of this Agreement, Brighton and Negussie shall enter into an amendment to the Purchase Agreement (the "Purchase Amendment"). In the event of any conflict between the terms of this Agreement and the terms of the Purchase Amendment, the terms of the Purchase Amendment shall control.

## ARTICLE 16

## BUSINESS OPPORTUNITIES

Except as otherwise specifically set forth herein, any Member or Manager, or any officer, director, employee, shareholder or other Person holding a legal or beneficial interest in any Member or Manager which is a member or manager of the Company, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including such business ventures as may be in direct competition with the Company's business, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

## ARTICLE 17

## GENERAL PROVISIONS

Section 18.1 Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings, or agreements in regard thereto.

Section 18.2 Amendment. This Agreement may not be amended without the unanimous written consent of all Members. No rights under this Agreement may be waived except by an instrument in writing signed by the party sought to be charged with such waiver.

Section 18.3 Applicable Law. This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of District Of Columbia.

Section 18.4 Waiver of Jury Trial. The Members agree that, in the event of a dispute, the Members hereby waive their right to a jury trial and shall submit to binding arbitration.

Section 18.5 Pronouns. References to a Member or a Manager, including by use of a pronoun, shall be deemed to include the masculine or feminine gender, singular or plural, and individuals, trusts, partnerships, corporations, or other legal entities where applicable.

Section 18.6 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

**IN WITNESS WHEREOF**, the Members have executed this Agreement to be effective as of the date set forth below.

Date: January 31, 2020

**Witness**

_______________________

_______________________

**423 Kennedy St Holdings LLC**
**Members:**
Brighton KSDC, Member Manager
By: Brighton Capital, LLC Manager

By: _______________________
Naveen Vavilala, Manager

_______________________
Mel Melaku Negussie, Member Manager

**EXHIBIT A**

1. **Design Phase Services.** NT shall assist the Company in determining the Company's program requirements for each Project to be constructed.

a. NT shall arrange and conduct meetings with all design consultants jointly deemed essential by the parties and coordinate the requirements of the Project and design development.

b. NT, in conjunction with the Project team, shall advise the Company on site use and improvements, selection of materials, building systems and equipment, and provide recommendations to the Company on relative construction feasibilities, applicability of materials and labor, time requirements for installation and construction, and factors relating to costs, including comparative costs of alternate designs or materials, preliminary budgets and possible economies. NT shall review with the Company, the Manager, the architect and the contractor, as applicable, the cost of various design and construction alternatives.

c. NT shall review and advise the Company with respect to draft plans and specifications prepared by the architect and recommend alternatives whenever it is apparent that design details affect construction feasibility or schedules, or may be improved for cost reductions and shall advise the Company when NT has knowledge of non-compliance of the same with applicable codes, laws, regulations, or ordinances or with industry standards.

d. NT shall review drawings and specifications that are being prepared to ensure that the Company's requirements are incorporated and shall advise the Company when the design details may affect the budget or Project schedule.

2. **Preconstruction Phase Services.** NT, the architect and the contractor shall coordinate, meet and assist with the appropriate governmental authority to ensure required permits are obtained at the appropriate times. NT or the manager or manager's representative shall represent the Company at all meetings and hearings necessary to obtain all required permits.

a. To the extent not previously provided by the Company and deemed necessary by the manager, NT shall arrange for applicable tests, surveys and/or inspections including, but not limited to, geotechnical, environmental, warranted by site conditions and appropriate due diligence requirements. The Company shall approve in writing in advance all testing companies.

b. NT shall review lists of prospective subcontractors provided by the contractor and assist in the review of bids. NT shall obtain information from the contractor to identify the financial condition and project experience of the proposed subcontractors to perform the work and make recommendations to the Company as to the preferred subcontractors based on price and qualifications.

3. **Construction Phase Services.** Subject to requirements of lender and review by the Manager, NT shall develop and implement procedures for the review and processing of applications by the contractor and subcontractors for progress and final payments. NT, after consulting with the Manager, shall make recommendations to the architect for certification of the contractor payment applications.

a. NT, with input from the Manager, shall oversee the efforts of the sub contractors in maintaining the budget and cost accounting of the Project suitable to the Company's needs. NT shall review cost detail reports to assist in the proper allocation of invoices and payment applications to the proper budget categories.

b. NT, with input from the Manager, shall facilitate the resolution of any questions or requests for interpretation that may arise in connection with the plans and specifications.

c. NT, with input from the Manager, shall develop and implement procedures for review and processing of change orders.

d. NT, with input from the Manager, shall oversee the efforts of the sub contractors who shall establish and implement adequate procedures for processing, approval and filing of shop drawings, product data, samples and other submittals.

e. NT, with input from the Manager, shall maintain appropriate record copies of all subcontracts, drawings, plans and specifications, shop drawings, and approved addenda, change orders and other modifications in good order. NT shall monitor the efforts of the contractor who shall mark up drawings and specifications to reflect as-built changes as they occur. Such plans shall be turned over to the Company upon completion of the Project.

f. NT, with input from the Manager, shall monitor the sub contractor's suppliers.

g. NT shall coordinate with the Manager the inspections by the Architect.

h. NT shall coordinate the efforts of the Manager, the Company, the architect, and the contractor in punchlist compilation. NT, with input from the Manager, shall monitor the efforts of the contractor in final completion of the punchlist items. NT shall assist the Manager and the Company in final inspection.

i. NT shall secure from the sub contractors all warranties and guaranties, manuals, record drawings, submittals and as-built plans, and keys upon final completion for turnover to the Company.

 WCP EX. T

# FIRST AMENDED AND RESTATED OPERATING AGREEMENT
# OF
# DEVELOPER RE1 LLC

THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into effective for all purposes and in all respects as of this 31st day of December 2021 (the "Effective Date") by and among Mulugeta Tesfakiros ("Tesfakiros"), Solomone Abebaw Desta ("Desta") and Mel Negussie (Tesfakiros, Negussie and Desta, individually and collectively, as the context may require, the "Members").

WHEREAS, the original Operating Agreement was effective on December 1, 2021;

WHEREAS, the Members have executed the ASSIGNMENT, ASSUMPTION AND CONSENT OF MEMBERSHIP INTEREST of Developer RE1 LLC, a District of Columbia limited liability company prior to this Agreement;

WHEREAS, the parties hereto desire to set forth herein their agreements and understandings with respect to the formation of the limited liability company and their future dealings;

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1. Defined Terms. The terms used in this Agreement with their initial letters capitalized, shall, unless otherwise expressly provided herein, have the meanings specified in this Section 1.1. When used in this Agreement, the following terms shall have the meanings set forth below:

1.1.1. "Act" shall mean the District of Columbia Uniform Limited Liability Company Act of 2010, as the same may be amended from time to time.

1.1.2. "Affiliate" shall mean any individual or Entity, directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with a Member.

1.1.3. "Agreement" shall mean this Operating Agreement and all exhibits attached hereto, as originally executed and as amended from time to time in writing.

1.1.4. "Managing Member(s)" shall, to the extent appointed by the Members, mean the one or more persons whose execution of documents on behalf of the Company shall bind the Company when authorized by action of the Company pursuant to Article VII of this Agreement.

1.1.5. "Available Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans (excluding excess refinancing proceeds) to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a reasonable working capital reserve for the Company.

1.1.6. "Bankruptcy" means, with respect to any Member: (i) an assignment for the benefit of creditors; (ii) a voluntary petition in bankruptcy; (iii) adjudication as a bankrupt or insolvent; (iv) the filing of a petition or answer seeking any reorganization, arrangement, , liquidation or similar relief under any statute, regulation or law; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding of this nature; or (vi) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of such Member's properties or of all or any substantial part of the Member's properties.

1.1.7. "Capital Account" shall, with respect to each Member shall mean the Capital Contribution of a Member (as of any particular date) (i) increased by the Member's distributive share of profits, income and gain of the Company and (ii) decreased by the Member's distributive share of losses and deductions of the Company and distributions by the Company to such Member.

1.1.8. "Capital Contribution" or "Capital Contributions" shall mean and refer to the amount of cash, and/or the agreed fair market value of property (less the amount of indebtedness, if any, of such Member which is assumed by the Company and/or the amount of indebtedness, if any, to which such property is subject, as of the date of contribution), actually contributed by a Member to the capital of the Company, as well as any additional contributions actually made pursuant to this Agreement

1.1.9. "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding law.

1.1.10. "Company" shall refer to Developer RE1 LLC, a District of Columbia limited liability company.

1.1.11. "Company Accounting Year" shall mean and refer to the accounting year of the Company, ending December 31 of each year.



DS MN DS SD DS

1.1.12. "Entity" shall mean any association, corporation, general partnership, limited partnership, limited liability company, joint venture, or any other business enterprise of every nature 'through which associates join together for the conduct of business.

1.1.13. "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time.

1.1.14. "Member" or "Members" shall mean and refer to those persons and/or Entities designated as such on Exhibit A attached hereto, either individually or collectively.

1.1.15. "Membership Interest" of a Member shall mean the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Membership Interest" in Exhibit A attached hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.

1.1.16. "Pro Rata Part" means the proportion that a Membership Interest of a Member bears to the aggregate Interests in the Company of all Members.

1.1.17. "Substitute Member" shall mean any person or Entity who or which is admitted as a Member of the Company pursuant to Article X hereof.

## ARTICLE II
## NAME, FORMATION, PURPOSE, RESIDENT AGENT AND TERM

Section 2.1. Name of Company. The name of the Company shall be Developer RE1 LLC.

Section 2.2. Formation of Company. Members acted as organizers and formed a limited liability company under the laws of the District of Columbia by the filing of Articles of Organization (the "Articles") for the Company pursuant to the Act on behalf of the Members, and any and all additional Members and/or Substitute Members.

This Agreement is subject to, and governed by, the Act and the Articles of the Company to be filed with the District of Columbia. In the event of a direct conflict between the provisions of this Agreement and either the mandatory provisions of the Act or the Articles of the Company, such provisions of the Act or the Articles of the Company, as the case may be, will be controlling.

Section 2.3. Company Purpose. The general purposes of the Company are as set forth in the Articles, including, but not limited to, the purchase, ownership, leasing, management, development and sale of real property in the District of Columbia, including but not limited to 67-71 Kennedy Street NW, 5501 1st Street NW, and 5505 1st Street NW, (the "Property"). The Company may exercise all powers reasonable or necessary to pursue the same. In addition, the



DS MN DS SD DS

Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act and to which the Members unanimously agree.

Section 2.4. Principal Office; Resident Agent. The principal office of the Company shall be located at 1629 K Street NW, Suite 300, Washington DC 20006. The Managing Members may change the principal office of the Company. The resident agent of the Company in the District of Columbia for service of process shall be OSI Management, Inc., or such other person or Entity as the Members may designate. The address of the resident agent is 1629 K Street, N.W., Suite 300, Washington DC 20006.

Section 2.5. Term. The term (the "Term") of the Company, which shall mean and refer to the period of time that the Company shall continue in existence, commencing as of the Effective Date and ending on December 31, 2099, unless sooner terminated in accordance with the provisions of Section 11.1 hereof.

## ARTICLE III
## CAPITAL CONTRIBUTIONS, LOANS, LIABILITIES AND SHARES

Section 3.1. Initial Contributions. Each Member shall contribute to the capital of the Company a capital contribution equal to the amount set forth next to his name in Exhibit A hereto. The parties acknowledge that such amounts represent the value of their respective interest in the Property based upon their prior ownership of the Property.

Section 3.2. Subsequent Contributions. No Member shall be required to make any Capital Contribution to the Company other than the initial Capital Contribution referenced in Section 3.1 hereof, except as may be agreed to buy such Member in writing. Additional capital may be contributed to the Company, but only upon the written consent of Members owning 2/3rds in interest of the Membership Interests.

Section 3.3. Member Loans or Services. Loans or services by any Member to the Company shall not be considered contributions to the capital of the Company and shall be upon such terms as the Member and the Company may negotiate.

Section 3.4. Capital Account. An individual Capital Account shall be established and maintained on behalf of each Member, including any Substitute Member or additional Member who shall hereafter receive an Interest in the Company.

Section 3.5. Interest on Contribution. No interest shall be paid on any Capital Contribution.

Section 3.6. Withdrawal of Contribution. No Member shall have the right to withdraw his or her Capital Contribution, or to demand and receive property of the Company or any



DS MN DS SD DS

distribution in return for his or her Capital Contribution, except as may be specifically provided in this Agreement or required by law.

Section 3.7. Restoration of Negative Capital Account. Except as is specifically provided otherwise in this Agreement or in the Act, no Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

Section 3.8. Liability to Creditors. No Member (in his or her capacity as a Member) shall be personally liable for losses, costs, expenses, liabilities or obligations of the Company in excess of his or her Capital Contributions, without such Member's express prior written consent.

## ARTICLE IV
## PROFIT AND LOSSES

Section 4.1. Allocation of Profit and Losses.

4.1.1. "Profit" and "Loss" shall, for purposes of this Article IV, mean, for each fiscal year of the Company or other period, an amount equal to the Company's taxable income, gain, loss or deduction for such year or period.

4.1.2. The distributive shares of each item of Profit, Loss, deduction, credit or basis of the Company for any Company Accounting Year or other period shall be allocated to the Members pro rata, in proportion to their respective Membership Interests.

## ARTICLE V
## DISTRIBUTIONS

Section 5.1. Timing of Distribution. The Available Cash shall to the extent deemed available, be distributed on an annual basis (or more or less frequently if the Members unanimously agree in writing) in accordance with the provisions of this Article V.

Section 5.2. Proration of Distribution. Except to the extent that Available Cash shall be distributed upon termination of the Company pursuant to the terms hereof, the Available Cash generated during a Company Accounting Year shall be distributed during such Company Accounting Year to the Members, in proportion to their respective Membership Interests, provided no distributions shall be made to the Members until such time as all members have received a return of their Capital Contributions, which shall be made on a pro-rata basis..

## ARTICLE VI
## LEGAL TITLE TO COMPANY ASSETS



DS MN DS SD DS

Legal title to the Company Assets shall be held in the name of the Company, or in any other manner which the Members determine to be in the best interest of the Company. Without limiting the foregoing grant of authority, the Members, by unanimous written consent, may take and hold title, or arrange to have title taken and held in the name of others, as trustees or nominees for and or behalf of the Company.

ARTICLE VII
MANAGEMENT AND CONTROL OF BUSINESS

Section 7.1. General. The Members shall use their best efforts to carry out the business of the Company and shall devote to the management of the business and affairs of the Company such time as it reasonably deems to be necessary. Notwithstanding anything herein to the contrary, all decisions relating to the business of the Company, except for those matters set forth in Section 7.3 ("Major Acts"), shall be made by the Managing Members, subject, however, to the provisions of this Article VII.

Section 7.2. Rights of Managing Member. The Managing Member shall be responsible for implementing the decisions of the Company and for conducting the ordinary and usual business and affairs of the Company. The acts of the Managing Member will bind the Company when within the scope of the Managing Member's authority. Except as otherwise specified in Section 7.4 below, in no event shall the Managing Member take any Major Acts or expend any money as a result of a Major Act, unless approved in writing by Members owning in total 51% of all the Membership Interests. The Managing Member shall at all times conform to policies and programs established and approved by the Members in accordance herewith. The Managing Member shall keep the other Members informed as to all matters of concern to the Company.

Section 7.3. Limitation on Authority of the Managing Member.

(A) Notwithstanding anything in this Agreement to the contrary, but subject to the provision of Section 7.4 below, the Managing Member shall not, without the prior written consent of owners of 51% or more of the Membership Interests, take any action outside of conducting the specified business of the Company (as more fully identified in Section 2.3 above) in accordance with the terms of this Agreement including, without limitation, the following Major Acts:

(1) The borrowing of any funds by the Company (and the selection of any lender), or the execution of any promissory note, bond, security agreement, mortgage, deed of trust, guarantee, or other document or instrument evidencing any indebtedness of the Company or pledging, granting a security interest in, placing a lien on or otherwise encumbering any of the Company's assets or the making of any loans or the extension of any credit by the Company or the binding of the Company as guarantor or surety for the Members on behalf of any Person;

(2) Causing or permitting the Company to sell, exchange, transfer or otherwise dispose of, or approve any offer to sell or exchange, the Project, or any material Company asset;



DS MN DS SD DS

(3) The confession by the Company of a judgment against itself, the Company's assets, or any portion thereof, or the assignment of Company assets in trust for creditors.

(4) The taking of any action by which the business of the Company shall be materially endangered or prejudiced, or the result of which would be to prevent the Company from continuing to carry on the Company's ordinary business.

(5) Admitting any additional person as a Member to the Company, except as otherwise permitted in this Agreement.

(6) Dissolution or liquidation of the Company other than in accordance with the terms of this Agreement.

(7) Any other item pursuant to this Agreement which requires the approval or consent of Members owning a stated percentage of the total Membership Interests.

(B) If the Managing Member desires the undertaking of a Major Act, he shall either (i) submit the proposal to the other Members in writing or (ii) request a meeting in accordance with Section 8.2. The failure of such other Members to consent in writing to a proposal within fifteen (15) business days of the receipt of the proposal shall be deemed a disapproval.

Section 7.4. Designation of Managing Member. Although Negussie and Desta were designated as the initial Managing Members of the Company, Tesfakiros is now likewise designated as a Managing Member as well. Subject to the following sentence, any Managing Member may be replaced by the affirmative vote of Members owning 51% of the Membership Interests. Additionally, and notwithstanding anything in this Agreement to the contrary, each Managing Member, acting jointly or alone, shall have full authority to make all decisions on behalf of the Company and to execute all documents required to be executed by the Company in connection with its business, including, but not limited to, all leases, financing documents, deeds, contracts, deeds of trusts and all other types of documents and instruments.

Section 7.5. Dispute Resolution. If any question, disagreement, difference or controversy shall arise among the Members concerning the affairs, transactions or business of the Company, the meaning or interpretation of this Agreement or the duties, or obligations of the Members, any Member may cause such question, disagreement, difference or controversy to be submitted to and determined by arbitration in accordance with the Rules of Commercial Arbitration of the American Arbitration Association in effect at the time such matter is submitted for arbitration (and the other Members hereby consent to such submission and determination), it being agreed and understood that any dispute among the Members under this Agreement shall be resolved by arbitration rather than litigation. The arbitration shall be conducted in Washington, D.C. by a single arbitrator using the expedited procedures provisions of the American Arbitration Association and shall be subject to, and the arbitrators shall have the powers and rights afforded by, the arbitration statute(s) then in effect in the District of Columbia. Costs of arbitration shall be borne by the non-prevailing party, unless the arbitrator determines it would be unjust to do so under all the facts and circumstances. A judgment



DS MN DS SD DS

upon the award rendered by the arbitrator may be entered in any court having jurisdiction over the parties.

Section 7.6. Compensation of Managing Members. Except as expressly provided herein, the Managing Members shall not receive any compensation from the Company for services rendered in its capacity as a Managing Member of the Company.

Section 7.7. Company Expenses; Reimbursement. The Company shall bear all costs and expenses incurred in connection with the management and operation of the business and affairs of the Company (including costs to obtain financing), or in carrying out the business, purposes, and objectives of the Company. If the Managing Member at any time or from time to time advances his own funds to pay any such costs or expenses, he shall be entitled to reimbursement of such funds from the Company promptly upon demand (to the extent funds are available), provided, that the Managing Member is permitted to make such expenditures on behalf of the Company pursuant to the terms of this Agreement and he submits evidence of such expenditures such as cancelled checks or paid invoices to the other Members, if so requested.

Section 7.8. Other Activities of Members.

A. The Company is formed solely for the purposes set forth herein and this Agreement shall not be deemed to create any type of partnership or venture between or among the Members with respect to any activities whatsoever other than the activities within the purposes of the Company as hereinabove specified. No Member shall have the power to bind the Company or any other Member except as specifically provided in this Agreement. Neither any Member nor the Company shall be responsible or liable for any indebtedness or obligation of the other Member incurred either before or after the execution of this Agreement, except as to those joint responsibilities, liabilities, indebtedness or obligations incurred pursuant to and as limited by the terms of this Agreement.

B. Except as set forth in this Section 7.8, each Member may have other business interests or may engage in other business ventures of any nature or description whatsoever including owning or operating real estate projects which compete with the Company's projects, and neither the Company nor the other Members shall have any right to participate in such other business ventures or to receive or share in any income or profits derived therefrom.

ARTICLE VIII
MEMBERS, INTERESTS, MEETINGS

Section 8.1. Names and Addresses of Members. The names of Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Membership Interests in the Company are set forth on Exhibit A attached hereto and made a part hereof. A Member need not be an individual.



DS MN DS SD DS

Section 8.2. Meetings of the Members.

8.2.1. The annual meeting of the Members shall be held at a reasonable hour on the second Tuesday of the second month of each Company Accounting Year, or at such other time as the Members may unanimously agree. Special meetings of Members may be called by any Member. Meetings of the Members shall be held at the principal office of the Company, or at such other place as the Members may mutually determine

8.2.2. Notice of meeting shall be delivered in accordance with applicable law. The Company shall deliver or mail written notice stating the date, time and place of any meeting. A Member may waive notice of any meeting, before or after the date of the meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company.

8.2.3. At any meeting of Members, each Member entitled to vote shall have a number of votes equal his or her Membership Interest as set forth on Exhibit A hereto, as the same may be amended from time to time, multiplied by (ii) one hundred (100). At any meeting of Members, the presence of Members entitled to cast more than fifty-one percent (51%) of the total votes of all Members entitled to vote at such meeting constitutes a quorum; provided, however, that, so long as there shall be two (2) Members, a quorum shall require attendance by both Members. Action on a matter is approved if it receives the approval of 51% of the total Membership Interests of the Members entitled to vote at such meeting

8.2.4. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes.

8.2.5. Any or all Members may participate in any Company meeting of Members by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

## ARTICLE IX
## ACCOUNTING AND RECORDS

Section 9.1. Records and Accounting. The books and records of the Company shall be kept, and the financial condition and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for Federal income tax purposes. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for Federal income tax purposes shall be the calendar year.



DS MN DS SD DS

Section 9.2. Annual and Tax Information. The Members shall use their best efforts to cause the Company to deliver to each Member within sixty (60) days after the end of each calendar year all information necessary for the preparation of such Member's Federal income tax return. The Members agree to report on their returns such of the Company operations as are attributable to them and not to take reporting positions contrary to the Company's reporting positions.

Section 9.3. Accounting Decisions. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by Negussie in accordance with generally accepted accounting principles. Negussie may rely upon the advice of the Company's Accountants.

## ARTICLE X
## ASSIGNABILITY

Section 10.1. Restriction on Transfer. No Member shall, without the written consent of the other Members, which may be granted or denied in each Member's sole and unreviewable discretion, transfer, sell, encumber or dispose of his Membership Interest now owned or hereafter acquired. Additionally, no additional Members shall be admitted to the Company without the express consent of all the Members, except as otherwise expressly provided herein.

Section 10.2. Transfer to Related Entity. Notwithstanding Section 10.1 above, a transfer by a Member to a spouse, lineal descendant or to a trust created by a Member for tax planning purposes shall be permitted without the consent of any other Member.

Section 10.3. Right of First Refusal. Notwithstanding the provisions of Section 10.1, at any time after two years after the effective date of this Agreement, a Member may transfer, sell or dispose of his Membership Interest now owned or hereafter acquired by him provided he first offers to transfer or dispose of his Company Interest to the other Members. The purchase price shall be agreed upon between the parties; provided, however, that in the event they are unable to agree upon a price, the parties shall each select one qualified appraiser who shall jointly select a third appraiser. Each appraiser shall appraise the value of the properties then owned by the Company, and the average of the three appraisals shall be the value of such properties. The actual purchase price for the interest of the Member desiring to sell shall be determined in accord with the provisions of Section 10.5 below, using the appraised value of the properties as the basis for such determination.

Section 10.4. Sale to Third-Party. In the event that none of the non-selling Members wish to exercise the right of first refusal set forth in Section 10.3 above to purchase all the Membership Interests of the selling Member, then the selling Member may sell such Interest (or portion thereof if part of the Interest is purchased by the other Members) to a third-party at a price and upon such terms no less favorable than that offered to the other Members in accord with Section 10.3. If the terms of sale to a third-party are more favorable than the terms previously rejected by the non-selling Member, the selling Member shall afford the non-selling Member an additional fifteen (15) day



DS MN DS SD DS

period within which to purchase the Interest being sold at the reduced price or more favorable terms, as the case may be.

Section 10.5. Sale of Property, Valuation of Company Interests. In connection with the purchase of a Membership Interest pursuant to the exercise of a right of first refusal, the value of the properties agreed upon or determined by appraisal shall be reduced by ordinary settlement costs which would be payable in connection with the actual sale of the properties and the amount of any encumbrances on the properties to determine, as nearly as possible, the net proceeds which would have been payable to the Company upon the sale of the properties. Additionally, the purchase price for the Member's Interest shall be further adjusted to reflect loans payable or due to the Company by the Members, the Membership Interest owned by the Members, and the capital accounts of each selling Member, so that the price actually paid for the Membership Interest being sold shall to the extent possible reflect the amount which such Member would have received upon the sale of the properties to a third-party followed by dissolution of the Company in accord with this Agreement, and distribution of available proceeds.

All amounts to be paid hereunder for the purchase of a Membership Interest shall be payable within sixty (60) days of an election by the purchasing Members to exercise their right of first refusal, provided any appraisals, if necessary, have been completed.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 11.1 Events of Dissolution. The Company shall be dissolved and shall commence winding up its affairs upon the first to occur of the following: (a) the time fixed in the Articles as the expiration of the term of the Company; (b) the vote of Members holding 80% or more of the Membership Interests; (c) any event which makes it unlawful or impossible to carry on the Company's business; (d) the sale, disposition or abandonment of all or substantially all of the Company's property; (e) the entry of a decree of judicial dissolution under the Act; or (f) the death, retirement, resignation, expulsion, dissolution or bankruptcy of a Member, or any other event which terminates the membership of a Member in the Company, unless within ninety (90) days after such event a majority in interest of the remaining Members agree in writing to continue the business of the Company.

Section 11.2. Settling of Accounts. In settling accounts of the Company after its dissolution, the liabilities of the Company shall be paid in the following order, unless otherwise required by the Act: (i) to creditors, in the order of priority as provided by law, except Members of the Company on account of their Capital Contributions or Capital Accounts; and (ii) to Members of the Company in respect of their Capital Accounts.

## ARTICLE XII
## INDEMNIFICATION

Section 12.1. Indemnification of Organizers or Members.



DS MN DS SD DS

12.1.1. To the greatest extent not inconsistent with the laws and public policies of the District of Columbia, the Company shall indemnify any organizer of the Company and Member (any such organizer or Member who is a person, and any responsible officers, partners, shareholders, directors, or manager of such organizer or Member which is an Entity, hereinafter being referred to in this Article as an "individual") made a party to any proceeding because such individual is or was a Member or organizer, as a matter of right, against all liability incurred by such individual in connection with any proceeding.

12.1.2. The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member or organizer of the Company.

12.1.3. Indemnification of an individual is permissible under this Section 12.1 only if:

(i) such individual conducted himself, herself or itself in good faith, and such individual reasonably believed that his, her or its conduct was in, or at least not opposed to, the Company's best interest;

(ii) in the case of any criminal proceeding, such individual had no reasonable cause to believe his or her conduct was unlawful; and

(iii) such individual is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of his or her duty. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, in and of itself, determinative that the individual did not meet the standards of conduct described in this Section 12.1.3.

12.1.4. A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i) By the Members by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii) By special independent legal counsel selected by the Managing Member.

12.1.5. Nothing contained in this Section shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or organizer of the Company or is or was serving at the Company's request as a director, officer or partner, or serving as the Company manager, trustee, employee, or agent of a foreign or domestic partnership, association, limited liability company, company, corporation, joint venture, trust, employee benefit plan or other enterprise, whether for profit or not. Nothing contained in this Section shall limit the ability of the Company otherwise to indemnify or advance expenses to any



DS MN DS SD DS

individual. It is the intent of this Section to provide indemnification to Members and organizers of the Company to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section.

## ARTICLE XIII
## GENERAL PROVISIONS

Section 13.1. Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Members. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice that is sent by mail will be deemed given two (2) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

Section 13.2. Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

Section 13.3. Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the District of Columbia.

Section 13.4. Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

Section 13.5. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

[SIGNATURE ON FOLLOWING PAGE]



DS MN DS SD DS

In Witness Whereof, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

MEMBERS:

DocuSigned by:
Solomone Desta
A941F3A3F5E24F1...
Solomone Abebaw Desta

DocuSigned by:
Mel Negussie
9A547C0DAF424F5...
Mel Negussie

DocuSigned by:
E43F3C21E382426...
Mulugeta Tesfakiros

# EXHIBIT A

## DEVELOPER RE1 LLC
## AMENDED SCHEDULE OF MEMBERSHIP INTERESTS

| MEMBERS NAME AND ADDRESS | MEMBERSHIP INTEREST |
|---|---|
| Solomone Abebaw Desta<br>8922 Tonbridge Terrace<br>Hyattsville, Maryland 20783 | 45.00% |
| Mel Negussie<br>1629 K Street, N.W., Suite 300<br>Washington, DC 20006 | 10.00% |
| Mulugeta Tesfakiros<br>925 H Street, N.W., Suite 801<br>Washington, DC 20001 | 45.00% |



DS MN DS SD DS

 WCP EX. U

MainStreetBank

**Term Sheet**

October 24, 2022

Developer RE1, LLC
C/O Mel M. Negussie
1629 K Street NW Suite 300
Washington, DC 20006

Dear Mel:

I am pleased to issue this Term Sheet to set forth MainStreet Bank's financing terms for Bridge Financing associated with 5501 First St., NW Washington DC 20011 ("the Property").

**This Term Sheet is for discussion purposes only and is not a commitment to lend.** The terms and conditions contained herein are subject to satisfactory credit underwriting and approval by MainStreet as well as execution of loan documentation satisfactory to MainStreet Bank and are not intended to include all terms and conditions to be contained in the loan documentation.

| | |
|---|---|
| Borrower: | Developer RE1 LLC |
| Guarantors: | Mel M. Negussie<br>Mulegeta Tesakiros<br>Any other Equity Partner with 20% or greater equity |
| Purpose: | Refinance existing debt secured by the property and provide bridge financing through completion of entitlement process for proposed plan to redevelop lot to 47-unit residential condominium building. |
| Loan: | No more than 75% LTV based on the "As-Is" value determined by a MainStreet Bank ordered appraisal |
| Interest Rate: | Prime + 1.0%; Floor Rate for life of loan is 7.25% |

| | |
|---|---|
| Points: | 1.0% |
| Repayment: | 12-months of I/O, payable monthly |
| Extension: | One 3-month extension |
| Extension Fee: | 0.25% |
| Prepaid Interest-Reserve: | A 12-mo. Interest-Reserve Account to be Pledged and held with MainStreet Bank with auto-debit established. |
| Collateral: | a). First Lien Deed of Trust and Assignment on the Property |
| Covenants: | Annual tax returns and rent roll on the Collateral as well as annual personal financial statements and tax returns on the Guarantors |

Conditions:

1. The Loan shall be conditional upon the Borrower's execution of the loan documents needed to evidence the Loan as required by the Bank in its sole discretion, the cost of which shall be borne by the Borrower.
2. The primary deposit account of the Borrower's operating company must be maintained with the Bank for the Term of the Loan.
3. Satisfactory Environmental Report on the Collateral.
4. Borrower agrees to execute any and all documents as required by the Bank in connection with the loan.
5. The mortgage shall be non-assumable.
6. Satisfactory examination of title to the Property by attorneys acceptable to the Bank, with a standard American Land Title Association lender's policy issued by an insurance company acceptable to the Bank.
7. Lender's title insurance commitment listing the Bank as first mortgagee must be provided to Bank at least seven business days prior to settlement of the loan.
8. Borrower agrees to keep the improvements now existing or hereafter erected on the property insured against loss. The insurance shall be maintained for the full insurable value of the Property and its contents, prepaid for at least one year, and list the Bank as first mortgagee.
9. Borrower will be responsible for all reasonable costs, expenses and fees associated with the closing of this loan, including document preparation, review fees by the Bank's attorney, title insurance, appraisal, appraisal review, survey, and recording fees. Borrower may choose the settlement agent to close this loan, subject to the Bank's approval.

As you are reviewing the proposal, I hope that you will consider MainStreet Bank's total package of capabilities, including our personalized service, online banking, and remote deposit service.

If you find the terms above acceptable, please return a signed copy of this term sheet along with a wire for $5,000. If the Bank approves a loan for the borrower with the terms noted above, the fee will be non-refundable, however if the Bank is unable to provide a loan commitment with the terms note above, the fee will be fully refundable less the cost of the appraisal, appraisal review and environmental.

Overall, I believe that our experience in banking, combined with the technology and range of services we offer, will provide you with the best of what banks have to offer, and help distinguish us from our competition in the community bank market.

Should you have any questions in this regard, please feel free to call me at 703-481-4557. Otherwise, I will follow-up with you to discuss our offer and next steps.

Sincerely,

Timothy L. Foster
Senior Vice President
Commercial Real Estate Lending

Approved and Accepted By:

BORROWER:

Developer RE1 LLC

Mel Negussie ______ 10/25/2022 ______
Date

______ ______
Date

______ ______
Date

GUARANTORS:

Mel Negussie ______ 10/25/2022 ______
Date

______ ______
Date

______ ______
Date

WCP EX. V

MainStreetBank

January 19, 2023

423 Kennedy St Holdings, LLC
2100 Reston Pkwy
Reston, VA 201910000

Dear Miss Mezanen, Mr. Musmar and Mr. Wardere:

I am pleased to advise you that MainStreet Bank ("Lender") has approved your request for the following commercial real estate loan. The Lender's commitment is subject to the following terms and conditions:

| | |
|---|---|
| Borrower: | 423 Kennedy St Holdings, LLC |
| Guarantor(s): | Inas Jamal Hussein El Mezanen; Ghaith F Musmar; Hamza A Wardere |
| Corporate Guarantor(s): | E3 Developers, LLC and Brighton KSDC, LLC |
| Loan: | $10,700,000.00 commercial mortgage loan (the "Loan") |
| Purpose: | To purchase a 50% interest and controlling ownership in a construction project, provide funds to complete the construction. |
| Loan Fee: | Non-refundable Loan Commitment Fee of 1.00% of the amount of the Loan. One-half (1/2) of the fee shall be considered earned and be payable upon Borrower's acceptance of this commitment. The remaining one-half (1/2) shall be due and payable at settlement. |
| Interest Rate: | During the initial 12 months of note, the rate will be the Prime Rate plus a margin of 1.00% with a minimum interest rate of 8.00%. The Prime Rate is the "U.S. Prime Rate" as published from time to time in The Wall Street Journal's Money Rates column. The interest rate charged on the principal amount outstanding shall adjust contemporaneously with changes to the Prime Rate, but no more frequently than once (1) per calendar day.<br><br>After the initial 12 months of the loan, the rate will be 6.25% for the next five (5) years of the Loan term. Thereafter, the interest rate will adjust to a rate which is equal to the Weekly Average Yield on U.S. Treasury Securities Adjusted to a Constant Maturity of Five (5) Years plus a margin of 3.50%, subject to a floor rate of 6.25%, for the remaining five (5) years of the Loan term. |
| Term: | The term of the Loan will be for 132 months. |
| Repayment: | Repayment of the Loan will be as follows: (1) for the first twelve (12) months of the Loan term monthly payments will consist of accrued unpaid interest, (2) after the interest only period monthly payments will consist of substantially equal installments of principal and interest in an amount sufficient to amortize the Loan over a thirty (30) year amortization period which period will be deemed to commence on the final interest only payment date. |

MainStreetBank

The monthly payment amount may increase or decrease based on changes to the Interest Rate. All remaining principal plus any accrued unpaid interest, together with all other applicable fees, costs or charges (if any) will be due and payable in full on the maturity date of the Loan.

Monthly Loan payments will be automatically debited from an operating deposit account established and maintained with Lender for the term of the Loan.

Prepayment Penalty: Any portion of the principal amount of the Loan which is prepaid will be subject to a prepayment charge at the time such prepayment is made equal to three percent (3.00%) during the first year of the loan term; two percent (2.00%) during the second and third years of the loan term; and One percent (1.00%) during the fourth, fifth and sixth years of the loan term. Notwithstanding the foregoing, any prepayments resulting from (i) funds derived solely from Borrower's internally generated funds or cash flow (rather than from borrowed funds) will not be subject to a prepayment charge. Lender may require that Borrower provide evidence, in form satisfactory to Lender, of the source of said funds.

Collateral: 1st lien priority deed of trust and assignment of rents and leases on real property and the improvements thereon located at:

*423 Kennedy St Washington, DC 20011*

Appraisal: The Loan is subject to Lender's receipt of a satisfactory appraisal of the Collateral property by an appraiser acceptable to the Lender establishing the current market value of the property. The appraisal will then be reviewed and approved by an appraisal reviewer satisfactory to the Lender. The loan to value ratio (i.e., the ratio of the maximum amount of the Loan to the appraised value of the property or the purchase price, whichever is less) is not to exceed **68% of the as-complete value**.

Environmental Investigation: The Loan is subject to Lender's receipt of a satisfactory Phase 1 environmental investigation report of the Collateral property performed by an environmental professional or firm acceptable to Lender reflecting that the Collateral property is free of materials and/or conditions which, under Federal, State, or Local law, statute, ordinance or regulation create an unacceptable environmental risk. Lender reserves the right to immediately withdraw this commitment if, in Lender's sole and absolute discretion, the environmental risks and/or conditions associated with the Collateral property are deemed to be unacceptable by Lender, its counsel or the environmental professional.

Financial Information and Covenants: Financial Reporting Requirements:

- Borrower will provide to Lender: (1) Annual year-end financial statements within ninety (90) days of the end of each year, and (2) Copies of federal tax returns within thirty (30) days of the applicable filing date.
- Corporate Guarantors will provide to Lender: (1) Annual year-end financial statements within ninety (90) days of the end of each year, and (2) Copies of federal tax returns within thirty (30) days of the applicable filing date.
- Individual Guarantors will provide to Lender: (1) Annual personal financial statement, and (2) Copies of federal tax returns within thirty (30) days of the applicable filing date.

MainStreetBank

Financial Covenants:

- Borrower will maintain a Debt Service Coverage Ratio of no less than 1.15 to 1.00. This coverage ratio will be calculated as Borrower's net profit plus depreciation plus interest expense for the year, less any shareholder/partner distributions DIVIDED BY the current portion due on all long term debt for the year plus interest expense for the year. This coverage ratio will be evaluated annually as of year-end.
- Borrower shall not create, incur or assume any additional indebtedness for borrowed money, including capital leases, without Lender's prior written consent.

Confession of Judgment: The loan documents will contain confession of judgment provisions that constitute a waiver of important rights you may have as a debtor and allows Lender to obtain a judgment against you without any further notice.

Waiver of Jury Trial: The loan documents will contain provisions waiving your right to a jury trial in any action, proceeding or counterclaim related to the Loan.

Conditions: The Loan will be subject to the fulfillment of the following additional conditions, as reasonably determined by Lender:

- Borrower will execute such loan documents as determined by Lender in its sole discretion, to evidence the Loan, the cost of which shall be borne by the Borrower.
- Borrower and Corporate Guarantors will provide to Lender certified copies of its organizational documents and proof of its good standing, establishing that Borrower and Corporate Guarantors are business entities then duly established under the laws of the state of its organization, that it is duly authorized to transact business in the jurisdiction in which the Collateral property is located, and that said entity has full power and authority to enter into the transaction.
- Certified copies of organizational documents and/or purchase agreement to outline which entities and/or individuals own liabilities prior to settlement and post settlement.
- Lender will be furnished with a title commitment or binder issued by a title insurance company acceptable to Lender insuring that Lender will have a valid first priority lien against the Collateral property, together with copies of all easements, restrictions or agreements to which the property is subject to. The title commitment or binder shall provide that upon fulfillment of the requirements set forth therein that Lender will receive an ALTA loan policy of title insurance in the amount of the Loan together with such endorsements to the title insurance policy as may be required by Lender or its counsel. Title commitment or binder to confirm no outstanding mechanics liens at the time of settlement.
- Borrower may be required to provide a current survey by a registered land surveyor of the jurisdiction in which the Collateral property is located designating at least (1) the location of the perimeter of the Collateral property; and (2) the location of all easements, rights of way, alleys, streams, waters, paths and encroachments, and (3) the location of all building restriction lines and setbacks; and (4) the location of any street or roadways.

MainStreetBank

- Borrower will keep the Collateral property insured against loss or damage in amounts and with companies reasonably satisfactory to Lender. The insurance shall be maintained for the full insurable value of the property and its contents, and name Lender as the mortgagee. Evidence of coverage must be provided prior to settlement.
- Borrower will maintain appropriate general liability and builder's risk insurance in amounts and with companies reasonably satisfactory to Lender. Evidence of coverage must be provided prior to settlement.
- Lender will obtain a flood hazard determination for the Collateral property. Should the Collateral property be, or subsequently become, located in a special flood hazard area, Borrower will provide to Lender evidence of flood hazard insurance for the Collateral property in amounts and with companies reasonably satisfactory to Lender. The insurance shall name Lender as the mortgagee for the Collateral property.
- Borrower will provide to Lender true executed copies of all leases affecting the Collateral property prior to settlement. Borrower will deliver to Lender prior to settlement fully executed tenant Estoppel certificates, and Subordination, Non-Disturbance and Attornment agreements from the tenants which are in form and contain substance satisfactory to Lender in its reasonable discretion.
- An Interest Reserve account in the amount of $728,000.00 shall be funded at settlement from a portion of the Loan. Borrower authorizes Lender to make advances from the interest reserve for the payment of accrued interest which becomes due and payable on the Loan. Borrower shall not have the right to draw against the interest reserve for any other purpose, without Lender's prior written consent. Notwithstanding Lender's right to draw against the interest reserve for payments, Borrower acknowledges that it will be liable for all payments of accrued interest due and payable on the Loan until the same are paid. In the event that an extension option is exercised Borrower will be required to replenish the interest reserve account from its own funds.
- A Payment Reserve account in the amount of $250,000.00 shall be funded at settlement from a portion of the Loan and may be utilized by Lender, in its sole discretion, to make monthly Loan payments after the occurrence of an event of default on the Loan. Lender agrees that upon Borrower's satisfaction of 12 months of rental operations resulting a DSCR of 1.15 to 1.00 excluding standard allowances, that Lender will release the funds held in the Payment Reserve account to Borrower. After the release of the Payment Reserve, if the Debt Service Coverage Ratio Financial Covenant is not met, the borrower will fund a payment reserve to be used at the bank's discretion. The amount will be sufficient that when added to the net cash flow, the Debt Service Coverage Ratio results in a 1.15 to 1.00.
- Bank to verify loan payoffs, the use of the loan proceeds and use of cash equity for settlement.
- Bank approved third party to perform an acceptable project review satisfactory to the Bank to include, but not limited to, budget review yielding satisfactory proceeds at settlement to complete the project, review of permits to complete the project, review of the construction contract, determination of work in place by the current ownership, review of current lien waivers and verification all subcontractors have been paid to date.

MainStreetBank

- Bank approved third party will perform a review of capital injection and proceeds spent by current ownership. This will be completed within 30 days of loan closing.
- Borrower agrees to utilize Lender as its primary depository institution.

Borrower will be responsible for the payment of all costs, expenses and fees associated with the Loan, whether or not settlement occurs, including by way of illustration and not limitation, appraisal fees, environmental fees, tax lien and judgment search fees, document preparation fees, attorney fees, title insurance premiums, and recording fees.

This letter is not meant to contain all of the terms and conditions of the Loan. The loan documents themselves will contain representations, warranties, covenants, and default provisions which are usual and customary in such transactions (include non-assumption clauses).

If the terms and conditions stated above are acceptable to you, please indicate your acceptance by signing and dating this commitment letter in the spaces provided for on the signature page. This commitment letter must be signed and returned to me within ten (10) calendar days from the date of this commitment letter together with a check or the written authorization to debit my account in the amount of $53,500.00 representing one-half (1/2) of the commitment fee or this commitment shall be considered null and void. The Loan must settle within sixty (30) calendar days from the date of this commitment letter or this commitment shall be considered to be null and void unless extended by Lender in writing.

Again, it is my pleasure to provide you with this commitment for the above referenced commercial real estate loan, and I appreciate the opportunity to assist you with your financing needs.

Yours truly,

Billy Freesmeier
SVP Commercial Lending

---

MainStreetBank

By signing below, I agree to the terms and conditions of the loan commitment described above.

I authorize the Lender to initiate a debit entry to my checking account at MainStreet Bank for the purpose of collecting Fees listed herein. A breakdown of these fees is found below. If this item is returned unpaid, I authorize an additional returned item fee of the maximum allowed by law. I acknowledge that the origination of ACH transactions must comply with the provisions of US law. This authorization is to remain in effect until the Lender has received written notice from me of its termination.

| | |
|---|---|
| (Fee Description) Commitment Fees | $53,500.00 |
| **Total Debit** | **$53,500.00** |

_MainStreet Bank______________________
(Bank Name)

_E3 Developers, LLC Operating___________
(Account Name)

_ Account Ending in XX12______________
(Account Number)

BORROWER:

423 Kennedy St Holdings, LLC

By:________________________________
(Ghaith Musmar)

________________________________
(Date)

GUARANTOR(S):

________________________________
(Inas Jamal Hussein El Mezanen)

________________________________
(Ghaith F Musmar)

________________________________
(Hamza A. Wardere)

CORPORATE GUARANTOR(S):

________________________________
(E3 Developers, LLC)

________________________________
(Brighton KSDC, LLC)

WCP EX. W

CL GROUP LLC

October 17, 2021

Washington Capital Partners
2815 Hartland Road,
Suite 200
Falls Church, VA 22043

RE: 13,225 Square Feet of MU-4 Zoned Land Area
5505 1st Street, NW / 67-71 Kennedy Street, NW
Washington D.C. 20011

Dear Sir/ Madam:

In accordance with your request and for the purpose of providing an estimate of market value, the CL Group, LLC, has inspected the above captioned property and submits the following appraisal report.



The subject properties under analysis consist of approximately 13,225± square feet of land currently planned as a mixed-use building containing a total gross building area of 62,091 square feet of space. It has been noted by the appraisers that although the subject has a total planned FAR of 62,091 square feet, the net sellable area is anticipated to encompass 50,771. The proposed improvements, which have not been approved by Washington DC planning authorities as of the day of inspection, will contain forty-two (42) residential units sold at market rates and 12,217 square feet of first floor commercial retail space, is projected to be completed March 1, 2025. Construction is scheduled to commence for the project known as 71 Kennedy Street on or by March 1, 2022.

The subject properties are located along the Northeast corner of Kennedy Street, NW, and 1st Street, NW in the Manor Park neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject properties are known as Lots 0817 & 0137 of Square 3389 and contains approximately 13,225± square feet of land area. The subject properties are zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

The purpose of this appraisal, per the request of the client, is to estimate the "as is" market value of the subject's Fee Simple Interest as described herein. The function of the appraisal is to assist the client in real estate valuation. The definition of **"Market Value"**, as defined in the Dictionary of Real Estate Appraisal, 6th Edition, is as follows:

> *"the most probable price which a property should bring in competitive and open market under all condition requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus".*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*
- *both parties are well-informed or well-advised, and each acting in what he considers his own best interest;*
- *a reasonable time is allowed for exposure in the open market;*
- *payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable there to; and*
- *the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

**It is assumed that the subject property is in compliance with all applicable codes, rules and regulations.**

The subject property was inspected by the undersigned of the CL Group, LLC on October 13, 2021, which is considered the effective date of the appraisal.

After considering all of the known factors that affect the value of the subject property, as described herein, it is the opinion of the undersigned that the estimated market value as of October 13, 2021, subject to the Statements of Limiting Conditions, is as follows:

**MARKET VALUE "AS IS"- OCTOBER 13, 2021**

**$4,772,000**

**FOUR MILLION SEVEN HUNDRED SEVENTY-TWO THOUSAND DOLLARS**

The market value indication does not include furniture, fixtures, or equipment.

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

**The coronavirus threat may be impacting market conditions. However, in most markets it is not yet clear to what extent, if any, market conditions are affected. Related, complicating factors include fluctuations in the stock market and changes in mortgage interest rates.**

Gregory R. Clucas is currently certified under the continuing education program of the Appraisal Institute. We have no interest in the property and our employment and compensation are not contingent upon the valuation. The appraisal report is hereto attached and made subject to the conditions and comments herein. This appraisal has been prepared in accordance with the current Uniform Standards of Professional Appraisal Practice (USPAP) as adopted by the Appraisal Foundation as mandated by the Office of Thrift Supervision and originated in conjunction with the Financial Institutions Reforms, Recovery and Enforcement Act of 1989 (FIRREA).

Respectfully submitted,

**Gregory R. Clucas, MAI**
**DC Certified General Real Estate Appraiser No. GA10008**

**Greg Clucas, Jr.,**
**Associate**

## EXECUTIVE SUMMARY OF SALIENT FACTS

| | |
|---|---|
| PROPERTY LOCATION: | The subject properties are located along the Northeast corner of Kennedy Street, NW, and 1st Street, NW in the Manor Park neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject properties are known as Lots 0817 & 0137 of Square 3389 and contains approximately 13,225± square feet of land area. The subject properties are zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations. |
| SUBJECT PROPERTY: | The subject properties under analysis consist of approximately 13,225± square feet of land currently planned as a mixed-use building containing a total gross building area of 62,091 square feet of space. It has been noted by the appraisers that although the subject has a total planned FAR of 62,091 square feet, the net sellable area is anticipated to encompass 50,771. The proposed improvements, which have not been approved by Washington DC planning authorities as of the day of inspection, will contain forty-two (42) residential units sold at market rates and 12,217 square feet of first floor commercial retail space, is projected to be completed March 1, 2025. Construction is scheduled to commence for the project known as 71 Kennedy Street on or by March 1, 2022. |
| FUNCTION OF THE APPRAISAL: | To assist the client in real estate valuation. |
| INTENDED USE/USERS: | The intended use of the appraisal is for finance or subsequent transaction of a loan. The intended users of the report are Washington Capital Partners and their successors or assigns, and any participating financial institutions. |
| PURPOSE OF THE APPRAISAL: | To estimate the “as is” Market Value as described herein. |
| EFFECTIVE DATE OF VALUATION: | October 13, 2021. |
| DATE OF INSPECTIONS: | The undersigned of the CL Group inspected the subject on October 13, 2021. |
| ZONING: | The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations. |

HIGHEST AND BEST USE: Proposed Development.

ESTIMATED MARKETING TIME: Given the size of the subject property, an estimated marketing time of one year or less appears reasonable. In addition, a recent PwC Real Estate Investor Survey references a national average marketing time of approximately nine months for all property types.

**FINAL VALUE ESTIMATE:**

**MARKET VALUE "AS IS"- OCTOBER 13, 2021**

**$4,772,000**

**FOUR MILLION SEVEN HUNDRED SEVENTY-TWO THOUSAND DOLLARS**

The market value indication does not include furniture, fixtures, or equipment.

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

---

**The coronavirus threat may be impacting market conditions. However, in most markets it is not yet clear to what extent, if any, market conditions are affected. Related, complicating factors include fluctuations in the stock market and changes in mortgage interest rates.**

# TABLE OF CONTENTS

## INTRODUCTION


| | PAGE |
|---|---|
| LETTER OF TRANSMITTAL | 1 |
| STATEMENT OF LIMITING CONDITIONS | 7 |
| QUALIFICATIONS OF THE APPRAISERS | 10 |
| PHOTOGRAPHS OF THE SUBJECT PROPERTY | 13 |
| IDENTIFICATION OF THE SUBJECT | 18 |
| LEGAL DESCRIPTION | 18 |
| FUNCTION OF THE APPRAISAL/INTENDED USER | 18 |
| INTENDED USE | 18 |
| DATE OF INSPECTION | 19 |
| EFFECTIVE DATE OF THE APPRAISAL | 19 |
| PURPOSE OF THE APPRAISAL | 19 |
| PROPERTY RIGHTS APPRAISED | 19 |
| HISTORY OF THE SUBJECT | 19 |
| SCOPE OF THE APPRAISAL | 20 |
| MARKETING & EXPOSURE PERIODS | 21 |
| DEFINITIONS PERTINENT TO VALUE | 22 |


## DESCRIPTION & ANALYSIS


| | |
|---|---|
| WASHINGTON, D.C. | 26 |
| IMMEDIATE ENVIRONS | 36 |
| SITE DESCRIPTION | 40 |
| ZONING DISCUSSION | 42 |
| REAL ESTATE ASSESSMENTS | 43 |
| HIGHEST AND BEST USE | 46 |


## VALUATION


| | |
|---|---|
| APPROACHES TO VALUE | 50 |
| MARKET VALUE AS IS | 53 |
| FINAL VALUE ESTIMATES | 63 |
| CERTIFICATION | 64 |

## STATEMENT OF LIMITING CONDITIONS

This report is made subject to the following assumptions and limiting conditions.

1. The appraiser assumes no responsibility for legal matters nor does the appraiser render any opinion as to the Title, which is assumed to be good. All existing liens and encumbrances, unless specified in the report, have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management. Unless otherwise noted herein, it is assumed there are no encroachments, zoning or other violations of any regulations affecting the subject.

2. The Plot Plan, if contained herein, is included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumes no responsibility in connection with such matters.

3. Information that was furnished by others is so noted and is believed to be reliable, but the appraiser assumes no responsibility in connection with such matters.

4. The appraiser is not required to give testimony nor to appear in court by reason of this appraisal, with reference to the property in question, unless arrangements have been previously made.

5. The client will indemnify the appraiser and has agreed to promptly defend appraiser against any damage resulting from any claim or cause of action by any third party arising out of said use or dissemination of this appraisal report (or the contents thereof). This obligation to indemnify and defend shall not apply to the extent any such claim or cause of action arising out of the adjudicated negligence or willful misconduct of the appraiser in performing the appraisal. The appraiser has the right to approve any attorney employed by the client to defend against such claim or cause of action and has the right to approve any settlement or compromise of such claim or cause of action.

6. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

7. The improvements, and particularly the buildings, appear to be free of hazards. The appraiser does not warrant against the presence of asbestos, radon gas, PCB's, underground storage tanks and/or use of formaldehyde foam insulation within the building.

8. The appraiser assumes no liability for structural conditions not visible through ordinary, careful inspection or a review of the plans and specifications, if proposed.

9. Subsurface rights (mineral, gas and oil) were not considered in making this appraisal.

10. Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media, without the written consent and approval of the author, particularly as to valuation conclusions, the identity of the appraiser or its firm. This report may be shared with an organization other than the client only in its entirety.

11. Possession of this report, or a copy thereof, does not carry with it the right of publication, nor may it be used for any purpose by anyone but the client without the previous written consent of the appraiser and the client, and then only with proper qualification.

12. It is assumed that any proposed improvements are completed unless stipulated otherwise in this report; any construction is assumed to conform with the building plans and/or improvements descriptions provided the appraiser and summarized in this report.

13. Any future discovery of a concealed or unapparent deficiency in the real estate (such as substance, toxic waste, radon gas, asbestos, UFFI or other hazards) renders this report invalid.

14. It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless no compliance is stated, defined and considered in the appraisal report.

15. It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state, or national governmental or private entity or organization has been or can be obtained or renewed for any use on which the value estimate contained in this report is contingent.

16. The current (as of the date of appraisal) purchasing power of the dollar is the basis for the value estimates; no extreme fluctuations in economic cycles are anticipated.

17. The value estimate is based upon appropriate research and applicable appraisal techniques. By its nature the appraisal of real estate is not an exact science, and the end product is an opinion with which others may differ. The final estimate of the value is not guaranteed, and no warranty is implied or intended.

18. Acceptance of and/or use of this appraisal report constitutes an understanding and acceptance of the foregoing assumptions and limiting conditions.

19 The Americans with Disabilities Act took effect January 26, 1992. We have not considered any part of this act and how it impacts the subject property in terms of compliance and/or renovation costs. We, therefore, reserve the right to amend this report should a competent survey indicate changes may be required.

20. *It is assumed that the subject property is in compliance with all applicable codes, rules and regulations. It is also noted and emphasized that the estimated value does NOT include FF&E.*

21. *It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

Respectfully Submitted,

**Gregory R. Clucas, MAI**
**DC Certified General Real Estate Appraiser No. GA10008**

**Greg Clucas, Jr., Associate**

CL GROUP LLC

# CL GROUP, LLC

*Over 45 years of experience appraising commercial real estate in the Washington DC area.*

## GREGORY R. CLUCAS, MAI
**~ PRESIDENT ~**

### EDUCATION

- B.S. Degree – Marketing, minor in Economics
- University of Arizona, Tucson, Arizona
- Post Graduate Studies, Real Estate and Urban Development
- American University, Washington, D.C.
- Currently certified under the Continuing Education Program of the Appraisal Institute (through December 31, 2022)

### LICENSES/CERTIFICATIONS

- District of Columbia Certified General Real Estate Appraiser No. 10008
- Maryland Certified General Real Estate Appraiser No. 04-428
- Virginia Certified General Real Estate Appraiser No. 4001-000931
- West Virginia Certified General Real Estate Appraiser No. 316

### COMPLETED CERTIFICATION COURSES AND SEMINARS

- Business Practices and Ethics Standards of Professional Practice (2019)
- USPAP Update, 2021
- Partial Interest Valuation – Undivided
- Partial Interest Valuation – Divided
- Attacking & Defending an Appraisal in Litigation
- An Introduction to Valuing Green Buildings
- Analyzing Distressed Real Estate
- Appraisal of Residential Property Foreclosure
- Current Issues in Appraising
- Deriving and Supporting Adjustments
- Appraising and Analyzing Industrial and Flex Buildings for Mortgage Underwriting
- Curriculum Overview – General
- Curriculum Overview – Residential
- Analyzing Operating Expenses
- Appraisal of Land and Site Valuation
- Appraisal of Self Storage Facilities
- Appraisal of Fast Food Facilities
- West Virginia Appraisal Law
- Appraisal of Assisted Living Facilities
- The Income Approach, An Overview
- Advanced Hotel Appraising, Full Service Hotels
- Basic Hotel Appraising, Limited Service Hotels
- The Discounted Cash Flow Model: Concepts, Issues & Apps

*Numerous conferences and seminars conducted by various professional organizations including the Appraisal Institute.*

### PROFESSIONAL MEMBERSHIPS

- Member, Appraisal Institute (MAI)

### EXPERIENCE

Valuation and investment counselor to institutional investors, corporations, associations, attorneys, and government agencies. Qualified as an expert witness before the local and federal courts of record as well as numerous special boards and commissions. Scope of experience includes all types of urban and suburban properties.

www.candlgroup.com
CL Group, LLC
19620 Club House Rd.
Montgomery Village,
Maryland, 20886
Tel.: 301.258.1008
GClucas@aol.com

WCP0078

# CL GROUP, LLC

*Over 45 years of experience appraising commercial real estate in the Washington DC area.*

## REPRESENTATIVE CLIENTELE

- 1st Mariner Bank
- Abdo Development
- Allstate Appraisal
- American Bank
- American Investors Life Insurance Company
- American Military University
- Annapolis West United Partnership
- Atena, Inc.
- Banco Popular North America
- Bank Annapolis
- Branch Banking & Trust Company
- Broad Street
- Cardinal Bank
- Ciena Capital
- City of College Park, Maryland
- Colliers International
- Colombo Bank
- Chain Bridge Bank
- Columbia Bank
- Congressional Bank
- Curtis Property Management Comp.
- Damascus Community Bank
- Eagle Bank
- Earthtek
- Federal Deposit Insurance Corp.
- First Citizens Bank
- First Horizon Appraisal Division
- First Mariner Mortgage Corp.
- First National Bank
- First United Bank & Trust
- First Virginia Community Bank
- FNB
- Freedom Bank
- Fulton Financial
- Genworth North America Corp.
- Graystone Bank
- Great Point Investors
- Jackson Life Insurance Company
- John Marshall Bank
- Live Oak Bank
- Montgomery Dept. of Public Works
- Mainstreet Bank
- Mid-Atlantic Financial Partners
- Montgomery County Public Schools
- Monument Bank
- NIH Federal Credit Union
- Northmarq Capital
- Ohio Public Employees Retirement System
- Old Line Bank
- Orrstown Bank
- Penrose Financial Group
- People's Bank
- Phillips Realty Capital
- PNC Bank
- PPM Finance
- Premier Bank
- Prince George's Financial Services
- Quadrant-Financial
- Revere Bank
- Rivita Lending
- Sandy Spring Bank
- Small Business Administration of America
- Southern Farm Bureau
- Southstar
- Sovereign Bank, N.A.
- StanCorp Mortgage Investors
- Stanley Martin Homes
- State Employees Credit Unit of MD
- Symetra Life Insurace
- The Fauquier Bank
- The Old Point National Bank
- The Patapsco Bank
- The University of Maryland
- The Washington Savings Bank
- Town of Oakland, MD.
- Valley Bank
- Washington First
- Washington Metropolitan Area Transit Authority
- William A. Hazel, Incorporated
- Zurich American Insurance Company

## APPRAISAL ASSIGNMENTS

Mr. Clucas has performed appraisals on various property types including, but not limited to, shopping centers, apartment complexes, manufacturing plants, office buildings, residential and office condominium buildings, raw and developed land, office parks, motels, hotels and mixed use properties. Mr. Clucas is currently certified in the State of Virginia, the State of Maryland, the State of West Virginia and the District of Columbia as a General Real Estate Appraiser.


CERTIFICATE OF LICENSURE

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
Occupational and Professional Licensing Administration

*certifies that*

**GREGORY CLUCAS**

*has met all requirements by law and regulations and is hereby licensed as:*

**APPRAISER CERTIFIED GENERAL**
LICENSE #: GA10008

Issue Date: 3/1/2020
Expiration Date: 2/28/2022

*Director, Department of Consumer and Regulatory Affairs*

dcra

Serial #: 450729

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

## PHOTOGRAPHS OF THE SUBJECT

CL GROUP LLC




Views of the subject property via Kennedy Street, NW





View of the subject property via 1st Street, NW




View of the subject property along Kennedy Street, NW




Exterior views of the subject property



CL GROUP LLC

## LOCATION MAPS OF THE SUBJECT






## IDENTIFICATION OF THE SUBJECT

The subject properties under analysis consist of approximately 13,225± square feet of land currently planned as a mixed-use building containing a total gross building area of 62,091 square feet of space. It has been noted by the appraisers that although the subject has a total planned FAR of 62,091 square feet, the net sellable area is anticipated to encompass 50,771. The proposed improvements, which have not been approved by Washington DC planning authorities as of the day of inspection, will contain forty-two (42) residential units sold at market rates and 12,217 square feet of first floor commercial retail space, is projected to be completed March 1, 2025. Construction is scheduled to commence for the project known as 71 Kennedy Street on or by March 1, 2022.

The subject properties are located along the Northeast corner of Kennedy Street, NW, and 1st Street, NW in the Manor Park neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject properties are known as Lots 0817 & 0137 of Square 3389 and contains approximately 13,225± square feet of land area. The subject properties are zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

## LEGAL DESCRIPTION

The subject property is legally described as Lots 0817 & 0137 of Square 3389.

## FUNCTION OF THE APPRAISAL

The function of the appraisal is for the internal utilization of the client, Washington Capital Partners, their successors or assigns, and any participating financial institutions. This valuation assignment was developed consistent with the scope specified. This specific appraisal is for the sole use of the client and may not be used for any other purpose without written consent from the appraiser.

## INTENDED USE

The intended use of this report is for a renewal, finance or subsequent transaction of a loan.

## DATE OF INSPECTION

The subject property was inspected by the undersigned of the CL Group, LLC on October 13, 2021.

## EFFECTIVE DATE OF THE APPRAISAL

The subject property was inspected by the undersigned of the CL Group, LLC on October 13, 2021, which is the effective date of this report.

## PURPOSE OF THE APPRAISAL

The purpose of the appraisal is to estimate the "as is" market value of the subject property.

## PROPERTY RIGHTS APPRAISED

The property rights appraised are those represented by the Fee Simple Interest. These property rights as defined in The Dictionary of Real Estate Appraisal, 6th Edition, are as follows:

**Fee Simple Interest:** *"Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation."*

## HISTORY OF THE SUBJECT

According to tax records, the subject is under the following two (2) ownerships:

**71 KENNEDY STREET HOLDINGS LLC**
**1215 1ST ST NE**
**WASHINGTON DC 20002-7935**

**5505 1st STREET HOLDINGS LLC**
**5505 1st STREET NW**
**WASHINGTON DC 20011-5207**

According to District of Columbia records, the subject property has not traded in the previous three years. Any trades on the subject have been off market transactions and are not reflected in tax records.

## SCOPE OF THE APPRAISAL

**Scope of Work** is defined by the Uniform Standards of Professional Appraisal Practice (USPAP) 2021/2022 Edition, as *"the type and extent of research and analyses in an assignment." The Scope of Work must include the research and analyses that are necessary to develop credible assignment results*.

The subject property has been inspected and tax records have been reviewed. The property has been identified and characteristics that influence value are described. A description of the property follows. The highest and best use of the property is then analyzed. The methods used in the appraisal are explained in the "Valuation Procedure" section of this report.

In estimating the property's market value, market data was researched from the subject's market area. In addition, owners of the other properties and real estate brokers have provided market information. A sufficient amount of data is available from which to draw reliable conclusions as to the value of the subject property. The appraisers are not qualified to render opinions that are legal in nature; however apparent easements other than normal utility services and other restrictions, where known or observed, are noted.

The appraisers are not experts in matters concerning engineering or toxic wastes. Where some hazard is observed, it is described.

This appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation

A partial list of data sources is found below. To which aspect of the analysis they apply, your attention is invited to that specific portion of the report. Every attempt has been made to ensure the accuracy in the reporting of this information. As a result, it is our opinion that a third party can rely, as much as is reasonable, on the data communicated in this report.

A partial list of the data sources utilized in this appraisal is as follows:

- Metropolitan Regional Information Systems, Inc. (MRIS)
- CoStar Group, Inc. (www.CoStar.com)
- The District of Columbia
- Surveys and Tax Maps
- Real Estate Agents and Brokers
- Appraisers

- Mr. Mel Negussie – Subject Sponsor

## MARKETING & EXPOSURE PERIODS

According to Advisory Opinion G-7 from the Appraisal Standards Board of the Appraisal Foundation, the estimate of marketing time occurs after the effective date of the market value estimate. Marketing time is sensitive to price/value relationships, meaning that, for a given property, marketing time may increase with higher prices, and decrease with lower prices. The estimate of a reasonable marketing time assumes that the subject sells at or near the estimate of market value as presented in this appraisal report.

According to Statement of Appraisal Standards No. 6 (SMT-6) of the Appraisal Standards Board of the Appraisal Foundation, exposure time is defined as the estimated length of time the property appraised would have been on the market prior to the hypothetical assumption that it sold as of the effective date of the appraisal for the appraised amount. Thus, exposure time differs from marketing time as it is a retrospective estimate, based upon the analysis of past events leading up to the date of the appraisal, and is provided as a means of synthesizing actual market trends for the purposes of accurately anticipating the future in a marketing time estimate.

The basis for estimated exposure periods is found in statistical information about time on the market, gathered through sales verification, and interviews of market participants. Based upon the market value estimate provided in this report, the appraiser estimates that a reasonable exposure period of 12 months would have been required to sell the subject property as of the date of the appraisal. The appraiser estimates that a marketing time of one year or less from the date of the appraisal would be required in order to sell the subject

property at the appraiser's market value estimate. This opinion is further substantiated by a recent PwC Investor Survey which references a national average marketing time of approximately nine months for all property types.

## DEFINITIONS PERTINENT TO VALUE

The definition of **"Market Value"**, as described within Attachment A of the engagement letter, is defined as follows:

> *"the most probable price which a property should bring in competitive and open market under all condition requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus".*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*
- *both parties are well-informed or well-advised, and each acting in what he considers his own best interest;*
- *a reasonable time is allowed for exposure in the open market;*
- *payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable there to; and*
- *the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

**"Hypothetical Condition"** is defined as:

> *"that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical condition assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property, such as market conditions or trends; or about the integrity of data used in an analysis.*

A hypothetical condition may be used in an assignment only if:

- *Use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;*
- *Use of the hypothetical condition results in a credible analysis; and*
- *The appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.*

**Market value "as is"** on appraisal date means an estimate of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical condition, assumption, or qualification as of the date of the appraisal is prepared.

**Market value "as if" complete** on appraisal date means the market value of a property with all proposed construction, conversion, or rehabilitation hypothetically complete, or under other specified hypothetical conditions as of the date of the appraisal.

With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value shall reflect the market value of the property as if completed and prepared for occupancy by tenants.

**Prospective future value upon completion of construction** means the prospective future value of a property on the date that construction is completed, based upon market conditions forecast to exist as of that completion date.

**Prospective future value upon reaching stabilized occupancy** means the prospective future value of a property at a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy.

## Other Terms and Definitions

**Retrospective Value Opinion**
"An opinion of value as of a specified historic date. A retrospective value opinion is most frequently sought in connection with appraisals for estate tax, condemnation, inheritance tax, and similar purposes."

**Extraordinary Assumption**
"An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions
external to the property such as market conditions or trends; or about the integrity of data used in an analysis.

**Fee Simple Interest**
"Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation."

**Leased Fee Estate**
An ownership interest held by a landlord with the landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor or the leased fee owner and leased fee are specified by contract terms contained within the lease.

**Cash Equivalent Value**
"A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts."

**Floor Area Ratio**
"The relationship between the above ground floor area of a building and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal; e.g., a total of 2.0 indicates that the floor area of a building is twice the total land."

**Discounted Cash Flow (DCF) Analysis**
"A set of procedures in which the quantity, variability, timing, and duration of periodic income, as well as the quantity and timing of reversions, are specified and discounted to a specific yield rate."

# DESCRIPTION & ANALYSIS

## WASHINGTON D.C.




Washington, D.C. covers more than 4,400 square miles of thriving businesses. As the center of the eighth largest metropolitan area in the nation, the mixture of people and purposes come together in Washington, D.C., making it an exciting place in which to live and work.

Streets and other public rights-of-way represent more than twenty-two percent of the District's land area. The city is divided into four quadrants, Northeast, Northwest, Southeast, and Southwest. The central point is the U.S. Capitol Building. Streets running east-west are lettered in alphabetical order. Numbered streets run north-south.

POPULATION

As of May 2021, the District's population was over 712,000 and continuing to increase. During the next ten years, the population in the District of Columbia is expected to increase further.

INCOME

Traditionally one of America's richest urban centers, Washington area residents spend more money per household than residents in nearly every major U.S. city. This market has more college graduates per capita, it has more $60,000 and above household incomes than any other market, and it is one of the top affluent markets in the country. One out of every five Washingtonians is an affluent urban dweller.

EMPLOYMENT GROWTH

The Greater Washington has its share of large companies and major corporate headquarters. Perhaps not as well known, the region also provides a thriving environment for small company creation and growth. In fact, Greater Washington is home to the most Inc. 500 fastest-growing private businesses in the US - for the past 12 consecutive years. It is worth noting The Association of Foreign Investors in Real Estate ranked Washington the No. 1 global city for real estate investment, beating out London, New York, Tokyo, Shanghai, and San Francisco.

TRANSPORTATION

At the center of a transportation network, including three major airports, a regional rail and bus system, and a major road system with several major interstate routes, the District is responsible for transportation where the demand is highest and the use is most intense, within the city.

Public transportation in the District includes both rail and bus service and is operated by the Washington Metropolitan Area Transportation Authority. In addition to public transportation and commercial and private vehicles, more than 7,200 taxicabs and hundreds of tour buses must be considered in discussing an efficient system.

RAIL

The Metrorail system (known locally as "Metro") has plans for over 103 track miles and 85 stations on five lines, extending from the District to the surrounding suburban areas. Currently, there are 36 rail stations and 29.6 miles of rail service operating solely in the District.

In addition to Metro, AMTRAK services the District with both regional and national service from Union Station to all points in the nation. There is a Metrorail stop at Union Station which makes access to AMTRAK service convenient.

ROADS

Getting into the District is facilitated by the limited access roadways, which are part of the federal interstate highway system. The major interstate access into the Washington area is the Capital Beltway (I-495). It is a 62-mile highway that circles Washington, D.C. and connects with all interstate highways.

In addition, there is I-95, a major north-south interstate that uses the eastern half of the Beltway as its route around Washington. Also, I-295 and I-395 run from Maryland to Virginia through the District, and I-66 runs from Virginia into the District. Critical interurban extensions of I-66 and Dulles Airport Access Road from Capital Beltway through Arlington to downtown Washington were completed in 1984 and 1985 respectively.

Other major highways in the Washington Metropolitan area that are easily accessible from the District include: the George Washington Memorial Parkway, Routes 1, 236, 7, 50, 29/211, and 123 in Virginia, and Routes 29, 1, 97, 4 and 50, and the Baltimore-Washington Parkway in Maryland.

AIR

Washington, D.C. is served by three full-service commercial airports. Of the three, Reagan National Airport is closest to downtown Washington, less than five miles from the city center. Open to traffic in 1940 and recently renovated, National now accommodates approximately 16 million passengers a year, approximately 45,000 air travelers every day.

Washington Dulles International Airport is now the fastest growing airport in the United States. Its location near Chantilly, Virginia is 26 miles from the District. Baltimore/Washington International Airport is located about 30 miles northeast of Washington, and is one of the few major airports in the country accessible by rail service. BWI is linked to both Baltimore and Washington by its own AMTRAK Station. Access to and from all three airports is by way of private automobile, taxi, or airport bus service. The Washington Flyer, an airport bus service,

operates between major hotels in the area, and more than 70 points throughout the region, to provide a connection with Reagan National and Dulles Airports. The Airport Connection runs buses between downtown hotels and BWI. In addition, the Metro system has a stop at Reagan National Airport.

SUMMARY

Washington, D.C. is a city which continues to diversify while retaining the charm of its past and its important role in national government and politics. It is a city where opportunities abound, and where public and private sector cooperation is strong. Any well-located real estate property stands to benefit from this combination of strong consumer demand, the many excellent modes of transportation available, and a diversified economic base.

**HOUSING CONDITIONS 2021**

## Washington, DC Market Key Findings

| | July 2021 | vs. June 2021 | vs. July 2020 |
|---|---|---|---|
| Median Sales Price | $550.0K | ▼ -2.7% | ▲ 6.6% |
| Closed Sales | 7,438 | ▼ -13.8% | ▲ 0.8% |
| New Pending Sales | 7,078 | ▼ -10.9% | ▼ -2.7% |
| New Listings | 8,648 | ▼ -17.3% | ▼ -3.0% |
| Median Days on Market | 7 Days | 6 Days | 8 Days |

## bright MLS | T3 Home Demand Index 123 Moderate

| Home Demand Index | Home Demand Index from prior month | Home Demand Index from prior year | Index change from prior month | Index change from same time last year |
|---|---|---|---|---|
| 123 (Moderate) | 148 | 141 | -16.9% | -12.8% |

The Bright MLS T3 Home Demand Index for the Washington Metro area decreased by nearly 17 percent in July to a reading of 123. Although in the Moderate demand range, the Index had been in the High category since March reflecting a surge in demand in the early part of the year that has since softened.

Demand among each of the six types of homes tracked by the Bright MLS T3 Home Demand Index decreased in July. The largest decrease in buyer interest was in the higher-priced single-family segment, although demand remained higher than other segments. The months supply of homes for sale was very low among the single-family segments and townhouses. The leanest supplies of homes were in the mid-priced single-family segment, at one month, and townhouses at 1.1 months.

**Metro area median sales price** ($550K) hit a July ten-year high. The 3% decline from June is within seasonal norms. Frederick County returned to all-time high set in May, up 20% from last July. Loudoun County condo/co-op prices set a new record, in the $400Ks for the first time (+18% from July 20).

**Overall closed sales activity** declined 14% from June, in line with the typical pattern for the month, and the first month since July '20 without a double digit year-over-year gain.

**New pendings** continued to slow, detached home sales (3,225) fell 11% from June, and 6% from July of 2020. Washington, D.C. saw 23% fewer new pending condo/co-op sales (427) versus June, higher than the June to July typical dip of 12%.

**Detached home new listings** (3,805) had a seasonal dip from June, down 10%.

Single-family homes spent **6 days average** on market, 2 days earlier than July of 2020.

**Showing activity** dipped 8% from last year's busy post-social distancing market.

CL GROUP LLC

## July 2021 Median Sales Price

- The metro area median sales price ($550K) hit a July ten-year high. The 3% decline from June is within seasonal norms.
- Washington D.C. fell 7% from last month's ten-year record. Condo / Co-ops ($480K) dipped 9% month over month and 3% year over year.
- Frederick County returned to the all-time high set in May, up 20% from last July.
- Loudoun County condo/co-op prices set a new record, breaking into the $400Ks for the first time (+18% from July 20).
- August median sales prices typically decline 2% from July.

| | July '21 | vs. July '20 | vs. July '19 | YTD '21 | vs. YTD '20 |
|---|---|---|---|---|---|
| Alexandria City | $649.8K | 3.1% | 32.6% | $611.5K | 3.6% |
| Arlington County | $657.0K | -9.1% | 6.7% | $661.0K | 1.7% |
| Fairfax City | $725.0K | 14.1% | 42.4% | $648.4K | 14.8% |
| Fairfax County | $632.0K | 2.8% | 17.1% | $625.0K | 7.8% |
| Falls Church City | $793.0K | -10.7% | -3.3% | $858.0K | 0.1% |
| Frederick County | $420.0K | 20.0% | 27.3% | $400.0K | 14.4% |
| Loudoun County | $625.0K | 10.6% | 22.0% | $615.0K | 15.6% |
| Montgomery County | $540.0K | 8.0% | 15.9% | $530.0K | 10.7% |
| Prince Georges County | $389.6K | 14.1% | 21.7% | $371.0K | 10.8% |
| Washington, D.C. | $652.5K | 2.0% | 10.1% | $653.0K | 7.1% |
| Washington, D.C. Metro | $550.0K | 6.6% | 19.6% | $535.0K | 10.4% |

## July 2021 Closed Sales

- Activity pulled back 14% from June, in line with the typical pattern for the month.
- It was the first month since July '20 without a double-digit year-over-year gain.
- Fairfax County attached home sales slipped 18% from June, much higher than the 7% typical dip for the month.
- In Montgomery County, the 20903 ZIP code reported a 135 Home Demand Index, up 17%. The area claimed a July sales record, adding four single-family home sales (798) compared to a year ago.
- August sales generally decline 5% from July levels.

| | July '21 | vs. July '20 | vs. July '19 | YTD '21 | vs. YTD '20 |
|---|---|---|---|---|---|
| Alexandria City | 284 | 4% | 24% | 1,914 | 37% |
| Arlington County | 342 | 21% | 29% | 2,109 | 47% |
| Fairfax City | 39 | 8% | 5% | 255 | 16% |
| Fairfax County | 1,852 | 6% | 10% | 11,560 | 30% |
| Falls Church City | 19 | -32% | -10% | 112 | 18% |
| Frederick County | 537 | -12% | 18% | 3,461 | 20% |
| Loudoun County | 840 | -1% | 12% | 5,065 | 27% |
| Montgomery County | 1,516 | 11% | 17% | 9,006 | 31% |
| Prince Georges County | 1,043 | 10% | 9% | 6,993 | 22% |
| Washington, D.C. | 966 | 1% | 22% | 6,629 | 31% |
| Washington, D.C. Metro | 7,438 | 1% | 8% | 47,104 | 27% |

CL GROUP LLC

## July 2021 New Pending Sales

- Upcoming sales continued to slow. New pending detached home sales (3,225) fell 11% from last month and 6% from last July.
- Washington, D.C. saw 23% fewer new pending condo/co-op sales (427) versus June, higher than the June to July typical dip of 12%.
- Frederick townhomes continued to move off the market. This month's 225 new pending townhome sales were a county ten-year record, up 6%.
- Typically, August new pending home decline 8% from July.

| | July '21 | vs. July '20 | vs. July '19 | YTD '21 | vs. YTD '20 |
|---|---|---|---|---|---|
| Alexandria City | 255 | -6.9% | 13.3% | 1,986 | 27.7% |
| Arlington County | 285 | -2.7% | 16.3% | 2,255 | 40.4% |
| Fairfax City | 40 | 14.3% | -40.3% | 278 | 14.4% |
| Fairfax County | 1,650 | -4.6% | 5.4% | 12,193 | 23.5% |
| Falls Church City | 15 | -25.0% | N/C | 118 | 8.3% |
| Frederick County | 609 | -5.1% | 35.3% | 3,669 | 9.4% |
| Loudoun County | 779 | -3.4% | 18.2% | 5,314 | 18.8% |
| Montgomery County | 1,383 | -5.6% | 7.8% | 9,577 | 23.7% |
| Prince Georges County | 1,203 | -4.6% | 2.4% | 7,283 | 11.1% |
| Washington, D.C. | 859 | -16.3% | -2.1% | 6,883 | 22.8% |
| Washington, D.C. Metro | 7,078 | -2.7% | 15.2% | 49,556 | 20.5% |

## July 2021 New Listings

- Detached home new listings (3,805) tracked similarly to July '20. The month had a season dip from June, down 19%.
- Frederick hit an overall ten-year high for new townhome listings (257), up 13% year over year.
- Fairfax County matched last July's surge of listings, as new townhome listings (672) advanced 9%.
- Loudoun County attached home listings hit a July best (542), off by only 22 from last month's ten-year high.
- August new home listings typically dip -8% from July.

| | July '21 | vs. July '20 | vs. July '19 | YTD '21 | vs. YTD '20 |
|---|---|---|---|---|---|
| Alexandria City | 295 | -15.2% | 19.9% | 2,368 | 26.2% |
| Arlington County | 360 | -19.3% | 39.5% | 3,012 | 41.0% |
| Fairfax City | 62 | 26.5% | -18.4% | 343 | 23.8% |
| Fairfax County | 2,141 | 0.1% | 25.4% | 14,739 | 21.1% |
| Falls Church City | 23 | -11.5% | 283.3% | 157 | 10.6% |
| Frederick County | 681 | 4.0% | 12.6% | 4,311 | 11.4% |
| Loudoun County | 959 | -1.9% | 19.7% | 6,180 | 12.2% |
| Montgomery County | 1,661 | 5.7% | 15.2% | 11,181 | 21.3% |
| Prince Georges County | 1,324 | 9.5% | 4.0% | 8,619 | 14.7% |
| Washington, D.C. | 1,142 | -23.6% | 9.2% | 9,659 | 20.0% |
| Washington, D.C. Metro | 8,648 | -3.0% | 14.4% | 60,569 | 19.3% |

CL GROUP LLC

## July 2021 Median Days on Market

- Single-family homes came under contract in six days, two days earlier than July of '20.
- Days on the market for detached homes steady from June, typically, they stay on the market three days longer in July.
- Prince George's County held at seven days for the third straight month. However, this was a five-day decline from a year ago and an eight-day dip from 2019.
- Montgomery County ticked up one day after holding at six days on the market since March.
- Generally, homes come under contract two days earlier in August compared to July.

| | July '21 | vs. July '20 | vs. July '19 | YTD '21 | vs. YTD '20 |
|---|---|---|---|---|---|
| Alexandria City | 8 | 7 | 6 | 7 | 6 |
| Arlington County | 14 | 7 | 7 | 9 | 7 |
| Fairfax City | 5 | 7 | 14 | 6 | 7 |
| Fairfax County | 6 | 6 | 9 | 6 | 6 |
| Falls Church City | 7 | 8 | 7 | 6 | 6 |
| Frederick County | 6 | 9 | 23 | 5 | 14 |
| Loudoun County | 5 | 6 | 12 | 5 | 6 |
| Montgomery County | 7 | 8 | 15 | 7 | 11 |
| Prince Georges County | 7 | 12 | 15 | 7 | 15 |
| Washington, D.C. | 11 | 9 | 11 | 9 | 12 |
| Washington, D.C. Metro | 7 | 8 | 12 | 6 | 9 |

## Washington, DC Metro Closed Sales

### By Median Days on the Market

| | July 2019 | July 2020 | July 2021 |
|---|---|---|---|
| 0 Days | 196 | 231 | 149 |
| 1 to 10 Days | 3,078 | 3,994 | 4,693 |
| 11 to 20 Days | 1,056 | 947 | 1,135 |
| 21 to 30 Days | 659 | 466 | 521 |
| 31 to 60 Days | 990 | 759 | 561 |
| 61 to 90 Days | 427 | 394 | 151 |
| 91 to 120 Days | 180 | 243 | 65 |
| 121 to 180 Days | 146 | 160 | 69 |
| 181 to 360 Days | 128 | 145 | 72 |
| 361 to 720 Days | 26 | 35 | 18 |
| 721+ Days | 2 | 3 | 3 |

### By Price Range

| | July 2019 | July 2020 | July 2021 |
|---|---|---|---|
| < $50,000 | 7 | 4 | 7 |
| $50K to $99,999 | 34 | 39 | 24 |
| $100K to $149,999 | 105 | 84 | 67 |
| $150K to $199,999 | 230 | 185 | 171 |
| $200K to $299,999 | 959 | 833 | 649 |
| $300K to $399,999 | 1,328 | 1,201 | 1,114 |
| $400K to $499,999 | 1,210 | 1,151 | 1,118 |
| $500K to $599,999 | 819 | 993 | 1,031 |
| $600K to $799,999 | 1,152 | 1,402 | 1,485 |
| $800K to $999,999 | 482 | 716 | 841 |
| $1M to $2,499,999 | 537 | 734 | 880 |
| $2.5M to $4,999,999 | 26 | 33 | 45 |
| $5,000,000+ | 1 | 2 | 6 |

CL GROUP LLC

# Washington, DC Metro Ten Year Trends

## Median Sales Price by Housing Type

| | Med Sale $ | Detached: All | Attached: All | Condo / Co-op | TH |
|---|---|---|---|---|---|
| July 2012 | $380.0K | $475.0K | $321.0K | $270.0K | $352.8K |
| July 2013 | $415.0K | $530.0K | $344.0K | $282.0K | $385.0K |
| July 2014 | $420.0K | $530.0K | $352.8K | $292.0K | $402.0K |
| July 2015 | $419.9K | $530.8K | $346.4K | $285.0K | $387.6K |
| July 2016 | $425.0K | $535.5K | $350.0K | $298.0K | $395.0K |
| July 2017 | $430.0K | $549.0K | $360.3K | $309.0K | $412.0K |
| July 2018 | $449.9K | $575.0K | $369.0K | $307.3K | $422.0K |
| July 2019 | $460.0K | $579.0K | $385.0K | $320.0K | $430.0K |
| July 2020 | $516.0K | $640.0K | $420.0K | $351.0K | $481.0K |
| July 2021 | $550.0K | $705.0K | $445.0K | $355.0K | $525.0K |

## All Pending Home Sales

| | |
|---|---|
| July 2012 | 8,106 |
| July 2013 | 7,905 |
| July 2014 | 7,098 |
| July 2015 | 7,650 |
| July 2016 | 8,752 |
| July 2017 | 8,053 |
| July 2018 | 7,397 |
| July 2019 | 7,576 |
| July 2020 | 8,890 |
| July 2021 | 8,782 |

## Months of Supply

| | |
|---|---|
| July 2012 | 3.58 |
| July 2013 | 2.82 |
| July 2014 | 3.70 |
| July 2015 | 3.72 |
| July 2016 | 3.00 |
| July 2017 | 2.56 |
| July 2018 | 2.40 |
| July 2019 | 2.18 |
| July 2020 | 1.68 |
| July 2021 | 1.04 |

## Median Sales Price to Original List Price Ratio

| | |
|---|---|
| July 2012 | 97.9% |
| July 2013 | 99.8% |
| July 2014 | 98.8% |
| July 2015 | 98.4% |
| July 2016 | 98.8% |
| July 2017 | 99.3% |
| July 2018 | 100.0% |
| July 2019 | 100.0% |
| July 2020 | 100.0% |
| July 2021 | 100.7% |

CL GROUP LLC

**WASHINGTON DC HOUSING DATA SEPTEMBER 2021**

There was a decrease in total units sold in September, with 677 sold this month in Washington DC Real Estate versus 883 last month, a decrease of 23%. This month's total units sold was lower than at this time last year, a decrease of 28% versus September 2020.

Versus last year, the total number of homes available this month is higher by 190 units or 10%. The total number of active inventory this September was 2,189 compared to 1,999 in September 2020. This month's total of 2,189 is higher than the previous month's total supply of available inventory of 1,731, an increase of 26%.

Last September, the median sale price for Washington DC Homes was $642,500. This September, the median sale price was $610,000, a decrease of 5% or $32,500 compared to last year. The current median sold price is 6% lower than in August.

In September, there was 3.2 months of supply available in Washington DC, compared to 2.1 in September 2020. That is an increase of 53% versus a year ago.

This month there were 1,843 homes newly listed for sale in Washington DC compared to 1,615 in September 2020, an increase of 14%. There were 874 current contracts pending sale this September compared to 943 a year ago. The number of current contracts is 7% lower than last September.

In September, the average sale price in Washington DC was 100.6% of the average list price, which is similar compared to a year ago.

## IMMEDIATE ENVIRONS




The subject properties are located along the Northeast corner of Kennedy Street, NW, and 1st Street, NW in the Manor Park neighborhood of Northwest Washington D.C. According to District of Columbia tax records, the subject properties are known as Lots 0817 & 0137 of Square 3389 and contains approximately 13,225± square feet of land area. The subject properties are zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

Manor Park is a neighborhood in Ward 4 of northwest Washington, D.C.. The National Capital Planning Commission 1967 "District Communities" map indicates this neighborhood is roughly bounded between 8th Street NW to the west, North Capitol Street NW, Blair Road NW, and the Washington Metropolitan Area Red Line train tracks to the east, Rittenhouse Street NW to the north, and Missouri Avenue NW to the south. Manor Park borders the adjacent neighborhoods of Takoma Park, Brightwood, and Brightwood Park in NW Washington D.C. and also borders the Riggs Park neighborhood in NE Washington D.C. In 1940, the Manor Park

Citizens Association deemed the boundaries to be Eighth Street, Whittier Street, North Capitol Street, and Concord Street (now Missouri Avenue).

The subject shares the 20011zip code with the more development active Petworth neighborhood to the West. Petworth has the following data points:

- **$675,000** -- The median home price in Petworth, up 5% compared to last year.
- **268** -- The number of homes sold in the neighborhood this year, down 13% compared to last year.
- **1.33** -- The contract ratio in July (the total number of homes under contract in a given period to the overall number of active listings), up 111% compared to last July.
- **1.36** -- The supply of homes on the market in July, down 32% year-over-year.

The roughly mile-long stretch of Georgia Avenue from Lamont Street to Upshur Street that includes part of the Petworth and Park View neighborhoods has at least 13 multifamily projects in various stages of development and has welcomed at least 17 new bars and restaurants since the start of 2018, plus a gym, a hair salon and a clothing store.

The majority of developments underway are building within that zoning limit and not going through the lengthy process to achieve additional density, meaning most of the new buildings in the neighborhood are six stories or shorter and have fewer than 100 units.

Over a dozen developments are planned, under construction or have recently delivered on the 1-mile stretch of Georgia Avenue, a review of building permits shows. Most of them are mid-rise buildings that feature ground-floor retail, potentially ushering in a new wave of restaurants in the coming years.

The Holladay Corp. is working on one of the largest projects in the neighborhood, a three-building project totaling 225 units just off Georgia Avenue on Lamont Street. The first two buildings of 143 units and 77 units delivered in March and are already 40% to 50% leased, Holladay Corp. President Jessica Holladay Sterchi confirmed.

A nine-unit project with retail at 3225 Georgia Ave. NW from Brick Lane Real Estate received its certificate of occupancy July 19. The project, branded as The Lamont, is actively leasing.

Another nine-unit project with retail at 4016 Georgia Ave. NW from Lock 7 Development received its certificate of occupancy in April.

Murillo Mallnati Group has also received its building permit to construct a 15-unit project with ground-floor retail at 3831 Georgia Ave.

Two entities controlled by a team of Robert Wixson and Michael Taylor received building permits in June and July to build a pair of eight-unit condo buildings with retail at 3622 and 3626 Georgia Ave. NW.

A 10-unit condo project from IFG Group received its building permits in April 2018 and is now actively leasing.

Washington DC Commercial Retail Space

Retail vacancies in Uptown were slightly elevated relative to the five-year average during the third quarter, but they were essentially unchanged from this time last year. The rate also sits above the overall market's average. Meanwhile, retail rents have fallen on a year-over-year basis, dropping by -1.3%.

As for the pipeline, construction has returned to Uptown after a lull in net new supply over the past few years.

Uptown is a very liquid investment market, characterized by heavy trading, and that remained the case in the past year. Compared to the overall Washington area, market pricing sits at $459/SF, which is well above the region's average pricing. The metro's market pricing sits down at $304/SF.

The coronavirus' impact on the market may lead to lasting structural changes within the retail sector. E-commerce has flourished, and spending and shopping habits may be permanently altered, particularly as brick-and-mortar retailers may be unable to adapt to the changing environment.

| AVAILABILITY | SUBMARKET | MARKET |
|---|---|---|
| Market Rent/SF | $42.67 | $29.66 |
| Vacancy Rate | 5.1% | 5.0% |
| Vacant SF | 324K | 13.2M |
| Availability Rate | 6.1% | 6.1% |
| Available SF | 389K | 16.3M |
| Sublet SF | 14.3K | 935K |
| Months on Market | 14.1 | 15.5 |

| DEMAND | SUBMARKET | MARKET |
|---|---|---|
| 12 Mo Net Absorption SF | 8.3K | (39.8K) |
| 6 Mo Leasing Probability | 38.5% | 32.2% |

| INVENTORY | SUBMARKET | MARKET |
|---|---|---|
| Existing Buildings | 1,160 | 20,525 |
| Inventory SF | 6.3M | 266M |
| Average Building SF | 5.5K | 12.9K |
| Under Construction SF | 1.8K | 1.8M |
| 12 Mo Delivered SF | 5.6K | 1.2M |

| SALES | SUBMARKET | MARKET |
|---|---|---|
| 12 Mo Transactions | 56 | 646 |
| Market Sale Price/SF | $459 | $304 |
| Average Market Sale Price | $2.5M | $4M |
| 12 Mo Sales Volume | $72.2M | $1.7B |
| Market Cap Rate | 5.1% | 6.4% |

## CONCLUSION

Based upon our analysis, both the Washington DC market and the subject's competitive neighborhood are experiencing sustained growth with development up, prices increasing, and reduction in inventory. With additional urban growth planned it is anticipated that the current growth model should stable into the foreseeable future.

## SITE DESCRIPTION

LOCATION: 1st Street NW & Kennedy Street, NW
Washington, DC 20011

SIZE/ZONING: According to District of Columbia tax records, the subject properties contain approximately 23,225± square feet of land area. The subject property is zoned MU-4 (Mixed-Use) under District of Columbia zoning regulations.

TOPOGRAPHY: The subject site is generally level to slightly sloping.

SHAPE AND FRONTAGE: The sites are rectangular in shape, with frontage on Kennedy Street, NW and 1st Street, NW.

ACCESS: Ingress and egress to the site is available via Kennedy Street, NW and 1st Street, NW.

UTILITIES: The subject site is serviced by all public utilities.

COVENANTS, EASEMENTS & RESTRICTIONS: We have not researched deed restrictions and have not been provided with the covenants of title. Therefore, it is assumed that any deed covenants permit the existing development scheme. There are utility easements over the site; however, these have no adverse effect. The appraisers are unaware of any ground lease on the subject property.

SOIL CONDITIONS: The appraisers have not been provided with the results of test borings, therefore, the only assumption made is that there are no obvious soil deficiencies. A visual examination of the site did not reveal any soil conditions that would adversely affect the current development.

FLOOD HAZARD: The subject does not lie in a HUD designated 100-year flood area as identified on the Federal Emergency Management Agency Flood Insurance Rate Map Community Panel Number: 1100010010C dated September 27, 2010.

ENVIRONMENTAL SITE ASSESSMENT: The appraisers have not been provided with any environmental report on the subject property. **The values indicated herein are predicated upon a non-contaminated site.**

SUMMARY: In conclusion, based on the subject's size, shape, terrain, access, frontage and depth, availability of utilities, etc., the subject site is more than adequate to support the proposed development scheme.

**TAX MAP**



## ZONING DISCUSSION




The subject property is located in the MU-4 (Mixed-Use) zoning area. The MU-4 zone is intended to:

> The Mixed-Use (MU) zones provide for mixed-use developments that permit a broad range of commercial, institutional, and multiple dwelling unit residential development at varying densities. The MU-4 zone is a mixed-use zone that is intended to be applied throughout the city consistent with the density designation of the Comprehensive Plan. A zone may be applied to more than 1 density designation.

<u>Zoning Analysis Summary</u>

The proposed improvements would have a 50' height maximum with 60% lot occupancy. Under the existing zoning designation, the proposed improvements appear to be conforming.

## REAL ESTATE ASSESSMENTS

Assessment and collection of annual ad valorem taxes on real and personal property is established each year - as of January 1 - by the Property Appraiser's Office. The tax due is computed according to annual millage rates established by the various taxing authorities. All real estate must be reassessed annually at 100% of fair market value. Based on historical assessments on the subject and nearby properties, this policy is being followed. However, due to equalization and other factors involved with the assessment process, actual assessments are usually less than 100% of market value. The assessments are effective January 1st of each year and taxes are payable (50%) by March 31st and (50%) on September 15th. The tax due is computed according to annual millage rates established by the various taxing authorities

The subject is assessed under the auspice of the District of Columbia Property Appraiser's Office. The following are the current real property tax rates in the District of Columbia.

Real Property Tax Rates

A tax rate is the amount of tax on each $100 of the assessed value of the property. Rates differ for each class of property. The rates are established by the Council of the District of Columbia and may change from year to year.

Property Details

SSL : 3389- -0137 > Make a Payment

Premise Address : 5501 1ST ST NW # 1 WASHINGTON DC 20011 Balance : $24,534.46

Property Details

SSL : 3389- -0817 > Make a Payment

Premise Address : 5505 1ST ST NW WASHINGTON DC 20011-5207 Balance : $8,325.86

CURRENT REAL ESTATE TAX BURDEN
(CALLED) $32,861

Please note that the subject will be reassessed upon completion of the proposed improvements. Taxes are currently due on the subject properties.

CL GROUP LLC

## PROPOSED PROJECT SUMMARY

| | | | |
|---|---|---|---|
| Project Name | 71 Kennedy Street Condos | | |
| Address | 71 Kennedy Street NW | | |
| Land Area SF | 13,225 | | |
| Zoning | MU-4 | | |
| Total Project GSF | 62,091 | 4.69 | FAR |
| Retail GSF | 12,217 | | |
| Residential GSF | 49,874 | | |
| Residential NSF | 38,554 | 77% | Efficiency |
| Number of Residential Units | 48 | 803 | Avg. Unit Size |
| Number of Parking Spaces | 22 | 0.46 | Spaces/Unit |
| Number of Storage Units | 10 | 0.21 | Storage/Units |

CL GROUP LLC

## GROSS AREA PLANS



1 P1 LEVEL
SCALE: 1/16"=1'-0"



2 GROUND FLOOR
SCALE: 1/16"=1'-0"



3 2ND-4TH FLOOR PLAN
SCALE: 1/16"=1'-0"



4 PENTHOUSE FLOOR PLAN
SCALE: 1/16"=1'-0"

| NAME | GFA | Exclusions | | | TOTAL GFA |
|---|---|---|---|---|---|
| | | SHAFT(S) 1 | SHAFT 2 | SHAFT 3 | |
| P1 LEVEL | 12995.89 | 15.6 | 5.35 | 25.48 | 12949.46 |
| GROUND FLOOR | 8396.40 | 15.60 | 5.35 | 25.48 | 8349.97 |
| 2ND FLOOR | 10288.16 | 17.16 | 9.01 | 25.48 | 10236.51 |
| 3RD FLOOR | 10288.16 | 17.16 | 9.01 | 25.48 | 10236.51 |
| 4TH FLOOR | 10288.16 | 17.16 | 9.01 | 25.48 | 10236.51 |
| PENTHOUSE | 5292.56 | 6.24 | 9.01 | 25.48 | 5251.83 |
| | | | | TOTAL | 57260.79 |
| BUILDING AREA | 9902.45 | | | | |

| NAME | GFA | | FAR PER FLOOR |
|---|---|---|---|
| P1 LEVEL | N/A | SF | N/A |
| GROUND FLOOR | 8350.0 | SF | 0.63 |
| 2ND FLOOR | 10236.5 | SF | 0.77 |
| 3RD FLOOR | 10236.5 | SF | 0.77 |
| 4TH FLOOR | 10236.5 | SF | 0.77 |
| PENTHOUSE | 5251.8 | SF | 0.40 |
| | | | |
| GFA ABOVE THE GROUND | 44311.3 | SF | |
| BUILDING AREA | 9902.5 | SF | |
| LOT | 13225.0 | SF | |
| FAR W/O PENTHOUSE | 2.95 | | |
| FAR TOTAL | 3.35 | | |
| LOT OCCUPANCY | 74.88% | | |

## HIGHEST & BEST USE

As defined by the Appraisal institute, highest and best use is described as follows:

> That reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest value.

This definition applies specifically to the highest and best use of land. It is to be recognized that in cases in which a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use. The highest and best use analysis includes both an analysis of the property as if vacant site only and also as improved.

When analyzing the property as if vacant, the value of the land can be determined by potential, rather than actual use. The possibility of removing any existing improvements is the premise for this concept. The improvements can be changed but the basic physical characteristics of the site cannot. When analyzing the property as improved, the appraiser is investigating the use of the existing improvements that will provide maximum benefits.

In order for the site to fulfill its highest and best use, that use must meet four criteria: (1) it must be physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive.

The site is analyzed first as if vacant and then as improved.

PHYSICALLY POSSIBLE

The first criterion, addresses the physical characteristics of a property, as size, shape, topography and the availability of utilities are all determinants of a property's development potential. The subject is within a well-established neighborhood. The underlying site is rectangular in shape and well suited for development. There appears to be adequate drainage and it is not situated in a flood plain. In addition, the site is fully served by utilities and enjoys good access from 1st Street, NW & Kennedy Street, NW. The width, depth and area of the site are sufficient to construct a project of reasonable size. There are no known soil conditions which

would adversely affect the property's development potential and there are no physical constraints to our knowledge which would preclude development.

LEGALLY PERMISSIBLE

The next step is to explore the legally permissible uses of the site. The zoning regulations, building codes, historical district controls, public and private restrictions and environmental regulations must be considered because they may preclude many possible highest and best uses. The most often encountered and widespread legal restriction is applicable zoning regulations, which may regulate the uses allowed on a site, limit allowable density, regulate building height, parking requirements, traffic circulation within a property, and other requirements that must be satisfied during development.

Depending upon the nature and location of a specific site, the other regulations mentioned herein may also have important consequences on highest and best use. In the case of the subject site, zoning regulations do indeed play a part in determining those uses that meet the second criterion, legally permitted.

The goal of the imposed zoning ordinances is to maintain a group of similar and compatible land uses within the specified classifications, as well as those land uses surrounding it. The result is usually a balanced and organized land development pattern which maintains or enhances value.

Based upon analysis of the MU-4 zoning regulations, the proposed development is a legal and permitted use.

FINANCIALLY FEASIBLE/MAXIMALLY PRODUCTIVE

Any use of the subject site which provides a financial return to the land in excess of the cost of the land defines the limit of such use which is financially feasible.

The optimum use of the subject site, if unimproved and available for development, would be that use which would generate the greatest net return on the property over the economic life of the proposed improvements.

In analyzing the highest and best use of the vacant site, careful consideration has been given to the following limitations imposed by neighborhood uses and market demands.

1. Examination of land use regulation that prescribe permitted development.
2. Compatibility of properties located in proximity to the subject. The appraisers have given careful consideration to the land use patterns established and the predominant types of development in the subject market area.
3. Analysis of the physical characteristics accepted by the market. The appraisers have investigated the size, density, layout, design, etc. of economically successful developments located within the subject market area.

In addition, given the subject's location, demand for residential properties within the subject market area continues to strengthen. Furthermore, the subject is located in an area surrounded by similar residential uses. This economic factor attests to the financially feasible/ maximally productive use of the subject property.

SUMMARY OF MARKET ANALYSIS

As detailed in our market analysis, the subject's competitive residential submarket and the Washington DC housing market appear to be stable, with increasing sales prices per unit/ square foot over the last five years. The subject immediate area represents an area which is beginning to see an increasing amount of renovation and redevelopment, as developable properties in the surrounding market areas, and closer to downtown become increasingly scarce. Given the strength of the subject's overall market and demand for residential space in the area, it is the opinion of the appraisers that the nature of the subject together with surrounding land uses lends support that the highest and best use is the proposed development scheme.

CONCLUSION - HIGHEST AND BEST USE

Pursuant to the analysis contained in this report, it is the appraiser's opinion that the highest and best use of the subject property is the proposed use and development scheme. The subject proposed renovation is consistent with the intended use of the site, per the District of Columbia and the site appears to be physically adaptable to such development. Finally, according to the analysis contained in this report, the development is considered to be a financially feasible undertaking.

# VALUATION

## VALUATION PROCEDURES

The valuation process is used to develop a well-supported estimate of a defined value, which is based on the consideration of all the pertinent general and specific data gathered. In appraising real estate for market value, the professional appraiser has three approaches to select from: the cost approach, the sales comparison approach, and the income capitalization approach.

### THE COST APPROACH

The cost approach is an estimation of market value developed by computing the current cost of replacing the improvements and subtracting any depreciation resulting from one or more of the following factors: physical deterioration, functional obsolescence and economic obsolescence. The value of the land is then added to the depreciated value of the improvements to produce a total value estimate. If entrepreneurial profit has been realized, it is added to the value indication.

The cost approach provides a reliable estimate of value for newly constructed properties. However, as buildings and other forms of improvements increase in age and begin to depreciate, the resultant loss in value becomes increasingly more difficult to accurately quantify.

### THE SALES COMPARISON APPROACH

The sales comparison approach estimates the value of a property by comparing it with similar properties recently sold in the open market. To obtain accurate estimate of value, the sales price of the comparable property must be adjusted to reflect any dissimilarities between it and the subject property. The sales are compared on the basis of:

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Market conditions
5. Location
6. Physical characteristics
7. Income-producing characteristics
8. Other characteristics (e.g., access, zoning, etc.)

Data such as income multipliers and income rates may also be extracted from the sales comparison analysis, but are generally applied to the income capitalization approach.

The Sales Comparison approach often provides a reliable estimate of value for real estate such as land and single-family homes where the properties are homogenous and adjustments are few in number and relatively simple to compute. For larger and more complex properties, such as shopping centers, office-industrial buildings and hotels, the adjustments may become numerous and, thus, become more difficult to accurately quantify.

THE INCOME CAPITALIZATION APPROACH

The income capitalization approach to value consists of methods, techniques, and mathematical procedures used to analyze the property's capacity to generate benefits (income and reversion) and convert these benefits into an indication of present value.

A property's income streams and its resale value are capitalized into a present value indication. This reflects a return on and a return of capital. The level of return needed to attract investment capital fluctuates with changes in the money markets and other alternative investments.

The appraiser investigates the property's gross income expectancy, the expected reduction in gross income due to vacancy and credit loss, the anticipated operating expenses, the pattern and duration of the income stream, and the anticipated resale value. After the income and expenses are estimated, they are converted to present value through capitalization or discounting. The rates used are derived from rates of returns for similar properties or investments.

The income capitalization approach is often selected as the preferred valuation approach for income-producing properties because it most closely reflects the investment thinking of knowledgeable buyers.

The accuracy of the income approach is dependent upon a sound evaluation of a project's future earning potential as well as an estimation of a capitalization rate that takes into account the various factors of risk.

While the appraiser must consider all three approaches to value, the inherent strengths of each approach and the nature of the subject property must be evaluated to determine which

of the three approaches will provide supportable estimates of market value. The appraiser is then free to select one or more of the appropriate approaches

## THE SALES COMPARISON APPROACH

The underlying premise of the Sales Comparison Approach is the concept that the analysis of sales of reasonably similar properties provides an appraiser with empirical data from which observations and conclusions about the property being appraised can be made.

Proper application of the approach requires that in the selection of sales data to directly compare with the subject:

- Only market (or arm's length) transactions be weighed, and the factual data of each transaction be confirmed to the greatest extent possible.
- The degree of comparability of each sale to the subject be considered; that differences in physical, functional, and economic characteristics be noted; and adjustments for the differences be made.
- The value conclusion derived be consistent with the analysis of the sales data.

For a conveyance to qualify as a "market" transaction four factors must traditionally be present:

- The conveyance must be "arm's length"; that is, it must be between two non-related parties, each acting in self-interest.
- Neither the buyer nor the seller should have been under compulsion to act.
- The property should be available for a reasonable period of time to the class of purchasers best able to utilize the facility.
- The price must be expressed in cash, adjusted for any special financing, concessions, or special terms.

For any class of real estate, the area in which comparative data are searched must reflect the market area prospective purchasers would consider. Comparability is also a function of the physical character of the asset being appraised. Classes of real estate in which physical

characteristics are standardized, or in which scale is small, and/or in which the commodity has achieved relatively uniform recognition require that the sales data closely resemble the appraised property. However, as specifications become more complex, as scale increases, and/or as market recognition declines, the physical similarity of the sales data and the appraised property tends to decline.

To judge the degree of comparability that exists between the subject and the sales selected for direct comparison with the subject, several guidelines have been applied:

- Each sale must be in the same market as the subject. To the extent that a market is a meeting place for buyers and sellers of real estate of a given type, the boundaries of the market are set by the participants in merchandising and absorbing competitive properties. The boundaries of a market are consequently economic in character, and not purely physical or geographical.

- Physical characteristics of the subject and the sales must be similar in many regards although it is clear that a sale need not be identical to the subject to provide evidence of market activity.

- The functional adequacy of each sale property and the subject property must be competitive in terms of ability of each to support similar (although not identical) functions.

The subject is valued based upon potential buildable floor area. The following sales comparables are the most recent and relevant transactions that we could secure in relation to the subject property.

## LAND SALES MAP



COMPARABLE LAND SALE

BUILDING SALE NO. 1




| | |
|---|---|
| LOCATION: | 4618 14th Street, NW<br>Washington D.C. 20011 |
| GRANTOR: | Raymar Corp. |
| GRANTEE: | Heleos |
| DATE OF SALE: | April 2021 |
| DOC. NUMBER: | 2021043420 |
| LAND AREA: | 25,152 Square Feet |
| ZONING: | MU-3 (1.2 FAR) |
| SALE PRICE: | $4,190,000 |
| SALE PRICE/ SF: | $166.58 |
| TERMS OF SALE: | Cash Equivalent |
| SALE PRICE/FAR.: | $138.82 |

COMMENTS: This retail storefront property sold for $4.19 Million or around $209.50 per square foot on 4/2/2021. The property is proposed for redevelopment into 99 multifamily units, 66 of them being affordable units. Feldman Ruel Urban Property Advisors brokered the deal.

COMPARABLE LAND SALE

BUILDING SALE NO. 2




| | |
|---|---|
| LOCATION: | 5500 Georgia Avenue, NW<br>Washington D.C. 20011 |
| GRANTOR: | Fuchs & Co. |
| GRANTEE: | Petra Development |
| DATE OF SALE: | April 2020 |
| DOC. NUMBER: | 2020049015 |
| LAND AREA: | 3,642 Square Feet |
| ZONING: | MU-4 (3.0 FAR) |
| SALE PRICE: | $1,625,000 |
| SALE PRICE/SQ. FT.: | $446.43 |
| TERMS OF SALE: | Cash Equivalent |
| SALE PRICE/ FAR: | $148.73 |

COMMENTS: Party/Parties with knowledge of this transaction confirmed that this 861 SF retail property sold for land value on April 15, 2020. The sales price was $1.625 million. The buyer approached the seller. The buyer believes the sales price was higher than market value because he needed this parcel in order to complete his assemblage. The buyer intends to construct a 46-unit, multifamily complex which encompasses the entire block. Demolition and ground breaking are expected to begin October 2020 with construction completing October 2021.

COMPARABLE LAND SALE

BUILDING SALE NO. 3



| | |
|---|---|
| LOCATION: | 930 Kennedy Street, NW<br>Washington D.C. 20011 |
| GRANTOR: | Bold Concepts |
| GRANTEE: | LDRE LLC |
| DATE OF SALE: | February 2020 |
| DOC. NUMBER: | 2020021380 |
| LAND AREA: | 2,648 Square Feet |
| ZONING: | MU-4 (3.0 FAR) |
| SALE PRICE: | $1,260,000 |
| TERMS OF SALE: | Cash Equivalent |
| SALE PRICE/SQ. FT.: | $475.83 |
| SALE PRICE/ FAR: | $125.26 |
| COMMENTS: | The building was sold vacant. The current structure sits on 2,648-SF of land zoned MU-4. The property was on the market for 35 days with an initial asking price of $1,350,000. The buyer was attracted to the property due to the fully permitted project and intends to construct 11 residential condo units at this site. The new structure will contain a total of 10,059 sf and will be delivered in 2022. |

COMPARABLE LAND SALE

BUILDING SALE NO. 4



| | |
|---|---|
| LOCATION: | 315 Kennedy Street, NW<br>Washington D.C. 20011 |
| GRANTOR: | 313 Kennedy Street LLC |
| GRANTEE: | 317 KENNEDY ST LLC |
| DATE OF SALE: | July 2021 |
| DOC. NUMBER: | 2021096206 |
| LAND AREA: | 5,815 Square Feet |
| ZONING: | MU-4 (3.0 FAR) |
| SALE PRICE: | $2,375,000 |
| TERMS OF SALE: | Cash Equivalent |
| SALE PRICE/SQ. FT.: | $408.42 |
| SALE PRICE/ FAR: | $105.30 |
| COMMENTS: | The building was sold vacant. The current structure and parking lot sit on 5,815-SF of land zoned MU-4. The property is proposed to be redeveloped into twenty-four (24) multi-family units and sold or rented at market rates. The total investment and construction budget including renovations, soft costs, and hard costs is forecasted at $7,180,550. |

**SUMMARY OF COMPARABLE LAND SALES**

| SALE NO. | LOCATION | DATE OF SALE | POTENTIAL FAR | SALES PRICE | SALES PRICE/ FAR |
|---|---|---|---|---|---|
| 1 | 4618 14th St., NW | 4/21 | 30,182 | $4,190,000 | $138.82 |
| 2 | 5500 Georgia Ave., NW | 4/20 | 10,926 | $1,625,000 | $148.73 |
| 3 | 930 Kennedy St., NW | 2/20 | 10,059 | $1,260,000 | $125.26 |
| 4 | 315 Kennedy St., NW | 7/21 | 22,555 | $2,375,000 | $105.30 |

Typically, the sales comparison approach reflects the actions of buyers and sellers in the marketplace and serves as a parameter as to what a potential buyer would be willing to pay for the subject property.

The comparables need to be adjusted to compensate for differences as compared to the subject property. These adjustments are made in order to bring the comparable sales in line with the subject property and more accurately indicate its value per FAR.

ADJUSTMENT FACTORS

TIME/MARKET CONDITIONS

The sales utilized herein have transacted since February 2020. The market has remained stable over that period. No adjustments are warranted.

LOCATION

Location adjustments are predicated upon accessibility, visibility, proximity to major transportation routes, metro access, and the immediate environs of the site. The subject site has a good location within a residential neighborhood. Market comparables 1, 2, and 3 have slightly superior locations and will be adjusted downward accordingly.

SIZE

The comparable sales have been adjusted to a potential FAR allowance per their zoning densities. It has been noted by the appraisers that although the subject has a total planned FAR of 62,091 square feet, the net sellable area is anticipated to encompass 50,771. The subject is also anticipated to have underground parking and storage for sale. Due to this factor a 5% adjustment upward will be made to the market comparables.

OTHER

Sale 2 was sold as part of a larger assemblage. This sale will be reduced by 20%. In addition, the market comparables were all sold fully entitled. The development team anticipates having fully approved plans and construction commencement by March 1, 2022. Each of the market comparables will be adjusted downward by 20% due to the fact that the subject properties have not been entitled.

CHART

A chart summarizing the building sales and the required adjustments to each is presented on the following page. General market anomaly has made it extremely difficult to extract reliable adjustments from the market for various dissimilarities between the subject property and the comparable sales. Adjustments can be estimated, based on judgment.

| SALE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| POTENTIAL FAR | 30,182 | 10,926 | 10,059 | 22,555 |
| SELLING PRICE | $4,190,000 | $1,625,000 | $1,260,000 | $2,375,000 |
| SALE DATE | 4/21 | 4/20 | 2/20 | 7/21 |
| UNIT PRICE/FAR | $138.82 | $148.73 | $125.26 | $105.30 |
| PROP. RIGHTS | 1.00 | 1.00 | 1.00 | 1.00 |
| FINAN./CASH EQUIV. | 1.00 | 1.00 | 1.00 | 1.00 |
| SALE CONDITIONS | 1.00 | 1.00 | 1.00 | 1.00 |
| MARKET CONDITIONS | 1.00 | 1.00 | 1.00 | 1.00 |
| INITIAL ADJ. | 1.00 | 1.00 | 1.00 | 1.00 |
| ADJ. BASE PRICE/FAR | $138.82 | $148.73 | $125.26 | $105.30 |
| LOCATION | .85 | .95 | .95 | 1.00 |
| DEVELOPMENT SIZE | 1.05 | 1.05 | 1.05 | 1.05 |
| OTHER FEATURES | .80 | .60 | .80 | .80 |
| TOTAL ADJ. | .70 | .60 | .80 | .85 |
| | | | | |
| ADJ. UNIT SELLING PRICE/FAR | $97.17 | $89.24 | $100.21 | $89.51 |
| | Median: | $93.34 | | |
| | Average: | $94.03 | | |

Under the analysis of the sales data, the appraisers have taken into consideration the following factors:

* building area;
* age and condition at time of sale;
* location in relation to subject;
* quality of construction;
* dates of sale;
* financing available at time of sale;
* occupancy at time of sale.

The value indicators for the subject "as is", after adjustments, derived an average of $94 and a median of $93 per FAR of land area. The subject has been proposed for a sellable area of 50,771 square feet of multi-family and commercial space.

Predicated on the analysis of the sales analyzed herein, a per FAR value of $94 will be utilized toward the subject's market value. Therefore, it is the opinion of the appraisers that the estimated market value of the subject "as is" utilizing the Sales Comparison Approach is as follows:

**MARKET VALUE "AS IS" VIA SALES COMPARISON APPROACH**

50,771± Sq. Ft. @ $94/ FAR = $4,772,474

**(CALLED)$4,772,000**

## FINAL VALUE ESTIMATE

Predicated on our findings herein and after considering all of the known factors that affect the values of the subject property, it is the opinion of the undersigned that the estimated market values subject to the limiting conditions set forth herein, as of October 13, 2021, is as follows:

**MARKET VALUE "AS IS"- OCTOBER 13, 2021**

**$4,772,000**

**FOUR MILLION SEVEN HUNDRED SEVENTY-TWO THOUSAND DOLLARS**

The market value indication does not include furniture, fixtures, or equipment.

*It is an assumption and a limiting condition of this analysis that the proposed development will be in accordance with the drawings, square footage, and finishes provided to the appraisers and utilized herein. As this information forms the basis for this analysis, any deviation will render this report null and void.*

---

**The coronavirus threat may be impacting market conditions. However, in most markets it is not yet clear to what extent, if any, market conditions are affected. Related, complicating factors include fluctuations in the stock market and changes in mortgage interest rates.**

Respectfully submitted,

**Gregory R. Clucas, MAI**
**D. C. Certified General Real**
**Estate Appraiser No. GA10008**

**Greg Clucas, Jr.**
**Associate**

CL GROUP LLC

## CERTIFICATION

We certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
- The analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Unifo1m Standards of Professional Appraisal Practice (USPAP) and the Appraisal Policies and Guidelines adopted by the client; this report and our actions relating to the report comply with the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Foundation.
- The undersigned has made a personal inspection of the property that is the subject of this report.
- We, the appraisers, have not previously appraised the subject property within the past three (3) years.
- No one provided significant professional assistance to the persons signing this report.
- As of the date of this report, Gregory R. Clucas, MAI has completed the continuing education program of the Appraisal Institute through December 31, 2022.

Respectfully submitted,

| | |
|---|---|
| **Gregory R. Clucas, MAI**<br>**D. C. Certified General Real Estate Appraiser No. GA10008** | **Greg Clucas, Jr.**<br>**Associate** |

WCP EX. X

WASHINGTON CAPITAL PARTNERS

**Real Estate Investment Track Record**

**Borrower:** Naveen Vavilala & Mel Negussie

| | Property Type | Property Address | City | State | Zip | Purchase Date | Purchase Price | Renovation Costs | Sale Date | Sale Price | Project Debt | Currently Leased? | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Development | 4101 Greensboro Street | Charlotte | NC | 28206 | 7/1/2018 | $9,000,000 | $1,000,000 | - | - | 5,000,000 | No | Currently for sale at $27,000,000 |
| 2 | Multi Family | 1716 Terrell Mill Rd | Marritta | GA | 30067 | 4/1/2018 | $33,000,000 | $1,000,000 | - | - | 22,000,000 | Yes | Rehabbed, Increased rents, 90% Occupancy, long term debt, fully stablized, holding |
| 3 | Land Development | Parcel ID 06138017 of 25.67 acres located on Providence Road | Waxhaw | NC | - | 3/1/2019 | $2,800,000 | $1,400,000 | - | $6,000,000 | 1,400,000 | No | Have an offer to sell for $6MM |
| 4 | Land Development | 3000 N Tryon St | Charlotte | NC | 28206 | 6/1/2019 | $1,700,000 | $2,500,000 | - | - | - | No | Fully entitled, Obtained plans/peermits, no debt on property, early phase of construction |
| 5 | Condo Development | 3630 N Davidson Street | Charlotte | NC | | 10/1/2019 | $1,000,000 | $8,000,000 | - | $1,350,000 | 8,000,000 | No | Fully entitled, Obtained plans/permits for 36 unit development project - under contract to sell |
| 6 | Multi Family | 1901 Old Concord Rd | Smyrna | GA | 30080 | 6/1/2016 | $ 10,250,000.00 | $2,150,000 | 11/1/2018 | $33,100,000 | 7,800,000 | No | Project completed and sold |
| 7 | Multi Family | 2001 Old Concord Rd | Smyrna | GA | 30080 | 2/1/2016 | $12,240,000 | $3,200,000 | 11/1/2018 | $33,100,000 | 9,350,000 | No | Project completed and sold |
| 8 | Condo | 3001 Veazey Terrace NW #728 | Washington | DC | 20008 | 7/7/2005 | $ 237,000.00 | $0 | - | - | - | Yes | Leased for $2500 |
| 9 | Multi-Family/Condo | 1100-1122 S Highland St Arlington VA | Arlington | VA | 22204 | 11/15/1991 | $ 750,000.00 | $6,000,000 | - | $14,500,000 | - | No | 5 condo unit project ground up (12 townhome structures) 75% complete, project broke ground April 2018 |
| 10 | Multi-Family/Condo | 1717 Hamlin Street NE | Washington | DC | 20018 | Under K | $2,000,000 | $6,000,000 | - | - | - | No | Paying cash to acquire, building 18 units similar to Lock7 next door, project comes with plans/permits |

Note: *rojects over the previous 5 years may adjust the pricing of your loan.*

WCP0274

WCP EX. Y

4:37

MN

Mel >

Hi Mel, thanks for sending it. We will not. We are going to keep it. Thank you

Understood. Makes sense.

202-809-9451

Jul 6, 2022 at 11:52 AM

Mel - we need payments on 419 Kennedy. You are two payments behind. What's going on ?

At this point we have late fees assessed.

What payment? We have interest reserve on this. We were never told this

Are you sure?

Yes. You owe money on 419 according to the system

You can talk to Leslie about it

Ok will do

Calling her now

iMessage

Cash

4:38

MN

Mel

Ok will do

Calling her now

We had prepaid interest of $246,763

Call her please. You probably already ran out

We just refinanced in March 2022. We couldn't have

I called and left her a message

Jul 14, 2022 at 5:44 PM

Please Daniel, I need resolution on Holbrook. Vendors and subs are upset and I need to pay them. I have already reached an agreement on the amount with Mike. He said final decision is with you. Georgia is going well and should be done next 2 weeks or less so I don't think we need any agreement. I have paid off the 2nd DOT on 201 Kennedy. I have done everything you asked. Please let me know. Thanks

Tue, Aug 2 at 8:04 PM

Good evening Daniel, please have them release the agreed amount. I

iMessage

Cash